## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF ILLINOIS; and STATE OF MINNESOTA,

Plaintiffs,

v.

ADMINISTRATION FOR CHILDREN AND FAMILIES; ALEX J. ADAMS, in his official capacity as the ASSISTANT SECRETARY OF THE ADMINISTRATION FOR CHILDREN AND FAMILIES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as the SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendants.

Case No. 26-cv-00172

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      In this case, Plaintiffs seek relief from Defendants' extraordinary and cruel action to immediately freeze $10 billion in federal funds that Plaintiff States use to help provide services and cash assistance that allow families to access food, safe housing, and child care. Defendants have no statutory or constitutional authority to do this. Nor do they have any justification for this action beyond a desire to punish Plaintiff States for their political leadership. The action is thus clearly unlawful many times over.

1

2.      In the past week, Defendants unilaterally froze all federal funding for three essential programs that serve vulnerable children and their families and individuals with disabilities in the five Plaintiff States, and only in those States: New York, Illinois, California, Colorado, and Minnesota (the "ACF Funding Freeze"). These three critical and *mandatory* funding programs are: the Child Care and Development Fund (CCDF); Temporary Assistance for Needy Families (TANF); and the Social Services Block Grant (SSBG) (together, the "ACF Funds").

3.      The importance of these programs cannot be overstated—they provide cash assistance and fund services to help low-income and vulnerable families. Without these programs, there will be immediate and devastating impacts in Plaintiff States.

4.      Defendants have said that the ACF Funding Freeze is necessary to root out "potential" fraud, but this is pretext. Their transparent motivation is to punish "Democrat-led" states who are disfavored by the Administration based on numerous public statements identified below.

5.      Congress has created statutory schemes that constrain the executive branch in how it can identify and sanction noncompliance or fraud by recipients of the ACF Funds. The statutes are clear, and do not permit the "shoot first ask questions later" approach Defendants have taken; Defendants have performed none of the elements of these statutory processes.

6.      The Government has offered no legitimate justification for the ACF Funding Freeze, which was implemented through a group of boilerplate letters issued to Plaintiffs on January 5 and 6. These Letters entirely ignore that these programs are each governed by complex statutes that dictate the processes Defendants can use to address possible irregularities related to the ACF Funds. Defendants have provided no explanation for why targeting just these five states— each of which, as they have emphasized, has a Democratic governor—is a reasonable response to

Defendants' unsubstantiated assertions of nationwide fraud. The January 5 and 6 Letters also ignore substantial reliance interests and harms.

7.       Defendants' ACF Funding Freeze also seeks to coerce Plaintiff States to turn over "the complete universe" of documents related to their use of billions of dollars of ACF Funds, including the personally identifying information of millions of their residents, and stunningly requires them to do so *within two weeks* to purportedly stop the freeze. As Defendants know, that is an impossible task on an impossible timeline, offered only as pretext to maintain the freeze against Plaintiff States. But this request reveals the fundamental problem with Defendants' position: they did not engage in any meaningful investigation before taking the draconian step of withholding all funding under the programs and only now seek to find any evidence of noncompliance. In other words: the ACF Funding Freeze's data demand is a fishing expedition to find a post hoc rationalization for the Freeze itself.

8.       In short, Defendants have publicly stoked allegations of fraud, including Plaintiff States purportedly providing unlawful benefits to undocumented immigrants, regardless of whether they have been substantiated, and used those speculative allegations as a pretextual justification to punish perceived political enemies of the Trump Administration by unlawfully withholding critical funding pending purported fraud detection measures unauthorized by any statute.

9.       For these reasons, the ACF Funding Freeze is both contrary to law and arbitrary and capricious in violation of the APA.

10.      Likewise, because Defendants chose to ignore Congress's commands regarding the expenditure of the ACF Funds, they are also violating the constitution and acting *ultra vires*. The "power of the purse" belongs to "Congress, not the President." *City & Cnty. of San Francisco v.*

*Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). In refusing to spend money Congress has appropriated and by using federal funding to impose a breathtaking array of unexpected, ambiguous, unreasonable, and coercive obligations on Plaintiffs in order to draw down their ACF funds, Defendants are usurping the legislative function, violating bedrock separation of powers principles, trampling the Appropriations and Spending Clauses of the Constitution, and acting *ultra vires*. Without any authority—express or implied—to implement the ACF Funding Freeze, the executive is acting at the "lowest ebb" of the executive's constitutional authority and power. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

11.    Plaintiff States respectfully request that the Court declare unlawful, vacate, and enjoin the ACF Funding Freeze, including the January 5 and 6 Letters in their entirety.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705, 706.

13.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district, and Defendants are United States agencies or officers acting in their official capacities.

## PARTIES

### A.  Plaintiffs

14.    Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States of America. The Attorney General is New

York State's chief law enforcement officer and is authorized under N.Y. Exec. Law § 63 to pursue this action.

15.    Plaintiff the State of California is a sovereign state of the United States of America. California Attorney General Rob Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of the State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11; *see Pierce v. Superior Court*, 1 Cal. 2d 759, 761–62 (1934) (the Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state[.]").

16.    Plaintiff the State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

17.    Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

18.    Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota's Attorney General, Keith Ellison, is the chief law enforcement officer of Minnesota and is authorized under Minnesota Statutes Chapter 8 and has common law authority to bring this action on behalf of the State and its residents, to vindicate the State's sovereign and quasi-sovereign interests, and to remediate all harm arising out of—and provide full relief for— violations of the law.

**B. Defendants**

19.     Defendant Administration for Children and Families is an executive branch agency within the federal government, headquartered in Washington, D.C. It is a component of the United States Department of Health and Human Services.

20.     Defendant Alex J. Adams is the Assistant Secretary of the Administration for Children and Families. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

21.     Defendant the United States Department of Health and Human Services is a cabinet agency within the executive branch of the United States government. 42 U.S.C. §§ 3501, 3501a.

22.     Defendant Robert F. Kennedy, Jr., is the Secretary of the Department of Health and Human Services, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 42 U.S.C. §§ 3501a, 3502.

**FACTUAL ALLEGATIONS**

**A. The Three Programs Subject to the ACF Funding Freeze Provide Benefits Critical to Plaintiff States**

23.     The three programs that are the subject of this lawsuit are central to State efforts to combat poverty and help fund essential services that provide low-income and vulnerable children and their families, and individuals with disabilities, with the resources and tools they need to survive and thrive.

**1. CCDF**

24.     The CCDF program provides $2.4 billion in federal funding annually to support Plaintiff States' programs that provide low-income families with funding for child care, so that those family members can work or go to school. CCDF program funds also support teacher training

6

and development, as well as programming and consumer education that educates parents about child care options. CCDF is comprised of two separate funding streams: Child Care and Development Block Grant (CCDBG) and Child Care Entitlement to States (CCES).[1]

25.    CCES is a statutory entitlement that is not subject to the annual appropriations process. 42 U.S.C. § 618. The statute provides that "each State *shall*, for the purpose of providing child care assistance, be entitled to payments" in an amount calculated based on sums paid to the State between 1992 and 1995. *Id*. (emphasis added).

26.    In contrast to CCES, CCDBG is subject to the annual appropriation process. In FY 2024, Congress appropriated $8,746,387,000 to this program, and directed the executive branch to disperse the funds to States. Pub. L. No. 118-47, 138 Stat. 665. In FY 2025, these appropriations were extended via continuing resolution. Pub. L. No. 119-4, 139 Stat. 13. They were further continued via continuing resolution in November 2025. Pub. L. No. 119-37, 139 Stat. 495-98. While the annual amount of funding is discretionary, the allocation and payment of those funds to States are not. Under 42 U.S.C. § 9858h, "a State that has an application approved by the Secretary . . . shall be entitled to a payment under this section for each fiscal year in an amount equal to its allotment under" 42 U.S.C. § 9858m. That section in turn lays out a mandatory formula for allocation of CCDBG funding.

27.    Each year, ACF publishes a chart that contains the formula allocations of CCDF funding to each State and territory (in total for both CCES and CCDBG). For 2025 (the most recent), the total federal-only CCDF funds allocated to Plaintiff States were: $1.09 billion

---

[1] Karen E. Lynch, *The Child Care and Development Block Grant: In Brief* (Dec. 3, 2024), https://www.congress.gov/crs-product/R47312.

(California); $140 million (Colorado); $412 million (Illinois); $185 million (Minnesota); and $638 million (New York).[2]

28.    Congress requires that, in order to receive this funding, each State "prepare and submit" a "State plan" that certifies that the State has certain procedures and protections in place and describes the State's training and professional development requirements, child care standards (including child-to-provider ratio), health and safety requirements, plans for increasing supply and quality of child care services, strategies for ensuring that child care is available to children in underserved areas and children with disabilities, among other requirements. 42 U.S.C. § 9858c. The statute further directs that the Secretary of HHS "*shall* approve" any application that meets these requirements. *Id*. (emphasis added). Each of the Plaintiff States administers their CCDF funding program in accordance with their respective federally-approved State plan.

### 2.    TANF

29.    TANF is a block grant program that provides more than $7 billion in federal funds annually to Plaintiff States, who in turn provide cash assistance and non-cash benefits to low-income families with children.[3] It is one of the largest sources of cash assistance to low-income American families and a crucial component of Plaintiff States' anti-poverty work. TANF funds include temporary cash assistance and non-cash benefits to low-income families with children. TANF funds meet basic family needs while also providing education, employment and training programs, and supportive services to give families opportunities to build resilience and achieve economic mobility.

---

[2] *GY2025 CCDF Funding Allocations (Based on Appropriations)* Office of Child Care, https://acf.gov/occ/data/gy-2025-ccdf-allocations-based-appropriations (last visited Jan. 8, 2026).
[3] *See* Gene Falk, *Temporary Assistance to Needy Families (TANF) Block Grant: A Primer* (Dec. 18, 2025), https://www.congress.gov/crs-product/R48413.

30.     In FY 2023, the allocations to each of Plaintiff States were as follows: $3.6 billion (California); $135 million (Colorado); $583 million (Illinois), $260 million (Minnesota); and $2.4 billion (New York).[4]

31.     TANF funds are allocated according to a mandatory formula based on the share each State had of TANF funding in 2002. 42 U.S.C. § 603(a)(1) ("Each eligible State shall be entitled to receive…"). The 2002 allocations were based on a formula created in the 1996 welfare reform law, the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), under which allocations were calculated based on shares of different program expenditures from 1992-1995.[5]

32.     Congress appropriated $16,566,542,000 in the Continuing Appropriations and Extensions Act, 2026, subject to the January 30, 2026, deadline applied to most funding. Pub. L. No. 119-37, 139 Stat. 497; Pub. L. No. 118-42, 138 Stat. 418; 42 U.S.C. § 603(a)(1)(C).[6]

33.     A State is eligible for TANF funding if it submits to the Secretary a plan outlining how the State will conduct the TANF program in compliance with federal work requirements, privacy protections, and other provisions. 42 U.S.C. § 602(a). As with their CCDF programs, each of the Plaintiff States administers their TANF program consistent with their respective federally-approved state plan.

**3.   SSBG**

34.     The SSBG program is a funding source providing approximately $870 million annually to Plaintiff States to provide them with "flexibility" and funding to support social services

---

[4] *Id.* at 3-4.
[5] *Id.* at 2 n. 6.
[6] Each year since 2019, Congress has reauthorized the 2019 funding level by renewing the previous year's reauthorization. Pub. L. No. 117-328, 136 Stat. 5964; Pub. L. No. 117-103, 136 Stat. 809; Pub. L. No. 116-260, 134 Stat. 2992; Pub. L. No. 116-59, 133 Stat. 1107.

in one of five categories: (1) "achieving or maintaining economic self-support"; (2) "achieving or maintaining self-sufficiency"; (3) addressing "neglect, abuse, or exploitation" of children and vulnerable adults; (4) preventing institutional care and supporting community-based care; and (5) where institutional care is needed, supporting application and admission and providing services to institutionalized individuals. 42 U.S.C. § 1397.

35.    In FY 2024, Congress appropriated $1.7 billion for SSBG. Pub. L. No. 118-47, 138 Stat. 665. FY 2025 and current funding was continued at that level. Pub. L. No. 118-83, 138 Stat. 1533; Pub. L. No. 119-37, 139 Stat. 497. And Congress has provided that SSBG funds must be allocated based on each State's percentage of the national population, based on census data. 42 U.S.C. § 1397b(b). Nor is payment optional. 42 U.S.C. § 1397a provides that "[e]ach State shall be entitled to payment under this division for each fiscal year in an amount equal to its allotment," and that "[t]he Secretary shall make payments . . . to each State[.]"

36.    Unlike CCDF and TANF, States are not required to submit a plan to be eligible for SSBG funding. Instead, the statute requires an annual report describing how it used the funds in the year prior. 42 U.S.C. § 1397e; *see also* 45 C.F.R. § 96.74.

**B.  Defendants' Escalating Threats Against Plaintiff States**

37.    Defendants' effort to use pretextual, vague, and unsubstantiated allegations of "fraud" as an opportunity to take illegal actions against Plaintiff States has escalated significantly in the course of weeks.

38.    In December 2025, ACF directed a number of demands to Plaintiff Minnesota to produce the "complete universe" of data for a number of programs, including CCDF, TANF, and SSBG. *See, e.g.*, Exs. 4-A, 5-A. Some of those general, boilerplate letters would ultimately be copied and pasted into letters later sent to other Plaintiff States. Plaintiff Minnesota confirmed

receipt of the bevy of ACF's December data demands, and without addressing the merits of the

demands, indicated a response would be forthcoming on January 9, 2026.

39.    In late December 2025, a 23-year-old YouTube content creator shared a 43-minute

video that purported to expose several child care centers in Minnesota engaging in fraud, focusing

blame heavily on Minnesota's Somali community.[7] The video was the focus of conservative news

coverage and then was promoted by Vice President J.D. Vance and former presidential advisor

Elon Musk.[8] A White House spokesperson stated that "the country should be deeply appreciative

to" the YouTube content creator "for shining a light on this issue."[9]

40.    In response to the YouTube video, on December 30, 2025, HHS Deputy Secretary

Jim O'Neil issued a video announcement via social media post on X.com stating that HHS was

taking action against Minnesota's CCDF funding, claiming, "[w]e have frozen all child care

payments to the state of Minnesota." The post concludes with the announcement, "[w]e have

turned off the money spigot and we are finding the fraud."[10]

41.    Late on December 30, 2025 (hours after HHS made its announcement on social

media), ACF directed written communication to Minnesota to memorialize its social media

announcement. That correspondence appears to reference the YouTube video (described as "recent

viral reports") as support for an expanded data demand for an even broader scope of CCDF and

TANF data. Ex. 4-B. The letter purported to set a January 9, 2026 deadline for the broader scope

---

[7] Ken Bensinger & Ernesto Londoño, *An Intense White House Response from a Single Viral Video*, N.Y. TIMES, Dec. 31, 2025, available at https://www.nytimes.com/2025/12/31/business/media/trump-conservatives-videos-viral-loop.html.
[8] Zoe Sottile & Andy Rose, *Minnesota investigators say child care centers accused of fraud are operating normally as governor drops reelection bid*, CNN, Jan. 5, 2026, available at https://www.cnn.com/2026/01/05/us/minnesota-child-care-fraud-investigation.
[9] Ken Bensinger & Ernesto Londoño, *An Intense White House Response from a Single Viral Video*, N.Y. TIMES, Dec. 31, 2025, available at https://www.nytimes.com/2025/12/31/business/media/trump-conservatives-videos-viral-loop.html.
[10] Deputy Secretary Jim O'Neill (@HHS_Jim), X, https://x.com/HHS_Jim/status/2006136004294664464 (Dec. 30, 2025 at 5:51 p.m. ET)

of records to be produced. However, the letter also announced immediate action to be taken even before that unreasonable deadline, stating "[t]he state of Minnesota will be placed on a temporary restricted drawdown for all CCDF funds provided by ACF until further notice, with specific instructions for these restrictions to be provided by January 5, 2026." Ex. 4-B.

42.     Over the next several days and culminating in correspondence sent January 5 and 6, 2026, Defendants accelerated their strategy to achieve their ultimate end: imposing sweeping and unlawful restrictions against all five of Plaintiff States' CCDF, TANF, and SSBG funding.

43.     On December 31, 2025, HHS spokesperson Andrew Nixon stated there would be a categorical freeze of federal child care funding to all states, and that those funds would only be released "when states prove they are being spent legitimately."[11]

44.     But instead, Defendants engaged in a set of a targeted attacks on five states only—the Plaintiffs in this litigation. President Trump repeatedly made clear that despite a lack of any actual evidence or legal basis to support such a freeze, the administration was going to go ahead, but not nationwide—it was instead going use these allegations to target Democratic governors and political rivals across the country. On December 31, 2025, during an auction event at a New Years Eve Party at Mar-a-Lago, President Trump said "[w]e want to take back our country, Can you imagine? They [Somali-Americans] stole 18 billion dollars. That's just what we're learning about, that's peanuts. California is worse, Illinois is worse, and sadly, New York is worse, a lot of other places, so we're going to get to the bottom of all of it."[12]

---

[11] *HHS freezing childcare payments to all states until they prove funds 'being spent legitimately'*, ABC News, Dec. 31, 2024, available at https://abc7.com/post/hhs-says-freezing-child-care-payments-minnesota-fraud-allegations/18335717/.
[12] https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-new-years-eve-live-auction-december-31-2025

45.    On January 4, 2026, during a press gaggle on Air Force One, President Trump segued from a conversation about piracy off of the cost of Somalia to fraud in social services funding to threats to retaliate against Democratic governors, saying, "[b]ut think of it, $19 billion, at least they [Somali-Americans] have stolen from Minnesota and from the United States…. And we're not going to pay it anymore. We're going to have [Minnesota Governor] Walz go pay. We're not going to pay them, and we're not going to pay California, and we're not going to pay Illinois with a big slob of a governor that they have."[13] There remains no evidence of any actual investigation by Defendants to support these claims.

46.    On January 5, 2026, in a social media post, President Trump again used allegations of fraud against Minnesota as a justification to target an entire group of Democratic governors in a single breath, without any basis or evidence: "Governor Walz has destroyed the State of Minnesota, but others, like Governor Gavin Newscum, JB Pritzker, and Kathy Hochul, have done, in my opinion, an even more dishonest and incompetent job. NO ONE IS ABOVE THE LAW!"[14]

47.    Defendants soon made good on these threats. As set forth further below, on January 5, 2026 and January 6, 2026, Defendants sent ACF Funding Freeze letters to the Plaintiff States. Exs. 1, 2, 3, 4-C, 5-B. Even before those letters were received, on January 5, 2026, the New York Post broke the news that the Trump administration was "cutting off more than $10 billion in social services and child care funding meant for a handful of Democrat-led states over concerns that the benefits were being fraudulently funneled to non-citizens."[15] In a statement, an HHS spokesperson

---

[13] https://www.youtube.com/watch?v=9XVjd3R2T3g&t=1157s
[14] https://truthsocial.com/@realDonaldTrump/posts/115844083693194821
[15] Josh Christensen, *Exclusive: Trump cuts off $10B in funding to five blue states for child care, social services over fraud fears*," N.Y. POST (Jan. 6, 2026), available at https://nypost.com/2026/01/05/us-news/trump-freezes-10b-in-funding-to-five-blue-states-for-child-care-social-services-over-fraud-fears/.

said, "[f]or too long, Democrat-led states and Governors have been complicit in allowing massive amounts of fraud to occur under their watch."[16]

48.    Also on January 6, 2026, President Trump posted on social media and reiterated that he was specifically targeting a Democratic rival, stating, "California, under Governor Gavin Newscum, is more corrupt than Minnesota, if that's possible??? The Fraud Investigation of California has begun. Thank you for your attention to this matter! President DONALD J. TRUMP."[17]

## C. The ACF Funding Freeze

49.    ACF issued a press release announcing a "funding freeze" on January 6, 2026, stating that it "froze access to certain federal child care and family assistance funds for California, Colorado, Illinois, Minnesota and New York." It specified the CCDF, TANF, and SSBG programs and stated that those five states' "access to these funding streams is now restricted."[18] ACF's announcement, which was widely reported prior to any official notification to most Plaintiff States, caused widespread alarm and confusion in each of the Plaintiff States.

50.    ACF claimed this action was taken based on unspecified "serious concerns about widespread fraud and misuse of taxpayer dollars in state-administered programs."

51.    ACF also claimed that it had "identified concerns that these benefits intended for American citizens and lawful residents may have been improperly provided to individuals who are not eligible under federal law."

---

[16] Adora Brown & Raymond Fernandez, *Trump Admin. to Freeze $10B in Social Programs to New York and Other Dem States*, THE CITY (Jan. 6, 2026), available at: https://www.thecity.nyc/2026/01/06/trump-cuts-funding-social-welfare-child-care/.
[17] https://truthsocial.com/@realDonaldTrump/posts/115848359372759872
[18] HHS Freezes Child Care and Family Assistance Grants in Five States (Jan. 6, 2026), https://acf.gov/media/press/2026/hhs-freezes-child-care-family-assistance-grants-five-states

52. According to ACF, "[f]unds will remain frozen in this fashion until ACF completes a review and determines that states are in compliance with federal requirements."

53. ACF stated that the funding freeze was effectuated via letters sent to the governors of the five states.

### D. The Funding Freeze Letters

54. Between January 5, 2026, and January 6, 2026, ACF sent correspondence to each Plaintiff State relating to each of the three programs at issue: the CCDF, TANF, and SSBG programs. Ex. 1 (CCDF Letters); Ex. 2 (TANF Letters); Ex. 3 (SSBG Letters); Ex. 4-C (MN CCDF Letters); Ex. 5-B (MN SSBG Letters).

55. The letters (except two, as detailed below) begin with a near-identical boilerplate introduction, which claims that ACF is "concerned by the potential for extensive and systemic fraud" within the ACF Funds programs generally; that these purported concerns "have been heightened by recent federal prosecutions and additional allegations that substantial portions of federal resources were fraudulently diverted away from the American families they were intended to assist"; and then claiming without any evidence that "ACF has reason to believe that the" Plaintiff State "is illicitly providing illegal aliens with . . . benefits intended for American citizens and lawful permanent residents." Much of this language is identical to boilerplate demands ACF sent to Minnesota several weeks earlier Exs. 4-A, 5-A.

56. None of the letters sent on January 5, 2026 or January 6, 2026 identify a single "prosecution" related to the ACF Funds, adduce or support any "allegations" of fraudulent diversion of ACF Funds, or cite any evidence or "reason to believe" that any state is "illicitly providing illegal aliens" with those funds. To be clear, even the letters sent to Plaintiff State Minnesota reference only "allegations" and "concerns" of "perceived fraud." Exs. 4-A, 4-B, 5-A. Nor does any letter explain why the Plaintiff States specifically were singled out for funding

freezes. When asked how Plaintiff States had been selected, HHS spokesperson Andrew Nixon provided no reasoned explanation nor cited any evidence that would justify targeting those states, but simply said, "[t]hat's where our highest suspicion is."[19]

### 1.  The CCDF Funding Freeze Letter

57.    The CCDF Letters to Plaintiff States New York, California, Colorado, and Illinois each state that "ACF will be conducting a thorough review of the State's use of funding for compliance and alignment with statutory requirements. ACF is placing the State on temporarily restricted drawdown of CCDF funds until additional fiscal accountability requirements are implemented and necessary information is provided for ACF to complete its review." Ex. 1.

58.    These CCDF Letters each assert that these "[e]nhancements of fiscal accountability requirements are clearly necessary to mitigate fraudulent activity" without explaining why that is so or providing any substantiation at all for the vague allegations in the Letters. Ex. 1.

59.    These CCDF Letters direct that each State's fiscal accountability requirements "must include submission of verified attendance documentation for subsidized child care services to the State prior to further draw down of federal CCDF funding." That documentation must establish the days or hours of care provided; must contain "contemporaneous payment information"; and must be "sufficient for ACF to determine that the drawdown amount is reasonable, allowable, and allocable." Ex. 1.

60.    These CCDF Letters each refer throughout to additional, unspecified requirements (e.g., "Until ACF determines that the State has established and implemented these *and other* internal controls…"). Ex. 1.

---

[19] https://www.axios.com/2026/01/05/trump-child-care-minnesota

61. These CCDF Letters each state that Plaintiff States' "CCDF funds shall be temporarily placed on restricted drawdown until these additional fiscal accountability requirements are implemented" and that Plaintiff States "will be placed on this temporary restricted drawdown for all CCDF funds provided by ACF until further notice, pending successful and satisfactory review of the requested information." Ex. 1.

62. Plaintiff State Minnesota received its own variation of the CCDF Letter a day before the other Plaintiff States, on January 5, 2026. Ex. 4-C. The substance and impact of the January 5, 2025 CCDF Letter is substantially similar to the other CCDF Letters. However, because Minnesota had separately received some of the boilerplate language regarding purported concerns regarding fraud, and data demands, its January 5, 2026 CCDF letter is styled as a set of directions explaining the restrictions imposed. As with the other CCDF Letters, Minnesota's CCDF Letter demands submission of verified attendance documentation for subsidized child care services to the State prior to any draw down of federal CCDF funding. Minnesota's CCDF letter also states the restriction will remain in effect until an unspecified time when ACF has determined the State has established and implemented sufficient internal controls.

## 2. The TANF Funding Freeze Letter

63. The TANF Letters to all Plaintiff States, dated January 6, 2025, each state that "[e]ffective today," ACF is reviewing each Plaintiff State's "TANF State Plan for completeness and for program compliance with applicable laws. As a result, ACF is placing the state TANF program on a restricted drawdown in accordance with 2 C.F.R. § 200.339." Ex. 2.

64. The TANF Letters make three specific demands of Plaintiff States.

65. *First*, the TANF Letters require each Plaintiff State to "provide the complete universe of TANF administrative data that exist and are in the state's possession for all recipients

17

for all available years, and at least 2022 to 2025. This includes recipient name, address, Social Security Number (if collected), date of birth, A-number (as applicable), and any state identification numbers used for program administration." Ex. 2.

66.    The TANF Letters each state that this information is "requested pursuant to 45 C.F.R. § 98.90 [and] is necessary for ACF to conduct a thorough review of program operations and to assess the extent of any irregularities that may have occurred." Ex. 2.

67.    **Second**, the TANF Letters demand "documentation demonstrating that the" state "has verified the eligibility of all TANF applicants and recipients in accordance with the requirements of the Personal Responsibility and Work Opportunity Reconciliation Act, 8 U.S.C. § 1611, which limits TANF eligibility to United States citizens and qualified aliens. This documentation should include the policies, procedures, system controls, and verification records used by [Plaintiff States] to confirm citizenship or qualified alien status during the application and recertification processes." Ex. 2.

68.    **Third**, the TANF Letters request "a comprehensive list of all organizations, subcontractors, service providers, local agencies, community groups, and any other entities that received TANF funds from the [state], directly or indirectly, during the period from 2019 through 2025. For each organization, to the extent the information exists and is in the state's possession, I request the amount of TANF funding provided, the purpose for which the funds were awarded, and documentation describing the State's oversight mechanisms, monitoring activities, and verification processes used to ensure proper use of TANF dollars." Ex. 2.

69.    The TANF Letters set a deadline of January 20, 2026, for Plaintiff States to provide the required information. Ex. 2.

70.    The TANF Letters state that each Plaintiff State will be placed "on a temporary restricted drawdown for all TANF funds provided by ACF until further notice, pending review of the state's current TANF plan for completeness and ACF confirming compliance with applicable laws." Ex. 2.

71.    Plaintiff State of Minnesota had previously received another letter from ACF regarding TANF on December 4, 2025, but that letter is not referenced in its January 6, 2025 TANF letter.

### 3.  The SSBG Funding Freeze Letter

72.    The SSBG Letters to Plaintiff States New York, California, Colorado, and Illinois each state that "ACF will be conducting a thorough review of the State's use of funding. As a result, ACF is notifying your office that the State is not authorized to further draw down" SSBG funds "without complying with the terms of a temporary restricted draw down until this review is complete." Ex. 3.

73.    These SSBG Letters make three specific demands of Plaintiff States. These requests are nearly identical to the requests made in the TANF Letters described above.

74.    *First*, these SSBG Letters each state that each Plaintiff State must "provide the complete universe of SSBG administrative data that exist and are in the state's possession for all grantees, their recipients and subrecipients, for all available years and at least 2022 through 2025." This data "includes recipient name, address, Social Security Number (if collected), date of birth, A-number (as applicable), and any state identification numbers used for program administration." Ex. 3.

75.    The SSBG Letters assert that "this information is necessary for ACF to conduct a thorough review of program operations and to assess the extent of any irregularities that may have occurred." Ex. 3.

76.    **_Second_**, the SSBG Letters request "documentation demonstrating that the" state has "verified the eligibility, where applicable, of all recipients and subrecipients of SSBG-funded entities in accordance with the requirements of the Personal Responsibility and Work Opportunity Reconciliation Act, 8 U.S.C. §1611, which limits the eligibility of federal public benefits to United States citizens and qualified aliens. This documentation should include the policies, procedures, system controls, and verification records used by Minnesota [sic] to confirm citizenship or qualified alien status during the application and recertification processes." Ex. 3.

77.    **_Third_**, these SSBG Letters request "a comprehensive list of all organizations, subcontractors, service providers, local agencies, community groups, and any other entities that received SSBG funds from the [state], directly or indirectly, during the period from 2019 through 2025. For each organization, to the extent the information exists and is in the state's possession, I request the amount of SSBG funding provided, the purpose for which the funds were awarded, and documentation describing the state's oversight mechanisms, monitoring activities, and verification processes used to ensure proper use of SSBG dollars." Ex. 3.

78.    These SSBG Letters do not cite to any source of legal authority for a funding freeze.

79.    These SSBG Letters set a deadline of January 20, 2026, for Plaintiff States to provide the information requested. Ex. 3.

80.    These SSBG Letters state that each Plaintiff State "will be placed on a temporary restricted drawdown for all SSBG funds provided by ACF until further notice, pending successful and satisfactory review of the requested information." Ex. 3.

81.     Plaintiff State of Minnesota also received an SSBG Letter on January 6, 2026, but with slight variations. Ex. 5-B. ACF had already demanded from Minnesota the same three categories of SSBG records described above on December 12, 2025. Ex. 5-A. Minnesota's January 6, 2026 SSBG letter, like the other Plaintiff States' SSBG Letters, notified Minnesota that it would be unable to draw down SSBG funding, and would be on temporary restricted drawdown, pending Minnesota's submission of the requested information. Ex. 5-B.

**E.  ACF Must Follow Specific Procedures Under Each Program's Authorizing Statute Before It May Impose Penalties for "Noncompliance."**

82.     Each of the three programs at issue has a detailed statutory and regulatory scheme that requires ACF to take a series of procedural steps before imposing any sanctions for noncompliance with program requirements, including requirements related to who may receive assistance under the programs and how they may receive it. Likewise, each program's governing laws and regulations set forth what data ACF may collect and the manner in which ACF may collect it.

83.     The January 5 and 6 Letters make vague, unexplained, and unsupported references to the "potential" for "fraud" in the CCDF, TANF, and SSBG programs. To be clear, there is no statutory or regulatory basis for freezing funds to the Plaintiff States on mere allegations or suspicion of fraud. In fact, there is no statutory or regulatory basis to freeze *all funds* for *an entire state* even based on substantiated instances of fraud by individual bad actors. The only statutory or regulatory bases for penalizing the Plaintiff States rest on findings of noncompliance in their administration of the programs, and such penalties can only be imposed in accordance with robust statutory and regulatory procedures set forth for each program.

### 1.  CCDF

84.     By statute, ACF may implement a penalty against a State for noncompliance in the CCDF program only after providing reasonable notice and the opportunity for a hearing. 42 U.S.C. § 9858g(b)(2)(A)-(B).

85.     ACF must do so by following specific procedural steps. First, ACF must conduct a "review or investigation [that] reveals evidence that" a State or its subgrantee "has failed to substantially comply with" law or regulations or receive a complaint that a state "has failed to use its allotment in accordance with" law or regulations. 45 C.F.R. §§ 98.90(b), 98.93(a).

86.     ACF must then "issue a preliminary notice . . . of possible non-compliance" to the state. 45 C.F.R. § 98.90(b). If the possible non-compliance is based on a complaint, ACF must "promptly furnish a copy of any complaint to the affected" state. 45 C.F.R. § 98.93(c).

87.     ACF must then provide the State a sixty-day period to submit comments. 45 C.F.R. §§ 98.90(b), 98.93(c). ACF must then consider the State's comments. *Id.*

88.     If ACF has made a finding that the State has made expenditures that are not allowed by law, it must notify the State in writing of its decision to disallow those expenditures. 45 C.F.R. § 98.66(b).

89.     During this process, the State has two opportunities to appeal.

90.     If ACF makes a finding of non-compliance as part of a compliance review, the State may appeal that decision. 45 C.F.R. § 98.66(i).

91.     If ACF makes a decision to disallow funds, the State may request reconsideration of, or appeal, that decision. 45 C.F.R. § 98.66(c).

92.     Upon a final decision, the sanction for the State is disallowance of funds in the specific amount found to be paid not in accordance with law or an offset of future payments in that

22

same amount. 45 C.F.R. § 98.65(d), *see also* 45 C.F.R. §§98.66(a), (h). ACF may also impose other "appropriate sanctions." 45 C.F.R. § 98.92(b).

93.    ACF did not take any of the required procedural steps before implementing the ACF Funding Freeze as to CCDF, and the CCDF Letters do not acknowledge any of these statutory or regulatory obligations. The only legal citation in the CCDF Letters is to 45 C.F.R. § 98.67(c)(2), which simply requires states to have "[f]iscal control and accounting procedures . . . sufficient to permit . . . [t]he tracing of funds to a level of expenditure adequate to establish that such funds have not been used in violation of the provisions of this part."

94.    CCDF statutes and regulations prescribe a number of ways in which ACF monitors States' compliance with program requirements, including potential fraud, and the manner in which data and records can be provided from States to ACF in furtherance of its compliance efforts. For example, Congress has specified that each State must undergo regular audits; must report certain data to ACF regularly; and must undergo a quality control process through which ACF calculates the rate of improper payments. *See* 42 U.S.C. § 9858i; 45 C.F.R. §§ 98.65, 98.100.

95.    ACF likewise did not acknowledge any of these oversight mechanisms in implementing the ACF Funding Freeze as to CCDF.

### 2.    TANF

96.    The TANF statute provides the specific and exclusive circumstances under which ACF may implement a penalty against a State for noncompliance in the TANF program, including a State's failure to submit required reports, failure to comply with child support enforcement obligations, and a "[g]eneral penalty" for when a State's statutorily-required audit finds that a State's funds have been used in violation of the law. 42 U.S.C. § 609(a); 45 C.F.R. § 263.10; *see*

*also* 42 U.S.C. § 617 ("No officer or employee of the Federal Government may regulate the conduct of States under" the TANF program "except to the extent expressly provided in this part.").

97.     ACF must follow specific procedures to implement these penalties.

98.     First, ACF must notify a State of the violation. 42 U.S.C. § 609(c)(1)(A). This notification must be in writing; must specify which penalty will be imposed and the reasons for the penalty; specify the sources of information ACF relied on and the reasons for its decision; and invite the State to present its arguments if it believes that the information or method that ACF used were in error or were insufficient. 45 C.F.R. § 262.4(a).

99.     Then, ACF must allow the State a sixty-day period to submit a corrective compliance plan that outlines how the State will correct or discontinue the violation and how the State will ensure continuing compliance. 42 U.S.C. § 609(c)(1)(A)-(B).

100.     Then, ACF has a sixty-day period to accept or reject the State's proposed compliance plan. 42 U.S.C. § 609(c)(1)(D).

101.     Only if ACF rejects the State's proposed compliance plan within 60 days can ACF impose penalties on the State. 42 U.S.C. §§ 609(c)(1)(D), (c)(2). *See also* 42 U.S.C. § 609(c)(3).

102.     Then, if ACF takes any adverse action against a State—which may include the imposition of a penalty as described above, but may also include an adverse action on the State's TANF plan—ACF must notify the State within five days. 42 U.S.C. § 610(a). This notification must include "the factual and legal basis for taking the penalty in sufficient detail for the State to be able to respond in an appeal." 45 C.F.R. § 262.7(a)(2).

103.     Then, ACF must provide a sixty-day period for the State to appeal. 42 U.S.C. § 610(b)(1).

104.    Upon a final decision, the penalty for the State is a reduction in future payments to the state in the amount that was unlawfully spent. 42 U.S.C. § 609(a)(1)(A). ACF can impose an additional 5% reduction upon a finding that the State's violation was intentional. 42 U.S.C. § 609(a)(1)(B).

105.    ACF is prohibited from reducing the quarterly payment to any State by more than 25%. 42 U.S.C. § 609(d)(1). If this limitation results in unrecovered penalties, the balance is carried forward and assessed the following year. 42 U.S.C. § 609(d)(2).

106.    ACF did not take any of the required procedural steps before implementing the ACF Funding Freeze as to TANF, and the TANF Letters do not acknowledge any of these statutory or regulatory obligations.

107.    The TANF Letters cites an Office of Management and Budget regulation (2 C.F.R. § 200.339), but that regulation does not supersede the processes and limits set forth by Congress in enacting TANF and, in any event, ACF did not comply with the procedural requirements of that regulation.

108.    TANF statutes and regulations prescribe a number of ways in which ACF monitors States' compliance with program requirements, including potential fraud, and the manner in which data and records can be provided from States to ACF in furtherance of its compliance efforts. For example, Congress has specified that each State must undergo regular audits; must report certain data to ACF regularly; and must conduct a quality control system covering determinations of eligibility, reviewed by ACF. *See* 42 U.S.C. §§ 611, 652; 45 C.F.R. pt. 265.

109.    ACF likewise did not acknowledge any of these oversight mechanisms in implementing the ACF Funding Freeze as to TANF. The TANF letter cites a regulation in support of its data demand, 45 C.F.R. § 98.90. But this regulation relates to CCDF, not TANF, and in any

event provides specific procedural steps ACF must take (and did not take here) to issue a finding of non-compliance for that program, as described above.

### 3.  SSBG

110.    ACF may implement a penalty against a State for noncompliance in the SSBG program only following specific procedural steps. 42 U.S.C. § 1397e(b); 45 C.F.R. § 96.51.

111.    First, ACF must make a finding that the State has expended funds not in accordance with law. 45 C.F.R. § 96.51(a).

112.    Then, ACF must provide the State with notice of this finding. *Id.*

113.    Then, ACF must provide the State the opportunity for a hearing to contest this finding. *Id.*

114.    After the hearing, the State has the opportunity to appeal. 45 C.F.R. § 96.52.

115.    Upon a final decision, the sanction for the State is disallowance of funds in the amount found to be paid not in accordance with law or an offset of future payments in that same amount. 45 C.F.R. § 96.51(a), (b).

116.    ACF can "withhold funds from a State *only if* the Department has provided the State an opportunity for a hearing." 45 C.F.R. § 96.51(c) (emphasis added).

117.    If ACF receives a complaint that a State "has failed to use its allotment . . . in accordance with" law or regulations, it must "promptly furnish a copy of any complaint to the affected State." 45 C.F.R. § 96.50(c).

118.    ACF must then provide the State a sixty-day period to submit comments in response to the complaint. *Id*. ACF must then consider the State's comments. *Id.*

119.    In considering a complaint or the results of an audit, ACF recognizes that "the States are primarily responsible for interpreting the governing statutory provisions," and that is

"consistent with the intent of and statutory authority for the block grant programs." As a result, ACF "will defer to a State's interpretation of its assurances and of the provisions of the block grant statutes unless the interpretation is clearly erroneous." 45 C.F.R. § 96.50(e).

120.    ACF did not take any of the required procedural steps before implementing the ACF Funding Freeze as to SSBG, and the SSBG Letters do not acknowledge any of these statutory or regulatory obligations.

121.    SSBG statutes and regulations prescribe a number of ways in which ACF monitors States' compliance with program requirements, including potential fraud, and the manner in which data and records can be provided from States to ACF in furtherance of its compliance efforts. For example, Congress has specified that each State must undergo regular audits and must report certain data to ACF regularly. *See* 42 U.S.C. § 1397e; 45 C.F.R. § 96.74.

122.    ACF likewise did not acknowledge any of these oversight mechanisms in implementing the ACF Funding Freeze as to SSBG.

**F.  Plaintiff States Have Been Harmed and Will Continue to Be Harmed by the ACF Funding Freeze**

123.    The ACF Funding Freeze will irreparably harm the Plaintiff States.

124.    The Plaintiff States rely on the ACF funds to help low-income families afford child care and other basic needs, and to provide social services to vulnerable populations. If the funds are cut, these programs will largely cease operations. Even a temporary disruption in such funding will have drastic consequences for Plaintiff States' ability to administer critical benefits programs, manage their budgets and plan for the future, and avoid wide scale disruptions to the economy that will stem from cessation of child care subsidies.

125.    The ACF Funding Freeze has created immediate budget uncertainty for agencies within the Plaintiff States that manage the budget for early child care programming. Agencies are

faced with the daunting task of trying to find a way to continue providing child care programming. Agencies must immediately expend resources to consider ways to reduce program liabilities to account for a decrease in program funds, including changing the eligibility to participate in early childhood programming (causing fewer children to receive care), increasing the co-pay a family must pay to receive child care, creating wait lists for program participation, or cutting the amounts that the agency pays out to child care providers. All of these options would harm the Plaintiff States and the children and family who reside in the Plaintiff States. Some of these funds are drawn down on a frequent basis. For example, in New York, some child care funds are drawn down every 24-48 hours.

126.    Additionally, because Plaintiff States seek reimbursement *after* they have spent funds, even if they cease operating these programs immediately, they will still be in a financial hole. For example, Plaintiff New York paid $106 million in December to cover TANF-related expenses that had previously been incurred throughout the State. It submitted the drawdown request to ACF for reimbursement of those expenses, which is typically processed in 24-48 hours, on January 5, 2026, but as of the date of filing, that request is still "pending review."

127.    The ACF funds allow low-income families to secure child care while they work or attend school. This is a substantial benefit for working families, and the economy generally, in the Plaintiff States. In Illinois, there are currently over 150,000 children who receive ACF-funded child care. While these children are receiving quality care, their parents can participate in the work force, which supports the regional economy and increases families' household income. ACF funds also are used to support access to after-school and summer programming, which supports children's growth and allows parents to work. If such care were disrupted and parents were forced to stay home to care for children, household budgets would suffer, employers would lose

28

productive employees, and demands for unemployment benefits would increase. Even children who do not receive ACF-funded care may lose care if facilities are forced to reduce staff or shut down due to a lack of funding. Children would lose access to quality child care and other programming, which could result in placement in unsafe situations and the long-term harm that comes from lack of access to quality early-childhood services. The net result of these employment and productivity losses would be slowed economic growth in the Plaintiff States and strained State and local budgets, harms that are not reparable.

128.    Furthermore, if parents are required to leave the workforce due to an inability to obtain child care, those parents may be unable to meet work requirements necessary to participate in federal support programs such as SNAP or Medicaid. The loss in federal benefits for food and health care for individuals in Plaintiff States would put immense strain on state budgets.

129.    TANF provides more than $7 billion in funds to Plaintiff States that they use to provide cash assistance and services to low-income families with children. And SSBG provides approximately $870 million to Plaintiff States for the provision of social services. Removing access to these funding sources will sow chaos not only for these children and families, but also the Plaintiff States as they look for funds for services for these families based on their already-strained budgets.

130.    With the potential disruption of child care and other support systems for tens and hundreds of thousands of families in each state, Plaintiff States expect that participants will seek answers and support from state agencies, causing further strain on Plaintiff States' ability to provide services.

131.    The uncertainty and distress caused by Defendants' efforts to broadly announce the immediate implementation of the ACF Funding Freeze adds immediate strain on child care

providers, who must continue to invest in staffing, food, and real estate for their facility at a time when their income has been thrown into question. Furthermore, child care employers already must manage a workforce subject to high employee turnover, and an increase in budget uncertainty could only increase that turnover. The net result of the uncertainty for providers is uncertainty for families and additional challenges for Plaintiff States in administering these programs.

132.    Finally, State agencies also risk damage to their reputations from the impending cut back and/or cessation of services as the public face of these services. The ACF Funding Freeze generates the public perception that state agencies have failed or engaged in wrongdoing, thereby damaging their reputation. This, in turn, will increase public distrust of the CCDF, TANF, and SSBG programs and will chill public participation in these programs.

## CAUSES OF ACTION

### COUNT I

**Substantive Violation of the Administrative Procedure Act – In Excess of Statutory Authority, Contrary to Law, Ultra Vires**

133.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

134.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

135.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B)–(C).

136.    The ACF Funding Freeze, as implemented through the January 5 and 6 Letters, constitutes final agency action, because it marks "the consummation" of agency decision making and determines "'rights or obligations' . . . from which 'legal consequences'" flowed. *Bennett v.*

*Spear*, 520 U.S. 154, 177-78 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). ACF has been clear that it has *already* frozen Plaintiff States' funds.[20]

137.   Congress enacted the APA "'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not equate to deference. Rather, it "'remains the responsibility of the court to decide whether the law means what the agency says.'" *Id*. at 392 (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109) (2015) (Scalia, J., concurring in judgment)).

138.   An agency may not take any action that exceeds the scope of its constitutional or statutory authority.

139.   As a general matter, the "purpose statute" requires that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a), meaning that funds can only be used for the purposes that Congress has designated.

140.   Federal agencies lack authority to freeze funds without following the specific processes set forth in the relevant statutes and regulations. A purported interest in rooting out unspecified and unsubstantiated alleged fraud does not permit Defendants to immediately, categorically, and indefinitely freeze funding when such a freeze is contrary to the relevant statutes.

141.   Each of the funding streams Defendants have frozen is governed by a complex statutory and regulatory scheme that provides specific processes for Defendants to seek remedies

---

[20] HHS Freezes Child Care and Family Assistance Grants in Five States (Jan. 6, 2026), https://acf.gov/media/press/2026/hhs-freezes-child-care-family-assistance-grants-five-states

against the States for noncompliance with the law. Defendants have failed to follow any of those processes, and do not even purport in the Letters to be attempting to follow those processes.

142.    Defendants thus lack any authority to impose and maintain the ACF Funding Freeze, which is an across-the-board pause on disbursement of the ACF Funds without regard to the individual authorizing statutes, regulations, and terms that govern each funding stream.

143.    Defendants lack authority to freeze funds based on mere suspicion of fraud.

144.    Defendants lack authority to obtain the broad swaths of data demanded in the January 5 and 6 Letters as part of the ACF Funding Freeze.

145.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Defendants lack legal authority to implement the ACF Funding Freeze contrary to congressional directive and intent, and have, in so doing, acted contrary to law, outside of statutory authority, and in violation of the APA.

146.    Plaintiffs are also entitled to vacatur of the ACF Funding Freeze, 5 U.S.C. § 706, and a preliminary and permanent injunction preventing Defendants from implementing the ACF Funding Freeze, including enjoining Defendants from implementing the January 5 and 6 Letters in their entirety.

## COUNT II

**Substantive Violation of the Administrative Procedure Act – Arbitrary & Capricious**

147.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

148.    Defendants include "agenc[ies]" under the APA, 5 U.S.C. § 551(1).

149.    The ACF Funding Freeze, as implemented through the January 5 and 6 Letters, constitutes final agency action, because it marks "the consummation" of agency decision making and determine "'rights or obligations' . . . from which 'legal consequences'" flowed. *Bennett v.*

32

*Spear*, 520 U.S. 154, 177-78 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

150.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

151.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

152.    That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

153.    An action is also arbitrary and capricious if the agency "'failed to consider . . . important aspects of the problem'" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

154.    Defendants provided no reasoned basis for freezing billions of dollars in ACF Funds or for making their impossible data and documentation demands. The January 5 and 6 Letters assert that Defendants are taking action because of "concern[s]" they have regarding "the potential for extensive and systemic fraud" (concerns they claim were heightened by "recent federal prosecutions and additional allegations that substantial portions of federal resources were

fraudulently diverted") and supposed beliefs about the Plaintiff States "illicitly providing illegal aliens" with federal benefits. But the January 5 and January 6 Letters fail to adduce any evidence of "fraud," identify a single "prosecution," substantiate any "allegations" of diversion of resources, or cite any evidence that any state is "illicitly providing illegal aliens" with any improper benefits using the ACF Funds. Nor do the Letters provide any factual or legal basis for refusing to disburse funds appropriated by Congress. The absence of any reasoned basis for the ACF Funding Freeze renders that action arbitrary and capricious.

155.    That Defendants' purported "concerns" with fraud are pretextual explanations is confirmed by the fact that Defendants took the draconian action of freezing all ACF funds to the Plaintiff States before conducting any investigation into the unsubstantiated and vague "concerns," and before they received any of the documents or information they are now seeking from Plaintiff States. The pretext is further confirmed by the lockstep manner in which Defendants have asserted the same general and unexplained "concerns," at the same time, to entire programs within five particular States, while apparently passing over other states—even states that have had highly public reporting of multi-million dollar ACF program fraud.

156.    Defendants also failed to consider the consequences of an immediate, categorial, and indefinite funding freeze, including on the Plaintiff States' ability to help their most vulnerable residents: children in need. The January 5 and 6 Letters do not contain any reasoning addressing these dramatic consequences. Defendants' actions are arbitrary and capricious for this independent reason.

157.    Defendants also failed to consider reliance interests on receipt of these critical appropriated funds. In particular, Plaintiff States draw down federal funds *after* they have made expenditures, relying upon Defendants to reimburse them for proper expenses. The January 5 and

6 Letters do not contain any reasoning that addresses this reliance interest, and for that independent reason, Defendants' actions are arbitrary and capricious.

158.    Further, Defendants have made clear that they targeted the Plaintiff States because of the political affiliations of their governors, and nothing more. Reliance on such an extra-statutory factor is impermissible. The ACF Funding Freeze is a pretextual effort to punish States the Trump Administration disfavors and is arbitrary and capricious for that independent reason.

159.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the ACF Funding Freeze is arbitrary and capricious in violation of the APA.

160.    Plaintiffs are also entitled to vacatur of the ACF Funding Freeze, 5 U.S.C. § 706, and a preliminary and permanent injunction preventing Defendants from implementing the ACF Funding Freeze, including enjoining Defendants from implementing the January 5 and 6 Letters in their entirety.

## COUNT III

## Equitable *Ultra Vires* – Conduct Outside the Scope of Statutory Authority Conferred on the Executive

161.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

162.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

163.    Defendants' conduct in initiating and maintaining the ACF Freeze without regard to the individual authorizing statutes, regulations and terms that govern each funding stream is contrary to law and outside of Defendants' authority.

164.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the ACF Funding Freeze is ultra vires.

165.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Defendants from implementing the ACF Funding Freeze because it is ultra vires, including enjoining Defendants from implementing the January 5 and 6 Letters in their entirety.

## COUNT IV

### Violation of the Separation of Powers—Usurping the Legislative Function

166.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

167.    The Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).

168.    Congress also possesses exclusive power to legislate. Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. art. I, § 1; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

169.    Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to

unilaterally decline to spend appropriated funds. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

170.    The ACF Funding Freeze violates the separation of powers because the executive branch has overridden the careful judgments of Congress by refusing to disburse the ACF Funds pending a non-statutorily authorized fishing expedition.

171.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the ACF Funding Freeze violates the constitutional separation of powers doctrine and impermissibly arrogates to the executive power that is reserved to Congress.

172.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Defendants from implementing the ACF Funding Freeze, including enjoining Defendants from implementing the January 5 and 6 Letters in their entirety.

## COUNT V

## Violation of the Appropriations Clause

173.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

174.    The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause is a "straightforward and explicit command" that "'no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

175.    Through the ACF Funding Freeze, Defendants are declining to expend appropriated funds, contrary to the enabling statutes governing the ACF funding streams.  The ACF Funding Freeze therefore infringes on Congress's appropriations power and is unconstitutional.

176.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the ACF Funding Freeze violates the Appropriation Clause of the U.S. Constitution.

177.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Defendants from implementing the ACF Funding Freeze, including enjoining Defendants from implementing the January 5 and 6 Letters in their entirety.

## Count VI
## Violation of the Spending Clause

178.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

179.    The Spending Clause of the U.S. Constitution provides that "[t]he Congress shall have Power To . . . provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Legislation establishing the CCDF, TANF, and SSBG programs was enacted pursuant to the Spending Clause.

180.    Among other requirements, the Spending Clause requires that states must receive "fair notice" of any conditions on the receipt of federal funds. *Arlington Ctrl. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006). Any conditions on federal funding must be accepted by States "knowingly and voluntarily." *Id. a*t 296 (citation omitted). And "States cannot knowingly accept conditions of which they are 'unaware.'" *Id.* Any condition on the states' acceptance of federal funds must thus be set forth "unambiguously." *Id.* "[I]t strains credulity to argue that participating States should have known of their 'obligations' under [a statute] when . . . the governmental agency responsible for the administration of the [statute] and the agency with which the participating States have the most contact, has never understood [it] to impose conditions on participating States." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981).

38

181.    The government also cannot unconstitutionally coerce states using federal funding. This can include when the government requires States to "transform" their programs "dramatically" in order to continue receiving federal funding. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012).

182.    The ACF Funding Freeze demands immediately that Plaintiff States clear numerous non-statutory, ambiguous, and draconian conditions in order to restore presently frozen funds. At no point did the Plaintiff States understand that such conditions could be suddenly and unilaterally imposed given the statutory framework governing the ACF Funds. The federal government is also attempting to coerce states to align themselves with the Trump Administration's priorities as the ACF Funding Freeze is clear retribution against the Plaintiff States—weaponizing billions of dollars—for their sovereign political choices. For these reasons, the ACF Funding Freeze violates the Spending Clause.

183.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the ACF Funding Freeze violates the Spending Clause of the U.S. Constitution.

184.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Defendants from implementing the ACF Funding Freeze, including enjoining Defendants from implementing the January 5 and 6 Letters in their entirety.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

i.    Issue a judicial declaration that the ACF Funding Freeze is in excess of statutory authority, contrary to law, and arbitrary and capricious, in violation of the Administrative Procedure Act and is unconstitutional and *ultra vires*;

ii.    Pursuant to 5 U.S.C. § 705, stay the ACF Funding Freeze;

iii.   Pursuant to 5 U.S.C. § 706, vacate the ACF Funding Freeze;

iv.   Preliminarily and permanently enjoin Defendants from implementing the ACF Funding Freeze, including enjoining Defendants from implementing the January 5 and 6 Letters in their entirety;

v.   Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

vi.   Grant other such relief as this Court may deem proper.

Dated: January 8, 2026                          Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Jessica Ranucci
Molly Thomas-Jensen
*Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8333
rabia.muqaddam@ag.ny.gov
jessica.ranucci@ag.ny.gov
molly.thomas-jensen@ag.ny.gov

*Attorneys for the State of New York*

**ROB BONTA**                                    **PHILIP J. WEISER**
Attorney General for the State of California     Attorney General for the State of Colorado

By: */s/ Daniel C. Sheehan*                      By: */s/ David Moskowitz*
Daniel C. Sheehan*                               David Moskowitz*
*Deputy Attorney General*                        *Deputy Solicitor General*
Paul Stein*                                      Nora Passamaneck
Christine Chuang                                 *Senior Assistant Attorney General*
Nicholas R. Green*                               Colorado Department of Law

40

*Supervising Deputy Attorneys General*
Jesse Basbaum*
Alexis Piazza*
Harald Kirn*
James Bowen*
*Deputy Attorneys General*
California Department of Justice
300 South Spring Street, Los Angeles, CA
90013
(213) 269-6078
Daniel.Sheehan@doj.ca.gov

*Attorneys for the State of California*


**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Vikas Didwania*
Vikas Didwania*
*Complex Litigation Counsel*
Sherief Gaber*
Michael Tresnowski*
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Vikas.Didwania@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Attorneys for the State of Illinois*


 *Pro hac vice application forthcoming

1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for the State of Colorado*


**KEITH ELLISON**
Attorney General of the State of Minnesota
By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp*
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Attorneys for the State of Minnesota*