# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, STATE OF
CALIFORNIA; STATE OF COLORADO; STATE
OF ILLINOIS; and STATE OF MINNESOTA,

       Plaintiffs,

v.

ADMINISTRATION FOR CHILDREN AND
FAMILIES; ALEX J. ADAMS, in his official
capacity as the ASSISTANT SECRETARY OF THE
ADMINISTRATION FOR CHILDREN AND
FAMILIES; U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; and ROBERT F.
KENNEDY, JR., in his official capacity as the
SECRETARY OF THE U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

       Defendants.

Case No. 26-cv-00172

## PLAINTIFFS' EMERGENCY
## MOTION FOR A TEMPORARY RESTRAINING ORDER AND 5 U.S.C. § 705 STAY

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

     A.   The ACF Funds Are Critical for Plaintiffs and Are Needed Uninterrupted ................................................................................................. 3

     B.   Defendants' Escalating Threats Against Plaintiff States ................................ 3

     C.   The ACF Funding Freeze and January 5 and 6 Letters ................................ 5

     D.   The CCDF Letters ........................................................................................ 6

     E.   TANF and SSBG Letters .............................................................................. 7

ARGUMENT ...................................................................................................................... 8

   I.    Plaintiffs Are Likely to Succeed on the Merits ..................................................... 9

     A.   The ACF Funding Freeze Is In Excess of Statutory Authority and Contrary to Law. .......................................................................................... 9

     B.   The ACF Funding Freeze is Arbitrary and Capricious ................................ 14

       1.   Defendants acted without analyzing any evidence ................................ 15

       2.   Defendants' remedy—an indefinite, across-the-board funding freeze—lacks any rational connection to the purported problem. ........................ 16

       3.   Defendants impermissibly relied on an extra-statutory and arbitrary factor when targeting the Plaintiff States. ........................................................ 17

       4.   Defendants completely disregarded substantial reliance interests, jeopardizing State's ability to support its most vulnerable residents. ..... 19

   II.   The Equities Compel Emergency Relief ................................................................ 20

     A.   Emergency Relief Is Needed to Avert Irreparable Harm, and the Court has the Authority to Preserve the Status Quo ................................................ 20

     B.   The Balance of Equities and Public Interest Favor Emergency Relief ........ 23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aera Energy LLC v. Salazar*,
    642 F.3d 212 (D.C. Cir. 2011)......................................................................................19

*Am. Ass'n of Univ. Professors v. Trump*,
    No. 25-CV-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025)................................12

*Bennett v. Spear*,
    520 U.S. 154 (1997)....................................................................................................9

*California v. Trump*,
    786 F. Supp. 3d 359 (D. Mass. 2025) ...........................................................................22

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)...........................................................................................8

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...........................................................................3, 9, 22

*Connecticut v. U.S. Dep't of the Interior*,
    363 F. Supp. 3d 45 (D.D.C. 2019) ...............................................................................19

*Dep't of Commerce. v. New York*,
    588 U.S. 752 (2019)........................................................................................15, 17, 19

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    591 U.S. 1 (2020)..................................................................................15-16, 19-20

*East Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ..................................................................................21-22

*ExpertConnect, LLC v. Parmar*,
    773 F. App'x 651 (2d Cir. 2019) .................................................................................22

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009).......................................................................................21

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) .....................................................................................9

*Int'l Org. of Masters, Mates & Pilots v. NLRB*,
  61 F.4th 169 (D.C. Cir. 2023)........................................................................20

*Jacobson v. Commonwealth of Massachusetts*,
  197 U.S. 11 (1905)........................................................................................24

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)...........................................................................23

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)......................................................................................10

*Louisiana Pub. Serv. Comm'n v. F.C.C.*,
  476 U.S. 355 (1986)........................................................................................9

*Massachusetts v. Nat'l Institutes of Health*,
  No. 25-1343, 2026 WL 26059 (1st Cir. Jan. 5, 2026) .....................................8

*Michigan v. E.P.A.*,
  576 U.S. 743 (2015)................................................................................. 15-16

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).................................................................................15, 17

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  775 F. Supp. 3d 100 (D.D.C. 2025) ...............................................................17

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025)....................................................................................8

*New York v. Noem*,
  No. 25-cv-8106, 2025 WL 2939119 (S.D.N.Y. Oct. 16, 2025)........................16

*New York v. Trump*,
  767 F. Supp. 3d 44 (S.D.N.Y.)........................................................................21

*New York v. Trump*,
  769 F. Supp. 3d 119 (D.R.I. 2025).............................................................10, 17

*New York v. United States Dep't of Educ.*,
  No. 25-1424 (2d Cir. June 20, 2025), Dkt. 40.1 .............................................8

*New York v. United States Dep't of Homeland Sec.*,
  969 F.3d 42 (2d Cir. 2020)............................................................................23

*Nken v. Holder*,
  556 U.S. 418 (2009)................................................................................23

*Ohio v. EPA*,
  603 U.S. 279 (2024)............................................................................ 14-15

*Park Irmat Drug Corp. v. Optumrx, Inc.*,
  152 F. Supp. 3d 127 (S.D.N.Y. 2016)....................................................8

*Planned Parenthood Ass'n of Utah v. Herbert*,
  828 F.3d 1245 (10th Cir. 2016) ............................................................22

*Planned Parenthood of N.Y.C., Inc., v. United States HHS*,
  337 F. Supp. 3d 308 (S.D.N.Y. 2018).....................................................24

*Porwancher v. Nat'l Endowment for the Humanities*,
  792 F. Supp. 3d 107 (D.D.C. 2025) .......................................................12

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...................................................................................8

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
  778 F. Supp. 3d 440 (D.R.I. 2025).........................................................17

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)................................................................................3

**Federal Statutes**

5 U.S.C.
  § 705............................................................................................2, 25
  § 706............................................................................................9, 14

8 U.S.C.
  § 1611..............................................................................................7

42 U.S.C.

§ 602 .................................................................................................................14
§ 603 .................................................................................................................10
§ 609 ......................................................................................................11-12, 24
§ 610 .................................................................................................................12
§ 618 .................................................................................................................10
§ 1397a ..............................................................................................................11
§ 1397b ..............................................................................................................11
§ 1397e .........................................................................................................11, 24
§ 9858c ..............................................................................................................14
§ 9858g ...................................................................................................11-12, 24
§ 9858h ..............................................................................................................10
§ 9858m .............................................................................................................10

Pub. L. No. 118-47, 138 Stat. 665 .......................................................................10

Pub. L. No. 118-83, 138 Stat. 1533 .....................................................................10

Pub. L. No. 119-37, 139 Stat. 495-98 ............................................................10-11

**Federal Regulations**

2 C.F.R.

§ 200.339 ...........................................................................................................12
§ 200.342 ...........................................................................................................12

45 C.F.R.

§ 96.50 ...............................................................................................................12
§ 96.51 ...............................................................................................................12
§ 96.52 ...............................................................................................................12
§ 98.45 ...............................................................................................................14
§ 98.60 ...............................................................................................................13
§ 98.65 ...............................................................................................................13
§ 98.65 ...............................................................................................................24
§ 98.66 ...............................................................................................................24
§ 98.67 ..........................................................................................................13-14
§ 98.90 .........................................................................................................12, 13
§ 98.92 ...............................................................................................................13
§ 98.93 ...............................................................................................................12
§ 262.1 ...............................................................................................................13
§ 262.4 ...............................................................................................................12
§ 262.7 ...............................................................................................................12

91 Fed. Reg. 207 (Jan. 5, 2026) ..........................................................................14

## INTRODUCTION

Recognizing that States needed federal support in order to better serve vulnerable children and families in their communities, Congress enacted three critical and *mandatory* funding programs that are the subject of this case: the Child Care and Development Fund (CCDF); Temporary Assistance for Needy Families (TANF); and the Social Services Block Grant (SSBG) (together, the "ACF Funds"). The importance of these programs to Plaintiff States cannot be overstated—they provide cash assistance and fund services to help low-income and vulnerable children and families and individuals with disabilities. Without federal funding flowing to these programs, there will be immediate and devastating impacts in Plaintiff States.

Despite Congress's mandates and in the face of such extraordinary harm, Defendants indefensibly announced two days ago that they were immediately and categorically freezing $10 billion in ACF Funds to the five Plaintiff States, and only to those states (the "ACF Funding Freeze"). Although Defendants have said that the ACF Funding Freeze is necessary to address "potential" fraud, this is pure pretext. Defendants provided no basis or evidence to support their unsubstantiated allegations of potential fraud and took the draconian step of freezing *all* ACF funding across the five Plaintiff States before conducting any investigation. Their transparent motivation is to punish "Democrat-led" states who are disfavored by the Administration.

Congress has created statutory schemes that constrain the executive branch in how it can identify and sanction noncompliance or fraud by recipients of the ACF Funds. The statutes are clear, but Defendants have performed none of the required steps of these statutory processes. Nor has the federal government offered any legitimate justification for its action. The boilerplate January 5 and 6 Letters to Plaintiff States implementing the freeze entirely ignore that the affected programs are each governed by complex statutes that dictate the processes Defendants can use to address possible noncompliance in the administration of the ACF Funds. And Defendants' own

public statements have further confirmed that their "potential" fraud rationale is merely pretext for unlawfully targeting and punishing these five states—each of which, as Defendants have emphasized, has a Democratic governor—based on Plaintiff States' sovereign policies and choices with which Defendants disagree politically. The January 5 and 6 Letters also ignore significant reliance interests and harms.

Further, Defendants' Funding Freeze seeks to coerce Plaintiff States to turn over "the entire universe" of documents related to their use of billions of dollars of ACF Funds, including the personally identifying information of millions of their residents. And it requires the States to do so *within two weeks* to stop the freeze. As Defendants know, that is an impossible task on an impossible timeline, offered only as pretext to maintain the freeze against Plaintiff States, absent court intervention. But this request also further reveals the fundamental problem with Defendants' position: they did not engage in any meaningful investigation before withholding all funding under the programs and only now seek to find any evidence of noncompliance. In other words: the ACF Funding Freeze's data demand is a fishing expedition to find a post hoc rationalization for the Freeze itself.

Plaintiff States respectfully request that the Court enter a temporary restraining order and 5 U.S.C. § 705 stay blocking any implementation of the ACF Funding Freeze, including implementation of the January 5 and 6 Letters in their entirety, pending resolution of a forthcoming request for preliminary injunction.[1] The ability of the Plaintiff States to operate programs supporting the wellbeing of millions of children and families hangs in the balance.

---

[1] In order to file this Motion as expeditiously as possible, Plaintiffs have briefed only the APA claims at present. Given that the Constitutional and equitable *ultra vires* claims in the Complaint are based on Defendants' refusal to follow Congress's commands regarding the expenditure of the ACF Funds and their attempts to impose unconstitutional spending conditions on the States, Plaintiffs expect that largely the same factual basis for their APA claims will undergird a finding that Defendants have interfered with

# BACKGROUND

## A.    The ACF Funds Are Critical for Plaintiffs and Are Needed Uninterrupted

Plaintiff States rely on the ACF Funds to provide critical services and resources to low-income and vulnerable children and their families. CCDF alone provides over $2.4 billion in federal funding each year to support Plaintiffs States' programs providing low-income families with child care, permitting the parents to work or attend educational programs. TANF provides more than $7 billion in funds to Plaintiff States that they use to provide cash assistance and other services to low-income families with children. And SSBG provides approximately $870 million to Plaintiff States for the provision of social services.

Plaintiff States rely on these funds to administer social services and assist low-income families that cannot otherwise afford sufficient child care, food, housing, utilities, clothing, and social services. Even a temporary disruption in this funding jeopardizes these programs. It would force parents in low-income families to stay at home to care for children instead of working; cause employers to lose valued employees; increase demand for unemployment benefits; lead to staffing reductions in ACF-funded facilities; and increase strain on Plaintiff States' budgets.

## B.    Defendants' Escalating Threats Against Plaintiff States

In late December 2025, a YouTube user posted a video purporting to expose childcare centers in Minnesota engaging in fraud, which a White House spokesperson and Vice President

---

"power of the purse," which belongs to "Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Further, in doing so, they are usurping Congress's role in enacting the appropriations statutes that enable the ACF funding programs at issue in this case, violating those appropriations statutes, trampling on the Spending Clause, and acting at the lowest ebb of the executive's constitutional authority and power. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

J.D. Vance subsequently promoted.[2] Then, on December 30, 2025, HHS Deputy Secretary Jim O'Neill claimed on social media that the Department had "frozen all child care payments to the State of Minnesota."[3] In the same social media post, Deputy Secretary O'Neill announced that "all ACF payments across America" would "require a justification and a receipt or photo evidence" before any funds could be disbursed.[4] The next day, HHS spokesperson Andrew Nixon stated this justification requirement would take the form of a freeze of federal child care funding, which would only be released "when states prove they are being spent legitimately."[5]

But instead, Defendants engaged a targeted attack on five states only—the Plaintiffs in this litigation. On January 4, 2026, President Trump announced to the press from Air Force One that the administration would actually only target specific States with Democratic governors: "We're not going to pay [Minnesota], and we're not going to pay California, and we're not going to pay Illinois with a big slob of a governor that they have."[6] The next day on social media, President Trump reiterated his intent to target Democratic-led States: "Governor Walz has destroyed the State of Minnesota, but others, like Governor Gavin Newscum [sic], JB Pritzker, and Kathy Hochul, have done, in my opinion, an even more dishonest and incompetent job."[7]

On January 5, 2026, HHS made an even more direct, unsupported, false assertion that "Democrat-led states and Governors have been complicit in allowing massive amounts of fraud to

---

[2] Ken Bensinger & Ernesto Londoño, *An Intense White House Response from a Single Viral Video*, N.Y. TIMES, Dec. 31, 2025, available at https://www.nytimes.com/2025/12/31/business/media/trump-conservatives-videos-viral-loop.html.
[3] https://x.com/HHS_Jim/status/2006136004294664464.
[4] https://x.com/HHS_Jim/status/2006136004294664464.
[5] HHS freezing childcare payments to all states until they prove funds 'being spent legitimately', ABC News, Dec. 31, 2024, available at https://abc7.com/post/hhs-says-freezing-child-care-payments-minnesota-fraud-allegations/18335717/.
[6] https://www.youtube.com/watch?v=9XVjd3R2T3g&t=1157s.
[7] https://truthsocial.com/@realDonaldTrump/posts/115844083693194821.

occur under their watch."[8] And on January 6, 2025, President Trump claimed that Plaintiff "California, under Governor Gavin Newscum [sic] is more corrupt than Minnesota, if that's possible???"[9] Each of these posts, comments, insults, and threats laid the groundwork for the ACF Funding Freeze and underscores its pretextual nature.

### C.    The ACF Funding Freeze and January 5 and 6 Letters

On January 6, 2026, ACF announced a "funding freeze," stating that it "froze access to certain federal child care and family assistance funds for California, Colorado, Illinois, Minnesota and New York."[10] ACF effectuated the Funding Freeze via letters sent to Plaintiff States on January 5 and January 6, 2026 (the "January 5 and 6 Letters"). In these letters, ACF announced it would "plac[e]" each Plaintiff State "on a restricted drawdown for all" CCDF, TANF, and SSBG funds "until further notice." Ex. 1 (CCDF Letters), Ex. 2 (TANF Letters), Ex. 3 (SSBG Letters); Ex. 4-C (MN CCDF Letter); Ex. 5-B (MN SSBG Letter).[11]

Aside from two of the letters sent to Minnesota (detailed below), the CCDF, TANF, and SSBG letters sent to each Plaintiff State are identical from state-to-state, swapping out only the recipients and States' names. Exs. 1-3. All three letters begin with a statement that ACF is "concerned by the potential for extensive and systemic fraud" within the ACF programs generally, and that those concerns "have been heightened by recent federal prosecutions and additional allegations that substantial portions of federal resources were fraudulently diverted away from the American families they were intended to assist." *Id*. The letters claim that "ACF has reason to

---

[8] Adora Brown & Raymond Fernandez, *Trump Admin. to Freeze $10B in Social Programs to New York and Other Dem States*, THE CITY (Jan. 6, 2026), available at: https://www.thecity.nyc/2026/01/06/trump-cuts-funding-social-welfare-child-care/.
[9] https://truthsocial.com/@realDonaldTrump/posts/115848359372759872.
[10] HHS Freezes Child Care and Family Assistance Grants in Five States (Jan. 6, 2026), https://acf.gov/media/press/2026/hhs-freezes-child-care-family-assistance-grants-five-states.
[11] All of these letters are attached to the Complaint in Exhibits 1-5.

believe that" each Plaintiff State "is illicitly providing illegal aliens with . . . benefits intended for American citizens and lawful permanent residents." *Id.* But these letters provide no detail regarding specific "prosecutions" or "allegations," nor how ACF came to its belief that the Plaintiff States are "illicitly providing illegal aliens" with benefits. *See id.*

### D.    The CCDF Letters

The CCDF Letters to Plaintiff States New York, California, Colorado, and Illinois each state that "ACF is placing the State on temporarily restricted drawdown of CCDF funds until additional fiscal accountability requirements are implemented and necessary information is provided for ACF to complete its review." Ex. 1. These CCDF Letters each assert that these "[e]nhancements of fiscal accountability requirements are clearly necessary to mitigate fraudulent activity" without explaining why that is so or providing any substantiation at all for the vague allegations in the Letters. *Id.*

These CCDF Letters direct that each State's fiscal accountability requirements "must include submission of verified attendance documentation for subsidized child care services to the State prior to further draw down of federal CCDF funding." Ex. 1. That documentation must establish the days or hours of care provided; must contain "contemporaneous payment information"; and must be "sufficient for ACF to determine that the drawdown amount is reasonable, allowable, and allocable." *Id.* These CCDF Letters each refer throughout to additional, unspecified requirements and state that the freeze will last "until further notice, pending successful and satisfactory review of the requested information." *Id.*

Plaintiff State Minnesota received its own variation of the CCDF Letter a day before the other Plaintiff States, on January 5, 2026. Ex. 4-C. The substance and impact are substantially similar to the other CCDF Letters. However, because Minnesota had separately received some of

the boilerplate language regarding purported concerns regarding fraud, and data demands, its January 5, 2026 CCDF letter is styled as a set of directions explaining the restrictions imposed. *Id.*

E.    **TANF and SSBG Letters**

The TANF and SSBG letters likewise state that ACF is placing each Plaintiff State's program on a "restricted drawdown." Ex. 2 ("effective today"), Ex. 3, Ex. 5-B. These letters require even more data. First, these letters (except Minnesota's SSBG letter, which is detailed separately below) demand that each Plaintiff State "provide the complete universe of TANF [and SSBG] administrative data that exist and that are in the state's possession for all grantees, their recipients and subrecipients, for all available years and at least 2022 through 2025." Exs. 2, 3. This specifically "includes recipient name, address, Social Security Number (if collected), date of birth, A-number (as applicable), and any state identification numbers used for program administration." *Id.* Second, the letters specifically request "documentation demonstrating" that each Plaintiff State "has verified the eligibility" of all recipients under 8 U.S.C. § 1611's asserted "limitation" of eligibility "to United States citizens and qualified aliens." *Id.* Third, the letters request a "comprehensive list of all organizations, subcontractors, service providers, local agencies, community groups, and any other entities that received [TANF and SSBG] funds" from 2019 to 2025. Exs. 2, 3. The letters set a deadline of January 20, 2026, for Plaintiff States to provide the information requested. Ex. 2, 3.

Minnesota's TANF letter is identical to the other Plaintiff States'. Plaintiff State of Minnesota also received a SSBG Letter on January 6, 2026, but with slight variations. Minnesota had already received ACF's onerous demand for the same three categories of SSBG records on December 12, 2025. Ex. 5-A. Minnesota's January 6, 2026 SSBG's letter, like the other Plaintiff States' SSBG Letters, notified Minnesota that it would be unable to draw down SSBG funding and

would be on temporary restricted drawdown, pending Minnesota providing the same requested records. Ex. 5-B.

## ARGUMENT

The standard for a temporary restraining order is the same as the standard for a preliminary injunction. *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 n.1 (S.D.N.Y. 2016). The motion should be granted where the moving party establishes that: (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). When the government is a party, the last two factors merge. When the balance of equities tips decidedly toward the party requesting preliminary relief, "sufficiently serious questions going to the merits to make them a fair ground for litigation" are sufficient for preliminary relief even in the absence of likelihood of success. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010). All the preliminary relief factors overwhelmingly support granting a temporary restraining order here.[12]

---

[12] The Government has consistently asserted that the Tucker Act dictates that all manner of funding-related cases belong in the Court of Federal Claims. Plaintiffs anticipate that the Government may do the same here, no matter how inapposite the argument is, and so Plaintiffs have briefly addressed it here. Courts have repeatedly rejected this argument in cases where States have challenged overarching agency policies, including policies impacting funding (as opposed to specific contractual arguments related to specific grants). *See Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) (concluding that a "District Court was likely correct to conclude that it had jurisdiction to entertain an APA challenge" to a general guidance policy that was used as the basis for grant terminations, which should be litigated in the Court of Federal Claims); *Massachusetts v. Nat'l Institutes of Health*, No. 25-1343, 2026 WL 26059, at *5 (1st Cir. Jan. 5, 2026) (concluding that Justice Barrett's concurrence in *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, "plainly distinguishes between challenges to agency-wide policies, which belong in district court, and challenges to the withholding of *contractually* awarded funds that result from those policies," which belong in the Court of Federal Claims) (*emphasis added*); Mot. Order, *New York v. United States Dep't of Educ.*, No. 25-1424 (2d Cir. June 20, 2025), Dkt. 40.1 at 3 (rejecting a Tucker Act challenge to the court's jurisdiction to hear a case challenging agency action that prohibited states from spending down education funds in an expected window of time and concluding that

## I.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are highly likely to succeed in establishing that the ACF Funding Freeze violates the APA because it is in excess of statutory authority, contrary to law, and arbitrary and capricious. 5 U.S.C. § 706(2). The ACF Funding Freeze, as effectuated through the January 5 and 6 Letters, is final agency action subject to review under the APA, because it marks "the 'consummation'" of agency decision making, *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.* 333 U.S 103, 113 (1948)), and determines "'rights or obligations' . . . from which 'legal consequences'" flowed. *Id. at 178* (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). ACF has been clear that it has *already* implemented the Funding Freeze, which was "effective immediately." Ex. 2.[13]

### A.    The ACF Funding Freeze Is In Excess of Statutory Authority and Contrary to Law.

Defendants have acted outside of their statutory authority and contrary to law because they have failed to follow the statutory directives that govern the formula funding streams at issue and prescribe how alleged noncompliance is remedied.

"[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986). Particularly in the context of government funding, it is clear that "the President must follow statutory mandates so long as there is appropriated money available[.]" *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (emphasis omitted); *accord, e.g.*, *City & Cnty. of San Francisco*, 897 F.3d at 1232 ("[T]he

---

Plaintiffs' claims pertained to the "Government's exercise of its *regulatory* authority . . . not a *contractual* duty to pay money to the States") (citation omitted and emphasis in original). The same is true here.

[13] *See also* HHS Freezes Child Care and Family Assistance Grants in Five States (Jan. 6, 2026), https://acf.gov/media/press/2026/hhs-freezes-child-care-and-family-assistance-grants-five-states.

President is without authority to thwart congressional will by canceling appropriations passed by Congress."); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes[.]"). Further, as another federal court held when ruling on a similar funding freeze, Defendants cannot withhold funding streams contrary to statute because of the President's policy disagreements with the states where "Congress did *not* tie" those funds "to compliance with the President's policy priorities[.]" *New York v. Trump*, 769 F. Supp. 3d 119, 140 (D.R.I. 2025), *enforced*, 777 F. Supp. 3d 112 (D.R.I. 2025), *reconsideration denied*, No. 1:25-CV-39-JJM-PAS, 2025 WL 1098966 (D.R.I. Apr. 14, 2025), and *appeal dismissed*, No. 25-8010, 2025 WL 2523574 (1st Cir. May 12, 2025) (emphasis added).

But that is exactly what ACF has done here. Congress has made specific appropriations for these three programs and requires ACF to issue funds to states via formulas set by statute. None of these appropriations permit Defendants to simply stop funding these mandatory programs in order to engage in any non-statutory review. The applicable statutes provide certain enforcement tools to Defendants and require them to engage in certain processes before they penalize States for alleged noncompliance. Defendants cannot just pull the plug on funding based on a whim without even attempting to use any of those tools or following any of the statutorily required processes.

Specifically, CCDF funds are allocated and paid via formulas set by statute. *See* 42 U.S.C. §§ 618, 9858h, and 9858m. In FY 2024, Congress appropriated $8,746,387,000 to this program, which has been extended via two continuing resolutions. *See* Pub. L. No. 118-47, 138 Stat. 665; Pub. L. No. 119-37, 139 Stat. 495-98. TANF funds are allocated according to a mandatory formula. 42 U.S.C. § 603(a)(1)(B). In FY 2024, Congress appropriated $1.7 billion for SSBG, which was continued for FY 2025 and 2026. Pub. L. No.118-47, 138 Stat. 665, Pub. L. No. 118-83, 138 Stat.

1533; Pub. L. No. 119-37, 139 Stat. 497. And Congress has provided that SSBG funds must be allocated based on each State's percentage of the national population, based on census data. 42 U.S.C. § 1397b(b). Nor is payment optional. 42 U.S.C. § 1397a provides that "[e]ach State shall be entitled to payment under this division for each fiscal year in an amount equal to its allotment," and that "[t]he Secretary shall make payments . . . to each State[.]"

But the ACF Funding Freeze violates more than those appropriations statutes. None of the statutes that govern the ACF Funds permit Defendants to immediately and categorically freeze the ACF Funds to address purported fraud that is alleged but unsubstantiated. To start, ACF did not make any actual finding that any Plaintiff State has expended any funds in violation of the law— a prerequisite to the imposition of penalties under each of the programs. *See* 42 U.S.C. § 9858g(b)(2)(A)-(B) (CCDF); 42 U.S.C. § 609(a) (TANF); 42 U.S.C. § 1397e(b) (SSBG). Rather, in its boilerplate introduction to the letters, ACF references only unspecified "concern[]" about "potential" fraud, without presenting evidence that would substantiate such concern. This is true even of the letters to Plaintiff State Minnesota. *See* Ex. 4-A, 4-B, 5-A. (referencing "allegations" and "concerns" of "perceived fraud"). No statute or regulation allows ACF to impose penalties against Plaintiff States based on unidentified and unsubstantiated concerns.

In addition, Defendants have pointed to nothing in any of the programs' statutes that would authorize ACF to cut off the *entire* stream of funding to a state, as they have done here, rather than impose more limited penalties pegged to the magnitude of noncompliant expenditures.

Moreover, each of these programs' statutes requires that ACF follow specific procedures before imposing any penalty against states for noncompliance. *See* Compl. ¶¶ 84-122 (detailing statutory and regulatory requirements). ACF took *none* of the many steps that it was required to take. For example, it did not provide the requisite written notice in advance of cutting off funds.

11

42 U.S.C. § 9858g(b)(2)(A)-(C) (CCDF); 42 U.S.C. §§ 609(c)(1)(A), 610(a); 45 C.F.R. §§ 262.4(a), 262.7(a) (TANF); 45 C.F.R. § 96.51(a) (SSBG). The agency did not provide complaints, if any were made, to states. 45 C.F.R. § 98.93(c) (CCDF); 45 C.F.R. § 96.50(c) (SSBG). It did not provide the opportunity for states to submit comments in response to the notice or the complaints and (of course) did not consider the comments it failed to solicit. 45 C.F.R. §§ 98.90(b); 98.93(c) (CCDF); 45 C.F.R. § 96.50(c) (SSBG). It did not allow states to submit any corrective action plan. 42 U.S.C. § 609(c)(1)(A)-(B) (TANF). It did not provide the opportunity for states to request reconsideration, appear at a hearing, or make an administrative appeal. 42 U.S.C. § 9858g(b)(2) (CCDF); 42 U.S.C. § 610(b)(1) (TANF); 45 C.F.R. §§ 96.51(a), 96.52 (SSBG).

The TANF Letter is the only one of the boilerplate letters that cites *any* purported source of authority for the freeze, but the OMB regulation it cites (2 C.F.R. § 200.339, which allows withholding of funds under certain circumstances) does not and cannot supersede the processes and limits set forth by Congress in enacting TANF. *See Am. Ass'n of Univ. Professors v. Trump*, No. 25-CV-07864-RFL, 2025 WL 3187762, at *28 (N.D. Cal. Nov. 14, 2025) (2 C.F.R. § 200.339 does "not give Defendants a blank check to ignore . . . the statutory commands imposed by Congress."); *Partners in Nutrition*, 995 N.W.2d 631, 644 (Minn. Ct. App. 2023) (2 C.F.R. § 200.339 does not supersede program-specific regulations). Moreover, even if it applied, the OMB regulation comes with its *own* set of procedural requirements that ACF would have been obligated to follow but did not.[14] And the Minnesota-specific CCDF Letters cites various provisions of the CCDF regulations, *see* Ex. 4-B, 4-C, but none of these provisions remotely authorize this action, instead reiterating that "[t]he CCDF *is* available" to states "subject to the availability of

---

[14] *See* 2 C.F.R. § 200.339 (requiring that a federal agency first determine that noncompliance "cannot be remedied by imposing specific conditions"); 2 C.F.R. § 200.342 (requiring federal agency to provide recipient with "opportunity to object and provide information" to challenge imposition of any remedy); *see also Porwancher v. Nat'l Endowment for the Humanities*, 792 F. Supp. 3d 107, 114 (D.D.C. 2025).

appropriations[.]" 45 C.F.R. § 98.60 (emphasis added); *see also* 45 C.F.R. §§ 98.65, 98.67, 98.92, and 262.1 (other cited regulations, none of which authorize a funding freeze).

And to the extent the statutory schemes provide for the collection of data to substantiate any purported noncompliance—that collection is, as would be natural, supposed to happen *before* remedial action is taken. And, in any event, Defendants have failed to set forth any legal basis that would justify their impossible demand for the "complete universe" of States' data rather than a request for specific data relevant to some specific allegation. Even though each program's statutes and regulations set forth a number of mechanisms for ACF to use to monitor States' compliance with program requirements, ACF ignored these mechanisms and the information sharing provisions they contain.

Taking the TANF and SSBG letters first, ACF demanded a breathtakingly wide set of data, including "the complete universe of [program] administrative data that exist and are in the state's possession for all recipients for all available years." Exs. 2, 3. This includes a broad swath of personally identifiable information: each recipient's "name, address, Social Security Number (if collected), date of birth, A-number (as applicable), and any state identification numbers used for program administration." *Id.* The only purported source of legal support ACF offers for the SSBG and TANF demands is in the TANF Letter, but the cited regulation (45 C.F.R. § 98.90) does not relate to the TANF program at all and, in any event, requires procedures that ACF did not follow.

The CCDF letter similarly fails to provide a legal basis for the sweeping data Defendants request. There, ACF insists that Plaintiff States must provide onerous documentation of each expense pursuant to 45 C.F.R. § 98.67(c), which requires States to have "[f]iscal control and accounting procedures . . . sufficient to permit . . . [t]he tracing of funds to a level of expenditure adequate to establish that such funds have not been used in violation of the provisions of this part."

But this regulation in no way authorizes Defendants' demand. It provides that States—*not* ACF—"expend and account for CCDF funds in accordance with their *own* laws and procedures for expending and accounting for their *own* funds." 45 C.F.R. § 98.67(a) (emphasis added). It is also difficult to square ACF's demanded documentation—which requires States to provide documentation of childcare offered and contemporaneous payment—with 45 C.F.R. § 98.45(m)(1), which requires provider payment "in advance of or at the beginning of" the delivery of service.[15]

In short, based on some unsubstantiated claims of the speculative and vague possibility of fraud, ACF forewent the prescribed administrative process and instead demanded personally identifying information for millions of Americans be provided within two weeks without even asserting any plausible legal basis for doing so and without acknowledging any limits on the use of that data or any privacy protections. That is straightforwardly unlawful.

Finally, Defendants have taken this action notwithstanding that they have already approved Plaintiff States' plans for implementing each program, violating the statutes relating to those plans. *See* 42 U.S.C. § 9858c (CCDF); 42 U.S.C. § 602(a) (TANF).

For these reasons, Defendants have violated the APA because they have acted outside of their authority, contrary to law, and *ultra vires*.

### B.    The ACF Funding Freeze is Arbitrary and Capricious

The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious "if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*,

---

[15] On January 5, 2026, ACF issued a Notice of Proposed Rulemaking that would repeal 45 C.F.R. § 98.45(m)(1), but it is currently in effect. *See* 91 Fed. Reg. 207, 208-09 (Jan. 5, 2026).

592 U.S. 414, 423 (2021)). The Court cannot "substitute its judgment for that of the agency," but it "must ensure" that the agency has "offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id*. (cleaned up). Furthermore, an agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or ignores "'serious reliance interests[.]'" *Dep't of Homeland Sec. v. Regents of the Univ. of Californi*a, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)).

Here, Defendants' decision to abruptly freeze billions of dollars was not reasonable, as the January 5 and 6 letters reveal. Those letters contain no evidence of any alleged fraud nor any explanation for why such allegations require an immediate and complete funding freeze across five States. Furthermore, the Administration's public statements reveal the actual basis for the action here—partisan animus towards Plaintiff States' elected leaders. Finally, the abrupt and significant nature of the ACF Funding Freeze shows Defendants simply ignored Plaintiff States' reliance on funding intended to support children and families.

### 1. Defendants acted without analyzing any evidence.

An agency must "examine[] 'the relevant data'" when making a reasoned decision. *Dep't of Commerce. v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm.*, 463 U.S. at 43), and when an agency acts without any examination of any evidence, its decision is arbitrary and capricious. *Id*.; *State Farm*, 463 U.S. at 43. Review of an agency's examination of the factual record is limited to the "grounds that the agency invoked when it took the action." *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

Here, Defendants neglected to analyze any data or evidence of any kind in the January 5 and 6 letters. In many of the letters, they simply state, without any factual support, that they are

"concerned" that there is the "potential" for fraud in ACF programs, based on unspecified "federal prosecutions and additional allegations." Exs. 1-3. They cite no evidence nor any "reason to believe" that any state is "illicitly providing illegal aliens" with any ACF Funds. *Id*. They do not identify a *single dollar* that has gone to any Plaintiff State that has purportedly been used fraudulently. *Id*. And tellingly, Defendants sought data and evidence only *after* imposing the Freeze. Defendants have it backwards: the APA requires them to consider the evidence *before* acting. Defendants' request for voluminous records from the Plaintiff States confirms this is merely a partisan fishing expedition, unsupported by any facts. Defendants cannot freeze billions of dollars in funding, hoping to one day stumble across evidence of fraud *post hoc. Regents*, 591 U.S. at 22-23; *see also New York v. Noem*, No. 25-cv-8106, 2025 WL 2939119, at *8-10 (S.D.N.Y. Oct. 16, 2025) (holding that DHS acted arbitrarily and capriciously when it zeroed out funding for a state agency because DHS failed to give a reasonable, contemporaneous, statutorily authorized basis for its decision). The fact that Defendants sent thirteen letters with an identical purported justification underscores that Defendants have not identified any specific facts that would support allegations of fraud or noncompliance as to any specific Plaintiff State or any specific federal funding stream. Defendants' actions, taken without any evidentiary basis, are arbitrary and capricious.

### 2. Defendants' remedy—an indefinite, across-the-board funding freeze— lacks any rational connection to the purported problem.

Even if Defendants had cited concrete instances of specific fraud within the Plaintiff States in the ACF Programs—which they have not—they do not explain why such instances of fraud by individual bad actors targeting ACF programs would require the dramatic and extreme action of freezing all of the ACF Funds across the entirety of the Plaintiff States. This lack of explanation about the drastic choice they made renders their decision disproportionate and arbitrary and

capricious, as multiple courts have recognized in similar circumstances. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 124 (D.D.C. 2025) ("Evaluating funding priorities can be done without needing to starve citizens or deny critical health services."); *New York v. Trump*, 769 F. Supp. 3d 119, 141 (D.R.I. 2025) ("the Defendants have not proffered a rational reason for how their alleged goal of safeguarding taxpayer funds justified a de facto suspension of nearly all federal funding"); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025)*; see also Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019). The implication of Defendants' position is astounding: any alleged fraud, no matter how small or idiosyncratic, would authorize them to categorically freeze billions of dollars needed for critical programs while Defendants investigate such fraud. The APA prohibits such arbitrary action. In any case, each at-issue program is *already governed* by robust fraud prevention mechanisms, detailed in statutes and regulations. Defendants have utterly failed to explain why these preexisting mechanisms are insufficient and why they must be supplanted with a "freeze first, ask questions later" approach.

### 3.    Defendants impermissibly relied on an extra-statutory and arbitrary factor when targeting the Plaintiff States.

While the January 5 and 6 letters do little to explain why the Plaintiff States have been selected for such a draconian funding freeze, the administration's statements make clear that this decision was based solely on partisan animosity towards Plaintiff States and their leadership. The APA forecloses such reliance on a "factor[] which Congress has not intended [them] to consider," *State Farm*, 463 U.S. at 43.

The administration has not shied away from explaining why the Plaintiff States were targeted. Through interviews, internet posts, and press releases, the administration has announced its intent to first use the pretextual concern regarding fraud to dismantle programs within

Minnesota and in other states with Democratic elected officials. The administration has frozen funds only for five Democratic states, despite failing to cite any relevant facts specific to these states or citing any evidence at all of any fraud or noncompliance with law. The only fact the administration itself has highlighted is that the Plaintiff States are led by Democratic officials. When discussing piracy in Somalia during a press gaggle, President Trump stated "[b]ut think of it, $19 billion, at least, they [Somali-Americans] have stolen from Minnesota and from the United States . . . . And we're not going to pay it anymore. We're going to have [Governor] Walz go pay. We're not going to pay them, and we're not going to pay California, and we're not going to pay Illinois with a big slob of a governor that they have."[16] Trump later confirmed online his intent to retaliate against "Governor Gavin Newscum [sic], JB Pritzker, and Kathy Hochul" based on allegations of fraud in another state, Minnesota.[17] An HHS spokesperson confirmed that the funding cuts were intended to hit "Democrat-led states and Governors." [18] Subsequently, the administration implemented the freeze on the states identified by President Trump, as well as Colorado, which President Trump has previously targeted for political retribution. Meanwhile, other Republican-led states have apparently been passed over, including Mississippi, for example, which recently received national attention for a $77 million dollar fraud scheme involving TANF in which even state employees have been charged as co-conspirators.[19] The Trump administration has been abundantly clear: it is targeting the Plaintiff States because of the political affiliations of their governors, and nothing more.

---

[16] https://www.youtube.com/watch?v=9XVjd3R2T3g&t=1157s.
[17] https://truthsocial.com/@realDonaldTrump/posts/115844083693194821.
[18] Adora Brown & Raymond Fernandez, Trump Admin. to Freeze $10B in Social Programs to New York and Other Dem States, THE CITY (Jan. 6, 2026), available at:
https://www.thecity.nyc/2026/01/06/trump-cuts-funding-social-welfare-child-care/.
[19] Madison Colombo, Mississippi Auditor Warns Welfare Fraud is "Incredibly Easy" as $77M Trial Begins, Fox News (Jan. 6, 2026), available at https://www.foxnews.com/media/mississippi-auditor-warns-welfare-fraud-incredibly-easy-77m-trial-begins.

When facing "an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process" a court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (citation omitted). The record shows Defendants' allegations of fraud are merely "contrived reasons," *id.*, intended to cover up Defendants' impermissible reliance on political animus. Such reliance on extra-statutory, political factors further violates the APA. *See, e.g.*, *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 64–65 (D.D.C. 2019) (concluding at pleading stage, that "plausible inference that political pressure may have caused the agency to take action it was not otherwise planning to take" is adequate to sustain an arbitrary and capricious claim when the agency provided only "vague, cursory reasoning" for its action); *Aera Energy LLC v. Salazar*, 642 F.3d 212, 220 (D.C. Cir. 2011) (evaluating whether an "agency successfully insulated its final decisionmaker from the effects of political pressure").

### 4. Defendants completely disregarded substantial reliance interests, jeopardizing State's ability to support its most vulnerable residents.

The ACF Funding Freeze is also arbitrary and capricious because defendants "failed to address whether there was legitimate reliance on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30. As the Supreme Court has explained, "[w]hen an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 30, 33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id.* at 30.

Plaintiff States will suffer immense consequences from an immediate and indefinite funding freeze. Plaintiff States rely on the ACF Funds to support child care for low-income families, allowing parents to work and contribute to the local economy. A complete freeze of such

payments would have calamitous effects in the Plaintiff States and would substantially impact state budgets.

This reliance was foreseeable and reasonable. The Plaintiff States are entitled to count on the ACF Funds. Congress made them *mandatory* programs, and in reliance on that mandate, the Plaintiff States have submitted detailed plans to ACF outlining the ways in which they intend to use those funds. Furthermore, these programs function on a reimbursement basis by which Plaintiff States make expenditures in reliance on the fact they can later draw down funds. Finally, Plaintiff States are entitled to rely on the robust procedures and processes in place for adjudicating any disputes of misuse of program funds, which provide for notice of the alleged fraud, an opportunity to contest the allegation, and an opportunity to appeal. *Supra* 11-12. Plaintiff States had no reasonable basis to expect one day that the government would spontaneously freeze all funding.

Rather than reckon with these reliance interests as the APA requires, Defendants simply ignored them. *Regents*, 591 U.S. at 30. Defendants provided no rationale for freezing the funds on which Plaintiff States rely. Because Defendants imposed the ACF Funding Freeze "with no regard for the [States'] reliance interests," and Defendants "did not acknowledge—much less justify"—the Funding Freeze's deleterious effects, the agency decision is arbitrary and capricious. *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023).

## II.    The Equities Compel Emergency Relief

### A.    Emergency Relief Is Needed to Avert Irreparable Harm, and the Court has the Authority to Preserve the Status Quo

Defendants' unilateral and immediate freeze of ACF Funds will cause irreparable harm to Plaintiffs in the administration and provision of these programs which support the most vulnerable children and their families in Plaintiff States. If the funds are cut, these programs will cease operations. Even a very temporary disruption will constrain Plaintiffs' ability to administer life-

saving benefits programs and deliver crucial social services to their most vulnerable families. Additionally, any freeze will impose significant operational challenges on state agencies and make it nearly impossible to manage their budgets and plan for the future.

"To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). Plaintiffs need only show that there is a "'threat of irreparable harm, not that irreparable harm already [has] occurred.'" *New York v. Trump*, 767 F. Supp. 3d 44, 83 (S.D.N.Y.) (quoting *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010)), *opinion modified on denial of reconsideration,* 778 F. Supp. 3d 578 (S.D.N.Y. 2025), *and modified,* 784 F. Supp. 3d 619 (S.D.N.Y. 2025). In other words, the "increased 'risk' of negative consequences is sufficient to meet the irreparable harm requirement for a preliminary injunction." *Id.* (citations omitted). Plaintiff States have demonstrated this injury through harm to agencies that administer these programs and harms to state services as a whole.

*First*, Plaintiffs will not be able to cover the massive shortfall caused by the ACF freeze, resulting in near-term impacts to the agencies that administer these programs (not to mention the numerous providers for these programs and the families that rely on them). *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (irreparable harm established where absence of preliminary injunction will result in "significant change in [] programs and a concomitant loss of funding"). Some of these funds are drawn down on a frequent basis. In New York, for instance, some childcare funds are drawn down every 24-48 hours. Additionally, because Plaintiff States seek reimbursement *after* they have spent funds, even if they cease operating these programs

immediately, they will still be in a financial hole. For example, Plaintiff State New York paid $106 million throughout the State in December for TANF-related expenses. It submitted the drawdown request for reimbursement of those expenses, which is typically processed in 24-48 hours, on January 5, 2026, but as of the date of filing, that request is still "pending review." This creates operational and budgetary uncertainty, making administration and basic planning for the future nearly impossible. Plaintiff States have a "need for certainty," and in the face of a "catastrophic" loss of funding, this too constitutes irreparable harm. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

*Second*, with the potential termination of child care and other support systems for tens and hundreds of thousands of families in each state, Plaintiffs expect that participants will seek answers and support from state agencies, causing further strain on Plaintiffs' ability to provide services. *See California v. Trump*, 786 F. Supp. 3d 359, 391 (D. Mass. 2025) (finding that states' diversion of resources "from other key projects" constitutes irreparable harm); *see also East Bay Covenant*, 993 F.3d at 677 (acknowledging that "economic harm can be considered irreparable" in APA cases).

*Third*, State agencies also risk damage to their reputations from the impending cut back and/or cessation of services. *See ExpertConnect, LLC v. Parmar*, 773 F. App'x 651, 653 (2d Cir. 2019) (affirming grant of preliminary injunction based on harm to "good will and reputation"); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1264 (10th Cir. 2016) (governor's directive to withhold funding to health services provider would irreparably harm provider's reputation). State agencies are the public face of these services, and the ACF Funding Freeze generates the public perception that state agencies have failed or engaged in wrongdoing, thereby damaging their reputation and damaging the trust that State agencies have spent years building up.

Indeed, the very reason Defendants assert for the ACF Funding Freeze is uncorroborated concerns of "extensive and systemic fraud." Allowing the ACF Funding Freeze to proceed will only give credence to these unfounded accusations. Moreover, this reputational harm will result in the erosion of trust among benefits recipients and chill participation in ACF-funded benefits programs. This, too, is irreparable harm. *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (concluding that a "chilling effect on non-citizen use of public benefits" is irreparable harm).

*Finally*, removing the safety net for children and their families will irreparably harm the provision of other State services. Millions of households rely on these services to allow parents to work, to provide quality care to children, and to afford basic expenses. Cessation of services and programs for the neediest families in Plaintiff States will sow chaos not only for these families, but also for Plaintiffs as they look for funds to help these families based on their already-strained budgets.

These harms are detailed in six declarations filed contemporaneously with this motion.

## B.    The Balance of Equities and Public Interest Favor Emergency Relief

The equities and public interest also overwhelmingly favor preliminary relief. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance of equities and the public interest "merge when the Government is the opposing party.").

Plaintiff States have shown that the ACF Funding Freeze clearly violates the APA in numerous ways. This "extremely high likelihood of success on the merits" shows that preliminary relief "would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Indeed, there is a significant public interest in "having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (citation omitted).

Moreover, Plaintiff States have a substantial interest in the successful operation of their public services systems. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 38 (1905) ("The safety and the health of the people . . . are, in the first instance, for [the State] to guard and protect."). The ACF Funding Freeze will significantly impair the functioning of key social services and anti-poverty programs and initiatives by cutting off funds that Plaintiff States rely upon for child care subsidies, cash assistance, and social services programs, all of which are essential for low-income and vulnerable families, who do not have savings that would allow them to weather a funding freeze. Additionally, many non-profits that receive the ACF Funds for the provision for social services would likely to have to cease operations if the funding freeze is not ended, and this would have cascading consequences for Plaintiff States. As a result, the equities and public interest strongly favor preliminary relief.

In comparison, the federal government faces no "harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see also Planned Parenthood of N.Y.C., Inc., v. United States HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018). Indeed, there is a detailed process Defendants could have (and should have) followed before imposing any penalties such as the ACF Funding Freeze. *See, e.g.*, 42 U.S.C. § 9858g(b)(2)(A)-(B); 42 U.S.C. § 609(c)(1) (A)-(D); 42 U.S.C. § 1397e(b). Moreover, to the extent Defendants argue that they face harm because they will be forced to expend funds due to a temporary restraining order or stay that they cannot recoup, there is a statute, as well as regulations, that provide for the offset of future payments should any funds be ultimately disallowed. 45 C.F.R. §§ 98.65(d), 98.66(a), (h); 42 U.S.C. § 609(a)(1)(A).

24

**CONCLUSION**

For the foregoing reasons, Plaintiff States respectfully request that the Court enter a temporary restraining order and § 705 stay blocking any implementation of the ACF Funding Freeze, including implementation of the January 5 and 6 letters in their entirety, pending resolution of a forthcoming request for preliminary injunction.

Dated: January 8, 2026                    Respectfully submitted,

                                        **LETITIA JAMES**
                                        Attorney General for the State of New York

                                        By: */s/ Rabia Muqaddam*
                                        Rabia Muqaddam
                                        *Chief Counsel for Federal Initiatives*
                                        Jessica Ranucci
                                        Molly Thomas-Jensen
                                        *Special Counsel*
                                        28 Liberty St.
                                        New York, NY 10005
                                        (212) 416-8333
                                        rabia.muqaddam@ag.ny.gov
                                        jessica.ranucci@ag.ny.gov
                                        molly.thomas-jensen@ag.ny.gov

                                        *Attorneys for the State of New York*

**ROB BONTA**                           **PHILIP J. WEISER**
Attorney General for the State of California    Attorney General for the State of Colorado

By: */s/ Daniel C. Sheehan*             By: */s/ David Moskowitz*
Daniel C. Sheehan*                      David Moskowitz*
*Deputy Attorney General*               *Deputy Solicitor General*
Paul Stein*                             Nora Passamaneck
Christine Chuang                        *Senior Assistant Attorney General*
Nicholas R. Green*                      Colorado Department of Law
*Supervising Deputy Attorneys General*  1300 Broadway, #10
Jesse Basbaum*                          Denver, CO 80203
Alexis Piazza*                          (720) 508-6000
Harald Kirn*                            david.moskowitz@coag.gov
James Bowen*
*Deputy Attorneys General*              *Attorneys for the State of Colorado*

                                        25

California Department of Justice
300 South Spring Street, Los Angeles, CA
90013
(213) 269-6078
Daniel.Sheehan@doj.ca.gov

*Attorneys for the State of California*

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Vikas Didwania*
Vikas Didwania*
*Complex Litigation Counsel*
Sherief Gaber*
Michael Tresnowski*
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Vikas.Didwania@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Attorneys for the State of Illinois*

*Pro hac vice application forthcoming

**KEITH ELLISON**
Attorney General of the State of Minnesota
By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp*
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Attorneys for the State of Minnesota*

26

**CERTIFICATION**

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum of Law contains 7,964 words, calculated using Microsoft Word, which complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.


Dates: New York, New York

January 8, 2026


By: */s/ Jessica Ranucci*
Jessica Ranucci
*Special Counsel*
*Attorney for the State of New York*