# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK; STATE OF
CALIFORNIA; STATE OF COLORADO; STATE
OF ILLINOIS; and STATE OF MINNESOTA,

      Plaintiffs,

v.

ADMINISTRATION FOR CHILDREN AND
FAMILIES; ALEX J. ADAMS, in his official
capacity as the ASSISTANT SECRETARY OF THE
ADMINISTRATION FOR CHILDREN AND
FAMILIES; U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; and ROBERT F.
KENNEDY, JR., in his official capacity as the
SECRETARY OF THE U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

      Defendants.

Case No. 26-cv-00172

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION AND § 705 STAY

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    A.   Defendants' Escalating Threats Against Plaintiff States ................................ 2

    B.   The ACF Funding Freeze and January 5 and 6 Letters ................................. 4

    C.   Impact of the ACF Funding Freeze on Plaintiff States................................. 6

         1.   Impact on Plaintiff States from the CCDF Freeze................................. 7

         2.   Impact on Plaintiff States from the TANF Freeze ................................. 9

         3.   Impact on Plaintiff States from the SSBG Freeze ............................... 11

         4.   Impact on Plaintiff States from the Data Demands ............................... 13

    D.   Procedural History....................................................................................... 14

ARGUMENT ...................................................................................................... 15

    I.   Plaintiffs Are Likely to Succeed on the Merits ..................................... 15

        A.   The ACF Funding Freeze Is In Excess of Statutory Authority and Contrary to Law............................................................................................ 15

        B.   The ACF Funding Freeze is Arbitrary and Capricious ................................ 21

            1.   Defendants acted without analyzing any evidence................................ 22

            2.   Defendants' remedy—an indefinite, across-the-board funding freeze— lacks any rational connection to the purported problem. ....................... 23

            3.   Defendants impermissibly relied on an extra-statutory and arbitrary factor when targeting Plaintiff States................................................................ 23

            4.   Defendants completely disregarded substantial reliance interests, jeopardizing States' ability to support their most vulnerable residents... 25

        C.   Plaintiffs Are Likely to Succeed on Their Constitutional Claims. ............... 26

        D.   Defendants' Anticipated Threshold Defenses Are Meritless........................ 28

            1.   This Court Has Jurisdiction.................................................................. 29

            2.   The ACF Funding Freeze Is Final Agency Action. .............................. 30

    II.   The Equities Compel a Preliminary Injunction .................................... 31

        A.   Relief Is Needed to Avert Irreparable Harm.............................................. 31

        B.   The Balance of Equities and Public Interest Favor Emergency Relief ......... 34

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aera Energy LLC v. Salazar*,
 642 F.3d 212 (D.C. Cir. 2011) ............................................................................24

*Afr. Communities Together v. Lyons*,
 799 F. Supp. 3d 362 (S.D.N.Y. 2025) ................................................................15

*Am. Ass'n of Univ. Professors v. Trump*,
 No. 25-CV-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ...............20

*Appalachian Power Co. v. EPA*,
 208 F.3d 1015 (D.C. Cir. 2000) ..........................................................................31

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
 548 U.S. 291 (2006) ............................................................................................28

*Biden v. Texas*,
 597 U.S. 785 (2022) ............................................................................................30

*California v. Trump*,
 786 F. Supp. 3d 359 (D. Mass. 2025) .................................................................32

*California v. U.S. Dep't of Transp.*,
 No. 25-cv-208, 2025 WL 3072541 (D.R.I. Nov. 4, 2025) ....................................29

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
 598 F.3d 30 (2d Cir. 2010) ..................................................................................15

*City of Arlington v. FCC*,
 569 U.S. 290 (2013) ............................................................................................15

*City of Providence v. Barr*,
 954 F.3d 23 (1st Cir. 2020) .................................................................................26

*City of Saint Paul v. Wright*,
 No. 25-cv-03899, 2026 WL 88193 (D.D.C. Jan. 12, 2026) .................................25

*Clinton v. City of New York*,
 524 U.S. 417 (1998) ............................................................................................26

*Commonwealth v. Sebelius*,
    674 F.3d 139 (3d Cir. 2012)................................................................20

*Connecticut v. U.S. Dep't of the Interior*,
    363 F. Supp. 3d 45 (D.D.C. 2019) ........................................................24

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)........................................................ 21, 23-24, 31

*Dep't of Homeland Sec. v. Regents*,
    591 U.S. 1 (2020)................................................................. 22, 25-26

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ........................................................ 32-33

*ExpertConnect, LLC v. Parmar*,
    773 F. App'x 651 (2d Cir. 2019) ..........................................................33

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)..............................................................31

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ....................................................... 26-27

*Int'l Org. of Masters, Mates & Pilots v. NLRB*,
    61 F.4th 169 (D.C. Cir. 2023)............................................................26

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)..............................................................34

*Level the Playing Field v. Fed. Election Comm'n*,
    961 F.3d 462 (D.C. Cir. 2020)............................................................25

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)......................................................................18

*M.F. v. Dep't of Hum. Servs., Div. of Fam. Dev.*,
    395 N.J. Super. 18, 928 A.2d 71 (N.J. Sup. Ct. App. Div. 2007)..........................20

*Massachusetts v. Trump*,
    790 F. Supp. 3d 8 (D. Mass. 2025) ......................................................30

*Metro. Transportation Auth. v. Duffy*,
    784 F. Supp. 3d 624 (S.D.N.Y. 2025)....................................................15

*Michigan v. E.P.A.*,
    576 U.S. 743 (2015)......................................................................................................21

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...............................................................................................21, 23

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
    775 F. Supp. 3d 100 (D.D.C. 2025).............................................................................22

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)......................................................................................................28

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025)..................................................................................................29

*New York v. Nat'l Highway Traffic Safety Admin.*,
    974 F.3d 87 (2d Cir. 2020)...........................................................................................16

*New York v. Noem*,
    No. 25-cv-8106, 2025 WL 2939119 (S.D.N.Y. Oct. 16, 2025)....................................22

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025)..........................................................................................30

*New York v. Trump*,
    767 F. Supp. 3d 44 (S.D.N.Y. 2025)....................................................................... 31-32

*New York v. Trump*,
    769 F. Supp. 3d 119 (D.R.I. 2025)...............................................................18, 23, 27

*New York v. U.S. Dep't of Educ.*,
    No. 25-1424 (2d Cir. June 20, 2025) ...........................................................................29

*New York v. U.S. Dep't of Health & Human Servs.*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019).........................................................................28

*New York v. U.S. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020)......................................................................................33, 35

*New York v. U.S. Dep't of Justice*,
    No. 1:25-CV-00345, 2025 WL 2618023 (D.R.I. Sept. 10, 2025) .................................28

*Nken v. Holder*,
    556 U.S. 418 (2009)......................................................................................................34

*Office of Pers. Mgmt. v. Richmond*,
496 U.S. 414 (1990)................................................................................27

*Ohio v. EPA*,
603 U.S. 279 (2024)................................................................................21

*Paskar v. U.S. Dep't of Transp.*,
714 F.3d 90 (2d Cir. 2013)......................................................................30

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)....................................................................................28

*Planned Parenthood Ass'n of Utah v. Herbert*,
828 F.3d 1245 (10th Cir. 2016) ..............................................................33

*Planned Parenthood of N.Y.C., Inc., v. U.S. Dep't of Health and Human Servs.*,
337 F. Supp. 3d 308 (S.D.N.Y. 2018)....................................................35

*Porwancher v. Nat'l Endowment for the Humans.*,
792 F. Supp. 3d 107 (D.D.C. 2025) ........................................................21

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) ..........................................................35

*South Dakota v. Dole*,
483 U.S. 203 (1987)................................................................................27

*State of California v. U.S. Dept. of Health and Human Servs.*,
3:25-cv-05536 (N.D. Cal. Dec. 4, 2025) ................................................34

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)................................................................................30

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................................................................................14

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
778 F. Supp. 3d 440 (D.R.I. 2025).....................................................23, 29

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)................................................................................26

**Constitutions**

U.S. Const.
    art. I, § 8, cl. 1 .................................................................................26
    art. I, § 9, cl. 7 .................................................................................26

U.S. Constitution .................................................................................30

**Federal Statutes**

5 U.S.C.
    § 552 ...............................................................................................19
    § 701 ...............................................................................................31
    § 705 ...................................................................................1, 15, 35
    § 706 ...............................................................................................21

8 U.S.C.
    § 1611 ...............................................................................................6

28 U.S.C.
    § 1491 .............................................................................................29

42 U.S.C.
    § 602 ...............................................................................................16
    § 603 ...........................................................................................9, 18
    § 609 ..................................................................................15-17, 35
    § 610 ...............................................................................................16
    § 611 .........................................................................................18, 19
    § 617 ...............................................................................................20
    § 618 ......................................................................................7, 17-18
    § 652 .................................................................................................8
    §1397 ..............................................................................................11
    § 1397a ......................................................................................11, 17
    § 1397b ......................................................................................11, 18
    § 1397e .......................................................................................16-18
    § 9857 ...............................................................................................7
    § 9858c ...........................................................................................16
    § 9858g .....................................................................................15-17
    § 9858h ...........................................................................................18
    § 9858i ............................................................................................18
    § 9858m ..........................................................................................18

**State Statutes**

Cal. Welf. & Inst. Code
    § 10850(a) .................................................................................................34

Colo. Rev. Stat. Ann.
    § 26-1-114 ................................................................................................34

Ill. Comp. Stat.
    § 5/11-9 ....................................................................................................34

N.Y. Soc. Serv. Law
    § 21(3) ......................................................................................................34

**Federal Regulations**

2 C.F.R.
    § 200.101 ..................................................................................................20
    § 200.339 ..................................................................................................20
    § 200.342 ..................................................................................................21
    § 300.106 ..................................................................................................20

45 C.F.R.
    § 96.50 ......................................................................................................16
    § 96.51 ..................................................................................................15-16
    § 96.52 ......................................................................................................16
    § 98.45 ......................................................................................................19
    § 98.65 ......................................................................................................35
    § 98.66 ......................................................................................................35
    § 98.67 ......................................................................................................19
    § 98.90 ................................................................................................16, 19
    § 98.93 ......................................................................................................16
    § 262.4 ......................................................................................................15
    § 262.7(a) .................................................................................................15

90 Fed. Reg. 13681 (Mar. 25, 2025) ................................................................34

91 Fed. Reg. 207, 208-09 (Jan. 5, 2026) .........................................................19

## INTRODUCTION

Recognizing that States needed federal support to better serve vulnerable children and families in their communities, Congress enacted three critical and *mandatory* programs that are the subject of this case: the Child Care and Development Fund (CCDF); Temporary Assistance for Needy Families (TANF); and the Social Services Block Grant (SSBG) (together, the "ACF Funds"). The importance of ACF-funded programs to Plaintiff States cannot be overstated—they provide cash assistance and life-saving services for low-income and vulnerable children and families and individuals with disabilities. Without federal funding flowing to these programs, there will be immediate and devastating impacts in Plaintiff States.

Despite Congress's mandates, and in the face of such extraordinary harm, Defendants announced on January 6, 2026, that they were immediately and categorically freezing $10 billion in ACF Funds to the five Plaintiff States, and only to those states (the "ACF Funding Freeze"). Defendants asserted, without explanation or evidence, that this Freeze was based on a "concern" about "potential" fraud. But Defendants provided no colorable legal justification for the Freeze. Plaintiffs filed this action two days later. The day after that, the Part I Court issued a temporary restraining order prohibiting Defendants from enforcing the ACF Funding Freeze for fourteen days in order to allow the Court to adjudicate Plaintiffs' Preliminary Injunction Motion.

Plaintiff States now respectfully request that the Court enter a preliminary injunction and 5 U.S.C. § 705 stay blocking any implementation of the ACF Funding Freeze, including implementation of Defendants' letters imposing the Freeze (the "January 5 and 6 Letters") in their entirety. The Funding Freeze should be enjoined because it is unlawful many times over. Congress has created statutory schemes that constrain the Executive Branch in how it can identify and sanction noncompliance or fraud by recipients of the ACF Funds, but Defendants have taken none of the steps required by these statutory processes and, in any event, no law authorizes a freeze of

1

the entirety of a state's funds. Defendants have also acted arbitrarily, as evidenced by Defendants' own statements, which confirm that their stated rationale for the Funding Freeze—combatting "potential" fraud—is merely pretext for unlawfully punishing the five Plaintiff States because of their political leadership and policies. Further, Defendants' Funding Freeze seeks to coerce Plaintiff States to turn over "the complete universe" of documents related to their use of billions of dollars of ACF Funds, including the personally identifiable information of millions of their residents, within two weeks. This is an impossible demand on an impossible timeline, offered only as pretext to maintain the Freeze against Plaintiff States and find a post hoc rationalization for the Freeze itself. Finally, Plaintiff States and the public interest face enormous irreparable harm if the Freeze is permitted to go into effect, as the Freeze would immediately jeopardize Plaintiff States' ability to operate programs supporting the wellbeing of millions of children and families.

## BACKGROUND

### A.    Defendants' Escalating Threats Against Plaintiff States

Beginning in late November 2025, the Trump Administration began drawing attention to a COVID-19 era fraud scheme that had previously been investigated and prosecuted in Minnesota.[1] Even though a Minnesota state agency was the entity to identify the fraud and referred it to federal officials and cooperated fully in the prosecution, President Trump and others within the

---

[1] This action, referred to as the "Feeding our Future" fraud, involved fraud perpetrated between 2020 and early 2022 in a USDA-funded child nutrition program. The Minnesota Department of Education (the state agency administering the USDA funds) identified the fraud, attempted to halt payments to Feeding our Future sites, and affirmatively brought the State's concerns first to the USDA Inspector General, and then to the FBI in April 2021. The State ultimately provided documents and testimony to support federal investigation and prosecution, which resulted in federal charges against 47 defendants for their alleged roles in the fraud scheme, many of whom pled guilty or were later convicted at trial. https://www.justice.gov/archives/opa/pr/us-attorney-announces-federal-charges-against-47-defendants-250-million-feeding-our-future. Far from a scenario where a state agency hid fraud or obstructed investigations, public records and the federal government's own work product shows a partnership between state and federal investigative resources to combat fraud.

Administration have repeatedly used pretextual concern about this fraud to justify a number of actions taken against both Minnesota and other Democrat-led states.

Against this backdrop, in late December 2025, a YouTube user posted an as-yet unverified video purporting to expose Somali-owned childcare centers in Minnesota engaging in fraud, which a White House spokesperson and Vice President Vance subsequently promoted. Ex. 8-A.[2] Then, on December 30, 2025, HHS Deputy Secretary Jim O'Neill claimed on social media that HHS had "frozen all child care payments to the State of Minnesota." Ex. 7-A. In the same post, he announced that "all ACF payments across America" would "require a justification and a receipt or photo evidence" before funds could be disbursed. Ex. 7-A. The next day, HHS spokesperson Andrew Nixon stated this requirement would take the form of a freeze of federal child care funding, which would only be released "when states prove they are being spent legitimately." Ex. 8-B.

But instead, Defendants engaged in a targeted attack on five states only—the Plaintiff States. On January 4, 2026, President Trump told the press that the administration would target specific States with Democratic governors: "We're not going to pay [Minnesota], and we're not going to pay California, and we're not going to pay Illinois with a big slob of a governor that they have."[3] The next day, President Trump reiterated his focus: "Governor Walz has destroyed the State of Minnesota, but others, like Governor Gavin Newscum [sic], JB Pritzker, and Kathy Hochul, have done, in my opinion, an even more dishonest and incompetent job." Ex. 7-B.

On January 5, 2026, an HHS spokesperson made an even more direct, false assertion that "Democrat-led states and Governors have been complicit in allowing massive amounts of fraud to

---

[2] All cited exhibits are attached to the January 15, 2026 affirmation of Jessica Ranucci, filed contemporaneously with this motion.

[3] Ex. 8-E, The White House, *President Trump Gaggles with Press on Air Force One*, YouTube (Jan 4, 2026), https://www.youtube.com/watch?v=9XVjd3R2T3g&t=1157s.

occur under their watch." Ex. 8-C. And on January 6, 2026, President Trump claimed that "California, under Governor Gavin Newscum [sic] is more corrupt than Minnesota, if that's possible???" Ex. 7-C. Each of these posts, comments, insults, and threats laid the groundwork for the ACF Funding Freeze and underscores its pretextual nature. The overtly partisan attacks continued after this case was filed. For example, on January 8, 2026, the HHS General Counsel posted on X a link to news coverage of this lawsuit, accusing "Attorney Generals from these Democrat-led states" of a "partisan political stunt[]" and being "complicit in . . . perpetuation of" some unspecified "fraud" at the expense of "real Minnesotans." Ex. 7-D.

### B.    The ACF Funding Freeze and January 5 and 6 Letters

On January 6, 2026, ACF announced a "funding freeze," stating that it "froze access to certain federal child care and family assistance funds for California, Colorado, Illinois, Minnesota and New York." Ex. 6; *see also* Ex. 7-E. ACF effectuated the Funding Freeze via letters sent to Plaintiff States on January 5 and January 6, 2026 (the "January 5 and 6 Letters"). In these letters, ACF announced it "plac[ed]" each Plaintiff State "on a restricted drawdown for all" CCDF, TANF, and SSBG funds "until further notice." Ex. 1 (CCDF Letters), Ex. 2 (TANF Letters), Ex. 3 (SSBG Letters); Ex. 4-C (MN CCDF Letter); Ex. 5-B (MN SSBG Letter).

Aside from two of the letters sent to Minnesota (detailed below), the CCDF, TANF, and SSBG letters sent to each Plaintiff State are identical, swapping out only the recipients and States' names (and going so far as to contain in the SSBG letter what appears to be a copy-paste error requesting certain "records used by Minnesota" from the other four states). Exs. 1-3. All three letters begin with a statement that ACF is "concerned by the potential for extensive and systemic fraud" within the ACF programs generally, and that those concerns "have been heightened by recent federal prosecutions and additional allegations that substantial portions of federal resources were fraudulently diverted away from the American families they were intended to assist." *Id*. The

letters claim that "ACF has reason to believe that" each Plaintiff State "is illicitly providing illegal aliens with . . . benefits intended for American citizens and lawful permanent residents." *Id.* The letters provide no details, much less any evidence, regarding any "prosecutions" or "allegations" of fraud, nor any substantiation of the assertion that the Plaintiff States are "illicitly providing illegal aliens" with benefits. *See id.*

The CCDF Letters to Plaintiff States New York, California, Colorado, and Illinois each state that "ACF is placing the State on temporarily restricted drawdown of CCDF funds until additional fiscal accountability requirements are implemented and necessary information is provided for ACF to complete its review." Ex. 1. These CCDF Letters each assert that this is "clearly necessary to mitigate fraudulent activity" without providing any substantiation for the vague allegations. *Id.* These CCDF Letters direct that each State must "immediately" implement fiscal accountability requirements, which "must include submission of verified attendance documentation for subsidized child care services to the State prior to further draw down of federal CCDF funding." *Id.* That documentation must establish the days or hours of care provided; must contain "contemporaneous payment information"; and must be "sufficient for ACF to determine that the drawdown amount is reasonable, allowable, and allocable." *Id.* These Letters each refer to additional, unspecified requirements and state that the Freeze will last "until further notice, pending successful and satisfactory review of the requested information." *Id.*

Minnesota received its own version of the CCDF Letter a day before the other Plaintiff States, on January 5, 2026. Ex. 4-C. The substance and impact are substantially similar to the other CCDF Letters. However, because ACF had separately sent Minnesota two prior letters in December 2025 that contained some of the boilerplate language regarding purported concerns

regarding fraud, and data demands, Ex. 4-A, 4-B, the agency's January 5, 2026, CCDF letter to Minnesota is styled as a set of follow-up directions imposing the restrictions. Ex. 4-C.

The TANF and SSBG letters likewise say that ACF is placing each Plaintiff State's program on a "restricted drawdown." Ex. 2 ("[e]ffective today"); Ex. 3; Ex. 5-B. These letters demand even more data. First, they demand that each Plaintiff State "provide the complete universe of TANF [and SSBG] administrative data that exist and that are in the state's possession for all grantees, their recipients and subrecipients, for all available years." Exs. 2, 3. The letters specifically request personally identifiable information on recipients, including "Social Security Number (if collected) [and] date of birth." *Id.* Second, the letters specifically request "documentation demonstrating" that each Plaintiff State "has verified the eligibility" of all recipients as "to United States citizens and qualified aliens" under 8 U.S.C. § 1611. *Id.* Third, the letters request a "comprehensive list of all" entities "that received [TANF and SSBG] funds" from 2019 to 2025. Exs. 2, 3. The letters set a deadline of January 20, 2026, for Plaintiff States to provide the information requested. Ex. 2, 3.

Minnesota's TANF letter is effectively identical to the other Plaintiff States'. Minnesota also received an SSBG Letter on January 6, 2026. Minnesota had already received ACF's onerous demand for the same three categories of SSBG records on December 12, 2025. Ex. 5-A. Minnesota's January 6, 2026, SSBG's letter, like the other Plaintiff States', notified Minnesota that it would be unable to draw down SSBG funding and would be on temporary restricted drawdown, pending Minnesota providing the same requested records. Ex. 5-B.

### C.    Impact of the ACF Funding Freeze on Plaintiff States

The three funding streams affected by the Freeze provide crucial benefits in Plaintiff States, and the ACF Funding Freeze would cause the Plaintiff States and their most vulnerable children and families significant harm by putting numerous ACF-funded programs in jeopardy.

### 1.    Impact on Plaintiff States from the CCDF Freeze

The CCDF program provides nearly $2.4 billion in federal funding annually to support Plaintiff States' programs that provide low-income families with funding for child care. Ex. 6. CCDF is comprised of two separate funding streams: Child Care Entitlement to States (CCES) and Child Care and Development Block Grant (CCDBG). 42 U.S.C. §§ 618, 9857 *et seq.* CCES is a statutory entitlement program that is not subject to the annual appropriations process; the formula for allocation of funding to each State is set by statute. 42 U.S.C. § 618. While CCDBG is subject to the annual appropriations process, Congress has established by statute a mandatory formula for allocation of CCDBG funds. Pub. L. No. 118-47, 138 Stat. 665; 42 U.S.C. §§ 9858h, 9858m.

The CCDF program provides funds to States for child care subsidies for eligible low-income families, investment in child care coaching and professional development, and licensing and oversight of child care programs. Ex. 10 ¶ 11; Ex. 14 ¶ 7; Ex. 16 ¶ 37; Ex. 19 ¶ 12; Ex. 23 ¶ 7. In New York State, for example, CCDF funding provides childcare assistance to over 200,000 children. Ex. 16 ¶ 40; Ex. 20 ¶ 7. Each of Plaintiff States operates CCDF pursuant to a state plan approved by HHS. *See, e.g.*, Ex. 16 ¶ 41.

Plaintiff States have robust programs in place to detect and prevent fraud in CCDF-funded programs. For example, Colorado "currently exceeds federal regulation requirements for fraud prevention for child care assistance programs." Ex. 10 ¶ 22. This work involves, among other things: "unannounced inspections of all licensed child care programs," investigation of fraud allegations, "typically within seven or fewer business-days," tracking daily child attendance in a system that requires verification "by both providers and families"; and "County-level fraud prevention plans approved and monitored" by the State. Ex. 10 ¶ 22. *See also* Ex. 14 ¶ 11; Ex. 16 ¶¶ 50-62 (describing "a robust series of measures in place to address program integrity").

Plaintiff States submit routine drawdown requests to ACF for CCDF program expenses. *See, e.g.*, Ex. 19 ¶ 22. Plaintiff "Illinois draws down CCDF funding on a monthly basis." Ex. 14 ¶ 8. Typically, funds are released "within two days of a draw down request." Ex. 10 ¶ 18; *see* Ex. 19 ¶ 17. But after the ACF Funding Freeze and prior to the temporary restraining order, some Plaintiff States did not receive funds they had requested. *E.g.*, Ex. 14 ¶ 10; Ex. 19 ¶ 19. And Minnesota had several CCDF drawdown requests rejected *after* the entry of the restraining order. Ex. 23 ¶ 40.

The ACF Funding Freeze "create[s] operational and budgetary uncertainty, making administration and basic planning for the future nearly impossible." Ex. 10 ¶ 19. In California, "it is not clear whether available state funds" can "cover outstanding child care costs." Ex. 19 ¶ 23. The freeze has already caused delays in reimbursing child care providers and required states "to redirect staff time and attention to developing and investigating funding contingency plans, and managing responses" in response to the "abrupt federal changes." Ex. 19 ¶ 21. With a Freeze, Illinois will soon run out of resources to support child care and has to decide "immediately" whether to "change the eligibility" for child care subsidies, increase family co-pays, create wait lists, or cut reimbursement for providers. Ex. 14 ¶¶ 9, 42. One option "under consideration" would result in over 80,000 children losing care. Ex. 14 ¶ 43. Colorado has a "limited buffer" and will also soon run out of child care funds with a Freeze. Ex. 10 ¶¶ 17-18; *see also* Ex. 18 ¶ 32 (New York City).

The ripple effects will be broad because States would be unable to support families in need of child care, meaning that parents would be unable to work, which will have direct effects on both vulnerable families and State tax revenues. Ex. 10 ¶ 17; Ex. 14 ¶¶ 44-45; Ex. 19 ¶¶ 51-52; Ex. 21 ¶24; Ex. 23 ¶ 36; *see also* Ex. 22 ¶ 15 (describing affects of Freeze on professional development for providers). Because so many child care providers operate on very "slim margins," the cessation

of subsidies would result in closures of child care facilities, impacting families across Plaintiff States regardless of whether they depend on the subsidies. Ex. 19 ¶ 52; *see also* Ex. 10 ¶ 17; Ex. 14 ¶ 45; Ex. 16 ¶ 44; Ex. 18 ¶ 34; Ex. 23 ¶ 36. Plaintiff States' local social services districts are likely to be affected as well, as they may need to furlough and lay off staff who administer child care subsidies and oversight on a local level. Ex. 10 ¶ 17; Ex. 16 ¶ 44.

### 2.    Impact on Plaintiff States from the TANF Freeze

TANF is a block grant program that provides more than $7 billion in federal funds annually to Plaintiff States. Ex. 6. TANF funds are allocated to States according to a mandatory formula set by Congress. 42 U.S.C. § 603(a)(1); *see also* Pub. L. No. 119-37, 139 Stat. 497 (appropriations). Plaintiff States administer TANF pursuant to approved state plans. *See* Ex. 14 ¶ 13; Ex. 19 ¶ 28; Ex. 23 ¶ 14. TANF funds critical direct financial assistance for low-income families in Plaintiff States to pay for expenses like food, shelter, and utilities. *See* Ex. 11 ¶ 5 (77,000 individuals in Colorado); Ex. 14 ¶ 16 (70,000 in Illinois); Ex. 17 ¶ 16 (300,000 in New York City); Ex. 19 ¶ 34 (350,000 families in California); Ex. 23 ¶ 16 (44,000 children in Minnesota). TANF also funds other services, which vary across Plaintiff States, including: childcare subsidies; emergency housing for families fleeing domestic violence; emergency food; a 24/7 emergency child abuse hotline; pregnancy support; early childhood school readiness; and financial aid for low-income college students. Ex. 11 ¶ 6; Ex. 14 ¶ 14; Ex. 19 ¶¶ 25-26; Ex. 22 ¶¶ 27-28; Ex. 23 ¶ 17. TANF funds are a crucial part of Plaintiff States' social services programs: here in New York City, for example, TANF funds nearly half of the cost of providing shelter to families with children and the vast majority of cash assistance to eligible low-income families. Ex. 17 ¶¶ 17-18.

Plaintiff States engage in robust processes for fraud prevention and detection in the TANF program. Individual applicants must prove eligibility for all program requirements, including immigration status. Ex. 11 ¶ 8; Ex. 14 ¶ 17; Ex. 15 ¶¶ 16-18. Plaintiff States use extensive data

matching to verify identity, earnings, immigration status, and potential duplicate benefits. Ex. 11 ¶ 9; Ex. 14 ¶ 17; Ex. 15 ¶¶ 19-25. Plaintiff States take affirmative action against fraud in the TANF program, including through criminal prosecution. Ex. 11 ¶¶ 10-11; Ex. 15 ¶¶ 27-28. Plaintiff States engage in quality control processes to ensure that required processes are being followed at the local level. Ex. 11 ¶¶ 13-14. Additionally, Plaintiff States engage in federally-required reporting for their TANF programs. *See, e.g.*, Ex. 15 ¶ 29.

TANF operates primarily on a reimbursement basis. Plaintiff States generally draw down TANF funds monthly, but drawdowns can occur as often as daily. Ex. 11 ¶ 15; Ex. 14 ¶ 19. In the period after the Funding Freeze and before the Court's temporary restraining order, certain Plaintiff States could not draw down TANF funds that they had requested prior to the Freeze, but after the Court's order, Plaintiffs were able to access most of those funds. *See* Ex. 11 ¶ 21; Ex. 15 ¶¶ 31-32.

A freeze on TANF funds would create chaos in Plaintiff States by creating massive immediate budgetary uncertainty for Plaintiff States. *See, e.g.*, Ex. 11 ¶ 29; Ex. 14 ¶¶ 42, 46; Ex. 19 ¶ 41. This would have a devastating impact on Plaintiff States. *See* Ex. 11 ¶¶ 22-23 (In Colorado, emergency housing and cash assistance programs would be at significant risk of abruptly ceasing, as no general state funds could float program expenses); Ex. 14 ¶¶ 42, 46 (Illinois would be required to find funds for services funded by TANF); Ex. 15 ¶¶ 34-35 (New York would not be able to reimburse local districts, creating "significant programmatic and operational impacts"); Ex. 19 ¶¶ 40, 53-54 (California has concerns it would not be able to meet the needs of families who rely on TANF and "would need to expend significant time, resources, and effort" on "attempt[s] to backfill the funding" with "no guarantee [it] would be available"); Ex. 20 ¶ 20; Ex. 21 ¶¶ 24-25; Ex. 23 ¶ 38 ("Minnesota does not have access to another financial source").

The Funding Freeze would have ripple effects throughout Plaintiff States with destructive consequences. Individuals receiving TANF-funded services would suffer, not only by a potential lack of benefits or services but also by the disruption in the continuity of those services, and risk unemployment, homelessness, and other negative effects of extreme poverty. Ex. 11 ¶¶ 23-25; Ex. 14 ¶¶ 42-46 (in Illinois, where TANF funds supplement CCDF, the freeze would exacerbate the impact on childcare described above); Ex. 17 ¶ 14 ("immediate uncertainty and confusion" for "some of the neediest" families in NYC); Ex. 19 ¶¶ 35-37, 49; Ex. 21 ¶ 24; Ex. 23 ¶ 39 ("Without TANF cash assistance, families may struggle to afford basic needs like food, housing, utilities, diapers, and clothing, increasing homelessness and food insecurity."). Community partners who have provided TANF-funded services would not be reimbursed for their work, threatening their ability to continue operations and impairing States' and their localities' ability to contract with new providers. Ex. 11 ¶ 25; Ex. 17 ¶¶ 19-21. There is a risk that both local and state governments would be required to lay off staff who administer TANF programs, reducing Plaintiff States' ability to process new applications, pursue fraud investigations, conduct administrative hearings, and oversee quality assurance, among other things. Ex. 11 ¶¶ 26-27; Ex. 20 ¶ 20. Meanwhile, Plaintiff States are likely to face an increased administrative burden to respond to increased calls from recipients, discontinue services to existing recipients, and attempt to find alternative programs to meet residents' needs, and would also have an increased burden on their other social services programs. Ex. 11 ¶ 28; Ex. 19 ¶ 54; Ex. 23 ¶ 39.

### 3.    Impact on Plaintiff States from the SSBG Freeze

The SSBG program provides approximately $870 million annually to Plaintiff States. Ex. 6. Plaintiff States can use this flexible funding to support social services in one of five statutory categories. 42 U.S.C. § 1397. SSBG funds are allocated to states according to a mandatory formula set by Congress. 42 U.S.C. § 1397b(b); 42 U.S.C. § 1397a. SSBG funding supports a range of

social services, including maternal and family health, food assistance, family support, domestic violence prevention, behavioral health and disability services, employment and self-sufficiency, youth services, corrections and reentry, and aging services. *See* Ex. 14 ¶ 24; Ex. 20 ¶ 17; Ex. 19 ¶ 44; Ex. 23 ¶ 21. For example, in Illinois, SSBG funding supports all crisis nurseries in the state, which provide 24/7 emergency and short-term care for children under age seven, and medical assessments for infants in their first six months of life. Ex. 14 ¶¶ 47-48. In New York, SSBG funds support emergency shelter for domestic violence survivors. Ex. 17 ¶ 13. Colorado, New York, and Minnesota also use these funds to provide adult and child protective services. Ex. 12 ¶ 12; Ex. 13 ¶ 5; Ex. 16 ¶¶ 6, 10-18; Ex. 17 ¶ 13; Ex. 20 ¶ 17; Ex. 21 ¶ 21; Ex. 23 ¶ 21.

Fraud in SSBG programming is rare because these funds are often provided to localities for operational and personnel costs for administering services—not to individuals as a direct benefit. *See* Ex. 12 ¶ 22; Ex. 13 ¶ 21; *see also* Ex. 17 ¶ 12; Ex. 20 ¶¶ 17-18. Even so, Plaintiff States maintain multiple layers of oversight to ensure lawful use of SSBG funding. In Colorado, for example, state agencies maintain an allocation plan to ensure SSBG funds are expended lawfully and audit all cases involving children in out-of-home care. Ex. 12 ¶¶ 23, 25; *see also* Ex. 13 ¶¶ 21-25; *see also* Ex. 16 ¶ 52.

Plaintiff States submit routine drawdown requests for SSBG funding as expenses are incurred. *See, e.g.*, Ex. 14 ¶ 26 (monthly requests); Ex. 12 ¶ 7 (daily requests). These funds are typically released within days of a request. *See, e.g.*, Ex. 19 ¶ 45; Ex. 23 ¶ 23.

Freezing SSBG funds would force Plaintiff States to operate as the sole source of funding for many adult and child protective, domestic violence, and mental health services, likely resulting in budgetary shortfalls that require localities to cut or reduce services for their most vulnerable residents. *See* Ex. 12 ¶ 16; Ex. 13 ¶ 18; Ex. 19 ¶¶ 53-54; Ex. 20 ¶ 20; Ex. 23 ¶ 38. This is especially

true in places like New York City, where SSBG funds account for nearly half of the funding for adult protective services and, with TANF, about half of domestic violence services as well. Ex. 17 ¶¶ 14, 18. In New York and Colorado, where child protection services are mandatory, the loss of SSBG funding may ripple to other programs, which may be reduced "to ensure adequate funding levels for child protection services are maintained," Ex. 12 ¶ 16, or even result in "local governments being pushed toward financial disaster," Ex. 16 ¶ 22; *see also* Ex. 13 ¶ 18. This operational and budgetary uncertainty makes basic planning for the future administration of SSBG programs "nearly impossible." Ex. 12 ¶ 21; Ex. 16 ¶ 27; *see also* Ex. 17 ¶ 21.

Individuals within Plaintiffs States will suffer. In California, childcare services would be reduced, causing the harms described above. Ex. 19 ¶¶ 51-52; *see also* Ex. 14 ¶ 47-48. Thousands of individuals facing abuse and neglect, including approximately 3,400 in New York City alone, would face a disruption and reduction of critical services to help them find safe housing, likely increasing the number of children entering the foster care system. Ex. 12 ¶ 15; Ex. 17 ¶¶ 17, 19; Ex. 20 ¶ 20; Ex. 23 ¶ 38. This would cause cascading harms to Plaintiff States as they are left to address the resulting increase in unemployment, homelessness, and negative educational and emotional outcomes for vulnerable children and adults. Ex. 14 ¶ 45; Ex. 19 ¶¶ 51-54; Ex. 21 ¶ 24.

### 4.    Impact on Plaintiff States from the Data Demands

As detailed above, the ACF Funding Freeze includes broad data demands seeking, among other things, "the complete universe" of Plaintiffs' TANF and SSBG records "for all available years," including personal identifying information (e.g., date of birth and Social Security Number). Exs. 2, 3. Defendants' unlawful and extremely onerous demands for data would immediately impose significant burdens on Plaintiff States, above and beyond the impacts, described above, to Plaintiff States' ability to maintain critical child care and social welfare programs.

Even if States were to attempt to comply with these burdensome and unlawful demands, compliance within two weeks would be impossible and would impose enormous, irreparable burdens on Plaintiff States. Ex. 11 ¶ 19; Ex. 14 ¶ 52 (estimating more than six months for just one childcare-specific request); Ex. 15 ¶ 13; Ex. 19 ¶ 55. Attempting to do so would require the diversion of significant personnel and resources away from Plaintiff States' operation of their critical programs. Ex. 11 ¶ 19; Ex. 14 ¶ 51; Ex. 23 ¶ 42. Much of this data is held by localities and other third parties, including many non-profits with limited resources, and coordinating with these other entities will involve additional significant time and coordination for Plaintiff States. Ex. 11 ¶ 19; Ex. 19 ¶¶ 55-56. Much of the data requested may not be stored in an electronic format, and producing it would require review of a significant volume of paper records. Ex. 11 ¶ 19; Ex. 19 ¶ 56. Additionally, ACF has not provided any secure transfer system, requiring further state resources. *See* Ex. 11 ¶ 19.

Moreover, these demands, which Defendants state are further conditions on resumption of funding, are far outside legal procedures, and Plaintiff States are aware of no past similar demands from any oversight agency. *See* Ex. 14 ¶¶ 42, 50; Ex. 19 ¶ 57; Ex. 23 ¶ 41. This makes sense: turning over the personally identifiable information of millions of Plaintiff States' residents risks significant harm, including undermining public trust in these programs, and potentially compelling Plaintiff States to violate federal or state laws that protect the privacy and security of these records.

### D.    Procedural History

On January 8, 2026, Plaintiffs filed this action and moved for a temporary restraining order. ECF Nos. 1, 8. On January 9, 2026, Judge Subramanian, presiding in Part I, granted Plaintiffs' motion and restrained and stayed Defendants from implementing the ACF Funding Freeze, including the entirety of the January 5 and 6 Letters, through January 23, 2026. ECF No. 22.

## ARGUMENT

A motion for a preliminary injunction should be granted where the moving party establishes that: (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). When the government is a party, the last two factors merge. When the balance of equities tips decidedly toward the party requesting preliminary relief, "sufficiently serious questions going to the merits to make them a fair ground for litigation" are sufficient for preliminary relief even in the absence of likelihood of success. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010). The standard for a stay of agency action pursuant to 5 U.S.C. § 705 (which here would have the same practical effect as a preliminary injunction) is the same as the standard for a preliminary injunction. *Afr. Communities Together v. Lyons*, 799 F. Supp. 3d 362, 382 (S.D.N.Y. 2025) (citing *Eastern Air Lines v. Civil Aeronautics Board*, 261 F.2d 830, 830 (2d Cir. 1958)). All the preliminary relief factors overwhelmingly support granting a preliminary injunction and stay here.

## I.    Plaintiffs Are Likely to Succeed on the Merits

### A.    The ACF Funding Freeze Is In Excess of Statutory Authority and Contrary to Law.

A federal agency is "charged with administering congressional statutes," which means that "[b]oth [its] power to act and how [it is] to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013); *Metro. Transportation Auth. v. Duffy*, 784 F. Supp. 3d 624, 668 (S.D.N.Y. 2025) ("An agency can take only such actions as Congress has enabled it to take."). The ACF Funding Freeze was not authorized by Congress; it is contrary to law and *ultra vires* for five independent reasons.

15

*First*, each of these programs' statutes requires that ACF follow specific procedures before imposing any penalty against States for noncompliance, including a funding cut or freeze. *See* Compl. ¶¶ 84-122 (detailing statutory and regulatory requirements). ACF took *none* of the many steps that it was required to take. For example, it did not provide the requisite written notice in advance of cutting off funds. 42 U.S.C. § 9858g(b)(2)(A)-(C) (CCDF); 42 U.S.C. §§ 609(c)(1)(A), 610(a); 45 C.F.R. §§ 262.4(a), 262.7(a) (TANF); 45 C.F.R. § 96.51(a) (SSBG). It did not provide complaints, if any were made, to States. 45 C.F.R. § 98.93(c) (CCDF); 45 C.F.R. § 96.50(c) (SSBG). It did not provide the opportunity for States to submit comments in response to the notice or the complaints and (of course) did not consider the comments it failed to solicit. 45 C.F.R. §§ 98.90(b); 98.93(c) (CCDF); 45 C.F.R. § 96.50(c) (SSBG). It did not allow States to submit any corrective action plan. 42 U.S.C. § 609(c)(1)(A)-(B) (TANF). It did not provide the opportunity for States to request reconsideration, appear at a hearing, or make an administrative appeal. 42 U.S.C. § 9858g(b)(2) (CCDF); 42 U.S.C. § 610(b)(1) (TANF); 45 C.F.R. §§ 96.51(a), 96.52 (SSBG). These failures are straightforwardly contrary to law in violation of the APA. *See New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 100 (2d Cir. 2020).[4]

*Second*, none of the statutes that govern the ACF Funds permit Defendants to penalize states for unsubstantiated fraud. 42 U.S.C. § 9858g(b)(2)(A)-(B) (CCDF statute requires agency to "find" noncompliance); 42 U.S.C. § 609(a)(1)(A) (same for TANF); 42 U.S.C. § 1397e(b) (SSBG statute requires agency to have "ultimately found" noncompliance). ACF did not make any finding that any Plaintiff State has expended even a single dollar of ACF funds in violation of the law—a prerequisite to the imposition of penalties under each of the programs. Rather, in its

---

[4] Defendants have taken this action notwithstanding that they have already approved Plaintiff States' plans for implementing each program, violating the statutes relating to those plans. See 42 U.S.C. § 9858c (CCDF); 42 U.S.C. § 602(a) (TANF).

boilerplate introduction to the letters, ACF references only an unspecified "concern[]" about "potential" fraud, without presenting evidence that would substantiate such concern.[5] No statute or regulation allows ACF to impose penalties against Plaintiff States based on unidentified and unsubstantiated concerns.

*Third*, even had ACF followed the statutory processes and made findings of fraud, the ACF Funding Freeze would still be unlawful because Congress has not authorized ACF to cut off the *entire* stream of CCDF, TANF, or SSBG funding to a state, as Defendants have done here. Rather, Congress has authorized ACF to impose a dollar-for-dollar reduction in amounts payable to offset any improperly spent funds, as well as limited additional sanctions. As to TANF, Congress set a comprehensive regime for noncompliance that includes a dollar-for-dollar reduction as penalty for improperly spent funds and an additional 5 percent penalty for intentional noncompliance, and mandated that regardless of any penalty imposed, ACF "shall not reduce any quarterly payment to a State by more than 25 percent." 42 U.S.C. §§ 609(a)(1), 609(d); *see also id.* §§ 609(a)(2)-(16) (other limited penalties); 617 (prohibiting any additional requirements on states except as expressly provided in statute). As to SSBG, Congress provided that States "shall be entitled" to their appropriated amounts and authorized ACF only to require states to "repay to the United States amounts ultimately found not to have been expended in accordance with" law or to "offset such amounts against" future SSBG payments to the state. 42 U.S.C. §§ 1397a(a)(1), 1397e(b). And as to CCDF, Congress allows ACF to seek dollar-for-dollar reimbursement of improperly spent funds. 42 U.S.C. § 9858g(b)(2)(A)(ii). Congress authorized as an additional sanction disqualification from receipt of future funds *only* for the discretionary (Child Care and

---

[5] To be clear, this is true even as to Plaintiff State Minnesota. *See* Ex. 4-A, 4-B, 5-A. (referencing "allegations" and "concerns" of "perceived fraud").

Development Block Grant) portion of CCDF, and *not* for the mandatory (Child Care Entitlement to States) portion. And even for disqualification of those discretionary funds, ACF must have provided notice and hearing, and made a "finding of noncompliance," 42 U.S.C. § 9858g(b)(2)(B), which it has not done here.[6]

*Fourth*, Congress has made specific appropriations for these three programs and requires ACF to issue funds to states via formulas set by Congress itself. *See* 42 U.S.C. §§ 618, 9858h, and 9858m (CCDF); 42 U.S.C. § 603(a)(1)(B) (TANF); 42 U.S.C. § 1397b(b) (SSBG). Where, as here, Congress has appropriated funds for specific programs, "an agency is not free simply to disregard statutory responsibilities." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes[.]"). Further, there is also significant evidence of pretext, namely that Defendants have unlawfully chosen not to spend appropriated funds to further the President's policy and political disputes with the Plaintiff States' elected leadership. As another federal court held when ruling on a similar funding freeze, Defendants cannot withhold funding streams contrary to statute because of the President's policy disagreements with the states where "Congress did *not* tie" those funds "to compliance with the President's policy priorities" in the governing statutes. *New York v. Trump*, 769 F. Supp. 3d 119, 140 (D.R.I. 2025).[7]

*Fifth*, Defendants have failed to set forth any legal basis that would justify their impossible data demand, including the "complete universe" of States' data "for all available years," *see* Exs.

---

[6] While 42 U.S.C. § 618(c) generally provides that the mandatory CCES funds are "subject to requirements and limitations of" the discretionary CCDBG program, the specific sanctions provision of the CCDBG statute, 42 U.S.C. § 9858g(b)(2)(B), authorizes only "disqualification from the receipt of financial assistance under *this subchapter*"—that is, receipt of funds under the discretionary CCDBG program. (emphasis added).

[7] *Enforced*, 777 F. Supp. 3d 112 (D.R.I. 2025), *reconsideration denied*, No. 1:25-CV-39-JJM-PAS, 2025 WL 1098966 (D.R.I. Apr. 14, 2025), and *appeal dismissed*, No. 25-8010, 2025 WL 2523574 (1st Cir. May 12, 2025) (emphasis added).

2, 3, rather than a request for specific data relevant to a specific allegation. Each program's statutes and regulations set forth mechanisms that ACF may use to monitor States' compliance with program requirements. 42 U.S.C. § 9858i (CCDF); 42 U.S.C. §§ 611, 652 (TANF); 42 U.S.C. § 1397e (SSBG); *see, e.g.*, Ex. 15 ¶¶ 28-29. ACF ignored these mechanisms and the information-sharing provisions they contain. As to TANF and SSBG, ACF instead requested the sensitive information of millions of Plaintiff States' residents, including Social Security Numbers and date of birth, with no provisions for privacy protections or limitations on the use of data. ACF has asserted no source of authority that would support this request even though there are a host of federal laws governing the collection of data and records that Defendants appear to have ignored in making their unprecedented demand.[8] The only purported source of legal support ACF offers for the SSBG and TANF demands is in the TANF Letter, but the cited regulation (45 C.F.R. § 98.90) does not relate to the TANF program and, in any event, requires procedures that ACF did not follow. Further, the TANF Statute specifically prohibits ACF from requiring States to provide data for all participants. 42 U.S.C. § 611(a)(1)(B)(i). As to CCDF, ACF insists that Plaintiff States must provide onerous documentation of each expense as part of the "[f]iscal control and accounting procedures" required by 45 C.F.R. § 98.67(c), but this same regulation provides that States—*not*

---

[8] Notably, the Privacy Act mandates procedures when an agency collects or maintains personally identifiable information, 5 U.S.C. § 552a(e)-(f), including detailed and specific notice in the Federal Register when an agency establishes or revises a system of records, *id*. § 552a (e)(4). The Paperwork Reduction Act similarly requires an agency to provide public notice with certain information prior to collecting or sponsoring a collection of information, 44 U.S.C. § 3507(a)(1)(D), and the Federal Information Security Management Act creates additional information security requirements where information is "collected or maintained by or on behalf of an agency," 44 U.S.C. §3553(a)(2). The Computer Matching and Privacy Protection Act of 1988 created additional protections for individuals' personal information against federal agency use of computer matching programs. Pub. Law No. 100-503, § 2, 102 Stat. 2507. Defendants have not published a SORN in the Federal Register for this data collection, provided any public notices or otherwise undertaken the steps required to comply with *any* of these laws.

ACF—"expend and account for CCDF funds in accordance with their *own* laws and procedures for expending and accounting for their own funds." 45 C.F.R. § 98.67(a) (emphasis added).[9]

Ultimately, Defendants' letters fail to provide even a colorable legal justification for the Freeze. The TANF Letter is the only one of the boilerplate letters that cites *any* purported source of authority: 2 C.F.R. § 200.339, an OMB umbrella regulation adopted by HHS that governs federal grant awards—"unless a . . . Federal statute provides otherwise." 2 C.F.R. § 200.101(a)(2); *see also* 2 C.F.R. § 300.106 (HHS adoption). In other words, "Federal statutes or regulations govern in any circumstances where they conflict with" 2 C.F.R. § 200.339. *See id.* § 200.101(d); *see also id.* § 200.106. Here, the specific provisions governing noncompliance in the TANF statute (and the statutes for the other programs at issue in this case) supersede § 200.339. First, by its own terms, the OMB umbrella regulation is superseded by the specific enforcement procedures and penalties outlined in the programs' authorizing statutes and regulations. *See supra* 16. Second, as to TANF in particular, Congress prohibited ACF from "regulat[ing] the conduct of States under" the TANF program "except to the extent expressly provided in this part," 42 U.S.C. § 617 (which would include enforcing the umbrella OMB regulation), and it separately prohibited ACF from cutting more than a quarter of a State's TANF payments, *id.* § 609(d). *See also Commonwealth v. Sebelius*, 674 F.3d 139, 147-48 (3d Cir. 2012); *M.F. v. Dep't of Hum. Servs., Div. of Fam. Dev.*, 395 N.J. Super. 18, 25, 928 A.2d 71, 76 (N.J. Sup. Ct. App. Div. 2007). At bottom, 2 C.F.R. § 200.339 does "not give Defendants a blank check to ignore" the statute's limits and to "nullify the

---

[9] It is also difficult to square ACF's demanded documentation—which requires States to provide documentation of childcare offered and contemporaneous payment—with 45 C.F.R. § 98.45(m)(1), which requires provider payment "in advance of or at the beginning of" the delivery of service. On January 5, 2026, ACF issued a Notice of Proposed Rulemaking that would repeal 45 C.F.R. § 98.45(m)(1), but it is currently in effect. *See* 91 Fed. Reg. 207, 208-09 (Jan. 5, 2026).

safeguards" imposed by Congress. *Am. Ass'n of Univ. Professors v. Trump*, No. 25-CV-07864-RFL, 2025 WL 3187762, at *28 (N.D. Cal. Nov. 14, 2025).

In any event, even were Section 200.339 to apply here, it comes with its own set of procedural requirements before any agency could "temporarily withhold payments," 2 C.F.R. 200.339(a), and, here again, Defendants have completely failed to follow those requirements. Defendants did not make any "determin[ation] that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339; *see id.* § 200.208(c). Nor did they provide Plaintiff States "with an opportunity to object and provide information challenging" the Freeze, as required. 2 C.F.R. § 200.342. These procedural defects alone render Defendants' actions unlawful. *See Porwancher v. Nat'l Endowment for the Humans.*, 792 F. Supp. 3d 107, 114 (D.D.C. 2025).

### B.    The ACF Funding Freeze is Arbitrary and Capricious

The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious "if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation omitted). The Court "must ensure" that the agency has "offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (quotation omitted).

Here, Defendants' decision to abruptly freeze billions of dollars was not reasonable or reasonably explained, in the January 5 and 6 Letters or elsewhere. Those letters contain no evidence of alleged fraud nor explanation for why such allegations require an immediate and complete funding freeze across Plaintiff States. Further, the Administration's public statements reveal the actual basis for the action here—partisan animus towards Plaintiff States' elected leaders. Finally, the abrupt and significant nature of the ACF Funding Freeze shows Defendants simply ignored Plaintiff States' reliance on funding intended to support children and families.

## 1.    Defendants acted without analyzing any evidence.

An agency must "examine[] the relevant data" when making a reasoned decision. *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quotation omitted), and when an agency acts without any examination of any evidence, its decision is arbitrary and capricious. *Id.*; *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Review of an agency's examination of the factual record is limited to the "grounds that the agency invoked when it took the action." *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

Here, Defendants neglected to analyze any data or evidence of any kind in the January 5 and 6 Letters. In many of the letters, they simply state, without any factual support, that they are "concerned" that there is the "potential" for fraud in ACF programs, based on unspecified "federal prosecutions and additional allegations." Exs. 1-3; *see also* Ex. 5-A. They cite no evidence nor any "reason to believe" that any state is "illicitly providing illegal aliens" with any ACF Funds. *Id.* They do not identify a *single dollar* that has gone to any Plaintiff State that has been used fraudulently. *Id.* And tellingly, Defendants sought data and evidence only *after* imposing the Freeze. Defendants have it backwards: the APA requires them to consider the evidence *before* acting. Defendants' request for voluminous records from Plaintiff States confirms this is merely a partisan fishing expedition. Defendants cannot freeze billions of dollars in funding, hoping to one day stumble across evidence of fraud *post hoc. Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 22-23 (2020); *see also New York v. Noem*, No. 25-cv-8106, 2025 WL 2939119, at *8-10 (S.D.N.Y. Oct. 16, 2025) (holding that DHS acted arbitrarily and capriciously when it zeroed out funding for a state agency because DHS failed to give a reasonable, contemporaneous, statutorily authorized basis for its decision). That Defendants sent thirteen letters with an identical purported justification

underscores the complete absence of any specific facts that would support fraud or noncompliance allegations. Defendants' actions, taken without any evidentiary basis, are arbitrary and capricious.

### 2. Defendants' remedy—an indefinite, across-the-board funding freeze—lacks any rational connection to the purported problem.

Even if Defendants had cited concrete instances of fraud within Plaintiff States in the ACF Programs—and they have not—they do not explain why such instances of fraud by individual bad actors would require the dramatic and extreme action of freezing all funds. This lack of explanation about the drastic choice they made, and whether they considered other, less draconian actions, renders their decision disproportionate and arbitrary and capricious. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 124 (D.D.C. 2025) ("Evaluating funding priorities can be done without needing to starve citizens or deny critical health services."); *New York v. Trump*, 769 F. Supp. 3d at 141 ("Defendants have not proffered a rational reason for how their alleged goal of safeguarding taxpayer funds justified a de facto suspension of nearly all federal funding"); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025)*; see also Dep't of Com.*, 588 U.S. at 773. The implication of Defendants' position is astounding: any alleged fraud, no matter how small or idiosyncratic, would authorize them to categorically freeze billions of dollars needed for critical programs while Defendants investigate. The APA prohibits such arbitrary action. In any case, each at-issue program is *already governed* by robust fraud prevention mechanisms, detailed in statutes and regulations. Defendants have utterly failed to explain why these preexisting mechanisms are insufficient and why they must be supplanted with a "freeze first, ask questions later" approach.

### 3. Defendants impermissibly relied on an extra-statutory and arbitrary factor when targeting Plaintiff States.

While the January 5 and 6 Letters do little to explain why Plaintiff States have been selected for such a draconian action, the administration's public statements make plain that this decision

was based solely on partisan animosity towards Plaintiff States. The APA forecloses such reliance on a "factor[] which Congress has not intended [them] to consider," *State Farm*, 463 U.S. at 43.

Through interviews, internet posts, and press releases, the only fact the administration has highlighted is that Plaintiff States are led by Democratic officials. President Trump said, for example, that there was "$19 billion, at least" in fraud in Minnesota, and that "We're going to have [Governor] Walz go pay. We're not going to pay them, and we're not going to pay California, and we're not going to pay Illinois with a big slob of a governor that they have." Ex. 8-E. Trump later confirmed his intent to retaliate against "Governor Gavin Newscum [sic], JB Pritzker, and Kathy Hochul" based on allegations of fraud in another state, Minnesota. Ex. 7-B. An HHS spokesperson confirmed that the funding cuts were intended to target "Democrat-led states and Governors" and on X, both HHS Deputy Secretary O'Neill and General Counsel Mike Stuart emphasized that Plaintiff States' elected leaders were members of the Democratic Party. Ex. 8-C; Ex. 7-F (referring to "Five blue states"); Ex. 7-D (referring to "Attorney Generals [sic] from these Democrat-led states"). Meanwhile, other Republican-led states have apparently been passed over, including Mississippi, for example, which recently received national attention for a multi-million-dollar fraud scheme involving TANF in which even state employees have been charged as co-conspirators. Ex. 8-D. The Trump administration has been abundantly clear: it is targeting Plaintiff States because of the political affiliations of their governors, and nothing more.

When facing "an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process" a court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com.*, 588 U.S. at 785 (citation omitted). The record shows Defendants' allegations of fraud are merely "contrived reasons," *id*., intended to cover up Defendants' impermissible reliance on political animus. Such reliance on

extra-statutory, political factors further violates the APA. *See, e.g.*, *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 64-65 (D.D.C. 2019) ("plausible inference" when an agency provides only "vague, cursory reasoning" is that "political pressure may have caused" the agency action); *Aera Energy LLC v. Salazar*, 642 F.3d 212, 220 (D.C. Cir. 2011). Defendants have made "decisions featuring unjustifiable bias or partisanship," which "are precisely the types of agency actions that . . . work a violation of the arbitrary-and-capricious standard." *Level the Playing Field v. Fed. Election Comm'n*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quotation omitted); *see also City of Saint Paul v. Wright*, No. 25-cv-03899, 2026 WL 88193, at *5 (D.D.C. Jan. 12, 2026) (finding that a "grant recipient's state's political identity . . . does not provide a rational basis for why Defendants chose to terminate Plaintiffs' grants over others . . . .")

### 4. Defendants completely disregarded substantial reliance interests, jeopardizing States' ability to support their most vulnerable residents.

The ACF Funding Freeze is also arbitrary and capricious because Defendants "failed to address whether there was 'legitimate reliance' on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30. As the Supreme Court has explained, "[w]hen an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id*. at 30, 33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id*. at 30.

Plaintiff States will suffer immense consequences from an immediate and indefinite funding freeze. Plaintiff States rely on the ACF Funds to support child care for low-income families, allowing parents to work. A complete freeze of such payments would have calamitous effects in Plaintiff States' economies and would substantially impact state budgets.

This reliance was foreseeable and reasonable. Plaintiff States are entitled to count on the ACF Funds. Congress made them *mandatory* programs, and in reliance on that mandate, Plaintiff States have submitted detailed plans to ACF outlining the ways in which they intend to use those funds. Furthermore, these programs function primarily on a reimbursement basis by which Plaintiff States make expenditures in reliance on the fact they can later draw down funds. Finally, Plaintiff States are entitled to rely on the robust procedures and processes in place for adjudicating any disputes of misuse of program funds, which provide for notice of the alleged fraud, an opportunity to contest the allegation, and an opportunity to appeal. *Supra* 16. Plaintiff States had no reasonable basis to expect that the government would spontaneously freeze all funding.

Rather than reckon with these reliance interests as the APA requires, Defendants simply ignored them. *Regents*, 591 U.S. at 30. Defendants provided no rationale for freezing the funds on which Plaintiff States rely. Because Defendants imposed the ACF Funding Freeze "with no regard for the [States'] reliance interests," and Defendants "did not acknowledge—much less justify"— the Funding Freeze's deleterious effects, the agency decision is arbitrary and capricious. *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023).

### C.    Plaintiffs Are Likely to Succeed on Their Constitutional Claims.

Defendants also violated separation-of-powers principles, the Appropriations Clause, and the Spending Clause because Congress has not authorized Defendants to unilaterally freeze these critical funds. The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see also* U.S. Const. art. I, §9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). It is a "settled, bedrock principle[] of constitutional law" that the Executive must expend funds that Congress has duly authorized and appropriated. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *accord City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020); *City &*

*Cnty. of San Francisco,* 897 F.3d at 1231. By contrast, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Ultimately, under "the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

*First*, when the Executive Branch refuses to obey congressional appropriations, it is violating the separation of powers by usurping the legislature's authority. Here, Defendants have entirely usurped Congress' power of the purse and violated separation-of-powers principles by creating and executing a new funding condition, not authorized by law, that freezes billions of dollars in critical funding that Congress has mandated. *New York v. Trump*, 769 F. Supp. 3d at 127 ("Federal agencies and departments can spend, award, or suspend money based only on the power Congress has given to them—they have no other spending power."). The ACF Freeze runs wholly contrary to the statutes governing these programs, *see supra* 15-21. Our constitutional structure does not allow the Executive Branch to "ignore statutory mandates . . . merely because of policy disagreement with Congress." *See Aiken Cnty.*, 725 F.3d at 260.

*Second*, for these same reasons, Defendants have violated the Appropriations Clause by refusing to comply with the provisions that Congress has enacted to govern the ACF Funds. The Appropriations Clause is a "straightforward and explicit command" that "'no money can be paid out of the Treasury unless it has been appropriated by an act of *Congress*.'" *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)) (emphasis added). A necessary implication is that the Executive branch is excluded from any authority over appropriations, including the ability to override Congress's appropriations by ignoring the constraints Congress has explicitly identified for any appropriation.

*Third*, the ACF Funding Freeze violates the Spending Clause by halting funding that Congress has appropriated while demanding that Plaintiff States first comply with numerous post-acceptance, non-statutory, ambiguous, and coercive conditions in order to restore frozen funds. *See supra* 4-6. While "Congress may attach conditions on the receipt of federal funds," "[t]he spending power is of course not unlimited[.]" *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987) (citations omitted). As the Supreme Court has repeatedly held, the Spending Clause requires the federal government to provide "fair notice" of any conditions on the receipt of federal funds, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24-25 (1981), and it cannot use the Spending Power as a form of compulsion against the States, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78 (2012). These requirements apply to federal agencies when adopting or enforcing spending conditions. *See, e.g.*, *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019) (holding that an agency rule violated the Spending Clause); *New York v. U.S. Dep't of Justice*, No. 1:25-CV-00345, 2025 WL 2618023, at *20-21 (D.R.I. Sept. 10, 2025) (same). At no point did the Plaintiff States understand that such onerous and unclear conditions could be suddenly and unilaterally imposed. Plaintiffs were thus not given fair notice of these conditions, *see Pennhurst*, 451 U.S. at 25. They amount to unlawful compulsion where the Administration is holding $10 billion in critical funding hostage until its unlawful demands are met. *Sebelius*, 567 U.S. at 581-82.

In sum, the Constitution prohibits Defendants from enacting the Funding Freeze.

### D.    Defendants' Anticipated Threshold Defenses Are Meritless

At the January 9, 2026, hearing on Plaintiffs' Emergency Motion for a Temporary Restraining Order, counsel for Defendants indicated that they did not yet have "full clarity" on whether Defendants would defend their actions as lawful, or whether they would rely only on

threshold defenses such as the Tucker Act. Ex. 9 at 3:18-4:3. Accordingly, Plaintiffs address two anticipated threshold defenses, each of which lack merit.

### 1.    This Court Has Jurisdiction

Defendants asserted at the January 9, 2026, hearing that this Court may lack jurisdiction over this case due to the Tucker Act. Ex. 9 13:14-23. That Act grants the Court of Federal Claims exclusive jurisdiction over "any claim against the United States founded . . . upon any express or implied contract with the United States" for amounts over ten thousand dollars. 28 U.S.C. § 1491(a)(1); *see id*. § 1346(a)(2). The Tucker Act does not apply to this case: Plaintiffs seek to halt a forward-looking freeze on drawdowns of federal funding; they do not seek to reinstate any grants, nor to pay out any monies due under a contract, nor do they seek any damages or plead any contract claims at all. Courts have repeatedly made clear that disputes—such as this—which seek only forward looking, nonmonetary relief to halt implementation of agency policy or guidance are not subject the Tucker Act, even if they relate to federal funding. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring); Ex. 24, Mot. Order, *New York v. U.S. Dep't of Educ*., No. 25-1424 (2d Cir. June 20, 2025), at 3 (rejecting a Tucker Act argument in a challenge to agency action prohibiting states from spending education funds, because claims pertained to the "Government's exercise of its regulatory authority . . . not a contractual duty to pay money to the States") (cleaned up); *California v. U.S. Dep't of Transp.*, No. 25-cv-208, 2025 WL 3072541, at *5 (D.R.I. Nov. 4, 2025) (Tucker Act did not apply to challenge to agency letter regarding grant administration, including mandatory block grants, because "the Tucker Act does not cover challenges to grant funding conditions[.]" (quotation omitted)).

Here, the challenged agency letter does not terminate any grant but rather announces a new forward-looking policy to freeze funding across the board unless Plaintiff States accede to voluminous data demands. Federal district courts—including this one—have recognized that they

have jurisdiction to preside over litigation concerning comparable policies notwithstanding the Tucker Act. *See Metro. Transp. Auth.*, 784 F. Supp. 3d at 664–67 (Tucker Act did not divest district court jurisdiction over challenge to agency policy to "withhold federal funding" if "Plaintiff did not comply" with agency demand); *Woonasquatucket,* 778 F. Supp. 3d at 465-66. Defendants have already conceded this is not a grant termination case, instead calling it a "temporary restriction in place on drawdowns" because the agency has imposed "certain procedures to further vet funding." Ex. 9 11:4-11. There is simply no contract at issue here. This is a dispute over whether Defendants' action comports with the APA and the U.S. Constitution, and the Tucker Act does not apply.

### 2.    The ACF Funding Freeze Is Final Agency Action.

Defendants may also raise finality, as they often do in defending challenges to federal agency action. The ACF Funding Freeze, as effectuated through the January 5 and 6 Letters, is final agency action subject to review under the APA. An agency action is "final" if: (1) it "mark[s] the 'consummation of the agency's decisionmaking process,'" and (2) determines rights or obligations or creates legal consequences. *Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 96 (2d Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)); *see also Biden v. Texas*, 597 U.S. 785, 808-09 (2022). Courts have followed a "pragmatic" approach in analyzing finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599-600 (2016).

The language of the January 5 and 6 Letters, and Defendants' public statements, confirm that the Funding Freeze was the consummation of Defendants' decisionmaking process. The TANF Letters state, for example, that the actions were "[e]ffective today" and would remain in place "until further notice." Ex. 2; *see also* Ex. 1 ("immediately"). Defendants' public statements were in keeping with these mandates: HHS stated that on January 6 it "froze access to certain federal child care and family assistance funds" in Plaintiff States and that "access to these funding streams *is now restricted.*" Ex. 6 (emphasis added); *see New York v. Trump*, 133 F.4th 51, 67-69 (1st Cir.

2025) (agencies' "decisions . . . to implement" funding freezes constituted final agency actions);

*Massachusetts v. Trump*, 790 F. Supp. 3d 8, 27 (D. Mass. 2025).

The Funding Freeze also imposed immediate legal consequences. In the days following the Freeze and prior to the temporary restraining order, Defendants did not fulfill Plaintiff States' drawdowns totaling hundreds of millions of dollars. *See, e.g.*, ECF Nos. 9-3 ¶ 21, 9-6 ¶ 15. In addition to withholding funds, the January 5 and 6 Letters also imposed immediate data submission obligations with firm deadlines. *See supra* 4-6; *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (action is final when an agency has given "the States their 'marching orders'" and "expects [them] to fall in line" (citation omitted)).[10]

## II.    The Equities Compel a Preliminary Injunction

### A.    Relief Is Needed to Avert Irreparable Harm

Defendants' unilateral and immediate freeze of ACF Funds will cause irreparable harm to Plaintiffs in the administration and provision of these programs which support the most vulnerable children and their families in Plaintiff States. If the funds are cut, many programs will cease operations. Even a temporary disruption will constrain Plaintiffs' ability to administer life-saving benefits programs and deliver crucial social services to their most vulnerable families. Additionally, any freeze will impose significant operational challenges on state agencies and make it nearly impossible to manage their budgets and plan for the future.

"[T]o satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the

---

[10] Nor are these actions part of the narrow class "committed to agency discretion by law" and unreviewable in federal court. 5 U.S.C. § 701(a)(2). Where, as here, the authorizing statutes and appropriations legislation govern the scope of Defendants' discretion, there are "meaningful standard[s] by which to judge the [agency]'s action" and the actions are reviewable. *Dep't of Com.*, 588 U.S. at 772.

harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted). Plaintiffs need only show that there is a "threat of irreparable harm, not that irreparable harm already has occurred[.]" *New York v. Trump*, 767 F. Supp. 3d 44, 83 (S.D.N.Y. 2025) (quotation omitted).[11] In other words, the "increased 'risk' of negative consequences is sufficient to meet the irreparable harm requirement for a preliminary injunction." *Id.* (citations omitted). Plaintiff States have demonstrated this injury through harm to agencies that administer these programs and harms to state services as a whole.

*First*, Plaintiff States will not be able to cover the massive shortfall caused by the ACF Freeze, resulting in cuts to essential social services programs. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (irreparable harm established by a "significant change in [] programs and a concomitant loss of funding"). Many programs will be shuttered, and in States where the operation of those programs is mandatory, the State or its subdivisions will need to find funding to keep the programs operational, which will require them to take money from other programs, causing a domino effect of program reduction or closure. *See supra* 7-13.

*Second*, the Funding Freeze would create massive operational and budgetary uncertainty, making administration and basic planning for the future nearly impossible. Plaintiff States have a "need for certainty," and in the face of a "catastrophic" loss of funding, this too constitutes irreparable harm. *City & Cnty. of San Francisco*, 897 F.3d at 1244. States must devote time and resources to determining whether, for instance, they must change the eligibility rules or child care reimbursement rates in order to weather the Freeze or whether they must furlough staff. *See supra* 7-13.

---

[11] *Opinion modified on denial of reconsideration*, 778 F. Supp. 3d 578 (S.D.N.Y. 2025), *and modified*, 784 F. Supp. 3d 619 (S.D.N.Y. 2025).

*Third*, with the potential termination of child care and other support systems for hundreds of thousands of families, Plaintiffs expect that participants will seek answers and support from state agencies, causing further strain on Plaintiffs' ability to provide services. *See California v. Trump*, 786 F. Supp. 3d 359, 391 (D. Mass. 2025) (finding that states' "diver[sion of] resources from other key projects" constitutes irreparable harm); *see also E. Bay Sanctuary*, 993 F.3d at 677 (acknowledging that "economic harm can be considered irreparable" in APA cases).

*Fourth*, State agencies also risk damage to their reputations from the impending cutback and cessation of services. *See ExpertConnect, LLC v. Parmar*, 773 F. App'x 651, 653 (2d Cir. 2019) (affirming grant of preliminary injunction based on harm to "good will and reputation"); *see also Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1264 (10th Cir. 2016). State agencies are the public face of these services, and the ACF Funding Freeze generates the public perception that state agencies have engaged in fraud, thereby damaging their reputation and damaging the trust that State agencies have spent years building up. *See supra* 7-13. This reputational harm will erode trust among benefits recipients and chill participation in ACF-funded benefits programs. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (concluding that a "chilling effect on non-citizen use of public benefits" is irreparable harm).

*Fifth*, removing the safety net for children and their families will irreparably harm their residents and providers, which will in turn harm the provision of other State services and will increase enrollment in other State-provided benefits while decreasing State tax revenue. Millions of households rely on these services to allow parents to work, to provide quality care to children, and to afford basic expenses. And because the likely outcome of the Freeze is that numerous child care centers will close, the Freeze will have a massive effect on Plaintiff States' economies and on

demand for other benefits, as parents are forced to quit their jobs because they cannot find or afford child care. *See supra* 7-13.

*Finally*, if the Funding Freeze is not enjoined and Plaintiffs are forced to collect and produce data of millions of their residents in order to access these critical programs, they would face immense harm. Compliance would be extremely burdensome, requiring the diversion of significant resources away from Plaintiff States' operation of critical programs. *See supra* 13-14. Further, disclosing data containing millions of individuals' personally identifying information without any systems in place to limit its use or its confidentiality and security will harm States by undermining public trust in the programs. This is particularly true because, on the one hand, Plaintiff States have laws that protect the confidentiality of individuals who have applied for or receive public social services and, on the other hand, this administration has repeatedly taken the position that State records, once in possession of the federal government, are freely accessible by the Department of Homeland Security regardless of the purpose for which they were collected.[12]

### B.    The Balance of Equities and Public Interest Favor Emergency Relief

The equities and public interest, which "merge when the Government is the opposing party," also overwhelmingly favor preliminary relief. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff States have shown that the ACF Funding Freeze clearly violates the APA and the Constitution in numerous ways. This "extremely high likelihood of success on the merits" shows that preliminary relief "would serve the public interest." *League of Women Voters of U.S. v. Newby*,

---

[12] *Compare* Cal. Welf. & Inst. Code § 10850(a); Colo. Rev. Stat. Ann. § 26-1-114; N.Y. Soc. Serv. Law § 21(3); 305 Ill. Comp. Stat. § 5/11-9 *with* Exec. Order No. 14243: Stopping Waste, Fraud, and Abuse by Eliminating Information Silos, 90 Fed. Reg. 13681 (Mar. 25, 2025), *and* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj., *State of California v. U.S. Dept. of Health and Human Servs.*, 3:25-cv-05536 (N.D. Cal. Dec. 4, 2025), ECF No. 138.

838 F.3d 1, 12 (D.C. Cir. 2016). There is "substantial public interest in having government agencies abide by the federal laws that govern their existence and operations." *Id*. (citation omitted).

Moreover, the ACF Funding Freeze will significantly impair the functioning of key social services and anti-poverty programs and initiatives by cutting off funds that Plaintiff States rely upon for child care subsidies, cash assistance, and social services programs, all of which are essential for low-income and vulnerable families, who do not have savings that would allow them to weather a funding freeze. As a result, the equities and public interest strongly favor preliminary relief. *See New York*, 969 F.3d at 87.

In comparison, the federal government faces no "harm from an injunction that merely ends an unlawful practice or reads a statute as required[.]" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quotation omitted); *see also Planned Parenthood of N.Y.C., Inc., v. U.S. Dep't of Health and Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018). Indeed, there is a detailed process Defendants should have followed before imposing any penalties such as the ACF Funding Freeze. *See supra* 16. Moreover, to the extent Defendants argue that they face harm because they will be forced to expend funds due to a preliminary injunction or stay that they cannot recoup, statutes and regulations provide for the offset of future payments should any funds be ultimately disallowed. 45 C.F.R. §§ 98.65(d), 98.66(a), 98.66(h); 42 U.S.C. § 609(a)(1)(A). A preliminary injunction would preserve the decades-long status quo through which Plaintiff States continue to receive TANF, SSBG, and CCDF funds as mandated by Congress, without unlawful disruptions.

## CONCLUSION

For the foregoing reasons, Plaintiff States request that the Court enter a preliminary injunction and stay pursuant to 5 U.S.C. § 705 enjoining Defendants from implementing the ACF Funding Freeze, including implementation of the January 5 and 6 Letters in their entirety.

Dated: January 15, 2026

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Jessica Ranucci
Molly Thomas-Jensen
*Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8333
rabia.muqaddam@ag.ny.gov
jessica.ranucci@ag.ny.gov
molly.thomas-jensen@ag.ny.gov

*Attorneys for the State of New York*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Daniel C. Sheehan*
Daniel C. Sheehan*
*Deputy Attorney General*
Paul Stein*
Christine Chuang
Nicholas R. Green*
*Supervising Deputy Attorneys General*
Jesse Basbaum*
Alexis Piazza*
Harald Kirn*
James Bowen*
*Deputy Attorneys General*
California Department of Justice
300 South Spring Street, Los Angeles, CA
90013
(213) 269-6078
Daniel.Sheehan@doj.ca.gov

*Attorneys for the State of California*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
Nora Passamaneck
*Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for the State of Colorado*

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Vikas Didwania*
Vikas Didwania*
*Complex Litigation Counsel*
Sherief Gaber*
Michael Tresnowski*
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Vikas.Didwania@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Attorneys for the State of Illinois*

*Pro hac vice application forthcoming

**KEITH ELLISON**
Attorney General of the State of Minnesota
By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp*
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Attorneys for the State of Minnesota*