# EXHIBIT 14

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF ILLINOIS; and STATE OF MINNESOTA,<br><br>Plaintiffs,<br>v.<br><br>ADMINISTRATION FOR CHILDREN AND FAMILIES; ALEX J. ADAMS, in his official capacity as the ASSISTANT SECRETARY OF THE ADMINISTRATION FOR CHILDREN AND FAMILIES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as the SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Defendants. | Case No. 26-cv-00172<br><br>**SUPPLEMENTAL DECLARATION OF PRIYA KHATKHATE** |

**SUPPLEMENTAL DECLARATION OF PRIYA KHATKHATE**

1.   I am a resident of the State of Illinois. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2.   The Illinois Department of Human Services (IDHS) provides Illinois residents with streamlined access to integrated services, especially those who are striving for economic independence, and others who face multiple challenges to self-sufficiency.

3.   I am Deputy for Programs and have held this position since March 2025. As part of my work at IDHS, I am familiar with the Illinois programs that are funded by the Child Care and Development Fund (CCDF); Temporary Assistance for Needy Families (TANF); and the Social Services Block Grant (SSBG) (together, the "ACF Funds").

**Background on CCDF, TANF, and SSBG**

4.   The ACF Funds help Illinois provide food, shelter, childcare and other critical services to hundreds of thousands of vulnerable Illinois residents—including children, the elderly, domestic violence victims, and lower-income families.

   a.   **CCDF**

5.   The CCDF program provides over $12 billion nationwide annually in federal funding to support State, territorial, and tribal programs that provide low-income families with funding for child care, so that those families can work or go to school. CCDF funds also support teacher training and development, as well as programming and consumer education that educates

parents about child care options. CCDF is comprised of two separate funding streams: Child Care and Development Block Grant (CCDBG) and Child Care Entitlement to States (CCES).

6. For FY2025, Illinois was allocated approximately $400 million in CCDF funding (comprising CCDBG and CCES funds combined).

7. Illinois relies on CCDF funding to fund the Illinois Child Care Assistance Program (CCAP), which provides financial assistance to low-income families to help cover child care costs, enabling parents to work or attend school.

8. Illinois draws down CCDF funding on a monthly basis. Soon thereafter, money drawn for CCAP is sent to child care providers for reimbursement for services provided to Illinois families.

9. The CCAP is funded through CCDF, TANF, and state funds. If CCDF and TANF funds were frozen, and Illinois took no steps to reduce program liabilities or find additional state sources of funding, Illinois would run out of resources to support its current level of programming around April 2026.

10. Illinois initiated a $16 million drawdown on January 2, 2026. Illinois received those funds on January 13, 2026.

11. The IDHS Division of Early Childhood maintains a comprehensive overpayment and fraud detection and prevention framework. It investigates all referrals and allegations and employs a fraud liaison and an overpayment manager. Furthermore, IDHS submits referrals of fraud through the Office of Inspector General Fraud Portal when warranted. Additionally, in partnership with grantees, IDHS conducts regular reviews of CCAP providers' eligibility and payment files and submits identified overpayment referrals for formal processing and investigation.

      **b.**    **TANF**

12.    TANF is a block grant program that provides over $16.5 billion nationwide annually in federal funding to States, territories, and tribal governments, which in turn provide cash assistance and non-cash benefits to low-income families with children. In Illinois, the TANF program provides temporary financial assistance for pregnant women and families with one or more dependent children. TANF provides financial assistance to help pay for food, shelter, utilities, and expenses other than medical. It is one of the largest sources of cash assistance to low-income American families. TANF was created through the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA, P.L. 104-193).

13.    To receive TANF funds, Illinois must submit to the Administration for Children and Families (ACF) a plan that outlines how it will conduct the TANF program in compliance with federal work requirements, privacy protections, and other provisions. 42 U.S.C. § 602(a). Illinois submitted its last TANF plan on December 30, 2025.

14.    TANF funds are allocated according to a mandatory formula based on the share each State had of TANF funding in 2002. Illinois currently receives approximately $583 million annually in TANF funds and spends approximately $500 million on CCAP. Illinois uses state dollars in addition to the federal grant to fund the TANF cash assistance benefits to eligible Illinoisians.

15.    In Illinois, TANF is administered by the Family & Community Services Division of IDHS. Illinois families work with a local Family Community Resource Center, operated and staffed by IDHS, to apply for TANF cash assistance.

16. In 2025, more than 70,000 individuals (in more than 26,000 families) received benefits through the TANF cash assistance program each month to help pay for food, shelter, utilities, and expenses other than medical.

17. IDHS determines eligibility and conducts recertifications for TANF cash assistance (along with other benefits programs) using an integrated eligibility system. This program interfaces with state and federal data sources to verify certain financial and nonfinancial information to assist in determining eligibility for various benefits programs. IDHS' TANF eligibility criteria comply with federal guidelines, including mandatory verification of citizenship and immigration status.

18. TANF funds are awarded quarterly. Illinois received its Fiscal Year 2026, First Quarter award on December 16, 2025. Illinois expected to receive its Second Quarter award in mid-January.

19. Illinois draws down TANF funding monthly.

20. Illinois initiated a $25 million drawdown on January 5, 2026. It arrived on January 7. Illinois has not yet initiated another drawdown but expects to initiate another drawdown for the remainder of the first quarter award on January 14.

    **c. SSBG**

21. The SSBG program provides $1.7 billion nationwide annually in federal funding to States, providing them with "flexibility" and funding to support social services in one of five categories: (1) "achieving or maintaining economic self-support"; (2) "achieving or maintaining self-support"; (3) addressing neglect, abuse, or exploitation of children and vulnerable adults; (4) preventing institutional care and supporting community-based care; and (5) where institutional care is needed, supporting application and admission and providing services to institutionalized individuals. 42 U.S.C. § 1397.

22. Congress has provided that SSBG funds must be allocated based on each State's percentage of the national population, based on census data. 42 U.S.C. § 1397b(b). Unlike CCDF and TANF, States are not required to submit a State plan to be eligible for SSBG funding. Instead, Illinois must submit annual reports describing how it used the funds in the year prior. 42 U.S.C. § 1397e; see also 45 C.F.R. § 96.74. Illinois submitted its last annual report on December 31, 2025.

23. For FY2025, Illinois was allotted approximately $62 million in SSBG funds.

24. SSBG funds support several social service programs, including programs that support maternal and family health, nutrition and food assistance, family support and prevention, domestic violence prevention, behavioral health and disability services, employment and self-sufficiency, youth services, corrections and reentry, and aging services.

25. In FY2025, approximately 216,000 Illinois recipients—including approximately 21,000 children—received SSBG-funded services.

26. Illinois draws down SSBG funding monthly.

27. Because Illinois only draws down the SSBG funds it needs on a monthly basis, a freeze on SSBG funds would have immediate consequences. IDHS would need to take steps as early as February to notify grantees of the need to suspend services.

28. Illinois initiated a drawdown on January 6, 2026. The funds arrived on January 7. Illinois has not yet initiated another drawdown but expects to initiate another drawdown on January 14.

## The Funding Freeze Letters

29.     On January 6, 2026, ACF sent correspondence to Illinois relating to CCDF, TANF, and SSBG (collectively, the "Freeze Letters").

      **a.  The CCDF Letter**

30.     The CCDF Letter states that "ACF will be conducting a thorough review of the State's use of funding for compliance and alignment with statutory requirements. ACF is placing the State on temporarily restricted drawdown of CCDF funds until additional fiscal accountability requirements are implemented and necessary information is provided for ACF to complete its review."

31.     The CCDF Letter directs Illinois to implement "fiscal accountability requirements" to "improve compliance with relevant statutes and program regulations," and specifies that such requirements must "include submission of verified attendance documentation for subsidized child care services to the State prior to further draw down of federal CCDF funding." That documentation must establish the days or hours of care provided; must contain "contemporaneous payment information"; and must be "sufficient for ACF to determine that the drawdown amount is reasonable, allowable, and allocable."

32.     The CCDF Letter further states that "CCDF funds shall be temporarily placed on restricted drawdown until these additional fiscal accountability requirements are implemented" and that Illinois "will be placed on this temporary restricted drawdown for all CCDF funds provided by ACF until further notice, pending successful and satisfactory review of the requested information."

      **b. The TANF Letter**

33. The TANF Letter states that "[e]ffective today," ACF is reviewing Illinois' "TANF State Plan for completeness and for program compliance with applicable laws. As a result, ACF is placing the state TANF program on a restricted drawdown in accordance with 2 C.F.R. § 200.339."

34. The TANF Letter makes three specific demands.

35. ***First***, the TANF Letter requires Illinois to "provide the complete universe of TANF administrative data that exist and are in the state's possession for all recipients for all available years, and at least 2022 to 2025. This includes recipient name, address, Social Security Number (if collected), date of birth, A-number (as applicable), and any state identification numbers used for program administration."

36. ***Second***, the TANF Letter demands "documentation demonstrating that the State of Illinois has verified the eligibility of all TANF applicants and recipients in accordance with the requirements of the Personal Responsibility and Work Opportunity Reconciliation Act, 8 U.S.C. § 1611, which limits TANF eligibility to United States citizens and qualified aliens. This documentation should include the policies, procedures, system controls, and verification records used by Illinois to confirm citizenship or qualified alien status during the application and recertification processes."

37. ***Third***, the TANF Letter requests "a comprehensive list of all organizations, subcontractors, service providers, local agencies, community groups, and any other entities that received TANF funds from the State of Illinois, directly or indirectly, during the period from 2019 through 2025. For each organization, to the extent the information exists and is in the state's possession, I request the amount of TANF funding provided, the purpose for which the funds were

7

awarded, and documentation describing the State's oversight mechanisms, monitoring activities, and verification processes used to ensure proper use of TANF dollars."

38.     The TANF Letter sets a deadline of January 20, 2026 for Illinois to provide the required information.

39.     The Letter states that Illinois will be placed "on a temporary restricted drawdown for all TANF funds provided by ACF until further notice, pending review of the state's current TANF plan for completeness and ACF confirming compliance with applicable laws."

    c.  **The SSBG Letter**

40.     The SSBG Letter states that "ACF will be conducting a thorough review of the State's use of funding. As a result, ACF is notifying your office that the State is not authorized to further draw down" SSBG funds "without complying with the terms of a temporary restricted draw down until this review is complete."

41.     The SSBG Letter make three specific demands of Illinois that are nearly identical to the requests made in the TANF Letter described above. The SSBG Letter also sets a deadline of January 20, 2026 for Illinois to provide the information requested.

## Harms associated with Funding Freeze

42.     The freeze on ACF funds created uncertainty in IDHS's budgeting process, as it must prepare to cover expenses with state revenue in the absence of federal funding.  Furthermore, to account for the possibility of budget shortfall, IDHS must immediately use substantial resources to consider how to reduce program liabilities to account for the decrease in program funds that results from the freeze in funds. IDHS could be required to change the eligibility to participate in early childhood programming (causing fewer children to receive care), increase the co-pay a

family must pay to receive child care, create a wait list for program participation, or cut the amounts that the agency pays out to child care providers.

43. If IDHS had to reduce the income eligibility requirement for family participation in the CCAP from 225% of the federal poverty level to 116% of the federal poverty level (which is one option under consideration to reduce program liabilities), over 80,000 children in Illinois could lose child care programming.

44. A disruption in the provision of child care benefits to Illinois parents would have catastrophic consequences for the state. ACF funds allow low-income families to secure child care while they work or attend school. In Illinois, there are currently over 150,000 children who receive ACF-funded child care. While these children are receiving quality care, their parents can participate in the work force, which supports the regional economy and increases families' household income. ACF funds also are used to support access to after-school and summer programming, which supports children's growth and allows parents to work.

45. If such care were disrupted and parents were forced to stay home to care for children, household budgets would suffer, employers would lose productive employees, and demands for unemployment benefits would increase. Even children who do not receive ACF-funded care may lose care if facilities are forced to reduce staff or shut down due to a lack of funding. Children would lose access to quality care and other programming, which could result in placement in unsafe situations and the long-term harm that comes from lack of access to quality early-childhood education often provided in daycare settings. Illinois would have to expend additional resources to identify, review, and license new child care providers to replace those that shut down due to the lack of federal funding. The net result of these employment and productivity losses would be slowed economic growth in Illinois and a strained Illinois budget.

46.     Furthermore, removing access to TANF and SSBG funds in Illinois would sow chaos for families in Illinois, and would harm Illinois as the state would be required to find funds for services.

47.     For example, SSBG funding supports all seven crisis nurseries in Illinois. These nurseries provide 24/7 emergency and short-term care for children under age seven when families face medical, mental health, substance use, housing, or other crises. In FY2025 alone, these programs served 7,310 children, allowing parents to stabilize without putting their children at risk or triggering DCFS involvement. If SSBG funding were halted, providers would lose 15–33% of their operational funding support, forcing reductions in capacity or closures. Families in crisis would be left with no safe option for their children, increasing the likelihood of unsafe caregiving arrangements or child welfare system involvement.

48.     Furthermore, without SSBG funding to support the Better Birth Outcomes programs in Illinois and the High Risk Family Case Management Pilot, pregnant persons, new parents, and their infants in the first six months of life will not receive critical early services. Without timely assessment by a registered nurse or other trained staff, conditions contributing to morbidity and mortality may go unrecognized until later in pregnancy or infancy and result in greater need for care and higher healthcare costs.

49.     IDHS also faces the risk of damage to its reputation from the impending cutback and/or cessation of services as the public face of these services. The ACF Funding Freeze generates the public perception that state agencies have failed or engaged in wrongdoing, thereby damaging their reputation and damaging the trust that Illinois agencies have spent years building.

**The Feasibility of the Data and Documentation Demands**

50. I am informed and believe that the scope of the data and documentation demands is not how any oversight body has ever conducted quality control, audits, or any other program integrity purpose relating to CCDF, TANF, or SSBG.

51. Furthermore, attempting to comply with the onerous data and documentation demands would require the re-deployment of significant personnel and resources diverted from administering Illinois' critical programs.

52. I understand program staff at IDHS estimate it would take a minimum of six weeks to pull attendance and financial payment information from providers across Illinois regarding the CCAP. While Illinois collects attendance records at the provider level, Illinois providers maintain child level records. If by "verified attendance records" ACF means it wants copies of the actual records each child care provider maintains to record attendance, it could take more than six months to gather such information given the number of providers and the limited personnel available to work on this demand.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 14, 2026, at Chicago, Illinois.

Priya Khatkhate
Digitally signed by Priya Khatkhate
Date: 2026.01.14 12:41:01 -06'00'

Priya Khatkhate