# EXHIBIT 15

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF ILLINOIS; and STATE OF MINNESOTA,<br><br>　　　　　　　Plaintiffs,<br>　　　　v.<br><br>ADMINISTRATION FOR CHILDREN AND FAMILIES; ALEX J. ADAMS, in his official capacity as the ASSISTANT SECRETARY OF THE ADMINISTRATION FOR CHILDREN AND FAMILIES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as the SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>　　　　　　　Defendants. | Case No. 26-cv-00172<br><br>**DECLARATION OF RAJNI CHAWLA** |

## DECLARATION OF RAJNI CHAWLA

I, Rajni Chawla, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Executive Deputy Commissioner of the New York State Office of Temporary and Disability Assistance (OTDA).

2. As OTDA's Executive Deputy Commissioner, I am the principal assistant to the Commissioner of OTDA. I advise on matters of policy and co-manage the operations of the agency with the Commissioner.

3. The mission of OTDA is to help vulnerable New Yorkers meet their essential needs and advance economically by providing opportunities for stable employment, housing, and nutrition. The agency's vision is to empower New Yorkers to improve their financial security and household stability in support of strong families and communities.

4. OTDA administers a wide range of programs that provide services and support to low-income families and individuals, including programs funded through the federal Temporary Assistance for Needy Families (TANF) block grant and contingency grant. OTDA oversees these programs, which are administered through social services districts, providing policy guidance and systems support to the districts in their implementation of OTDA programs, as well as monitoring and quality assurance of district operations and adjudication of fair hearings reviewing district determinations.

5. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with OTDA staff, or from my review of relevant documents and information.

6. I understand that on January 5th and 6th, the U.S. Administration for Children and Families (ACF), which sits within the U.S. Department of Health and Human Services (HHS), unilaterally froze federal funding for three programs that provide essential support for vulnerable children and their families in New York and four other states (the "Plaintiff States"). These mandatory funding programs are: the Child Care and Development Fund (CCDF); Temporary Assistance for Needy Families (TANF); and the Social Services Block Grant (SSBG). OTDA administers one of these programs in New York—TANF. A separate New York State agency, the Office of Children and Family Services (OCFS), administers the two other programs.

7. TANF is a block grant program that provides billions of dollars in federal funds to states, who in turn provide cash assistance and non-cash benefits and services to low-income families with children. It is one of the largest sources of cash assistance to low-income families and a cornerstone of New York's anti-poverty work. New York State receives approximately $2.7 billion annually in TANF funding and provides hundreds of thousands of New Yorkers with basic recurring cash assistance and non-cash assistance benefits.

8. On January 6th, OTDA received a letter from ACF implementing the funding freeze (the "TANF Letter") (attached as Exhibit A). The TANF Letter stated that the freeze was "[e]ffective today," and that ACF is "reviewing New York's TANF State Plan for completeness and for program compliance with applicable laws." It further stated that, as a result, "ACF is placing the state TANF program on a restricted drawdown in accordance with 2 C.F.R. § 200.339."

9. The TANF Letter makes three specific demands of Plaintiff States, but it imposed an immediate freeze.

10. *First*, the TANF Letter requires New York to "provide the complete universe of TANF administrative data that exist and are in the state's possession for all recipients for all

available years, and at least 2022 to 2025. This includes recipient name, address, Social Security Number (if collected), date of birth, A-number (as applicable), and any state identification numbers used for program administration."

11. **_Second_**, the TANF Letter demands that New York provide "documentation demonstrating that the" state "has verified the eligibility of all TANF applicants and recipients in accordance with the requirements of the Personal Responsibility and Work Opportunity Reconciliation Act, 8 U.S.C. § 1611, which limits TANF eligibility to United States citizens and qualified aliens." It further states that this "documentation should include the policies, procedures, system controls, and verification records used by [Plaintiff States] to confirm citizenship or qualified alien status during the application and recertification processes."

12. **_Third_**, the TANF Letter requests "a comprehensive list of all organizations, subcontractors, service providers, local agencies, community groups, and any other entities that received TANF funds from the [state], directly or indirectly, during the period from 2019 through 2025." For each organization, "to the extent the information exists and is in the state's possession," the letter further requests "the amount of TANF funding provided, the purpose for which the funds were awarded, and documentation describing the State's oversight mechanisms, monitoring activities, and verification processes used to ensure proper use of TANF dollars."

13. The TANF Letter set an impracticable deadline of January 20, 2026, for Plaintiff States to provide the required information. Producing such detailed information on this timeline is impossible. In the meantime, New York's ability to access TANF funds had been completely shutoff despite having an approved TANF State Plan.

14. The TANF Letter does not provide examples of any alleged noncompliance by New York State. Nevertheless, it states that New York will be placed "on a temporary restricted

drawdown for all TANF funds provided by ACF until further notice, pending review of the state's current TANF plan for completeness and ACF confirming compliance with applicable laws."

15. I provide this brief declaration to attest to the robust procedures OTDA, on behalf of New York State, ensures are in place to prevent ineligible TANF benefits distributions and address erroneous payments or attempted fraud, as well as to attest to some of the harms we have been able to document quickly to support Plaintiffs' request for preliminary relief from the immediate freeze of TANF funds.

16. To ensure TANF funds are issued only to TANF eligible recipients, OTDA has a robust eligibility determination process that social services districts must follow for applicants and recipients of recurring and emergency cash assistance and non-cash benefits, and clearly defined program requirements for other TANF funded services and supports. Further, OTDA conducts reviews of social services districts to ensure program compliance, in accordance with federal and State statutes, rules and regulations. OTDA provides extensive direction and support via on-site monitoring, policy directives, meetings, trainings, phone calls, and emails to local social services districts to help guide them in ensuring the accuracy of their determinations.

17. Applicants and recipients of cash assistance grants must document to social services districts that they are TANF eligible at application and recertification. Additionally, if a household experiences a change in between certifications, they are required to report the change to the applicable district within ten (10) days to ensure that the household continues to be eligible for the grant.

18. Such eligibility determination process includes an interview conducted by the social services district with the applicant and recipient, at which time several documents are collected by the district to determine eligibility. Each applicant and recipient must, as a condition

of eligibility for themselves or others in the applying household, furnish evidence to the district to provide verification of those factors which affect eligibility and benefit amount, including: identity, residence, family composition, housing costs, income and resources, and United States citizenship or, if not a United Citizen, lawful residence in the United States.

19. Additionally, OTDA requires that social services districts utilize approved federal and State databases to validate and monitor for compliance with program eligibility for each applicant and recipient of TANF funded cash assistance and non-cash benefits and services. The Front End Detection System (FEDS) program is mandated by New York for every social services district. Each district develops a list of indicators that could uncover potential fraud or misleading/erroneous statements on the application. Any indicators that cannot be resolved by the eligibility worker are referred for investigation prior to the case being opened. Social services districts must use the federal Systematic Alien Verification for Entitlements (SAVE) system to verify an applicant or recipient's qualified alien and sponsorship status.

20. OTDA also ensures that various computer matches also take place to confirm eligibility, in compliance with several federal laws and regulations. OTDA utilizes the Income Eligibility Verification System (IEVS), as required by 42 U.S.C. § 1320b-7 to confirm continuing eligibility and benefit levels. OTDA uses IEVS to receive federal tax information, confirm its availability to the recipient and whether it exceeds TANF income and resources. Cases that appear to have income exceeding TANF income and resources are referred to the applicable social services district to determine if the identified income and resources are available and if they impact the recipient's continuing eligibility.

21. OTDA also reviews Public Assistance Reporting Information System (PARIS) to identify if benefits are being received in another state. OTDA also conducts a Border Match with

the Massachusetts Department of Transitional Assistance to identify duplication of benefits. OTDA refers match results to social services districts for investigation and appropriate case action.

22. OTDA conducts a Prison Match to identify cash assistance recipients who are incarcerated and have been sentenced to a term in a New York State prison as reported to the New York State Department of Corrections and Community Supervision (DOCCS), a New York local jail as reported to DOCCS, or a federal prison as reported on the SSA Federal Prison file. OTDA refers match results to social services districts for investigation and appropriate case action.

23. OTDA also undertakes a quarterly match to identify individuals whose Electronic Benefits Transfer (EBT) cash transactions are conducted 100% out of state during a calendar quarter which may indicate residence in a state other than New York. The matches are then referred to the social services districts for investigation. Based upon the results of that investigation, appropriate case action is then taken by the social services district.

24. OTDA performs monthly matches of active TANF recipients with the federal National Directory of New Hires (NDNH), which contains nationwide W-4 information. The TANF matches involve all active adult recipients. NDNH matches are verified through a third-party vendor or by sending Manual Employment Verification (MEV) forms to employers. Responses from the third-party vendor and MEVs are provided to the social services districts for investigation and appropriate case action.

25. OTDA also runs daily and monthly matches against the New York State Directory of New Hires, to identify applicants and recipients who have filed a W-4 with New York State and thus potentially identify new employment that could impact TANF eligibility.

26. The Welfare Fraud Reporting Web-based Referral System enables the public to electronically submit welfare fraud allegations to OTDA. These submissions contain information

regarding individuals suspected of public assistance fraud and are referred to the applicable social services districts by OTDA for investigation and appropriate case action.

27. In addition to computer matches, OTDA requires each social services district to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When a social services district determines it has issued benefits to a recipient as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the district attorney's office for prosecution or to OTDA's Office of Administrative Hearings for an Administrative Disqualification Hearing (ADH). If the recipient is found to have committed an intentional program violation (IPV), the claim is established and recovery is pursued from the recipient. If a recipient is found to have committed an IPV in a court proceeding or at an ADH, the recipient may be disqualified from the participation in the program for a period of time.

28. Moreover, as part of its internal controls, OTDA conducts work participation verification reviews, which is a quality assurance process that selects representative samples of work-eligible assistance cases for purposes of verifying the accuracy of the social services district's participation reporting processes, the accuracy of reporting, and compliance with federal and state regulations. OTDA conducts a yearly review of a sample of cases according to New York's HHS approved Work Verification Plan. The social services district is required to establish claims to recover any benefits issued in error when it is determined that fraud has occurred. When the social services district determines benefits were issued as a result of fraud, the facts used in the determination are reviewed. If the suspected fraud is substantiated by the available evidence, the case is referred to the county's district attorney's office for prosecution or to OTDA's Office of

Administrative Hearings for an ADH. If the client is found to have committed an IPV, the claim is established and recovery is sought from the client.

29. OTDA also undertakes sample TANF data collection activities, consistent with 42 U.S.C. § 611(a)(1)(B) and 45 C.F.R. § 265.5. On a monthly basis, OTDA uses stratified random sampling to select a sufficient number of TANF/Maintenance of Effort (MOE) cases to meet federal reporting requirements. These monthly caseloads are reviewed by regional OTDA office staff who analyze case records and eligibility system information. OTDA staff then review all sampled cases for employment and work activities.

30. Without emergency relief, New York State faces immediate harm in its ability to provide necessary services to children and families in need.

31. We initially confirmed on January 7th and again on January 13th that $106 million TANF drawdown submitted by New York was still showing as pending review, and New York's Office of the State Comptroller had not received it. The draw request date was January 5, which pre-dates the TANF Letter, and the delay in receipt was unusual because drawdowns are typically completed within one (1) business day which would be in accordance with New York's Cash Management Agreement with the US Treasury. The draw request is related to the State's December 2025 "settlement payments" to local social services districts, primarily for reimbursement of assistance benefit costs incurred by local social services districts in September 2025 which are TANF-eligible costs. What this means is that New York State already paid out $106 million throughout the state in December, and was expecting reimbursement from ACF for those funds.

32. Post the temporary restraining order, that draw down has been fulfilled. New York received the funds on January 14th.

33.     Without relief, New York would have expended $106 million of State funds to pay for TANF expenditures, despite ACF's clear statutory obligation to provide these funds, *and* be unable to obtain any new funds without any clear end date.

34.     While the $106 million is the value of payments New York State made to reimburse the local social services districts in December, it does not begin to represent the costs that districts have expended for the past few months that New York State will not be able to timely reimburse, or even reimburse at all, if TANF funds are frozen once more.

35.     A loss of TANF reimbursement to social services districts would likely have significant programmatic and operational impacts. Each social services district would need to address the loss of funding within their own local budgets and the impacts would vary, but it could be anticipated that social services districts could implement staffing reductions and the elimination of non-mandated services.

DATED: January 14, 2026

*Rajni Chawla*

Rajni Chawla

Executive Deputy Commissioner
New York State Office of Temporary
and Disability Assistance