# EXHIBIT 16

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF ILLINOIS; and STATE OF MINNESOTA,<br><br>　　　　　　Plaintiffs,<br>　　　　　v.<br><br>ADMINISTRATION FOR CHILDREN AND FAMILIES; ALEX J. ADAMS, in his official capacity as the ASSISTANT SECRETARY OF THE ADMINISTRATION FOR CHILDREN AND FAMILIES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as the SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>　　　　　　Defendants. | Case No. 26-cv-00172<br><br>**DECLARATION OF LAURA DARMAN** |

# DECLARATION OF LAURA DARMAN, EXECUTIVE DEPUTY COMMISSIONER NEW YORK STATE OFFICE OF CHILDREN AND FAMILY SERVICES (OCFS)

1. I, LAURA DARMAN, pursuant to 28 U.S.C. § 1746 declare as follows:

2. I am a resident of the State of New York. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

3. I am currently the Executive Deputy Commissioner of the Office of Children and Family Services (OCFS).

4. I began working as Executive Deputy Commissioner for OCFS in 2025.

5. I submit this declaration in connection with Plaintiff States' Motion for a Preliminary Injunction pertaining to the January 6, 2026 directive letters from the United States Department of Health and Human Services (HHS) Administration for Children and Families (ACF) restricting the State of New York's access to Social Security Block Grant (SSBG) and Child Care Development Fund (CCDF) funds. I have personal knowledge of the matters set forth below, or with respect to matters for which I do not have personal knowledge, I have reviewed information gathered from OCFS records by others within the organization.

*OCFS Role in SSBG Administration*

6. In New York, OCFS provides child welfare services through a state supervised-county administered service model, under which OCFS establishes practice standards, provides training and technical assistance, and issues subawards for programmatic funding under several federal grant programs, including the SSBG program established pursuant to 42 U.S.C. § 1397 et seq., to local departments of social

1

services (LDSS). OCFS has complied with the statutory requirements to receive SSBG funds, with its most recent Intended Use Plan (IUP) submitted on 8/29/25 and set to expire on 03/31/2027.

7. Under the SSBG, OCFS receives approximately $93 million annually. In 2025 OCFS also transferred over $204 million in TANF funds into the SSBG.

8. Funding is awarded on a quarterly basis, via a Notice of Award providing a quarterly credit allotment, with the most recent Notice of Award having been issued by ACF on 12/10/25. Funding is then drawn down regularly, as authorized expenditures are incurred, against the quarterly credit allowance.

*OCFS SSBG Programming*

9. By not following the legal process prescribed by federal law and regulations, which include notice of a final determination and a right to appeal and be heard before any disallowances, penalties or sanctions can be imposed, ACF has, and will continue to cause, irreparable harm to New York State. as a result of the delay and threat of cessation of SSBG funding. SSBG has provided decades upon decades of predictable, relied-upon social services funding under a consistent claiming structure. New York State has relied on the SSBG for over 40 years for funding essential services. The state and its local districts account for receipt of these SSBG funds in their annual programming budgets. New York complies with the federal laws governing eligibility for SSBG funds and, in turn, anticipates annual SSBG funding based upon the terms of those federal laws.

10. Of the approximately $93 million in SSBG annual funding, OCFS distributes approximately $88 million directly to LDSS for allowable expenditures such as

|      | |
|------|---|
| | adoption services, child welfare case management, and child abuse and maltreatment prevention services. |
| 11.  | As demonstrated in our most recent IUP, allocations to LDSS are based on the historical LDSS' claims for the 12-month period ending June 30 of the prior federal fiscal year (FFY) and includes a set-aside for reimbursement of expenditures for the provision and administration of adult protective services as well as residential and non-residential services for certain victims of domestic violence. |
| 12.  | Funding provided to the LDSS by the SSBG may be used for any allowable SSBG service as defined by the federal Administration for Children and Families.  The LDSS must use the funds for specific allowable services under their program operation which may include but are not limited to: Adoption support, aftercare, child care,  emergency cash, emergency goods and/or shelter, alternative child protective response programs (family assessment response), day services, family planning, health-related services, homemaker services, home management services, housekeeper/chore services, housing improvement, information and referral services, parent services, post adoption services, preventive services for children, protective services for adults, protective services for children, services for victims of domestic violence, transportation, related training and administrative activities. |
| 13.  | NYS OCFS will also use less than 5% of the allotment for training or other administrative activities at the state level. |
| 14.  | Services provided by the LDSS under SSBG funding will allow families to achieve or maintain economic self-support and self-sufficiency to prevent, reduce, or eliminate dependency; prevent or remedy neglect, abuse, or exploitation of children and adults |

|      | unable to protect their own interests, or preserve, rehabilitate or reunite families; or prevent or reduce inappropriate institutional care by providing community-based care, home-based care, or other forms of less intensive care. |
|------|---|
| 15.  | Adoption services include assisting a child to secure an adoptive home. |
| 16.  | Child preventive services, defined in New York State Social Services Law (SSL) §409, provide supportive and rehabilitative services to children and their families to avert an impairment or disruption of a family that will or could result in the placement of a child into foster care. Preventive services enable a child who has been placed in foster care to return to their family at an earlier time than would otherwise be possible or reduces the likelihood that a child who has been discharged from foster care returns to such care. Some preventive services are mandated to be provided to children and their families who are at risk of placement or replacement in foster care. |
| 17.  | Child protective services, services made on behalf of children under the age of 18 (including runaway children) whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of a parent or other person legally responsible for the child through non-accidental means. This encompasses sexual abuse, as well as physical, mental, or emotional abuse or maltreatment, including the failure to provide adequate food, clothing, shelter, or education. |
| 18.  | In New York, when a report of suspected child abuse or maltreatment is registered and referred to the LDSS, child protection services are mandatory. Thus, when the LDSS receives a report of suspected child abuse or maltreatment, LDSS are required |

to investigate and provide services as necessary which could include preventive services, protective services, adoption services, and more.

19. For context, during the 2024 calendar year, there were more than 143,836 CPS reports registered and referred to LDSS for investigation. Pursuant to these investigations the LDSS provided placement prevention and intervention services for approximately 31,450 families and out-of-home placement support for approximately 13,115 children and youth.

*Impacts of January 6, 2026 ACF Letter and Restricted Drawdown*

20. On January 6, 2026, OCFS received a letter from ACF indicating that "the State is not authorized to further draw down SSBG funding without complying with the terms of a temporary restricted draw down until this review is complete." The letter requires New York State provide the complete universe of SSBG administrative data that exist for all grantees, their recipients and subrecipients, for all available years by January 20, 2026. The letter further indicates that "[t]he State of New York will be placed on a temporary restricted drawdown for all SSBG funds provided by ACF until further notice, pending successful and satisfactory review of the requested information."

21. The loss of this funding could result in basic needs being unmet and potential increase of children entering into the foster care system. Additionally, loss of this funding could result in community-based organizations and services providers having to close their doors and/or drastically reduce services, whereby continuing to decimate an already over-burdened and under-resourced continuum of resources and supports.

22. Based on data as to the extent of past service provision, claiming and federal drawdown, suspension of SSBG funding will significantly reduce funding for LDSS

5

to provide mandatory services to children and families in need. However, as these services are mandated, the freeze will result in local governments being pushed toward financial disaster.

23. Additional mandated services for LDSS utilizing SSBG include Adult Protective Services and some Domestic Violence services.

24. Domestic violence services, involve identifying, assessing, providing, and evaluating services to wives, husbands, or persons living together, with or without children, to resolve the problems leading to violence, or to establish themselves independently, if necessary, to avoid violence.

25. Adult protective services are provided to those eighteen and older who are unable to protect their own interest.

26. Additionally, ACF's freeze has created a significant administrative burden on OCFS. SSBG funds are utilized by all of New York through the LDSS. Each LDSS requires notice and direction on the status and availability of funds. This burden is exacerbated by the cryptic and inconsistent communications from ACF, and the uncertainty as to whether funding remains available for restricted drawdowns or if it is wholly inaccessible.

27. At a minimum, a restricted drawdown creates operational and budgetary uncertainty, making administration and basic planning for the future nearly impossible.

28. As LDSS have the flexibility in how they can utilize SSBG funds, the potential impact to the services outlined above is dependent on exactly how the LDSS and associated local governments have planned for the utilization of funds in the coming fiscal year to support the enumerated services.

*OCFS's Role in CCDF Administration*

29. OCFS acts as the lead agency for child care policy, regulatory oversight, and CCDF administration for New York State.

30. OCFS is responsible for licensing and oversight of all child day care facilities and enrolled legally exempt child care providers for the State of New York, with the exception of child day care centers in New York City. OCFS oversees New York State's Child Care Assistance Program (CCAP).

31. The Child Care and Development Block Grant Act (CCDBG) is the federal law governing child care programs for low-income working families. Lead Agencies receive discretionary CCDBG funds combined with mandatory funds from the Child Care Entitlement to States program (CCES). CCES is permanently authorized in Section 418 of the Social Security Act. CCES funds generally must be spent in accordance with CCDBG Act rules. Together, the CCES and CCDBG are commonly called the Child Care and Development Fund (CCDF).

32. The U.S. Department's Health and Human Services' (HHS) Administration for Children & Families (ACF), Office of Child Care (OCC), administers CCDF.

33. The regulations governing the administration and disbursement of CCDF funds include guidelines for submission and approval of the State's CCDF Plan covering a 3-year fiscal period; conducting of audits and financial reporting requirements; and submission of a corrective action plan if the State is determined to be out of compliance with the approved CCDF Plan. The regulations also specify processes for appeals and hearings before disallowance of funds, penalties, and/or sanctions can be imposed against the State for noncompliance.

34. OCFS is the sole state agency responsible for administering the state plan for the CCDF. OCFS administers the program by distributing funds to New York's local departments of social services (LDSSs). The LDSSs receive applications, verify a family's eligibility, and pay eligible and participating child care providers for CCDF-eligible children enrolled in their facilities. OCFS requires all LDSSs to enter into an agreement with OCFS to receive CCDF funds. Part of CCDF funds are retained by OCFS for program administration and oversight, and child care quality investments and supports, as detailed below.

*OCFS CCDF Programming*

35. CCDF is the primary federal grant program that funds New York State's provision of child care assistance to eligible families.

36. CCDF is a critical federal funding source helping eligible families afford child care, and supports child care providers and the early childhood workforce across New York State. OCFS receives approximately $626 million annually in CCDF funding, representing approximately 37% of New York's total CCAP funding. This support plays a crucial role in enabling New York's parents and caregivers to work, pursue education, or participate in job training while their children are cared for in safe, nurturing learning environments.

37. In New York State, CCDF supports:

   a. The New York Child Care Assistance Program (CCAP), which helps eligible families afford child care;

   b. Child care quality investments, including coaching, professional development, and learning materials;

  c. Infant and toddler quality supports; and

  d. Program administration and oversight, including licensing and monitoring.

38. CCDF funding supports New York State's Child Care Assistance Program (CCAP), which in Federal Fiscal Year (FFY) 2024-25 helped more than 219,000 children from over 129,000 families access child care so parents could pursue education, work, or participate in training. These services were delivered through a statewide network of more than 18,883 providers.

39. CCDF funding is also crucial to maintaining child care providers' operations, supporting working families, and promoting children's health, safety and development.

40. To give an example of CCDF's impact in FFY 2024-2025:

  a. Assisted parents of over 219,000 children to find child care for their families, through the early childhood councils funded throughout the state;

  b. Delivered approximately 1248 hours of infant–toddler quality coaching to an estimated 549 early childhood professionals in 2024;

  c. CCDF-funded staff conducted approximately 15,682 unannounced inspections in 2024, and investigated approximately 3,937 complaints of child health and safety or illegal child care programs operating in NYS. Approximately 2,149 of those complaints alleged that children were in imminent danger of harm; and

  d. Over 7,000 child care programs received epinephrine autoinjectors to use in the event of an allergy emergency, in addition to receiving training and support for the implementation.

*OCFS's CCDF Plan and the January 6, 2026 ACF Letter*

41. OCFS submitted its CCDF Plan for federal fiscal years 2025-2027 to the OCC on July 1, 2024. On November 8, 2024, OCC conditionally approved New York State's FFY 2025-27 CCDF Plan; it is a fully approved plan with conditions that must be met. OCC determines the conditions are met when provisions of CCDBG are fully implemented and the implementation plan action steps are completed. On January 9, 2025 the appendix for the CCDF plan was approved by OCC which lists action steps that must be taken to comply with the conditions.

42. On January 6, 2026 New York State received a letter from ACF indicating that it was "placing the State on temporarily restricted drawdown of CCDF funds until additional fiscal accountability requirements are implemented and necessary information is provided for ACF to complete its review." The letter requires New York State to immediately implement additional fiscal accountability requirements including submission of verified attendance documentation for subsidized child care services to the State prior to further draw down of federal CCDF funding through the Payment Management System (PMS). According to the letter, "CCDF funds shall be temporarily placed on restricted drawdown until these additional fiscal accountability requirements are implemented." The letter further indicates that "[t]he State of New York will be placed on this temporary restricted drawdown for all CCDF funds provided by ACF until further notice, pending successful and satisfactory review of the requested information." To date, OCFS has not received any final determinations of noncompliance.

43. For background on how drawdowns are completed, the Department of Health and Human Services' (HHS) Division of Payment Management uses a custom-developed Payment Management System (PMS) that provides federal awarding agencies and state grant recipients the tools to manage grant payment requests, and disbursement reporting activities. It is a full-service centralized grants payment and cash management system. For most New York State agency accounts, the Office of the State Comptroller (OSC) initiates payment requests based on the project's accounts receivable balance in SFS. OSC regularly initiates drawdowns.

*Impacts of January 6, 2026 ACF Letter and Restricted Drawdown*

44. Due to the restricted drawdown of CCDF, OCFS has a limited buffer. OCFS expects the following will be impacted:

    a. CCAP families and the providers who serve them, as families will likely lose assistance if there is a shortage on funding and as a result not be able to work, go to school or participate in training programs, which could having a devastating effect on New York's economy. Over 70% of NYS child care providers serve families with CCAP, and those providers will likely have to reduce their hours pr close their programs if they do not have the families to sustain their business, leaving families across NYS without access to child care and exacerbating the child care shortages that already exist across the state;

    b. All licensed programs who are supported by OCFS. OCFS licensing staff inspect programs on a quarterly basis, ensuring all child care programs maintain high quality health and safety standards. If there is a lack of funds,

and OCFS' regulatory oversight role is impacted, this could result in delays in all licensing activities, ongoing health and safety monitoring inspections, as well as background check processing, which are critical to ensure appropriate staff clearances;

c. LDSSs. Local districts will have to close enrollment for their communities or identify local funds in their budgets to maintain federal compliance with eligibility for CCAP families for the full 12 months. This could result in local reductions in services as funds are redirected to comply with federal mandates;

d. Licensing and registration staff and contracts. OCFS will be unable to maintain approximately 400 regulatory staff who are exclusively funded by CCDF. OCFS would also be limited in staffing to investigate illegally operating and unsafe child care programs;

e. Child Care Resource and Referrals (CCR&R) specialists, and other early childhood, workforce and quality contracts. OCFS would be unable to fully support local contracts that work with child care providers on delivering high quality early education programs, resulting in lower quality educational outcomes for children; and

f. OCFS staff who oversee the licensing and CCAP systems. OCFS staff that oversee the CCAP system will have to monitor local districts adherence to federal and state laws and regulations while districts don't have sufficient funds to properly administer the program leading to additional work and burden on staff.

Case 1:26-cv-00172-VSB    Document 40-16    Filed 01/15/26    Page 15 of 20

45. OCFS estimates the following fiscal impacts if ACF freezes funds to New York:

    a. For FFY 2026, Congress allocated to New York State $626 million in CCDF funding. New York State has also allocated $484 million of New York State's TANF award to support child care services and administration.

    b. Without CCDF and TANF federals to support CCAP, approximately 1/3 of funding for the program will be lost, having a detrimental impact on services, as described below.

46. Sudden delays in New York State's CCDF funding supporting CCAP will result in child care providers being unable to pay their bills and will be forced to close. New York State is already fighting to reduce the number of child care deserts throughout the State, and this measure will only serve to create more instead of less. Provider closures will result in families being unable to find safe child care for their children, and will be unable to work, attend school, and participate in training. Families will be forced to choose providers that do not provide quality care due to lack of adequate funding and supports. This will quickly result in a socioeconomic crisis for New York State.

47. Delays in CCDF funding, which funds 100% of the State's licensing infrastructure, will result in foreseeable harm to children. Licensing staff are essential to ensuring that child care programs meet minimum health, safety, and supervision standards required under federal and State law. Any delay in funding could impact the funding for staff. In addition to inspections, a funding freeze that restricts staffing capacity would undermine the State's ability to carry out background check verification.

48. Any reductions in funding to licensing staff will impact New York's federal compliance. CCDF requires states to maintain effective oversight systems to protect children in care.

13

Without sufficient staffing, the State cannot reasonably ensure timely inspections, effective monitoring, or appropriate enforcement actions.

49. Since ACF's January 6, 2026 letter, OCFS has been contacted by child care providers, families, LDSSs, and OCFS staff who now live in a state of fear and uncertainty about their services and livelihoods.

*OCFS's Robust Program Integrity and Compliance Controls*

50. ACF's January 6, 2026 letter references that ACF is concerned by the "potential for extensive and systemic fraud" in New York State, and that New York State is "illicitly providing illegal aliens with CCDF benefits intended for American citizens and lawful permanent residents."

51. New York State has a robust series of measures in place to address program integrity within CCAP.

52. These include requirements for LDSSs to have fraud prevention plans. Fraud prevention plans are part of an LDSSs child and family services plan, which OCFS requires LDSSs to submit every 5 years and update annually. OCFS has a dedicated team that monitors LDSSs' compliance with their fraud detection plans via annual site visits.

53. OCFS also maintains a statewide child care fraud hotline for reporting concerns.

54. NYS agencies, including OCFS work together to prevent fraud and partner with the New York State Welfare Fraud Investigators Association to combat fraud, educate investigators and the public, and increase prevention measures.

55. In December of 2025, OCFS issued regulations that included new provisions to further strengthen program integrity. These changes included:

    a. Allowing an LDSS to disqualify a provider from receiving payments for CCAP if the LDSS becomes aware the provider was disqualified or removed from any other federal, state or local program; and

    b. Requiring that providers report to the paying county within five calendar days of the provider being notified that the child is no longer enrolled in the program. Failure to notify the county and continuing to seek reimbursement for said child constitutes fraud and may result in provider disqualification and/or overpayment recovery.

56. Additionally, OCFS submits a CCDF Plan to the federal government every three years.

57. The CCDF plan requires OCFS to demonstrate how they prevent fraud and maintain program integrity and accountability in the administration of CCAP. Working in collaboration with local, state and federal agencies on investigations when necessary is an example of how OCFS demonstrates compliance with federal requirements.

58. LDSSs may utilize the Welfare Management System (WMS) to increase program integrity by identifying any potential duplication of benefits families may be receiving, household makeup composition, cross services and verifying names, date of birth and Client Information Numbers (CIN) to confirm an applicant is providing factual information regarding their identity. LDSSs may also access birth certificates by using the Imaging and Enterprise Document Repository (IEDR) as a way to identify parental information, date of birth, and possible relationship to a child. Potential unreported income that may be earned as a child care provider may be identified and reported to other income eligibility-based programs.

59. LDSSs also compare attendance records utilizing Child Care Time and Attendance System (CCTA) with Child and Adult Care Food Program (CACFP) to promote program integrity and detect fraud.

60. LDSSs hold primary responsibility for reviewing cases and establishing standards consistent with their caseloads. LDSSs also have a sampling methodology, outlined in their Child and Family Service Plan (CFSP), to determine which providers of child care services the LDSS will review for the purpose of comparing the provider's attendance forms for children receiving child care services and any Child and Adult Care Food Program inspection forms to verify that child care was actually provided on the days listed on the attendance forms. LDSSs submit their sampling methodology plan yearly as part of the submission of the CFSP, which is reviewed by the lead agency. OCFS conducts an annual site visit to review a sample of cases. As part of these visits, OCFS discusses any intentional (potentially fraudulent) program violations or questions around the process. OCFS makes programmatic recommendations based on the results of the case reviews. OCFS and LDSSs use these findings, where applicable, to disqualify ineligible applicants and thus prevent intentional program violations.

61. ACF's implementation of the procedures outlined in the January 6, 2026 letters unnecessarily interferes with New York State's ability to provide essential services.

62. ACF's Office of Child Care (OCC) provides oversight over Lead Agencies' compliance with CCDF regulations through the approval of Lead Agencies' CCDF Plans, and routine monitoring for compliance through audits, error rate reviews, onsite visits, and corrective action plans (as needed).

63. The immediate timeframe for implementation in ACF's January 6, 2026 letter and last-minute notice compounds New York State's injuries. New York State is unable to effectively plan for any future fiscal effects and is unable to prepare for or mitigate the fiscal impact.

64. ACF has historically addressed program integrity issues in CCDF through post-payment oversight to minimize systemic-wide disruption and maximize continuity of services. New York State has always worked in cooperation with OCC to identify areas for improvement and take corrective action when needed. New York State enhances monitoring when necessary and aggressively pursues the recovery of improperly spent funds.

65. Requiring a heightened level of *pre-disbursement* oversight such as additional verification procedures and the submission of attendance records to ACF *before* funds can be drawdown will unnecessarily disrupt the funding reimbursement process, delay the release of funds before reports of noncompliance can be reviewed and determined, and ultimately result in instability for families, child care providers, and agencies across New York State. The withholding of funds subject to such a non-statutory review will inevitably result in payment disruptions and the inability for New York State, child care providers, and early childhood specialists to maintain consistent program operations required to ensure the safety and well-being of the children of New York State.

66. By not following the legal process prescribed by federal law and regulations, which include notice of a final determination and a right to appeal and be heard before any disallowances, penalties or sanctions can be imposed, ACF has, and will continue to cause, irreparable harm to New York State.

67. The receipt of federal funding to which New York State is lawfully entitled is critical to ensure safe and quality child care for children from eligible families, many of whom comprise the State's most vulnerable and at-risk populations. The lack of safe and affordable child care results in the inability for eligible families to earn a living, attend school, and receive training to advance economically, which will detrimentally impact New York's workforce, its economy (which will inevitably have ripple effects throughout the world), and most importantly, the health, safety and welfare of its children.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 14, 2026, in Rensselaer, New York.

/s/ Laura Darman

_____

LAURA DARMAN
Executive Deputy Commissioner
New York State Office of Children
and Family Services