# EXHIBIT 19

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF ILLINOIS; and STATE OF MINNESOTA,

Plaintiffs,

v.

ADMINISTRATION FOR CHILDREN AND FAMILIES; ALEX J. ADAMS, in his official capacity as the ASSISTANT SECRETARY OF THE ADMINISTRATION FOR CHILDREN AND FAMILIES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as the SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendants.

Case No. 26-cv-00172

**DECLARATION OF KIRA YOUNGER**

**DECLARATION OF KIRA YOUNGER**

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**PROFESSIONAL AND AGENCY BACKGROUND**

2. The California Department of Social Services (CDSS) is responsible for the administration of public social services, except health care services and medical assistance, throughout California.

3. I am currently employed by CDSS as Chief Financial Officer and Deputy Director of the Finance and Accounting Division (CFO) and have held this position since June 2025. The Finance and Accounting Division provides fiscal support and oversight through budget development, financial management, accounting, and fund management for CDSS.

4. As CFO, I oversee all fiscal operations of CDSS and supervise staff performing administrative and operational functions including budgeting and forecasting, allocating funding to local governments and tribes, budgeting and administering state operations, and accounting for accounts payable. This includes fiscal activities for California programs that are funded by the Child Care and Development Fund (CCDF); Temporary Assistance for Needy Families (TANF); and the Social Services Block Grant (SSBG) (together, the "Administration of Children and Families (ACF) Funds").

5. Prior to my current position as CFO, I have been employed by CDSS since November 2019; first as Budget Officer from November 2019 through May 2021; then as Chief of Fiscal Forecasting from June 2021 through June 2025. I was the Financial Manager at the Office of Systems Integration from November 2018 through October 2019. From October 2016 through October 2018, I was employed by CDSS as a Staff Services Manager.

6. I have a Master of Business Administration degree in Strategic Management and a Bachelor of Business Administration degree in Accounting from Western Governors University.

**BACKGROUND ON CCDF, TANF, AND SSBG**

7. Millions of vulnerable Californians—including children, the elderly, domestic violence victims, lower-income families, and people with disabilities—require the food, shelter, childcare and other critical services that the ACF Funds help California provide.

8. Among the social services programs administered or overseen by CDSS that utilize ACF Funds are its child care and development programs, the California Work Opportunity and Responsibility to Kids (CalWORKs) program, Child Welfare Services (CWS), Foster Care, Community Care Licensing, and Deaf Access.

CCDF

9. CCDF is an aggregate of several funding sources, including the Child Care and Development Block Grant (CCDBG), that are distributed as block grants by the federal government to states and is a source of funding for many of CDSS' child care and development programs. The Child Care and Development Block Grant Act, together with section 418 of the Social Security Act, authorize CCDF as the primary federal funding source devoted to helping families with low incomes afford child care and increasing the quality of child care for all children. SSBG (Title XX) and TANF are additional sources of federal funding for this purpose.

10. CDSS is designated as the CCDF Lead Agency and administers California's CCDF child care program in accordance with applicable federal laws and regulations and the provisions of the approved CCDF State Plan for Federal Fiscal Years (FFY) 2025-2027. CDSS' CCDF child care programs comprise a high-quality, affordable, early childhood system of care designed to comprehensively and effectively serve California's children and working families.

11. CDSS child care and development programs support the healthy physical, cognitive, social and emotional growth and development of children; help families achieve personal, social, economic, and emotional stability and enhance parenting skills through participation; and allow families to have maximum choice in planning, implementation, operation, and evaluation of child care programs.

12. Child care quality initiatives administered by CDSS and funded by CCDF provide system infrastructure and professional development support to the childcare workforce to foster the development of ongoing skills and abilities that are intended to create positive outcomes for young children.

13. CDSS utilizes a combination of federal funding, State funding, and other sources of funding to provide child care and development services. In State Fiscal Year (FY) 2024-25, CDSS' comprehensive system of early learning and care described in California's CCDF State Plan served approximately 367,000 California children through CDSS child care subsidy programs administered by one of about 500 local CDSS contractors. Over 72,000 licensed centers and family child care homes and license-exempt providers cared for these children.

14. In FY 2024-25, child care and development programs administered by CDSS included $1.8 billion in Federal Funds. In FY 2025-26, child care and development programs administered by CDSS will utilize approximately $1.1 billion in CCDF dollars, $169 million in Title XX funding, and $329 million in TANF funding. CDSS is scheduled to receive two additional quarterly awards of this funding in April and July of this year.

15. To receive CCDF funds, CDSS must submit to ACF a state plan that the Secretary of the U.S. Department of Health and Human Services (HHS) determines has included all mandatory program requirements.

16. To initiate a drawdown, CDSS must first receive a Notice of Award from ACF. Notices of Award for CCDF are generally issued on a quarterly basis. CCDF funds that are awarded to California remain in bank accounts with the United States Department of Treasury. When needed, CDSS submits requests to draw down CCDF funds from the federal bank accounts through the federal Payment Management System (PMS).

17. Historically, ACF has released the requested CCDF funds within 48 hours. Within one day of receipt by California, the funds are transferred to the fiscal agent to process payments to up to 500 child care contractors via electronic funds transfer or paper check. The fiscal agent is required to disburse all payments to ensure that child care contractors receive timely payment for services rendered and ensure seamless child care delivery to working families. The entire process from ACF approval to disbursement of funds typically occurs within five business days.

18. CDSS also receives administrative funding from CCDF funds through the same PMS submission and ACF approval process. California may utilize up to 5% of the block grant to support its administrative activities. See 45 C.F.R. § 98.54.

19. CDSS last submitted a drawdown request for $125,897 in CCDF funds on January 2, 2026, with the expectation that the funds would be released on January 5, 2026. The drawdown was not approved until January 14, 2026.

20. The funds for these unfilled drawdowns are needed for child care contractors. The funds will be released to our fiscal agents to issue directly to child care contractors who provide direct services to program recipients. Child care contractors use the funds to cover program expenses, including reimbursement payments to child care providers serving subsidized children. State child care subsidy program contractors are obligated to maintain and implement payment plans that include a provision requiring that providers be paid within 21 calendar days of the submission of a complete record or invoice for services (attendance record), or daily sign-in/sign-out sheets. Once providers submit complete records, contractors have 21 days to pay. Failure to meet these requirements risks harm to providers who are waiting for payment for services they have already provided and, in the context of family child care providers, a grievance pursuant to their collective bargaining agreement with the state.

21. The delays in receiving CCDF funds, including the CCDBG funds, have caused substantial disruption and harm. Specifically, CDSS was required to redirect staff time and attention to developing and investigating funding contingency plans, and managing responses to multiple external entities regarding the nature of the abrupt federal changes. CDSS had to redirect staff time and resources away from their day-to-day activities that support administering agencies, families, and the child care workforce; thus, negatively impacting CDSS's ability to provide timely information and service to California families and the child care field that supports them. The delays also created challenges for CDSS to reliably plan for the steady flow of funds needed to ensure continuity of care for children. Due to the unreliable and inconsistent receipt of federal funds, the completion of at least one payment cycle has been delayed thus far.

22. CDSS typically submits multiple CCDF fund draw down requests in any given month. In the month of January 2026, California is scheduled to complete five payment calculations on or about the following dates: January 2; January 8; January 16; January 21; and January 30. Following the completion of these payment calculations, CDSS will subsequently submit the required CCDF fund drawdown into PMS.

23. The estimated total of CCDF funds needed to complete January 2026 payments is at least $70 million. The projected draw down amount for CCDF for February is $71.4 million. In the event that CCDF drawdowns are delayed or paused, it is not clear whether available state funds would be sufficient to cover outstanding child care costs. Without CCDF funding, California will not be able to process January 2026 payment calculations occurring after January 7, 2026, within normal business processes and protocols. These delays disrupt cash flows to hundreds of local contractors that administer child care programs and providers who rely on reimbursement.

TANF

24. TANF is a block grant program that provides over $16.5 billion nationwide annually in federal funding to states, territories, and tribal governments, who in turn provide time-limited assistance, including cash aid and other benefits, to needy families with children. It is one of the largest sources of cash assistance to low-income American families.

25. California receives federal TANF funds and implements most of those TANF funds through its CalWORKs program. CalWORKs is overseen by CDSS and is administered by the State's 58 counties. CalWORKs provides temporary cash assistance for a family's basic needs. It also provides education, employment, training programs, supportive services, and child care subsidies to assist the family's progress toward self-sufficiency.

26. TANF funds also support several other service programs, including financial aid for low-income college students.

27. CalWORKs is funded through a combination of federal, State, and county funds. The federal funds are provided to California through the annual TANF block grant, which is calculated according to a mandatory formula based on the share each state had of TANF funding in 2002. Since 1996, the federal TANF block grant amount to California has been set at approximately $3.7 billion annually.

28. To be awarded TANF funds, CDSS must submit to ACF a state plan that the Secretary of HHS determines includes all mandatory components of a plan, including how the state will conduct its TANF program in compliance with federal work requirements, privacy protections, and other mandatory provisions. CDSS submitted its renewal plan to ACF on December 18, 2025.

29. To access TANF funding, CDSS must first receive a Notice of Award from ACF. Notices of Award for TANF are generally issued on a quarterly basis during the Federal Fiscal Year. California received its Quarter 2 Notice of Award from ACF for $908,528,802 in TANF funds on December 16, 2025.

30. TANF funds that are awarded to CDSS sit in bank accounts with the United States Department of Treasury. CDSS submits requests to draw down TANF funds from the federal bank accounts when needed through PMS.

31. Historically, ACF has released the requested TANF funds within 48 hours. When CDSS submits a drawdown request, which may include both reimbursement for actual expenditures and advance costs, CDSS reports the net amount that reflects the true-up of actual expenditures and prior-quarter advance payments, along with any new advance costs for the current quarter. The process for TANF drawdowns depends on whether the funding is to be used for administrative and assistance costs or for invoice payments, and whether the payment is going to a county or a contractor.

32. For county payments for administrative costs, payments are due around the 15th of each month.

33. TANF payments to states are governed by federal regulations. States and subrecipients must follow procedures for minimizing the time that elapses between the transfer of federal funds from the U.S. Treasury and benefits disbursements, regardless of whether the transfer occurs before or after the payout of funds.

34. Approximately 350,000 families receive CalWORKs benefits each month.

35. CalWORKs is a key component of California's safety net for low-income families. Families that qualify for ongoing assistance utilize that funding to pay for housing, food, electricity, and other necessary basic needs. Loss of TANF funds would increase the risk of low-income families becoming homeless or facing increasing financial pressures, including poverty, which could increase the risk of involvement with other public social service programs, such as child welfare.

36. Loss of TANF funding would have significant economic impact including but not limited to families losing TANF-funded supportive and barrier removal services that allow them to obtain and maintain employment causing economic harm not only to families but also to employers relying upon these employees.

37. The delivery of child welfare programs such as emergency assistance foster care, family preservation, and kinship support would be disrupted, which would put vulnerable children at higher risk of placement in institutional settings rather than in family homes. Increased reliance on institutional settings has a negative health and safety impact to children and families and increases costs to the state and local government.

38. Pressure on state funded housing programs would increase. Loss of TANF would also increase reliance upon state and county funded general assistance/general relief programs administered by counties.

39. The loss of TANF funding would have a significant fiscal impact on California. For example, the loss of these benefits will result in greater need and requests for state-funded assistance programs, including, for example, state-funded emergency food resources access programs.

40. It would be incredibly difficult, if not impossible, to replace federally funded TANF benefits with state-funded equivalent benefits on an ongoing basis.

41. CDSS also anticipates that disruption to TANF benefit issuance will result in additional administrative burden as a result of the need for additional support services and communications to TANF recipients. Moreover, the ambiguity of not knowing the ultimate duration of a disruption itself exacerbates the burden on CDSS, because CDSS must dedicate additional resources to planning for multiple contingencies.

<u>SSBG</u>

42. The SSBG program provides $1.7 billion nationwide annually in federal funding to States, providing them with "flexibility" and funding to support essential social services in one of five critical categories: (1) "achieving or maintaining economic self-support"; (2) "achieving or maintaining self-support"; (3) addressing neglect, abuse, or exploitation of children and vulnerable adults; (4) preventing institutional care and supporting community-based care; and (5) where institutional care is needed, supporting application and admission and providing services to institutionalized individuals. SSBG provides funding support for child welfare services, foster care services, community care licensing adult and children's daycare services, the Deaf Access program, and Regional Center services in partnership with the Department of Developmental Services.

43. Congress has provided that SSBG funds must be allocated based on each state's percentage of the national population, based on census data. Unlike CCDF and TANF, states are not required to submit a state plan to be eligible for SSBG funding. Instead, California must submit annual reports describing how it used the funds in the year prior. CDSS submitted its last annual report on December 30, 2025.

44. For FY 2025, California was allotted approximately $160 million in SSBG funds. On January 23, 2026, CDSS will draw $11.5 million for assistance payments that are due to counties. The next federal draw will be $5.3 million for county administration costs due to the counties by February 15, 2026. SSBG funds support several social service programs, all of which are administered locally by counties and supervised by CDSS. These programs include Child Welfare Services (CWS), Foster Care, Community Care Licensing, Deaf Access, and CalWORKs. The California Department of Developmental Services (DDS) uses SSBG funds to support seven state developmental centers and a statewide network of 21 private, nonprofit Regional Centers. In FY 2022, approximately 1.7 million Californians—including approximately 1.4 million children—received SSBG-funded services.

45. Historically, ACF has released requested SSBG funds within 48 hours. The process for SSBG drawdowns, which is the same process for TANF, depends on whether the funding is to be used for administrative and assistance costs or for invoice payments, and whether the payment is going to a county or a contractor.

46. For county payments for administrative costs, payments are due around the 15th of each month. For county payments for assistance costs, payments are due at the end of the month.

**<u>THE FUNDING FREEZE LETTERS</u>**

47. On January 6, 2026, ACF sent correspondence to California relating to CCDF, TANF, and SSBG (collectively, the "Freeze Letters").

48. I am informed and believe that those letters were filed in *State of New York, et al. v. Administration for Children and Families, et al.*, No. 26-cv-00172 (S.D.N.Y. Jan. 8, 2026), ECF No. 9-6.

**<u>HARMS ASSOCIATED WITH FUNDING FREEZE</u>**

49. The freezing of our federal funding will have crippling effects on the administration of these programs and on government operations generally. Significant

pauses or delays in these disbursements could result in the State's inability to fund all of CalWORKs' payments, subsidies, vouchers, housing assistance, and other services to CalWORKs clients. This would not only devastate clients, who will have less cash available to pay rent, buy food, and support their families, but also impact service providers that serve clients who utilize CalWORKs for services including mental health and substance abuse, domestic violence, education and workforce support, child care, and housing and homelessness intervention.

50. In FY 2025-26, CDSS is scheduled to receive disbursements of $1.6 billion between the three different funding sources utilized for Child Care and Development Programs administered by CDSS. The freezing of these disbursements indefinitely would make it incredibly challenging to support child care and development programs, and would negatively impact children and families who currently rely on the State for child care.

51. The freezing of CDSS' federal funding would force parents—who use CDSS direct-contract childcare providers that must scale back or cease services—to cut back on work if they are unable to find alternative care, which would harm not only the parent and child, but also State and federal revenues. According to research completed by the First Five Years Fund, child care, and investments in child care and early childhood education, yield enormous returns to society. Every $1 invested in high-quality child care yields $7 to $12 in social returns, including long term impacts on educational attainment, employment, and earnings both for the children who attend and participating families. Child care is also key to increasing labor force participation, employment, and earnings among parents; during the pandemic, federal American Rescue Plan stabilization funds led to a 2-3 percentage point increase in the labor force participation rate among mothers of young children, nationally, in the two years after their onset—roughly 325,000 more women were working each year over two years. *See* Guevara, New Research: ARP Stabilization Dollars Were Critical For Our Nation's Child Care, First Five Years Fund (Nov. 21, 2023).

52. Licensed child care centers and family child care homes that serve children who participate in voucher-based programs may be unable to maintain a sustainable business model without these public funds, due to the already slim margins associated with operating a child care business. Losing even a small portion of clients could cause a cascading impact throughout the child care system, resulting in disenrollment of subsidized children, full cost

of care burden being placed on low-income, working parents, or even closures of licensed child care facilities and loss of access to care for both subsidized and non-subsidized families across the State – further impacting vulnerable children and families who struggle to access care and child care businesses, with resulting impacts to State and federal tax revenues.

53. If the federal funding remains paused, blocked, denied or delayed, we are concerned that we will not be able to meet the needs of families who rely on these programs and that the impacts on their well-being and economic stability will be significant.

54. In addition to the effects on families and child care providers and resulting impacts to State and federal tax revenues, freezing federal funding would have significant negative impacts on State operations. CDSS relies on regular disbursements of the federal funding at issue to operate the wide variety of social services programs discussed above. Were such funding to be frozen going forward, CDSS would need to expend significant time, resources, and effort investigating and developing contingency plans to attempt to backfill the funding for such programs (with no guarantee that such funding would be available) and communicating with other entities (including end recipients) about the freezing of funds, among other operational impacts. Any backfilling of the frozen federal funds to continue to operate social services programs, if possible, would likely involve pulling funding from other State programs.

**THE FEASIBILITY OF THE DATA AND DOCUMENTATION DEMANDS**

55. I am informed and believe that it would be nearly impossible for California to comply with the Freeze Letters' data and documentation demands within two weeks. The various public benefit programs and services supported by the ACF funds are, in many instances, decentralized across the entire State of California within counties, tribes, school districts, contractors, and other entities.

56. Furthermore, the documentation being requested is not necessarily stored in an electronic format, and especially in a child care setting, may include a significant volume of paper records. The request for de-identified and aggregate records for the CCDF would require an unknown, and at this time incalculable amount of staff time, to gather records and distill the requested data into an appropriate format. Attempting to comply with the onerous data and documentation demands would require the re-deployment of significant personnel and the diversion of staff resources to data collection from administering California's critical

programs. The diversion of staff resources to a data collection task of this magnitude will reduce the staff available to administer programs and potentially extend payment delays to cover subsidized child care costs for children.

57. I am further informed and believe that the scope of the data and documentation demands is not how any oversight body has ever conducted quality control, audits, or any other program integrity purpose relating to CCDF, TANF, or SSBG.

58. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 14, 2026, at Fair Oaks, CA.

*/s/ Kira Younger*
KIRA YOUNGER