# EXHIBIT 20

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF ILLINOIS; and STATE OF MINNESOTA,<br><br>        Plaintiffs,<br><br>        v.<br><br>ADMINISTRATION FOR CHILDREN AND FAMILIES; ALEX J. ADAMS, in his official capacity as the ASSISTANT SECRETARY OF THE ADMINISTRATION FOR CHILDREN AND FAMILIES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as the SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>        Defendants. | C.A. No. 26-cv-172 |

**DECLARATION OF STEPHEN J. ACQUARIO**

1.      I am a resident of the State of New York. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2.      New York State Association of Counties ("NYSAC") was established in 1925. Its membership consists solely of New York's 62 counties, including the five counties comprising the City of New York. Throughout its history, NYSAC has taken on the role of the "official voice" of all New York counties, large and small, regardless of political ideology, representing the interests of its member counties. These interests include the duties and concerns of county elected officials,

1

such as county executives, county legislators, and county supervisors, and also includes the interests and duties of county social service commissioners, county administrators and managers, county attorneys, aging departments, public health and mental health directors, and others charged with implementing health and human services across New York State.

3. I am the Executive Director of NYSAC and have held this position since December of 2004. I am responsible for representing, educating, advocating for and serving New York's county elected officials and the county social service districts charged with implementing programs that are funded by the Child Care and Development Fund (CCDF); Temporary Assistance for Needy families (TANF); and the Social Services Block Grant (SSBG) (together, the "ACF Funds").

4. Prior to my employment as Executive Director with NYSAC, I served as General Counsel to NYSAC.

Background on CCDF, TANF, and SSBG

5. The ACF Funds help the 62 counties of New York State provide food, shelter, childcare, and other critical services to millions of vulnerable New Yorkers—including children, seniors, domestic violence victims, and low-income families. Counties—including New York City—play a significant role in implementing TANF, SSBG, and child care program goals in partnership with the State. As a result, counties are highly concerned about the potential impact on their finances if this federal funding freezes goes into effect.

    a. **CCDF**

6. The CCDF program provides over $12 billion nationwide annually in federal funding to support state, territorial, and tribal programs that provide low-income families with funding for childcare so that those families can work or go to school. CCDF funds also support

teacher training and development, as well as programming and consumer education that educates parents about childcare options. CCDF is comprised of two separate funding streams: Child Care and Development Block Grant (CCDBG) and Child Care Entitlement to States (CCES). These funds first go to the State of New York, which then distributes them to local social services districts (LDSSs). CCDF supports reliable childcare services, enabling parents to work and pursue continuing education and job training, ultimately improving family well-being, financial stability, and child development.

7. The CCDF is 100% federally funded and it helps the State cover all eligible families in NYS. According to data from the NYS Office of Children and Family Services (OCFS) for Federal Fiscal Year 2025, approximately $2.2 billion in funding was provided in total for childcare services across NYS, with $1.2 billion (55 percent) coming from state resources and $1 billion from federal resources ($300 million from CCDF and $700 million from TANF). For FFY 2025, this combined funding provided childcare coverage for 219,000 children from 129,000 families.

8. To my knowledge, New York's counties utilize important safeguards to ensure services are provided only to eligible children and families. Counties also undertake multiple program integrity efforts to ensure providers of services are in good standing and that services billed are accurate. In a typical county, upon receipt by the county agency, childcare applications are forwarded to Data Entry units for registration and indexing. Once registered, the application is returned to the CCAP Eligibility Unit for review. Eligibility staff conduct a comprehensive review to ensure the application is complete and that all required documentation is requested and obtained. This includes verification of household composition; income verification for all adults in the household; verification of identity for all household members; and completion of the Front-End Detection System (FEDS) referral, when applicable.

9. If a fraud indicator is identified, the referral is forwarded to the Fraud Unit for review. A 10-Day Documentation Requirement Form (10DD) notice is issued to request any missing or clarifying documentation. Upon receipt of required information, eligibility determinations are made in accordance with the eligibility standards within the required 30-day timeframe. While CCAP does not require a formal telephonic interview, eligibility specialists are required to contact applicants or recipients by phone when clarification is needed or when documentation raises questions that must be resolved prior to determination. Households approved for CCAP receive a one-year certification period.

10. Funding for childcare services is distributed to counties based on historical data. For SFY 2026, the allocation methodology for FFY 2026 is based on LDSS's proportionate share childcare block grant claims for the 18-month period that covers October 1, 2023 – March 31, 2025. Unused funds by a county in the prior year can be rolled over to the next fiscal year, but rollover funds are capped, and any remaining funds are then reallocated to other counties for use.

    b. **TANF**

11. TANF is a block grant program that provides over $16.5 billion nationwide annually in federal funding to states, territories, and tribal governments, who in turn provide cash assistance and non-cash benefits to low-income families with children. It is one of the largest sources of cash assistance to low-income families in the United States. TANF was created through the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA, P.L. 104-193).

12. TANF funds are allocated to states according to a mandatory formula based on the share each state had of TANF funding in 2002. The TANF program, mandated under federal law, aims to support families through various initiatives, including monthly assistance payments,

emergency housing support, programs to reduce unplanned pregnancies, and helping families become self-sufficient through job training and education. TANF is primarily funded by federal resources, with state and local resources augmenting the program to achieve its goals. It is important to note that TANF benefits are time-limited, with a 60-month limit on assistance, including any months of state-funded assistance. When these limits are exhausted, New York State's Safety Net Program provides ongoing assistance to families and individuals, with the financial burden predominantly borne by the counties.

13. According to statewide data released by the NYS Office of Temporary and Disability Assistance (OTDA), in October 2025, about 201,000 individuals were receiving services supported by TANF funding at a cost of $56 million for the month. Another 517,000 individuals were supported in October by the state's Safety Net Program funded by counties (71 percent) and the state (29 percent) at a total cost of $224 million for the month. The demand for these programs continues to grow as families face increasing costs, which are outpacing employment and financial opportunity. This upward trend places additional financial pressure on counties, particularly if federal funding is reduced or eliminated.

    **c. SSBG**

14. The SSBG program provides $1.7 billion nationwide annually in federal funding to States, providing them with flexibility and funding to support social services in one of five categories: (1) achieving or maintaining economic self-support; (2) achieving or maintaining self-support; (3) addressing neglect, abuse, or exploitation of children and vulnerable adults; (4) preventing institutional care and supporting community-based care; and (5) where institutional care is needed, supporting application and admission and providing services to institutionalized individuals. 42 U.S.C. § 1397.

15. Congress has provided that SSBG funds must be allocated based on each state's percentage of the national population, based on census data. 42 U.S.C. § 1397b(b). As with CCDF and TANF, funds first go to the State of New York, which then distributes them to local social services districts based on historical claims data.

16. SSBG funds support several social service programs, all of which are administered locally by counties. SSBG funding is divided into two primary categories: Adult Protective and Domestic Violence Services and Child Welfare Eligible Services.

17. The Social Services Block Grant (SSBG) funds essential programs such as adult and child protective services, domestic violence prevention, child welfare programs, foster care, senior meals, and adoption services. These programs are vital in supporting children and families across the state. While SSBG is entirely federally funded, state and county funding augment the program to meet the demand. Counties implement most of these programs on behalf of the state and the financial burden on counties has increased significantly in recent years, including increasing the county share of program costs for child welfare (from 35% to 38%) and adoption assistance (from 24% to 38%), the establishment of a foster care block grant, and mandated rate increases to be funded by counties. These changes added new costs for counties and NYC exceeding $2.8 billion since enactment.

18. SSBG funds are distributed to counties based on prior year expenditures. Unused allocations are redistributed to counties running deficits in their program. In SFY 2026, $66 million in SSBG funds were set aside to cover expenses for Adult Protective Services and Domestic Violence Victims. Remaining SSBG funds of $22.4 million were set aside for counties to cover expenses for child protective services. In all cases, if federal funding is insufficient to cover all costs, the state and counties provide additional resources.

Harms associated with Funding Freeze

19.     The federal freeze and restricted drawdown of funds will affect all county Department of Social Services (DSS) programs with the exception of Medicaid. Currently, counties are highly concerned about how these federal funding freezes will impact county finances if they extend for any significant amount of time. The immediate impact is primarily cash flow problems for counties and NYC, but if funding freezes extend, counties could be exposed to hundreds of millions of dollars in higher costs each year that would likely grow.

20.     Districts are required to provide assistance to residents of the locality, and they are also required to provide assistance and care to any individual who is found within their county under what is referred to as "where found" principle.  The counties of New York are prohibited from refusing to pay benefits to those in need. Counties are not allowed to opt out of providing this care absent federal funding; instead, they are required to continue processing applications. Accordingly, a freeze of federal funds would likely require counties to end discretionary programs for their most vulnerable residents, reduce spending in other critical areas, slash employees, and take other actions to try to find resources to fund mandatory benefits subject to the federal freeze. But this is beyond the financial capacity of county governments. Even a temporary disruption in federal funding would create cash flow crises requiring counties to identify hundreds of millions of dollars in emergency funding, likely through increased borrowing, depletion of fund balances, or emergency budget cuts to other essential services.

21.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 12, 2026 at Albany, New York.

_Stephen J. Acquario_
_____

Stephen J. Acquario