Q194STAC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STATE OF NEW YORK, *et al.*,

                Plaintiffs,

        v.                              26 Civ. 172 (AS)

ADMINISTRATION FOR CHILDREN
AND FAMILIES, *et al.*,
                                        Remote Conference

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        January 9, 2026
                                        2:00 p.m.

Before:

                    HON. ARUN SUBRAMANIAN,

                                        District Judge

                        APPEARANCES

NYS OFFICE OF THE ATTORNEY GENERAL
     Attorneys for Plaintiffs
BY:  JESSICA RANUCCI
     RABIA MUQADDAM

U.S. ATTORNEY'S OFFICE, SDNY
     Attorneys for Defendants
BY:  KAMIKA SHAW
     PIERRE ARMAND

Q194STAC

(Case called)

THE COURT:  Who is appearing on behalf of the plaintiffs?

MS. RANUCCI:  Good afternoon, your Honor.  This is Jessica Ranucci from the New York State office of the Attorney General for plaintiff.  I'm joined on the line by one of my colleagues as well, who I will let introduce herself.  I'll also just note there are a number of colleagues from our office and from other plaintiff state offices who are listening in on this line.

THE COURT:  All right.

MS. MUQADDAM:  Good afternoon.

THE COURT:  Please proceed.

MS. MUQADDAM:  This is Rabia Muqaddam also from the New York Office of the Attorney General office for the plaintiff states.

THE COURT:  All right.  And who will be speaking on behalf of the defendants?

MS. SHAW:  Good afternoon, your Honor.  This is Kamika Shaw from the U.S. Attorney's Office from the Southern District of New York on behalf of defendants.  I'm joined by a colleague, who will introduce himself as well.

MR. ARMAND:  Good afternoon, your Honor.  Pierre Armand also from the U.S. Attorney's Office on behalf of the defendants.

Q194STAC

THE COURT:  Good afternoon to everyone.  Just so everyone is aware, I received notice of the plaintiffs' application for a temporary restraining order yesterday before this case had been assigned.  And so in this Court's part one capacity, we scheduled this hearing, just so everyone understands why I am here, as opposed to Judge Broderick, who will be your judge for the remainder of this case.

For today's purposes let me start with Ms. Shaw or Mr. Armand.  I had asked Mr. Oestericher earlier this morning whether there was some way to address the immediate issue for purposes of the temporary restraining order while the defendants would reserve all rights concerning any relief that would be granted.

MS. SHAW:  I'm conferring with our client and at this time our client does not think there would be a path forward that might obviate the need for a TRO at this time.  Our client intends to go forward and oppose the TRO.

THE COURT:  All right.  And do you know at this time whether the defendants will be making an argument that their actions were consistent with the requirement to not engage in arbitrary and capricious decision making and act in accordance with law?  Are they going to be making that argument, or rather are they going to simply be making an argument on jurisdiction that this case actually belongs in the Court of Claims?  Do you have clarity on that at this juncture?

Q194STAC

MS. SHAW:  I don't have full clarity on that yet at this juncture.  I would not want to make any representations yet about what defendants intend to argue.

THE COURT:  All right.  So at this time if I were to ask you whether the policy, as reflected in the letters that were sent to the plaintiffs, were consistent with the statutes and regulations cited in the plaintiffs' briefs, would you be able to answer that question at this time?

MS. SHAW:  I would not be able to make any representations about that at this time.  We are still analyzing the allegations in the complaint and in the accompanying exhibits as well as plaintiffs' arguments in its motion for a TRO.

THE COURT:  All right.  So given that, should the TRO simply be granted at this time subject to any revision at the preliminary injunction stage?

MS. SHAW:  No, the defendants would request an opportunity to put in briefing opposing the TRO, laying out its standpoint and the factual course for the way the defendants have proceeded.

THE COURT:  All right.  Let me turn to Ms. Ranucci.

Ms. Ranucci, maybe you can help me with a logistical issue, which is that Judge Broderick, I believe, is prepared to address the temporary restraining order and any further proceedings in this matter.  And I'm assuming that if there was

Q194STAC

a resolution on the temporary restraining order, let's say by the end of next week or shortly thereafter, then that would not cause -- there would not be some unaddressed harm that would happen between now and then; is that fair?

MS. RANUCCI:  We're certainly not in a position to say that right now, your Honor.  For example, there was a $106 million drawdown request by the State of New York earlier this week that remains pending, even though those requests are usually fulfilled within 24 to 48 hours.  Colorado is in the same boat there.  Illinois and California both have drawdown requests, those are under the TANF program, under the CCDBG program that are being unfulfilled.  We are talking about harm every day in the magnitude of hundreds of millions of dollars. This cannot wait a week from plaintiffs' perspective.

THE COURT:  And can you put some more color on that. Like, I understand that there are reimbursement requests and drawdowns that are not being presently honored.  And so what harm does that cause today, for instance, right?  Let me just make clear what I'm asking.  It may be, hypothetically speaking, the case that a state has funds in reserve or funds at their disposal, and so the inability to drawdown funds today may not impair any programs being operated under what's at issue here.  However, it poses a risk for the near-term future because obviously the funds are going to run out.  That's one scenario.

Q194STAC

          The alternative scenario is that the funds that need to be drawn down today need to be used today because there are not other funds available, and so programs will be stopping today.  And so that presents a more immediate harm.  Which of those two buckets is it?

          MS. RANUCCI:  Your Honor, I don't think I'm going to be able to give you a simple answer because of the fact we are talking about different funding streams with different drawdown schedules across different states, and I think there is going to be a lack of uniformity as to those.  I would say the current harms are like operational chaos is going to come to the states if we are unable to follow the typical accounting practices that rely on these funds, not only prospectively but also for reimbursement.

          I would also note that these requests impose sweeping data demands within two weeks which will require significant state resources to respond to, that would be unreasonable for the state to wait for the next week.  So that would be a drain on the states' resources.

          THE COURT:  What's your proposal because Ms. Shaw fairly says that the government needs to be able to respond to the TRO.  And so what's your proposal as to how we might proceed here?

          MS. RANUCCI:  Could you allow me one minute to confer with my colleagues?

Q194STAC

THE COURT:  Of course.

MS. RANUCCI:  Your Honor, plaintiffs believe we have made the requisite showing for a TRO to be granted today in advance of the government's response, given the magnitude of the harm here and the lack of legal basis for the actions that the government has taken, that TRO would be, as is required, short term and would allow the parties to turn to preliminary injunction briefing where, of course, defendants would have the opportunity to make any of the arguments that they are able to make.  And I would note that that TRO would just preserve the status quo that existed for decades in which states have entitlement to these funds that were designated by congress.

THE COURT:  Understood.

Let me go back to what the short-term harm is.  I think you've mentioned a chaos that would ensue due to the need to deal with these new accounting realities.  Could you explain that to me a little bit more.

MS. RANUCCI:  Absolutely, your Honor.  These programs we are talking about hundreds of millions of dollars, billions over the course of the year, but right now we are talking about hundreds of millions of dollars to plaintiff states that include, for example, reimbursement to municipalities.  It includes payments to nonprofits.  I think the child care context is perhaps particularly concrete.  If we go a week in which plaintiff states like even I believe Illinois and

California are experiencing now, they have child care fund reimbursement requests that should have, in the normal course, would have been fulfilled that have not been fulfilled, we understand due to the freeze.  That means that those states have uncertainty about how they will be able to pay for the many nonprofit and other providers of child care, in turn creating uncertainty for those nonprofits and for the family. The uncertainty is immediate.  And even if there is some runway for some of these programs, it will create tremendous burdens on the state administrative systems.  And also harms, sort of the ripple effects within the community of plaintiff state residents will also -- the chaos sort of is a harm in and of itself.

THE COURT:  Understood.  So what you're saying is, look, even if there is some runway for the funding of these programs, the harm starts today because there will be immense burdens on the states to try to deal with the funding freeze and all the consequences of it.  There will be uncertainty as to the availability of these programs in the immediate near term that poses problems for the program recipients and that additionally causes additional administrative burdens for the states in having to deal with all of that.

In the meantime, the letters request the collection and provision of significant information that would cause a burden, again, today.  And so the harm that's being incurred is

Q194STAC

one that is there right now.

MS. RANUCCI:  Precisely, your Honor.  And I would just highlight that these are mandatory entitlement spending programs that have been in place for decades and upon which plaintiff states have reasonably relied in setting expectation like their budgets that were approved pursuant to state plans. And the sort of chaos this has created is on the longstanding background that plaintiffs understood when the rug was pulled out from under us on Tuesday.

THE COURT:  All right.  And understanding what you're saying, would it be fair if the defendants were able to respond to the TRO over the weekend, and you would get a decision by, let's say Monday or Tuesday, would that be consistent in terms of what you're talking about, sort of the real immediacy of this?

MS. RANUCCI:  If you just allow me one moment, your Honor.

Your Honor, plaintiffs' position is strongly that there should be a TRO issued and that the next round of briefing should be preliminary injunction briefing.  We are willing to go as quickly as the government would propose.  But given the significant evidence and allegations that have been raised, we strongly feel that -- we are seeking a decision today in order to move quickly.

THE COURT:  All right.  And your point on the TRO is

Q194STAC

that this relief would be interim in nature and really interim within interim because it would be interim to any disposition of the motion for a preliminary injunction; right?

MS. RANUCCI:  Precisely, your Honor.

THE COURT:  Okay.  And then last question is in your brief you note that for purposes of a TRO in this context, the only thing that you need to show is serious questions going to the merits.  You don't need to show a likelihood of success, as long as the balance of equities tips in your favor.  And in this case your position at least is that those equities do point in your favor.  And given the defendant's position at least at this time that they don't have a representation as to the merits without even sort of inquiring as to the merits arguments that you have, there should be grounds for relief at this preliminary stage; is that fair?

MS. RANUCCI:  Yes, your Honor.

THE COURT:  Anything further, Ms. Ranucci, that you would like to add?  If not, I will turn to Ms. Shaw and allow her a chance to respond.

MS. RANUCCI:  Not at this time.  Thank you.

THE COURT:  Ms. Shaw, I'm happy for you to respond to the colloquy that I had with Ms. Ranucci and add anything else that you would like to.

MS. SHAW:  Thank you, your Honor.

As I mentioned, we are still gathering information and

Q194STAC

are not in a position to make firm factual representations. But from our conversations with our client, our preliminary understanding is that there is not actually a funding freeze in place at this time. What's been conveyed to me is that there is a temporary restriction in place on drawdowns. But I understand that funds are still flowing.

What I understand is that HHS has put into place certain procedures to further vet funding before recipients can drawdown from funds, and they are in the process of reviewing that additional information and I believe that funds are being disbursed. So from that perspective, we do think that further briefing on the TRO is necessary to develop a fuller factual record because the irreparable harm that plaintiff is alleging, I think it turns on this question of whether or not there is, in fact, a freeze and from our client's perspective it's not a freeze, and funds are still going out the door.

THE COURT: All right. Ms. Ranucci, just to clarify the relief you are seeking on the TRO, what you're seeking is to, on an interim basis, set aside the policy as reflected in the January 5th and 6th letters that were the basis for the freeze. And it is not that the defendants have to immediately disburse funds. If, as Ms. Shaw is saying, they are just conducting a review of files that they would have the authority to do in the normal course, that's not what you're challenging here. Am I right about that?

Q194STAC

MS. RANUCCI:  Your Honor, I agree with what you said that plaintiffs are not seeking relief that would somehow compel defendants to issue funds if they had some lawful basis for not doing so that's separate and apart from the thing that's challenged in this case.  However, I strongly disagree with the characterization that my colleague offered of what's going on here.  I'm not sure if it will be helpful now or later to sort of point you to the places in the record that don't match up with that.

THE COURT:  Please, I think you should do that now.

MS. RANUCCI:  Thank you.

First, I'm reading from the press release that was issued with this.  This was on January 5, "The U.S. Department of Health and Human Services today froze access to child care and family assistance funds for California, Colorado, Illinois, Minnesota, and New York."  So start there.

Then there is also, I'll just point you to a few places in the record.  First, in the Colorado declaration from Mr. McMahon, I believe that's ECF 9-3, Paragraph 21.  That shows the Colorado has not been able to access its Temporary Assistance for Needy Families, TANF, drawdown in the normal course.  California and Illinois, if you go to ECF 9-1 in Paragraph 9, and ECF 9-6 and Paragraph 15 are in the same position as to the child care development funds.  They've requested a drawdown.  In the normal course, it would have been

Q194STAC

processed.  It has not been processed.  So I understand that defendant's counsel is still getting up to speed, but I think there is evidence in the record to support that plaintiffs are not getting the funds that defendants themselves have frozen.

THE COURT:  Ms. Shaw, would you like to respond to that?

MS. SHAW:  Yes, your Honor.  My apologies.  I was muted.

Again, I think the decision here that I'm trying to make is, yes, HHS has put in place additional procedures for states seeking funds.  But, again, from HHS's perspective, my preliminary understanding is that it's not a freeze on funds, and they are, in fact, disbursing funds.

Additionally, your Honor, you inquired earlier as to what legal arguments my client intends to make.  Again, we are still analyzing the complaint, particularly with respect to whether or not we will be making an argument, but at this stage I would contend that it's not clear that this Court does have jurisdiction to enter a TRO, and I think further briefing is needed before that determination can be made.

THE COURT:  And when you make that jurisdictional argument, is that the Tucker Act argument?

MS. SHAW:  Correct, your Honor.

THE COURT:  And so how would you respond to Footnote 12 in the plaintiffs' brief that addresses that issue and says

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q194STAC

that given the opinion of Justice Barrett that sort of delineates what's a proper challenge to be raised in district court, as opposed to the Court of Claims, there is kind of on the one side there's attack on a policy. And that's why I was speaking with Ms. Ranucci I talked about the policy as reflected in the letters, as opposed to a demand for payment or a mandated payment which may fall on the other side of the divide. Do you have a response on that point at this time?

MS. SHAW: A preliminary response, your Honor, and again, we are still reviewing our legal arguments here. But, yes, partially the plaintiffs may argue they are challenging a policy, but this does implicate the use of funds which is subject to, for example, it may be subject to HHS's standard terms and conditions. So I don't think at this point we can make a determination that rely on cases saying that to the extent what you are really talking about is a policy controls here. Again, the government contends that is why briefing is needed on this TRO before the Court decides to enter the TRO.

THE COURT: All right. Thank you. Anything else that you'd like to add?

MS. SHAW: If the Court does intend to enter a TRO, we would request a bond.

THE COURT: Of what kind?

MR. ARMAND: Your Honor, it's Pierre Armand.

We would have to talk to the client in terms of

Q194STAC

getting a monetary figure.  We don't have that information.
But there is an executive order and a DOJ policy that requires
us to make the request for the bond in this scenario.  But we
don't have a specific number to provide to the Court at this
time.

          THE COURT:  Okay.  Understood.

          Ms. Ranucci, anything further to add?

          MS. RANUCCI:  Just very briefly on the bond point.  I
think the last sentence of our brief cites some authority that
shows that if defendants were to follow lawful procedures, they
would be able to recover any funds that were improperly
expended.  So I think that obviates the need for a bond in this
case.

          THE COURT:  Very good.

          Thank you to the parties for appearing at this hearing
on such short notice.  The Court greatly appreciates it and
good argument on both sides.  We will take the matter under
submission, and the Court will issue an order regarding the TRO
and any next steps very shortly.

          With that anything further, Ms. Ranucci, before we
adjourn?

          MS. RANUCCI:  One minute, your Honor.

          Nothing further.  Thank you.

          THE COURT:  Thank you.

          And Ms. Shaw, anything on your end?

Q194STAC

MS. SHAW:  No, nothing further, your Honor.  Thank you.

THE COURT:  Thank you, Ms. Shaw and everyone.

Have a great weekend.  We are adjourned.

(Adjourned)