**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et al*.,

        Plaintiffs,

        v.

ADMINISTRATION FOR CHILDREN AND
FAMILIES, *et al*.,

        Defendants.

Case No. 26 Civ. 172 (VSB)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

JAY CLAYTON
United States Attorney
Southern District of New York
86 Chambers St., 3rd Floor
New York, New York 10007

*Attorney for Defendants*

KAMIKA S. SHAW
MALLIKA BALACHANDRAN
Assistant United States Attorneys

BRETT A. SHUMATE
Assistant Attorney General

Civil Division

DIANE KELLEHER
Director
Federal Programs Branch

MICHELLE R. BENNETT
Assistant Director
Federal Programs Branch
    *Of Counsel*

**TABLE OF CONTENTS**

PAGE(s)

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 2

    I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY ..................................... 2

         *A.  The Administration for Children and Families* ............................................. 2

         *B.  The Relevant Funding Schemes* ................................................................... 3

         *C.  The Implementation of Defend the Spend* ................................................... 6

         *D.  ACF Implements Restricted Drawdowns* ..................................................... 6

         *E.  Procedural History* ....................................................................................... 8

    II.  LEGAL STANDARDS ................................................................................................. 8

ARGUMENT .......................................................................................................................... 9

    I.  PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS ..................................................................................................................... 9

         *A.  Defendants' Actions Were Not Ultra Vires* .................................................. 9

         *B.  Plaintiffs' APA Claims Fail* ....................................................................... 11

         *C.  Plaintiffs' Constitutional Claims Cannot Succeed* ..................................... 13

    II.  PLAINTIFFS DO NOT FACE IRREPARABLE HARM ............................................. 16

    III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVORS THE GOVERNMENT ........................................................................................................ 19

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**                                                                       **PAGE(s)**

*Am. Cruise Lines v. United States*,
    96 F.4th 283 (2d Cir. 2024) ........................................................................... 12

*Ameron, Inc. v. U.S. Army Corps of Eng'rs*,
    809 F.2d 979 (3d Cir. 1986) ........................................................................... 14

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) ....................................................................................... 15

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) ......................................................................... 9

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
    370 F.3d 151 (1st Cir. 2004) ........................................................................... 18

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ....................................................................................... 12

*Climate United Fund v. Citibank, N.A.*,
    154 F.4th 809 (D.C. Cir. 2025) ....................................................................... 18

*Clinton v. City of N.Y.*,
    524 U.S. 417 (1998) ....................................................................................... 13

*Comm'n v. Texas*,
    605 U.S. 665 (2025) ....................................................................................... 9

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ..................................................................... 17

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*,
    887 F.2d 275 (D.C.Cir.1989) ......................................................................... 14

*Faculty Senate of Fla. Int'l Univ. v. Winn*,
    477 F. Supp. 2d 1198 (S.D. Fla. 2007) ........................................................... 17

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) ........................................................................... 16

*Fed. Express Corp. v. United States Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ........................................................................... 9

*Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*,
  103 F. Supp. 3d 113 (D.D.C. 2015) ................................................................. 11

*FTC v. Standard Oil Co. of California*,
  449 U.S. 232 (1980) ......................................................................................... 11

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ........................................................................... 11

*Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ......................................................................... 17

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) ................................................................................. 8

*Independent Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ......................................................................... 11

*In re TelexFree Sec. Litig.*,
  No. 4:14-md-002566-TSH, 2021 WL 11604879 (D. Mass. Apr. 21, 2021) ................... 18

*Int'l Bus. Machines Corp. v. De Freitas Lima*,
  No. 7:20-CV-04573 (PMH), 2020 WL 5261336 (S.D.N.Y. Sept. 3, 2020) .............. 16, 17

*Kakar v. USCIS*,
  29 F.4th 129 (2d Cir. 2022) ........................................................................ 12, 13

*Koehler v. United States*,
  No. CIV. A. 90-2384, 1990 WL 292493 (D.D.C. Oct. 16, 1990) ..................... 19

*Lujan v. Nat'l Wildlife Fed'n*,
  4497 U.S. 871 (1990) ....................................................................................... 12

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ........................................................................................... 8

*New Jersey v. Bessent*,
  149 F.4th 127 (2d Cir. 2025) ........................................................................... 12

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................... 8

*Off. of Pers. Mgmt. v. Richmond*,
   496 U.S 414 (1990)...................................................................................... 14

*Penhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984)........................................................................................ 10

*Resins, Inc. v. E.P.A.*,
   787 F.3d 544 (D.C. Cir. 2015)...................................................................... 17

*Rochester Pure Waters Dist. v. U.S. E.P.A.*,
   724 F. Supp. 1038 (D.D.C. 1989).................................................................. 12

*Rodriguez v. DeBuono*,
   175 F.3d 227 (2d Cir.1999)............................................................................ 16

*Rural & Migrant Ministry v. United States Env't Prot. Agency*,
   565 F. Supp. 3d 578 (S.D.N.Y. 2020)............................................................. 8

*S. Dakota v. Dole*,
   483 U.S. 203 (1987)....................................................................................... 15

*Sampson v. Murray*,
   415 U.S. 61 (1974)......................................................................................... 17

*Steir v. Girl Scouts of the USA*,
   383 F.3d 7 (1st Cir. 2004)............................................................................. 18

*Students for Fair Admissions v. U.S. Mil. Acad. at West Point*,
   709 F. Supp. 3d 118 (S.D.N.Y. 2024)............................................................. 8

*Vill. of Bensenville v. Fed. Aviation Admin.*,
   457 F.3d 52 (D.C. Cir. 2006)........................................................................ 11

*Winter v. NRDC*,
   555 U.S. 7 (2008)............................................................................................ 8

*Yale New Haven Hosp. v. Becerra*,
   56 F.4th 9 (2d Cir. 2022) ............................................................................... 9

**STATUTES**

5 U.S.C. § 704.................................................................................................... 11

5 U.S.C. § 705...................................................................................................... 8

31 U.S.C. § 3357 ................................................................................................ 14

42 U.S.C. § 618 .................................................................................................... 3
42 U.S.C. § 1397 .................................................................................................. 3

42 U.S.C. § 9857 .................................................................................................. 3

42 U.S.C. § 9858g(b) .......................................................................................... 14

42 U.S.C. § 601-619 ............................................................................................ 4

## REGULATIONS

2 C.F.R. Part 200.300 ..................................................................................... 4, 14

2 C.F.R. 200.302(a) .............................................................................................. 5

2 C.F.R. 200.302(b)(3) .......................................................................................... 5

45 C.F.R. Part 98 .................................................................................................. 3

45 C.F.R. § 96 ...................................................................................................... 4

45 C.F.R. § 96.30 ........................................................................................... 4, 14

45 C.F.R. § 98.90 ......................................................................................... 3, 6, 7

## OTHER AUTHORITIES

EO 14222 ........................................................................................................ 6, 15

Defendants the Administration for Children and Families ("ACF"), Alex J. Adams, in his official capacity as the Assistant Secretary of ACF, the U.S. Department of Health and Human Services ("HHS"), and Robert F. Kennedy Jr., in his official capacity as the Secretary of HHS (collectively, the "Government") by their attorney Jay Clayton, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in opposition to the motion for injunctive relief filed by the State of New York, the State of California, the State of Illinois, the State of Colorado, and the State of Minnesota (collectively, "Plaintiffs").  ECF. No. 38.

## PRELIMINARY STATEMENT

Plaintiffs bring this action under the Administrative Procedure Act ("APA") and various Constitutional provisions, challenging the ACF's implementation of temporary draw down restrictions relating to three federal grant programs: the Child Care and Development Fund ("CCDF"); Temporary Assistance for Needy Families ("TANF"); and the Social Services Block Grant ("SSBG").  By this motion, Plaintiffs ask the Court for a preliminary injunction to enjoin ACF from implementing these temporary draw down restrictions, which they characterize as a broad "funding freeze." Mot. at 1.  However, Plaintiffs cannot discharge their burden to establish entitlement to injunctive relief, a drastic and extraordinary remedy.  In particular, Plaintiffs' APA claim fails because there is no final agency action with respect to any grant funding Plaintiffs may receive, and their constitutional claims fail because ACF is within its authority to implement these payment processing controls.  Accordingly, Plaintiffs cannot demonstrate a likelihood of success on the merits.  More importantly, Plaintiffs cannot show that they will suffer irreparable harm, because they have continued to receive funding, and will continue to do so without injunctive relief if they simply follow the newly implemented procedures, with which Plaintiffs

do not contend they are unable to comply.  They also cannot demonstrate that the balance of interests mandates an injunction. For these reasons, as detailed further below, this Court should deny Plaintiffs' motion for injunctive relief.

## BACKGROUND

### I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

#### A.    _The Administration for Children and Families_

The Administration for Children and Families ("ACF") is a division within the U.S. Department of Health and Human Services.  Declaration of Reese Cody Inman dated January 20, 2026 ("Inman Decl."), ¶ 1.  ACF administers more than sixty social services programs that provide funding to grantees and, in turn, thousands of recipients.  _Id._ ¶ 4.  Grantees include but are not limited to states, tribes, territories and non-profits.  _Id._  These entities receive funding for human services programs such as the three programs at issue here: Temporary Assistance for Needy Families ("TANF"), the Social Services Block Grant ("SSBG") and the Child Care and Development Fund ("CCDF").  _Id._   In Fiscal Year 2024, ACF obligated $52.6 billion in grant funds to over fourteen thousand grant projects. _Id._ ¶ 5. Approximately 21 percent of that funding was for block grants, nearly 15 percent for entitlement grants, approximately 39 percent for formula grants and approximately 25 percent was for discretionary grants. _Id._

Grant funds are disbursed through the HHS's Payment Management System ("PMS"). Declaration of Melissa Bruce dated January 20, 2026 ("Bruce Decl.") ¶ 4.  Grant recipients submit draw down requests directly into PMS, across multiple awards. _Id._  PMS implements

standard internal control checks during payment processing that may trigger conditions resulting in additional layers of review and approval.  *Id.* ¶ 8.

    *B.*  *The Relevant Funding Schemes*

        1.  The Child Care and Development Fund

CCDF is authorized by the Child Care and Development Block Grant ("CCDBG") Act, 42 U.S.C. § 9857 *et seq*.  Inman Decl. ¶ 9.  ACF awards approximately $12.3 billion in CCDF grants annually to states, territories and tribes.  *Id*. ¶ 7.  These grants provide assistance in securing childcare services for families in need and aim to improve the quality of child care services and programs more broadly.  *Id*. ¶ 8.  CCDF is funded through two appropriation streams: through annual appropriations (the "Discretionary Funds") and through Section 418 of the Social Security Act (42 U.S.C. § 618) (the "Mandatory and Matching Funds").  *Id*.  ¶ 10.  All CCDF funds are subject to the CCDBG Act.  Pursuant to Section 658I(b)(1) of the CCDBG Act, the Secretary of HHS "shall review and monitor State compliance" with the Act. 42 U.S.C. § 9858g (b)(1). .  Further, all CCDF funds are subject to the regulations at 45 C.F.R. Part 98. .  Subpart J gives the Secretary authority to "monitor programs funded under the CCDF for compliance with: (1) the act; (2) the provisions of this part; and (3) the provisions and requirements set for in the CCDF Plan approved under § 98.18."  This subpart also requires recipients to "make appropriate books, documents, papers, manuals, instructions, and records available to the Secretary, or any duly authorized representatives, for examination or copying on or off the premises of the appropriate entity, including subgrantees and contractors, upon reasonable request."  45 C.F.R. § 98.90 (c).

2.  <u>The Social Services Block Grant</u>

SSBG is authorized by Title XX of the Social Security Act, 42 U.S.C. § 1397 *et seq.*

SSBG awards approximately $1.7 billion in SSBG grants annually to states and territories.

Inman Decl. ¶ 13.  These grants provide assistance for a broad array of social services.  *Id.*  ¶¶

13-14.  These services include, among other things, child or adult care, employment services,

and protective services.  *Id.*  States have broad discretion to use these funds for the social

services enumerated in the statute.  *Id.* ¶ 14.  SSBG is subject to the general Block Grant

Regulations at 45 C.F.R. Part96.  *Id.*  Pursuant to 45 C.F.R. § 96.30, SSGB recipients must have

"[f]iscal control and accounting procedures . . . sufficient to (a) permit preparation of reports

required by the statute authorizing the block grant and (b) permit the tracing of funds to a level of

expenditure adequate to establish that such funds have not been used in violation of the

restrictions and prohibitions of the statute authorizing the block grant."

3.  <u>The Temporary Assistance for Needy Families</u>

The Temporary Assistance for Needy Families ("TANF") program is authorized by 42

U.S.C. §§ 601-619.  ACF awards approximately $16.5 billion in TANF grants to states annually.

Inman Decl. ¶ 15.  These grants provide services and benefits to low-income families with the

aim of promoting work participation and economic stability.  *Id.* ¶ 16.  Grantees may use TANF

funds for a variety of services, including cash assistance, short-term benefits, and facilitating

transitions to work opportunities.  *Id.* ¶ 17.  Further, grantees may elect to transfer up to 30% of

their TANF funds to CCDF and/or SSBG.  *Id.* ¶ 18.   Funds transferred to CCDF are subject to

CCDF rules and regulations.  *Id.*  Grantees receive funding on a quarterly basis.  *Id.* ¶ 20.

TANF is subject to the Uniform Administrative Requirements for grants located in 2

C.F.R. Part 200.300  *Id.* ¶ 22.  2 C.F.R § 200.300 requires ACF to "manage and administer"

TANF fundings "so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations . . .and the requirements of this part."  Recipients and subrecipients are required to have "financial management systems, including records documenting compliance with Federal statutes, regulations, and the terms and conditions of the Federal award" that are "sufficient to permit the . . . tracking of expenditures to establish that funds have been used in accordance with Federal statutes, regulations, and the terms and conditions of the Federal award."  *Id.* § 200.302(a).  These financial management systems must provide for "maintaining records that sufficiently identify the amount, source, and expenditure of Federal funds for Federal awards." *Id.* § 200.302(b)(3).

    4.  <u>HHS' General Terms & Conditions</u>

In addition to the statutes and regulations referenced above, all grantees are subject to HHS and ACF's Standard Terms and Conditions ("T&Cs").  Inman Decl. ¶ 6.  The T&Cs provide that grant recipients must "[e]nsur[e] that expenditures are free from fraud, waste, abuse, and duplication."  *ACF's Standard T&Cs, Federal Fiscal Year 2025* at 4, https://acf.gov/sites/default/files/documents/main/FFY2025-ACF-STANDARD-TERMS-and-CONDITIONS--updated-2025-07-29-.pdf.  To that end, the T&Cs further advise that non-compliance may result in any number of enforcement actions.  Specifically, "[f]ailure to comply with the [Terms & Conditions] of the award may result in an enforcement remedy such as a disallowance, restricted drawdown, withholding of future awards, deferral of claims for Federal Financial Participation (FFP), or termination of the award."  *Id.*

C.  _The Implementation of Defend the Spend_

On February 26, 2025, President Donald J. Trump issued Executive Order ("EO") 14222, Implementing the President's the Department of Government Efficiency ("DOGE") Cost Efficiency Imitative.  https://www.federalregister.gov/documents/2025/03/03/2025-03527/implementing-the-presidents-department-of-government-efficiency-cost-efficiency-initiative.  As part of its implementation of EO 14222, HHS adopted Defend the Spend ("DTS") in March 2025.  Bruce. Decl. ¶ 10.  To implement DTS, PMS, the program HHS utilizes to process and submit grant requests for disbursement, designed a new field in the payment request system that required a written justification from grantees of up to 1,000 characters that explained the purposes of the requested payment.  _Id._  On December 30, 2025, HHS began to implement DTS for non-discretionary grants.  _Id._ at ¶ 15.

D.  _ACF Implements Restricted Drawdowns_

On December 30, 2025, ACF sent a letter to the governor of Minnesota notifying him that the State would be placed on temporary restricted drawdown for all CCDF funds.  ECF No 40-4 at 6-8.  Minnesota was placed on a restricted drawdown after it failed to provide documentation ACF requested on December 12, 2025 pursuant to 45 C.F.R. §98.90 with respect to the CCDF funds; these requests were prompted by concerns of fraud.  _Id._ at 3-4.  On January 5, 2026, ACF provided further guidance about the restricted drawdown.  The January Letter detailed the kind of information Minnesota would have to submit prior to drawing down funds.  _Id._ at 10-12.  Specifically, ACF directed Minnesota to provide attendance documentation prior to drawing down funds from PMS.  _Id._ at 11.  The letter specified that the attendance documentation had to consist of contemporaneous records from the provider, agency or

6

subcontractor that reflected the units of service delivered and were sufficient to show that the funds requested were reasonable and allowable under the applicable federal laws. *Id*.

On January 6, 2026, ACF sent letters to New York, , Colorado, California and Illinois notifying them that they would be placed on restricted drawdown for each of the three grants due to concerns about possible fraud and misuse of funds. *See* ECF Nos. 40-1–40-3. The letters explicitly provide that Plaintiffs were placed on restricted drawdown pending review of each state's plan and confirmation of each state's compliance with any applicable laws. *Id*. To aid in the review of the state's plans for completeness, ACF asked each state to provide administrative and verification data for TANF and SSBG funding, ECF Nos. 40-2, 40-3, and certain fiscal accountability data improvements for CCDF funding, ECF No. 40-1. On the same day, ACF also notified Minnesota that it would be placed on temporary restricted drawdown for all SSBG funds after it failed to provide sufficient information in response to ACF's December 12 requests. ECF No. 40-5 at 6. ACF also notified Minnesota it was being placed on restricted drawdown for all TANF funds due to concerns about fraud and misuse of funds. ECF No. 40-2 at 15. In this notification regarding TANF, ACF requested the same information and administrative and verification data it requested from the other four Plaintiff states. ECF No. 40-2.

On January 6, 2026, Colorado, Illinois, and California all made draw down requests through PMS. Bruce Decl.¶ 17. After being processed, the funds were disbursed by January 12, 2026, Inman Decl. ¶ 39, Bruce Decl. ¶ 17. It is the Agency's intention that once the TRO is

lifted, HHS will continue to process and pay payment requests from the States in the ordinary course to the extent that they follow the new payment procedures.  *Id.* ¶ 18.[1]

     *E.*  *Procedural History*

Plaintiffs filed this action alleging that Defendants' actions were in excess of HHS' statutory authority and arbitrary and capricious pursuant to the APA, *ultra vires*, and in violation of separation of powers, the Spending Clause and the Appropriations Clause on January 8, 2026. ECF No. 1 ("Compl.").  Plaintiffs requested a temporary restraining order ("TRO") restraining Defendants from keeping the restricted drawdowns in place; the Court granted Plaintiffs' request and entered the TRO on January 9, 2026.  ECF No. 22.  Plaintiffs subsequently filed the instant motion seeking a preliminary injunction on January 15, 2026. ECF No. 39 ("Mot.").

## II.  LEGAL STANDARDS

A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"  *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (*quoting Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. NRDC,* 555

---

[1] Due to a miscommunication between HHS and PSC, Minnesota CCDF drawdown requests were inadvertently automatically rejected between January 5th and January 14th.  After becoming aware of the issue when Plaintiffs filed this instant motion, HHS plans to follow up with Minnesota and ask them to resubmit their drawdown requests for processing.  HHS did not intend to automatically reject these requests before of after the TRO was entered.  Inman Decl. at ¶ 40.

U.S. 7, 20 (2008).  The last two factors of the analysis "merge when the Government is the opposing party*." Nken v. Holder*, 556 U.S. 418, 435 (2009).   The movant bears the burden of demonstrating "by a clear showing" that the remedy is necessary and that the prerequisites for issuance of the relief are satisfied.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).  "The standard for a stay under 5 U.S.C. § 705 is the same as or similar to the standard for a preliminary injunction." *Rural & Migrant Ministry v. United States Env't Prot. Agency*, 565 F. Supp. 3d 578, 595 (S.D.N.Y. 2020).

## ARGUMENT

I.   **PLAINTIFFS  CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS**

   A.  *Defendants' Actions Were Not Ultra Vires*

Plaintiffs' claims that ACF's action were *ultra vires* and in excess of statutory authority fail.  This claim "is only available in the extremely limited circumstance when three requirements are met: (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 26-27 (2d Cir. 2022) (internal quotation marks and citations omitted).  The last requirement is particularly exacting, as "[o]nly error that is patently a misconstruction of the" pertinent statute, "that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Fed. Express Corp. v. United States Dep't of Com.,* 39 F.4th 756, 764–65 (D.C. Cir. 2022) (internal quotation marks and citations omitted).

To satisfy these stringent requirements, the claimant must demonstrate that an agency action is "taken in excess of its delegated powers and contrary to a specific prohibition" in the law."). *Id*. at 763 (internal quotation marks omitted).   An *ultra vires* claim is "essentially a Hail Mary pass" that "rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). In light of this, "[t]ime and again, courts have stressed that *ultra vires* review has extremely limited scope." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (internal quotation marks omitted).

Plaintiffs' claims fail on the third prong of the test because Defendants have not violated a "clear and mandatory" statutory requirement.  As discussed above in Section I. D.  Defendants have not frozen any funding.  Rather, Defendants implemented a restricted drawdown that required Plaintiffs to submit additional documentation to ensure that funds from the public fisc are being spent appropriately and in accordance with the purposes laid out in each implementing statute. Even after the January 5 and 6 Letters notifying Plaintiffs of the restricted drawdown were issued, Defendants have continued to process Plaintiffs' drawdown requests.  An action is *ultra vires* only when an officer "acts without any authority whatever." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 n.11 (1984) (internal quotation marks omitted).  Plaintiffs cannot show that is the case here.   Plaintiffs cite to a litany of statutory and regulatory provisions regarding procedures for noncompliance that they claim are applicable here, but they are not. Defendants' have not imposed noncompliance penalties such that these procedures would apply. Defendants have not, as Plaintiffs insist, frozen funding and they have not made any final determinations regarding noncompliance. Rather, Defendants have taken steps to fortify their internal review system to more efficiently monitor each States' compliance with their plans and applicable laws in response to concerns about misuse of funds.   Defendants' actions—requiring

10

additional documentation prior to the release of funds and requesting data related to the states' fiscal controls and integrity—fall within HHS's general monitoring authority as outlined in the regulations enumerated above in Section I. B.  As detailed above, the Secretary of HHS acted in accordance with his monitoring authority pursuant § 658I(b)(1) of the CCDBG Act, 45 C.F.R. § 98.90(c), 45 C.F.R. § 96.30 and 2 C.F.R. § 200.300 .  As such, Plaintiffs cannot succeed on their claim.

### B. *Plaintiffs' APA Claims Fail*

Plaintiffs' APA claims must fail because the January 5 and 6, 2026 Letters do not constitute final agency actions.  The APA permits judicial review only of "final agency action[s]," and it does not provide for review of "preliminary, procedural, or intermediate agency action[s] or ruling[s]."  5 U.S.C. § 704; *see also Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 103 F. Supp. 3d 113, 121 (D.D.C. 2015).  The requirement that an action be final aims to avoid "piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary."  *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 242 (1980).  An agency action is final when it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 68 (D.C. Cir. 2006) (internal quotation marks and citations omitted).  This definition is "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency."  *Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (internal quotation marks omitted).  The APA does not permit review of actions that are "of a merely tentative or interlocutory nature[,]"  *Vill. of Bensenville.*, 457 F.3d 52 at 68 (D.C. Cir. 2006), or that are part of an agency's "day-to-day operations."

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).  Significantly, nor does it authorize judicial review of "the common business of managing government programs."  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).

The January Letters do not constitute final agency actions.  These letters constitute the kind of intermediate agency action the APA excludes from its purview.  As detailed above, the January 5 and 6 Letters did not freeze any funding stream.  Rather, the letters informed Plaintiffs that they were placed on restricted drawdown pending review of each states' plans, use of funding and implementation of certain internal controls.    The Letters articulate an intermediate step that is part of the agency's ongoing monitoring and review of the grantees' use of funds. This is not a situation where the agency took a final action resulting in funds reverting back to the Department of Treasury such as where the agency has terminated, taken steps to de-obligate funding, or allowed funds to lapse.  *See, e.g.*, *Rochester Pure Waters Dist. v. U.S. E.P.A.*, 724 F. Supp. 1038, 1044–45 (D.D.C. 1989), *rev'd sub nom. Rochester Pure Waters Dist. v. E.P.A.*, 960 F.2d 180 (D.C. Cir. 1992) (noting that injunctive relief is appropriate where there is no final agency action when relief is "sought to suspend a reversion of previously appropriated funds back to the federal Treasury" before the reversion occurs.).The letters make no determinations that would categorically freeze or revoke funds.  Instead, the agency has, in keeping with its notifications to Plaintiffs, continued to process and approve drawdown requests after sending the January 5 and 6 Letters subject to additional screening requirements.

Even if the court were to determine the January 5 and 6 Letters constitute final agency actions reviewable under the APA, the agency's actions were not arbitrary and capricious.  At the outset, the APA provides for "narrow and deferential" judicial review.  *Kakar v. USCIS*, 29 F.4th 129, 132 (2d Cir. 2022) (citations and quotation marks omitted).  In reviewing the agency action,

the Court cannot "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Agency action is arbitrary and capricious only where  "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *New Jersey v. Bessent*, 149 F.4th 127, 152 (2d Cir. 2025) (quoting *Am. Cruise Lines v. United States*, 96 F.4th 283, 286 (2d Cir. 2024).

As the letters stated, the agency took action based on concerns about programmatic fraud and insufficient internal controls within the States to detect and prevent it.  Plaintiffs attempt to claim that agency acted without analyzing any evidence, but "in justifying its decision the agency need not provide written findings about every piece of evidence that it consider[s]."  *Kakar v. United States Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (internal quotations marks omitted).   Further, Plaintiffs cannot contend that the remedy here lacks a rational relationship to the problem the agency identified.  Plaintiffs attempt to make their case by mischaracterizing the agency's action as a broad categorical freeze on funds.  Rather, as explained in detail above, the agency placed Plaintiffs on a temporary restricted drawdown status, which simply requires them to submit some additional corroborating documentation before drawing down funds and requested data to aid in reviewing each states' compliance with applicable laws. This has not, as Plaintiffs claim, imposed a categorical bar on the flow of funds.

C.  *Plaintiffs' Constitutional Claims Cannot Succeed*

Plaintiffs essentially claim, through three counts titled "Violation of the Separation of Powers—Usurping the Legislative Function," "Violation of the Appropriations Clause" and "Violation of the Spending Clause," that the Agency exceeded its authority in implementing the

13

temporary draw down restrictions. Compl. at 36–39. Plaintiffs are unlikely to succeed on their constitutional claims because as discussed above, the Agency is within its rights to implement procedures in order to responsibly disperse funds.

The Agency has not violated the separation of powers. Congress may, consistent with the separation of powers, properly delegate to the Executive Branch the authority to attach conditions on agency spending. *See, e.g., Clinton v. City of N.Y.*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money.") (Breyer, J. dissenting) (citing examples dating back to the founding of the Republic); *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275 at 280-81 (D.C. Cir. 1989) (upholding conditions on spending imposed by President where statute authorized President to set certain "terms and conditions as he may determine"); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of purposes and delegates to executive branch officials the authority to make certain decisions regarding how those funds are to be spent.")  The governing regulations for the three programs in question require certain fiscal controls—for example, 45 C.F.R. § 96.30 requires procedures sufficient to "permit the tracing of funds to a level of expenditure adequate to establish that such funds have not been used in violation of the restrictions and prohibitions of the statute authorizing the block grant" for SSBG; Section 658I(b) of the CCDBG Act (42 U.S.C. § 9858g(b)), which governs CCDF, authorizes the Secretary to "review and monitor State compliance with this subchapter and the plan"; and 2 C.F.R. § 200.300, governing TANF requires ACF to "manage and administer" the awards "so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations." It follows that the Agency has the

14

authority to implement control and procedures to disperse the funds appropriated by Congress responsibly. *See, e.g.,* 31 U.S.C. § 3357 (c) (stating the "guidelines required to be established under section 3(a) of the Fraud Reduction and Data Analytics Act of 2015" as including "conducting an evaluation of fraud risks," and "collecting and analyzing data from reporting mechanisms on detected fraud"). That is what the agency is doing here.

The Appropriations Clause, as Plaintiffs acknowledge, provides "that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S 414, 424 (1990). ACF has not improperly appropriated any funds in violation of the Appropriations Clause, nor do Plaintiffs allege it has done so. Rather, Plaintiffs argue that "[a] necessary implication" of the Appropriations Clause is that the Executive branch is "excluded from any authority over appropriations, including the ability to override Congress's appropriations by ignoring the Constraints that Congress has explicitly identified for any appropriation." Mot. at 27. But ACF is not spending funds in violation of any Congressionally imposed restraints; rather, it is implementing procedures to ensure that the funds are being used appropriately. Therefore, Plaintiffs' Appropriations Clause claim fails.

Neither do ACF's actions violate the Spending Clause. Article I of the Constitution confers on Congress the authority to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Spending Clause authority is "broad" and empowers Congress to "set the terms on which it disburses federal money to the States[.]" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); see also, e.g., *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (noting that Congress has "repeatedly employed the [spending] power to further broad

policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." (citations omitted)).

In particular, Plaintiffs argue that the government is required, under the Spending Clause, to provide "fair notice" of any conditions on the receipt of such funds and that "it cannot use the Spending Power as a form of compulsion against the States." Mot. at 28.  This has not happened here.  The Agency standard terms and conditions include that recipients "must comply with T&Cs of their awards, including . . . . Ensuring that expenditures are free from fraud, waste, abuse, and duplication."  *ACF's Standard T&Cs, Federal Fiscal Year 2025* at 4, https://acf.gov/sites/default/files/documents/main/FFY2025-ACF-STANDARD-TERMS-and-CONDITIONS--updated-2025-07-29-.pdf .Further, consistent with Executive Order 14222, the Agency began designing and implementing a new system that required grant recipients to provide a written justification of up to 1,000 characters for their draw down request when making the request and the change was communicated to recipients in April 2025.   Bruce Decl. ¶ 10.  Plaintiffs were therefore on notice that protecting against fraud was a condition of receiving the funding, and it follows that ACF would take steps to ensure that funding is used appropriately, including by implementing additional screening procedures to detect fraud, waste, and abuse.

## II.   PLAINTIFFS DO NOT FACE IRREPARABLE HARM

Plaintiffs cannot plausibly allege that ACF's decision to require additional procedures in connection with draw down requests would result in irreparable harm, because they continue to receive funding if they provide the requisite supporting documentation.  Plaintiffs allege that "[i]f the funds are cut, many programs will cease operations." Mot. at 31. Establishing irreparable harm is "'the single most important prerequisite for the issuance of a preliminary

16

injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)

(quoting *Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir.1999)). "To satisfy the irreparable

harm requirement, [a plaintiff] must demonstrate that absent a preliminary injunction [it] will

suffer an injury that is neither remote nor speculative, but actual and imminent[.]" *Int'l Bus.

Machines Corp. v. De Freitas Lima*, No. 7:20-CV-04573 (PMH), 2020 WL 5261336, at *14

(S.D.N.Y. Sept. 3, 2020), *aff'd sub nom. Int'l Bus. Machines Corp. v. Lima*, 833 F. App'x 911

(2d Cir. 2021) (internal quotation marks and citation omitted).

Plaintiffs describe six alleged harms they will suffer if the Agency is not enjoined: (1)

Plaintiffs will not be able to cover the massive shortfall caused by the restrictions; (2) the

restrictions will create "massive operational and budgetary uncertainty"; (3) participants in these

programs will seek answers and support from Plaintiffs, increasing the strain on Plaintiffs to

provide services; (4) state agencies will suffer damage to their reputation; (5) the restrictions

increase in enrollment in other state provided benefits; and (6) Plaintiffs will be forced to collect

and produce data regarding their residents. Mot. at 32–34.  The first five of these six harms rely

on the faulty assumption that as a result of the temporary drawdown restrictions, Plaintiffs will

not receive funding.  That is simply not the case here.  The Bruce Declaration demonstrates that,

on January 6, 2026, the Agency continued to process draw down requests and disbursed funds to

the States.  Bruce Decl. ¶ 17.  For example, prior to the TRO, California requested a drawdown

from TANF on January 6, 2026 and the requested funds were dispersed on January 7, 2026. *Id.*

Similarly, on January 6, 2026, Illinois made drawdown request from SSBG and the requested

funds were dispersed on January 8, 2026.  *Id.* It is the Agency's intention, as this demonstrates,

that once the TRO is lifted, HHS will continue to process and pay payment requests from the

States in the ordinary course as long as the new procedures are followed.  *Id.* ¶ 18.  If there are

any delays in funding as a result of the new procedures, that does not suffice for irreparable injury. "Where the injuries alleged are purely financial or economic, the barrier to proving irreparable injury is higher still, for it is 'well settled that economic loss does not, in and of itself, constitute irreparable harm.'" *Mexichem Spec. Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The Supreme Court has echoed this message, finding that 'the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.'" *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Therefore, Plaintiffs cannot demonstrate irreparable harm.[2]

Finally, Plaintiffs' last argument that the data request would be "extremely burdensome" and that disclosing personally identifying information would undermine trust in the public programs does not rise to the level of harm required for a preliminary injunction. That that these additional requests would be extremely burdensome or undermine trust in the public programs are just possibilities grounded in speculation. "Plaintiffs must show that irreparable harm is *likely*, not merely possible." *In re TelexFree Sec. Litig.*, No. 4:14-md-002566-TSH, 2021 WL 11604879, at *7 (D. Mass. Apr. 21, 2021) (citing *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 16 (1st Cir. 2004)). That showing "must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Further, as discussed above,

---

[2] Further, the Agency is not preventing Plaintiffs from providing services; it has just added additional steps to receive funding that would provide reimbursement for the state administered services. *See e.g.*, *Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) ("There is no irreparable harm here because the plaintiffs can fund the desired travel themselves and then, if they prevail in this suit, obtain reimbursement. In other words, the harm is financial.").

additional reporting requirements are part of the funding system in which Plaintiffs have agreed
to participate.

### III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVORS THE GOVERNMENT

Plaintiffs have not shown that the balances of equities and public interest favor a
preliminary injunction.  The Agency seeks to ensure that funds appropriated for vital social
services make it into the hands of the communities Congress intends to benefit.   In order to do
so, the agency has implemented a temporary restricted drawdown and requested data to aid it in
determining if funds have been improperly spent.  An injunction would essentially prevent the
agency from effectively screening requests for billions of dollars of funds to detect and prevent,
fraud, waste, and abuse.    While grantees have an interest in accessing these funds—and indeed,
are still able to access these funds— "the government and the public have a stronger interest in
protecting the public fisc and eliminating the appearance of impropriety around these grant
programs." *Climate United Fund v. Citibank, N.A*., 154 F.4th 809, 830 (D.C. Cir. 2025), *reh'g
en banc granted, opinion vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025);
*see also Koehler v. United States*, No. CIV. A. 90-2384, 1990 WL 292493, at *4 (D.D.C. Oct.
16, 1990) (concluding that the Government has a "strong interest in protecting public funds."  .
In light of the harm HHS would face if it was prevented from protecting public funds from
misuse, the balance of equities and public interest tip in favor of the Government.

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for injunctive relief.

Dated:  New York, New York
        January 20, 2026

                                              Respectfully submitted,

                                              JAY CLAYTON
                                              United States Attorney
                                              Southern District of New York
                                              *Attorney for Defendants*

                                      By:      /s/ *Kamika S. Shaw*
                                              KAMIKA S. SHAW
                                              MALLIKA BALACHANDRAN
                                              Assistant United States Attorneys
                                              86 Chambers Street, 3rd Floor
                                              New York, New York 10007
                                              Tel.: 212-637-2768/2781
                                              Email:Kamika.shaw@usdoj.gov
                                                    mallika.balachandran@usdoj.gov

Of Counsel

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DIANE KELLEHER
Director
Federal Programs Branch

MICHELLE R. BENNETT
Assistant Director
Federal Programs Branch

**Certificate of Compliance**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 5,749 words.