## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK; STATE OF
CALIFORNIA; STATE OF COLORADO; STATE
OF ILLINOIS; and STATE OF MINNESOTA,

       Plaintiffs,

v.

ADMINISTRATION FOR CHILDREN AND
FAMILIES; ALEX J. ADAMS, in his official
capacity as the ASSISTANT SECRETARY OF THE
ADMINISTRATION FOR CHILDREN AND
FAMILIES; U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; and ROBERT F.
KENNEDY, JR., in his official capacity as the
SECRETARY OF THE U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

       Defendants.

Case No. 26-cv-00172

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR
## MOTION FOR A PRELIMINARY INJUNCTION AND § 705 STAY

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.      Defendants Mischaracterize Their Own Actions ..................................... 2

    II.    Plaintiffs Are Likely to Show that Defendants Violated the APA ......................... 4

          A.   Defendants Do Not Meaningfully Contest that Their Actions Are In Excess of Statutory Authority and Contrary to Law ....................................... 4

          B.   The ACF Funding Freeze is Arbitrary and Capricious .................................. 8

          C.   The ACF Funding Freeze Is Final Agency Action. ......................................... 9

    III.   Plaintiffs Are Likely to Show That the ACF Funding Freeze is Unconstitutional and Ultra Vires ................................................................. 11

    IV.   The Equities Compel a Preliminary Injunction .................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aera Energy LLC v. Salazar,*
  642 F.3d 212 (D.C. Cir. 2011)................................................................................................8

*Appalachian Power Co. v. EPA,*
  208 F.3d 1023 (D.C. Cir. 2000)..............................................................................................9

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006)................................................................................................................7

*California Communities Against Toxics v. Env't Prot. Agency,*
  934 F.3d 627 (D.C. Cir. 2019)..............................................................................................10

*California v. United States Dep't of Transportation,*
  No. 25-CV-208-JJM-PAS, 2025 WL 3072541 (D.R.I. Nov. 4, 2025)...................................10

*Council for Opportunity in Educ. v. McMahon,*
  No. 25-CV-03491 (TSC), 2026 WL 120984 (D.D.C. Jan. 16, 2026)......................................7

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
  591 U.S. 1 (2020)....................................................................................................................8

*Fed. Commc'ns Comm'n v. NextWave Pers. Commc'ns, Inc.,*
  537 U.S. 293 (2003)................................................................................................................4

*HTH Corp. v. NLRB,*
  823 F.3d 668 (D.C. Cir. 2016)................................................................................................6

*Ipsen Biopharmaceuticals, Inc. v. Azar,*
  943 F.3d 953 (D.C. Cir. 2019)..............................................................................................10

*Kakar v. U.S. Citizenship & Immigr. Servs.,*
  29 F.4th 129 (2d Cir. 2022)....................................................................................................9

*Louisiana v. Biden,*
  622 F. Supp. 3d 267 (W.D. La. 2022).............................................................................10, 11

*Met. Transp. Auth'y v. Duffy,*
  784 F. Supp. 3d 624 (S.D.N.Y. 2025)...................................................................................10

*Mexichem Specialty Resins, Inc. v. E.P.A.*,
    787 F.3d 544 (D.C. Cir. 2015) ................................................................14

*Minnesota v. U.S. Dep't of Ag.*,
    No. 25-CV-4767, 2026 WL 125180 (D. Minn. Jan. 16, 2026)........................................6, 7, 9

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010)................................................................13, 15

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................12

*New York v. Trump*,
    767 F. Supp. 3d 44 (S.D.N.Y. 2025) ........................................................9, 13, 15

*New York v. Trump*,
    769 F. Supp. 3d 119 (D.R.I. 2025) ................................................................7

*New York v. Trump*,
    777 F. Supp. 3d 112 (D.R.I. 2025) ................................................................7

*New York v. Trump*,
    No. 25-CV-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ........................................11

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981)................................................................11, 12

*San Francisco Herring Ass'n v. Dep't of the Interior*,
    946 F.3d 564 (9th Cir. 2019) ................................................................10

*U.S. Army Corps of Engineers v. Hawkes Co.*,
    578 U.S. 590 (2016)................................................................10

*Van Buren v. United States*,
    593 U.S. 374 (2021)................................................................7

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
    778 F. Supp. 3d 440 (D.R.I. 2025)................................................................7

**Constitutional Provisions**

U.S. Const.
    art. I, § 8, cl. 1 ................................................................11
    art. I, § 9, cl. 7 ................................................................11

**Federal Statutes**

5 U.S.C.
    § 705.................................................................................................................15
    § 706(2)(A) .......................................................................................................4

42 U.S.C.
    § 617.................................................................................................................12
    § 9858g(b).........................................................................................................5

**Federal Regulations**

2 C.F.R.
    § 200.300...........................................................................................................5

45 C.F.R.
    § 96.30...............................................................................................................5
    § 96.51...............................................................................................................6
    § 98.90(c) ...........................................................................................................5
    § 98.91...............................................................................................................6

**Executive Orders**

Executive Order 14222 ........................................................................................3

## INTRODUCTION

On January 6, 2026, HHS announced what it called a "funding freeze" as to the five Plaintiff States: "The U.S. Department of Health and Human Services today froze access to certain federal child care and family assistance funds for California, Colorado, Illinois, Minnesota and New York." Ex. 6. Through counsel, Defendants now claim that this was not a "broad categorical freeze on funds" and that "Defendants have not frozen any funding." Opp'n 10, 13. Their remarkable, revisionist assertions should be rejected—but are also beside the point. All Parties agree that, through the January 5 and 6 Letters, Defendants acted to withhold *all* CCDF, TANF, and SSBG funds from Plaintiff States, indefinitely, until Defendants' unlawful demands made in those letters are met. Nowhere do Defendants disavow their intent to immediately cut off all funds to Plaintiff States unless Plaintiffs accede to their demands, or a preliminary injunction is issued.

Equally remarkable is that Defendants do not contest, and thus concede, that their actions contravene numerous statutes and regulations governing the CCDF, TANF, and SSBG programs. They cite no legal authority that gives colorable authorization for them to withhold these funds in their entirety, much less without following the detailed statutory enforcement procedures governing the programs. They do not cite one shred of evidence of fraud that could give rise to the statutory enforcement procedures. Indeed, they do not deny that their actions—selectively applied only to the five Plaintiff States—were in fact motivated by political animus. Nor do they claim to have considered reliance interests, making their actions arbitrary as a matter of law. Defendants likewise offer no legal support for their demands for the personally identifiable information of millions of Plaintiff States' residents—or even acknowledge that this is what they have improperly, and infeasibly, demanded, within two weeks. And in ignoring the reality of their actions and impossible burden of their demands, they ignore much of the immense irreparable harm their actions will immediately impose.

Whether called a "funding freeze" or not, Defendants' actions are straightforwardly unlawful many times over, will cause Plaintiff States irreparable harm, and must be enjoined.

## ARGUMENT

## I.    Defendants Mischaracterize Their Own Actions

Defendants' arguments rest on a series of assertions about the agency's actions that are contradicted by the evidence in the record.

*First*, despite publicly and plainly announcing a "funding freeze" as to Plaintiff States,[1] Defendants now backtrack, labeling their action as, inter alia, "payment processing controls," Opp'n 1; "steps to fortify their internal review system," *id.* 10; "requiring additional documentation," *id.* 10-11; and "a temporary restricted drawdown status," *id.* 13. Such labels are beside the point. All parties agree on what Defendants did: through the January 5 and 6 letters, Defendants for the first time required Plaintiff States to submit highly, if not impossibly, burdensome documentation and data "*before drawing down funds.*" Opp'n 13 (emphasis added). Plaintiff States cannot draw down ACF Funds, indefinitely, unless they have provided the documents and data Defendants demanded. *See* Exs. 1-3, 4-B, 5-B ("restricted drawdown . . . until further notice"); Opp'n 16 (Plaintiffs will "continue to receive funding if they provide the requisite supporting documentation"); *id.* 17 (similar). That action is unlawful, whatever it is called.

*Second*, Defendants do not meaningfully dispute that hundreds of millions of dollars were in fact frozen. Plaintiff States have identified six funding streams that they could not access

---

[1]  Indeed, this statement remains on both the HHS and ACF websites today, available at https://acf.gov/media/press/2026/hhs-freezes-child-care-family-assistance-grants-five-states and https://www.hhs.gov/press-room/hhs-freezes-child-care-family-assistance-grants-five-states-fraud-concerns.html. Defendants also announced on X that they "froze access to certain @ACFHHS-run federal child care and family assistance funds for California, Colorado, Illinois, Minnesota and New York." Ex. 7-E. For ease, Plaintiffs continue to refer to Defendants' action as the ACF Funding Freeze. But the Court need not find that the action constitutes a "freeze" in order to enjoin it.

between January 6 and 9 (that is, during the period between when the Funding Freeze was implemented and the TRO was issued) but that they would have been able to access in the normal course absent the Freeze. Ex. 10 ¶ 18 (Colorado CCDF); Ex. 11 ¶ 21 (Colorado TANF); Ex. 14 ¶ 10 (Illinois CCDF); Ex. 15 ¶¶ 31-32 (New York TANF); Ex. 19 ¶ 19 (California CCDF); Ex. 23 ¶ 40 (Minnesota CCDF). Defendants have offered no evidence to the contrary, instead providing solely a conclusory and unsubstantiated assertion that "ACF did not freeze any funds." ECF No. 54 ¶ 39.[2] Defendants point to two facts to support this conclusory assertion, neither of which is persuasive. First, Defendants provide examples showing that they released funds *after* the January 9 TRO. Opp'n 7.[3] But the fact that most funds were released following the entry of a TRO further confirms that Defendants were freezing funds until ordered to stop. Second, Defendants provide two drawdowns that were released prior to the TRO. Opp'n 17; ECF No. 55 ¶¶ 17(a) (California TANF), 17(c) (Illinois SSBG); *accord* Ex. 14 ¶ 28 (Illinois SSBG). But the fact that Defendants did not yet freeze *all* funding streams to all Plaintiff States in the seventy-two hours the Freeze was standing before the TRO does not change the fact that the Freeze went into effect as to hundreds of millions of dollars.

*Third*, Defendants' focus on "Defend the Spend" is misdirection. "Defend the Spend" is a term used for federal agency actions, pursuant to Executive Order 14222, requiring recipients of federal funds to provide certain documentation for particular expenses. HHS adopted "Defend the

---

[2] Defendants err in focusing on drawdown requests made on or after January 6, *see* ECF No. 55 ¶ 17. Requests made *before* January 6 were the ones unusually still pending in the January 6 to 9 period, whereas requests made after January 6 may reasonably still have been pending at the time the TRO was entered, because Plaintiff State expect 24-48 hours of processing.

[3] *See also* ECF No. 55 ¶¶ 16(a) (Minnesota SSBG disbursed January 14), 17(b) (Colorado TANF disbursed January 12); *accord* Ex. 10 ¶ 18 (Colorado CCDF funds received January 12); Ex. 11 ¶ 21 (Colorado TANF funds received January 12); Ex. 14 ¶ 10 (Illinois CCDF funds received January 13); Ex. 15 ¶¶ 31-32 (New York TANF received January 14); Ex. 19 ¶ 19 (California CCDF funds approved January 14). Plaintiffs showed—and Defendants now admit—that the Minnesota CCDF drawdowns were rejected after the TRO. ECF No. 54 ¶ 40.

Spend" last March and, on December 30, 2025, extended it to non-discretionary grants. Opp'n 6; ECF No. 55 ¶¶ 10-15; ECF No. 54 ¶¶ 23-25. "Defend the Spend" applies to all States, not just Plaintiffs, who were singled out for the ACF Funding Freeze, and it was not referred to in the January 5 and 6 Letters.

*Fourth*, Defendants' brief does not grapple with—and instead ignores—the breathtaking scope of data demanded in the January 5 and 6 Letters. Defendants characterize their data demands as "administrative and verification data," Opp'n 7, and "supporting documentation," *id.* 16. But to be clear, these data requests encompass personally identifiable information for millions of Americans, *see* Mot. 4-6, and Defendants have nowhere narrowed or disavowed this demand.

## II.    Plaintiffs Are Likely to Show that Defendants Violated the APA

### A.    Defendants Do Not Meaningfully Contest that Their Actions Are In Excess of Statutory Authority and Contrary to Law.

Defendants offer no colorable defense of their actions on the merits, effectively conceding that they have acted contrary to law and in excess of their statutory authority.[4]

Defendants effectively concede that they have acted contrary to law. First, Defendants do not even attempt to argue that they followed any of the statutorily required procedures for addressing purported fraud concerns or alleged other noncompliance with program terms. Opp'n 10; *see* Mot. 16. Second, Defendants do not point to a single piece of actual evidence of fraud to justify freezing Plaintiff States' funding and instead admit that they acted only on "concerns" of fraud. Opp'n 7, 13; *see also* ECF No. 54 ¶ 33. This is not permitted by statute, Mot. 16-17—which

---

[4] Defendants attempt to muddy the waters by starting their argument section with the legal standard for equitable *ultra vires* claims—that is, a claim that Plaintiffs make in the alternative to their straightforward APA claims. The "exacting" standard Defendants cite, *see* Opp'n 9, does not apply to APA contrary to law claims, as the APA mandates that courts "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). This "means, of course, *any* law." *Fed. Commc'ns Comm'n v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

Defendants nowhere dispute. Third, Defendants have offered no authority that allows them to stop all CCDF, TANF, or SSBG payments, because no such authority exists. *See* Mot. 17-18.

Defendants' sole defense is that this "litany of statutory and regulatory provisions" is not "applicable" to their actions because they "have not imposed noncompliance penalties." Opp'n 10. Defendants instead claim that their actions "fall within HHS's general monitoring authority," citing to the CCDF statute (42 U.S.C. § 9858g(b)(1)) and three regulations (45 C.F.R. §§ 98.90(c), 96.30 and 2 C.F.R. § 200.300). Opp'n 11. But none of these authorities authorizes Defendants' actions, i.e., cutting off or conditioning all program funding without notice and an opportunity to be heard. The CCDF Statute merely authorizes ACF to "review and monitor State compliance." 42 U.S.C. § 9858g(b)(1).  The CCDF regulation requires States to make "appropriate" books and records available to ACF "upon reasonable request." 45 C.F.R. § 98.90(c). The SSBG regulation requires states to have "[f]iscal control and accounting procedures." 45 C.F.R. § 96.30. And the generic OMB regulation is a general statement of policy regarding federal grants that does not and cannot supersede the specific program regulations applicable here. 2 C.F.R. § 200.300; *see* Mot. 20. Defendants do not cite any statute or regulation specific to TANF.

Indeed, the provisions invoked by Defendants are in some instances the very same ones mandating that Defendants follow specific procedures before penalizing Plaintiffs—which Defendants effectively admit they did not follow and appear to have no intention of following. For instance, the *very same subsection* of the CCDF statute that Defendants invoke requires them to follow precisely the procedures cited by Plaintiffs, including providing "reasonable notice to a State," and "opportunity for a hearing," making a finding that the State has failed to substantially comply, and imposing a penalty "amount that is less than or equal" to the amount found to have been improperly expended. 42 U.S.C. § 9858g(b) (cited Opp'n 11 and Mot. 16). The very next

5

provision of the CCDF regulation after the one Defendants invoke, 45 C.F.R. § 98.91, provides for similar procedures. Likewise, for SSBG, 45 C.F.R. § 96.51, in the same subpart Defendants cite, provides the procedures they failed to follow. And the umbrella OMB regulations likewise require procedures Defendants did not follow. *See* Mot. 20. Congress and the defendant agencies themselves have spoken clearly by setting forth the government's remedy for any State's noncompliance, and Defendants must follow those commands—but have entirely failed to do so.

Moreover, federal agencies do not maintain any "general monitoring authority," *see* Opp'n 11. "As a creature of statute," HHS "has only those powers conferred upon it by Congress," and "it is wrong to speak of agencies as having *any* inherent authority." *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016) (emphasis in original). Defendants can act only if Congress authorized them to do so, and it did not authorize Defendants' actions here. Congress mandated funds be paid to Plaintiffs; prescribed only specific penalties for noncompliance; and required certain procedures be followed. Mot. 16-18. Congress authorized no other action, including the ACF Freeze.

The scope of the power Defendants claim would be breathtaking. Per Defendants, any "concern" of fraud, no matter how unsubstantiated, could support an indefinite freeze on all federal funding to impose any requirement at all. Because their demand is untethered to any reasonable reading of any statutory authority, they have offered no limiting principle on what "additional documentation" they could demand, *see* Opp'n 11, what "payment procedures" they could implement, *id.* 8, or what "additional steps to receive funding" they could impose, *id.* 18 n.2.

In similar scenarios, courts have repeatedly rejected efforts by this Administration to penalize States by cutting off funding via methods outside of those prescribed by Congress, and the Court should do the same here. *See, e.g.*, *Minnesota v. U.S. Dep't of Ag.*, No. 25-CV-4767, 2026 WL 125180, at *13 (D. Minn. Jan. 16, 2026) (granting preliminary injunction prohibiting USDA

from cutting off SNAP administrative funds to Minnesota because, among other things, USDA did not follow the legally mandated procedures for noncompliance); *New York v. Trump*, 777 F. Supp. 3d 112, 117 (D.R.I. 2025) (rejecting funding freeze when regulation's "text is general and nothing within" it authorizes freeze), *reconsideration denied*, 2025 WL 1098966 (D.R.I. Apr. 14, 2025); *New York v. Trump*, 769 F. Supp. 3d 119, 138 (D.R.I. 2025) (procedural history omitted); *cf. Council for Opportunity in Educ. v. McMahon*, No. 25-CV-03491 (TSC), 2026 WL 120984, at *12 (D.D.C. Jan. 16, 2026); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 472 (D.R.I. 2025).

Constitutional principles provide "extra icing on a cake already frosted" because Defendants certainly have not pointed to any clear and unambiguous statutory authorization for the Freeze. *Van Buren v. United States*, 593 U.S. 374, 394 (2021). Where "Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). No such unambiguous statutory conditions exist here. And Defendants' assertion of unfettered authority that would permit the ACF Funding Freeze also raises major questions, furthering counseling against finding such authority when there is no unmistakable statutory language of delegation. *Minnesota*, 2026 WL 125180, at *12-13; *Woonasquatucket*, 778 F. Supp. at 472.

Lastly, Defendants' actions are unlawful for two additional, independent reasons that they have not attempted to rebut. First, Defendants do not address the violations of the appropriations statutes, which are unlawful, and egregiously so, as these are mandatory programs. *See* Mot. 18.

Second, Defendants do not provide any legal basis at all for their exceedingly broad data demands. Nor could they, as those demands on their face violate a host of laws. Mot. 18-19 & n.8.

This is critical, because Defendants' suggestion that Plaintiffs "simply follow the newly implemented procedures" contravenes these legal restrictions. Opp'n 1. Defendants are unlawfully demanding the data of millions of Plaintiff States' residents, with no lawful procedures and no privacy protections. Separate and apart from all of the other problems, that is contrary to law.

### B.    The ACF Funding Freeze is Arbitrary and Capricious

Plaintiffs identified four separate ways in which the ACF Funding Freeze was arbitrary and capricious. Mot. 22-26. Defendants do not even dispute two of them. *See* Opp'n 13. Each of these is an independent basis for enjoining Defendants' actions.

First, Defendants do not dispute that they relied on extra-statutory and arbitrary factors in targeting Plaintiffs. Defendants offer no evidence for their decision to target four of the Plaintiff States except to say that "[i]n early January 2026, ACF became concerned about potential fraud in the states of California, Colorado, Illinois and New York," ECF No. 54 ¶ 33, which when coupled with the Defendants' statements about "blue states" and the administration's political attacks on the elected leadership of those States, *see* Mot. 2-4, makes clear that the agency considered impermissible factors. *See Aera Energy LLC v. Salazar*, 642 F.3d 212, 220 (D.C. Cir. 2011). And Defendants seem to have dropped each Letter's purported justification that Defendants had a "reason to believe" Plaintiffs were "illicitly providing illegal aliens with" benefits.

Second, Defendants do not even attempt to argue that they considered Plaintiffs' reliance interests. This is an independent reason why the ACF Funding Freeze arbitrary and capricious. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020).

Third, Defendants do not meaningfully address their failure to provide *any* written findings or evidence supporting their actions. Defendants contend that they had no obligation to "'provide written findings about every piece of evidence'" they considered. Opp'n 13 (citing *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022)). But Defendants have provided *no*

written findings and cited *no* evidence they considered at all. At a minimum, Defendants must provide some written justification from which "the agency's path may reasonably be discerned," *Kakar*, 29 F.4th at 132, and they have not done so. *See also Minnesota*, 2026 WL 125180 at *14 (no connection between past fraud in COVID-era food benefit program and "the potential of fraud within . . . an entirely different entitlement program").

Fourth and finally, Defendants contend that their actions are reasonably tailored because they "simply" have required "some additional corroborating documentation" before Plaintiffs can draw down funds. Opp'n 13. But this mischaracterizes the January 5 and 6 Letters. *See supra* Section I. In any event, Defendants have still not explained "how its specific, heavy-handed demands would help uncover" fraud, *Minnesota*, 2026 WL 125180 at *15, much less how cutting off *all* funding, rather than whatever portion of the funding is the subject of the purported fraud concern, is rational.

**C.    The ACF Funding Freeze Is Final Agency Action.**

Defendants argue that because "the January 5 and 6 Letters did not freeze any funding stream" they are "an intermediate step that is part of the agency's ongoing monitoring" of State use of federal moneys and therefore not final agency action. Opp'n 12. This argument fails on the facts and fails on the law.

On the facts: Defendants acknowledge that they have decided that they will not pay the funds owed to Plaintiffs unless Plaintiffs first abide by Defendants' impossibly onerous data demands. There is nothing "intermediate" or non-final about that decision, which has already taken effect. Finality is not determined by how the Defendants describe their action, but what the action was and what its effects were. *See Appalachian Power Co. v. EPA*, 208 F.3d 1023 (D.C. Cir. 2000); *New York v. Trump*, 767 F. Supp. 3d 44, 76 (S.D.N.Y. 2025) (subsequent history omitted) ("The practical effect of the agency's action, not the informal packaging in which it was presented, is the

determining factor.") (quotation omitted)). Finality is a "pragmatic" inquiry, and here, the record is replete with evidence of serious "legal consequences" that "flow" from the January Letters. *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016); *see also California Communities Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019) (describing pragmatic inquiry "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it"); *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 959 (D.C. Cir. 2019). Defendants do not dispute (nor could they) that the January Letters announcing the Freeze had all of the hallmarks of finality—announcing actions that were "[e]ffective today" and "until further notice." *See, e.g.*, ECF No. 1-2. And as explained above, Plaintiffs' funds were indeed frozen, causing immediate consequences for Plaintiffs. In any event, Defendants stand behind their data requests demanding that Plaintiffs produce voluminous records within two weeks, a concrete consequence sufficient for finality.

On the law: "a 'final agency action' does not have to be defined as permanent to be considered final," so Defendants cannot hide behind their claim that the Freeze is merely temporary. *Louisiana v. Biden*, 622 F. Supp. 3d 267, 292 (W.D. La. 2022); *see also Met. Transp. Auth'y v. Duffy*, 784 F. Supp. 3d 624, 660 (S.D.N.Y. 2025). "[A] central rationale of the final agency action requirement is to prevent premature intrusion into the agency's deliberations; it is not to require regulated parties to keep knocking at the agency's door when the agency has already made its position clear." *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 579 (9th Cir. 2019). Here, Defendants have made their position exceedingly clear: Plaintiffs must first comply with their unlawful demands if they wish to receive statutorily mandated funds. *See also* Ex. 7-D ("HHS stands by its decision to take this action."). Courts have routinely concluded that similar funding freezes are final agency action. *See, e.g., California v. United States Dep't of*

*Transportation,* No. 25-CV-208-JJM-PAS, 2025 WL 3072541, at *6 (D.R.I. Nov. 4, 2025) (funding condition was final agency action because it "impose[d] concrete legal consequences on the States, who must choose whether to accede to an allegedly unlawful condition or else forgo billions of dollars of federal grant funding"); *see also Louisiana,* 622 F. Supp. 3d at 291-92 (collecting cases).

## III.    Plaintiffs Are Likely to Show That the ACF Funding Freeze is Unconstitutional and Ultra Vires

Plaintiffs also are likely to succeed on their constitutional claims and their *ultra vires* claim, which provide several independent bases for a preliminary injunction here.

Defendants' actions are a clear violation of the Constitution's grant of the power of the purse to Congress, and not to the Executive. *See City & Cnty. of San Francisco*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see also* U.S. Const. art. I, §9, cl. 7 (Appropriations Clause); U.S. Const. art. I, §8, cl. 1 (Spending Clause). Defendants argue that Congress *may* delegate authority to the Executive Branch to attach conditions, Opp'n 15, but they cannot point to any such delegation here. Quite the opposite: Congress mandated that these funds be provided to Plaintiff States, devised specific procedures for any noncompliance, and delegated absolutely no authority to Defendants to withhold these critical funds in full.  *See New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *1 (D.R.I. Mar. 6, 2025), *denying stay pending appeal*, 2025 WL 914788 (1st Cir. Mar. 26, 2025) ("Federal agencies and departments can spend, award, *or suspend* money based only on the power Congress has given to them—they have no other spending power.") (emphasis added)). The record shows Defendants have usurped Congress' power of the purse, in violation of separation of powers, the Appropriations Clause, and the Spending Clause.

The Court should also reject Defendants' Spending Clause arguments. Defendants are correct that the Spending Clause grants Congress authority to set the terms of federal spending, but Congress has not authorized anything like Defendants' actions here, let alone

11

"unambiguously," as the Constitution requires. *Pennhurst*, 451 U.S. at 17. Instead, Defendants decided to punish five "blue states" by attaching new and retroactive conditions, holding $10 billion dollars in critical funds hostage unless its new conditions were met. Ex. 7-F. Boilerplate statements of a desire to prevent waste, fraud, and abuse provide neither "fair notice" nor support for these unlawful retroactive conditions, which are a marked departure from both governing law and past practice. *See* Opp'n 16; *see also Pennhurst*, 451 U.S. at 25 (explaining that it "strains credulity to argue that participating States should have known of their 'obligations' under [a federal statute] when . . . the [agency] has never understood [it] to impose [the] conditions" it now claims). And Defendants do not defend the unlawful coercive nature of their actions. *Nat'l Fed'n of Indep. Bus. v. Sebeliu*s, 567 U.S. 519, 577-78 (2012).

Finally, Defendants' actions here epitomize the reason *ultra vires* claims exist: to stop executive actions that are taken with no congressional authorization and contrary to statutory prohibitions. Again, Defendants do not meaningfully contend that they acted with congressional authorization, other than by asserting a nonexistent "general monitoring authority." Opp'n 11; *see supra* Section IIA. Rather, Defendants wrongly assert that Plaintiffs' *ultra vires* claim fails because Defendants "have not violated a clear and mandatory statutory requirement." *Id.* 10. But Defendants *have* violated many such statutory requirements: they violated the statutes requiring them to follow particular procedures imposing penalties, Mot. 16; they violated the mandatory congressional appropriations statutes, *id*. 17-18; and, as to TANF, they violated the statutory prohibitions on imposing additional requirements not authorized by law, 42 U.S.C. § 617, and restricting more than one-quarter of a State's payment, *id.* § 609(d).

## IV.   The Equities Compel a Preliminary Injunction

Plaintiffs have made a detailed showing of the harms that would flow to their States if the Freeze is allowed to go into effect. As to the first five categories of harms explained by Plaintiffs,

*see* Mot. 32-34, Defendants do not dispute that they would arise upon Plaintiffs losing funding—nor could they. A loss of funding would be immediately and irreparably devastating, since it would require Plaintiffs to stop providing vital services to vulnerable families.

Defendants instead assert three reasons why Plaintiffs purportedly would not face irreparable harm—none of which withstands scrutiny. First, they inexplicably claim that Plaintiffs will not lose funding and therefore that no harms from loss of funds should count in the analysis. *See* Opp'n 17 (it "is simply not the case" that "Plaintiffs will not receive funding"). But this belies common sense and the evidence in the record. As detailed above, Plaintiffs *already* lost funds when the Freeze was enacted and Defendants have not disavowed any intention to immediately cut off funds again absent preliminary relief. Thus, unless the court issues an injunction, Plaintiffs will not have access to ACF Funds and will not be able to regain access until they comply with Defendants' infeasible and unlawful demands, and perhaps other, unstated, requirements. *See, e.g.*, Ex. 1 ("until additional fiscal accountability requirements are implemented and necessary information is provided for ACF to complete its review"). Plaintiffs thus face, at a minimum, the "*threat* of irreparable harm" from the loss of funding, satisfying the Second Circuit's standard—and indeed, *already* faced *actual* harm when the Freeze was in effect. *Compare Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010), *with* Opp'n 18 (citing First Circuit cases); *see also New York v. Trump*, 767 F. Supp. 3d at 83 (In the Second Circuit, "courts have recognized that increased risk of negative consequences is sufficient to meet the irreparable harm requirement for a preliminary injunction") (collecting cases).

Second, Defendants assert a categorical rule that delays in funding do not suffice for irreparable injury, Opp'n 17-18, but no such rule exists. Rather, Defendants' citations repeat only the ordinary rule that financial injury *can* be irreparable, where "no adequate compensatory or

other corrective relief will be available at a later date, in the ordinary course of litigation."
*Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cited Opp'n 18).
Plaintiffs' evidence establishes precisely why relief at the end of this litigation would not suffice.
Absent preliminary relief, Plaintiff States would face significant budgetary and operational
uncertainty. Ex. 10 ¶ 19; Ex. 11 ¶ 29; Ex. 16 ¶ 27. Funding for critical programs will run out within
weeks or months. *E.g.*, Ex. 10 ¶¶ 16-18; Ex. 19 ¶ 23. The funding crisis will cause irreparable
changes, including some combination of modified eligibility requirements excluding participants
from services, Ex. 14 ¶ 43; layoff of state employees, *see* Ex. 10 ¶¶ 17, 24; Ex. 16 ¶¶ 44, 49; and
program closures, *e.g.* Ex. 23 ¶ 38. Plaintiff States would also face an increased administrative
burden to respond to questions about the changes and find new options for program participants.
*See, e.g.*, Ex. 11 ¶ 28; Ex. 16 ¶ 49; Ex. 19 ¶ 41. And they would face damage to their reputations.
Ex. 14 ¶ 49. None of these harms could be ameliorated by a final judgment down the line. Contrary
to Defendants' assertion, this case is not analogous to a trip to Cuba, where an individual plaintiff
may be able to front the costs and win reimbursement at the end of the lawsuit. *See* Opp'n 18 n.2
(citing *Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007)).
There is specific and detailed evidence in the record showing precisely the opposite: Plaintiffs *do
not* have other available funding sources and *cannot* withstand even a temporary deprivation of
funds without facing dramatic, irreparable consequences. *See, e.g.*, Ex. 11 ¶ 23 (Colorado TANF
programs "at significant risk of abruptly ceasing" and February 2026 cash assistance to 14,000
families "will not be issued without funding."); Ex 14 ¶ 27 (Illinois would have to notify grantees
"as early as February" that they need to suspend SSBG services).

Third, Defendants assert that any harm stemming from their broad data requests is
speculative. Defendants again cite the wrong standard and again ignore the evidence in the record

of these harms. Plaintiffs' evidence shows that compliance with these data requests within two weeks is impossible, Ex. 11 ¶ 19; Ex. 15 ¶ 13; Ex. 19 ¶ 55, that doing so would take many weeks or even months, Ex. 14 ¶ 52; and that compliance would require a diversion of resources away from other vital programs, Ex. 11 ¶ 19; Ex. 14 ¶ 51; Ex. 23 ¶ 42. This is certainly, at minimum, a "*threat* of irreparable harm." *Mullins*, 626 F.3d at 55. On top of all this, "[c]ourts in the Second Circuit have repeatedly found that the future risks of disclosure of [personal identifying information] can amount to irreparable harm satisfying the injunctive relief standard." *New York v. Trump*, 767 F. Supp. 3d at 83.

Finally, Defendants' argument regarding balancing of the equities is fatally flawed. Defendants assert that "[a]n injunction would essentially prevent the agency from effectively screening requests for billions of dollars of funds to detect and prevent, fraud, waste, and abuse," Opp'n 19. But it would do no such thing. An injunction would preserve Defendants' ability to monitor for fraud in ACF programs, including Plaintiff States' ACF programs, through the procedures Congress set forth, like routine audits and the statutorily defined noncompliance procedures. It would also preserve Defendants' ability to recoup every dollar of any funds found to have been spent unlawfully, as Congress authorized. *See* Mot. 35. On the other side of the ledger, there is substantial public interest in requiring the government to follow the law when administering critical programs for Plaintiff States and millions of their residents.

## CONCLUSION

For the foregoing reasons, Plaintiff States request that the Court enter a preliminary injunction and stay pursuant to 5 U.S.C. § 705 enjoining Defendants from implementing the ACF Funding Freeze, including implementation of the January 5 and 6 Letters in their entirety.

Dated: January 22, 2026

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Jessica Ranucci
Molly Thomas-Jensen
*Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8333
rabia.muqaddam@ag.ny.gov
jessica.ranucci@ag.ny.gov
molly.thomas-jensen@ag.ny.gov

*Attorneys for the State of New York*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Daniel C. Sheehan*
Daniel C. Sheehan**
*Deputy Attorney General*
Paul Stein**
Christine Chuang
Nicholas R. Green**
*Supervising Deputy Attorneys General*
Jesse Basbaum*
Alexis Piazza*
Harald Kirn*
James Bowen*
*Deputy Attorneys General*
California Department of Justice
300 South Spring Street, Los Angeles, CA 90013
(213) 269-6078
Daniel.Sheehan@doj.ca.gov

*Attorneys for the State of California*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
Nora Passamaneck
*Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for the State of Colorado*

16

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Vikas Didwania*
Vikas Didwania*
*Complex Litigation Counsel*
Sherief Gaber
Michael Tresnowski*
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Vikas.Didwania@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Attorneys for the State of Illinois*

* Pro hac vice
**Pro hac vice application forthcoming

**KEITH ELLISON**
Attorney General of the State of Minnesota
By: */s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp**
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Attorneys for the State of Minnesota*