UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF ILLINOIS, and STATE OF MINNESOTA,<br><br>                      Plaintiffs,<br><br>     v.<br><br>ADMINISTRATION FOR CHILDREN AND FAMILIES; ALEX J. ADAMS, in his official capacity as the ASSISTANT SECRETARY OF THE ADMINISTRATION FOR CHILDREN AND FAMILIES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as the SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>                      Defendants. | No. 26-cv-00172 (VSB) |

**AMENDED DECLARATION OF REESE CODY INMAN**

    I, Reese Cody Inman, make the following amended declaration in lieu of an affidavit, as permitted by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed with the United States District Court of the Southern District of New York and that it is the legal equivalent of a statement under oath. I make this declaration to the best of my

1

knowledge and belief, based on my personal knowledge and information made available to me in my official capacity.

1. I am the Deputy Assistant Secretary for Management within the Administration for Children and Families (ACF) a component of the U.S. Department of Health and Human Services (HHS).

2. In this role, I am generally responsible for overseeing ACF's grant programs and ensuring their financial integrity, including promoting efficient and effective operation and administration of ACF federal assistance programs. I and my staff have overall responsibility for the management, oversight, and direction of ACF programs and funds.

3. This declaration is based upon my personal knowledge, information acquired by me in the course of performing my official duties, information contained in the records and systems of ACF to which I have access in the course of my duties, and information conveyed to me by other knowledgeable HHS employees with whom I work on a regular basis.

**ACF Grants**

4. ACF administers more than sixty social services programs that provide funding to grantees and in turn thousands of recipients. Grantees include but are not limited to states, tribes, territories and non-profits. These entities receive funding for human services programs such as the three programs at issue here, Temporary Assistance for Needy Families (TANF), the Social Services Block Grant (SSBG) and the Child Care and Development Fund (CCDF).

5. In fiscal year ("FY") 2024, ACF obligated $52.6 billion in grant funds to over fourteen thousand grant projects. In FY 2024, approximately 21 percent of the funding was for block grants, nearly 15 percent was for entitlement grants, approximately 39 percent was for

formula grants and approximately 25 percent was for discretionary grants. The grants at issue in this case, TANF, CCDF, and SSBG are described below, and are all formula grants. These grants are defined as Non-Discretionary awards under 2 C.F.R. § 200.1, meaning that they are awards made by ACF to specific recipients in accordance with statutory, eligibility, and compliance requirements, and that the annual amounts of the awards available are determined by statute either directly or by formula. *See* 2 C.F.R. § 200.1 (Definitions) and HHS Grants Policy Statement, 1.5: Types of HHS Awards, at 7.

6. HHS/ACF's Standard Terms and Conditions, which are provided with all grant awards, provide that "[f]ailure to comply with the [Terms & Conditions] of the award may result in an enforcement remedy such as a disallowance, restricted drawdown, withholding of future awards, deferral of claims for Federal Financial Participation (FFP), or termination of the award." ACF Standard Terms & Conditions at 4.

**Child Care and Development Fund ("CCDF")**

7. ACF awards $12.3 billion in CCDF grants annually. *See* GY 2025 CCDF Funding Allocations (Based on Appropriations), available at https://acf.gov/occ/data/gy-2025-ccdf-allocations-based-appropriations.

8. CCDF funds are awarded to states, territories, and tribes to provide assistance to needy families in obtaining child care services and to improve the overall quality of child care services and programs generally. *See* 42 U.S.C. § 9857.

9. CCDF is authorized by the Child Care and Development Block Grant (CCDBG) Act, 42 U.S.C. § 9857 *et seq*, which authorizes the HHS Secretary "to make grants to States in accordance with the provisions of this subchapter." 42 U.S.C. § 9858a.

3

10. A portion of funding for CCDF is appropriated through annual appropriations (called "Discretionary Funds") and a portion is appropriated with additional conditions through Section 418 of the Social Security Act (42 U.S.C. § 618) (called "Mandatory and Matching Funds"). Regardless of the source of appropriation, all CCDF funds are subject to the CCDBG Act and regulations at 45 C.F.R. Part 98.

11. Section 658I(b) of the CCDBG Act authorizes the Secretary to "review and monitor State compliance with this subchapter and the plan," and provides for reimbursement of improperly expended funds and other enforcement mechanisms. 42 U.S.C. § 9858g(b).

12. CCDF regulations require grantees to "make appropriate books, documents, papers, manuals, instructions, and records available to the Secretary, or any duly authorized representatives, for examination or copying on or off the premises of the appropriate entity, including subgrantees and contractors, upon reasonable request." 45 C.F.R. § 98.90(c).

**Social Services Block Grant "(SSBG)"**

13. ACF awards $1.7 billion in SSBG grants annually. *See* 42 U.S.C. § 1397b(c). SSBG funds are awarded to states and territories for use in social services directed at the goals of "(1) achieving or maintaining economic self-support to prevent, reduce, or eliminate dependency; (2) achieving or maintaining self-sufficiency, including reduction or prevention of dependency; (3) preventing or remedying neglect, abuse, or exploitation of children and adults unable to protect their own interests, or preserving, rehabilitating or reuniting families;(4) preventing or reducing inappropriate institutional care by providing for community-based care, home-based care, or other forms of less intensive care; and (5) securing referral or admission for

institutional care when other forms of care are not appropriate, or providing services to individuals in institutions." 42 U.S.C. § 1397.

14. States have discretion to use SSBG funds for any social service aimed at the goals listed above. The statute lists examples of specific services at 42 U.S.C. § 1397a(a)(2), such as child or adult care, protective services, employment services, and meal preparation and delivery. States must submit annual intended use plans and pre-expenditure reports, which may be revised throughout the year. 42 U.S.C. § 1397c. At the end of the fiscal year, states submit reports on the activities carried out with their SSBG allotments. 42 U.S.C. 1397e(a). Not less than every two years, grantees must audit their expenditures and submit the audit to the Secretary. 42 U.S.C. § 1397e(b). SSBG is subject to general Block Grant Regulations at 45 C.F.R. Part 96. 45 C.F.R. § 96.30(a) provides that states "shall obligate and expend block grant funds in accordance with the laws and procedures applicable to the obligation and expenditure of its own funds" and that "[f]iscal control and accounting procedures must be sufficient to ... permit the tracing of funds to a level of expenditure adequate to establish that such funds have not been used in violation of the restrictions and prohibitions of the statute authorizing the block grant."

## Temporary Assistance for Needy Families ("TANF")

15. ACF awards $16.5 billion in TANF family assistance grants annually. *See* 42 U.S.C. § 603(a)(1)(C).

16. In general, TANF funds are awarded to states to provide benefits and services to low-income families and to move people towards work and end dependence on government benefits. *See* 42 U.S.C. § 601.

17. Grantees expend TANF funds for many services and benefits including cash assistance, short-term benefits necessary for a temporary crisis situation, and helping individuals move into jobs and work.

18. States can transfer up to thirty percent of its TANF funds to CCDF and SSBG. 42 U.S.C. § 604(d)(1)(B). Funds transferred to CCDF have to be used in accordance with the CCDF rules. 42 U.S.C. § 604(d)(3)(A).

19. Thus, TANF funds are used to provide child care both as direct expenditures in a state's TANF program and also when the funds are transferred to CCDF to be used for child care. *See* 42 U.S.C. 604(d).

20. Eligible states (which include tribes and territories) receive quarterly funding. *See* 42 U.S.C. § 605(a).

21. TANF is governed by 2 C.F.R. § 200.300, which requires ACF to "manage and administer" the awards "so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations."

### Drawdown of Funds

22. State grantees for all three programs drawdown funds in the Payment Management System ("PMS"). PMS is a platform that provides disbursement, grant monitoring, reporting and cash management services for both awarding agencies and grant recipients. Additional information about PMS is available in the Declaration of Melissa Bruce dated January 20, 2026.

23. HHS has focused on improving internal procedures to ensure program integrity and reduce fraud, waste, and abuse of federal funds. Beginning in March 2025, HHS began

implementing the technical mechanics of Defend the Spend ("DTS"), requiring grantees to submit a justification for drawing down funds, and for most of 2025, the DTS justification step was active and applied to discretionary grants, those grants awarded through a competitive process or based on the merit of a proposal, as defined under 2 C.F.R. § 200.1. Accordingly, as part of the process for a grantee to drawdown funds in PMS, the PMS User is asked to provide a short, written justification supporting the allowability of the expenditure under the program statute and regulations. The justification consists of a popup box in the PMS drawdown system where the grantee explains the context for the cost but does not need to provide supporting documentation.

The change was communicated directly to all PMS Users in mid-March:

https://mailchi.mp/psc.hhs.gov/update-hhs-payment-management-system-new-mandatory-field?e=4678e7d399

24. In response to specific and ongoing concerns about fraud and non-compliance, on December 30, 2025, ACF Non-Discretionary awards were enrolled in DTS, meaning a PMS User would be prompted to provide a short narrative explaining how the use of federal funds conformed with the requirements of the federal program for which the payment was being requested. HHS also started to implement a documentation upload and review capability into the DTS platform so that, if and as necessary and appropriate, ACF would have the ability to require enhanced DTS procedures, meaning DTS could send a document request to a grant recipient (the PMS User), in addition to the justification feature already incorporated into PMS.

### Fraud concerns

25. In May 2025, the HHS Office of Inspector General finalized a report that concluded that Minnesota was not complying with federal and state child care attendance

documentation requirements used to drawdown childcare funds and that the state agency was not conducting enough monitoring and reviews to properly carry out its oversight responsibilities. *See* https://oig.hhs.gov/documents/audit/10320/A-05-24-00001.pdf.

26. ACF grew increasingly concerned about the possibility of fraud with respect to ACF funds that was required to be used for child care purposes in Minnesota. ACF also became concerned about potential fraud in connection with other Minnesota grant programs receiving ACF funds following media reports of potential fraud in Minnesota's social service programs that rely on federal funding. As the federal agency responsible for administering the CCDF, SSBG, and TANF programs, it is ACF's oversight responsibility to ensure that funds are being used solely for the intended services and benefits to recipients who qualify for those funds.

27. On December 3, 2025, the Committee on Oversight and Government Reform informed Minnesota that it was investigating fraud in Minnesota's social services programs. *See* *https://oversight.house.gov/wp-content/uploads/2025/12/Letter-to-Gov-Walz-120325.pdf*

28. In the period leading up to December 4, 2025, ACF became aware of reports alleging fraud in Minnesota. These reports identified potential misuse of social service funding streams, particularly those where funds are used for child care, and also including Medicaid. In response, ACF determined that it might be necessary to obtain data and records from the state to assess whether appropriate program compliance and integrity controls were in place.

29. On December 4, 2025, ACF sent a letter to Minnesota requesting complete administrative data and documentation for Minnesota TANF expenditures by December 19, 2025.

30. On December 12, 2025, consistent with 45 C.F.R. § 98.90(c) and 45 C.F.R. § 96.50, ACF sent a letter to Minnesota requesting complete administrative data and documentation for Minnesota CCDF and SSBG expenditures by December 26, 2025.

31. On December 30, 2025, following Minnesota's request for additional time to respond on December 23, 2025, the HHS Deputy Secretary issued a subsequent letter with an expanded request under 45 CFR 98.90(c) for (1) specific data for child care centers flagged as fraudulent; (2) comprehensive CCDF administrative data; (3) information related to alleged fraud networks and oversight failures; and (4) comprehensive list of all CCDF funded providers and intermediaries. ACF also asked for the total number of subsidized children in care at each provider receiving federal assistance, including any vacant slots at directly funded providers.

32. In early January 2026, ACF became concerned about potential fraud in the states of California, Colorado, Illinois and New York.

### ACF's response to Fraud Concerns and Subsequent Restrictions on Drawdown

33. Due to ACF's concerns about fraud and misuse of federal funds, on January 5, 2026, a letter was sent to Minnesota regarding the temporary restricted drawdown for CCDF. Due to ACF's continued concerns about fraud and misuse of federal funds, on January 6, 2026, HHS made the decision to restrict Minnesota's SSBG and TANF drawdowns, and California, Colorado, Illinois and New York's SSGB, TANF and CCDF drawdowns. HHS wanted to ensure that federal grant funds are being drawn down for the purposes and services that the program statute and regulations provide for.

34. On January 6, 2026, letters were sent to California, Colorado, Illinois, and New York informing them about the drawdown restrictions and the temporary restricted drawdown was enacted for SSBG, TANF, and CCDF. The letters requested that the states provide additional data to ACF relating to use of SSBG, TANF, and CCDF dollars.

35. On January 6, 2026, letters were sent to Minnesota relating to SSBG and TANF informing them about the drawdown restrictions and the temporary restricted drawdown was

enacted, as well as the request for additional data to be provided to ACF relating to the use of funds for those programs.

36. The Agency drafted guidance to each of California, Colorado, Illinois, and New York to provide further instructions regarding the temporary restricted drawdown steps for DTS, but the Agency was subject to the January 9, 2026 Temporary Restraining Order ("TRO") before that guidance was distributed.

37. On January 9, 2026, ACF received a letter from Minnesota noting that it would not be providing the requested data for CCDF, TANF or SSBG because the request falls within the scope of this lawsuit.

38. ACF did not freeze any funds. Drawdown requests made by California, Colorado, and Illinois on or after January 6, 2026, were approved and the requested funds were dispersed. New York did not make any draw down requests until after the TRO was in place.

39. Due to a misunderstanding between HHS and PSC, Minnesota CCDF drawdown requests were inadvertently automatically rejected between January 5 and January 14. After becoming aware of the issue through plaintiffs' motion and exhibits, HHS is following up with Minnesota to request that Minnesota resubmit the drawdown requests for processing. HHS had no intent to automatically reject these drawdown requests between January 5 and January 9 and had no intent to do so after the TRO was entered on January 9.

40. There were also some drawdown requests for Colorado that were not fully processed until a few business days after the TRO was entered. Again, this was due to an administrative oversight and HHS had no intent to violate the TRO.

Executed on January 23, 2026.

_____

Reese Cody Inman

Deputy Assistant Secretary for Management
