UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                      :
State of New York, et al.,                :
                    Plaintiffs,      :
                                        :
           - against -         :         26-CV-172 (VSB)
                                        :
                                        :         **OPINION & ORDER**
Administration for Children and Families, et al., :
                                        :
                   Defendants.    :
                                        :
----------------------------------------------------------X

<u>Appearances</u>:

Jessica Grace Ranucci, Molly Anne Thomas-Jensen, Philip Levitz, Stephen Christopher
Thompson, Rabia Claire Muqaddam
NYS Office of The Attorney General
New York, NY
*Counsel for Plaintiff State of New York*

Daniel C. Sheehan, Alexis Martin Piazza, James R. Bowen
California Department of Justice
Los Angeles, CA

Christine Hsiao-Ting Chuang
Office of The Attorney General of California
San Francisco, CA

Harald H. Kirn
California Attorney General's Office
Sacramento, CA

Jesse P. Basbaum
Office of The Attorney General of California
Oakland, CA
*Counsel for Plaintiff State of California*

David Moskowitz, Nora Q.E. Passamaneck
Colorado Department of Law
Denver, CO
*Counsel for Plaintiff State of Colorado*

Michael M. Tresnowski, Sherief Gaber, Vikas Didwania
Illinois Attorney General's Office
Chicago, IL
*Counsel for Plaintiff State of Illinois*

Lindsey E. Middlecamp
Minnesota Attorney General's Office
St. Paul, Minnesota
*Counsel for Plaintiff State of Minnesota*

Kamika Shaw, Mallika Balachandran
U.S. Attorney's Office, SDNY
New York, NY
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

This action concerns the federal government's attempt to conditionally freeze $10 billion of funding from the Administration for Children and Families ("ACF") to five states:  New York, California, Minnesota, Illinois, and Colorado ("Plaintiff States" or "Plaintiffs" or, individually, "Plaintiff State").  These states filed suit against Defendants United States Department of Health and Human Services ("HHS"), a federal cabinet agency within the executive branch, ACF, a division within HHS, Alex J. Adams, the Assistant Secretary of ACF, and Robert F. Kennedy, Jr., the Secretary of HHS (collectively, "Defendants" or the "Government"), seeking declaratory and injunctive relief that would declare unlawful, vacate, and enjoin the ACF funding freeze. (Doc. 1 ("Compl.") ¶¶ 11, 19–22.)

On February 6, 2026, I granted Plaintiffs' motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.  (Doc. 71.)  In my order granting the preliminary injunction, I stated that the reasons would be explained in a forthcoming opinion.  (*Id.*)  This is that opinion. Because I find that Plaintiffs:  (1) are likely to succeed on the merits of their claims under the Administrative Procedures Act ("APA"); (2) demonstrate that they would suffer irreparable harm absent a preliminary injunction; and (3) establish that the balance of equities and public interest

lies in favor of maintaining the status quo, Plaintiffs' motion for a preliminary injunction and a stay is GRANTED.  Defendants' request for a bond is DENIED.

## I.    <u>**Factual Background**</u>[1]

### A.    *ACF Funding Programs*

Three funding programs enacted by Congress are central to this case:  the Child Care and Development Fund ("CCDF"), Temporary Assistance for Needy Families ("TANF"), and the Social Services Block Grant ("SSBG") (collectively, the "ACF Funds").  (Doc. 39 ("PI Mot.") at 1.)  Each of these programs, which are overseen by the HHS's ACF, provides cash assistance and life-saving services for vulnerable and low-income children and for families and individuals with disabilities.  (*Id.*)

#### 1.  CCDF Program

In 1996, Congress created the CCDF to improve the quality of childcare available to low-income families.  (Doc. 40-22 ("Matthews Decl.") ¶ 7.)  The program was enacted with the purpose of granting each state flexibility in developing childcare programs that best suit the needs of families within that state and providing early childhood care and educational services to empower parents.  45 C.F.R. § 98.1(a).  The program combined two separate federal funding streams:  the Child Care and Development Block Grant ("CCDBG")—funds appropriated by Congress each year—and Child Care Entitlement to States ("CCES")—entitlement funds that Congress statutorily codified.  (Compl. ¶¶ 24–26.)

CCES mandates that "each State shall, for the purpose of providing child care assistance, be entitled to payments under a grant" that is calculated based on amounts paid to the state

---

[1] In resolving a motion for a preliminary injunction, "a court may consider the entire record including affidavits and other hearsay evidence."  *J.T. v. de Blasio*, 500 F. Supp. 3d 137, 181 (S.D.N.Y. 2020) (internal quotation marks omitted).  Accordingly, I consider the supporting declarations and attached exhibits submitted by the parties in connection with the preliminary injunction motion.  (*See, e.g.*, Docs. 40, 40-1–40-24, 55, 66.)

between 1992 and 1995.  42 U.S.C. § 618(a)(1).  The CCDBG was first enacted in 1990, 42

U.S.C § 9857, and is governed by the annual appropriations process, (Compl. ¶ 26).  Congress

appropriated almost $9 billion to this program in fiscal year 2024, and in fiscal year 2025, these

appropriations were extended twice through continuing resolutions.  (*Id.*)  While the amount of

funding is discretionary, the payment of these funds to states is mandated by Congress.  (*Id.*)

The statute lays out a mandatory formula for the allocation of the CCDBG and instructs that "'a

State that has an application approved by the Secretary . . . shall be entitled to a payment under

this section for each fiscal year in an amount equal to its allotment.'"  (*Id.* (quoting 42 U.S.C. §

9858h).)

      In total, ACF awards approximately $12.3 billion in CCDF grants annually to states,

territories and tribes.  (Doc. 66 ("Am. Inman Decl.) ¶¶ 7–8.)  Of this amount, nearly $2.4 billion

in federal funding supports Plaintiff States' childcare and family assistance programs.  (PI Mot.

7; Doc. 40-6 ("HHS Press Release.").)  In 2025, the federal CCDF funds allocated to each

Plaintiff States were as follows:  $1.09 billion to California; $140 million to Colorado; $412

million to Illinois; $185 million to Minnesota; and $638 million to New York.  (Compl. ¶ 27.)

These funds include contributions to childcare subsidies for eligible low-income families,

investment in childcare coaching and professional development, and the licensing and oversight

of childcare programs.  (PI Mot. 7.)  In New York State, for example, CCDF funding provides

childcare assistance to approximately 219,000 children.  (Doc. 40-16 ("Darman Decl.") ¶ 40;

Doc. 40-20 ("Acquario Decl.") ¶ 7.)  The CCDF program also supports development and teacher

training, and programming and consumer education that informs parents about childcare options.

(Compl. ¶ 24.)

To receive funds from the CCDF, Congress requires that each state prepare and submit a state plan "that certifies that the State has certain procedures and protections in place and describes the State's training and professional development requirements, child care standards (including child-to-provider ratio), health and safety requirements, plans for increasing supply and quality of child care services, [and] strategies for ensuring that child care is available to children in underserved areas and children with disabilities, among other requirements." (*Id.* ¶ 28 (citing 42 U.S.C. § 9858c).) Moreover, the statute explicitly directs the Secretary of HHS to approve any application that meets these requirements. (*Id.*) Each of the Plaintiffs administers its CCDF funding program in accordance with its respective federally-approved State plan. (*Id.*)

### 2. TANF Program

TANF is a block grant program that was created as part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 to provide dedicated federal funds for low-income families. (Acquario Decl. ¶ 11.) The TANF grant was created to increase the flexibility of states in operating a program designed to provide assistance to low-income families and promote job preparation and work opportunities for families. 42 U.S.C. § 601(a). Of the approximately $16.6 billion that Congress most recently appropriated for the program, TANF provides more than $7 billion in federal funds annually to the five Plaintiff States—one of the largest sources of cash assistance and non-cash benefits to help Plaintiffs with their anti-poverty work. (Compl. ¶¶ 29, 32.) The amounts allotted to each Plaintiff State in fiscal year 2023 were as follows: $3.6 billion to California; $135 million to Colorado; $583 million to Illinois; $260 million to Minnesota; and $2.4 billion to New York. (*Id.* ¶ 30.)

TANF funds are a crucial part of Plaintiff States' social services programs. The program supports more than 77,000 individuals in Colorado, (Doc. 40-11 ("McMahon Decl.") ¶ 5), more

than 70,000 individuals in Illinois, (Doc. 40-14 ("Khatkhate Decl.") ¶ 16), approximately 300,000 residents in New York City, (Doc. 40-17 ("Park Decl.") ¶ 16), approximately 350,000 families in California, (Doc. 40-19 ("Younger Decl.") ¶ 34), and approximately 23,000 families in Minnesota, (Doc. 40-23 ("Weeks Decl.") ¶ 16).  In addition to helping families meet their basic needs, including funds for food, shelter, and utilities, TANF funds also provide education, employment, training programs, and supportive services for low-income families to achieve economic mobility.  (Compl. ¶ 29.)  For example, TANF assists with a 24/7 emergency child abuse hotline, pregnancy support, early childhood school readiness, and financial aid for low-income college students in the Plaintiff States.  (PI Mot. 9.)  In New York City, the TANF program funds nearly half of the cost of providing shelter to families with children and the vast majority of cash assistance to eligible low-income families.  (*Id.* (citing Park Decl. ¶¶ 17–18).)

Although the TANF program was created three decades ago, the amount of funding provided for the block grant remains rooted in historical expenditures within the pre-TANF programs of the early to mid-1990s.  TANF funds are allocated according to a mandatory formula based on the share each state had of TANF funding in 2002, which was originally based on a 1996 formula under which allocations were calculated based on shares of different program expenditures from 1992 to 1995.  (Compl. ¶ 31 (citing 42 U.S.C. § 603(a)(1)).)  For a state to be eligible for TANF funding, it must submit a plan outlining to the HHS Secretary how the state will conduct the TANF program in compliance with federal work requirements, among other provisions.  42 U.S.C. § 602(a).  As with their CCDF programs, each of the Plaintiff States administers its TANF program consistent with its respective federally-approved state plan. (Compl. ¶ 33.)

### 3. SSBG Program

The SSBG program provides approximately $870 million of annual flexible funding to Plaintiff States to support social services in one of five statutory categories: "(1) achieving or maintaining economic self-support; (2) achieving or maintaining self-sufficiency; (3) addressing neglect, abuse, or exploitation of children and vulnerable adults; (4) preventing institutional care and supporting community-based care; and (5) where institutional care is needed, supporting application and admission and providing services to institutionalized individuals." (*Id.* ¶ 34 (internal quotation marks omitted)). In 2024, Congress appropriated $1.7 billion for the SSBG program, Pub. L. No. 118-47, 138 Stat. 665, and that level of funding was continued for 2025, Pub. L. No. 118-83, 138 Stat. 1533; Pub. L. No. 119-37, 139 Stat. 497. States are statutorily entitled to payment of these funds, 42 U.S.C. § 1397a, and Congress has provided that SSBG funds must be allocated based on each state's percentage of the national population, 42 U.S.C. § 1397b(b).

SSBG funding supports a range of social services for low-income families, including food assistance, maternal health, domestic violence prevention, employment and self-sufficiency, and corrections and reentry. (PI Mot. 11–12.) In Illinois, for example, SSBG funding supports all seven crisis nurseries in the state, which provide 24/7 emergency and short-term care for over 7,000 children under the age of seven when families face medical, mental health, substance use, housing, or other crises. (Khatkhate Decl. ¶ 47.) In Colorado, New York, and Minnesota, these funds are also used to provide adult and child protective services. (PI Mot. 12.) Moreover, in New York, the SSBG supports emergency shelter for domestic violence survivors. (Park Decl. ¶ 13.) Plaintiff States are not required to submit a plan to be eligible for SSBG funding, unlike for the TANF and CCDF programs—instead, they are required to submit an annual report describing

how the state used the funds in the previous year.  (Compl. ¶ 36.)  Each state is up to date on

providing this required information.  (*See* Khatkhate Decl. ¶ 22 (noting that Illinois submitted its

last annual report on December 31, 2025); Younger Decl. ¶ 43 (representing that California

agency submitted its last annual report on December 30, 2025); Weeks Decl. ¶ 19 ("Minnesota

submitted its most recent annual report on Dec. 22, 2025."); Doc. 40-12 ("Homlar Decl.") ¶ 5

(detailing Colorado's compliance with SSBG requirements submission because of submission of

their "Intended Use Plan"); Darman Decl. ¶ 6 (explaining that New York "has complied with the

statutory requirements to receive SSBG funds, with its most recent Intended Use Plan (IUP)

submitted on 8/29/25 and set to expire on 03/31/2027").)

> ### B. *Drawdown of Funding*

States have historically accessed federal funds for these three programs primarily on a

reimbursement basis.  (PI Mot. 26.)  Thus, states make their childcare and family assistance

expenditures in reliance on the fact that they can later receive these reimbursements, or draw

down the funds.  (*Id.*)  States are authorized to draw down funds from each of these three

programs generally on a quarterly basis, and authorization is issued through letters of credit or a

notice of award.  (McMahon Decl. ¶¶ 15–16; Younger Decl. ¶ 16; Doc. 40-13 ("Miller Decl.") ¶

7.)  For example, CCDF and TANF funds sit in bank accounts with the United States Department

of Treasury.  (Younger Decl. ¶¶ 16, 30.)  When states need these funds, they submit requests to

drawn down funds through a central grants payment and cash management system, HHS's

Payment Management System ("PMS"), which provides federal awarding agencies and state

grant recipients the tools to manage grant payment requests and the disbursement of funds.  (*Id.*;

Darman Decl. ¶ 43.)  While drawdown authorization generally occurs on a quarterly basis, actual

drawdown submissions occur based upon individual state expenditures and can be submitted as

frequently as every day.  (McMahon Decl. ¶ 16.)  Drawdown reimbursements are generally received in 1-3 business days of the request, (*id.*), with ACF generally releasing requested funds from all three programs within 48 hours, (Younger Decl. ¶¶ 17, 31, 45).  Finally, within one day of receipt, states transfer these funds to a fiscal agent to process payments for childcare centers, contractors, and other state programs.  (*See, e.g.*, *id.* ¶ 17.)

However, since HHS's March 2025 adoption of a program called Defend the Spend ("DTS")—which was issued to implement President Donald J. Trump's executive order regarding the Cost Efficiency Initiative—the drawdown submission process has changed for some funds.  (Doc. 53 ("Opp'n") at 6; Doc. 55 ("Bruce Decl.") ¶ 10.)  Beginning in March 2025, to access all discretionary HHS funding, state grantees were required to submit a written justification of up to 1,000 characters that explained the purpose of the drawdown request.  (*Id.*)  On December 30, 2025, HHS began to implement these DTS procedures for non-discretionary grants, including the CCDF, TANF, and SSBG programs.  (Opp'n 6; Bruce Decl. ¶ 15.)

### C.  *Penalties*

Each of these three funding programs has a statutory and regulatory scheme that outlines the procedures for monitoring states' compliance with the law and the steps the Government must take to disallow funds or levy sanctions against the states for noncompliance with their program obligations, "including requirements related to who may receive assistance under the programs and how they may receive it."  (Compl. ¶ 82.)

### 1.  CCDF Guidelines

The CCDF program's associated statutes and regulations give the HHS Secretary authority to monitor states' compliance with the law and their approved state plans.  Under the CCDBG Act, which governs CCDF funds, the Secretary of HHS "shall review and monitor State

compliance" with the law and each states' approved plans.  42 U.S.C. § 9858g(b)(1); *see also*

Am. Inman Decl. ¶ 10.  Moreover, all CCDF funds are subject to the regulations under 45 C.F.R.

§ 98, which give the HHS Secretary authority to "monitor programs funded under the CCDF for

compliance with:  (1) [t]he [a]ct; (2) [t]he provisions of this part; and (3) [t]he provisions and

requirements set forth in the [approved] CCDF Plan[s]."  45 C.F.R. § 98.90(a).

These statutes and regulations set out the mechanisms and the myriad of ways in which

HHS and ACF can monitor states' compliance with their program requirements and the law,

including the way in which states address potential fraud.  For example, the CCDF regulations

make clear that, among other requirements:  (1) state agencies administering these funds "shall

have an audit conducted after the close of each program period," 45 C.F.R. § 98.65(a), *see also*

42 U.S.C. § 9858i; (2) states must submit financial reports quarterly for every fiscal year, 45

C.F.R. § 98.65(g); (3) states that receive assistance must submit a quarterly case-level report of

monthly family case-level data, 45 C.F.R. § 98.70(a); (4) the plan that states submit to the HHS

Secretary must include processes to identify program fraud, 45 C.F.R. § 98.68(b)(1); (5) states

must undergo a quality control process through which ACF calculates the rate of improper

payments, 45 C.F.R. § 98.100; and (6) pursuant to a monitoring investigation, a state "shall make

appropriate books, documents, papers, manuals, instructions, and records" for examination

"upon reasonable request,"  45 C.F.R. § 98.90(c).

Congress has also codified at least two subsections of the CCDF regulation governing

funding penalties against states:  "Disallowance Procedures," 45 C.F.R. § 98.66, and "Non-

compliance," 45 C.F.R. § 98.91.[2]  Under the CCDF disallowance procedures, if the federal

---

[2] While the CCDF regulations do not explicitly define the distinction between "disallowance" and "non-compliance," disallowance disputes are generally "far more narrowly focused: they generally arise in connection with a routine audit and involve the accuracy of that audit."  *New Jersey v. Dep't of Health & Hum. Servs.*, 670 F.2d 1262, 1271 (3d Cir. 1981) (internal quotation marks omitted).  In other words, disallowance is the denial of funding

agency "as the result of an audit or a review," finds that "expenditures should be disallowed," the agency must inform the state of the decision in writing. 45 C.F.R. § 98.66(b). If the state agrees with the disallowance determination, it must "repay any amounts improperly expended." 45 C.F.R. § 98.66(c)(1). Otherwise, the state can appeal the decision or request reconsideration of the finding. 45 C.F.R. § 98.66(c)(2), (f).

Meanwhile, the regulations make clear that any penalty after a finding of state noncompliance generally requires reasonable notice and an opportunity for a hearing. 42 U.S.C. § 9858g(b)(2)(A)–(B). *But see* 45 C.F.R. § 98.92(d) (stating that nothing in the regulations preclude a grantee and the federal agency from "informally resolving a possible compliance issue without following all of the steps described"). The CCDF program regulations detail these procedural notice and hearing requirements for noncompliance issues. First, the agency must conduct a "review or investigation [that] reveals evidence that" the state or grantee "has failed to substantially comply with the [proposed state plan] or with one or more provisions of the Act or implementing regulations," or receive a complaint that a state "has failed to use its allotment in accordance with" law or regulations. 45 C.F.R. §§ 98.90(b), 98.93(a). Second, the HHS Secretary "will issue a preliminary notice" to the state regarding the possible non-compliance. 45 C.F.R. § 98.90(b). "If the possible non-compliance is based on a complaint, ACF must 'promptly furnish a copy of any complaint to the affected' state." (Compl. ¶ 86 (quoting 45 C.F.R. § 98.93(c)).) Third, the Government must "consider comments received from the [state] within 60 days." 45 C.F.R. § 98.90(b); 45 C.F.R. § 98.93(c). Finally, if ACF has made a finding that the State has made expenditures that are not allowed by law, it must notify the State in

---

"for a narrow item or class of items, and do not, in some general sense, affect the working of the program or federal-state cooperation." *Massachusetts v. Departmental Grant Appeals Bd.*, 698 F.2d 22, 25 (1st Cir. 1983). On the other hand, a noncompliance finding is often a broader "determination that a state's [] program does not conform to a federally mandated requirement." *New Jersey*, 670 F.2d at 1272.

writing of its decision to disallow those expenditures.  45 C.F.R. § 98.66(b).  The regulations

also provide a chance for the state to appeal the noncompliance decision.  45 C.F.R. § 98.66(i).

Upon a final decision, the sanctions may include disallowance of improperly expended funds,

disqualification of the state from receipt of further funding under the CCDF, or other

"appropriate sanctions."  45 C.F.R. § 98.92.

### 2.  TANF Guidelines

The TANF statutes and regulations mandate a number of ways in which ACF and HHS

monitor states' compliance with program requirements, including potential fraud and the manner

in which state records can be provided to ACF in furtherance of its compliance efforts.  (Compl.

¶ 108.)  Among other requirements, Congress has specified that each State must undergo regular

audits, must report certain data to the Government regularly, and must conduct a quality control

system covering determinations of eligibility, reviewed by ACF.  *See* 42 U.S.C. §§ 611, 652; 45

C.F.R. § 265.

The TANF statute provides the steps that ACF and HHS must follow when implementing

a penalty against a state for noncompliance with the TANF program requirements, including

when an audit finds that the state's funds have been used in violation of the law, or a finding that

the state failed to submit required reports.  42 U.S.C. § 609(a); 45 C.F.R. § 263.10; 45 C.F.R. §

262.3; *see also* 42 U.S.C. § 617 ("No officer or employee of the Federal Government may

regulate the conduct of States under" the TANF program "except to the extent expressly

provided in this part.").  First, the Government identifies if a state is subject to a penalty under

TANF based on audits, reviews, submitted state records, and other data sources, as appropriate.

45 C.F.R. § 262.3.  Second, if the agency finds a state violation, the Government must notify the

state of the violation in writing.  42 U.S.C. § 609(c)(1)(A); 45 C.F.R. § 262.4(a).  This

notification must:  (1) specify the penalty provision at issue, including the penalty amount; (2) specify the source of information and the reason for the decision; (3) invite the state to present its arguments; and (4) explain how the state can submit a reasonable cause justification as a defense or a corrective compliance plan.  45 C.F.R. § 262.4(a).  Third, the federal agency must allow the state 60 days to submit a written response that either outlines the state's defenses against the finding or details the state's corrective compliance plan, which outlines how the state will discontinue or correct the violation in a timely manner and how the state will ensure continuing compliance.  42 U.S.C. § 609(c)(1)(A)–(B); 45 C.F.R. § 262.4(b); 45 C.F.R. § 262.6(d).  If the federal agency finds that the penalty was determined erroneously or the state "has adequately demonstrated that it had reasonable cause for failing to meet one or more requirements," the Government will not impose the penalty.  45 C.F.R. § 262.4(c).  Otherwise, the Government will notify the state in writing of its findings and decision regarding the state's defenses or its corrective compliance plan, if this was submitted, within 60 days of the state's response.  42 U.S.C. § 609(c)(1)(D); 45 C.F.R. § 262.4(f).  If the state's reasonable cause argument or other defenses fail, and it did not submit a corrective compliance plan, the state has an additional 60 days from the date it receives the Government's second notice and finding to submit this plan. 45 C.F.R. § 262.6(c).  The federal agency can only impose penalties on the state if it rejects the state's proposed compliance plan or if the state otherwise does not correct or discontinue the violation.  42 U.S.C. §§ 609(c)(1)(D), (c)(2); *see also* 42 U.S.C. § 609(c)(3).  Fourth, if the Government takes any adverse action against a State—which may include the imposition of a penalty or an "adverse action" on the state's TANF plan—ACF must notify the State within five days.  42 U.S.C. § 610(a).  This notification must include "the factual and legal basis for taking the penalty in sufficient detail for the State to be able to respond in an appeal."  45 C.F.R. §

262.7(a)(2).  Finally, after this decision, the state has sixty days to appeal, 42 U.S.C. § 610(b)(1), and upon a final decision, the penalty can include the amount by which a state misused its TANF funds, an additional five percent penalty if the misuse was intentional, or the outstanding loan amount for failure to repay a federal loan, 45 C.F.R. § 262.1.  Moreover, the Government is prohibited from reducing the quarterly payment to any state by more than 25 percent.  42 U.S.C. § 609(d)(1); 45 C.F.R. § 262.1(d).  If this limitation results in unrecovered penalties, the balance is carried forward and assessed the following year.  42 U.S.C. § 609(d)(2); 45 C.F.R. § 262.1(d).

### 3.  SSBG Guidelines

Just like the CCDF and TANF programs, Congress also created a statutory and regulatory scheme for the SSBG program that prescribes a number of ways in which HHS and ACF can monitor states' compliance with these requirements and a process for issuing noncompliance penalties.  For example, each state must submit an annual report to the HHS Secretary that details, among other information, the number of individuals who receive services from the SSBG grant and the total number of federal, state, and local funds spent in providing each service.  45 C.F.R. § 96.74.  Each state must also undergo regular audits and report other data to HHS and ACF regularly.  *See* 42 U.S.C. § 1397e; 45 C.F.R. § 96.74.  Further, pursuant to 45 C.F.R. § 96.30, SSBG recipients must have "[f]iscal control and accounting procedures . . . sufficient to (a) permit preparation of reports required by the statute authorizing the block grant and (b) permit the tracing of funds to a level of expenditure adequate to establish that such funds have not been used in violation of the restrictions and prohibitions of the statute authorizing the block grant."

To issue a penalty against a state for noncompliance under the SSBG program, HHS must first find that the state expended funds that were not in accordance with the law.  45 C.F.R. §

96.51(a).  This finding can occur through an audit, investigation, or through receipt of a

complaint that a state has "failed to use its allotment under a block grant in accordance with the

terms of the act."  45 C.F.R. § 96.50(a), (e).  If HHS receives a complaint, it must "promptly

furnish a copy of any complaint to the affected State," 45 C.F.R. § 96.50(c), and provide the state

with a sixty-day period to submit comments, after which it will consider the state's response and

conduct an investigation where appropriate, 45 C.F.R. § 96.50(c), (d).  In considering a

complaint, audit, or investigation, the Government "will defer to a State's interpretation of its

assurances and of the provisions of the block grant statutes unless the interpretation is clearly

erroneous."  45 C.F.R. § 96.50(e).

Once HHS has made this finding, the agency must provide the state with notice of this

finding and an opportunity for a hearing.  45 C.F.R. § 96.51(a).  An opportunity for a hearing is

withheld only when the state, in resolving audit findings or other investigations, acknowledges

that the amounts expended were not in accordance with law.  *Id.*  Otherwise, HHS can withhold

funds from a state "only if [the federal government] has provided the State an opportunity for a

hearing."  45 C.F.R. § 96.51(c).  Finally, in some circumstances, the state has the opportunity to

appeal the decision after the hearing.  45 C.F.R. § 96.52.  "Upon a final decision, the sanction for

the State is disallowance of funds in the amount found to be paid not in accordance with law or

an offset of future payments in that same amount."  (Compl. ¶ 115 (citing 45 C.F.R. § 96.51(a),

(b)).)[3]

---

[3] HHS and ACF's Standard Terms and Conditions ("T&Cs"), which are provided with each grant award, also briefly outline possible sanctions against a state for failing to comply with program and T&C requirements.  These T&Cs mandate that grant recipients must ensure that expenditures are free from fraud, waste, abuse and duplication.  (Am. Inman Decl. ¶ 6; *ACF's Standard T&Cs*, Federal Fiscal Year 2025 ("ACF Standard T&Cs") at 4, https://acf.gov/sites/default/files/documents/main/FFY2025-ACF-STANDARD-TERMS-and-CONDITIONS--updated-2025-07-29-.pdf.)  "Failure to comply with the T&Cs of the award may result in an enforcement remedy such as a disallowance, restricted drawdown, withholding of future awards, deferral of claims for Federal Financial Participation (FFP), or termination of the award."  (ACF Standard T&Cs at 4.)

### D.    *Fraud Claims and Statements Against Plaintiff States*

New York, California, Minnesota, Illinois, and Colorado have relied on these funding programs for over 20 years to provide essential services to some of their most vulnerable citizens to combat poverty.  (Compl. ¶ 23.)  In late November 2025, the Trump administration began "drawing attention to a COVID-19 era fraud scheme that had previously been investigated and prosecuted in Minnesota."  (PI Mot. 2.)  This scheme, referred to as "Feeding our Future," involved fraud perpetrated several years prior in a child nutrition program, funded by the U.S. Department of Agriculture, which the Minnesota Department of Education identified, affirmatively raised, and jointly investigated with the Government.  (*Id.* at 2 n.1.)

On December 12, 2025, ACF issued letters to Plaintiff Minnesota noting that recent reports, including "public statements from hundreds of Minnesota Department of Human Services employees," have raised "serious concerns" about "systematic fraud" within the state's social services programs.  (Doc. 40-4-A ("Dec. 12 CCDF MN Letter") at 1; Doc. 40-5-A ("Dec. 12 SSBG MN Letter") at 1.)  The letters mandated that Minnesota turn over three categories of data:  (1) a "complete universe of [CCDF and SSBG] administrative data that exist and are in the state's possession" for all recipients for "all available years, and at least 2022 to 2025," which includes recipient's names, addresses, dates of birth, A-numbers, social security numbers, and any other state identification numbers relevant to program administration; (2) comprehensive data regarding all of the organizations, agencies, community groups, and subcontractors that have received CCDF and SSBG funding from 2019 to 2025; and (3) documentation demonstrating that the State of Minnesota had verified the eligibility of all CCDF and SSBG recipients, including the policies and verification records used by Minnesota to "confirm citizenship or qualified alien status."  (*Id.* at 1–2.)  These two letters, from ACF Assistant

Secretary Alex J. Adams, set a December 26, 2025 deadline for responses to these data requests.

(*Id.* at 2.)  The State of Minnesota acknowledged receipt of the request and indicated a response

would be forthcoming on January 9, 2026 without addressing the merits of the demands.

(Compl. ¶ 38.)

      In late December 2025, a YouTube content creator shared a 43-minute video that

purported to expose extensive fraud at Somali-owned childcare centers in Minnesota.  (Compl. ¶

39; PI Mot. 3.)  Specifically, the video alleged that "dozens of child care and autism centers

receiv[ed] millions of dollars in state funding without caring for any children."  (Doc. 40-8-A

("N.Y. Times Article").)  The video was shared and promoted by Vice President J.D. Vance and

former presidential advisor Elon Musk, among other prominent political figures.  (Compl. ¶ 39.)

On December 30, 2025, James O'Neill, the HHS Deputy Secretary at the time, posted on X.com

that HHS had "frozen all childcare payments to the State of Minnesota," and requested "a

comprehensive audit of these centers."  (Doc. 40-7-A ("O'Neill Tweet").)  He also announced

that he "activated [the] defend the spend system for all ACF payments" and that "[s]tarting

today, all ACF payments . . . will require justification and a receipt or photo evidence before

[ACF] send[s] money to a state."  (*Id.*)  O'Neill concluded his tweet by stating that HHS had

"turned off the money spigot and we are finding fraud."  (*Id.*)

      That same day, on December 30, 2025—hours after HHS made its announcement on

social media—O'Neill issued another letter to Minnesota, noting that he was "troubled" by the

"lack of timely response" from Minnesota, since the state had requested an extension instead of

producing comprehensive data to ACF by December 26, 2025, as set by the previous deadline.

(Compl. ¶ 41; Doc. 40-4-B ("Dec. 30 MN Letter") at 1.)  The letter also noted that the Assistant

Secretary for Family Support "could not confirm whether the perceived fraud is isolated to

specific counties or rampant through [the] state." (Dec. 30 MN Letter 1.) "[A]s authorized by 45 CFR 98.90(c)," the letter "demanded[ed] transparency" of the "state's use of federal welfare dollars" and expanded the data request. (*Id.* at 1.) In addition to the previous requests in the December 12 letters, ACF also requested, among other information: (1) the total amount of CCDF or TANF funds received by a particular list of childcare centers; (2) attendance, licensing, monitoring, and enforcement records regarding these centers; (3) internal state assessments of fraud risks, including "[a]ny evidence that political considerations, community pressures, or DEI-related directives influenced or constrained fraud prevention"; and (4) the "total number of subsidized children in care at each provider receiving federal assistance." (*Id.* at 1–2.) The correspondence cites "recent viral reports" as support for the expanded data demand, possibly referencing the YouTube video. (*Id.* at 1.) While the letter purported to set a January 9, 2026 deadline—after which ACF "may withhold CCDF funds" and "impose the penalties" specified in 45 CFR § 98.92, the subsection for CCDF penalties that are imposed upon a final determination of noncompliance, and 45 CFR § 262.1, the TANF penalties statute for noncompliance—the letter also announced immediate action, claiming that"[t]he state of Minnesota will be placed on a temporary restricted drawdown for all CCDF funds provided by ACF until further notice, with specific instructions for these restrictions to be provided by January 5, 2026." (*Id.*) On December 31, 2025, HHS spokesperson Andrew Nixon stated that the Trump administration was "freezing federal child care funding to all states, not just Minnesota," and the funds would only be released "when states prove they are being spent legitimately." (Doc. 40-8-B ("HHS spokesperson statement").)

Shortly thereafter, Defendants issued a series of statements specifically targeting the five Plaintiff States. On January 4, 2026, President Trump explicitly named the Plaintiff States

concerning potential fraud allegations.  (PI Mot. 3.)  The next day, on January 5, 2026, President

Trump posted the following on social media:  "Governor Walz has destroyed the State of

Minnesota, but others, like Governor Gavin Newscum [sic], JB Pritzker, and Kathy Hochul, have

done, in my opinion, an even more dishonest and incompetent job."  (Doc. 40-7-B ("Jan. 5

Trump Tweet").)  On January 5, 2026, an HHS spokesperson also alleged that "Democrat-led

states and Governors have been complicit in allowing massive amounts of fraud to occur under

their watch."  (Doc. 40-8-C.)  On January 6, 2026, Trump speculated that California "is more

corrupt than Minnesota."  (Doc. 40-7-C.)

<strong><em>E.      January 5 and 6 Letters</em></strong>

On January 6, 2026, HHS announced that the agency "froze access to certain federal

child care and family assistance funds for California, Colorado, Illinois, Minnesota and New

York following serious concerns about widespread fraud and misuse of taxpayer dollars in state-

administered programs."  (HHS Press Release.)  This action was effectuated through letters sent

to the five Plaintiff States on January 5 and January 6, 2026.  (PI Mot. 4.)  In each of these

letters, ACF states that it placed the Plaintiff States on a "restricted drawdown" status for all

CCDF, TANF, and SSBG funds until further notice.  (Doc. 40-1 ("CCDF Letters"); Doc. 40-2

("TANF Letters"); Doc. 40-3 ("SSBG Letters"); Doc. 40-4-C ("Jan. 5 MN CCDF Letter"); Doc.

40-5-B ("Jan. 6 MN SSBG Letter").)

All the January 5 and 6 letters are signed by ACF Assistant Secretary Alex J. Adams, and

the CCDF, TANF, and SSBG communications are essentially identical across the four non-

Minnesota states.  The January 6, 2026 CCDF letters all begin with boilerplate statements that

ACF "is concerned by the potential for extensive and systemic fraud" and that those concerns

"have been heightened by recent federal prosecutions and additional allegations that substantial

19

portions of federal resources were fraudulently diverted away from the American families they were intended to assist." (CCDF Letters.)  The letters follow with a statement that ACF "has reason to believe" that the state "is illicitly providing illegal aliens with CCDF benefits intended for American citizens and lawful permanent residents." (*Id.*)  However, the letters do not provide any further detail concerning these prosecutions or investigations or their ties to any individual state.  Further, each of the CCDF letters states that "ACF is placing the State on temporarily restricted drawdown on CCDF funds until additional fiscal accountability requirements are implemented and necessary information is provided for ACF to complete its review," because this is "clearly necessary to mitigate fraudulent activity." (*Id.*)

In all four CCDF letters, ACF states that the "additional fiscal accountability requirements . . . must include submission of verified attendance documentation for subsidized child care services to the State prior to further draw down of federal CCDF funding." (*Id.*)  The letter mandates that these submissions must:  (1) establish the days or hours of care provided; (2) contain "contemporaneous payment information"; and (3) be "sufficient for ACF to determine that the drawdown amount is reasonable, allowable, and allocable." (*Id.*)  Finally, the CCDF letters state that the funding restrictions will last "until further notice, pending successful and satisfactory review of the requested information" and that ACF staff "will coordinate directly with the appropriate state officials to establish a secure reporting method and confirm technical specifications." (*Id.*)

Minnesota received its own version of the CCDF letter one day earlier than the other Plaintiff States.  Although the substance is substantially similar to the other CCDF Letters, the letter is styled as a follow-up to the previous December 2025 letters issued to Minnesota.  (Jan. 5 MN CCDF Letter.)  The January 5 letter cites regulations 45 C.F.R. §§ 98.60, 98.65, and 98.67

and notes that ACF "has placed the State of Minnesota on a restricted drawdown status . . . in response to the State's failure to provide required administrative data." (*Id.* at 1.)  The letter contains many of the same data demands and conditions for funding issued to other Plaintiff States, including requiring the submission of attendance records prior to any drawdown.  (*Id.* at 2.)  The letter concludes by noting that the "drawdown restriction shall remain in effect until ACF determines that the [state] has established and implemented internal controls sufficient to ensure that all future drawdown requests are supported by reliable attendance documentation consistent with federal and state law."  (*Id.* at 2–3.)

The January TANF and SSBG letters sent to the non-Minnesota Plaintiff States are styled similarly, but with even more expansive data requests.  Both sets of letters begin with the same boilerplate language highlighting ACF's fraud concerns and explain that the agency is placing the states' TANF and SSBG programs "on a restricted drawdown."  (TANF Letters; SSBG Letters.)  Moreover, the letters demand that Plaintiff States provide: (1) "the complete universe" of TANF and SSBG administrative data that exist and that "are in the state's possession . . . for all available years" and "at least 2022 to 2025"; (2) recipients' personally identifiable information, including social security numbers, names, date of births, addresses, and A-numbers; (3) documentation demonstrating that each state "has verified the eligibility" of all recipients; and (4) a "comprehensive list" of all entities that received TANF and SSBG funds between 2019 and 2025.  (*Id.*)  Each of these letters sets a January 20, 2026 deadline for Plaintiff States to provide the requested information and explains that the restricted drawdown status is effective "until further notice," pending review of the state's current plans and the requested information. (*Id.*)  Minnesota's TANF and SSBG letters are almost identical to the letters sent to the other four Plaintiff States.  (PI Mot. 6.)

Plaintiff States contend that ACF's actions paused multiple funding streams totaling over $100 million, which they would have been able to access prior to this policy. (McMahon Decl. ¶ 21 (Colorado TANF funds); Khatkhate Decl. ¶ 10 (Illinois CCDF funds); Doc. 40-15 ("Chawla Decl.") ¶¶ 31–32 (New York TANF funds); Younger Decl. ¶ 19 (California CCDF funds); Weeks Decl. ¶ 40 (Minnesota CCDF funds).) According to Plaintiffs, this delay or pause of funding "creates operational and budgetary uncertainty, making administration and basic planning for the future nearly impossible." (PI Mot. 9.) If states lose these consistent funding streams, tens of thousands of children and families would lose care. (*See, e.g.*, Khatkhate Decl. ¶ 43.) Because so many childcare providers operate on slim margins, "[t]he ripple effects will be broad because States would be unable to support families in need of child care, meaning that parents would be unable to work, which will have direct effects on both vulnerable families and State tax revenues." (PI Mot. 8.) Plaintiffs also allege that the expansive data demands, which include "the complete universe" of Plaintiffs' TANF and SSBG records "for all available years," including personal identifying information (*e.g.*, date of birth and Social Security Number), also impose significant burdens on state resources. (PI Mot. 13–14.) Even if Plaintiffs were to attempt to comply with these demands on an accelerated timeline (set for January 20, 2026 initially in the letter, giving states two weeks to respond), they state that this would be "impossible" and "would require the diversion of significant personnel and resources away from Plaintiff States' operation of their critical programs." (*Id.*)

## II.    **Procedural History**

On January 8, 2026, Plaintiffs filed their Complaint and an emergency motion for a temporary restraining order ("TRO"). (Docs. 1, 7.) On January 9, 2026, Judge Arun Subramanian, sitting as the Part I Judge, granted Plaintiffs' motion and restrained and stayed

Defendants from implementing the ACF policy, including the entirety of the January 5 and 6 Letters, through January 23, 2026, and directed Defendants to remove restrictions on Plaintiffs' abilities to draw down the ACF funds.  (Doc. 22.)  On January 13, 2026, I held a telephonic conference to set the briefing scheduling for the preliminary injunction motion.  (Doc. 25.)  On January 15, 2026, pursuant to the ordered briefing schedule, Plaintiffs filed their motion for a preliminary injunction and 5 U.S.C. § 705 stay, (Doc. 38), an associated memorandum of law, (Doc. 39), and accompanying exhibits and declarations, (Doc. 40).  On January 20, 2026, Defendants filed their opposition brief, (Doc. 53), and two accompanying declarations, (Docs. 54, 55, *amended at* 65).  On January 22, 2026, Plaintiffs filed their reply.  (Doc. 62 ("Reply").)  On January 23, 2026, the parties appeared before me for oral argument on the preliminary injunction motion.  (Doc. 69 ("Tr.").)  On the same day, I ordered that the TRO would remain in effect until February 6, 2026, finding that good cause existed under Federal Rule of Civil Procedure 65(b)(2) to extend the TRO for an additional 14 days.  (Doc. 64.)  On February 6, 2026, I issued an order granting Plaintiffs' motion for a preliminary injunction and stay, noting that the reasons would be stated in a forthcoming opinion.  (Doc. 71.)

### III.    <u>Legal Standard</u>

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "Any party seeking a preliminary injunction 'must demonstrate that it will suffer irreparable harm in the absence of the requested relief.'"  *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quoting *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999)).  To succeed on an application for a preliminary injunction, a movant must demonstrate: "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on

the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "The purpose of a preliminary injunction is not to award the movant the ultimate relief sought in the suit but is only to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (per curiam) (internal quotation marks omitted).

A movant seeking injunctive relief has a "heavier burden" than a plaintiff who must plead a "plausible claim necessary to avoid dismissal." *New Hope Fam. Servs., v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020) (citation omitted). Indeed, in considering the motion for a preliminary injunction, courts "need not accept as true the well-pleaded allegations in [p]laintiff's complaint." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020) (internal quotation marks omitted). The standard for a stay of agency action under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction. *New York v. Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 223 (S.D.N.Y. 2020)

IV.    <u>**Discussion**</u>

A. *Likelihood of Success on the Merits*

Plaintiffs contend that they are likely to succeed on the merits of their underlying causes of action because: (1) I have jurisdiction over their claims; (2) Defendants' funding policy, effectuated through the January 5 and 6 letters, is arbitrary and capricious under the APA; (3) Defendants' funding freeze is contrary to law and in excess of their statutory authority; and (4) Plaintiffs are likely to succeed on their constitutional claims, since the funding freeze violates separation-of-powers principles, the Appropriations Clause, and the Spending Clause. (PI Mot.

15–31.)  In response, Defendants argue that Plaintiffs are unlikely to succeed on the merits and

contest almost every one of Plaintiffs' arguments on this issue.  (Opp'n 9–16.)  I evaluate each

argument in turn.

### 1.  Jurisdiction under the Tucker Act[4]

As an initial matter, I must evaluate whether Plaintiffs have adequately established my

jurisdiction over their APA claims.[5]

The APA "confers a general cause of action upon persons 'adversely affected or

aggrieved by agency action within the meaning of a relevant statute'" against the federal

government.  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702).

In doing so, the APA "waives the government's sovereign immunity with respect to such claims

in that forum."  *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999).

However, the APA's waiver of sovereign immunity, "does not apply 'if any other statute that

grants consent to suit expressly or impliedly forbids the relief which is sought.'"  *Dep't of Educ.*

*v. California*, 604 U.S. 650, 651, (2025) (quoting 5 U.S.C. § 702).  The Tucker Act waives

sovereign immunity and vests exclusive jurisdiction in the Court of Federal Claims over any

claim against the United States founded "upon any express or implied contract with the United

States."  28 U.S.C. § 1491.  It forbids a district court from reviewing an APA claim seeking

---

[4] Although Defendants do not dispute this Court's jurisdiction pursuant to the Tucker Act, I have an obligation to evaluate subject matter jurisdiction and can raise any issues *sua sponte*.  *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).  Plaintiffs also raise jurisdictional arguments in their own motion for preliminary injunction, (PI Mot. 29–30), so I evaluate them briefly here.

[5] I do not evaluate whether I have jurisdiction over Plaintiffs' constitutional claims under the Tucker Act because, as I discuss in detail below, Plaintiffs have already established the relevant factors necessary for a preliminary injunction—likelihood of success, irreparable harm, and balance of equities and public interest—on their APA claims.  "To obtain a preliminary injunction, Plaintiff need not establish a likelihood of success on every claim." *Smart Study Co. v. A Pleasant Trip Store*, No. 1:20-CV-1733, 2020 WL 2227016, at *5 (S.D.N.Y. May 7, 2020) (citing *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019)).  "It is sufficient to establish likelihood of success on the merits of only one of its claims." *Id.*

injunctive and declaratory relief if that action is simply just a disguised breach of contract claim. *See, e.g.*, *Up State Fed. Credit Union*, 198 F.3d at 376–77 (holding that the Court of Federal Claims had exclusive jurisdiction over plaintiff's claim that the army violated an agreement to assume the title to a building, because "the source of the right at issue" was "the contract between the parties rather than Army Regulation"). However, "the mere fact that a contract is involved does not divest the district court of jurisdiction." *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 664 (S.D.N.Y. 2025) (collecting cases).

"Whether a claim is 'founded . . . upon any express or implied contract with the United States' has long been understood to depend upon 'the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought.'" *Am. Council of Learned Soc'ys v. McDonald*, 792 F. Supp. 3d 448, 480 (S.D.N.Y. 2025) (quoting *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022)). Moreover, courts "categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006).

Two recent *per curiam* Supreme Court orders on its emergency docket have addressed the interplay between the APA and the Tucker Act.[6] The first, *Department of Education v. California*, which was issued in April 2025, stayed a temporary restraining order issued by a district court. 604 U.S. at 651. By a narrow 5-4 vote, the Supreme Court indicated that the APA's waiver of sovereign immunity was unlikely to apply in the case because the order "to pay out past-due grant obligations and to continue paying obligations as they accrue" was akin to an

---

[6] As other courts have noted, I recognize that "the Supreme Court's decision[s] [in these two orders]. . . [are] not a final order." *Am. Council of Learned Societies*, 792 F. Supp. 3d at 482.

order that "enforce[d] a contractual obligation to pay money." *Id*. (internal quotation marks omitted). However, the Supreme Court acknowledged that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)).

In August 2025, the Supreme Court addressed another emergency stay application in *National Institutes of Health v. American Public Health Association* ("*NIH*"), 145 S. Ct. 2658 (2025). Justice Amy Coney Barrett, writing the critical concurrence, explained that, with regard to the Tucker Act, there is a difference between challenges to grant terminations and challenges to internal agency guidance discussing funding priorities. *NIH*, 145 S. Ct. at 2660–61 (2025). While the district court "likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims," "[p]laintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court." *NIH*, 145 S. Ct. at 2661 (2025). The Supreme Court found that the district court was likely correct that it had jurisdiction to entertain an APA challenge to agency guidance, because "[v]acating the guidance does not reinstate terminated grants." *Id.* "That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim founded upon contract that only the [Court of Federal Claims] can hear." *Id.* (internal quotation marks omitted). In *NIH*, Judge Barrett advocated for "a two-track litigation that bifurcates vacatur claims (the prospective claims) in the district court while sending terminated grants (the retrospective claims) to the Court of Federal Claims." *California v. Dep't of Educ.*, No. 25-CV-10548, 2025 WL 3165713, at *12 (D. Mass. Nov. 13, 2025).

The decisions in *NIH* and the *Department of Education* along with the Supreme Court's earlier decision in *Bowen*, which set aside HHS's disallowance decisions with regard to

27

Medicaid funds, suggest that "an order for money past due . . . is relief at law, not relief at equity" and belongs in the Court of Federal Claims. *City of Chicago v. Dep't of Homeland Sec.*, No. 25 C 5463, 2025 WL 3043528, at *9 (N.D. Ill. Oct. 31, 2025). In other words, district courts cannot order "the immediate payment of past-due [contractual] grant obligations." *Washington v. Dep't of Educ.*, 161 F.4th 1136, 1140 (9th Cir. 2025). Claims "seeking the reinstatement of grant funding . . . belong in the Court of Federal Claims, not district court." *Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, 804 F. Supp. 3d 45, 65 (D.D.C. 2025).

However, "prospective challenges to vacate [agency] guidance," such as seeking to vacate a "government's decision to freeze funding" and "enjoining the government from relying on its stated reasons to withhold payment" are exactly the type of claims that belong in district court. *City of Chicago*, 2025 WL 3043528, at *11; *see also Washington*, 161 F.4th at 1140 ("Because Plaintiff States' claims seek purely prospective relief regarding multiyear grant discontinuations . . . and vacatur would not result in the automatic reinstatement or continuance of those grants or the payment of any money to grantees—the Government has not demonstrated a strong showing of success on the merits of its Tucker Act jurisdictional claim.")

Here, Plaintiffs are not retrospectively contesting contractual grant terminations nor are they disputing rights that are primarily sourced in contract law at all. In fact, the Complaint does not even allege any contractual violations,[7] and Defendants do not contest jurisdiction—their opposition only briefly acknowledges the existence of HHS' Terms & Conditions. Instead, the states seek to vacate a policy that establishes purportedly unlawful additional conditions to their

---

[7] The Complaint contains six counts: "Substantive Violation of the Administrative Procedure Act – In Excess of Statutory Authority, Contrary to Law, Ultra Vires" (Count I); "Substantive Violation of the Administrative Procedure Act – Arbitrary & Capricious" (Count II); "Equitable *Ultra Vires* – Conduct Outside the Scope of Statutory Authority Conferred on the Executive" (Count III); "Violation of the Separation of Powers—Usurping the Legislative Function" (Count IV); "Violation of the Appropriations Clause" (Count V); and "Violation of the Spending Clause" (Count VI). (Compl. ¶¶ 133–84.)

funding—acting as a funding freeze—and restricts the flow of future drawdown requests that the states have not yet even submitted for reimbursement.  (PI Mot. 29.)  Each of the ACF letters to the Plaintiff States make clear that their access to future funds will also be restricted unless the states comply with the Government's data requests.  (*See* CCDF Letters (The state "will be placed on this temporary restricted drawdown for all CCDF funds provided by ACF until further notice, pending successful and satisfactory review of the requested information."); TANF Letters (The state "is placed on a temporary restricted drawdown for all TANF funds provided by ACF until further notice, pending review of the state's current TANF plan for completeness and ACF confirming compliance with applicable laws."); SSBG Letters (The state "will be placed on a temporary restricted drawdown for all SSBG funds provided by ACF until further notice, pending successful and satisfactory review of the requested information.").)

The Tucker Act does not apply here because "these are not challenges to the terms and conditions of an executed grant agreement, but rather to the imposition of an allegedly unlawful condition on [continued funding]."  *Illinois v. Noem*, No. 25-CV-495, 2025 WL 3707011, at *7 (D.R.I. Dec. 22, 2025); *see also Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 90 (D.R.I. 2025) (finding that the Tucker Act does not bar jurisdiction over the district court's review of APA claims where plaintiff states were not able to access federal funds unless they agreed to the Government's new policy terms, because this case does not arise out of the "specific context of grant terminations and damages claims," but rather "the promulgation of grant conditions that govern eligibility for future funding").

Moreover, in examining the "source of the rights" and the "type of relief sought," I find that Plaintiffs' APA claims do not arise out of contractual obligations.  *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).  The core of Plaintiffs' claim is that ACF is acting

unlawfully in freezing funds and conditioning future funding on states' production of voluminous amounts of data—contrary to the statutes and regulations that govern the distribution of CCDF, TANF, and SSBG funds and dictate the steps ACF must take before they issue any penalties or sanctions against states. "Plaintiffs do not cite any contractual rights . . . but rather statutory entitlements—federal funding and approvals guaranteed by federal laws" and regulations "that do not derive from any contract." *Metro. Transp. Auth.*, 784 F. Supp. 3d at 665. "[P]laintiffs seek to enforce compliance with statutes and regulations, not any government contract." *Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 938 (9th Cir. 2025); *see also New York v. Dep't of Educ.*, No. 25-1424, (Doc. 40 at 3) (2d Cir. June 20, 2025) (rejecting a Tucker Act argument in a challenge to agency action prohibiting states from spending education funds, because claims pertained to the "Government's exercise of its regulatory authority . . . not a contractual duty to pay money to the States" (cleaned up)). Defendants also do not contest that Plaintiffs' claims are premised on statutes and regulations. Indeed, the CCDF, TANF, and SSBG letters only cite statutes and regulations that allegedly give the federal agency power to restrict these funds and monitor states. Thus, the gravamen of Plaintiffs' allegations does not turn on contract terms, but the federal statutes and regulations that Congress put in place.

Plaintiffs also do not seek to reinstate any contractual grants, nor do they request money damages. (PI Mot. 29.) Instead, the states seek to vacate the underlying agency policy so that a funding freeze and drawdown restriction do not affect their future access to funds. This is the exact type of remedy "that [is] at the heart of the APA's judicial review scheme." *New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562, 594 (S.D.N.Y. 2025); *see also N.J. Conservation Found. v. Fed. Energy Regul. Comm'n*, 111 F.4th 42, 63 (D.C. Cir. 2024) ("Vacatur is the normal

remedy when we are faced with unsustainable agency action." (internal quotation marks omitted)). "Plaintiff States' interests in procedural regularity and predictability of how the [agency] will award grants in the future is distinct from their interest in obtaining retrospective monetary relief sought." *California v. Dep't of Educ.*, 2025 WL 3165713, at *16 (internal quotation marks omitted). Such requests for relief could not be left to the Court of Federal Claims since "[t]he Claims Court does not have the general equitable powers of a district court to grant prospective relief." *Bowen*, 487 U.S. at 905. Moreover, "the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available." *Megapulse*, 672 F.2d at 971. "Plaintiffs are better understood as arguing that Defendants' acts are unauthorized by any law or other source of authority." *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d at 665. Therefore, Plaintiffs adequately establish that I have jurisdiction over their APA claims.

### 2. APA Claims

#### a. Final Agency Action

Plaintiff States contend that under the APA, Defendants' funding announcements are arbitrary and capricious, contrary to law, and in excess of their statutory authority. (PI Mot. 15–26.) As a threshold matter, I must evaluate whether the funding decision at issue is a final agency action. The APA explicitly only allows for judicial review of a "final agency action." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003). The finality requirement "allows the agency an opportunity to apply its expertise and correct its mistakes, it avoids disrupting the agency's processes, and it relieves the courts from having to engage in piecemeal review which is at the least inefficient and upon completion of the agency process might prove to

have been unnecessary." *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) (internal quotation marks omitted).

To be considered "final," the agency action must satisfy two conditions. First, it "must mark the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). "[I]t must not be of a merely tentative or interlocutory nature." *Id.* Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)). "For the second prong, the core question is whether the result of the agency's decisionmaking process is one that will directly affect the parties." *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016) (internal quotation marks omitted). "The Supreme Court has interpreted the finality element in a 'pragmatic way.'" *Id.* (quoting *Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2d Cir. 2008)); *see also Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 97–98 (2d Cir. 2013) (considering the "substantial practical impact" of an agency's letter in deciding if it was a final agency decision).

Defendants argue that the January 5 and 6 letters do not constitute final agency actions because the letters "did not freeze any funding stream," and they "articulate an intermediate step that is part of the agency's ongoing monitoring and review of the grantees' use of funds." (Opp'n 12.) They claim that the agency has continued to process and approve drawdown requests subject to the additional screening requirements detailed in the ACF letters. (*Id.*) However, an agency action can satisfy the "consummation" prong "notwithstanding the agency's characterization of the [action] as an interim" one. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). "[A]n interim agency resolution counts as final agency action despite

the potential for a different permanent decision . . . [because] the interim resolution is the final word from the agency on what will happen up to the time of any different permanent decision." *Id.*; *Salazar*, 822 F.3d at 83–84 ("The APA does not require that the challenged agency action be the agency's final word on the matter for it to be 'final' for the purposes of judicial review.")

Plaintiffs have adequately demonstrated that these letters amount to a "consummation" of the agency's decision-making process.  Defendants' own January 6 press release alongside the issuance of its January 5, 2026 and January 6, 2026 letters belies its characterization that this was simply an intermediate letter further monitoring Plaintiff States, not a funding restriction or freeze.  In its January 6, 2026 official press release, HHS stated that it "froze access to certain federal child care and family assistance funds" for Plaintiff States and that "access to these funding streams is now restricted."  (HHS Press Release.)  The press release also stated that the "funding freeze . . . now require[s] these five states to submit a justification and receipt documentation before any federal payment is released."  (*Id.*)  Additionally, on December 30, 2025, several days before the issuance of the letters, Jim O'Neill, the HHS Deputy Secretary at the time, unmistakably confirmed that ACF had "frozen all child care payments to the state of Minnesota."  (O'Neill Tweet.)  Defendants now attempt to post hoc rationalize these statements from high-level agency officials as ones that do not reflect the "reality" of ACF's actions.  (Tr. 40:4-41:21.)  However, this ignores the fact that the names on the press release, defining the action as a "funding freeze," are the very same individuals who issued these funding letters to the Plaintiff States:  former HHS Deputy Secretary Jim O'Neill and Assistance Secretary for Children and Families Alex J. Adams.  (*Compare* HHS Press Release, *with* CCDF Letters, TANF Letters, *and* SSBG Letters.)  In fact, as Plaintiffs also point out, the press release calling the decision a funding freeze still remains on HHS's website as of March 10, 2026, two months

after the announcement. (*See* Reply at 2 n.1.) Indeed, Defendants never corrected or retracted those statements.

The ACF letters and press release also have all the hallmarks of a final agency decision. In its January 6, 2026 TANF letter, for example, the agency states that the restriction is "effective today," as part of a program compliance review. (TANF Letters.) Moreover, the January 5, 2026 CCDF letter makes clear that Minnesota was "placed" on a "restricted drawdown status" in response to multiple alleged deficiencies, including "[Minnesota's] failure to provide required administrative data." (Jan. 5 MN CCDF Letter at 1.) Further, the letter clearly outlines "prerequisite" conditions to the drawdown of CCDF funds. (*Id.*) Defendants point to the data requests and drawdown restrictions to argue that this is not a categorical freeze in funds. (Opp'n 11–12.) Further, during oral argument, Defendants characterized the policy as a "work in progress," post hoc attempting to clarify that the agency was still determining some of the enhanced document requirements. (Tr. 6:18-7:10.)

But no matter how Defendants describe this policy—whether as a funding freeze, a drawdown restriction, or a "monitoring" of Plaintiff States' use of funds—they cannot avoid the facts relevant to this policy implementation: the agency made a decision to condition States' access to childcare funds based on compliance with additional data submissions, which has immediate consequences in how states materially access funding. (*See* Opp'n 16 (Plaintiffs will "continue to receive funding if they provide the requisite supporting documentation"); TANF Letters (The state "is placed on a temporary restricted drawdown for all TANF funds provided by ACF until further notice, pending review of the state' current TANF plan for completeness and ACF confirming compliance with applicable laws."); SSBG Letters (The state "will be placed on a temporary restricted drawdown for all SSBG funds provided by ACF until further

notice, pending successful and satisfactory review of the requested information.").)  This funding

decision also does not appear to include an appeal process but leaves the determination of

compliance on HHS.  Therefore, regardless of how the agency characterizes this decision, it is

still a reviewable final policy.  "As numerous other courts have likewise explained, the decision

to attach the conditions [to funding] can be final even if the final decision to award the funds . . .

is still pending."  *Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d at 89 (collecting cases).  In

other words, "agency placement of new conditions on grant funding amounts to final agency

action."  *R. I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 68 (D.R.I. 2025);

*see also California v. U. S. Dep't of Transp.*, No. 25-CV-208, 2025 WL 3072541, at *6 (D.R.I.

Nov. 4, 2025) (funding condition was a "final agency action for purposes of APA review"

because it "impose[d] concrete legal consequences on the States, who must choose whether to

accede to an allegedly unlawful condition or else forgo billions of dollars of federal grant

funding").

Defendants' policy imposes clear restrictions on Plaintiffs' funding access.  The January

5 and 6 letters are not made less final simply because funding might depend on the type and

amount of data that states turn over:  "a federal agency's assessment, plan, or decision qualifies

as final agency action even if the ultimate impact of that action rests on some other occurrence—

for instance, a future site-specific application, a decision by another administrative agency, or

conduct by a regulated party."  *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128

F.4th 1089, 1110 (9th Cir. 2025).  Defendants' attempts to characterize their policy as temporary

also does not withstand scrutiny here.  "The mere possibility that an agency might reconsider

[the policy] . . . does not suffice to make an otherwise final agency action nonfinal."  *Sackett v.

EPA*, 566 U.S. 120, 127 (2012).

Furthermore, clear legal consequences flow from this agency decision.  As Plaintiffs have demonstrated, this is not just a simple review of programs with no real change in status quo. "[T]he imposition of a new term to an agreement, by its very nature, changes the parties' legal obligations and rights."  *Washington v. U. S. Dep't of Health & Hum. Servs.*, No. 25-CV-01748, 2025 WL 3002366, at *9 (D. Or. Oct. 27, 2025).  "[N]ew conditions on grant funding" can "change the lawful scope of activities permitted with grant funds, lead to the termination of grant awards, and require [Plaintiffs] to subject themselves to potential . . . liability."  *R. I. Coal. Against Domestic Violence*, 794 F. Supp. 3d at 68 (internal quotation marks omitted).  The agency's decision to restrict funds imposed immediate legal consequences:  "[P]rior to the temporary restraining order, Defendants did not fulfill Plaintiff States' drawdowns totaling hundreds of millions of dollars."  (PI Mot. 31.)

Although Defendants argue that funds were still flowing during the purported freeze, (Opp'n 7), this does not change the fact that at least some funding streams were not being processed in the usual manner until Judge Subramanian issued the TRO on January 9, 2026, (Doc. 22).  Plaintiffs point to over $100 million of funding that was frozen or substantially delayed because of the new policy and issued only after the January 9, 2026 restraining order: (1) drawdown requests of TANF funds submitted as early as December 30, 2025, which Colorado only received on January 12, 2026, (McMahon Decl. ¶ 21); (2) a $16 million drawdown of CCDF funds submitted on January 2, 2026, which Illinois only received on January 13, 2026, (Khatkhate Decl. ¶ 10); (3) a $106 million TANF drawdown request submitted on January 5, 2026, which New York only received on January 14, 2026, despite drawdown funds usually reimbursed within "one (1) business day," (Chawla Decl. ¶¶ 31–32); (4) a January 2, 2026 drawdown request for $125,897 of CCDF funds, which California only received on January

14, 2026, 9 days after their expected date of receipt, (Younger Decl. ¶ 19); and (5) multiple drawdown requests totaling approximately $1.4 million submitted on December 31, 2025, which were rejected multiple times within the PMS system and still were not disbursed to Minnesota by January 15, 2026, (Weeks Decl. ¶ 40). Even if these funds were delayed, not frozen—likely due to the new funding conditions imposed by Defendants—approval timelines spanning more than one week is far longer than the "two day" fund release timeline that Plaintiffs typically rely on, and have caused "massive immediate budgetary uncertainty" and chaos. (PI Mot. 8, 10.)

Additionally, the specific January 20, 2026 deadline for these voluminous data requests creates additional possible legal consequences. Defendants acknowledge that this January 20 deadline was intended "to produce a broader array of data" and warn Plaintiff States that they "cannot draw down funds [without restrictions] until [they] submit all of this information on the 20th." (Tr. 9:8-19.) Moreover, as demonstrated by Minnesota, a state's failure to comply with these data requests can result in additional funding penalties. (*See* Dec. 30 MN CCDF Letter at 3 (stating that if Minnesota failed to provide responses to the many data request, "[ACF] may withhold CCDF funds" and impose penalties); Jan. 5 MN CCDF Letter at 1 (explaining that the "State's failure to provide [the] required administrative data" was among the reasons for placing Minnesota on a restricted drawdown status).) Thus, I find that Plaintiffs have adequately established that the agency action is final and are likely to succeed on the merits with regard to this issue.[8]

---

[8] Although neither party raised the issue of ripeness in their briefings, I briefly address it here because "[r]ipeness is a constitutional prerequisite to exercise of jurisdiction by federal courts," and therefore, I "can raise the issue *sua sponte*." *United States v. Fell*, 360 F.3d 135, 139 (2d Cir. 2004) (quoting *Nutritional Health All. v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998). At its core, this doctrine requires "ensur[ing] that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III of the U.S. Constitution" so that federal courts are not entangled in "abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Id.* (alteration in original and internal quotation marks omitted). In other words, the ripeness doctrine mandates that "an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 148

b.  Arbitrary and Capricious

The APA serves as a "check upon administrators whose zeal might otherwise have

carried them to excesses not contemplated in legislation creating their offices."  *United States v.*

*Morton Salt Co.*, 338 U.S. 632, 644 (1950).  As part of this purpose, the APA declares unlawful

---

(2d Cir. 2021) (internal quotation marks omitted).  "To determine whether a claim is prudentially ripe, courts ask '(1) whether [an issue] is fit for judicial resolution and (2) whether and to what extent the parties will endure hardship if decision is withheld.'"  *Metro. Transp. Auth.*, 784 F. Supp. at 662 (alteration in original) (quoting *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003)).  The fitness analysis, among other factors, considers "whether the issues sought to be adjudicated are contingent on future events or may never occur," *Simmonds*, 326 F.3d at 359 (internal quotation marks omitted), "whether the issues presented for review are primarily legal as opposed to factual in nature; and whether administrative remedies have been exhausted at least to the extent that an adequate factual record has been established," *Seafarers Int'l Union v. U.S. Coast Guard*, 736 F.2d 19, 26 (2d Cir. 1984) (citation omitted); *see also Isaacs v. Bowen*, 865 F.2d 468, 477 (2d Cir. 1989) (finding that a challenge to a proposed policy change in Medicare administration was unripe because plaintiffs' challenge was "directed at possibilities and proposals only, not at a concrete plan which has been formally promulgated and brought into operation").  The hardship analysis requires that "[I] ask whether the challenged action creates a direct and immediate dilemma for the parties."  *New York C.L. Union v. Grandeau*, 528 F.3d 122, 134 (2d Cir. 2008) (internal quotation marks omitted).

As discussed *supra* Section III.2.a, the agency action is fit for judicial resolution:  the January 5 and 6 funding letters constituted a final and promulgated policy that explained the agency's decision to immediately restrict the drawdown of federal funds, pursuant to specific statutory and regulatory authority.  These letters were accompanied by a formal public press release from HHS.  (HHS Press Release.)  Defendants attempt to backtrack and characterize some of the documentation requests and enhanced DTS requirements as a "work in progress."  (Tr. 6:18-7:10.)  However, similar to the arguments included above regarding the final agency decision, their arguments are nothing more than an effort to avoid judicial review and intervention.  *See Metro. Transp. Auth.*, 784 F. Supp. 3d at 663.  Even if additional enhanced DTS procedures were to be further clarified, Defendants' funding restriction went into place immediately with imminent consequences.  The issues to be decided in this action are clearly "legal ones" concerning whether the agency has the power to restrict or freeze these childcare funds—the Court does not need additional factual developments about these enhanced data requests or further administrative review "before it reads the statute and decides whether the Secretary's reading is correct or not."  *Id.*; *see also Am. Fed'n of State Cnty. & Mun. Emps. v. United States Off. of Mgmt. & Budget*, 807 F. Supp. 3d 1004, 1042–43 (N.D. Cal. 2025) ("The Court is not persuaded by defendants' argument that the claims against the federal defendant agencies that have not yet issued [reduction in force ("RIF")] notices [pursuant to the Office of Management and Budget's directive to agencies] are unripe. . . . OMB's and OPM's underlying directives for agencies to consider RIFs during the shutdown are likely unlawful. . . . It therefore follows that the agencies' actions in carrying out those directives should be enjoined under the APA, regardless of whether the agency is still in the RIF planning process, whether they have paused RIF notices that otherwise would have issued absent a TRO, or whether their RIF notices have already gone out.").  At issue is whether the agency could restrict CCDF, TANF, and SSBG funding in the manner which it did—and I can fully evaluate this issue based on the existing briefings.  Moreover, for the same reasons Plaintiffs have established irreparable harm, *see infra*, they have also shown that they will face a direct and immediate dilemma without a decision.  "A rule that requires an immediate and significant change in a party's conduct of its affairs with serious penalties attached to noncompliance presents a prototypical instance of hardship."  *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 565 (S.D.N.Y. 2019) (internal quotation marks omitted and alterations included).  Plaintiffs' harm is not speculative but imminent and concrete.  They point to several funding sources that were essentially frozen because of these ACF funding changes, (Reply 2–3), and continued data requirements and funding restrictions could cause huge funding delays and administrative chaos.  (PI Mot. 8.)

any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *New York v. U. S. Dep't of Homeland Sec.*, 969 F.3d 42, 63 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). "An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alzokari v. Pompeo*, 973 F.3d 65, 70 (2d Cir. 2020) (internal quotation marks omitted).

In other words, a court may hold unlawful and set aside agency action that is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Under this standard, "[t]he Court's scope of review is narrow: it determines only whether the Secretary [of an agency] examined the relevant data and articulated a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made." *New York v. Noem*, No. 25-CV-8106, 2025 WL 2939119, at *8 (S.D.N.Y. Oct. 16, 2025) (internal quotation marks omitted and cleaned up). "A court can thus uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Kakar v. U. S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (internal quotation marks omitted). To change its "existing policies," an agency need only "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). That obligation "ordinarily demand[s] that [the agency] display awareness that it is changing position" but does not justify the application of a "heightened standard" of review. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one;

it suffices that the new policy is permissible, . . . that there are good reasons for it, and that the agency believes it to be better." *Id.* at 515.  However, when changing positions, an agency must consider any "serious reliance interests" engendered by the status quo.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC*, 579 U.S. at 222).

Plaintiffs advance several reasons for why Defendants' "funding freeze," (*see* HHS Press Release), is arbitrary and capricious.  First, Plaintiff States argue that Defendants did not cite any evidence or data, except a vague reference to potential fraud, before restricting drawdown funds. (PI Mot. 22.)  Second, Plaintiffs argue that the remedy—an indefinite restriction and freeze of funding—lacks any rational connection to the purported problem.  (*Id.* at 23.)  Third, they contend that Defendants relied on partisan animosity when making this funding decision, an extra-statutory and arbitrary factor.  (*Id.* at 23–24.)  Fourth, Plaintiffs argue that Defendants disregarded the states' legitimate reliance on the existing funding landscape.  (*Id.* at 24–25.)  In response, Defendants counter that my review of the agency action as a district court judge is "narrow and deferential," and the agency took action based on legitimate programmatic fraud concerns, fashioning the remedy as a temporary drawdown restriction, not a broad categorical freeze on funds.  (Opp'n 12–13.)

Defendants' arguments are unpersuasive, and I find that Plaintiffs have adequately demonstrated that the agency's decision was arbitrary and capricious on multiple independent grounds.  The agency's attempts to recharacterize their decision as a narrowly fashioned temporary remedy to address their concerns about programmatic fraud are explicitly belied by the record and merely a post hoc litigation argument.

1.  <u>Defendants provide no reasoned explanation for their<br>funding decision.</u>

Plaintiffs "are likely to succeed on their claim" that ACF's funding freeze is "arbitrary and capricious" because, as an initial matter, Defendants proffer no "reasoned explanation or factual findings to support the decision to freeze [CCDF, TANF, and SSBG] funding" beyond their vague concern that the "funding [is] going to entities engaged in or facilitating illegal [or fraudulent] activities." *City of Chicago*, 2025 WL 3043528, at *23–24. Defendants claim that the Government is not required to provide "written findings about every piece of evidence that it consider[s]," *Kakar*, 29 F.4th at 132 (internal quotation marks omitted). (Opp'n 13.)

However, their argument fails for two reasons. First, in cases like this action, where a prior policy "has engendered serious reliance interests that must be taken into account," an agency may be required to provide a "more detailed justification." *Fox Television Stations, Inc.*, 556 U.S. at 515 (citing *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 742 (1996)). "[A]n about-face . . . owing to facts changed from those underlying the prior view requires that the new facts be addressed explicitly by reasoned explanation for the change of direction." *NLRB v. Lily Transp. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017) (citing *Fox Television Stations, Inc.*, 556 U.S at 515–16). "[W]hen an agency rescinds a prior position, its reasoned analysis must consider the 'alternatives' that are 'within the ambit of the existing position.'" *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 140 (D. Mass. 2025) (quoting *Regents of the Univ. of Cal.*, 591 U.S. at 5) (cleaned up). Plaintiff States have relied on the process of accessing these funding sources for years, if not decades. To impose a sudden restriction on funding without any explanation fails at all to consider these serious reliance interests.

Second, this is not a circumstance in which the agency's explanations, while less than clear, can still be reasonably discerned. *Id.* Defendants do not provide even one concrete detail

about the fraud investigations or an example of misused funds in their letters to Plaintiffs. The letters only include a conclusory statement that ACF "has reason to believe" that the state is "illicitly providing illegal aliens with [] benefits intended for American citizens and lawful permanent residents." (*See, e.g.*, TANF Letters.)

Indeed, in almost every one of the funding restriction letters, Defendants only point to their concern about the "potential" for fraud in ACF programs based on "federal prosecutions and additional allegations," not that they have already uncovered any evidence of this fraud. (*See, e.g.*, CCDF Letters.) "Statements of aspirational goals, however, are not the same as reasoned explanations for why an action is chosen or how the chosen action will effectuate the stated goals." *Ass'n of Am. Univs.*, 789 F. Supp. 3d at 140. Plaintiffs are correct that Defendants do not identify even a "*single dollar* that has gone to any Plaintiff State that has been used fraudulently." (PI Mot. 22 (emphasis in original).) Moreover, during oral argument, even after Defendants claimed that these fraud concerns came from "various media reports," they could not point to even one specific media report, let alone media reports from each Plaintiff State. (Tr. 11:20-12:24.) Furthermore, all of the letters contain virtually identical reasoning without any state-specific information about the funding freeze—even the letters to Minnesota, which are simply fashioned as a follow-up to a previous data request. "Defendants have offered no rational explanation for why they needed to freeze *all* federal financial assistance—with less than twenty-four-hours' notice—to" prevent fraudulent use of these childcare funds. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) (emphasis in original).

During the course of this litigation, Defendants include only one additional point about their potential concerns of fraud in an accompanying declaration: "[T]he HHS Office of

42

Inspector General finalized a report that concluded that Minnesota was not complying with federal and state child care attendance documentation requirements used to drawdown childcare funds." (Am. Inman Decl. ¶ 25.)  However, I must only "assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021).  I cannot "supply[] an [agency] explanation or accept[] one that the agency formulated while litigating this lawsuit." *Kakar*, 29 F.4th at 133.  Defendants were "required to articulate a contemporaneous explanation for its decision—in other words, an explanation at the time it issued its decision." *Id.* (internal quotation marks omitted).  None of the letters to any states includes even a reference to this report.  Even with the additional details Defendants have proffered during litigation, they are still not able to offer any concrete evidence of fraud in Plaintiff States or an underlying rationale for these funding restrictions beyond the fact that in "early January 2026, ACF became concerned about potential fraud." (Am. Inman Decl. ¶ 32.)  There is no evidence that Defendants examined any relevant data or came to any individualized assessment for each of the states.  In fact, ACF's sudden and voluminous information requests suggest that Defendants are using this funding restriction to collect the very information that their final agency decision should have been based on.

Indeed, Defendants' public statement provides an alternative, potentially arbitrary reason for the termination of these grants: partisan targeting.  An HHS spokesperson confirmed that the funding cuts were intended to target "Democrat-led states and Governors," and on X.com, both former HHS Deputy Secretary James O'Neill and HHS General Counsel Mike Stuart emphasized that Plaintiff States' elected leaders were members of the Democratic Party.  (Docs. 40-8-C at 1, 40-7-F, 40-7-D.)  Although I cannot "set aside an agency action solely because it

might have been influenced by political considerations or prompted by the priorities of a new

Presidential administration," *New York v. Trump*, 767 F. Supp. 3d 44, 79 (S.D.N.Y.), *opinion*

*modified on denial of reconsideration*, 778 F. Supp. 3d 578 (S.D.N.Y. 2025), *and modified*, 784

F. Supp. 3d 619 (S.D.N.Y. 2025), a plaintiff can demonstrate "a claim of improper political

influence on a federal administrative agency" if she can show that "the political pressure was

intended to and did cause the agency's action to be influenced by factors not relevant under the

controlling statute," *Town of Orangetown v. Ruckelshaus*, 740 F.2d 185, 188 (2d Cir. 1984).

Because the letters and press releases associated with the childcare funding decision do

not offer more than potential concerns and conclusory policy aspirations, I need not go any

further, and I find that Plaintiffs have demonstrated a likelihood of success in demonstrating that

the funding decision is arbitrary and capricious and therefore runs afoul of the APA.  Although I

find the funding decision to likely be arbitrary and capricious, I will still evaluate other

individual bases of Plaintiffs' arbitrary and capricious claim, because I note that this policy

change is "particularly troubling in light of decades of [state] reliance on [ACF's] prior [funding]

policy."  *Ass'n of Am. Univs.*, 789 F. Supp. 3d at 141 (internal quotation marks omitted).

2. <u>Defendants' policy remedy is not at all tailored or
justified in combatting the problem of potential funding
fraud.</u>

Next, Defendants "have not provided a rational reason that the need to safeguard valuable

taxpayer resources is justified by such a sweeping pause of nearly all federal financial assistance

with such short notice."  *New York v. Trump*, 769 F. Supp. 3d 119, 141 (D.R.I 2025.) (internal

quotation marks omitted) (subsequent history omitted); *see also Woonasquatucket River*

*Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 469–70 (D.R.I. 2025).  "Rather

than taking a deliberate, thoughtful approach to finding these alleged unsubstantiated wasteful or

fraudulent expenditures, the Defendants abruptly froze billions of dollars of federal funding for an indefinite period." *Id.* (internal quotation marks omitted).

In response, Defendants allege that the remedy here was appropriate because the January 5 and 6 agency letters did not signal a broad, categorical funding freeze, but rather "a temporary restricted drawdown status, which simply requires Plaintiffs to submit some additional corroborating documentation before drawing down funds and requested data to aid in reviewing each states' compliance with applicable laws." (Opp'n 13.)  However, Defendants' public statements and Plaintiffs' difficulties in getting funds reimbursed contradict this characterization. As previously discussed, HHS's own press release explains that the agency "froze access" to certain ACF programs following concerns about fraud.  (HHS Press Release; Doc. 40-7-E.)  At base, these sweeping funding restrictions change the status quo, which Defendants refuse to acknowledge.  Defendants mandate additional documentation for access to $10 billion worth of funds and request the "complete universe" of states' data "for all available years," an "impossible data demand."  (PI Mot. 18–19 (citing TANF Letters; SSBG Letters).)  If Plaintiffs want to keep their funding, they must comply with these additional document requests and funding conditions, which "require significant personnel and resources," coordination with organizations, agencies, and entities, and investment into "development resources to send a universal data set spanning multiple years."  (McMahon Decl. ¶ 19; Weeks Decl. ¶¶ 41–42; Khatkhate Decl. ¶ 51.)

Ultimately, Defendants have essentially imposed conditions that amount to a full funding freeze by including such onerous and unrealistic data requests for program compliance.  They cannot neatly plead around these new funding conditions and call it a temporary restriction that still allows for the flow of funds.  "Evaluating funding priorities can be done without needing to

starve citizens or deny critical [social] services." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 124 (D.D.C. 2025) (subsequent history omitted). "Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision." *Id.* (internal quotation marks omitted). In doing so, they legitimize the overnight restriction of over $10 billion worth of funds—a "breathtakingly large sum"—simply to investigate a specter of potential wrongdoing, taking a "freeze first, ask questions later" approach. *Id.* at 124–25 (internal quotation marks omitted). Plaintiff States allege that some drawdown requests have still not been fulfilled; as of January 15, 2025, six days after the temporary restraining order was issued, SSBG funding continued to be withheld from Colorado and drawdowns remained pending. (Homlar Decl. ¶ 10.) Moreover, even if I were to take Defendants' claim at face value—that this policy is merely a temporary funding restriction requiring additional documentation, not a freeze— "[t]he indiscriminate application of these [funding] conditions across the entire spectrum of [these childcare] grants demonstrates the absence of tailoring and the failure to consider whether such conditions [and data requests] are appropriate for particular programs." *Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d at 93–94. Defendants could have requested documents from states and monitored their programs without tying these conditions to the flow of funds. In doing otherwise, they have used an axe when, at maximum, only a scalpel was necessary to monitor states.

Finally, in abruptly imposing these funding freezes and restrictions, Defendants ignored Plaintiffs' "serious reliance interests" engendered by ACF's funding policy. *Regents of the Univ. of Cal.*, 591 U.S. at 30. "It would be arbitrary or capricious to ignore such matters." *Fox Television Stations, Inc.*, 556 U.S. at 515. In weighing whether there were reliance interests, the

agency must "determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33.

Plaintiffs have marshalled considerable evidence to demonstrate that their states actively rely on this funding and these timely reimbursements to operate their family assistance and childcare programs. As described by one state employee, "community partners rely on this funding to be reimbursed to provide services to their community." (McMahon Decl. ¶ 25.) Even if Defendants' policy is a funding restriction, rather than a full funding freeze, with only some associated document requests, states have relied on the Government's payments to support low-income families for over 20 years and "have structured their budgets . . . for decades around consistent federal support." *Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d at 94. These funding programs primarily function on a reimbursement basis, and additional restrictions and data requests impede the timely reimbursement of Plaintiffs' drawdown requests. (*See* PI Mot. 26.) Moreover, Plaintiff States' reliance on these funding sources was reasonable and foreseeable—many parts of this funding scheme, like CCES, are mandatory statutory entitlements that are fixed funding amounts separate from the appropriations process. (Compl. ¶¶ 24–26.) Even the other parts of the funding scheme that are subject to congressional appropriations are still mandatory programs, as Defendants themselves acknowledge. (*See* Opp'n 6; Am. Inman Decl. ¶ 5.)

In light of these facts, it is difficult for me to perceive any rationality in the decision to abruptly restrict drawdown funds and announce this conditional funding freeze to Plaintiff States, endangering the states' abilities to provide vital family and childcare assistance. I find that Plaintiffs have demonstrated a likelihood of success that this agency decision is arbitrary and capricious under the APA.

c.  <u>Contrary to Law Claim</u>[9]

The APA requires a court to "hold unlawful and set aside agency action . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §§ 706(2)(A), (C).  For "agencies charged with administering statutes[,] [b]oth their power to act and how they are to act is authoritatively prescribed by Congress."  *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).  Therefore, "[i]t is well settled that an agency may only act within the authority granted to it by statute."  *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018).  Thus "[a]n agency action [] must be set aside as contrary to law when it is inconsistent with regulations."  *New York v. Trump*, No. 25-CV-11221, 2025 WL 3514301, at *14 (D. Mass. Dec. 8, 2025).  I "must reject administrative constructions" that are "contrary to the unambiguously expressed intent of Congress."  *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 55 (2d Cir. 2003) (internal quotation marks omitted).

The statutory scheme governing the CCDF, TANF, and SSBG programs are at the forefront of the Plaintiff States' claims against Defendants.  Plaintiffs lay out five reasons for their argument that the ACF funding decision is contrary to law:  (1) each of these programs have statutes and regulations that require ACF to follow specific procedures before imposing penalties on states for noncompliance—but ACF took none of these steps; (2) the statutes and

---

[9] Although I only address Plaintiffs' claims that the agency actions are contrary to law, Plaintiffs alternatively make an *ultra vires* claim, arguing that the agency is acting in excess of its statutory authority.  I do not directly address this claim because Plaintiffs have already established that they have a likelihood of success on their other APA claims, including their contrary to law claim.  An *ultra vires* claim is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (internal quotation marks omitted).  "[A]n agency action allegedly 'in excess of authority' must not simply involve a dispute over statutory interpretation or challenged findings of fact."  *Dart v. United States*, 848 F.2d 217, 231 (D.C. Cir. 1988).  The agency must "plainly act[ ] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."  *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 26–27 (2d Cir. 2022) (internal quotation marks omitted).  Because Plaintiffs have already established a likelihood of success on their other APA claims, I do not assess the strength of their *ultra vires* clam in this Opinion & Order.

regulations do not permit Defendants to penalize states for unsubstantiated fraud; (3) ACF does not have the authority to cut off entire streams of funding for these programs, even if it did make a fraud finding; (4) Congress has appropriated specific funds for these programs, and an agency is not free to disregard these responsibilities; and (5) Defendants have failed to set forth any legal basis to justify their voluminous data demands for states' "complete universe" of data.  (PI Mot. 15–21.)  In response, Defendants argue that these arguments fail because they have not violated a "clear and mandatory" statutory requirement, since ACF only implemented a restricted drawdown that requires Plaintiffs to submit additional documents, not a funding freeze.  (Opp'n 9–11.)  Therefore, because Defendants claim they have not actually issued noncompliance penalties or made a final decision on Plaintiff States' programs, they maintain that the statutory and regulatory scheme governing noncompliance for these three funding programs are not even at issue in this case.  (*Id.* at 10.)  Instead, in issuing the restrictions on drawdown requests pending additional documentation, Defendants claim that the HHS Secretary acted in accordance with his monitoring authority, pursuant to "§ 658I(b)(1) of the CCDBG Act, 45 C.F.R. § 98.90(c), 45 C.F.R. § 96.30 and 2 C.F.R. § 200.300."  (*Id.* at 11.)

I begin, as I must, with the text of the statute.  *See, e.g.*, *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985) ("[T]he starting point in every case involving construction of a statute is the language itself." (internal quotation marks omitted)).  This involves a "careful examination of the ordinary meaning and structure of the law itself."  *New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 95 (2d Cir. 2020) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019)).  As discussed, *supra*, each of these three funding programs—CCDF, TANG, and SSBG—have a statutory and regulatory scheme that provides mechanisms to monitor states, procedures for the disallowance of funds, and steps to be taken before the

Government can issue sanctions or penalties for a grantee's noncompliance of their program obligations or the law.

Defendants' argument that this action is not governed by the "litany of statutory and regulatory [noncompliance] provisions" is puzzling given that they reference at least two of the noncompliance and penalty funding regulations in their letters to Minnesota.  (Opp'n 10.)  For example, in ACF's January 5 letter to Minnesota explaining the restriction of drawdown funds, the agency cites 45 C.F.R. § 98.92, the very CCDF regulation that details the penalties and sanctions issued against states "[u]pon a final determination that the [state] has failed to substantially comply" after notice and a hearing.  (*See* Jan. 5 MN CCDF Letter at 3.)  This regulation also immediately follows 45 C.F.R. § 98.91, a CCDF regulation titled "Non-compliance."  In an earlier December 30, 2025 letter to Minnesota, Defendants also state that if the state "fail[s] to provide satisfactory responses to the above questions, we may withhold CCDF funds to the state of Minnesota and impose the penalties specified in 45 C.F.R. § 98.92 and 45 C.F.R § 262.1."  (Dec. 30 MN CCDF Letter at 3.)  45 C.F.R § 262, which governs the TANF accountability provisions and penalties—not the CCDF program—makes clear that if a state is subject to a penalty, ACF will "notify the State agency in writing" and "[i]nvite the State to present its arguments" before finalizing its decision and imposing a penalty.  45 C.F.R § 262.4(a)(3).  Defendants essentially cite multiple penalty and noncompliance regulations in their initial funding letters and now seek to downplay these references in this litigation.

To justify the drawdown restriction policy, Defendants cite four specific statutes and regulations governing their ability to monitor states' funding programs in their opposition brief: § 658I(b)(1) of the CCDBG Act (CCDF funds), 45 C.F.R. § 98.90(c) (CCDF funds), 45 C.F.R. § 96.30 (SSBG funds), and 2 C.F.R. § 200.300 (OMB regulation).  (Opp'n 11.)  Under 42 U.S.C. §

9858g(b)(1), the HHS Secretary has the ability to "review and monitor State compliance" with the CCDBG Act and states' approved CCDF plans. 42 U.S.C. § 9858g(b)(1). 45 C.F.R. § 98.90(c), a CCDF regulation, requires grantees to "make appropriate books, documents, papers, manuals, instructions, and records" available to ACF during their monitoring and investigation of states "upon reasonable request." 45 C.F.R. § 98.90(c). The SSBG regulation requires states to have "[f]iscal control and accounting procedures." 45 C.F.R. § 96.30(a). Finally, Defendants cite an OMB regulation to argue that ACF has an obligation to "manage and administer [each] Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations . . . and the requirements of this part." 2 C.F.R. § 200.300(a).

However, none of these authorities include anything beyond a cursory nod to the Government's ability to monitor states' compliance with their approved programs and the law. For Defendants to read these statutes and regulations as endorsing the restricting, freezing, or conditioning of CCDF, TANF, and SSBG funds without process—when other penalty regulations lay out notice and hearing requirements—is inapposite to the law and explicitly contrary to the principles of statutory interpretation. The "text is general and nothing within the regulation authorizes [ACF's] imposition of the [] review process [conditioning funds on data submissions]—which essentially imposes an indefinite categorical pause on payments." *New York v. Trump*, 777 F. Supp. 3d at 117. Additionally, the term "monitor," without more, does not indicate the authority and power to condition or freeze funds. *See* Monitor, *Oxford English Dictionary*, https://www.oed.com/dictionary/monitor_v?tab=meaning_and_use#36265198 (last visited Mar. 5, 2026) (defining "monitor" as "[t]o observe, supervise, or keep under review"); *see also Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 473 (finding that the

OMB's power to "monitor the financial execution of the budget" falls short of the power to "temporarily pause" federal financial assistance).  If I was to read these general monitoring statutes to confer a broad power to restrict and condition billions of dollars without any process, the scope of Defendants' power would be breathtaking.  Any concern of wrongdoing or fraud, even if such concerns were documented and substantiated, could cause a restriction or freeze of billions of dollars' worth of childcare assistance without providing Plaintiffs any opportunity to contest this point.[10]

Furthermore, even the "monitoring" statutes cited in Defendants' opposition brief also include references to noncompliance procedures.  The meaning of "certain words or phrases [in statutes] may only become evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).  It is therefore a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).  The subsection of the CCDBG Act that Defendants cite is explicitly titled "Review of Compliance with State Plan."  42 U.S.C. § 9858g(b)(1).  The next subsection, titled "Noncompliance," explicitly states that if there has been a finding of state noncompliance only after "reasonable notice" and an "opportunity for a hearing," then the state shall "reimburse the

_____

[10] Defendants also ignore that these the agency regulations already provide a robust framework for monitoring states. For example, the CCDF regulations make clear that, among other requirements:  (1) state agencies administering these funds "shall have an audit conducted after the close of each program period," 45 C.F.R. § 98.65(a), *see also* 42 U.S.C. § 9858i; (2) states must "submit financial reports" quarterly for every physical year, 45 C.F.R. § 98.65(g); (3) states that receive assistance must submit a "quarterly case-level report of monthly family case-level data," 45 C.F.R. § 98.70(a)(1); (4) the plan that states submit to the HHS Secretary must include processes to identify program fraud, 45 C.F.R. § 98.68(b)(1); and (5) states must undergo a quality control process through which ACF calculates the rate of improper payments, 45 C.F.R. § 98.100.  As Plaintiffs note, each of these states already have measures in place to detect and prevent fraud.  (*See, e.g.*, Doc. 40-10 ("Cohen Decl.") ¶ 22 (Colorado "currently exceeds federal regulation requirements for fraud prevention for child care assistance payments."); Darman Decl. ¶¶ 50–62 (describing New York's "robust series of measures in place to address program integrity")).

Secretary for any funds that were improperly expended," 42 U.S.C. § 9858g(b)(2)(A)(ii), or

"impose other appropriate sanctions, including . . . disqualification from the receipt of financial

assistance," 42 U.S.C. § 9858g(b)(2)(B).  As discussed above, the same CCDF monitoring

regulations that Defendants cite also includes a subsection requiring notice to the states before

imposing any sanctions:  "If a review or investigation reveals evidence that the [state], or an

entity providing services under contract or agreement with the [state], has failed to substantially

comply with the Plan or with one or more provisions of the Act or implementing regulations, the

Secretary will issue a preliminary notice to the [state] of possible non-compliance."  45 C.F.R. §

98.90(b).  Therefore, Congress has made clear that even if an investigation reveals evidence of a

states' wrongdoing, ACF cannot restrict or condition funding until after a notice and hearing

period.  So, for Defendants to restrict funding only based on "concerns about misuse of funds,"

(Opp'n 10), before any official finding of wrongdoing and notice contravenes these statutes and

regulations.[11]

---

[11] In the ACF letters regarding the restriction of TANF funds, Defendants cite 2 C.F.R. § 200.339, an OMB regulation adopted by HHS that governs federal grant awards.  (TANF Letters.)  This regulation states that if the federal government determines that noncompliance cannot be remedied by imposing specific conditions, the federal agency may "temporarily withhold payments until the recipient or subrecipient takes corrective action."  2 C.F.R. § 200.339.  Moreover, the statute cites to § 200.208, which states that a federal agency may "implement specific conditions if the recipient or subrecipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award."  Id.  Under 2 C.F.R. § 200.208, a federal agency may adjust specific conditions to the federal award based on, among other factors, an analysis of the recipient's "history of compliance," a review of "government-wide data," the state's "ability to meet expected performance goals."  2 C.F.R. § 200.208(b).  Specific conditions to the federal award can include "establishing additional prior approval," "requiring additional or more detailed financial reports," or "requiring additional project monitoring."  Id. § 200.208(c).  In addition, an agency must notify the states "[p]rior to imposing specific conditions" as to:  (1) "[t]he nature of the specific condition(s)"; (2) "[t]he reason why the specific condition(s) is being imposed"; (3) "[t]he nature of action needed to remove the specific condition(s)"; (4) "[t]he time allowed for completing the actions"; and (5) "[t]he method for requesting the Federal agency . . . to reconsider imposing a specific condition."  2 C.F.R. § 200.208(d).  These OMB regulations apply "unless a . . . Federal statute provides otherwise."  2 C.F.R. § 200.101(a).  In other words, "[f]ederal statutes or regulations govern in any circumstances where they conflict with" 2 C.F.R. § 200.339.  See id. § 200.101(d).  Here, by the OMB's own terms, the CCDF, TANF, and SSBG statutes and regulations clearly supersede the OMB regulations.  Congress also expressly indicated that ACF could only regulate to the TANF program "to the extent . . . provided in this part."  42 U.S.C. § 617.  These OMB regulations "do not give Defendants a blank check to ignore" the CCDF, TANF, SSBG processes and "[s]uch an interpretation would nullify the safeguards imposed" by Congress.  Am. Ass'n of Univ. Professors v. Trump, No. 25-CV-07864, 2025 WL 3187762, at *28 (N.D. Cal. Nov. 14, 2025).  "Agencies would never need to go through the onerous process of

In imposing what was essentially a punishment against the Plaintiff States, including a pause in funding, Defendants took none of the required steps mandated under statutes and regulations. As an initial matter, Defendants did not produce any specific findings or conclusions of fraud before initiating these funding restrictions. *See* 42 U.S.C. § 9858g(b)(2)(A)-(B) (CCDF statute requires agency to "find" noncompliance); 42 U.S.C. § 609(a)(1)(A) (same for TANF); 42 U.S.C. § 1397e(b) (SSBG statute requires agency to have "ultimately found" noncompliance). Defendants only highlight their concern for "potential" fraud. (*See, e.g.*, CCDF Letters.) They also fail to provide the requisite written notice in advance of cutting off funds. 42 U.S.C. § 9858g(b)(2)(A)–(C) (CCDF); 42 U.S.C. §§ 609(c)(1)(A), 610(a); 45 C.F.R. §§ 262.4(a), 262.7(a) (TANF); 45 C.F.R. § 96.51(a) (SSBG). ACF did not provide opportunity for the states to submit comments in response to this notice of noncompliance, *see* 45 C.F.R. §§ 98.90(b); 98.93(c) (CCDF); 45 C.F.R. § 96.50(c) (SSBG), nor did it allow states to submit any corrective action plans, *see* 42 U.S.C. § 609(c)(1)(A)-(B) (TANF). It did not provide the opportunity for states to request reconsideration, appear at a hearing, or make an administrative appeal. 42 U.S.C. § 9858g(b)(2) (CCDF); 42 U.S.C. § 610(b)(1) (TANF); 45 C.F.R. §§ 96.51(a), 96.52 (SSBG). These statutes and regulations are promulgated "for good reason: providing timely and adequate advance notice to [state] recipients is critical to ensuring that recipients are aware of an impending termination of critical benefits if they do not act." *Minnesota v. U. S. Dep't of Agric.*, No. 25-CV-4767, 2026 WL 125180, at *11 (D. Minn. Jan. 16, 2026). The agency's failure to follow these procedures is clearly contrary to the law under the APA.

---

terminating funds under [the ACF funding statutes and regulations] if they could take the very same actions simply by citing 2 C.F.R. §§ 200.339–40." *Id.* "Nothing permits an agency to 'regulate away' the statutory commands imposed by Congress in Title VI and IX in that manner." *Id.* (internal quotation marks omitted).

Finally, Congress has independently placed restrictions on the Government's ability to disallow or freeze some funding, even if ACF had properly gone through the noncompliance procedures and found specific evidence of fraud. These are mandatory funding programs for which Congress has set forth statutes governing how to calculate appropriations for these programs. *See, e.g.,* 42 U.S.C. §§ 618, 9858h, and 9858m (TANF and CCDF). In doing so, Congress also imposed restrictions on the sort of penalties the Government can impose for some of these funding programs. For example, the TANF statute governing penalties explains that the Government "shall not reduce any quarterly payment to a State by more than 25 percent." 42 U.S.C. §§ 609(d)(1). While Defendants insist that this is only a temporary restriction and not a freeze of funds, Plaintiff have identified several examples where these states did not receive funds for more than 1 week, *see supra*, suggesting that this "restriction" operated like a freeze. Thus, I find that Plaintiffs have established a likelihood of success with regard to their argument that ACF's funding restrictions were contrary to law.[12]

### B.    *Irreparable Harm*

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Sterling v. Deutsche Bank Nat' l Tr. Co. as Trs. for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723, 727 (S.D.N.Y. 2019) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citation omitted)). To establish irreparable harm, movants must demonstrate "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting

---

[12] I do not evaluate Plaintiffs' likelihood of success with regard to their constitutional claims, because they have already independently demonstrated a likelihood of success on their APA claims.

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).  Irreparable harm

is one for which "money damages cannot provide adequate compensation." *Kamerling v.*

*Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X– Ray Lab'ys., Inc.*

*v. Immigr. & Naturalization Serv.*, 523 F.2d 79, 81 (2d Cir. 1975)).  Accordingly, "Plaintiffs are

entitled to an injunction only if they can demonstrate that, in the interval between this date and

the date in the near future upon which the Court is expected to render a final decision, they will

suffer an injury that cannot be repaired." *Metro. Transp. Auth.*, 784 F. Supp. 3d at 690.

      Plaintiffs argue that Defendants' funding restrictions will cause irreparable harm because

even a "temporary disruption will constrain Plaintiffs' ability to administer life-saving benefits

programs and deliver crucial social services to their most vulnerable families." (PI Mot. 31.)

Moreover, if funds are cut, "programs will cease operation" and even a temporary pause in

funding will make it nearly impossible for agencies to plan and manage their budgets. (*Id.*)  In

response, Defendants reiterate their claim that this is not a wholesale funding freeze and HHS

will continue to process payments "as long as the new procedures are followed." (Opp'n 17.)

They argue that if there are delays as a result of the new policies, "that does not suffice for

irreparable injury," because economic loss itself does not constitute irreparable harm. (*Id.* at 17–

18.)

      Even if I were to accept Defendants' claim that their policy is only a funding condition,

not a funding freeze, the "dilemma confronting the [Plaintiffs]" irreparably harms these states.

*See R. I. Coal. Against Domestic Violence*, 794 F. Supp. 3d at 72.  Plaintiff States choice to

"either to decline the [] funds based on what it believes to be [unlawful] conditions or accept

them [with conditions that could cause irreparable harm] . . . is the type of 'Hobson's choice'

that supports irreparable harm." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill.

2017), *aff'd*, 888 F.3d 272 (7th Cir. 2018) (subsequent history omitted).  "Courts have repeatedly

recognized the irreparable harm inherent to a situation such as the one in which Defendants have

presently placed Plaintiffs, in which a plaintiff can either accede to the government's

presumptively unlawful threat or else disobey the government's directive and expose itself to

potentially devastating injury throughout the pendency of the proceedings."  *Metro. Transp.

Auth.*, 784 F. Supp. 3d at 693.  Here, Plaintiff States are faced with an impossible choice:  either

they must comply with the presumptively unlawful funding conditions and produce huge

volumes of data—including the "complete universe" of administrative data for these funding

programs, including thousands of recipients' personally identifying information and hope that the

Government deems their compliance adequate, (*see* TANF Letters; SSBG Letters)—or they will

lose congressionally authorized funding with the attendant consequences to some of their most

vulnerable citizens.  *See City of Los Angeles v. Sessions*, No. CV 17-7215, 2018 WL 6071072, at

*3 (C.D. Cal. Sept. 13, 2018) ("While Los Angeles makes many arguments as to how it will

suffer irreparable injury absent an injunction, this Court finds most persuasive its argument that

it is faced with an impossible choice: either it must certify compliance with unconstitutional and

unlawful directives that impinge on the City's sovereignty, damage community trust, and harm

public safety, or it will lose congressionally authorized . . . funding."), *aff'd sub nom. City of Los

Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019).

      Moreover, Plaintiffs presented significant evidence that:  (1) Defendants' letters

functioned at least as a partial funding freeze; and (2) even funding delays can cause irreparable

harm, where states' budgets rely on the prompt disbursement of these funds.  As discussed,

*supra*, states could not access over $100 million of funds that they would have been able to in the

normal course of drawdowns.  (*See* McMahon Decl. ¶ 21 (Colorado TANF funds); Khatkhate

Decl. ¶ 10 (Illinois CCDF funds); Chawla Decl. ¶¶ 31–32 (New York TANF funds); Younger

Decl. ¶ 19 (California CCDF funds); Weeks Decl. ¶ 40 (Minnesota CCDF funds).)  These funds

were frozen or substantially delayed until after the issuance of the TRO, because many of these

drawdown requests had been made shortly before the January 5 and January 6 funding letters.

(*Id.*)  Where programs rely heavily on federal funding, "[a] total loss of federal funding would be

catastrophic, and the [Plaintiffs'] need for certainty renders damages inadequate." *City & Cnty.*

*of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (citation omitted).  "Even

though some funding has begun to flow again after the TRO entered, the States have presented

evidence of harm resulting from the chaos and uncertainty that the Defendants' arbitrary decision

to categorically freeze billions of dollars in federal funding." *New York v. Trump*, 769 F. Supp.

3d at 145.  Therefore, Defendants assertion that some funds were still flowing does not mitigate

the loss or delay of $100 million dollars of childcare funding.

Defendants do not deny and indeed acknowledge that there could be delays as a result of

ACF's new funding conditions.  (Opp'n 18.)  This is not just a situation where there will be

delays in money disbursements—such funding delays also implicate billions of dollars of state

budgets.  (Reply 13–14.)  "The threat to withhold funding causes [plaintiffs] irreparable injury in

the form of budgetary uncertainty." *City & Cnty. of San Francisco v. Trump*, 779 F. Supp. 3d

1077, 1082 (N.D. Cal. Apr. 24, 2025).  Absent a preliminary injunction, Plaintiff states face

significant budgetary and operational uncertainty.  Delays or the specter of a potential loss of

funding could exclude participants from services, cause layoffs of state employees, increase

administrative costs, and effectively end certain social services programs.  (Reply 13–14.)

"[W]hen money is obligated and therefore expected (particularly money that has been spent and

reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is

unpaid, essential health and safety services stop, and budgets are upended." *New York v. Trump*, 769 F. Supp. 3d at 142. "And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again." *Id.*

Finally, Defendants' claim that Plaintiffs' harm from these broad data requests is speculative is unavailing. "As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *League of Women Voters of U. S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (citing *Winter*, 555 U.S. at 22). "A preliminary injunction is intended to prohibit a defendant from undertaking actions the Court has determined is likely unlawful before those actions are taken." *Metro. Transp. Auth.*, 784 F. Supp. 3d at 692. Plaintiffs submitted multiple declarations that show that these data requests are impossible to comply with within two weeks, risking the wholesale freeze of funds, and that compliance with these funding conditions would require a diversion of resources away from other vital programs. (*See, e.g.*, McMahon Decl. ¶ 19 ("Full compliance of these broad data requests is not feasible by January 20, 2026. Attempting to comply with the onerous data and document requests will require significant personnel and resources"); Khatkhate Decl. ¶¶ 51–52 ("[A]ttempting to comply with the onerous data and documentation demands would require the re-deployment of significant personnel and resources diverted from administering Illinois' critical programs. . . . If by 'verified attendance records' ACF means it wants copies of the actual records each child care provider maintains to record attendance, it could take more than six months to gather such information given the number of providers and the limited personnel available to work on this demand.").) Courts have recognized that a states' "diver[sion of] resources from other key projects" constitutes irreparable

harm. *California v. Trump*, 786 F. Supp. 3d 359, 391 (D. Mass. 2025). These harms are hardly speculative, and Plaintiffs are not required to wait to seek preliminary injunctive relief simply to prove the harm that Defendants' policy will imminently cause. Thus, Plaintiffs have demonstrated that they would be irreparably harmed absent a preliminary injunction.

## C.    *Balance of Equities and Public Interest*

As a final assessment, courts must "'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Yang v. Kosinski*, 960 F.3d 119, 135–36 (2d Cir. 2020) (quoting Winter, 555 U.S. at 24). "When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir.) (per curiam), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021). Enjoining enforcement of ACF's funding restriction pending final decision on the merits is in the public interest.

Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest" because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12 (citation omitted). "An agency is not harmed by an order prohibiting it from violating the law." *New York v. Trump*, 769 F. Supp. 3d at 146. To the contrary, "[f]orcing federal agencies to comply with the law is undoubtedly in the public interest." *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016).

Defendants argue that the Government has a stronger interest in protecting the public and eliminating the appearance of impropriety compared to Plaintiffs' interest in accessing these funds. In support of this proposition, Defendants cite only one case, *Climate United Fund v.*

60

*Citibank, N.A.*, (Opp'n 19), which was vacated after a rehearing en banc was granted.  *See* 154 F.4th 809, 830 (D.C. Cir. 2025), *reh'g en banc granted*, *opinion vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025).  Contrary to Defendants' position, courts have repeatedly found that the public interest was supported by a preliminary injunction where a restriction or pause in funding would affect critical social services programs.  *See, e.g.*, *Nat'l Council of Nonprofits*, 775 F. Supp. 3d at 130 (public interest supported preliminary injunction where a pause in funding "placed critical programs for children, the elderly, and everyone in between in serious jeopardy"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 298 (W.D. La. 2022) (recognizing that balance of equities and public interest weighed in favor of granting preliminary injunction where "[l]ocal government funding, jobs for Plaintiff States' workers, and funds for the restoration of Louisiana's Coastline are at stake"); *Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 476 (finding that the balance of equities and the public interest weighed heavily in favor of injunctive relief where the funding pause "placed critical climate, housing, and infrastructure projects in serious jeopardy").  "The Government is not harmed where an order requires them to disburse funds that Congress has appropriated and that Agencies have already awarded." *Id.*  Denying a preliminary injunction would cause Plaintiffs hardship and harm the public by endangering the vital childcare and family assistance services that Plaintiff States provide.  The drawdown restrictions, the voluminous data requests, and potential looming wholesale freeze of $10 billion of funding interferes with Plaintiffs' abilities to administer key social services across these five states.  Thus, I find that the balance of equities and public interest lies in maintaining the status quo and enjoining Defendants' ACF funding policy.

61

### D. *Bond*

The Government asks me to require the states to provide as security a bond commensurate with the dollar value of drawdown funds that Plaintiffs have accessed since the TRO was issued: $282,349,826.17. (Doc. 67 at 1.) I decline to require a bond.

Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (internal quotation marks omitted). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). In a case where HHS is alleged to have unlawfully restrict or terminated large sums of appropriated and committed funds to numerous recipients against Congress's will, it "would defy logic—and contravene the very basis of this opinion—to hold" the states "hostage for the resulting harm." *Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 477. Any decision to require states to post an almost $300 million bond when they are purportedly entitled to these mandatory entitlements sends a chilling effect to other state and public entities that rely on federal funds for their social services programs.

V.    **<u>Conclusion</u>**

For the reasons outlined above, Plaintiffs' motion for a preliminary injunction and 5

U.S.C. § 705 stay is GRANTED.  Defendants' request for a bond is DENIED.


SO ORDERED.

Dated:        March 10, 2026
              New York, New York

                                              Vernon S. Broderick
                                              United States District Judge