

# Child Care Assistance Program: Assessment of Fraud Allegations

**SPECIAL REVIEW**
**March 13, 2019**

**OFFICE OF THE LEGISLATIVE AUDITOR**

STATE OF MINNESOTA

ACF 000145

# State of Minnesota
# Office of the Legislative Auditor

## Special Reviews

We conduct special reviews in response to requests from legislators and other public officials, or to address a government issue that has come to our attention in some other way.

While the focus of a special review is more narrow than an audit or evaluation, our objective is the same:  to find the facts and report them accurately and objectively.

For more information about the Office of the Legislative Auditor, go to our website at:

www.auditor.leg.state.mn.us

Photo provided by the Minnesota Department of Administration with recolorization done by OLA. (https://www.flickr.com/photos/139366343@N07/25811929076/in/album-72157663671520964/) Creative Commons License:  https://creativecommons.org/licenses/by/2.0/legalcode

ACF 000146



**OFFICE OF THE LEGISLATIVE AUDITOR**
STATE OF MINNESOTA  •  James Nobles, Legislative Auditor

March 13, 2019

Members of the Legislative Audit Commission:

This report resulted from OLA's review of allegations made by a former employee of the Minnesota Department of Human Services about the Minnesota Child Care Assistance Program. We repeat the allegations in the report and provide our assessment.

The department cooperated fully with our review.

Sincerely,

James Nobles
Legislative Auditor

Elizabeth Stawicki
Legal Counsel

ACF 000147



ACF 000148

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

SUMMARY .................................................................................................................5

CHAPTER 1:  $100 MILLION IN CCAP FRAUD .......................................................7

CHAPTER 2:  CCAP FRAUD PROSECUTIONS .......................................................15

CHAPTER 3:  CCAP MONEY FUNDING TERRORISTS ...........................................21

CHAPTER 4:  OTHER ISSUES...................................................................................27

RESPONSE BY DEPARTMENT OF HUMAN SERVICES ........................................31

APPENDIX A:  MINNESOTA CCAP FRAUD PROSECUTIONS ........................................ A-1

APPENDIX B:  SWANSON E-MAIL ON CCAP FRAUD .......................................................B-1

ACF 000149



ACF 000150

# INTRODUCTION

The federal government established the Child Care Assistance Program (CCAP) in 1990 to help low-income parents—particularly those receiving other public assistance—afford child care so they can work and/or participate in job training.[1]

The federal government grants money to states that participate in the program, but states must provide additional funding and comply with a complex set of federal laws and requirements.[2]  Like most human service programs in Minnesota, the Department of Human Services (DHS) and counties share administrative responsibility for CCAP.[3]

In Fiscal Year 2018, the state paid $254 million in subsidies for services provided to approximately 30,000 children from CCAP eligible families.[4]  Federal revenues contributed about $119 million, the state contributed approximately $132 million, and counties contributed about $3 million.[5]

## PREVIEW OF ALLEGATIONS

In a television interview and testimony to Minnesota Senate and House committees, Scott Stillman, a former DHS employee, made several CCAP-related allegations. We focused primarily on two of his allegations:

- State investigators at the Department of Human Services suspect CCAP fraud in Minnesota amounts to $100 million or more annually.

- Government investigations have uncovered evidence that individuals in Minnesota have sent CCAP fraud money to foreign countries where terrorist organizations have obtained and used the money to fund their operations.

We also examined several other issues that resulted from Stillman's television interview and legislative testimony.  We will discuss them later in this report.

---

[1] For more information about the history and structure of CCAP, see:  Karen E. Lynch, *The Child Care Development Block Grant:  Background and Funding*, Congressional Research Service (Washington, DC, January 2014); Minnesota House of Representatives, Research Department, *Minnesota Family Assistance:  A Guide to Public Programs Proving Assistance to Minnesota Families* (St. Paul, December 2018), 113-135; and Minnesota House of Representatives, Research Department, *Child Care Assistance* (St. Paul, June 2017).

[2] The Office of Child Care within the U.S. Department of Health and Human Services administers the CCAP grants that the federal government awards to states, and it establishes the federal regulations states must follow.  For more information about the Office of Child Care, see https://www.acf.hhs.gov/occ/about, accessed January 8, 2019.

[3] For more information about the responsibilities of the state and Minnesota counties, as well as other information related to CCAP, see Minnesota Department of Human Services, *Child Care Assistance Program (CCAP) Policy Manual* (St. Paul, October 2018).

[4] This number does not include administrative costs, which were approximately $13 million in Fiscal Year 2018.

[5] Minnesota Department of Human Services, *Family Self-Sufficiency and Health Care Program Statistics* (St. Paul, May 2018), 13.

## ORGANIZATION OF REPORT

In Chapter 1, we present our assessment of the $100 million fraud allegation and the perspective of CCAP investigators.

In Chapter 2, we discuss the challenges prosecutors have faced in prosecuting CCAP fraud cases, and we review the results of CCAP prosecutions.  Summaries of the cases are in Appendix A.

In Chapter 3, we assess the allegation that CCAP fraud money has been used to support terrorist organizations.

In Chapter 4, we assess these four issues:

- Stillman's allegation that a "well-known politician" interfered with a DHS investigation because the investigation involved an important campaign contributor

- Distrust between the DHS Inspector General and CCAP investigators

- The Inspector General's lack of independence from DHS management

- Stillman's departure from DHS

## SCOPE OF REVIEW

We emphasize that this review had a limited scope.  We did not evaluate CCAP, nor did we fully assess the state's efforts to prevent, detect, and investigate CCAP fraud.

We examined laws, reports, and other documents, particularly documents related to CCAP investigations and prosecutions.  We also interviewed DHS officials, CCAP investigators, law enforcement officials, prosecutors, and others about the amount of CCAP fraud, fraud schemes, how fraud is detected and investigated, possible links between CCAP fraud and support for terrorist organizations, and various other issues and concerns.

We made several efforts to contact Stillman to schedule an interview, but he did not respond.  Therefore, on December 17, 2018, we served Stillman with a subpoena while he was attending a legislative committee hearing to provide public testimony about his allegations.  We interviewed Stillman under oath on December 20, 2018.

To obtain some information from prosecutors, investigators, and law enforcement officials, we agreed not to disclose certain details, and we agreed to protect the identity of the individuals who provided the information to us.  To make use of the information

we obtained, we summarize the content in ways that do not disclose details or the identity of certain individuals.[6]

## SCOPE OF COMPANION REVIEW

Given the limited scope of this review, OLA is in the process of conducting a second review of CCAP.  That review is selectively examining controls that DHS had in place during Fiscal Year 2018 to prevent, detect, and recover improper payments in CCAP. Our objective in that review is to determine whether DHS's oversight of CCAP was adequate to safeguard financial resources of the program.

The findings and recommendations that resulted from that review are in a separate report, *Child Care Assistance Program:  Assessment of Internal Controls*, which will be available in early April 2019 on the Office of the Legislative Auditor's (OLA's) website (paper copies will be available on request from OLA).

---

[6] See *Minnesota Statutes* 2018, 13.05, subd. 7.



ACF 000154

# SUMMARY

## $100 MILLION IN ANNUAL FRAUD ALLEGATION

We did not find evidence to substantiate the allegation that the level of CCAP fraud in Minnesota is $100 million annually.  On the other hand, we believe the level of CCAP fraud is more than the $5 to $6 million that prosecutors have been able to prove, but we cannot offer a reliable estimate of how much fraud exists in the program.

Federal and state officials have been concerned about CCAP fraud for several years.  In 2013, for example, the Minnesota Legislature passed a law that requires the Minnesota Department of Human Services (DHS) to investigate alleged or suspected financial misconduct by child care providers.  In response, the department created a team of investigators with significant law enforcement experience to focus on detecting and investigating CCAP fraud.  They receive assistance from two agents from the Minnesota Bureau of Criminal Apprehension.

Based on state, county, and federal investigations, Minnesota prosecutors have charged several individuals in recent years with CCAP fraud.  Those cases showed that CCAP fraud schemes are relatively simple, but proving CCAP felony theft "beyond a reasonable doubt" is extremely difficult.  Both investigators and prosecutors believe this results largely from the way the state administers the program.

## FRAUD MONEY TO TERRORISTS ALLEGATION

We were unable to substantiate the allegation that individuals in Minnesota sent CCAP fraud money to a foreign country where a terrorist organization obtained and used the money.  On the other hand, we found that federal regulatory and law enforcement agencies are concerned that terrorist organizations in certain countries, including Somalia, obtain and use money sent from the United States by immigrants and refugees to family and friends in those countries.  In addition, federal prosecutions have convicted several individuals in Minnesota of providing material support to terrorist organizations in foreign counties.

## OTHER OLA FINDINGS

- Stillman's allegation that a politician interfered with a DHS investigation was misleading; the case was properly handled.

- There is a serious rift between the DHS Inspector General and CCAP investigators.

- The DHS Inspector General lacks independence from DHS management.

- DHS officials did not fire Stillman or force him to resign.



ACF 000156

# CHAPTER 1:  $100 MILLION IN CCAP FRAUD

On May 13, 2018, KMSP (Fox 9) television reported that it had uncovered "what appears to be rampant fraud in a massive state program," and later identified the program as the Minnesota Child Care Assistance Program (CCAP).

According to the Fox 9 story:

> This fraud is suspected of costing Minnesota taxpayers as much as $100 million a year.  The Fox 9…reporting is based on public records and nearly a dozen government sources who have direct knowledge of what is happening.  These sources have a deep fear, and there is evidence to support their concerns that some of that public money is ending up in the hands of terrorists.[7]

Fox 9 based its investigation in part on statements from Stillman, and in a follow-up story on May 14, 2018, featured an interview with Stillman.[8]

On May 15, 2018, Stillman spoke at a Minnesota Senate committee hearing.  He told senators:

> I've heard it said that daycare fraud is $100 million.  I've heard investigators at DHS tell me, well, I've heard the news media say it's 50 percent fraud rate.  I've had investigators tell me it's closer to 80, 70-80 percent fraud rate.[9]

## PAST CONCERNS ABOUT CCAP FRAUD

Stillman's $100 million fraud allegation brought visibility to the issue, but concerns about CCAP fraud are not new.  Government reports—including reports about Minnesota's program—have acknowledged for several years that CCAP is vulnerable to fraud.[10]  For example:

- In 2009, investigative reports by the *Milwaukee Journal Sentinel* about CCAP fraud sparked a program review by the Wisconsin Legislative Audit Bureau,

---

[7] Jeff Baillon, "Millions of dollars in suitcases fly out of MSP, but why?" KMSP Television (Fox 9), May 13, 2018, http://www.fox9.com/news/investigators/millions-of-dollars-in-suitcases-fly-out-of-msp-but-why, accessed September 8, 2018.

[8] Jeff Baillon, "Whistleblower reported daycare fraud and possible link to terrorism to DHS management," KMSP Television (Fox 9), May 14, 2018, http://www.fox9.com/news/whistleblower-reported-daycare-fraud-and-possible-link-to-terrorism-to-dhs-management, accessed September 8, 2018.

[9] Scott Stillman, testimony to the Minnesota Senate Committee on Human Services Reform Finance and Policy, May 15, 2018.

[10] In Chapter 2 (and with more details in Appendix A), we discuss the laws prosecutors have used to charge people with defrauding the Minnesota Child Care Assistance Program.

which confirmed weaknesses in the program's ability to prevent, detect, and investigate fraud.[11]

- In 2010, the U.S. Government Accountability Office issued a report expressing concern about CCAP's "vulnerability to fraud and abuse," based on an undercover investigation in five states.[12]

- In 2012, the Louisiana Legislative Auditor issued a report on CCAP that said internal controls in that state were not adequate to help ensure that "expenditures are supported by adequate documentation and eligibility criteria."[13]

- In 2014, the Minnesota Department of Human Services Office of Inspector General (OIG) issued a report that said:  "The OIG is seriously concerned about a pattern of child care fraud activities that involves deception and exploitation.  It begins with recruiting parents as child care center employees with the condition that they enroll their children in a child care assistance program (CCAP) to ensure public funds revenue for the business; the scheme ends with exploiting four sets of victims:  the children, parents, those on the Child Care Assistance Program waiting list, and taxpayers."[14]

## OLA ASSESSMENT OF $100 MILLION FRAUD ALLEGATION

We did not find evidence to substantiate Stillman's allegation that there is $100 million in CCAP fraud annually.  We did, on the other hand, find that the state's CCAP fraud investigators generally agree with Stillman's opinions about the level of CCAP fraud, as well as why it is so pervasive.

Minnesota prosecutors have proven fraud in the state's Child Care Assistance Program, and we discuss those cases in Chapter 2.  The level of fraud that prosecutors have proven is about $5 million to $6 million over several years.

Based on the challenges prosecutors face proving fraud in the Child Care Assistance Program, which we discuss in Chapter 2, we believe there is more CCAP fraud than has been proven in prosecutions.  We were not, however, able to establish a reliable estimate.

---

[11] Raquel Rutledge, "Child-care scams rake in thousands," *Milwaukee Journal Sentinel*, January 25, 2009; Raquel Rutledge, "Government blind to child-care fraud," *Milwaukee Journal Sentinel*, August 31, 2009; and Wisconsin Legislative Audit Bureau, *Wisconsin Shares Child Care Subsidy Program*, June 2009.

[12] United States Government Accountability Office, *Child Care and Development Fund:  Undercover Tests Show Five State Programs are Vulnerable to Fraud and Abuse* (September 2010, Washington, DC).

[13] Louisiana Legislative Auditor, Performance Audit, *Department of Children and Family Services:  Processes to Prevent, Identify, and Recover Improper Payment in the Child Care Assistance Program* (Baton Rouge, December 2012).

[14] Minnesota Department of Human Services, Office of Inspector General, *2014 Annual Report* (St. Paul, 2014), 3.

## CCAP INVESTIGATORS' PERSPECTIVES ON CCAP FRAUD

When we asked Stillman for evidence to substantiate his $100 million fraud allegation, he said, "The investigators know the real figures."[15]

Stillman was referring to investigators in the DHS CCAP Investigations Unit.[16]  DHS established the unit in 2014 to implement a 2013 law that requires DHS to "investigate alleged or suspected financial misconduct by providers and errors related to payments issued by the child care assistance program."[17]  The CCAP investigators are part of the department's Office of Inspector General (OIG), which DHS established in 2011.[18]

According to DHS officials, they created the CCAP Investigations Unit to strengthen the department's ability to conduct criminal investigations and obtain felony convictions.  As a result, from the beginning, the department has primarily hired people with law enforcement backgrounds, including former state troopers, county sheriff's deputies, and police detectives.  They have experience investigating homicides, predatory offenders, and property crimes.  The CCAP Investigations Unit currently has 14 investigators, plus 2 active-duty law enforcement officers from the Bureau of Criminal Apprehension (BCA) who work with the CCAP investigators under an interagency agreement.

We interviewed all of the CCAP investigators individually and under oath.  We also interviewed officials at the BCA about their perspectives on CCAP fraud.  The people we interviewed had varying levels of certainty about the amount of CCAP fraud.  Some said it could be $100 million or more, some thought it could be less, and some said they did not have enough experience to have an opinion.[19]

The manager of the CCAP Investigations Unit, Jay Swanson, was the most certain that Stillman's allegation is accurate.  In fact, Swanson amplified his position in an e-mail

---

[15] Scott Stillman, interview by James Nobles, Legislative Auditor, and Elizabeth Stawicki, Legal Counsel, in person, St. Paul, December 20, 2018.

[16] DHS refers to the unit as Recipient and Child Care Provider Investigations.

[17] *Laws of Minnesota* 2013, chapter 108, art. 5, sec. 5, codified as *Minnesota Statutes* 2018, Chapter 245E. According to department officials, they asked the Legislature to establish the mandate in response to concerns surfacing around the country about CCAP fraud, particularly the CCAP fraud scandal in Wisconsin.

[18] According to the department, it created the OIG to "increase its focus on fraud prevention and recovery, streamline its external program integrity operations, and more effectively structure staff who investigate, and evaluate…."  Minnesota Department of Human Services, Office of Inspector General, *Year-End Report Calendar Year 2012* (St. Paul, 2013), 34.

[19] These statements are based on interviews that are classified as private.  These interviews were conducted by James Nobles, Legislative Auditor, and Elizabeth Stawicki, Legal Counsel, in person, St. Paul, January 2019.

dated August 24, 2018.[20]  In the e-mail, he called CCAP fraud "pervasive" and pegged the level in the $100 million range.  A copy of Swanson's e-mail is in Appendix B.

The following is his conclusion on the amount of fraud:

> Investigators, as well as the Supervisor and Manager of this unit believe that the overall fraud rate in this program is at least 50% of the $217M paid to child care centers in CY2017.  In arriving at this opinion, members of this unit want to make clear how they would define fraud.  The fraud amount used in prosecuting criminal or administrative cases in this program involves a simple calculation of how many children arrived at a center, and how many children did the provider bill for on a given day.  If one takes a higher level view of this program and realizes that in these fraudulent centers, our investigations have shown that mothers are not receiving legitimate employment experience by having no show jobs or jobs that simply require them to spend a few hours a day at a center watching their own children, and that several internal video systems seized from these centers show day after day that children are unsupervised, running from room to room while adult "employees" spend hours in hallways chatting with other adults, or talking or texting on their phones, one could reach the conclusion that the entire amount paid to that provider in a given year is the fraud amount, since neither the children or the taxpayers received what was being paid for.[21]

As he stated, Swanson arrived at the 50 percent fraud amount by taking "a higher level view," a view that does not require the kind of proof needed in a criminal or administrative proceeding.  According to his e-mail, Swanson based the 50 percent fraud rate on "concerns" CCAP investigators have about 100 centers.  Those concerns involve not only overbilling, but also substandard child care that is so severe that Swanson calls these DHS licensed centers "fraudulent centers."  Therefore, in Swanson's opinion, all of the CCAP money paid to those centers in 2017—approximately $108 million—should be counted as fraud.[22]

---

[20] Swanson wrote the e-mail, dated August 24, 2018, in response to an OLA request for an assessment of CCAP fraud trends.  DHS Commissioner Emily Piper sent Swanson's e-mail to OLA on September 4, 2018, with this statement of concern in her cover letter:  "Some of the information contained within the document is new to me, DHS's deputy commissioner, and others on our leadership team.  Although we have not yet fully vetted the accuracy and veracity of all components of the document at this point, I did not want to delay sharing this information with you and your team."

[21] Jay Swanson, Manager, Recipient and Child Care Provider Investigations, Financial Fraud and Abuse Investigative Division, Office of Inspector General, Minnesota Department of Human Services, e-mail to Carolyn Ham, Inspector General, Minnesota Department of Human Services, August 24, 2018.  Swanson's e-mail is in Appendix B.  The quote is at B-13.

[22] For details about Swanson's fraud calculation, see his e-mail in Appendix B, at B-3.

## DHS'S PERSPECTIVE ON CCAP FRAUD

DHS officials do not dispute that CCAP fraud is a serious problem.  In fact, as Acting DHS Commissioner Chuck Johnson reminded legislators in his testimony on May 15, 2018, the department studied the fraud schemes uncovered in Wisconsin in 2009 and asked the Legislature for a mandate and staff to investigate CCAP fraud in Minnesota.[23]

DHS officials have, however, disputed the Fox 9/Stillman allegation that there is $100 million in CCAP fraud.  In response to the first Fox story, the department issued the following statement on May 14, 2018:

> $100 million is not a credible number for Child Care Assistance Program fraud.  We're concerned about fraud and are aggressively pursuing it, but it's not at that level.  Funding for the Child Care Assistance Program for 2017 was $248.2 million.  Most centers involved in the fraud cases completed to date have billed the Child Care Assistance Program for $1 million or more annually.  For convictions that have occurred since 2016, defendants have been ordered to pay $4.6 million to DHS in restitution related to six felony convictions.[24]

In response to Stillman's testimony to the Senate committee on May 15, 2018, Acting DHS Commissioner Chuck Johnson repeated that DHS officials do not think the $100 million allegation is credible.  When asked how much fraud is being perpetrated he said:

> [O]ne of the difficult things about talking about the scope of fraud is that you don't know what you don't know, and so we can't share beyond what we know.  And as I said before, we've convicted six cases, there's $4.6 million in restitution on that.  That gives you a sense of the size of those particular cases.  Often what gets actually put into restitution in the court order is less than what might have actually been paid out to that provider because, as [Solicitor General] Mr. Gilbert says, you have to go through this painstaking process of identifying all of the evidence, so I don't have an exact number, but it might be even more for those six. We're investigating ten now.  And so, I can't give you that exact number.

---

[23] We base this assessment on a review of the legislative history of *Laws of Minnesota* 2013, chapter 108, art. 5, sec. 5, as well as interviews with the former DHS Inspector General, the former DHS Deputy Inspector General, and several current DHS officials.  This history was also referenced by Chuck Johnson, Acting Commissioner, Minnesota Department of Human Services, in his testimony to the Minnesota Senate Committee on Human Services Reform Finance and Policy, May 15, 2018.

[24] Minnesota Department of Human Services, *Statement on Fraud Allegations*, May 14, 2018.  The statement was specifically requested by and sent to the *Rochester Post Bulletin* and published on the editor's blog on May 14, 2018.  Acting DHS Commissioner Chuck Johnson made a similar statement to the Minnesota Senate Committee on Human Services Reform Finance and Policy on May 15, 2018, in response to the committee watching the Fox 9 news stories and Stillman's testimony.

> Everyone wants to know what the exact number is and I'm not sure what it is either, it feels, but I can tell that $100 million doesn't seem credible because it's just too far beyond what we know from the investigations that we've done and the ones that we have ongoing and the ones that we know are coming to us and the scope of those particular providers.[25]

The department has also disputed Swanson's 50 percent fraud estimate. In her testimony to a House committee on December 17, 2018, DHS Inspector General Carolyn Ham said: "I do not trust the allegation that 50 percent of CCAP money is being paid fraudulently."[26]

Because DHS officials do not trust Swanson's fraud numbers, the department hired an outside consulting firm, Public Financial Management, Inc. (PFM) to examine his e-mail and methods of estimating CCAP fraud. Commissioner Piper explained her decision in a letter to OLA dated October 18, 2018. She said:

> After an initial look at this data [in Swanson's e-mail] we have determined that an independent review of our data, processes, and procedures is needed to make sure we can produce accurate and reliable metrics on our CCAP program. These metrics are part of the foundation that drives policy, helping us to resolve issues.[27]

We think the commissioner's letter and the department's decision to hire PFM indicated there is a serious rift between DHS officials and the department's CCAP investigators. We will discuss that rift in Chapter 4. For now, we turn back to the CCAP investigators' perspectives and, specifically, what solutions they have to the CCAP fraud problem.

## CCAP INVESTIGATORS' PERSPECTIVES ON SOLUTIONS TO CCAP FRAUD

In our interviews with CCAP investigators we asked about solutions to the CCAP fraud problem. We were somewhat surprised by the response. Rather than calling for the Legislature to provide more investigators, the investigators said the solution to CCAP fraud is tighter controls over the licensing of child care centers, as well as tighter controls over how child care centers submit bills for CCAP payments and how counties and DHS verify the integrity of bills before providers are paid.

---

[25] Chuck Johnson, Acting Commissioner, Minnesota Department of Human Services, testimony to the Minnesota Senate Committee on Human Services Reform Finance and Policy, May 15, 2018.

[26] Carolyn Ham, Inspector General, Minnesota Department of Human Services, testimony to the Minnesota House Subcommittee on Childcare Access and Affordability, December 17, 2018.

[27] Emily Piper, Commissioner, Minnesota Department of Human Services, letter to James Nobles, Legislative Auditor, October 18, 2018.

For example, the manager of the CCAP Investigations Unit wrote the following in his August 24, 2018, e-mail:

> Investigators in this unit do not believe, despite the number of cases investigated thus far, that any real progress has been made regarding CCAP fraud.  Investigators believe that current internal controls and statutes are not stringent enough to make reasonable progress in reducing the level of fraud in this program.  Investigators regularly see fraudulent child care centers open faster than they can close the existing ones down.  Investigators believe drastic actions on several fronts (legislative as well as policy) are needed to make progress in this area, not only to reduce the significant waste of taxpayer dollars involved in this program, but to also attempt to provide a reasonably effective pre-school education for this high risk group of children.[28]

The prosecutors we interviewed also expressed concern that the Minnesota Child Care Assistance Program lacks adequate financial controls, which makes fraud easier to perpetrate and more difficult to prove.  We discuss the challenges prosecutors have faced proving fraud in the next chapter.

Because this review had a limited scope, we do not make recommendations related to CCAP's internal controls.  We will make recommendations in our companion report, *Child Care Assistance Program:  Assessment of Internal Controls*, which we will release in early April 2019.

---

[28] Jay Swanson, Manager, Recipient and Child Care Provider Investigations, Financial Fraud and Abuse Investigative Division, Office of Inspector General, Minnesota Department of Human Services, e-mail to Carolyn Ham, Inspector General, Minnesota Department of Human Services, August 24, 2018.  Swanson's e-mail is in Appendix B.  This quote is at B-12.

ACF 000163



ACF 000164

**Child Care Assistance Program:  Assessment of Fraud Allegations**                    **15**

# CHAPTER 2:  CCAP FRAUD PROSECUTIONS

Prosecutors have charged at least a dozen Minnesota individuals and child care centers with defrauding CCAP in the past five years.  These cases have spanned state and federal courts; some prosecutions were successful while others were not.  The cases show that fraud exists in the program and that judges are willing to sentence convicted individuals to years in prison and to pay millions of dollars in restitution.  As noted earlier, we summarize the cases in Appendix A.

## PROSECUTION CHALLENGES

To get a sense of what it is like to prosecute CCAP fraud cases, we interviewed numerous federal and county attorneys, and their federal and county investigators.  We also reviewed court records from Minnesota's CCAP prosecutions.

### Financial Crimes in the Context of a Legitimate Business and Proving Intent to Defraud

Prosecutors in criminal CCAP fraud cases have the burden to prove that a person intended to violate the law.  In the case of an illicit drug trafficking operation—from setting up the business to obtaining the drugs to selling the drugs—everyone involved knows the business is illegal; and if they take part, it is clear they intended to break the law.

The complicating factor in prosecuting individuals for CCAP fraud is that the fraud occurs in the context of a legal business, which is providing child care.  If a center bills the state for more children than attended, prosecutors must prove a particular person intended to defraud CCAP; there must be more than sloppy bookkeeping or an error due to bad business practices.

It can be difficult to prove who is the person or persons at a child care center responsible for intending to defraud the state.  For example, it could be the person submitting the bills, but then again it may not be.  That person may just be doing the administrative work of submitting bills and depending on others for the accuracy of the number of children who attended, their ages, and when they attended.

In February 2013, Minnesota IT Services (MNIT) changed the wording on the billing forms generated by the DHS CCAP payment systems to drop the phrase, "I certify the following child care billed is correct."[29]

---

[29] We asked DHS why the language was changed and were told that DHS was unsure of what motivated the change. DHS said the intent may have been to replace "I certify the following child care billed is correct" with "I know that if I give false information on this billing form, I could be disqualified from receiving CCAP payment and could face civil penalties and/or criminal charges."  DHS said both statements address the accuracy of the bill–with the current statement also acknowledging the consequences for failure to submit accurate information.

ACF 000165

Prosecutors told us that while they have ways to prove a biller intended to defraud CCAP, a certification statement on bills might prevent individuals from cheating the program on the front end. A statement could also help prosecutors prove fraud when it does occur. One suggestion was to reinstate the "I certify" or include "I am responsible" along with a statement that submitting false information can be a felony. In addition, billers should be required to identify themselves by a signature or initials on each bill.

Prosecutors also suggested DHS provide training on how fraudulent billing can be a felony. In addition, at the end of the training, billers would be required to sign a form indicating that they understand what fraud is in the context of the program and that they will not share their unique login credentials with anyone else. If an additional person from their center conducts billing, that individual would need to undergo training and obtain separate login credentials.

## Challenges with Evidence

In prosecutions of child care centers for defrauding CCAP, video surveillance is typically a key piece of evidence. Obtaining, analyzing, and preparing the evidence for trial involves a significant amount of work and numerous challenges. After law enforcement officials complete the surveillance taping, investigators must watch the videos and count the number of children coming in and going out of the child care center. It is extremely labor intensive, particularly given that investigators must watch weeks, if not months, of video recordings.

During our review, we learned that a surveillance video was lost in a case and, as a result, the prosecutors had to drop the charges. While the mishap underscored how important surveillance videos can be in a CCAP fraud prosecution, videos alone are not sufficient to build a case.

A prosecutor needs to combine the surveillance video with other evidence such as billing records and attendance sheets to show the difference between the numbers of children the center billed for and the actual number of children who attended. This can be complicated for various reasons. For example, the law allows providers to bill for absent children. CCAP providers may bill the state for up to 25 full-day absent days per child, excluding holidays.[30] In addition, state law allows providers to submit bills up to 60 days, and in some cases up to a year, from the last date of service.[31]

At the same time, DHS does not require providers to include attendance logs with their bills to verify the days a child was present or absent. At least one prosecutor said providers should have to submit attendance records with their bills. In addition, child care centers are not required to use an electronic method to verify attendance as part of CCAP.

---

[30] *Minnesota Statutes* 2018, 119B.13, subd. 7.

[31] *Minnesota Statutes* 2018, 119B.13, subd. 6(b).

**Child Care Assistance Program:  Assessment of Fraud Allegations       17**

All of the prosecutors we interviewed agreed:  the paper sign-in/sign-out attendance sheets at child care centers present a serious prosecution challenge.  One prosecutor characterized these sheets as "almost comical" and another called them "useless" from an evidence standpoint because the sheets were often half empty and sometimes it looked like the same handwriting filled in ten rows of different names with the same pen.

The most recent publication (2011) we could find on the subject showed that 22 states required some kind of automated way of collecting time and attendance to prevent fraudulent billing; eight other states had a system under development.[32]  These states require parents to punch in codes, use key cards, or scan their fingers when dropping off or picking up a child.[33]  In fact, at least one of the major child care centers in Minnesota already uses a finger scanning system for security reasons to ensure that the designated parent or guardian is picking up the correct child.

Although there may be ways to get around electronic attendance, prosecutors told us that a digital record would still be better and easier to analyze than handwriting on paper.

## Challenges with DHS Investigators

Prosecutors can only prosecute CCAP cases based on the evidence that investigators provide them.  Various prosecutors told us that sometimes investigators wanted them to charge individuals before there was enough evidence.  A couple of prosecutors told us that investigators would come to them with only conclusory statements.  For instance, investigators would allude to a kind of CCAP fraud that perpetrators use but not have the evidence to show that it occurred in the particular case at hand.  One attorney said, "Everyone knows" is not evidence to prove beyond a reasonable doubt.  Sometimes investigators would only provide video surveillance, which was not enough to prove intent to defraud in some cases.  It was enough for probable cause but not enough for the higher level of proof of beyond a reasonable doubt to convict.

There were other problems related to the work of investigators.  Sometimes cameras were not set up at all of the doors so the child care center could argue that children also

---

[32] Walter R. McDonald & Associates for the Administration for Children and Families Office of Child Care, *Childcare Administrator's Improper Payments Information Technology Guide, Part I:  Inventory of State Childcare Information Systems* (Rockville, MD), 26-28.

[33] Louisiana had a significant CCAP fraud problem but saw improper payments decrease after it instituted an electronic attendance tracking system called TOTS in 2010.  TOTS stands for Tracking of Time Services.  A machine scans a designated parent or guardian's finger to record when a child arrives or departs.  The scan does not take a fingerprint but measures a finger's physical characteristics and converts those characteristics into an identifying numeric code. During Louisiana's Legislative Auditor's fieldwork for its 2012 audit, that state's Department of Human Services reported that thousands of "ghost children" suddenly disappeared after they implemented the TOTS system (the auditor's office did not verify that number, however).  In the latest Louisiana Legislative Auditor's report on CCAP in 2018, it identified approximately $24,000 in potentially improper CCAP payments.

ACF 000167

used another door to explain why investigators saw a lower number of children than for which the center had billed.

Some prosecutors told us that investigators could also improve their financial analyses. Not only would it be helpful to prosecutors in putting the case together, but also having a person with accounting credentials, such as a CPA or Certified Fraud Examiner, would provide more credibility to juries when testifying as witnesses in these cases.

We did hear from prosecutors that they wished investigators at DHS would involve them earlier in the investigative process. They told us that sometimes an investigation went on for years but they had no input on the kind or quality of evidence until the investigation was finished. They said there is no downside to communication particularly in CCAP cases where multiple agencies might be involved.

## OVERVIEW OF RECENT CCAP FRAUD PROSECUTIONS

Although prosecuting CCAP fraud cases are challenging, prosecutions have occurred and show fraud exists in Minnesota's CCAP. The U.S. Attorney's Office in Minnesota and county attorneys have charged individuals and centers with defrauding the program, and in some cases, obtained guilty pleas, prison time, and restitution.

### Prosecutions in State and Federal Court

In the past five years, prosecutors have charged at least a dozen Minnesota individuals and child care centers with defrauding CCAP. Prosecutions have occurred not only in Hennepin and Ramsey counties but also in Anoka, Blue Earth, and Stearns counties. We summarize these cases in Appendix A.

Prosecutors have charged individuals and child care centers with violating several laws. In federal court, prosecutors charged two individuals with theft of public money[34] and wire fraud.[35] Theft of public money is self-explanatory. Wire fraud essentially means using an electronic way to further an act of fraud. In one of the federal cases, the wire fraud occurred as a result of bank-to-bank transactions.

In state court, prosecutors have charged individuals and child care centers primarily with theft by swindle, "whether by artifice, trick, device, or any other means, obtains

---

[34] "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted shall be fined under this title or imprisoned not more than ten years, or both." 18 *U.S. Code*, sec. 641.

[35] "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." 18 *U.S. Code*, sec. 1343.

property or services from another person."[36]  They have also charged CCAP cases under wrongfully obtaining [child care] assistance.[37]  In a Ramsey County case, prosecutors also charged individuals with racketeering,[38] concealing criminal proceeds,[39] identity theft,[40] and violating tax laws.[41]

Judges have sentenced individuals who defrauded CCAP to years in prison time, restitution, and fines.  In the Ramsey County case, the judge sentenced an individual to five years in prison.  Restitution has varied from about $12,400 in one Blue Earth County case to $3.5 million in the Ramsey County case.

But not all charges result in convictions.  One case resulted in a hung jury; one prosecutor had to dismiss a case after a surveillance tape was lost (a key piece of evidence); and two individuals jumped bail before trial and are fugitives.

With one exception, most of these prosecutions focused on a simple scheme—child care centers padded their CCAP bills; they billed the state for more children than attended.  For example, as part of a multi-case prosecution in Hennepin County called, "Operation Kids Count," a center billed CCAP for 837 children during a 12-day period when surveillance video showed only 546 children attended during that time—an increase of 291 children.

Ramsey County, however, prosecuted a complex case involving a multi-layered scheme outside of the typical scam of inflating the numbers of children who attended the child care center.[42]  In that case, centers operated by Deqo Family Center LLC recruited mothers to enroll their children in exchange for working at the center.  The owners paid the mothers to essentially watch their own children.[43]  In addition, the centers falsified pay stubs and documents to make it appear to authorities that the mothers were working more hours than they actually were.  The owners then profited from the difference in what they received in CCAP payments and what they paid in wages.

---

[36] *Minnesota Statutes* 2018, 609.52, subd. 2(a) (4).

[37] "A person…is guilty of theft…[who] obtains or attempts to obtain, alone or in collusion with others, the receipt of payments to which the individual is not entitled as a provider of subsidized child care, or by furnishing or concurring in a willfully false claim for child care assistance."  *Minnesota Statutes* 2018, 256.98, subd. 1(3).

[38] *Minnesota Statutes* 2018, 609.903.

[39] *Minnesota Statutes* 2018, 609.496.

[40] *Minnesota Statutes* 2018, 609.527.

[41] *Minnesota Statutes* 2018, 289A.63, subd. 2(a) (filing a false tax return); and 289A.63, subd. 1 (failure to pay income taxes).

[42] *State of Minnesota v. Ali*, No. 62-CR-14-9521 (2nd Dist. Ramsey County filed Jan. 20, 2016).

[43] One of the owners, Yasmin Abdulle Ali, is the sister of Adarus Abdulle Ali.  Adarus Abdulle Ali pleaded guilty on November 2, 2009, to lying to a federal grand jury about his knowledge of a group of young Somali men in Minneapolis going to Somalia to fight with the U.S. designated terrorist organization, al-Shabaab, against the Transitional Federal Government of Somalia.  U.S. District Judge Michael Davis sentenced Adarus Abdulle Ali to two years in prison, three years of supervised release, and 100 hours of community service on May 16, 2013.  We explain more about this case in the next chapter.



ACF 000170

# CHAPTER 3:  CCAP MONEY FUNDING TERRORISTS

In addition to claiming that the level of fraud in CCAP may be as high as $100 million annually, the KMSP (Fox 9) television stories alleged that CCAP fraud money has been used to fund terrorist organizations.  The story that aired on May 13, 2018, showed a picture of a suitcase rolling through an airport and suggested that individuals departing from the Minneapolis-St. Paul International Airport have carried cash to foreign countries where the money has ended up in the hands of terrorists.[44]  The story said:

> The Fox 9…reporting is based on public records and nearly a dozen government sources who have direct knowledge of what is happening. These sources have a deep fear, and there is evidence to support their concerns, that some of that public money is ending up in the hands of terrorists.[45]

KMSP (Fox 9) aired another story on June 17, 2018, that quoted Stillman as saying "defrauded tax dollars are being sent overseas to countries and organizations connected to entities known to fund terrorism."[46]  The story specifically linked Minnesota money to the terrorist organization al-Shabaab based in Somalia.

At the Senate committee hearing after the May 13, 2018, Fox 9 story, Stillman said:

> I do think that there is a national security implication.  I think there are lives at stake.  And if I could just take a story, every time there was a terrorist attack, Paris, San Bernardino, France, Paris, even the Syrian war, we would, as investigators, we would get together the day after the attack and we would think, we would ponder amongst ourselves, how much Minnesota taxpayer dollars was being used to fund that, war, that attack….[47]

---

[44] According to U.S. Customs and Border Protection, there is no limit on the amount of money a person may carry onto an airplane.  If a person or persons traveling together are carrying more than $10,000 in currency or other monetary instruments, federal law and regulations require that they complete a declaration form.

[45] Jeff Baillon, "Millions of dollars in suitcases fly out of MSP, but why?" KMSP Television (Fox 9), May 13, 2018, http://www.fox9.com/news/investigators/millions-of-dollars-in-suitcases-fly-out-of-msp-but-why, accessed September 8, 2018.

[46] Jeff Baillon, "How defrauded Minnesota tax dollars can end up with terror groups," KMSP Television (Fox 9), June 17, 2018, http://www.fox9.com/news/how-defrauded-minnesota-tax-dollars-can-end-up-with-terror-groups, accessed September 9, 2018.

[47] Scott Stillman, testimony to the Minnesota Senate Committee on Human Services Reform Finance and Policy, May 15, 2018.

In his testimony to a House committee in December 2018, Stillman said:

> In my role analyzing digital evidence, I would examine the computers, cloud storage, cell phones. I found…wire transfers, money going overseas, multiple bank accounts, plans, instructions, money going to foreign countries, pictures of prominent people, things that caused me grave concern for the security of our nation and the CCAP program and the Medicaid program.[48]

## OLA ASSESSMENT

Stillman's statements and the Fox 9 stories created a strong and disturbing picture of individuals in Minnesota defrauding the state's Child Care Assistance Program and sending the money to foreign countries where terrorists have obtained the money to fund their organizations and operations. Despite the serious nature of the allegation, neither Stillman nor Fox 9 presented specific evidence to substantiate the allegation.

We asked Stillman for evidence that connected Minnesota CCAP fraud money to a terrorist organization, but he did not provide it to us. He said investigators and law enforcement agencies had the evidence. We sought the evidence from investigators, law enforcement officials, prosecutors, and court records, but did not find it there either.

Having not found evidence that clearly and directly connected CCAP fraud money to a terrorist organization in a foreign country, we examined the circumstantial evidence that Stillman has referenced in making the allegation. We think it is important to acknowledge that evidence in this report.

First, as we discussed in Chapter 2, several individuals with connections to Somalia have been convicted of defrauding the Child Care Assistance Program.

Second, individuals in Minnesota with close ties to Somalia send money—called "remittances"—to Somalia to help support family and friends. As the Minnesota journalist Ibrahim Hirsi said in a May 23, 2018, article in response to the KMSP stories:

> Like many immigrant communities, Somalis in Minnesota tend to have many family members, relatives and friends who still live in Somalia or other lesser developed nations. With the high unemployment rate and the lack of opportunities in some of those countries, Somalis in Minnesota often represent a significant source of income for their relatives. It's not

---

[48] Scott Stillman, testimony to the Minnesota House Subcommittee on Childcare Access and Affordability, December 17, 2018.

uncommon for Somalis in Minnesota to send funds on a monthly basis to sustain family members living in other places.[49]

Because the remittances are so important, when a key bank stopped processing remittances to Somalia, representatives of the Somali community asked state and federal officials to intervene so individuals could continue to transfer money from Minnesota to Somalia through other legal methods.[50]  Those methods often involve what regulators refer to as money transmitters, which can include the traditional Hawala system used in certain countries.[51]  While they are licensed and regulated businesses, money transmitters are vulnerable to being exploited by terrorist organizations, which Ibrahim Hirsi acknowledged in his May 28, 2018, article.  He said:

> The money-transfer companies aren't that different than any other financial institution.  They're international companies serving millions of clients across the world.  That means, some people can—and will—try to take advantage to commit wire fraud or provide unlawful financing.[52]

A 2015 report, *Emerging Terrorist Financing Risks*, issued by the Financial Action Task Force, highlighted the vulnerability of remittances sent through alternative money transfer methods.  The report said:

> Along with the banking sector, the remittance sector has been exploited to move illicit funds and is also vulnerable to terrorist financing.  In conflict-prone countries where access to banking services is limited and terrorist groups operate, remittance providers may be the primary financial institution through which consumers can engage in cross-border funds transfer activity.[53]

---

[49] Ibrahim Hirsi, "What you need to know about Somali money transfers and 'mysterious bags full of cash' flying out of MSP airport," *MINNPOST*, May 28, 2018.

[50] Allison Sherry, "Somalis push Minnesota officials to help after bank halts money transfers:  Merchant Bank halted money transfers to nation," *Star Tribune*, February 7, 2015.

[51] U.S. Government Accountability Office, "Remittances to Fragile Countries:  Treasury Should Assess Risks from Shifts to Non-Banking Channels" (Washington, DC, March 2018).  Hawala is the name for a traditional, often unregulated, system of transferring money used primarily in Arab and South Asia countries.  The system has various methods, but generally it works when an individual pays an agent (which U.S. law calls a money remitter) who then instructs an associate in the relevant country or area to pay the final recipient.

[52] Ibrahim Hirsi, "What you need to know about Somali money transfers and 'mysterious bags full of cash' flying out of MSP airport," *MINNPOST*, May 28, 2018.

[53] Financial Action Task Force, "Emerging Terrorist Financing Risks" (Paris, October 2015).  The Financial Action Task Force is a multinational organization created in 1989.  According to its website, the Task Force's objective is to "set standards and promote effective implementation of legal, regulatory and operational measures for combating money laundering, terrorist financing and other related threats to the integrity of the international financial system." For more information, see http://www.fatf-gafi.org/about/, accessed February 27, 2019.  The United States is a member of the organization.

Given all of the facts noted above, it is possible that money—and maybe even CCAP fraud money—has been sent by individuals in Minnesota to Somalia or other foreign countries, and terrorists have obtained and used the money.  It is possible that the individuals who sent the money sent it intending to provide support to a terrorist organization.  It is also possible that individuals in Minnesota sent money to Somalia and other countries to help their families and friends pay for food, medicine, or shelter, but terrorists obtained the money through theft or extortion.  All of these are possibilities, but for none of them did we find evidence to substantiate a connection between CCAP fraud money and support for a terrorist organization.

In seeking the evidence, we were particularly mindful that individuals in Minnesota have been convicted of providing support to terrorist organizations.  Therefore, we focused on those prosecutions for a possible connection to CCAP fraud money.

## FEDERAL PROSECUTIONS FOR SUPPORTING TERRORIST GROUPS

We reviewed cases in which federal officials in Minnesota investigated, prosecuted, and sentenced individuals who have conspired to provide, or attempted to provide, material support or resources to groups the United States has designated as terrorist organizations.[54]  There have been at least two dozen of these terrorism-related cases in Minnesota.  We reviewed these cases to see if they contained any mention of money obtained from defrauding the Minnesota Child Care Assistance Program (CCAP).  We did not find that CCAP fraud money was involved in these cases.  The following is a summary of some of these cases:

### Operation Rhino

In 2009, a federal grand jury in Minneapolis indicted Omer Abdi Mohamed of conspiring and providing material support to a foreign terrorist organization and conspiracy to kill, kidnap, maim, and injure persons outside the United States.  The Indictment alleged that Mohamed, as part of what federal authorities dubbed "Operation Rhino," helped Minneapolis men travel to Somalia to fight with al-Shabaab

---

[54] In 2001, shortly after the September 11, 2001, attacks on the United States, Congress enacted the U.S. Patriot Act. It contained a provision that made it a federal crime to provide material support to an organization the U.S. has designated a terrorist organization.  Under the federal law, "material support" means:  (1) any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (one or more individuals who may be or include oneself), and transportation, except medicine or religious materials; (2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and (3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.  See 18 *U.S. Code*, sec. 2339B, which uses the same definition as 18 *U.S. Code*, sec. 2339A(b).

ACF 000174

against Ethiopian and Somali government troops.[55]  At least 18 individuals were charged through Operation Rhino.  As part of the plea agreement, Mohamed pleaded guilty to one count of conspiracy to provide material support to terrorists.  U.S. District Judge Michael Davis sentenced Mohamed to 12 years in prison.

## Door-to-Door Fundraising for al-Shabaab

In 2010, a federal grand jury indicted two Rochester women with conspiracy and providing material support to al-Shabaab.  Amina Farah Ali and Hawo Mohamed Hassan were accused of raising funds door-to-door and through teleconferences and then sending the funds to al-Shabaab through the Hawala money remittance system.  A jury convicted both on all counts and Judge Davis sentenced Ali to 20 years in prison and Hassan to 10 years in prison.

## Conspiracy to Support ISIL

Eleven Minnesotans were charged with conspiracy to provide material support to the Islamic State of Iraq and the Levant (ISIL, also referred to as ISIS), a designated foreign terrorist organization.  The Justice Department called it the largest multi-defendant ISIL-related case in the United States.[56]  Six defendants pleaded guilty, two joined ISIL in Syria, and a federal jury convicted three others.  During one of the sentencings, Judge Davis called the group a "Jihadi cell" and said, "Everyone talks about Brussels or Paris having cells, we have a cell here in Minneapolis."[57]

One of the ISIL cases involved public program money—but it was U.S. Department of Education funds—not CCAP money.  Guled Ali Omar fraudulently obtained student financial aid to finance travel to join ISIL.[58]  After a jury convicted him on numerous counts including conspiracy to murder outside the United States and conspiracy to provide material support to a U.S. designated foreign terrorist organization, Judge Davis sentenced Omar to 35 years in prison.

---

[55] The federal investigation "Operation Rhino" focused on the disappearance of about 20 young Somali men from the Twin Cities area who were recruited to fight with al-Shabaab.  The groups began leaving in October 2007.  One of those Minneapolis men, Shirwa Ahmed, is believed to have been the first American suicide bomber in Somalia.  In July 2008, some Minneapolis men helped al-Shabaab ambush Ethiopian troops.

[56] U.S. Department of Justice, Office of Public Affairs, *Federal Jury Convicts Three Minnesota Men for Conspiring to Join ISIL and Commit Murder in Syria* (June 3, 2016), https://www.justice.gov/opa/pr/federal-jury-convicts-three-minnesota-men-conspiring-join-isil-and-commit-murder-syria, accessed March 7, 2019.

[57] Transcript of Sentencing at 25, *United States v. Adnan Abdihamid Farah*, No. 15-49 (MJD/FLN), 2016 U.S. Dist. LEXIS 50943 (D. Minn. Apr. 14, 2016).

[58] This was proven through bank records, business records, and testimony.

ACF 000175

## Additional Comments

In reviewing court documents and verifying with the U.S. Attorney's Office in Minnesota, none of Minnesota's past terrorism-related cases involved CCAP money. Moreover, none of the CCAP fraud cases included charges of anyone providing material support to terrorists.

We are aware, however, of a sibling relationship between the owner of the Deqo Family Center (the Ramsey County case referenced on page 19 of this report and page A-7 of Appendix A) and a man who pleaded guilty to lying to a federal grand jury in connection with Operation Rhino. Deqo owner Yasmin Abdulle Ali, who jumped bail and never stood trial, is the sister of Adarus Abdulle Ali.

Adarus Abdulle Ali pleaded guilty on November 2, 2009, to lying to a federal grand jury about his knowledge of a group of young Somali men in Minneapolis who traveled to Somalia to fight with al-Shabaab against the Transitional Federal Government of Somalia. U.S. District Judge Michael Davis sentenced Adarus Abdulle Ali to two years in prison, three years of supervised release, and 100 hours of community service on May 16, 2013.

We are confident that given the history and expertise of investigating and prosecuting terror-related cases in Minnesota, if there were any allegations of CCAP fraud money going to terrorist organizations, investigators would certainly follow up and prosecutors would prosecute them for providing material support to terrorist organizations.

ACF 000176

# CHAPTER 4:  OTHER ISSUES

## ALLEGATION THAT A POLITICIAN IMPEDED AN INVESTIGATION

At the House committee hearing about CCAP fraud on December 17, 2018, Stillman alleged that after he processed evidence obtained through a search warrant, an investigator involved in the case told him:  "I can't accept that evidence."  According to Stillman, when he asked "why not," the investigator said:  "Because a very well-known politician told me I can't continue the investigation because that individual contributed to their campaign."[59]

When we interviewed Stillman, we asked him for more details about the allegation.  He did not name the investigator or politician, but he did give us the name of staff at DHS who could help us find information about the case.  We followed up and found the following:

- The case involved the Medicaid program (also called Medical Assistance in Minnesota).

- In June 2015, the DHS Surveillance and Integrity Review Section (SIRS), which focuses on Medicaid fraud, began an investigation of Dr. Faruk Said Abuzzahab.

- In October 2016, SIRS and the Attorney General's Medicaid Fraud Control Unit served a search warrant at Dr. Abuzzahab's business office and obtained additional documents.

- During the investigation, representatives of the Attorney General's Office determined that Dr. Abuzzahab had literature in his office indicating he might be a supporter of Attorney General Lori Swanson.

- Therefore, to avoid any possible appearance of a conflict, the Attorney General's Office asked the Ramsey County Attorney's Office to handle the case, and that office agreed.

- Acting on behalf of the State of Minnesota, the Ramsey County Attorney's Office negotiated a settlement with Dr. Abuzzahab that required him to make a payment totaling $275,000 ($161,045.50 to the Minnesota Department of Human Services and $113,954.50 to UCare).  The settlement agreement was signed in mid-January 2019.[60]

---

[59] Scott Stillman, testimony to the Minnesota House Subcommittee on Childcare Access and Affordability, December 17, 2018.

[60] Civil Settlement and Non-Persecution Agreement Between Faruk Said Abuzzahab and Ramsey County (On Behalf of the State of Minnesota), January 14, 2019.

In addition to obtaining documents that substantiated these events, we also discussed the events with the government officials who participated. Based on that evidence, we are satisfied that the Attorney General's Office and Ramsey County prosecutors properly handled the case.

While Stillman's testimony to the House committee was accurate, it was not the whole story. We recognize that Stillman may not have known how the case was handled after the investigator told Stillman he could not take the evidence he had obtained. Nevertheless, Stillman created a false impression of impropriety that was unfair and untrue.

## DISTRUST BETWEEN IG AND CCAP INVESTIGATORS

While conducting our review, we found significant distrust between the current Inspector General (IG), Carolyn Ham, and the CCAP investigators that work in her office.

Investigators told us they had a good working relationship with the previous IG, Jerry Kerber, and his deputy. That changed, investigators said, when Ham was appointed IG in March 2017. According to the investigators, Ham had initial meetings with all of the other units within the IG's office, but not with the CCAP investigators. In addition, most of the investigators said they have never met Ham, and several noted her unwillingness to speak to them as they pass in the hallway.

According to the investigators, Ham only showed interest in their work after Stillman made his allegations and Jay Swanson wrote his memo supporting Stillman's allegations. The investigators told us they believe Ham is now trying to discredit their work and particularly Swanson. They point specifically to DHS hiring the consulting firm, Public Financial Management, Inc. (PFM) to assess Swanson's memo and his management of the CCAP investigation unit. DHS paid PFM $90,000 to complete the assessment.

The strained relationship between Ham and the CCAP investigators surfaced publically on December 17, 2018, when Ham testified before the Minnesota House Subcommittee on Childcare Access and Affordability. Legislators asked Ham why the department hired a consulting firm to examine the CCAP investigation unit since OLA was already conducting an outside review. As part of that discussion, a legislator asked Ham if she trusted her investigators. She responded after a long pause, "I trust their investigations."[61] While the answer was confusing, it clearly left the impression that Ham does not trust the CCAP investigators that work within her office.

As demonstrated in our assessment, IG Ham had reason to question Swanson's estimate of 50 percent fraud in CAAP. Rather than agreeing with DHS management's decision to bring in an outside consultant, we think Ham should have personally worked with Swanson and the CCAP investigators to better understand their perspective and develop a fraud estimate she can support.

---

[61] Carolyn Ham, testimony to the Minnesota House Subcommittee on Childcare Access and Affordability, December 17, 2018.

## INDEPENDENCE OF THE DHS INSPECTOR GENERAL

In addition to the personal distrust, we found uncertainty about the legal status of the IG and the role of that office within DHS.  As we noted earlier, DHS created the position in 2012; but its mission, authority, responsibilities, and independence are not defined in law.  This is in sharp contrast to the legal status of federal IGs and state auditors—including the Minnesota State Auditor and Legislative Auditor—all of whom have a legal charter that defines their responsibilities and authority.

In fact, the law that requires DHS to investigate CCAP fraud vests that responsibility and authority with the department's commissioner.[62]  Thus, it is not clear that DHS IG has any independence from DHS management.  When we asked Carolyn Ham what would happen if there was an action she thought was important to pursue but that the commissioner disagreed, she paused and answered that she has not encountered that situation.

To be a champion of rooting out fraud, waste, and abuse, an IG must have significant independence from department management and program administrators.  As a government watchdog group said:  "IG independence is crucial for their ability to provide objective and uncompromised reviews of their agency, reviews that benefit the government and taxpayers."[63]  Without its own statutorily established authority and responsibilities, we question whether the DHS OIG has a necessary level of independence from DHS management.

To address the issue, we recommend the Legislature establish in law an Inspector General for Human Services.  In drafting the law, the Legislature could follow laws that establish government audit offices, federal IG offices, state and local IG offices, and certain ombudsman offices.  The key is for the law to ensure that the Inspector General has the necessary authority and independence to investigate and issue reports on any suspected fraud or other improper actions affecting any human service program funded, administered, or overseen by the state or local unit of government.

## STILLMAN'S WORK EXPERIENCE AT DHS

We examined Stillman's work experience at DHS because in both his Senate and House testimony, Stillman said he left DHS under duress.  That gave some people the impression that DHS officials fired Stillman or forced him to resign.[64]  We found that Stillman was not fired, nor was he forced to resign.  In fact, DHS officials praised Stillman's skills as a digital forensic analyst and encouraged him to stay at DHS.

---

[62] *Minnesota Statutes* 2018, Chapter 245E.

[63] Nicholas Facifico, Project on Government Oversight, "Independence of Inspectors General is Essential" (September 9, 2016), https://www.pogo.org/analysis/2016/09/independence-of-inspectors-general-is-essential/, accessed January 9, 2019.

[64] For example, on Fox News Network at Night on May 15, 2018, Senator Abeler said that Stillman "got fired" for being a whistleblower.  See https://archive.org/details/FOXNEWSW20180516_030000_Fox_News__Night_With _Shannon_Bream/start/2520/end/2580, accessed February 28, 2019.



ACF 000180



**Minnesota Department of Human Services**
**Elmer L. Andersen Building**
**Commissioner Tony Lourey**
**Post Office Box 64998**
**St. Paul, Minnesota  55164-0998**


March 12, 2019

James Nobles, Legislative Auditor
Office of the Legislative Auditor
Centennial Office Building
658 Cedar Street
St. Paul, Minnesota  55155

Dear Legislative Auditor Nobles:

Thank you for the opportunity to review and comment on your office's report titled Minnesota Child Care Assistance Program: Assessment of Fraud Allegations. We, at the Department of Human Services ("Department"), appreciate the effort and professionalism of you and your staff as your office worked with us throughout the special review process.

Minnesota's Child Care Assistance Program (CCAP) provides financial assistance that helps families with low incomes pay for child care while parents work or attend school or training programs. CCAP supports the state's broader goal of strengthening the economic self-sufficiency of families and providing all children with quality early childhood programs. It is also a key tool that families in underserved communities can use to help break the cycle of poverty, reducing the need for public assistance.

In your report, you address allegations that arose last year regarding CCAP – specifically, that fraud was in excess of $100 million a year and that fraudulently obtained CCAP funds were going overseas to support terrorist activities. The report finds no credible evidence to support these allegations.

Findings of fraud are very serious, and we understand we have a great deal of work to do to improve the integrity of CCAP and our investigation processes. Proper oversight of this important program is essential to ensuring that the state's limited resources serve the eligible families in need of child care.  The Department has taken steps over the last several years and more recently to improve program integrity in CCAP, including:

- Establishing a CCAP Investigations Unit in 2014;
- Advocating for state investments and changes in state laws in support of efforts to investigate fraud;
- Developing internal policies and procedures focused on fraud investigations by engaging our continuous improvement unit to work with the CCAP Investigations Unit;
- Hiring an external consultant, PFM Group Consulting LLC, to conduct an independent assessment of our process for fraud investigations, which provided valuable insights for improving program oversight;
- Working to better diversify the skillset in the CCAP Investigations Unit, including hiring staff with expertise in financial investigations, such as forensic accountants, and

ACF 000181

Legislative Auditor James Nobles
March 12, 2019
Page 2 of 2

- Issuing a request for information (RFI) last year for an electronic attendance system, a key step to improving program integrity.

One of the key findings of our external consultant is the need to improve the use of data analytics by the Department's CCAP Investigations Unit. Such improvements will allow us to be more proactive in investigating fraud and monitoring and communicating trends, and to ensure consistency in how decisions are made. This would also provide greater assurance to state officials and the public that Department investigations of child care programs are based on valid and objective data, limiting the influence of any implicit bias in decisions.

The Walz-Flanagan budget package for this session includes a request to the Legislature for new state investments in a case management system for the CCAP Investigations Unit, already used by the state Bureau of Criminal Apprehension, that would help to improve data collection and analysis. The Walz-Flanagan budget package also includes other important investments and changes critical to moving the state forward on this issue, including proposals to:

- Enhance attendance record-keeping requirements for CCAP;
- Clarify that absent days and holidays must be marked on child care providers' billing forms;
- Establish a uniform method for calculating overpayments related to violations of attendance record-keeping requirements;
- Establish a penalty if providers fail to follow existing attendance-reporting requirements;
- Shorten retroactive eligibility for CCAP from six months to three months;
- Fund a case management and tracking system for CCAP Investigations to track and collect data and report on investigation activity; and
- Increase funding for fraud prevention grants to counties and providing additional training to county staff.

As your report indicates, the issue of fraud in CCAP is a complex problem. We at the Department remain committed to fixing it. To be successful, we must ensure our efforts provide equity and access to the diverse families we serve. This will require both greater state investments and sustained engagement with our local and community partners to ensure we are working together to prevent fraud. We are currently in the process of hiring an equity coordinator and developing new employee trainings for the Office of Inspector General (OIG) that are focused on the use of culturally competent practices in our investigation process. We also plan to establish a community and stakeholder advisory group over the interim to advise the Department on  efforts to improve the accessibility and integrity of CCAP. This advisory group will be made up of parents, child care professionals and teachers, county representatives, and other child care provider and advocacy organizations.  We also have plans to increase training at the county level to improve cultural competency and make sure there is consistency in practices across the state.

Thank you again for the professional and dedicated efforts of you and your staff during this special review. The Department's policy is to follow up on all findings to evaluate the progress made to resolve them. If you have any further questions, please contact Gary L. Johnson, Internal Audit Director, at (651) 431-3623.

Sincerely,
/s/
Tony Lourey
Commissioner

ACF 000182

# APPENDIX A:
# MINNESOTA CCAP FRAUD PROSECUTIONS

## FEDERAL CASES

### *United States v. Fozia Sheik Ali (2017)*

#### Introduction

A federal grand jury indicted Ali on four counts of wire fraud and one count of theft of public money in connection with fraudulently billing the state's CCAP for "hundreds of thousands of dollars in reimbursements for child care services that had not been provided." The federal government estimated the fraud at $1.449 million in CCAP payments through Ali's Salama Child Care Center.

The Indictment alleged that for 20 months between December 2013 through May 2015, Ali routinely submitted claims to DHS that greatly overstated the number of children in her child care center. DHS approved Salama to provide care for 60 children at a time. On numerous occasions, however, Salama inflated the number of children who had attended on a given day by 80 or more children. Virtually all of the families receiving child care services at Salama were enrolled in CCAP.

#### Investigation and Resolution

In December 2013, law enforcement began conducting surveillance of Salama. According to court records, on 57 days, Salama billed for more children than were actually present by an average of 57 percent. Between December 2013 and May 2015, Salama received a total amount of about $2.55 million. Based on an average daily fraud rate of 57 percent, prosecutors extrapolated the fraud to $1.449 million.

Ali pleaded guilty to theft of public money in exchange for dropping the wire fraud counts. On January 23, 2018, United States District Judge Joan Erickson sentenced Ali to two years in prison, two years supervised release, and restitution of $1,449,105.67.

### *United States v. Khadra Abdisafad Hirsi (2015)*

#### Introduction

On January 23, 2015, the United States Attorney in Minnesota charged Hirsi with one count of theft of public money for defrauding the state's CCAP out of more than $400,000 through her Ace Daycare center.

#### Investigation and Resolution

According to government documents, on November 18, 2011, a Carver County employee drove to Ace Daycare at 9:13 p.m. and took a photograph showing both the clock on her dashboard and

Ace's front door.  All of the lights were out, no one was present, and the child care was closed.  On November 27, 2011, Hirsi submitted to Carver County billing forms for November 14, 2011, to November 27, 2011, which claimed that Ace had provided child care services on November 18, 2011, to numerous school-age children from 4 p.m. to 10 p.m.

When Ace began operating in January 2011, it consistently billed for 20 to 30 children each weekday.  By spring 2011, it was billing between 30 and 50.  Throughout summer, Ace often billed in excess of 80 children per weekday and by the fall of 2011, Ace more often than not billed for between 65 and 85 children on weekdays.  By spring of 2012, Ace was routinely billing for more than 90 children on weekdays and would often bill for as many as 110 children on weekdays.

Surveillance in February 2013, showed Ace was billing, on average, 35 percent more children than it should have.  Using the conservative measure of the lowest daily reimbursement rate for Hennepin County, Ace fraudulently billed $21,817.90 over a 14-day period in February 2013.

The government contended the fraud rate applied back to 2011 based on several kinds of evidence—the center's overall billing levels and patterns; a worker confirmed many fewer children had attended; and that fraud existed in November 2011.  Applying the fraud rate in February 2013 back to November 2011, resulted in a loss more than $400,000.

Hirsi pleaded guilty to one count of theft of public money.  United States District Judge Donovan Frank sentenced Hirsi to a year and a day in prison, two years supervised release, and $300,000 in restitution.

## STATE CASES

*State of Minnesota v. Saynab Muse Yusuf (Anoka County 2017)*

**Introduction**

On October 4, 2017, the Anoka County Attorney's office charged Yusuf with two counts of theft, including theft by swindle for defrauding CCAP out of $29,134.56.  The Complaint alleged that for 13 days from June 8, 2016, through June 21, 2016, Yusuf's child care center, Samiras, billed the program for 1,299 children when surveillance video showed that 747 children attended, a difference of 552 children.

**Investigation and Resolution**

In March 2016, the State of Minnesota received a report that Samiras might be overbilling for children who were not actually attending the child care facility.  The State set up two cameras outside the child care center (one capturing footage of the front door and one camera capturing footage of the side door because these were the doors parents used to drop off and pick up their children).  Investigators then obtained billing records for the time period and calculated the difference between what Yusuf billed the State for and how many children appeared on the videos.  The investigators also set up cameras in April 2016 for eight days and found similar overbilling.

ACF 000184

**Child Care Assistance Program:  Assessment of Fraud Allegations**          **A-3**

Yusuf argued that the State's numbers were off because in setting up two cameras (east and west doors), the State ignored the fact that the child care center had three entry doors (south door). She argued that school-age children also used the south entrance.

Yusuf also argued that the State ignored the fact that the Legislature permitted licensed child care providers to bill for certain absent days up to 25 days in a year.  So even if a child did not attend day care on a certain day, Yusuf lawfully submitted billing forms and attendance records after noting on them if such child was absent or not.

Unrelated to the arguments, the State dismissed the case because a videotape was lost that reportedly showed the number of children entering Yusuf's child care, which was a different amount than the facility's recordkeeping.  Without the videotape, the State could not provide evidence of beyond a reasonable doubt.

*State of Minnesota v. Yasmin Munha Salim (Blue Earth County 2014)*

**Introduction**

The cases involving Salim were complicated not only because she was involved in both civil and criminal cases but also because the civil case included court decisions ranging from the Office of Administrative Hearings to the Minnesota Supreme Court on multiple issues.

On June 17, 2014, Blue Earth County charged Yasmin Salim with wrongfully obtaining assistance, felony theft, and felony theft by swindle for defrauding the CCAP through her Kind Heart Daycare.

**Investigation and Resolution**

On April 29, 2014, an investigator in the Blue Earth County Sheriff's Department received a fraud prevention investigation referral that Kind Heart Daycare was committing fraud by billing CCAP for children who were absent or no longer enrolled.  The County determined through reviewing attendance sheets and billing records that there was probable cause that Salim billed for $12,437.94, for which she was not entitled.

After Blue Earth County charged Salim, the Commissioner disqualified Salim from receiving services from programs licensed by DHS.  And because Salim was Kind Heart's controlling owner, DHS revoked her child care center license on June 23, 2014.  DHS also advised county CCAP administrators to make Kind Heart ineligible for future CCAP payments.  Salim appealed, and during that time, the criminal case was put on hold.

An administrative law judge (ALJ) in the Office of Administrative Hearings found that Salim billed CCAP for $9,434, and was properly disqualified.  The judge recommended setting aside the disqualification and rescinding the order to revoke Salim's child care license.  The Commissioner issued a final order correcting the ALJ's findings to conclude Salim erroneously billed $9,766 in CCAP funds.  The Commissioner adopted the ALJ's conclusion that Salim's disqualification had been appropriate but rejected his recommendations to set aside her disqualification and rescind the order revoking Kind Heart's license.

ACF 000185

**A-4**                                                                    **Special Review**

Salim appealed to the Minnesota Court of Appeals, which upheld the Commissioner's order in its entirety.

**Minnesota Supreme Court**

Salim appealed to the Minnesota Supreme Court based on a number of arguments including: DHS disqualified her under the wrong legal standard and that Salim was actually entitled to the payments.  A majority of the Minnesota Supreme Court (Justices Anderson and Chutich concurred in part and dissented in part) upheld the Court of Appeals' decision, which affirmed the Commissioner's order.

Salim also argued that DHS misinterpreted *Minnesota Statutes*, 256.98, subd. 1(3), regarding wrongfully obtaining public assistance.  Specifically, she argued that the Commissioner erred in determining that she was not entitled to more than $9,766 of CCAP payments because she was legally entitled to receive CCAP payments for up to 25 absent days per child regardless of whether she entered an "A" for absent on the billing form.

The justices agreed up to a point.  They said that a person is liable for wrongfully obtaining public assistance payments only to the extent that they receive payments they were not entitled to and which they would not have received otherwise.  As a result, the Court said Kind Heart was entitled to over $7,000 of the $9,766 for enrolled children who were absent and for whom the day care had not yet billed 25 days.  Nonetheless, the Court said the precise amount of public assistance a person fraudulently obtains is immaterial to violating *Minnesota Statutes*, 256.98, subd. 1(3), as long as he or she fraudulently obtains *some* amount.

**Criminal Case Resolution**

On March 14, 2018, Blue Earth County agreed to drop the criminal charges against Salim in exchange for her paying $12,437.94 in restitution, the original amount to which the County determined Salim was not entitled.

*State of Minnesota v. Children's Choice Center (Hennepin County 2015)*

*State of Minnesota v. Ummah Child Care Center, Inc. (Hennepin County 2015)*

*State of Minnesota v. Minnesota Child Care Services, Inc. (Hennepin County 2015)*

*State of Minnesota v. Abdirizak Ahmed Gayre (Hennepin County 2016)*

*State of Minnesota v. Ibrahim Awgab Osman (Hennepin County 2016)*

**Introduction**

Following an investigation by the Bureau of Criminal Apprehension (BCA) and DHS investigators called "Operation Kids Count," Hennepin County charged three child care centers with defrauding CCAP:  Children's Choice Center; Ummah Child Care Center, Inc.; and Minnesota Child Care Services, Inc.  Hennepin County also charged two individuals with theft by swindle in connection with Minnesota Child Care Services.  In all of these child care centers,

**Child Care Assistance Program:  Assessment of Fraud Allegations          A-5**

BCA and DHS agents began investigating because of a high level of billing as well as intelligence they said they gathered on other child care center fraud schemes in the metro area. These cases focused on centers billing for more children than they cared for.

### Children's Choice Center

On September 29, 2015, Hennepin County charged Children's Choice Center (CCC) of Minneapolis with one count of theft by swindle for defrauding the state's CCAP out of $15,638.34.  The Complaint alleged that between April 8, 2015, and April 20, 2015, CCC billed the program for 837 children when surveillance video showed only 546 children attended—a difference of 291 children or about one-third of the billing.

CCC became a licensed child care facility on February 15, 2014, and quickly became a significant recipient of CCAP funds.  In 2014, it received nearly $500,000 and up to September 2015, received $1.1 million.  DHS's Licensing Division issued correction orders to CCC for violations of recordkeeping, staff qualifications, training, crib violations, staff distribution, hazards, and cleanliness.

**Investigation and Resolution**

Video surveillance captured 61 days of video between April 8, 2015, and June 7, 2015.  At the time of the Complaint, investigators had reviewed only 13 days but said it showed "consistent gross overbilling."

CCC pleaded guilty to one felony count of theft by swindle and received a fine of $10,000 and was ordered to pay $28,267.24 in restitution.  CCC's owner, Sayed Jama Bihi, also signed a disqualification consent agreement barring him from working as a child care provider for two years or participating as an owner or director.  CCC agreed to forfeit all rights to outstanding CCAP payments.

### Ummah Child Care Center, Inc.

Also on September 29, 2015, Hennepin County charged Ummah Child Care Center, Inc. (Ummah), of Minneapolis with one count of theft by swindle for defrauding the state's CCAP out of $19,185.18.  The Complaint alleged that for 31 days between April 2015 and June 2015, Ummah billed CCAP for 357 children who were not present (Ummah billed for 2253 children when only 1896 children attended).

Ummah became a licensed child care facility on August 30, 2013, and quickly became one of the largest recipients of CCAP funds in Minnesota.  In 2014, it received $1.5 million and had received $1.2 million up to September 2015.  One of Ummah's co-owners was a prior controlling partner in Minnesota Child Care Services, Inc. (MCCS), which was also charged and which we detail in the next case.

The Complaint said MCCS received correction orders from DHS Licensing Division for violations related to recordkeeping, staff qualifications, training, crib violations, staff distribution, hazards, and cleanliness.

ACF 000187

**Investigation and Resolution**

Video surveillance of 31 days between April 24, 2015, and June 21, 2015, showed 15 percent of the billing was fraudulent.

Ummah pleaded guilty to theft by swindle and was fined $10,000 and ordered to pay $37,000 in restitution. Ummah forfeited any outstanding claims for CCAP payments. Hamdi Nur, an Ummah shareholder and director, also signed a disqualification consent agreement barring her from holding any ownership interest in, being employed by, or otherwise consulting or working with or for any DHS-licensed or DHS-funded child care/day care provider for two years.

### *Minnesota Child Care Services, Inc.*

On July 28, 2016, Hennepin County charged Minnesota Child Care Services, Inc. (MCCS), of Minneapolis with two counts of theft by swindle for defrauding the state's CCAP out of $184,650.64. The Complaint alleged that for 67 days between November 2014 and May 2015, MCCS billed the program for 146 children when surveillance video showed, on average, only 94 children attended each day.

MCCS became a licensed child care facility in April 2012. By 2013, it was the single largest recipient of CCAP funds in the State of Minnesota, receiving $2.7 million in 2013, and $3 million in 2014. In 2015, MCCS was again on track to be the state's largest CCAP recipient. The Complaint also said MCCS received correction orders from DHS Licensing Division for violations related to keeping records, staff qualifications, training, crib violations, staff distribution, hazards, and cleanliness.

**Investigation and Resolution**

Investigators found a consistent pattern of MCCS billing for far more children than attended the center. For example, during a two-week period in 2014, MCCS billed CCAP for 950 children who did not actually attend the center (meaning a third of the billing was fraudulent). In addition, the center routinely billed for days when no children attended, including holidays. For example, on Thanksgiving Day 2014, the center billed CCAP for 14 children even though no children actually attended the center on that day.

### *Abdirizak Ahmed Gayre and Ibrahim Awgab Osman*

While the case against MCCS was progressing, Hennepin County charged Gayre and Osman with theft by swindle. Gayre owned MCCS and Osman was MCCS's Assistant Director. Both submitted the center's billing records to the State.

The Complaint alleged that both withdrew large sums of money from company bank accounts on a regular basis by writing themselves checks. In most cases, they would put entries on the memo lines to obscure the true purposes of the funds. From July 2014 through September 2015, excluding paychecks, Gayre withdrew over $195,000 in this way. Osman withdrew money in the same way. For the same time period, Osman withdrew over $81,000 in cash from MCCS's main operating account by cashing checks that Gayre had written to him. Gayre's wife also received over $110,000 in such checks.

**Child Care Assistance Program:  Assessment of Fraud Allegations**        **A-7**

The Complaint also alleged that Gayre and Osman used some of the money to pay parents of children who attended MCCS.  These payments served two purposes:  to ensure that parents did not inform the State about the false billing submitted in regard to their children, and as a kick-back to parents for sending their children to MCCS.  Making the payments in cash also prevented parents from having to report the income, which was important since the family's income determined a family's eligibility in the child care program.

**Investigation and Resolution**

During the execution of the search warrant at MCCS and Osman's residence, law enforcement found lists of parents and the amounts of money they were to receive.  A former employee, who cooperated with investigators, confirmed that the lists law enforcement discovered during the search warrants were similar to the lists Osman provided to the employee in order to give money to parents.  The cooperating witness said the money was a kick-back payment to the family in exchange for the family sending their children to MCCS and that the employee knew it was wrong to make those payments.  The former employee reported taking steps to hide those actions, including handing the money to the parent in a location where there were no cameras.  The witness said that both Gayre and Osman also gave cash to parents in this way and did so in areas of the center where no cameras could record their actions.

The trial lasted three weeks with the jury deliberating for four days before jury members reported they were irreconcilably deadlocked.  The judge declared a hung jury and a mistrial.  The case was set for retrial but the State, MCCS, and the individuals reached an agreement.  MCCS pleaded guilty to one count of theft by swindle, forfeited any rights to unbilled CCAP funds (at least $126,000), and agreed to pay $153,078 in fines and restitution.  The Court barred Gayre and Osman from working or having an ownership interest in any licensed child care provider in Minnesota for two years.

*State of Minnesota v. Yasmin Abdulle Ali (Ramsey County 2014)*

*State of Minnesota v. Ahmed Aden Mohamed (Ramsey County 2014)*

*State of Minnesota v. Joshua John Miller (Ramsey County 2014)*

*State of Minnesota v. Jordan Christopher Smith (Ramsey County 2014)*

**Introduction**

Yasmin Ali and her husband Ahmed Mohamed owned a group of businesses that included All Nations Home Health Care LLC, and several child care centers, Deqo Family Center LLC.

On January 20, 2016, Ramsey County filed nearly 100 felony counts against the owners Ali, Mohamed, and two other individuals, Joshua John Miller and Jordan Christopher Smith.  Those charges included theft by swindle, failing to pay taxes, and identity theft.  Prosecutors also charged Ali, Mohamed, and Miller with racketeering for engaging in a pattern of criminal activity from at least December 2009 through February 2013.  The Complaint alleged the individuals, through the Deqo enterprise, bilked the State of Minnesota out of $4 million— $3.5 million in CCAP funds and $500,000 in Minnesota Health Care Program funds.

**A-8**                                                                                      **Special Review**

Deqo began providing child care in January 2011 and operated Deqo Family Center facilities in the metro area.

The Complaint alleged that Deqo recruited CCAP-eligible parents to enroll their children at the center and the center would then "employ" those parents. Deqo would report to DHS that the parents were working at least 50 hours every two weeks, when in reality, they were working a fraction of that amount and paid accordingly. When the parents did not work the amount necessary to remain eligible, Deqo falsified time records and employment information to make it appear the parents remained eligible. Deqo could then profit from receiving the CCAP payments, which was substantially more than it was paying the parents to work.

The County also alleged that Deqo concealed the proceeds of its illegal activities via family members. Deqo grossly inflated the prices for child care center meals, which they bought from their family members. The Complaint also alleged that Ali swindled would-be investors out of over $450,000 by promising an ownership interest in the businesses when no rights existed.

**Investigation and Resolution**

Unlike most other CCAP fraud cases, which focused on a child care center billing for children who never attended, the Deqo case focused on the center's employment of the CCAP parents. Ramsey County investigators conducted the investigation with assistance from the Minnesota Department of Revenue. They also relied on informants, documents, police reports, and data from DHS, Revenue, Secretary of State, Minnesota Department of Health, Minnesota Public Assistance, Minnesota Department of Employment and Economic Development, and public records.

Ali and Mohamed never faced trial. Both jumped bail and are currently fugitives. Mohamed fled immediately after the search warrants were served. Ali participated in the legal process up until the trial date, but on the day trial was supposed to start, September 19, 2016, Ali failed to appear.

Miller pleaded guilty to one count of racketeering and received a sentence of five years in prison and restitution of $3.5 million. Smith pleaded guilty to two counts of aiding and abetting theft by swindle and received a sentence of ten years of probation, 300 hours of community service, and restitution of $100,000.

*State of Minnesota v. Said Jire Kalinle (Ramsey County 2015)*

**Introduction**

On September 18, 2015, Ramsey County charged Said Jire Kalinle with one count of theft by swindle and one count of identity theft for fraudulently billing CCAP between $11,400.97 and $16,680.07 in connection with his Mumtaaz Family Day Care Center. According to the Complaint, Mumtaaz billed for children on days that the child care center was closed (including during the time of a search warrant) or on days the center was open but the children did not show up.

**Child Care Assistance Program:  Assessment of Fraud Allegations          A-9**

**Investigation and Resolution**

The Complaint said that after receiving numerous tips, DHS set up surveillance cameras that showed Kalinle billed CCAP for 19 children on days the day care center was closed and for 153 children who were not present when the day care was open (February 26, 2014, to May 18, 2014).  Moreover, according to the Complaint, Kalinle billed CCAP for the four days the center was closed when law enforcement had executed a search warrant.

Kalinle voluntarily closed Mumtaaz on October 2, 2014.  A former employee told an investigator that one of Kalinle's relatives bought the day care from Kalinle for $150,000 but that this was not enough money so Kalinle was going to remain as a "private" or "silent" partner.  The relative opened a day care center at the same location using a different name on June 24, 2015.

Kalinle pleaded guilty to one count of theft by swindle and the judge sentenced Kalinle to 30 days in jail, 30 days of home monitoring, 5 years of probation, and restitution of $16,680.97.

*State of Minnesota v. Abdi Ali Mohamud (Stearns County 2017)*

**Introduction**

On July 6, 2017, Stearns County charged Abdi Ali Mohamud with three counts of theft by swindle and three counts of wrongfully obtaining child care assistance for defrauding CCAP out of $58,158.  The Complaint alleged that during three separate time periods, Mohamud's Moon Light Child Care overbilled CCAP for 2,154 children.[1]

Moon Light started receiving CCAP funds in 2013 and families who sent their children there came from Stearns, Benton, and Sherburne Counties.  The reimbursement rates varied based on the County.  For example, Benton reimbursed $27 per day; Sherburne and Stearns reimbursed $30 per day.

**Investigation and Resolution**

The Complaint alleged that Stearns County and DHS began investigating Moon Light after discovering that an unusually high percentage of parents who sent their children there were also employed at the center.  Between March 31, 2014, and April 13, 2014, Moon Light was licensed for 83 children, but billed DHS for 122 children in Stearns County and 15 additional children from Benton County.  Of the Stearns County children, 85 percent had a parent working at the center and *all* of the children from Benton County had a parent working at the center.  St. Cloud Human Services also learned from some of the parents that parents were told that they had to enroll their children at the center as a requirement to work there.

Over three years, DHS, St. Cloud Human Services, BCA, and St. Cloud Police investigated Moon Light by reviewing billing documents, attendance sheets, and surveillance.

---

[1] July 1, 2014, through August 31, 2014; June 16, 2015, through July 29, 2015; and April 14, 2016, through July 1, 2016.

**A-10**                                                                                          **Special Review**

On July 13, 2016, BCA and DHS executed a search warrant and talked to Mohamud who admitted he was the primary controlling individual as the other co-owners of Moon Light did not work there.  He said he was the only one in charge of billing and had been there for three years. At one point he claimed he started billing in 2015 when DHS records show he was billing from June 2014 to August 2014.

The case is pending with a hearing set before Stearns County Judge Andrew Pearson on April 25, 2019.

# APPENDIX B:
# SWANSON E-MAIL ON CCAP FRAUD

Mr. Swanson prepared this e-mail in response to questions posed by the Office of the Legislative Auditor (OLA). He sent it to Inspector General Carolyn Ham for review. DHS Commissioner Emily Piper sent the e-mail to OLA on September 4, 2018. In her September 4, 2018, letter to OLA, Commissioner Piper said: "Some of the information contained within the document is new to me, DHS's deputy commissioner, and others on our leadership team. Although we have not yet fully vetted the accuracy and veracity of all components of the document at this point, I did not want to delay sharing this information with you and your team…."

When DHS officials learned that OLA would make Swanson's e-mail public in this report, they requested that OLA redact several specific names and references based on data privacy concerns. We agreed. The redactions are on pages B-6 and B-11.

Date: August 24, 2018

From: Jay Swanson, Manager, DHS Recipient & Child Care Provider Investigation Unit

To: Carolyn Ham, Inspector General, MN Department Human Services

Subject: DHS-OIG Response to OLA Inquiry of 08/03/2018

Since its inception in 2014, the Child Care Provider Investigations Unit has seen, in nearly all the cases it has investigated, CCAP providers using a similar scheme to successfully steal large sums of taxpayer money from this program. Based upon our four years of experience investigating fraud in this program, it is our opinion that while a significant amount of responsibility for this large scale theft of CCAP funds rests with the sophistication and daring of the criminals exploiting this program, an equal amount of responsibility rests with the lack of internal controls involving statutes, CCAP policies, and rules that dictate how this program operates.

When this unit was formed in mid-2014, it was originally staffed with 4 investigators, and 1 manager (who had oversite responsibilities for other units within DHS as well), as well as two BCA Special Agents which DHS contracted for. Over time a unit supervisor was hired, followed by a criminal forensic analyst, and beginning in late 2017 and carrying into mid-2018, 6 additional investigators and an investigative assistant were added to the unit. The initial group of 4 investigators consisted of retired law enforcement officers averaging 20 years of experience each, with many of those years spent investigating a variety of crimes up to and including homicide. The supervisor and manager were each retired law enforcement officers averaging 35 years of experience, many of those involving the investigation of crimes including narcotics trafficking and extensive experience investigating a wide variety of fraud. The manager & supervisor each have years of experience investigating federal crimes, conducting joint investigations with multiple law enforcement agencies, and having cases prosecuted in federal court. The recently hired investigators each have significant experience as law enforcement

ACF 000193

officers investigating a wide variety of crimes, and the criminal forensic analyst joins the unit with approximately 15 years of experience holding the same position with the BCA. I draw attention to the collective experience of this unit readers of this document can draw reasonable inferences as to the ability of this unit to make the assertions, and reach the conclusions contained herein.

The investigators in this unit, as well as each of the BCA Special Agents that have been assigned here are committed to aggressive investigation and prosecution of persons involved in defrauding CCAP. We recognize that aggressive investigation and prosecution of those responsible for large scale CCAP fraud is a critical element in solving this problem. These investigators and agents however also firmly believe that the extraordinary level of weaknesses present in the internal controls of this program will allow the fraud to continue unabated, or unfortunately possibly increase, until changes are made in this area. The weaknesses in internal controls will require changes in state statutes, CCAP policy, and Rules. Described below are the primary program integrity issues facing CCAP, along with some possible solutions.

**Many child care centers engaged in large scale overbilling**

DHS investigators routinely uncover large scale overbilling after receiving information in the form of tips or leads that specifically mention the overbilling taking place, or that mention activities which in their experience is indicative of a provider that is overbilling as well as possibly engaged in additional fraudulent activity. Since this unit became operational, it has always been faced with far more tips/leads which they deem to be likely valid, than they are able to investigate.

Throughout its existence, the unit has received tips/leads from a wide variety of sources. These include: county CCAP staff, DHS Child Care Licensing staff, the general public, CCAP parents, current and former employees & co-owners of child care facilities, a variety of other government agencies, and community members. With a finite (albeit recently increased) staff of investigators, the investigators are nearly always carrying a full load of cases. As soon as investigative resources become available as a case is completed, the unit manager and supervisor, having reviewed the tips/leads as they come in, discuss these with the investigators. After discussing the nature and severity of the tip, its likely credibility, the possible ties to other cases either under current investigation or past investigations, and the amount of CCAP funds that have been paid to the various providers, the manager, supervisor, and investigators reach a consensus on which provider should be investigated next.

Once a case has been selected for investigation, a preliminary workup is completed to research the known owners and controlling individuals involved in the providers operation. Often the information contained in the tip/lead may not specifically indicate overbilling CCAP, but it has been our experience that often the highly unusual actions alleged to have occurred involving the provider indicate overbilling or financial misconduct involving CCAP is likely occurring as well.

In order to prove a provider is overbilling CCAP, it is necessary to document how many children were cared for on a particular day, and later compare that to the number of children the provider claimed, via its billing, to have cared for. To do this investigators conduct both physical and video surveillance of a providers location. Physical surveillance is difficult to maintain for extended periods of time both from the investigators perspective (how many hours can an investigator sit in

**Child Care Assistance Program:  Assessment of Fraud Allegations          B-3**

a vehicle without moving, as well as leading to an increased likelihood of being detected by persons associated with the provider. Video surveillance is the preferred method of surveillance, since it results in evidence that can be introduced in either a criminal or administrative proceeding. When video surveillance is conducted at a provider's location, it is recorded, and while an investigator still must watch the video the same as they would watch a center physically, the video can be stopped at any time and the investigator can resume watching it at a later time. Additionally, if there is any question regarding how many children walked into a center at a particular time, the video can be replayed as many times as necessary to ensure an accurate count. In the 15 cases where this unit has directed CCAP payments stopped due to demonstrated intentional overbilling, the 15 centers overbilled by a combined total of 12,667 children over a total of 530 days, or an average of 23.9 children per day, per center. These 15 centers were paid a total of $56,361,680 in CCAP funds during the time those centers were in operation.

The fraud problem is so pervasive in this program that investigators at any given time have concerns, due to information received, or becoming aware of actions/indicators by a center that mirror indicators commonly seen by known fraudulent centers (actions or indicators that are not observed in legitimate child care centers). In CY2015 investigators had fraud concerns involving 35 of the 50 highest paid centers. In CY2016 there were concerns involving 41of the 50 highest paid centers. **In CY2017 there were fraud concerns involving 42 of the 50 highest paid centers.** Taking a broader look at the scope of the problem, in 2017:
**- Investigators have significant concerns regarding 72 of the top 100 highest paid centers.**
**- Investigators have significant concerns regarding 100 of the top 150 highest paid centers.**

**In 2017, the top 100 providers were paid a total of $118,208,722, or 54% of the CCAP funds paid to child care centers. In 2017, the top 150 providers were paid a total of $146,217,382 or 67% of the CCAP funds paid to child care centers.** Investigators in this unit believe auditors and elected officials should be very concerned about the high number of the highest paid child care centers that display indicators of fraud. This concern should be amplified when one considers the percentage of program dollars paid to these highest paid providers. Below is a breakdown showing the average CCAP payments made to the 50 highest paid centers as compared to the remaining 1,043 centers.

**CY2017 CCAP PAYMENTS TO LICENSED CHILD CARE CENTERS**

| 50 HIGHEST PAID CENTERS | REMAINING 1.043 CENTERS |
|---|---|
| TOTAL PAYMENTS:  $76,052,255 | $141,169,955 |
| AVG TO EACH CENTER:  $1,521,045 | $135,349 |

**CCAP eligible mothers recruited by providers paying cash kickbacks**

In a number of the cases investigated thus far, DHS investigators and BCA agents have determined that the child care center owner(s) have recruited CCAP eligible mothers by offering to pay kickbacks to entice the mothers to advise county CCAP staff that their children are attending a particular center. It is very common for center owners to pay kickbacks to the mothers of $200+ per child per month, with the highest kickback investigators have been told about by mothers being $300 per month per child. Providers do this to attract as many parents/children to their center as possible, so that providers can bill CCAP for the largest number of children possible. The only requirement of most mothers is that they come regularly

ACF 000195

to the provider's location to sign attendance records claiming all their children were at the center for the number of hours they were authorized for. The kickbacks are often paid in cash, which are not reported by mothers (such reporting may make them ineligible for benefits). In other instances the mothers receive what is purported to be a payroll check, when in reality the check is their kickback. These "payroll checks" at times are issued from the child care center, however as the restrictions on the number of parents who can work at a child care center their children attend become more restrictive, child care center owners are opening shell businesses such as janitorial companies or catering companies & issuing checks from those businesses. These types of businesses normally have no legitimate operations, and the only purpose they serve is to provide "a place of employment" which mothers need in order to remain eligible for the program. Investigators have interviewed some mothers who admitted this takes place, and have even recovered internal video footage showing an individual handing envelopes to mothers, and found an employee of that child care center that admitted that those were cash kickbacks in the envelopes, not payroll checks. That mother advised that you could easily tell the difference because the kickbacks were always in white envelopes and paid on a Saturday, while payroll checks to employees did not come in an envelope, and were issued on a different day of the week. DHS Licensors and OIG investigators regularly see documents, and interview excessive numbers of mothers of CCAP children who claim to be cleaners or janitors (in a facility that is filthy), or a large number claiming to be "kitchen help" when investigators viewing surveillance video for 30+ days have observed the only food going into a center is take-out pizza in a box. Some centers also seem to have a significant number of mothers whose job is that of a "toy or book washer". Investigators and Licensors have seen males whose purported job a child care center is "security", or "paper filer".

**Fraudulent centers opening in same location as previously fraudulent center**

This unit has seen a number of instances where a child care center has been closed due to having CCAP funding stopped as a result of fraudulent billing and/or criminal charges being filed against the owns. It has become a regular occurrence for DHS Child Care Center Licensing to receive an application for a new center, in the same location as the recently closed center within a few weeks of the other center closing. In time investigators determine that the newly opened center is also defrauding CCAP. Investigators strongly believe that many of these cases what occurred was that a sale took place on paper, and that the previous owner is likely a silent (off the books) partner in the new business.

**Child care centers being opened for no reason other than to defraud CCAP**

Since this unit was formed, investigators have heard reports from DHS Child Care Center Licensing that persons with no experience in child care, have been opening child care centers. As cases have been investigated we have seen repeated instances of persons associated with the operation of these centers that have no background in child care. Additionally, individuals have advised us that in these types of situations there are almost always several "silent owners" who have a financial interest in the center (greater than 5%), but whose identities have not been disclosed to DHS as required by law. The individuals that disclose this information to investigators often are persons formerly associated with a center and are in a position to know such things. In several cases thus far, investigators have found, during searches of the business, evidence corroborating such claims, generally in some type of financial document showing

## Child Care Assistance Program:  Assessment of Fraud Allegations          B-5

payments made to other individuals, often with a percentage of ownership noted. Some former co-owners of these centers, & some parents of CCAP eligible children have told investigators that it is common knowledge in certain communities that being an owner, or even partial owner of a child care centers is the easiest and surest way for immigrants to get rich in the U.S. **An OIG study in 2017 showed at that time that there were in excess of 320 child care centers receiving CCAP payments in Hennepin County alone.**

### Child care centers operating with nearly 100% public clients

Of the 15 child care centers DHS-OIG has stopped payments due to fraud thus far, all of the centers have operated with 100%, or nearly 100% CCAP clients. This model encourages fraudulent operation, since owners have recruited mothers based on them having CCAP eligible children. Since parents are recruited by offering kickbacks equal to or greater than other centers, as well as being told they are their children do not have to attend the center with any degree of regularity, the whole manner of operation is by definition fraudulent.

### Child care centers creating false documents

In nearly every case thus far, investigators have seen providers that create a variety of false documents in order to become licensed and to operate. This starts with false information on the license application regarding who the owner(s) and controlling individuals of the center are. Investigators have found fraudulent training certificates created by owners, purporting to claim that employees have completed required training in the area of children's safety. Often a clue is that the certificates for various training session purport to claim all employees completed the training on the same date. At times the suspicion regarding the documents is proven when employees admit that they never completed the training the certificate in their file claims they completed. The single most fraudulent document center owners provide to investigators are the attendance records. In every case thus far, when the attendance records of a center are compared against the video surveillance logs, the scope of the discrepancies between the two leaves no doubt that the attendance records are a complete fabrication. There are large discrepancies between both the number of children that attended the center on a given date, but also, and even more telling is the times at which children purportedly arrived. It is not unusual to see attendance records that claim X number of children arrived at the center between 8:00 am and 11:00 am, when the video surveillance shows only a fraction of that number of children actually arrived, and the purported arrival times according to the attendance records did not even come close to matching the times children were observed arriving at the center on video (see attached example of an analysis between attendance records and the video log).

### Center owners engaged in large scale money laundering

Most of the investigations conducted to date have revealed clear evidence that owners and controlling individuals of these fraudulently operated child care centers are engaged in money laundering on a large scale with the proceeds from CCAP fraud. This activity generally involves having an unusually large number of accounts at various financial institutions before the money reaches its final destination.

**Some industry representatives engaged in illegal activities**

In late 2016 DHS officials were contacted by a newly formed group, initially comprised of 6 individuals, purporting to represent a segment of child care center owners, advising that they had formed an association of minority child care center owners. Some DHS officials began meeting with these representatives, who professed that they wanted to work with DHS to reduce or eliminate fraud. In one of the early meetings, on 12/20/2016 a DHS management official reported to investigators immediately after a meeting with association representatives that the association reps wanted DHS' help in enacting regulations that would prohibit CCAP parents from moving their children from one center to another. When DHS officials advised that they would not agree to this, the association reps advised that if DHS could assist with this, that it would help to lower the number of fake paychecks that providers give clients, and would eliminate the need for providers to pay kickbacks. The association rep stated "If we make $50,000 a month, but pay out $30,000 to mothers in kickbacks, we lose profits".

Shortly after these meetings began, Child Care Investigators met with a community member who walked into the DHS office. This community member wanted to make investigators aware of the intentions of this group of representatives. The community member advised that many other community members referred to this group of child care center owners as "the sharks". Investigators were told that the child care representatives were going to profess to want to work with DHS, while at the same time attempting to derail investigations of fraudulent centers, and attempt to gain inside/advance knowledge of DHS' plans regarding child care program integrity efforts, so that their group could develop plans on how they could continue to defraud CCAP. As soon as the identities of the representative group became known, investigators conducted basic research and learned that various state and federal law enforcement agencies, and other government entities held very reliable information that approximately 1/2 of the members were clearly engaged in serious criminal activity. Investigators made DHS management aware of the general problem without going into specifics, so as not to compromise current and future investigations. In early 2017 the Acting Inspector General and the Manager of Child Care Provider Investigations were advised to meet with the association representatives. During that meeting the representatives interrupted the Acting Inspector General, and stated they wanted to speak to the "fraud guy", because when his people show up, their centers get shut down and the money is stopped. Association representatives requested the Managers cell phone number, and advised that DHS did not have to go looking for fraud, that the Association would call and tell the Manager which centers were engaging in fraud, and then the fraud guys "could go out the next day and shut them down". The Manager refused to provide his cell phone number, and advised the association reps that they could make fraud reports either via phone, or online, and they could remain anonymous. The association reps were advised that in any event, no investigators would be going out the next day to shut a child care center down, since there would be a need to conduct an investigation to determine if a provider was committing fraud before any action was taken. The association reps repeated their demand several times that they wanted the Managers cell phone number, and that they expected action the next day. They did not appear satisfied when these demands were not met.

**Child Care Assistance Program:  Assessment of Fraud Allegations**      **B-7**

In the summer of 2017, a DHS Child Care Center Licensor reported to investigators that on visits to two child care centers, owners of those centers had recently reported that several members of this association had arrived at their centers in a van, and had attempted to convince these center owners that they should join their association. One of the center owners reported that they were told the association dues were either $1,200 per month, or per quarter, they could not remember. When the owners stated they did not want to join the association, they were told that if they did not join the association would report them for fraud to DHS, and DHS would shut their business down. The association reps also told the owners that they have met with the Governor and with DHS bosses, and that they can make things like this happen.

**Center owners moving fraud proceeds out of the U.S.**

In nearly every case, BCA agents assigned to these cases have obtained bank records of owners and child care centers once they have documented that there is probable cause to prove that CCAP fraud is being committed. These records, clearly show that some owners/controlling individuals have made large wire transfers to banks primarily in the Middle East or Africa, often soon after they receive a large CCAP payment. BCA agents and DHS Investigators work closely with federal law enforcement agencies, and when evidence of federal crimes are uncovered during a child care investigation, that information is shared with the appropriate agency. While it is not within the purview of either DHS investigators or BCA agents to determine the final destination of the money sent overseas by persons involved in child care fraud, investigators have been advised by federal officials going back to 2015 that it is a near certainty that at least a percentage of the fraud proceeds that go overseas are being siphoned off by one or more Designated Terrorist Organizations (DTO's). BCA agents and DHS investigators have often seen clear evidence of money laundering and tax evasion being committed by persons associated with child care centers they have investigated. BCA agents and DHS investigators also review data obtained from the cell phones and computers used by persons operating suspected fraudulent child care centers. Information obtained from these sources, in some cases, has provided investigators and agents with clear proof that owners/controlling individuals have taken deliberate steps to defraud CCAP. Analysis of these electronic devices also shows that some of these child care center owners/controlling individuals have purchased or are in the process of purchasing expensive homes in stable foreign countries.

**Current State computer systems are unable to capture IP address of computers billing CCAP**

In early 2015 investigators in this unit discovered that state data systems were not capturing the IP address of computers used to bill CCAP. Individuals who use a computer to bill CCAP, do so via a program named MEC2Pro. Investigators in this unit have also discussed this matter with SIRS Management, and learned that state systems are not capturing the IP address of computers billing DHS for Medicaid Services. In 2015 this weakness was brought to the attention of the Commissioners of MNIT and DHS. To date this unit is not aware that any concrete steps have been taken to capture and retain this information in a format that would allow investigators to query it. It is a significant weakness of these programs. In order to prove who submitted fraudulent billing to either CCAP or a Medicaid program, the first step would be to locate the IP address of the computer that submitted the bill. Speaking only for CCAP, the lack of this basic information has significantly increased the amount of time to complete investigations, as we

focus on attempting to determine who was responsible for the fraudulent billing. In some cases even after spending hundreds of investigative hours in this area, we have been unable to prove who actually did the billing. It should be noted that **this weakness leaves both these units in the blind as to who is actually billing for the state for several billion dollars per year between the various programs.**

**Large scale collusion involving fraud between providers and recipients**

In the CCAP program as it currently exists, providers seeking to garner as many CCAP funds as possible, and willing to commit fraud to do so, can't do so without large numbers of CCAP eligible children. As a result of the large number of providers who are willing to pay kickbacks to mothers just to register their children at a center, mothers have many choices of where to register their children at. It is common knowledge among both fraudulent CCAP as well as CCAP eligible parents, that mothers or parents with a larger number of children are significantly more valuable to a fraudulent provider than a CCAP mother with one or two children. Investigators have repeatedly heard stories of mothers with 8 or 10 children who have gotten into "bidding wars" with various providers wishing to register those children at their center because of the CCAP billing they would generate. In addition to kickbacks, providers and mothers "work the system" in order to maximize the CCAP billing. For instance, a mother with both pre-school and school age children will be told that during the school year they will be offered a job at the child care center, but only on the evening shift. This is done so that the provider can bill for not only the pre-school aged children, but also the school aged children (once the children are out of school in the afternoon).

**Excessive time allowed for providers to submit CCAP bills**

Currently providers can submit bills up to 60 days after a two week billing period ends, however the statute seems to indicate that with good cause a provider could submit bills up to one year after the claimed date of service. In most of the cases investigated thus far, DHS-OIG investigators see providers that stagger their billing, and frequently wait for close to the 60 period before submitting all billing for a billing period. This causes investigators who have conducted surveillance on a center, and who know how many children actually entered a center on a given day, to often have to wait up to 60 days before they are able to determine if a provider overbilled. This limit should be reduced to 30 days after the last day of the billing period.

**No minimum stay requirement before a provider can charge for a full day.**

In every case this unit has investigated in the four years of its existence, investigators have seen many children who are not at the center for the number of hours that are being billed for, or that are indicated on the attendance records. Currently counties and agencies can approve up to 120 hours of child care every two weeks for each child. Providers are allowed to bill for the number of hours authorized. In every investigation investigators see numerous instances of mothers bringing their children to a center for short periods of time (approximately 15 minutes), and then leaving with the same number of children then entered with. In these instances investigators believe the mother is simply signing attendance records-perhaps for that day, possibly for a week or two. Another common scenario involves mothers bringing their children to a center later in the afternoon (approx 4:30 pm), the mother staying with the children at the center, and then mother and children departing in the early evening (approx 7:00 pm- 8:00 pm). During this time period

ACF 000200

**Child Care Assistance Program:  Assessment of Fraud Allegations            B-9**

investigators frequently see pizza being delivered to the center at approximately 6:00 pm-6:30 pm. In these instances it is believed that mothers are signing attendance records, mingling with other mothers, children are playing, and that it is essentially a taxpayer funded social event, which ends after mothers and children have a pizza dinner. It is imperative that statutes governing this program be changed to require children to be present for a certain number of hours per day before a provider can charge for a full day. Additionally, due to the very high rate of fraud involving paper attendance records in these types of cases, use of an attendance record keeping system that uses biometric scanning is essential.

**Providers "find" attendance records months after investigators make request**

Current statutes would seem to clearly state that child care providers must make their attendance records immediately available to counties or the commissioner upon request. A recent tactic successfully used by attorneys for providers, is when faced with a large overpayment due to inadequate or missing attendance records when county or OIG investigators made an on-site request, is to produce newly found records at the time of an appeal hearing, and having judges rule that those records (which now fully support a providers billing) will be accepted as evidence. This apparently clear statute needs to clarify that any attendance records not provided to investigators on site will not be admitted in evidence at any criminal or administrative hearing.

**Current method of calculating attendance record overpayments too time consuming**

When faced with attendance records that do not support a providers billing, counties currently have to undertake a very time consuming process to calculate the provider's overpayment. DHS is recommending that the overpayment calculation be simplified so that any day that a providers attendance records do not contain all data required by statute, that the overpayment be one daily rate for the age of the child involved.

**Inability to stop payments to fraudulent providers**

The database used to manage the Child Care Assistance Program is $MEC^2$. There is no method to immediately shut off payments to a provider when it has been determined that the provider has fraudulently billed CCAP. The system allows counties and agencies to close a provider's registration, and after a registration is closed in a county, if a bill were to be submitted for care after that date, that bill would be rejected by the system. The problem that exists is when DHS-OIG determines a provider has fraudulently billed CCAP, OIG can direct counties to immediately stop payments and close a provider's registration. The issue arises if say 45 days later a provider submits a bill to a county, and the bill claims to be for service prior to the date of the providers registration being closed, that unless a county worker remembers that this specific provider is in effect on a "do not pay list", and approves the bill, the bill will be paid.

DHS-OIG has seen time after time in its fraud cases that bills are being paid to fraudulent providers, either because they are accidently approved, or a bill is in the pipeline at the time DHS-OIG orders a payment stop. System upgrades should be made to allow DHS to immediately stop all payments to a provider once fraud has been determined. A recent study of this issue on the 15 DHS-OIG provider fraud cases show each provider received at least one payment after DHS-OIG determined fraud. **The total payments made to these 15 providers after fraud was determined was $776,063.86.**

**B-10**                                                            **Special Review**

In addition to system upgrades to allow for immediate payment stops,this unit strongly suggests system upgrades to require billers to enter the number of hours billed for each child each day, instead of the field being pre-populated, and stringent fraud warnings requiring an acknowledgement before a bill can be submitted.

**Young children whose mothers are not at a center are not fed**

DHS investigators have received multiple reports in the last four years from immigrant mothers who advise that it is very common, that if a young child is at a child care center, and their mother is not present, that the child will not be fed. In each case the mothers have explained to us that older children (such as school aged children) are big enough to fend for themselves, and the younger children whose mothers are "working" at a child care center will ensure their young children are fed, but that in their culture, these mothers feel no responsibility for feeding other young children that are not their own, even if the mother is a center "employee".

**Centers claim to care for children on multiple shifts**

In every case investigated thus far, providers have claimed to be caring for children on two shifts. One shift has children arriving in the morning, and then those children leaving in the early-mid afternoon, and another shift of children arriving in the late afternoon and staying until approximately 9:00 pm. Video surveillance in this cases has clearly proven children are not arriving as early as claimed, and are not staying as late as claimed. Investigators have determined that the reason for the providers actions in this area is so they can bill for more children each day. Every child care center has a capacity for their building that is set by local fire officials based in part on the square footage of their building, and is reflected on their child care center license. By billing for children on two shifts they can double the number of children billed for each day. For example a child care center with a capacity of 75 could bill CCAP for 75 children on a day shift, and 75 children on an afternoon shift, for a total of 150 children per day.

**DHS has no control over who becomes a CCAP provider**

Licensed child care centers wishing to become a CCAP provider enroll through the various counties and agencies. The amount of information required from these providers is minimal (see attached Provider Registration form). DHS-OIG has made requests that the form be altered to require more biographical information and a copy of a U.S. state driver's license or state ID card be obtained at the time of application in addition to the SSN's of the person(s) wishing to become CCAP providers. OIG spends many unnecessary investigative hours proving who a specific provider was due to this lack of biographical data. This situation becomes even more difficult when the provider has gone out of business. When one looks at the amount of money that can be siphoned from CCAP by a fraudulent provider, obtaining additional identifying data to assist investigators in locating that person should not be an issue. This function should be transferred to DHS-OIG.

**DHS has no control over who obtains access to the MEC²Pro billing system**

As with those wishing to become CCAP providers, DHS should have control over who can obtain access to the billing system. Again this is done through the counties and agencies. Again OIG has requested that additional biographical information and a copy of a U.S. state driver's

**Child Care Assistance Program:  Assessment of Fraud Allegations          B-11**

license or state ID card be obtained at the time of application, and this request has been denied. In this vitally important question of who is actually doing the billing for CCAP providers, this function should be transferred to DHS-OIG with appropriate changes in state law to require the necessary biographical information and identification to ensure that at a minimum we know who is being given access to the billing system.

### Current burden of proof for provider disqualification is too high

State statutes are somewhat unclear on what the burden of proof is for child care provider fraud disqualification cases, although the DHS Appeals Division has settled on proof by Clear and Convincing Evidence. This burden of proof is different from all other DHS provider types. All other provider types have a burden of preponderance of the evidence. The difference is quite significant, because it requires investigators to invest hundreds of additional hours on each case in order to develop that level of evidence. In doing so it slows all cases down, because the additional investigative resources spent developing these cases could be spent on other cases.

### Providers falsifying/misrepresenting employee identities and qualifications

DHS staff often encounter center employees who provide their names, and a short time later when center owners are asked for the personnel files of the employees on site, hand DHS staff personnel files with completely different names, and accuse DHS staff of intimidating employees so the employees provided false names. In nearly every one of these instances the owner was not present in the classroom when the DHS staff person had the conversation with the center employee.

### Fraudulent "High quality" centers receive higher reimbursement rates

The CCAP system has provisions for providers that have been certified by certain organizations as essentially high quality centers to receive higher reimbursement rates from CCAP. The certification process for these programs relies heavily on an easily created paper trail that a provider, in concert with others can and have created. **In the last four years the Child Care Provider Investigation unit has built fraud cases, and stopped payments due to fraudulent billing to 6 "Parent Aware" rated centers. This means that 40% of the cases this unit has investigated involve large scale billing fraud being committed by a "high quality" provider.**

While the stated goal of these programs are laudable, the reality is that their business model will always leave these rating vulnerable to fraud, which is not difficult for a determined provider.

### Additional fraud trends/concerns

- **Identity falsification / misrepresentation.**
  - The names on personnel files in CCAP Centers did not match the names provided by onsite teachers/staff providing services to children in some cases.
    - Centers fail to disclose all owners or controlling individuals in their licensing applications.

ACF 000203

- **False jobs / False Pay Stubs to meet CCAP qualification requirements. Tax Fraud.**
  DHS Licensors would document that the CCAP facility was dirty and unsanitary, despite CCAP Center records stating that the Center employed a large number of parents as cleaners or janitors each working 20-30 hours per week. When checking employee personnel files at a center, Licensors would note that there was an abnormally high number of staff, the majority of whom were parents of CCAP children. Licensors believed no business could operate profitably with the number of staff, and hours worked, claimed by the center. The job titles for these employees were titles Licensors had not seen previously at child care centers, such as:
  - A large number of "kitchen helpers" at a center that does not prepare food, but uses a caterer.
  - "Security" staff
  - "Landscaper"
  - "Hall monitor"
- **False Pay Stubs to Meet CCAP Qualification Requirements.**
  County case workers repeatedly encountered parents providing false pay stubs as evidence of employment. Applicants for CCAP told case workers that they were not employed or going to school. These applicants were informed that they were required to provide proof of employment or school attendance before they were eligible for CCAP. In some cases, the applicant would return the next day with pay stubs from the CCAP Center they wanted their child to attend, documenting that they had been employed for 4 weeks. When questioned about their earlier statements that they were unemployed, some applicants stated that the owner of the CCAP Center printed out false paystubs and told the applicant to provide them to the county caseworker.
- **Parent coercion / intimidation by CCAP Centers.**
  Parents informed county CCAP eligibility workers that they had applied for positions at CCAP Centers, but were told they would not be hired unless they were approved for CCAP and agreed to have their children registered at the CCAP Center they wanted to work at.
- **Facilities Fraudulently "Staged" for Purposes of Obtaining a CCAP License.**
  During pre-licensing inspections, Licensors would observe all necessary toys, books, and equipment in place. After becoming licensed, when the same Licensor made a follow-up visit, the vast majority of the toys, books, and equipment was not present in the center. Licensors would often see that when parent employee were arriving after the Licensors were onsite, the parents would be carrying baskets of toys or books to supplement the minimal amount of toys or books present in the center. When Licensors quested the parents as to why they were bringing a basket full of toys or books, the parent advised that they "had been washing the toys and books".

**Conclusion**

Investigators in this unit do not believe, despite the number of cases investigated thus far, that any real progress has been made regarding CCAP fraud. Investigators believe that current internal controls and statutes are not stringent enough to make reasonable progress in reducing the level of fraud in this program. Investigators regularly see fraudulent child care centers open faster than they can close the existing ones down. Investigators believe drastic actions on several fronts (legislative as well as policy) are needed to make progress in this area, not only to reduce the significant waste of taxpayer dollars involved in this program, but to also attempt to provide a reasonably effective pre-school education for this high risk group of children. Immediate action

**Child Care Assistance Program:  Assessment of Fraud Allegations          B-13**

is also necessary to curb the large flow of CCAP fraud proceeds leaving the country that are likely being used for purposes that should concern most taxpayers. Investigators within this unit are in regular contact with federal law enforcement officials, as well as fraud investigators in other states, and are aware that the significant issues seen in Minnesota regarding this program are also taking place in a number of other states.

Investigators, as well as the Supervisor and Manager of this unit believe that the overall fraud rate in this program is at least 50% of the $217M paid to child care centers in CY2017. In arriving at this opinion, members of this unit want to make clear how they would define fraud. The fraud amount used in prosecuting criminal or administrative cases in this program involves a simple calculation of how many children arrived at a center, and how many children did the provider bill for on a given day. If one takes a higher level view of this program and realizes that in these fraudulent centers, our investigations have shown that mothers are not receiving legitimate employment experience (by having no show jobs or jobs that simply require them to spend a few hours a day at a center watching their own children, and that several internal video systems seized from these centers show day after day that children are unsupervised, running from room to room while adult "employees" spend hours in hallways chatting with other adults, or talking or texting on their phones, one could reach the conclusion that the entire amount paid to that provider in a given year is the fraud amount, since neither the children or the taxpayers received what was being paid for.

In closing, some state officials have referred to a former DHS employee who testified in a Senate committee hearing this past May on the topic of CCAP fraud as a "disgruntled former employee", or something similiar. The impression left by these state officials was that this former employee (Mr. Scott Stillman) should not be believed. I will speak only for myself here, any state officials who wish to question other investigators in this unit will have to speak to those investigators individually. Mr. Stillman is a very honorable man, and a very talented and intelligent investigator. He was in a position to know many things regarding fraud in both the CCAP and the Medicaid funded programs at DHS due to his position as a forensic examiner of digital devices seized during the many investigations conducted by units investigating fraud in these programs. I have seen the results of the forensic exams conducted by Mr. Stillman and others in his unit on CCAP fraud cases. I have not seen the results of any investigations he or his unit conducted pertaining to Medicaid fraud. Based on the evidence I have seen that Mr. Stillman and his group uncovered during their forensic exams on child care fraud cases, I believe everything Mr. Stillman said in that hearing and in a subsequent interview by a local television station. In my opinion anyone who claims that Mr. Stillman was making false statements on this topic either has no knowledge of this situation, or is attempting to shift the focus of the conversation away from a very serious issue.

ACF 000205



ACF 000206

For more information about OLA and to access its reports, go to:  www.auditor.leg.state.mn.us.

To offer comments about our work or suggest an audit, evaluation, or special review, call 651-296-4708 or email legislative.auditor@state.mn.us.

To obtain printed copies of our reports or to obtain reports in electronic ASCII text, Braille, large print, or audio, call 651-296-4708.  People with hearing or speech disabilities may call through Minnesota Relay by dialing 7-1-1 or 1-800-627-3529.

    Printed on Recycled Paper

ACF 000207



**OFFICE OF THE LEGISLATIVE AUDITOR**
CENTENNIAL OFFICE BUILDING – SUITE 140
658 CEDAR STREET – SAINT PAUL, MN  55155

ACF 000208

Department of Health and Human Services

# Office of Inspector General

Office of Audit Services



May 2025 | A-05-24-00001

# Minnesota Could Better Ensure That Childcare Assistance Providers Comply With Attendance Requirements

OIG.HHS.GOV

ACF 000209

# HHS Office of Inspector General
# REPORT HIGHLIGHTS



May 2025 | A-05-24-00001

# Minnesota Could Better Ensure That Childcare Assistance Providers Comply With Attendance Requirements

## Why OIG Did This Audit

Prior OIG work found that States did not ensure providers adequately documented and maintained childcare attendance records and did not always verify the completeness and accuracy of attendance records. In addition, an audit performed by the Minnesota Office of the Legislative Auditor found the State did not always validate that provider billings aligned with childcare attendance records. We performed this audit to determine whether Minnesota complied with attendance and payment requirements for services at childcare centers.

## What OIG Found

Minnesota did not comply with Federal and State attendance documentation requirements for some payments made under its Child Care Assistance Program (CCAP) for 2023. For 38 of the 200 randomly selected childcare assistance payments, Minnesota did not comply with requirements related to attendance and payment for services. For the remaining 162 payments, we did not identify any errors related to attendance or payment. Based on our sample results, we estimate that 11 percent of all payments made to 1,155 licensed childcare centers in 2023 had 1 or more errors related to attendance and payment for services. Minnesota's limited oversight of attendance documentation at childcare centers resulted in overpayments to providers.

## What OIG Recommends

We recommend that Minnesota:

1. work with the childcare providers to collect, as appropriate, overpayments of CCAP claims identified by our audit;
2. strengthen its monitoring program to include routine reviews of CCAP attendance records for accuracy; and
3. continue to take steps to automate childcare attendance records through real-time electronic reporting as recommended by the Minnesota Office of the Legislative Auditor.

Minnesota concurred with our recommendations and described actions that it has taken or plans to take in response to our recommendations.

ACF 000210

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

    Why We Did This Audit ......................................................................................... 1

    Objective ............................................................................................................... 1

    Background ............................................................................................................ 1

        Childcare Services Funded by the Child Care and Development Fund Program.... 1
        Minnesota's Child Care Assistance Program ......................................................... 2

    How We Conducted This Audit ............................................................................. 3

FINDINGS..................................................................................................................... 4

    Childcare Payments Were Not Made in Accordance With Federal and State Attendance
    Documentation Requirements ............................................................................. 4
        Federal and State Requirements ........................................................................... 4
        Attendance Documentation Requirements Not Met ............................................. 5
        Limited Oversight of Attendance Documentation by the State Agency ............... 5

RECOMMENDATIONS ................................................................................................. 6

STATE AGENCY COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE ........................... 6

APPENDICES

    A: Audit Scope and Methodology ........................................................................ 7

    B: Related Office of Inspector General Reports.................................................... 9

    C: Statistical Sampling Methodology ................................................................. 10

    D: Sample Results and Estimates........................................................................ 12

    E: Summary of Attendance and Payment Errors ............................................... 13

    F: Minnesota Comments..................................................................................... 14

**INTRODUCTION**

**WHY WE DID THIS AUDIT**

Previous Office of Inspector General (OIG) audits and evaluations found that States did not ensure providers adequately documented and maintained childcare attendance records, and States did not always verify the completeness and accuracy of attendance records.  Appendix B contains a list of related OIG reports.  In addition, an audit performed by the Minnesota Office of the Legislative Auditor (Legislative Auditor) found the State did not always validate that provider billings aligned with childcare attendance records.[1]

**OBJECTIVE**

Our objective was to determine whether the Minnesota Department of Human Services (State agency) complied with Federal and State requirements related to attendance and payment for services at childcare centers.

**BACKGROUND**

**Childcare Services Funded by the Child Care and Development Fund Program**

Subsidized childcare services are available to assist low-income families, families receiving temporary public assistance, and families transitioning from public assistance to obtain childcare so that family members can work or attend training or education.  The services are administered (and funded in part) by each State and, under the provisions of the Child Care and Development Block Grant Act of 1990, as amended, and section 418 of the Social Security Act, are funded in part by the Child Care and Development Fund (CCDF) program.  At the Federal level, the U.S. Department of Health and Human Services, Administration for Children and Families (ACF), administers the CCDF program.

Under the CCDF program, States have considerable latitude in implementing and administering their childcare programs.  Each State must develop, and submit to ACF for approval, a State plan that identifies the purposes for which CCDF funds will be expended for three grant periods (i.e., 3 fiscal years) and that designates a lead agency responsible for administering childcare programs.   In addition, States are required to report expenditures on the quarterly Child Care and Development Fund ACF-696 Financial Report, which is a cumulative report for the fiscal year.[2]

---

[1] Child Care Assistance Program: Assessment of Internal Controls, accessed Oct. 4, 2024.

[2] The ACF-696 report summarizes the total childcare assistance expenditures made by the State agency and identifies the funding sources (Federal or State funds) that the State agency used for childcare assistance expenditures.

ACF 000212

**Minnesota's Child Care Assistance Program**

In Minnesota, the State agency is the lead agency responsible for administering the Child Care Assistance Program (CCAP), which helps families pay for childcare.[3]  The State agency is required to ensure that CCAP funds are expended in accordance with Federal requirements as well as requirements contained in the *Minnesota Child Care Assistance Program Policy Manual.*

In 2018, the Legislative Auditor initiated an audit to determine whether the State agency had adequate controls to prevent CCDF providers from overbilling.  The Legislative Auditor report found the State had weak processes to validate that provider billings aligned with actual childcare provided.  Specifically, the State did not reconcile billings against records of actual child attendance, and attendance records were often incomplete or missing.  The report recommended the implementation of a real-time electronic sign-in system to provide an automated way to verify actual attendance by children against provider billings and authorized care.[4]

*Billing Process*

Parents have a right to choose their childcare provider.  However, providers must register with the CCAP agency responsible for each county or Tribe where the children they serve reside to determine whether they meet requirements for receiving CCAP payments.

Minnesota's Electronic Child Care system, known as MEC[2], is used to register providers, authorize care for families and children, process bills, make payments, and track overpayment recoveries.  Childcare providers are paid in full up to the maximum daily rate, less the copayment for all authorized hours of childcare[5] (MN Statutes 3400.0110 Subd. 3d).  The system captures data from providers, including days the child is absent and holidays.  Licensed childcare providers must not be reimbursed for more than 25 full-day absent days per child, excluding holidays, in a calendar year, or for more than 10 consecutive full-day absent days,

---

[3] Certain children and family services are transferring from the State agency to the Department of Children, Youth, and Families (DCYF), which was established on July 1, 2024 (after the period of our audit).  Childcare services will transition to DCYF between July 2024 and July 2025.

[4] The recommendation to implement a real-time electronic sign-in system was unimplemented as of the start or our review.

[5] Families receiving childcare assistance may have to pay part of their childcare cost.  The family's copayment is based on their income and household size.

ACF 000213

subject to certain exceptions[6] such as documented illness of the child or parent that causes more frequent absences (MN Statutes 119B.13 Subd. 7).[7, 8]

Providers use MEC² to record a child's authorized attendance schedule for each day of that service period and any absences or holidays.  A child's actual attendance may differ from their scheduled hours.  If a child is recorded absent in the attendance records, but the absence is not recorded and billed in MEC², an overpayment would result.  Overpayments are calculated by subtracting the maximum daily rate from the total amount paid to a provider for each day that a child's attendance record is missing, unavailable, incomplete, inaccurate, or otherwise inadequate (MN Statutes 119B.125 Subd. 6d).[9]

*Attendance Documentation*

Although the State agency makes payments based on a child's authorized schedule rather than the actual hours the child attends, the State requires providers receiving childcare assistance payments to keep accurate and legible daily attendance records at the site where services are delivered for children and for these records to be available immediately on request.  Providers must retain the attendance documentation for 6 years after the date of service.  The records must be completed daily and include the date, the first and last name of each child in attendance, and the times when each child is dropped off and picked up.  To the extent possible, the times that the child was dropped off and picked up from the childcare provider must be entered by the person dropping off or picking up the child (MN Statutes 119B.125 Subd. 6a-b).[10]

As part of its oversight function, the State agency has monitoring procedures that consist of attendance record reviews.  Attendance record reviews can result from a tip or referral, routine auditing, or red flag indicators identified through data mining.  In practice, the State agency performs only a limited number of these reviews each year.

**HOW WE CONDUCTED THIS AUDIT**

Our audit covered $231.4 million in childcare payments made to 1,155 licensed childcare centers in Minnesota from January 1 through December 31, 2023 (audit period).  We used a multistage sample design, where we first randomly selected 20 licensed childcare centers as

---

[6] None of these exceptions affected our findings.

[7] MN Statutes 119B.13 Subd. 7 was renumbered MN Statutes 142E.17 Subd. 10 in March 2024.

[8] 2023 Minnesota Statutes 119B.125 Provider Requirements
https://www.revisor.mn.gov/statutes/2023/cite/119B.125, accessed on Oct. 4, 2024.

[9] MN Statutes 119B.125 Subd. 6d was renumbered MN Statutes 142E.16 Subd. 7 in March 2024.

[10] MN Statutes 119B.125 Subd. 6a-b was renumbered MN Statutes 142E.16 Subd. 9 in March 2024.

ACF 000214

our primary sample units.  For the second stage, we selected a random sample of 10 payments for services provided to distinct children over a 2-week period from each of the 20 licensed childcare centers selected in the first stage for a total of 200 sample payments for review.  We visited the 20 selected providers to collect the attendance documentation for each payment in our sample and reviewed the 200 randomly selected childcare payments to determine whether the State agency complied with Federal and State requirements.

We interviewed State agency officials and reviewed applicable Federal and State laws, regulations, and guidance to obtain an understanding of the policies and procedures that related to attendance and payment for services at childcare centers.

We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Appendix A contains details of our audit scope and methodology, Appendix C contains our statistical sampling methodology, Appendix D contains our sample results and estimates, and Appendix E contains our summary of attendance and payment errors.

### FINDINGS

The State agency did not comply with Federal and State attendance documentation requirements for some payments made under its CCAP for 2023.  For 38 of the 200 payments, the State agency did not comply with requirements related to attendance and payment for services.  For the remaining 162 payments, we did not identify any errors related to attendance or payment.  Based on our sample results, we estimate that 11 percent of all payments made to 1,155 licensed childcare centers in 2023 had 1 or more errors related to attendance and payment for services.  The State agency's limited oversight of attendance documentation at childcare centers resulted in overpayments to providers.

**CHILDCARE PAYMENTS WERE NOT MADE IN ACCORDANCE WITH**
**FEDERAL AND STATE ATTENDANCE DOCUMENTATION REQUIREMENTS**

**Federal and State Requirements**

In its State plan, the lead agency must assure that upon approval, it will have a program in effect that complies with the plan and that is administered in accordance with the program's authorizing legislation and all other applicable Federal laws and requirements (45 CFR § 98.15(a)(1)).  Federal regulations also require that a State's fiscal control and accounting procedures be sufficient to allow for the tracing of funds to a level of expenditure adequate to establish that funds were used in accordance with applicable Federal regulations (45 CFR § 98.67(c)(2)).  In addition, the State is to expend and account for CCDF funds in accordance

*Minnesota Child Care Assistance Program Attendance (A-05-24-00001)*          *4*

with its own laws and procedures for expending and accounting for its own funds (45 CFR § 98.67(a)).

Minnesota Statutes for childcare programs require as a condition of payment that all providers receiving CCAP payments must keep accurate and legible daily attendance records at the site where services are delivered for children receiving childcare assistance and retain those records for 6 years after the date of service.

**Attendance Documentation Requirements Not Met**

The State agency did not comply with Federal and State requirements for 38 of 200 sampled payments. Specifically, for the sampled 38 payments we identified 43 errors related to attendance documentation:[11]

- ❌ the attendance documentation was missing or unavailable for between 1 and 8 days of authorized childcare (10 payments);

- ❌ the attendance documentation was missing sign-in or sign-out times or included inaccurate dates (17 payments); or

- ❌ the attendance documentation indicated the child was absent, but the child was not billed as absent in MEC² (16 payments).

Payments to providers totaling $48,086 were associated with attendance records that included 1 or more days of overpayments for childcare services over the 2-week service period. Based on our sample results, we estimate that 11 percent of all payments made to 1,155 licensed childcare centers in 2023 had 1 or more errors related to attendance and payment for services.

**Limited Oversight of Attendance Documentation by the State Agency**

As part of its oversight function, the State agency has monitoring procedures that include attendance record reviews. Enhanced and more frequent reviews are performed at CCAP providers during their first year of operation. Additionally, the State agency may periodically audit childcare providers to determine compliance with record-keeping requirements. These attendance record reviews can result from a tip or referral, routine auditing, or other actions. However, in practice the State agency performs only a limited number of these attendance documentation reviews each year. A lack of oversight to ensure accurate and complete attendance documentation could increase the risk of fraud, waste, and abuse to the CCAP program.

---

[11] The number of errors exceeded the number of payments because five payments each contained two errors.

Additionally, the Legislative Auditor reported that the State had weak processes to validate that provider billings aligned with actual childcare provided.  Specifically, the State did not reconcile billings against records of actual child attendance, and attendance records were often incomplete or missing.  The report recommended the implementation of a real-time electronic sign-in system to provide an automated way to verify actual attendance by children against provider billings and authorized care.

### RECOMMENDATIONS

We recommend that the Minnesota Department of Human Services:[12]

- work with the childcare providers to collect, as appropriate, overpayments of CCAP claims identified by our audit;

- strengthen its monitoring program to include routine reviews of CCAP attendance records for accuracy; and

- continue to take steps to automate childcare attendance records through real-time electronic reporting as recommended by the Minnesota Office of the Legislative Auditor.

### STATE AGENCY COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE

In written comments on our draft report, the State agency concurred with our three recommendations and described actions that it has taken or plans to take to address them.  The State agency's actions include: (1) conducting unannounced compliance visits of the providers identified in the audit to review attendance records and recover overpayments; (2) updating and sending guidance and training materials on attendance record requirements to all CCAP providers and increasing compliance monitoring of new CCAP providers; and (3) providing technical assistance on proposed legislation that requires providers to keep electronic attendance records.

We acknowledge the corrective actions the State agency has taken or plans to take to address our recommendations.  These corrective actions should strengthen its oversight of attendance records and payment for services at childcare centers.

The State agency's comments appear in their entirety as Appendix F.

---

[12] Minnesota officials noted during our Dec. 6, 2024, exit conference that the Department of Human Services and the Department of Children, Youth, and Families will collaborate to address the recommendations.

*Minnesota Child Care Assistance Program Attendance (A-05-24-00001)*                                        *6*

**APPENDIX A: AUDIT SCOPE AND METHODOLOGY**

**SCOPE**

We reviewed the State agency's CCAP payments made on behalf of the CCDF program for January 1 through December 31, 2023.  During this timeframe, the State agency paid childcare claims totaling $231.4 million to 1,155 providers.  We used a multistage sample design, where we first randomly selected 20 licensed childcare centers as our primary sample units.  For the second stage, we selected a random sample of 10 payments for services provided to distinct children over a 2-week period from each of the 20 licensed childcare centers selected in the first stage for a total of 200 sample payments for review.  We visited the 20 selected providers to collect the attendance documentation for each payment in our sample and reviewed the 200 randomly selected childcare payments to determine whether the State agency complied with Federal and State requirements.

We interviewed State agency officials and reviewed applicable Federal and State laws, regulations, and guidance to obtain an understanding of the policies and procedures that related to attendance and payment for services at childcare centers.

We did not review the State agency's overall internal control structure.  We reviewed only those controls that pertained to our objective.  We discussed the State agency's procedures related to risk assessment and control activities during the entrance conference and obtained correspondence to support our assessment of these factors.

We conducted our audit work from October 2023 through March 2025.

**METHODOLOGY**

To accomplish our objective, we:

- reviewed applicable Federal laws, Federal regulations, Minnesota's CCDF State plan related to the CCAP for the audit period, and Federal and State program guidance for the CCDF program;

- interviewed State agency staff to obtain an understanding of the policies, procedures, and guidance for the CCAP;

- interviewed State agency staff to obtain an understanding of the State agency's specific controls for ensuring that providers maintained attendance documentation to support paid childcare services;

- obtained summary payment data from the State agency for all CCAP childcare payments for 2023, resulting in a sampling frame of $231.4 million in childcare payments made to

ACF 000218

1,155 licensed childcare centers in Minnesota from January 1 through December 31, 2023;

- selected a random sample of 200 payments using a multistage sample design consisting of two stages:

  - for the first stage, randomly selected 20 licensed childcare centers as our primary sample units and

  - for the second stage, selected a random sample of 10 payments for services provided to distinct children over a 2-week period from each of the 20 licensed childcare centers selected in the first stage for a total of 200 sample payments for review;

- visited the 20 selected providers to collect the attendance documentation for each payment in our sample;

- reviewed the 200 randomly selected childcare payments to determine whether the State agency complied with Federal and State requirements related to attendance documentation;

- on the basis of our sample results, estimated the number of childcare payments that had attendance and payment errors; and

- summarized the results of our audit and discussed these results with State agency and Department of Children, Youth, and Families officials on December 6, 2024.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

**APPENDIX B: RELATED OFFICE OF INSPECTOR GENERAL REPORTS**

| Report Title | Report Number | Date Issued |
|---|---|---|
| *Mississippi Needs To Improve Oversight of Its Child Care Payment Program* | A-07-18-04111 | 4/1/2020 |
| *States' Payment Rates Under the Child Care and Development Fund Program Could Limit Access to Child Care Providers* | OEI-03-15-00170 | 8/12/2019 |
| *Not All of Missouri's Child Care Subsidy Program Payments Complied With Federal and State Requirements* | A-07-15-04226 | 11/30/2017 |
| *More Effort Is Needed To Protect the Integrity of the Child Care and Development Fund Block Grant Program* | OEI-03-16-00150 | 7/12/2016 |

ACF 000220

**APPENDIX C: STATISTICAL SAMPLING METHODOLOGY**

**SAMPLING FRAME**

The sample design for this audit was a multistage design.  For the first stage of random selection, the sampling frame consisted of 1,155 licensed child centers in the State of Minnesota with CCAP payments from January 1 through December 31, 2023, totaling $231,422,974.  For the second stage of random selection, we obtained a listing of all CCAP payments (for distinct children) made to each licensed childcare center selected in the first stage.

**SAMPLE UNIT**

The primary sample unit was a licensed childcare center.  The secondary sample unit was a payment for a distinct child served by the CCAP program.

**SAMPLE DESIGN AND SAMPLE SIZE**

We used a multistage sample design consisting of two stages.  For the first stage, we used the Rao, Hartley, and Cochran (RHC) sample selection.  This method uses probability-proportional-to-size, weighted by the total number of children served by each licensed childcare center that received payments in CY 2023 in Minnesota.[13]  We randomly selected 20 licensed childcare centers as our primary sample units.

For the second stage, we selected a random sample of 10 payments from each of the 20 licensed childcare centers selected in the first stage, for a total of 200 sample units.

**SOURCE OF RANDOM NUMBERS**

We generated the random numbers using the OIG/Office of Audit Services statistical software.

**METHOD OF SELECTING SAMPLE UNITS**

For the primary sample units, the RHC sample selection utilized probability-proportional-to-size whereby the total number of children served in 2023 by each licensed childcare center was considered.

For the secondary sample units, we identified all payments made for children served by the CCAP program in each licensed childcare center selected as a primary sample unit and sorted the payments from the first stage by ascending Person ID number, Service Period Beg Date, and

---

[13] Probability-proportional-to-size is a sampling method from a finite population in which a size measure is available for each population unit before sampling and where the probability of selecting a unit is proportional to its size.

*Minnesota Child Care Assistance Program Attendance (A-05-24-00001)*                    *10*

Service Period End Date, and consecutively numbered the frame items.  Using the 10 random numbers generated for each center, we selected the corresponding frame items for review.  If a selected licensed childcare center had less than 10 payments for 2023, we reviewed all payments for the children served by the CCAP program at that center.

**ESTIMATION METHODOLOGY**

We used the OIG/OAS statistical software to estimate the number of payments in the sampling frame that had attendance and payment errors.  We calculated the point estimate and the corresponding two-sided 90-percent confidence interval for the estimated number of payments in the sampling frame with attendance and payment error.

ACF 000222

**APPENDIX D: SAMPLE RESULTS AND ESTIMATES**

**Table 1: Sample Results by Provider**

| Provider | Number of Frame Units | Sample Size | Number of Payments in the Sample With Attendance and Payment Errors |
|---|---|---|---|
| 1 | 25,566 | 10 | 0 |
| 2 | 3,419 | 10 | 3 |
| 3 | 1,075 | 10 | 6 |
| 4 | 18,466 | 10 | 1 |
| 5 | 62,997 | 10 | 1 |
| 6 | 12,477 | 10 | 2 |
| 7 | 9,568 | 10 | 1 |
| 8 | 30,844 | 10 | 2 |
| 9 | 33,488 | 10 | 0 |
| 10 | 38,029 | 10 | 2 |
| 11 | 18,438 | 10 | 2 |
| 12 | 8,839 | 10 | 1 |
| 13 | 765 | 10 | 6 |
| 14 | 15,787 | 10 | 6 |
| 15 | 65,161 | 10 | 2 |
| 16 | 18,996 | 10 | 1 |
| 17 | 18,219 | 10 | 1 |
| 18 | 20,309 | 10 | 1 |
| 19 | 6,268 | 10 | 0 |
| 20 | 15,736 | 10 | 0 |

**Estimated Number of Payments in the Sampling Frame With Attendance and Payment Errors**
*(Limits Calculated at the 90-percent Confidence Level)*

| | |
|---|---|
| Point estimate | 2,153,974 |
| Lower limit | 782,959 |
| Upper limit | 3,524,989 |

ACF 000223

**APPENDIX E: SUMMARY OF ATTENDANCE AND PAYMENT ERRORS**

| Provider | Missing Record | Inaccurate Record | Incorrect Billing | Total[14] |
|---|---|---|---|---|
| 1 | - | - | - | 0 |
| 2 | 3 | - | 1 | 4 |
| 3 | 1 | 4 | 1 | 6 |
| 4 | 1 | - | - | 1 |
| 5 | 1 | - | - | 1 |
| 6 | - | - | 3 | 3 |
| 7 | - | - | 1 | 1 |
| 8 | - | - | 2 | 2 |
| 9 | - | - | - | 0 |
| 10 | - | 2 | - | 2 |
| 11 | 1 | - | 1 | 2 |
| 12 | - | 1 | - | 1 |
| 13 | 1 | 5 | 1 | 7 |
| 14 | 1 | 5 | 2 | 8 |
| 15 | 1 | - | 1 | 2 |
| 16 | - | - | 1 | 1 |
| 17 | - | - | 1 | 1 |
| 18 | - | - | 1 | 1 |
| 19 | - | - | - | 0 |
| 20 | - | - | - | 0 |
| **Total** | **10** | **17** | **16** | **43** |

---

[14] The number of errors exceeded the number of payments because five payments each contained two errors.

*Minnesota Child Care Assistance Program Attendance (A-05-24-00001)*                    *13*

ACF 000224



April 17, 2025


Department of Health and Human Services
Office of Audit Services, Region V
Sheri L. Fulcher, Regional Inspector General for Audit Services
233 North Michigan, Suite 1360
Chicago, Illinois 60601


Dear Ms. Fulcher:

Thank you for providing an opportunity to comment on draft audit report AA-05-24-00001 entitled *Minnesota Could Better Ensure That Childcare Assistance Providers Comply With Attendance Requirements.* We appreciated the opportunity to work with your staff as they completed this audit.

The Department of Human Services (DHS) and the Department of Children, Youth and Families (DCYF) recognize the importance of strong internal controls that ensure providers are aware of and meeting program documentation requirements. DHS and DCYF are already working to implement the recommendations contained in this report and are committed to maintaining an effective control environment over Minnesota's Child Care Assistance Program.

Below are our responses to the recommendations contained in this report.

**Recommendation 1**

We recommend that the Minnesota Department of Human Services work with the childcare providers to collect, as appropriate, overpayments of CCAP claims identified by our audit.

Response to Recommendation 1:

DHS and DCYF concur with the recommendation to assess and collect overpayments, as appropriate. The DHS Office of Inspector General (DHS-OIG) will be conducting unannounced compliance visits on the providers identified in the audit. Upon transition of the CCAP integrity program to DCYF on June 18, 2025, DCYF Office of Inspector General will continue with this effort to the extent it is not completed. Attendance records will be collected and reviewed, and standard policies will be followed to recover payments based on that review.

**Recommendation 2**

We recommend that the Minnesota Department of Human Services strengthen its monitoring program to include routine reviews of CCAP attendance records for accuracy.

ACF 000225

Minnesota Response to A-05-24-00001
April 17, 2025
Page 2 of 2

<u>Response to Recommendation 2</u>:

DHS and DCYF concur with this recommendation. DHS-OIG recently updated and sent a reference guide with attendance record requirements to all CCAP providers, which included training videos on provider billing.

DHS is also expanding its Early and Often Program, a collaborative initiative that partners providers with DHS Licensing during the first year of a provider's operation. This program aims to ensure that new child care centers meet the requirements of CCAP by increased monitoring of their attendance record-keeping practices and compliance with state statutes. By focusing on early and frequent reviews, investigators can identify and address any issues before they escalate. This increased monitoring helps to ensure that providers understand their responsibilities and maintain high standards of care, benefiting both the providers and the families they serve.

<u>Recommendation 3</u>

We recommend that the Minnesota Department of Human Services continue to take steps to automate childcare attendance records through real-time electronic reporting as recommended by the Minnesota Office of the Legislative Auditor.

<u>Response to Recommendation 3</u>:

DHS and DCYF concur with this recommendation. DHS-OIG is working with DCYF on this issue. In the 2025 legislative session, the governor proposed legislation that would require providers to keep electronic attendance records. DHS-OIG and DCYF provided technical assistance on this bill. A vote on the legislation is expected this session. Should the bill pass into law, DCYF will have the funds to create this technological advancement.

We appreciate your review and if you have any questions, comments or concerns about our response, please contact Gary L. Johnson, Director of Internal Audits, at 651 431-3623 or through e-mail at Gary.L.Johnson@state.mn.us.

Sincerely,

Shireen Gandhi, Temporary Commissioner
Minnesota Department of Human Services

Cyndi Jahnke, Chief General Counsel
for
Tikki Brown, Commissioner
Minnesota Department of Children, Youth and Families

ACF 000226

# Report Fraud, Waste, and Abuse

OIG Hotline Operations accepts tips and complaints from all sources about potential fraud, waste, abuse, and mismanagement in HHS programs.  Hotline tips are incredibly valuable, and we appreciate your efforts to help us stamp out fraud, waste, and abuse.



## TIPS.HHS.GOV

## Phone: 1-800-447-8477

## TTY: 1-800-377-4950

## Who Can Report?

Anyone who suspects fraud, waste, and abuse should report their concerns to the OIG Hotline.  OIG addresses complaints about misconduct and mismanagement in HHS programs, fraudulent claims submitted to Federal health care programs such as Medicare, abuse or neglect in nursing homes, and many more.  Learn more about complaints OIG investigates.

## How Does It Help?

Every complaint helps OIG carry out its mission of overseeing HHS programs and protecting the individuals they serve.  By reporting your concerns to the OIG Hotline, you help us safeguard taxpayer dollars and ensure the success of our oversight efforts.

## Who Is Protected?

Anyone may request confidentiality.  The Privacy Act, the Inspector General Act of 1978, and other applicable laws protect complainants.  The Inspector General Act states that the Inspector General shall not disclose the identity of an HHS employee who reports an allegation or provides information without the employee's consent, unless the Inspector General determines that disclosure is unavoidable during the investigation.  By law, Federal employees may not take or threaten to take a personnel action because of whistleblowing or the exercise of a lawful appeal, complaint, or grievance right.  Non-HHS employees who report allegations may also specifically request confidentiality.



ACF 000227

# Stay In Touch

Follow HHS-OIG for up to date news and publications.

    OIGatHHS

 HHS Office of Inspector General

[Subscribe To Our Newsletter](#)

[OIG.HHS.GOV](#)

# Contact Us

For specific contact information, please visit us online.

U.S. Department of Health and Human Services
Office of Inspector General
Public Affairs
330 Independence Ave., SW
Washington, DC 20201

Email: Public.Affairs@oig.hhs.gov

ACF 000228



**Office of the Assistant Secretary** | 330 C Street, S.W., Suite 4034
Washington, D.C. 20201 | www.acf.hhs.gov

**DATE:**       January 6, 2026

**TO:**         Robert F. Kennedy Jr., Secretary

**Through:**    Liesl Fowler, Executive Secretary

**FROM:**       Alex J. Adams, Assistant Secretary for Children and Families

**SUBJECT:**    DECISION –Child Care and Development Fund (CCDF), Temporary Assistance for Needy Families (TANF), and Social Services Block Grant (SSBG) Temporary Restricted Drawdown for the State of California, the State of Colorado, the State of Illinois, and the State of New York

## ACTION REQUESTED

The Immediate Office of the Assistant Secretary (IOAS) requests the Secretary's review and decision on placing the State of California, the State of Colorado, the State of Illinois, and the State of New York on Temporary Restricted Drawdown for the Child Care and Development Fund (CCDF), Temporary Assistance for Needy Families (TANF), and Social Services Block Grant (SSBG) programs.

## BLUF

IOAS requests the Secretary's approval of the Temporary Restricted Drawdown of funds. The Administration for Children and Families (ACF) has temporarily withheld the State of California, the State of Colorado, the State of Illinois, and the State of New York from further unrestricted drawdown for all Child Care and Development Fund (CCDF), and Social Services Block Grant (SSBG) awards. The Temporary Restricted Drawdown of CCDF, TANF, and SSBG funds for California, Colorado, Illinois, and New York will continue until such time that ACF determines that the State has implemented adequate internal controls to ensure compliance with federal and state fiscal accountability standards.

## TARGET RELEASE DATE

January 6, 2026

## RATIONALE FOR EXPEDITED RELEASE

This temporary action is needed to ensure fidelity of federal funds and demonstrate compliance with federal requirements for CCDF, TANF, and SSBG funds. This action is intended to be temporary and will be lifted upon completion of a thorough review.

ACF 000229

## RECOMMENDATION

I recommend approval of the Temporary Restricted Drawdown for California, Colorado, Illinois, and New York, specific to CCDF, TANF, and SSBG funds.

## EXECUTIVE SUMMARY

ACF is seeking your approval to temporarily withhold the drawdown of funds for the State of California, the State of Colorado, the State of Illinois, and the State of New York for all Child Care and Development Fund (CCDF), Temporary Assistance for Needy Families (TANF), and Social Services Block Grant (SSBG) awards. This action is in response to the seriousness of the allegations regarding misuse of federal funds and the need to ensure the integrity of federal program expenditures with administrative data.

A forensic review of California, Colorado, Illinois, and New York's records should be conducted in light of these serious allegations.  To that end, ACF proposes to send letters to each of the states requesting information about their fiscal control and accounting procedures.  While that review is underway, ACF recommends imposing temporary restricted drawdown that would require the states to provide additional supporting documentation before any further CCDF, TANF, or SSBG funds may be accessed through the Payment Management System (PMS). This temporary restriction will remain in effect until ACF determines that the State has implemented adequate internal controls to ensure compliance with federal and state fiscal accountability.

CCDF, TANF, and SSBG were selected for this temporary restriction because child care is an allowable expense under these programs. While child care is an important service impacting families nationwide, this temporary restriction is necessary to ensure federal dollars are actually benefiting families in need for verified allowable purposes. Given the troubling reports from California, Colorado, Illinois, and New York, an enhanced review is both justified and essential.

I have attached for your review reports documenting state-specific concerns with regard to child care fraud. See Tab A (California), Tab B (Colorado), Tab C (Illinois) and Tab D (New York). Each Tab also contains the relevant state plans for each program in addition to the reported fraud concerns.

**Background:**

*CCDF*
The Child Care and Development Fund (CCDF) is a federal program **that funds child care for low-income working families** so parents can work or pursue education and training. Administered by the Office of Child Care within HHS, CCDF provides grants to states, territories, and tribes to subsidize child care and improve the quality and safety of child care services. The program also promotes child development and school readiness by supporting health, safety, and early learning standards.

*TANF*
The Temporary Assistance for Needy Families (TANF) program provides flexible federal funding

2

to states, territories, and tribes to support low-income families and promote economic stability and work participation. States may use TANF **funds to help families afford child care** either directly through the TANF block grant or through funds transferred to the CCDF program under 42 USC § 604(d)(1)(B) so parents can work, participate in job training, or meet work requirements, either directly or by transferring funds to the Child Care and Development Fund (CCDF). This flexibility allows TANF to complement child care subsidies and support family self-sufficiency while ensuring children are cared for in safe and stable settings.

*SSBG*

The Social Services Block Grant (SSBG) provides flexible federal funding to states and territories to support a wide range of social services for vulnerable children, adults, and families. SSBG **funds may be used to help provide or supplement child care services** that enable parents to work, participate in training, or address family needs not fully met by other programs. This permits states to use SSBG to fill gaps, support special populations, and complement programs like CCDF and TANF in strengthening child and family well-being.

Due to the extensive questions of fraud and misuse in the child care space, it is necessary to implement a temporary restriction on California, Colorado, Illinois, and New York's drawdown of federal funds for CCDF, TANF, and SSBG until a thorough analysis can be completed. This action will allow ACF to assess and review the expenditures of federal dollars awarded to the State of California, the State of Colorado, the State of Illinois, and the State of New York to ensure conformity with all applicable laws and regulations.

**Notable Timing Factors and Administration Priorities**:
This action is needed immediately due to increasing reports of misuse and fraud.

**Novel Elements to Consider**:
N/A

## RECOMMENDATION

Approve Temporary Restricted Drawdown for the State of California, the State of Colorado, the State of Illinois, and the State of New York, specific to CCDF, TANF, and SSBG.

The Temporary Restricted Drawdown for the State of California, the State of Colorado, the State of Illinois, and the State of New York will restrict State access to CCDF, TANF, and SSBG funds in the Payment Management System (PMS).
Approval of the Temporary Restricted Drawdown
- Helps to ensure that the State has implemented adequate internal controls to ensure compliance with federal and state fiscal accountability standards.
- Without approved Temporary Restricted Drawdown , ACF will not be able to act upon its ability to monitor funds and ensure compliance with applicable fiscal accountability standards.

**Outstanding Questions:** N/A

3

## FAMILY IMPACT STATEMENT

N/A

## ROLLOUT

ACF will send letters to the Governors of California, Colorado, Illinois, and New York with the approved CCDF, TANF, and SSBG Temporary Restricted Drawdown  and request information regarding their fiscal control and accounting procedures.

**For questions, please contact:**  Alex J. Adams, Assistant Secretary for Children and Families

## DECISION

Approve CCDF, TANF, and SSBG Temporary Restricted Drawdown for the State of California, the State of Colorado, the State of Illinois, and the State of New York until a thorough review can be conducted.

Approved [        ]
Disapproved [        ]
Briefing Needed [      ]
Additional Comments:

/S/ Robert F. Kennedy, Jr.,                                                              Date

4

ACF 000232



Home / Specialized Programs / Early Education / Contractor Information

# Child Care Fraud Definitions, Table 1

A total of 12 counties submitted their definitions of parental fraud: Butte, Contra Costa, Fresno, Kern, Lassen, Monterey, Riverside, Sacramento, San Diego, Santa Clara, Tulare, and Yolo. The table below displays the definitions received and the number of counties reporting fraud occurrence matching that description.

| Definition of Child Care Fraud Caused by Parents | Number of Counties Reporting the Indicator |
|---|---|
| Child in care when need has ceased | 9 |
| Increased earnings not reported | 9 |
| Care requested when adult in home | 2 |
| Cash aid fraud | 2 |
| Parent/employer collusion to falsify work | 3 |
| False statements that affect eligibility or payment | 3 |
| Failure to report changes in household, work, etc. | 6 |
| Absent parent in home | 5 |
| Child is not dependent of parent | 5 |
| Parent receives more than one subsidy for same service | 4 |

**Related pages**

- Table 1: Definition of Child Care Fraud Caused by Parents
- Table 2: Definition of Fraud Caused by Providers or Both Parents and Providers
- Table 3: Fraud Indicators, Parents and Providers
- Table 4: Fraud Indicators, Parents and Providers
- Table 5: Fraud Indicators, Parents and Providers
- Table 6: Fraud Indicators, Parents and Providers

ACF 000233

- <u>Table 7: Fraud Indicators, Parents and Providers</u>

**Questions:   Early Education Division | 916-322-6233**

Last Reviewed: Tuesday, December 9, 2025



Home / Specialized Programs / Early Education / Contractor Information

# Child Care Fraud Definitions, Table 2

The table below displays fraud types caused by provider or both parent and provider along with the frequency of each occurrence among these 12 counties: Butte, Contra Costa, Fresno, Kern, Lassen, Monterey, Riverside, Sacramento, San Diego, Santa Clara, Tulare, and Yolo.

| Types of Fraud Caused by Providers or Both Parents and Providers | Number of Counties Reporting the Indicator |
|---|---|
| Provider receives payment for services rendered by another | 3 |
| Provider claims hours of care not provided | 10 |
| Signatures on attendance claim don't match parent's or provider's | 3 |
| Provider receives In-Home Supportive Services from parent | 2 |
| Misuse of evening/weekend adjustment | 1 |
| Falsifying relationship to child to avoid Trustline | 1 |
| Provider over licensed capacity | 2 |
| Provider also on cash aid and fails to report income | 1 |
| Parent/provider collusion | 2 |

Related pages

- Table 1: Definition of Child Care Fraud Caused by Parents
- Table 3: Fraud Indicators, Parents and Providers
- Table 4: Fraud Indicators, Parents and Providers
- Table 5: Fraud Indicators, Parents and Providers
- Table 6: Fraud Indicators, Parents and Providers
- Table 7: Fraud Indicators, Parents and Providers

Questions:  CDMIS Office | CDMIS@cde.ca.gov

ACF 000235

Last Reviewed: Tuesday, June 10, 2025

ACF 000236



Home / Specialized Programs / Early Education / Contractor Information

# Child Care Fraud Indicators, Table 1 of 5

Child care fraud indicators submitted by county departments of social services.[1]

| Fraud Indicators for Both Parents and Providers | Number of Counties Reporting the Indicator |
|---|---|
| Use of indicators or red flags, but not specific | 2 |
| Participant/provider more than 25 miles | 9 |
| Child has perfect attendance | 4 |
| Parent completed sign-in/out sheet at same time | 5 |
| Provider's work hours interferes with care | 6 |
| Presence of older children and exempt care | 6 |
| Parent and provider live together or other links | 6 |
| Parent or provider change addresses often | 6 |
| Shared custody or absent parent in contact with children | 4 |
| Child care claims exceed need | 13 |
| Frequently changing schedules or providers | 6 |

[1] These 21 counties responded to the survey. Butte, Colusa, Contra Costa, Glenn, Imperial, Kern, Lake, Los Angeles, Monterey, Orange, Riverside, Sacramento, San Bernardino, San Diego, San Francisco, Santa Clara, Sonoma, Stanislaus, Tulare, Tuolumne, and Yuba counties.

Related pages

- Table 1: Definition of Child Care Fraud Caused by Parents
- Table 2: Definition of Fraud Caused by Providers or Both Parents and Providers
- Table 4: Fraud Indicators, Parents and Providers
- Table 5: Fraud Indicators, Parents and Providers

ACF 000237

- Table 6: Fraud Indicators, Parents and Providers
- Table 7: Fraud Indicators, Parents and Providers

**Questions:   Early Education Division | EarlyEducation@cde.ca.gov**

Last Reviewed: Wednesday, October 22, 2025

ACF 000238



*California* DEPARTMENT OF
**EDUCATION**

Home / Specialized Programs / Early Education / Contractor Information

# Child Care Fraud Indicators, Table 2 of 5

Child care fraud indicators submitted by county departments of social services. [1]

| Fraud Indicators for Both Parents and Providers | Number of Counties Reporting the Indicator |
|---|---|
| Siblings attending at different times with no explanation | 1 |
| Male license-exempt provider | 1 |
| Very high or very low rate or excessive work hours reported | 5 |
| Parent has prior record of fraud | 2 |
| Parent cannot be contacted at work or provider at home | 6 |
| Unknown persons always answers parent's phone | 3 |
| "White-out" used on child care claim forms | 6 |
| Parent has expensive lifestyle | 1 |
| "Job search" during evenings or weekends | 1 |
| Signature on attendance sheets do not match other records | 7 |
| Evidence of a wedding ring | 1 |

[1] These 21 counties responded to the survey. Butte, Colusa, Contra Costa, Glenn, Imperial, Kern, Lake, Los Angeles, Monterey, Orange, Riverside, Sacramento, San Bernardino, San Diego, San Francisco, Santa Clara, Sonoma, Stanislaus, Tulare, Tuolumne, and Yuba counties.

Related pages

- Table 1: Definition of Child Care Fraud Caused by Parents
- Table 2: Definition of Fraud Caused by Providers or Both Parents and Providers
- Table 3: Fraud Indicators, Parents and Providers
- Table 5: Fraud Indicators, Parents and Providers

ACF 000239

- Table 6: Fraud Indicators, Parents and Providers
- Table 7: Fraud Indicators, Parents and Providers

**Questions:   Early Education Division | EarlyEducation@cde.ca.gov**

Last Reviewed: Tuesday, June 10, 2025

ACF 000240



Home / Specialized Programs / Early Education / Contractor Information

# Child Care Fraud Indicators, Table 3 of 5

**Important Notice: Programs Moved to CDSS**

While the California Department of Education continues to operate the California State Preschool Program, the Early Childhood Development Act of 2020 (Senate Bill (SB) 98, Chapter 24, Statutes of 2020) authorized the transfer of many childcare programs from the California Department of Education to the California Department of Social Services (CDSS) effective July 1, 2021. The content on this page may include programs that have moved to CDSS. For additional assistance you can either visit the CDSS Child Care Transition web page ⬀ or call 1-833-559-2420 for more information.

Child care fraud indicators submitted by county departments of social services. [1]

| Fraud Indicators for Both Parents and Providers | Number of Counties Reporting the Indicator |
|---|---|
| Suspicious pay stubs or falsified documents | 4 |
| Parent and provider disagree on hours of care | 5 |
| Change to exempt provider with suspicious hours | 1 |
| Pregnant by absent parent or he is emergency contact | 3 |
| Info. on pay stub inconsistent with information given by parent | 3 |
| Parent forgets documents or gives inconsistent information | 4 |
| Provider often requests duplicate attendance logs or late billings | 3 |
| Exempt provider caring for more than one family | 2 |
| Employer states parent not working or false employer | 5 |
| Child not in care with provider | 3 |

ACF 000241

[1] These 21 counties responded to the survey. Butte, Colusa, Contra Costa, Glenn, Imperial, Kern, Lake, Los Angeles, Monterey, Orange, Riverside, Sacramento, San Bernardino, San Diego, San Francisco, Santa Clara, Sonoma, Stanislaus, Tulare, Tuolumne, and Yuba counties.

Related pages

- Table 1: Definition of Child Care Fraud Caused by Parents
- Table 2: Definition of Fraud Caused by Providers or Both Parents and Providers
- Table 3: Fraud Indicators, Parents and Providers
- Table 4: Fraud Indicators, Parents and Providers
- Table 5: Fraud Indicators, Parents and Providers
- Table 6: Fraud Indicators, Parents and Providers
- Table 7: Fraud Indicators, Parents and Providers

**Questions:  Early EducationDivision | 916-322-6233**

Last Reviewed: Tuesday, December 9, 2025

ACF 000242