| | | | | |
|---|---|---|---|---|
| 11.b. Pre-Kindergarten/Head Start | $0.00 | $84,851,513.44 | $0.00 | $0.00 |
| 12. Financial Education and Asset Development | $165,749.33 | $0.00 | $0.00 | $0.00 |
| 13. Refundable Earned Income Tax Credits | $103,444,631.37 | $0.00 | $0.00 | $0.00 |
| 14. Non-EITC Refundable State Tax Credits | $0.00 | $0.00 | $0.00 | $0.00 |
| 15. Non-Recurrent Short Term Benefits | $31,990.00 | $0.00 | $0.00 | $0.00 |
| 16. Supportive Services | $0.00 | $1,517,632.28 | $0.00 | $0.00 |
| 17. Services for Children and Youth | $0.00 | $0.00 | $0.00 | $0.00 |
| 18. Prevention of Out-of-Wedlock Pregnancies | $2,430,355.66 | $0.00 | $0.00 | $0.00 |
| 19. Fatherhood and Two-Parent Family Formation and Maintenance Programs | $0.00 | $0.00 | $0.00 | $0.00 |
| 20. Child Welfare Services | $100,067,284.45 | $0.00 | $0.00 | $0.00 |
| 20.a. Family Support/Family Preservation /Reunification Services | $0.00 | $0.00 | $0.00 | $0.00 |
| 20.b. Adoption Services | $0.00 | $0.00 | $0.00 | $0.00 |
| 20.c. Additional Child Welfare Services | $100,067,284.45 | $0.00 | $0.00 | $0.00 |
| 21. Home Visiting Programs | $0.00 | $0.00 | $0.00 | $0.00 |
| 22. Program Management | $47,246,979.56 | $766,326.96 | $0.00 | $0.00 |
| 22.a. Administrative Costs | $0.00 | $0.00 | $0.00 | $0.00 |
| 22.b. Assessment/Service Provision | $47,246,979.56 | $766,326.96 | $0.00 | $0.00 |
| 22.c. Systems | $0.00 | $0.00 | $0.00 | $0.00 |
| 23. Other | $0.00 | $0.00 | $0.00 | $0.00 |
| 24. Total Expenditures | $291,563,136.00 | $636,499,267.60 | $0.00 | $0.00 |
| 25. Transitional Services for Employed | $0.00 | $0.00 | $0.00 | $0.00 |
| 26. Job Access | $0.00 | $0.00 | $0.00 | $0.00 |
| 27. Federal Unliquidated Obligations | $0.00 | | | $0.00 |
| 28. Unobligated Balance | $0.00 | | | $0.00 |
| 29. State Replacement Funds | | $0.00 | | |
| **Quarterly Estimate** | Estimate of TANF Funds Requested | | | |
| 30. Estimate of TANF Funds Requested for the Following Quarter | $145,781,568.00 | | | |

THIS IS TO CERTIFY THAT THE INFORMATION REPORTED ON ALL PARTS OF THIS FORM IS ACCURATE AND TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

| Signature, Approving State Official | State Official Name | State Official Title | State Official Agency |
|---|---|---|---|
| *E-sign* | Victoria Pyles | Manager, Acting Bureau Chief | ILLINOIS |

| Signature Date: 05/15/2025 | Date Submitted: 05/15/2025 |
|---|---|

PAGE 1 OF 1 APPROVED OMB No 0970-0247 expires 08/31/2015          FORM ACF-196

Page 2 of 2

ACF 000508



**PRESS RELEASE**

# Owner of Chicago-Area Child Care Centers Sentenced to Four Years in Prison for Fraudulently Obtaining More Than $3.3 Million in State Subsidies

Monday, April 8, 2024

**For Immediate Release**

U.S. Attorney's Office, Northern District of Illinois

CHICAGO — The owner of Chicago-area child care centers has been sentenced to four years in federal prison for scheming to fraudulently obtain more than $3.3 million in State of Illinois subsidies designed to help low-income families afford child care.

ALEESHA McDOWELL owned child care providers A&A Kiddy Kollege Inc. in Calumet City, Ill., A&A Kiddy Kollege 2 in Calumet Park, Ill., and Kreative Kidz Academy Inc., Kreative Kidz Academy II Inc., and Kreative Kidz Academy III Inc. in Chicago. From 2012 to 2020, McDowell schemed with directors of her centers and others to defraud the Illinois Department of Human Services' Child Care Assistance Program by submitting applications containing materially false information, including fraudulent paystubs and income verification letters regarding a parent's eligibility to qualify for state subsidy payments. In many instances, McDowell or the directors falsely represented in the applications that a parent was employed by one of McDowell's child care centers in order to satisfy IDHS's requirement that recipients of the funds either be in school or employed and earning less than a certain income threshold.

ACF 000509

As a result of the scheme, McDowell and her co-schemers caused IDHS to pay McDowell's child care centers more than $3.3 million in subsidy payments for services purportedly provided to children who were not eligible to receive such benefits. McDowell spent some of the criminally derived money on a Bentley Bentayga and a house in Mokena, Ill.

McDowell, 44, of Mokena, Ill., pleaded guilty last year to a federal wire fraud charge. In addition to the prison sentence, U.S. District Judge Manish S. Shah on March 27, 2024, ordered McDowell to pay restitution of $3,339,563.

Seven other defendants charged as part of the investigation also pleaded guilty to federal criminal charges.

McDowell's sentence was announced by Morris Pasqual, Acting United States Attorney for the Northern District of Illinois, Robert W. "Wes" Wheeler, Jr., Special Agent-in-Charge of the Chicago Field Office of the FBI, Justin Campbell, Special Agent-in-Charge of the IRS Criminal Investigation Chicago Field Office, and Shantel R. Robinson, Special Agent-in-Charge of the Midwest Region of the U.S. Department of Agriculture, Office of Inspector General. The government was represented by Assistant U.S. Attorneys Kate McClelland and Brian Hayes.

*Updated April 8, 2024*

**Topics**



CYBERCRIME      FINANCIAL FRAUD      IDENTITY THEFT

**Components**

Federal Bureau of Investigation (FBI)      USAO - Illinois, Northern

# Related Content

PRESS RELEASE

ACF 000510

## U.S. Postal Service Employee Indicted for Alleged Workers' Compensation Fraud

GRACIELA VENEGAS allegedly pocketed $51,776 in augmented work comp benefits to which she was not entitled.

December 19, 2025

**PRESS RELEASE**

## Federal Jury in Chicago Convicts Man of Orchestrating $14 Million Cryptocurrency Fraud

ROBERT DUNLAP, 54, of Houston, Texas, was convicted of two counts of mail fraud.

November 20, 2025

**PRESS RELEASE**

## Former Administrative Professional for Chicago Company Admits Embezzling More than $615,000

CRYSTA LYON-HALBERT made a series of unauthorized credit card purchases.

November 20, 2025

 Northern District of Illinois

Eastern Division
219 S. Dearborn St., 5th Floor
Chicago, IL 60604

ACF 000511

Western Division
327 S. Church Street, Room 3300
Rockford, IL 61101

Email USAO-NDIL

 Chicago: (312) 353-5300
Rockford: (815) 987-4444

ACF 000512



**PRESS RELEASE**

# Four Chicago Women Indicted for Allegedly Defrauding Child Care Subsidy Program of More Than $1 Million

Tuesday, October 13, 2020

**For Immediate Release**

U.S. Attorney's Office, Central District of Illinois

SPRINGFIELD, Ill. – A grand jury has returned indictments that charge four Chicago women with allegedly defrauding a government child care subsidy program intended to provide affordable child care to eligible parents. Each woman owned and operated a licensed day care in Chicago that allegedly submitted false claims for payment for child care services that were not provided or were not provided to the extent charged. As a result of the alleged schemes, the estimated loss to the government is more than $1 million.

The Illinois Department of Human Services administers the Child Care Assistance Program with state funds and block grants provided by the U.S. Department of Health and Human Services. The program provides child care services to low-income parents transitioning from educational programs or welfare to work and economic independence. Parents are required to make a co-payment based on their ability to pay and the remainder is paid by the Child Care Assistance Program.

Those charged are Tarnavis A. "Bonnie" Lee, 41, owner and operator of Lee's Toddler Town, Inc.; Demetra M. Jackson, 41, owner and operator of Jitter Bugs, Inc.; Elizabeth McFarland, 46,

ACF 000513

currently of Madison, Tenn., who owned and operated Tater Tots, Inc.; and, LaShanda Hudson, 39, who owned and operated a day care business in her name.

Lee is charged in two indictments, one with Jackson and one with McFarland, for operating similar fraud schemes. Lee, who owned Lee's Toddler Town day care, participated in the subsidy program as a licensed child care provider and submitted claims for services. The indictment against Lee and Jackson alleges that from March 2016 to April 2019, the two women received child care subsidy money by submitting false information regarding applicants' eligibility and the type of child care and services actually provided. Lee allegedly submitted application forms, on behalf of parents, that contained false information about their employment and income, the time a child would spend at Jackson's Jitter Bugs day care, the number and names of children, and the location where the services were provided. Payments to Jitter Bugs were deposited to an account that the two women controlled. When payments were received, more than one-half of the funds were transferred to accounts over which only Lee had control. In addition, Lee repeatedly made kickback payments to parents who were purported clients of Jitter Bugs. The two continued to submit false claims for payment even after Jackson had moved from her residence, the licensed day care address. As a result, Lee and Jackson allegedly submitted approximately $312,000 in claims with a loss to the government of more than $140,000.

In addition, Lee is charged in a second indictment with McFarland, who owned and operated Tater Tots, Inc., in Chicago, for allegedly operating a similar fraud scheme from June 2009 to April 2019. False applications and claims for payment were allegedly submitted for child care and services through the Child Care Assistance Program, and upon payment, more than one-half of the payment received was transferred to Lee. Kickback payments were allegedly paid to parents. The indictment alleges that false claims continued to be submitted even after McFarland moved in August 2016 to Nashville, Tenn. As a result of the alleged scheme, Lee and McFarland submitted claims of approximately $1.5 million with an estimated loss to the government of more than $800,000.

The third indictment charges Hudson with operating a similar fraud scheme on behalf of her personal day care business in Chicago from January 2009 to November 2019. Hudson allegedly submitted false records and information regarding applicants' eligibility as well as information about the type of care and services and the extent of services actually provided. Hudson also allegedly made kickback payments to parents who were purported clients. As a result of the alleged scheme, Hudson submitted claims totaling approximately $734,000 resulting in an estimated loss of more than $400,000.

Specifically, the indictment against Lee and Jackson charges each woman with 17 counts of mail and wire fraud; Lee is additionally charged with eight counts of money laundering. The indictment of Lee and McFarland charges Lee with 35 counts of mail and wire fraud and seven counts of money laundering; McFarland is charged with Lee, with 12 counts of mail and wire fraud. Hudson is charged with 12 counts of wire fraud and nine counts of money laundering.

ACF 000514

Each woman will be issued a summons to appear for arraignment in federal court in Springfield. If convicted, the maximum statutory penalty for each count of the offenses of mail fraud, wire fraud and money laundering is up to 20 years in prison.

The charges were investigated by the Illinois State Police, Medicaid Fraud Control Unit, Central Division; the U.S. Department of Health and Human Services, Office of Inspector General, Office of Investigations; and, the Federal Bureau of Investigation. In addition, the Illinois Department of Health and Family Services, which administers the Child Care Assistance Program for the state of Illinois, assisted in the investigation. Assistant U.S. Attorney Timothy A. Bass is representing the government in the case prosecution.

Members of the public are reminded that an indictment is merely an accusation; each defendant is presumed innocent unless proven guilty.

*Updated October 13, 2020*

**Topics**

**FINANCIAL FRAUD**    **GRANTS**    **HEALTH CARE FRAUD**

**Component**

USAO - Illinois, Central

# Related Content

ACF 000515

**PRESS RELEASE**

## East Peoria Man Charged with Wire Fraud and Identity Theft

PEORIA, Ill. – A grand jury today returned an indictment charging Stephen H. Keith, 35, of East Peoria, Illinois, for allegedly perpetrating a wire fraud and identity theft scheme starting...

December 16, 2025

**PRESS RELEASE**

## Former Peoria Store Owner Convicted of Twenty-One Felonies After Being a Fugitive for Fifteen Years

A federal jury returned a guilty verdict at approximately 9:00 pm on September 10, 2025, against Jalal Nimer Asad, 61, of Lindenhurst, Illinois, on twenty-one felony offenses for his role...

September 11, 2025

**PRESS RELEASE**

## Rossi Sentenced to an Additional Three Years in Prison for Healthcare Fraud Related to COVID Testing

Aaron Rossi, 42, of Morton, Illinois, was sentenced on July 15, 2025, to an additional 37 months in prison for healthcare and wire fraud related to false billing for COVID...

July 17, 2025

ACF 000516

✉ **Central District of Illinois**

Main Office:
318 S. Sixth Street
Springfield, IL 62701

📞 Springfield (HQ): (217) 492-4450
Peoria: (309) 671-7050
Moline: (309) 793-5884
Urbana: (217) 373-5875

ACF 000517



**PRESS RELEASE**

# Former Illinois Department of Children and Family Services Employee and 14 Others Charged in $3.2 Million Fraud Scheme

Thursday, August 17, 2023

**For Immediate Release**

U.S. Attorney's Office, Northern District of Illinois

CHICAGO — A former Illinois Department of Children and Family Services social worker and 14 others have been indicted on federal charges for allegedly participating in a scheme to fraudulently obtain $3.2 million in state funds intended for childcare services.

A 41-count indictment unsealed Wednesday in U.S. District Court in Chicago alleges that SHAUNTELE Y. PRIDGEON orchestrated the fraud scheme from 2016 to 2022 while serving as a Community Social Service Planner for DCFS in Chicago. Pridgeon fraudulently entered the information of several of her co-defendants into the DCFS computer system and approved them to be paid as providers caring for foster children, the indictment states. Pridgeon directed at least $3.2 million in State of Illinois funds to the co-defendants and others, each of whom agreed to receive the money even though they knew that no foster children were actually in their care, the indictment states. The co-defendants and others then paid bribes and kickbacks to Pridgeon totaling approximately $1.6 million, the indictment states. Pridgeon allegedly used the bribe money to pay personal expenses, including gambling losses at a casino in Hammond, Ind.

ACF 000518

The indictment accuses each of Pridgeon's co-defendants of accepting various amounts of state money for the nonexistent childcare services. For example, LATASHA THOMAS received more than $1.6 million and TRACEY JERVIER received more than $695,000, the indictment states. RONNIE WEBB received more than $228,000, which was paid via checks made payable to "Webb Feet Child Care Inc.," a bogus company that listed its address as Webb's residence, the indictment states.

Charged with honest services wire fraud are Pridgeon, 54, of Chicago; Thomas, 48, of Chicago; Jervier, 60, of Chicago; Webb, 57, of South Holland, Ill.; TAHNDREA N. HARPER, 50, of Chicago; JOI SANDERSON, 49, of Frankfort, Ill.; KELLI PAYNE, 49, of Hammond, Ind.; NIKKI GIOVANNI HOUSTON, 53, of Chicago; SHENITA MCGARY, 37, of Chicago; SHERRI BAINES, 45, of Chicago; KEICHA L. LACEY, 50, of Country Club Hills, Ill.; CHRISTINA A. DAVIS, 54, of Chicago; MARISSA TERRY, 36, of Frankfort, Ill.; ARAMIS COLLIER, 39, of Chicago; and AUNSHEREE NELSON, 44, of Chicago.

Most of the defendants were arrested Wednesday and have begun making initial appearances in federal court in Chicago.

The indictment was announced by Morris Pasqual, Acting United States Attorney for the Northern District of Illinois; Robert W. "Wes" Wheeler, Jr., Special Agent-in-Charge of the Chicago Field Office of the FBI; Brendan F. Kelly, Director of the Illinois State Police; and Ann McIntyre, Inspector General of DCFS. The government is represented by Assistant U.S. Attorneys John D. Mitchell, Bradley A. Tucker, and Christine M. O'Neill.

The public is reminded that an indictment is not evidence of guilt. The defendants are presumed innocent and entitled to a fair trial at which the government has the burden of proving guilt beyond a reasonable doubt. If convicted, the Court must impose reasonable sentences under federal statutes and the advisory U.S. Sentencing Guidelines.

Pridgeon et al indictment

*Updated August 17, 2023*

## Topics

| **PUBLIC CORRUPTION** | **CYBERCRIME** | **FINANCIAL FRAUD** |

## Components

ACF 000519

Federal Bureau of Investigation (FBI)        USAO - Illinois, Northern

# Related Content

**PRESS RELEASE**

## U.S. Postal Service Employee Indicted for Alleged Workers' Compensation Fraud

GRACIELA VENEGAS allegedly pocketed $51,776 in augmented work comp benefits to which she was not entitled.

December 19, 2025

**PRESS RELEASE**

## Federal Jury Convicts Former Suburban Chicago Police Chief of Bribery and Obstruction of Justice

JOHN KOSMOWSKI accepted a bribe from a local businessman to help facilitate the transfer of a liquor license.

December 10, 2025

ACF 000520

Case 1:26-cv-00172-VSB    Document 85-4    Filed 04/01/26    Page 14 of 107

1/6/26, 4:25 PM          Northern District of Illinois | Former Illinois Department of Children and Family Services Employee and 14 Others Charged in $3.2 Mil...

**PRESS RELEASE**

## Federal Jury in Chicago Convicts Man of Orchestrating $14 Million Cryptocurrency Fraud

ROBERT DUNLAP, 54, of Houston, Texas, was convicted of two counts of mail fraud.

November 20, 2025

 Northern District of Illinois

Eastern Division
219 S. Dearborn St., 5th Floor
Chicago, IL 60604

Western Division
327 S. Church Street, Room 3300
Rockford, IL 61101

Email USAO-NDIL

Chicago: (312) 353-5300
Rockford: (815) 987-4444

ACF 000521

ILGA.GOV

(5 ILCS 805/) Illinois TRUST Act.

Illinois Compiled Statutes (ILCS)

Updating the database of the Illinois Compiled Statutes (ILCS) is an ongoing process. Recent laws may not yet be included in the ILCS database, but they are found on this site as Public Acts soon after they become law. For information concerning the relationship between statutes and Public Acts, refer to the Guide.

Because the statute database is maintained primarily for legislative drafting purposes, statutory changes are sometimes included in the statute database before they take effect. If the source note at the end of a Section of the statutes includes a Public Act that has not yet taken effect, the version of the law that is currently in effect may have already been removed from the database and you should refer to that Public Act to see the changes made to the current law.

(5 ILCS 805/1)
Sec. 1. Short title. This Act may be cited as the Illinois TRUST Act.
(Source: P.A. 100-463, eff. 8-28-17.)

(5 ILCS 805/5)
Sec. 5. Legislative purpose. Recognizing that State law does not currently grant State or local law enforcement the authority to enforce federal civil immigration laws, it is the intent of the General Assembly that nothing in this Act shall be construed to authorize any law enforcement agency or law enforcement official to enforce federal civil immigration law. The changes made to the definitions of immigration detainer and civil immigration warrant (formerly "non-judicial immigration warrant") by Section 10 of this amendatory Act of the 102nd General Assembly are declarative of existing law. This Act shall not be construed to prohibit or restrict any entity from sending to, or receiving from, the United States Department of Homeland Security or other federal, State, or local government entity information regarding the citizenship or immigration status of any individual under Sections 1373 and 1644 of Title 8 of the United States Code. Further, nothing in this Act shall prevent a law enforcement officer from contacting another law enforcement agency for the purposes of clarifying or confirming the civil or criminal nature of notifications or other records provided by the National Crime Information Center or the Law Enforcement Agencies Data Administrative System.
(Source: P.A. 102-234, eff. 8-2-21.)

(5 ILCS 805/10)
Sec. 10. Definitions. In this Act:
"Citizenship or immigration status" means all matters regarding citizenship of the United States or any other country or the authority to reside in or otherwise be present in the United States.
"Civil immigration warrant" means any document that is not approved or ordered by a judge that can form the basis for an individual's arrest or detention for a civil immigration enforcement purpose. "Civil immigration warrant" includes Form I-200 "Warrant for the Arrest of Alien", Form I-203 "Order to Detain or Release Alien", Form I-205 "Warrant of Removal/Deportation", Form I-286 "Notice of Custody Determination", any predecessor or successor form, and all warrants, hits, or requests contained in the "Immigration Violator File" of the FBI's National Crime Information Center (NCIC) database. "Civil immigration warrant" does not include any criminal warrant.
"Contact information" means home address, work address, telephone number, electronic mail address, social media information, or any other personal identifying information that could be used as a means to contact an individual.
"Immigration agent" means an agent of federal Immigration and Customs Enforcement, federal Customs and Border Protection, or any similar or successor agency.
"Immigration detainer" means a request to a State or local law enforcement agency to provide notice of release or maintain custody of an individual based on an alleged violation of a civil immigration law, including detainers issued under Sections 1226 or 1357 of Title 8 of the United States Code or 287.7 or 236.1 of Title 8 of the Code of Federal Regulations. "Immigration detainer" includes Form I-247A "Immigration Detainer - Notice of Action" and any predecessor or successor form.
"Law enforcement agency" means an agency of the State or of a unit of local government charged with enforcement of State, county, or municipal laws or with managing custody of detained persons in the State.
"Law enforcement official" means any individual with the power to arrest or detain individuals, including law enforcement officers, corrections officers, and others employed or designated by a law enforcement agency. "Law

ACF 000522

enforcement official" includes any probation officer.
(Source: P.A. 102-234, eff. 8-2-21; 103-154, eff. 6-30-23.)

(5 ILCS 805/15)
Sec. 15. Prohibition on enforcing federal civil immigration laws.
(a) A law enforcement agency or law enforcement official shall not detain or continue to detain any individual solely on the basis of any immigration detainer or civil immigration warrant or otherwise comply with an immigration detainer or civil immigration warrant.
(b) A law enforcement agency or law enforcement official shall not stop, arrest, search, detain, or continue to detain a person solely based on an individual's citizenship or immigration status.
(c) (Blank).
(d) A law enforcement agency or law enforcement official acting in good faith in compliance with this Section who releases a person subject to an immigration detainer or civil immigration warrant shall have immunity from any civil or criminal liability that might otherwise occur as a result of making the release, with the exception of willful or wanton misconduct.
(e) A law enforcement agency or law enforcement official may not inquire about or investigate the citizenship or immigration status or place of birth of any individual in the agency or official's custody or who has otherwise been stopped or detained by the agency or official. Nothing in this subsection shall be construed to limit the ability of a law enforcement agency or law enforcement official, pursuant to State or federal law, to notify a person in the law enforcement agency's custody about that person's right to communicate with consular officers from that person's country of nationality, or facilitate such communication, in accordance with the Vienna Convention on Consular Relations or other bilateral agreements. Nothing in this subsection shall be construed to limit the ability of a law enforcement agency or law enforcement official to request evidence of citizenship or immigration status pursuant to the Firearm Owners Identification Card Act, the Firearm Concealed Carry Act, Article 24 of the Criminal Code of 2012, or 18 United States Code Sections 921 through 931.
(f) Unless otherwise limited by federal law, a law enforcement agency or law enforcement official may not deny services, benefits, privileges, or opportunities to an individual in custody or under probation status, including, but not limited to, eligibility for or placement in a lower custody classification, educational, rehabilitative, or diversionary programs, on the basis of the individual's citizenship or immigration status, the issuance of an immigration detainer or civil immigration warrant against the individual, or the individual being in immigration removal proceedings.
(g)(1) No law enforcement agency, law enforcement official, or any unit of State or local government may enter into or renew any contract, intergovernmental service agreement, or any other agreement to house or detain individuals for federal civil immigration violations.
(2) Any law enforcement agency, law enforcement official, or unit of State or local government with an existing contract, intergovernmental agreement, or other agreement, whether in whole or in part, that is utilized to house or detain individuals for civil immigration violations shall exercise the termination provision in the agreement as applied to housing or detaining individuals for civil immigration violations no later than January 1, 2022.
(h) Unless presented with a federal criminal warrant, or otherwise required by federal law, a law enforcement agency or official may not:
(1) participate, support, or assist in any capacity with an immigration agent's enforcement operations, including any collateral assistance such as coordinating an arrest in a courthouse or other public facility, providing use of any equipment, transporting any individuals, or establishing a security or traffic perimeter surrounding such operations, or any other on-site support;
(2) give any immigration agent access, including by telephone, to any individual who is in that agency's custody;
(3) transfer any person into an immigration agent's custody;
(4) permit immigration agents use of agency facilities or equipment, including any agency electronic databases not available to the public, for investigative interviews or other investigative or immigration enforcement purpose;
(5) enter into or maintain any agreement regarding direct access to any electronic database or other data-sharing platform maintained by any law enforcement agency, or otherwise provide such direct access to the U.S. Immigration and Customs Enforcement, United States Customs and Border Protection or any other federal entity enforcing civil immigration violations;
(6) provide information in response to any immigration agent's inquiry or request for information regarding any individual in the agency's custody; or
(7) provide to any immigration agent information not

otherwise available to the public relating to an individual's release or contact information, or otherwise facilitate for an immigration agent to apprehend or question an individual for immigration enforcement.

(i) Nothing in this Section shall preclude a law enforcement official from otherwise executing that official's duties in investigating violations of criminal law and cooperating in such investigations with federal and other law enforcement agencies (including criminal investigations conducted by federal Homeland Security Investigations (HSI)) in order to ensure public safety.
(Source: P.A. 102-234, eff. 8-2-21; 103-154, eff. 6-30-23.)

(5 ILCS 805/20)
Sec. 20. Law enforcement training. By January 1, 2018, every law enforcement agency shall provide guidance to its law enforcement officials on compliance with Section 15 of this Act.
(Source: P.A. 100-463, eff. 8-28-17.)

(5 ILCS 805/25)
Sec. 25. Reporting requirements.
(a) In order to ensure compliance with this Act, starting on the effective date of this amendatory Act of the 102nd General Assembly, law enforcement agencies shall submit a report annually to the Attorney General. This report shall include:
(1) Any requests from the United States Department of Homeland Security, including, but not limited to, Immigration and Customs and Enforcement, with respect to participation, support, or assistance in any immigration agent's civil enforcement operation, and any documentation regarding how the request was addressed, provided that if an agency does not receive any such requests during a reporting period, the agency shall certify and report that it received no such requests;
(2) All immigration detainers or civil immigration warrants received by the law enforcement agency, provided that if an agency does not receive any such detainers or warrants during a reporting period, the agency shall certify and report that it received no such detainers or warrants. The reports shall include:
(A) the date when the immigration detainer or civil immigration warrant was received;
(B) the date and time the individual subject to the immigration detainer or civil immigration warrant posted criminal bail, if applicable;
(C) whether the individual subject to the immigration detainer or civil immigration warrant was released or transferred;
(D) the date and time the individual was released or transferred; and
(E) if the individual is transferred, to which governmental agency's custody.
(b) Law enforcement agencies shall not include names or other personally identifying information in any reports required under this Section.
(Source: P.A. 102-234, eff. 8-2-21.)

(5 ILCS 805/30)
Sec. 30. Attorney General enforcement provisions. In order to ensure compliance with this Act:
(a) The Attorney General shall have authority to conduct investigations into violations of this Act. The Attorney General may: (1) require a law enforcement agency, law enforcement official, or any other person or entity to file a statement or report in writing under oath or otherwise, as to all information the Attorney General may consider necessary; (2) examine under oath any law enforcement official or any other person alleged to have participated in or with knowledge of the alleged violation; or (3) issue subpoenas, obtain records, conduct hearings, or take any other actions in aid of any investigation. In the event a law enforcement agency, law enforcement official, or other person or entity fails to comply, in whole or in part, with a subpoena or other investigative request issued pursuant to this paragraph, the Attorney General may compel compliance through an action in the circuit court.
(b) Upon his or her own information or upon the complaint of any person, the Attorney General may maintain an action for declaratory, injunctive or any other equitable relief in the circuit court against any law enforcement agency, law enforcement official, or other person or entity who violates any provision of this Act. These remedies are in addition to, and not in substitution for, other available remedies.
(Source: P.A. 102-234, eff. 8-2-21.)

(5 ILCS 805/99)
Sec. 99. Effective date. This Act takes effect upon becoming law.
(Source: P.A. 100-463, eff. 8-28-17.)

ACF 000524



# ILLINOIS STATE PLAN

For Temporary Assistance for Needy Families (TANF)

In Accordance with the Personal Responsibility and Work

Opportunity Reconciliation Act of 1996

Effective: January 1, 2023 – June 30, 2025

ACF 000525

STATE OF ILLINOIS
Plan for Temporary Assistance for Needy Families
10/01/2024
Amendment

**Table of Contents**

**SECTION 1 - INTRODUCTION**     1

**SECTION 2 - CASH ASSISTANCE PROGRAM**     2

**I.**    **Eligibility**
| | | |
|---|---|---|
| A. | Families | 2 |
| B. | Minor Parents | 3 |
| C. | Disabled Persons | 4 |
| D. | Temporary Absence from the Home | 5 |
| E. | Residence | 5 |
| F. | Citizenship Status | 5 |
| G. | Felons | 7 |
| H. | Assets | 7 |
| I. | Income Eligibility | 7 |
| J. | Payment Levels | 15 |
| K | Employment and Child Support Requirement | 16 |
| L. | Personal Responsibility | 16 |
| M. | 60-Month Time Limit | 16 |
| N. | Exceptions to the Time Limit | 18 |
| O. | Other Eligibility Factors | 18 |
| P. | Application Disposition and Initial Date of Eligibility | 19 |
| Q. | Redetermination of Eligibility | 19 |

**II.**    **Program Model**     20

**III.**    **Work and Training Participation Requirements**     21
| | | |
|---|---|---|
| A. | Work Eligible Individuals – Exclusions | 21 |
| B. | Individuals Excluded from the Federal Participation Rate (Receiving Assistance under a Solely State Funded Program for Whom MOE Expenses are Not Claimed) | 21 |
| C. | Individuals Included in the Federal Participation Rate but Exempt from Work Participation Requirements | 22 |

**IV.**    **Work and Training Activities**     22
| | | |
|---|---|---|
| A. | Unsubsidized Employment | 22 |
| B. | Subsidized Employment | 22 |
| C. | Work Experience | 22 |
| D. | Work First - Program deleted 07/01/2021 | 22 |
| E. | Community Service | 23 |

ACF 000526

|   | F. | Vocational Education | 23 |
|   | G. | Job Search and Job Readiness | 23 |
|   | H. | Job Skills Training | 23 |
|   | I. | Education Directly Related to Employment | 23 |
|   | J. | Satisfactory Attendance at Secondary School | 24 |
|   | K. | Bachelor or Associate Degree Program | 24 |
| **V.** | **Other Self Sufficiency Activities** | | **24** |
|   | A. | Alcohol and Substance Abuse Treatment | 24 |
|   | B. | Family Violence Program | 24 |
|   | C. | Mental Health Treatment | 24 |
|   | D. | Parents with Children under Age One | 24 |
| **VI.** | **Work Verification Plan** | | **25** |
| **VII.** | **Sanctions** | | **25** |
| **VIII.** | **Client Rights** | | **28** |
|   | A. | Client Notifications | 28 |
|   | B. | Right to Appeal | 28 |
|   | C. | Client Grievance Procedure | 29 |
|   | D. | Non-Discrimination | 29 |
|   | E. | Interpretive Services | 29 |
|   | F. | Confidentiality | 29 |
|   | G. | Anti-Displacement and Grievance Procedure | 30 |
| **IX.** | **Additional Program Provisions** | | **31** |
|   | A. | Benefit Delivery | 31 |
|   | B. | Statewide Program Uniformity | 34 |
|   | C. | Child Support Services Link | 34 |
|   | D. | Recoupment of Overpayments | 34 |
|   | E. | Native American Tribes | 35 |
|   | F. | EBT Use Restrictions | 36 |

**SECTION 3 – ADDITIONAL USES OF TANF BLOCK GRANT FUNDS
AND STATE MAINTENANCE OF EFFORT FUNDS**                          37

| **I.** | **Program Funded by TANF Block Grant Funds** | **37** |
| **II.** | **Programs Funded by TANF Block Grant Funds or MOE Funds To Families with Income Below 200%** | **37** |
| **III.** | **Programs Funded by TANF Block Grant Funds that Meet Purpose 3 or Purpose 4** | **39** |

ACF 000527

**IV.     Programs Funded by MOE**                                    40

**V.      Subsidized Employment Programs**                            40

**SECTION 4 - PROGRAMS TO ATTACK DEPENDENCE
RELATED ISSUES**                                                       41

**I.      Teen Pregnancy Prevention Strategies and Programs**         41

**II.     Programs that Provide Education on the Problem of
          Rape/Sexual Assault**                                       43

**SECTION 5 - PROGRAMS TO PROMOTE HEALTHY
RELATIONSHIPS AND MARRIAGES**                                         44

**SECTION 6 – TANF PARTICIPANTS IN RESEARCH PROJECTS**                44

**SECTION 7- TANF PARTICIPANTS IN GUARANTEED INCOME
PILOTS**                                                              44

**SECTION 8- LIST OF FEDERAL CERTIFICATIONS AND**                     45

**ASSURANCES**                                                        45

ACF 000528

## SECTION 1 - INTRODUCTION

The state of Illinois has developed this State Plan (Plan) to provide Temporary Assistance for Needy Families in accordance with Section 402 of the Social Security Act as revised by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104-193) and further amended by the Deficit Reduction Act of 2005 (Public Law 109-171). The Plan retains and builds upon concepts successfully implemented in recent years that have dramatically altered welfare in Illinois and provided the impetus for thousands of families to become fully or partially self-supporting.

The Plan describes the program to be administered commencing January 1, 2023, through June 30, 2025.

The Illinois Department of Human Services (IDHS) is the administering agency.

ACF 000529

### SECTION 2 – CASH ASSISTANCE PROGRAM

### I.  Eligibility

**COVID-19 –** Procedures implemented April 2020 through the National Pandemic Emergency include: Telephone interviews, Client Statement acceptance for certain eligibility verifications after good faith effort, and verbal attestation accepted for written signatures on applications (Illinois Executive Order 2020-20). Other COVID-19 policy changes are noted in relevant sections of this Plan.

Due to the end of the Public Health Emergency (PHE) on May 11, 2023, and per policy June 23, 2023, Good Cause due to COVID-19 is no longer an accepted exemption for failure to participate in TANF W&T activities.

### A.    Families

Families must contain at least one eligible child under the age of 18, or under the age of 19 if attending secondary school full time and may contain no more than two adult caretakers who are related to the children. All siblings residing in the home, including half siblings of children included in the assistance unit, must be included in the assistance unit. Parents of the children living with them must be included in the assistance family unit, and their income must be considered when determining eligibility and assistance levels.

Other related caretakers may choose to be included in or excluded from the assisted family unit if they have insufficient income to support themselves according to agency standards. They are not required to be included.

Pregnant women and, if living in the home, their husbands, with no children in the home, may be eligible upon application and verification of her pregnancy.

To be eligible a child must live with a caretaker adult related to the child to the fifth degree of consanguinity.

Children and their married minor parent(s) under age 18 living with the minor parent's parents will be considered separate family units from their parents and siblings. If both legal parents are living with the children, one or both are minors, and they are not married, they will be considered a separate family unit even if living with the children's grandparents.

An unmarried parent under the age of 18 and the minor's children will be included in any existing assistance unit of the minor parent's parents if all three generations are living together.

### B.    Minor Parents

Unmarried parents under the age of 18 and their children living with them will be assisted

2

ACF 000530

only if residing with their parent, legal guardian or other adult relative, or in an adult supervised arrangement as identified in Section 408(a)(5) of the Social Security Act. The unmarried parent may receive assistance for up to six months while an adult-supervised living arrangement is located.

Families headed by unmarried parents under age 18 are exempted from this requirement if the adult parents or guardians are deceased or their whereabouts are unknown, the minor or a child's physical or emotional health or safety would be in danger living with the adult parent or guardian, or the adult parents or guardians will not allow the minor parent and child to live with them.  The State of Illinois also finds it is in the best interest of the minor parent and child(ren) towaive this requirement when the minor parent has lived apart from the parent or guardian for at least one year before the child's birth or applying for the Illinois TANF Program, or the minor has one of the following good causes to live apart from the parent or guardian:

- the parent or guardian lives out of State, is living in an institution, or is addicted to drugs or alcohol;

- the minor's return to the parent's or guardian's home would violate their lease or local health or safety standards;

- the minor has been placed in an independent living program by the Illinois Department of Children and Family Services; or

- the minor is participating in a licensed substance abuse treatment program which would not be available if living in the parent's or guardian's home.

The five-year time limit on receipt of assistance does not apply to minor parents under age 18.

Minor parents under age 20, married or unmarried, with no child under the age of 12 weeks must attend school unless they have successfully completed high school or have a GED certificate.

**C.     Disabled Persons**

Individuals who receive disability benefits from Supplemental Security Income (SSI),

ACF 000531

Social Security, Railroad Retirement, or Black Lung, based on their disability are not eligible for TANF cash assistance if the benefit level equals or exceeds the difference in the payment level between the individual being included or excluded in the assistance payment. For example, a family of four including one adult has a payment level of $875 and a family of three children has a payment level of $544. If the disability payment exceeds the difference of $331, the individual is not eligible to be included in the TANF payment.

However, the disability income up to the SSI level for an individual with no other income is disregarded when determining the TANF eligibility and payment amount for the other family members.

The preceding paragraphs also apply to individuals receiving benefits from the Veterans Administration based on a 100% disability.

4

ACF 000532

**D.    Temporary Absence from the Home**

Assistance for a child may be continued if the child is temporarily absent from the home for a period not to exceed three months.

The absence of the child may exceed three months and not affect eligibility if the child is hospitalized or attending school and all the following criteria are met:

- the caretaker relative retains primary responsibility for the child's welfare,

- the child considers the relative's home to be the child's permanent residence,

- the child was not removed from the home by court order, and

- the child has not been placed in an IDHS Individual Care Program.

The child's absence does not affect eligibility if the Illinois Department of Children and Family Services certifies the child will shortly be returned to the home.

In no instance are children eligible to receive assistance concurrently in more than one case.

TANF eligibility is not affected whenever the caretaker relative is temporarily absent from the home for a period that does not exceed three months.


**E.    Residence**

Families assisted by the Illinois TANF Program must be residents of Illinois. Illinois residence is established by living in the State and having no current intent to leave. Illinois does not treat families moving into the State from other states differently than other families. The rental or ownership of a home is not required for the establishment of residence.  Those without a fixed permanent home are Illinois residents if staying within the State with no intent to leave.

If a family is homeless the Responsibility and Services Plan (RSP) will focus on helping to stabilize the housing situation.


**F.    Citizenship Status**

TANF cash assistance in Illinois will be available to citizens of the United States and to the noncitizens specified below with any applicable limitations.

- People who entered the United States before August 22, 1996 and currently are

5

ACF 000533

legally admitted for permanent residence.

- People lawfully admitted for permanent residence who entered the U.S. on or after August 22, 1996, who have resided in the United States for a period of five years beginning on the date the person obtained qualified alien status. There are limited exceptions to this as detailed in some of the categories described below.

- Refugees under Section 207 of the Immigration and Naturalization Act (INA).

- Asylees under Section 208 of the INA.

- A Cuban or Haitian entrant as defined in Section 501(e) of the Refugee Education Assistance Act of 1980.

- Amerasians from Vietnam and their close family members who are issued an immigrant visa and departed from Vietnam on or after March 22, 1988.

- Hmongs or Highland Laotians

- Those whose deportation is being withheld under Section 243(h) of INA, (as in effect before April 1, 1997) or section 241(b)(3) of the INA.

- Those paroled under Section 212(d)(5) of the INA for at least one year and who entered the United States before August 22, 1996.

- Those paroled under Section 212(d)(5) of the INA for at least one year who entered the United States on or after August 22,1996 and have resided in the United States for five years beginning on the date the person obtained qualified alien status.

- Those granted conditional entry under Section 203(a)(7) of the INA as it existed prior to April 1, 1980.

- Those meeting the veteran and active-duty exceptions specified in Sec. 403(b)(2) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).

- Abused noncitizens who meet the definition in Section 431 of Public Law 104-193.

- Noncitizens certified by the United States Citizenship and Immigration Services (USCIS) as trafficking victims.

- Iraqi or Afghan immigrants with special immigrant status under Section 101(a)(27) of the INA.

ACF 000534

- Noncitizens who receive TANF will participate fully in the program. The same benefitsand services available to others will be provided to eligible noncitizens.

## G.    Felons

Probation and parole violators and fugitive felons will not be assisted.

Beginning 10/01/2021 (Illinois Public Act 102-0178) persons convicted of a Class X or Class 1 felony for an act occurring after August 21, 1996, involving the possession, use, or distribution of a controlled substance under Illinois or comparable Federal law are no longer ineligible to receive TANF.  Additionally, persons who have been convicted of any other drug related felony under Illinois or Federal law are no longer ineligible to receive TANF for two years following date of conviction.

An individual convicted in State or Federal court of misrepresenting an address to receive assistance from programs funded by the TANF grant, Title XIX, the Food Stamp Act of 1977, or the Supplemental Security Income Program in two or more states is ineligible to participate in the Illinois TANF Program for a ten-year period beginning with the date of conviction.

## H.    Assets

A family's assets are not considered in the determination of TANF eligibility.

## I.    Income Eligibility

In order to receive cash payments under the Illinois TANF Program, a family's countable income must be below the applicable Assistance Payment Level.

An earnings disregard will be applied at application in the amount of the difference between the Assistance Payment Level and 50% of the Federal Poverty Level (FPL) for the applicable family size. Applicants will not be eligible if the monthly income, less the earnings disregard (if applicable), exceeds the Assistance Payment Level.  Applicants for TANF will not have three of every four dollars earned exempted when determining eligibility.

7

ACF 000535

Families already found eligible for assistance who are working will remain eligible until their earned income, minus the earned income disregard, plus their unearned income is greater than the appropriate Assistance Payment Level. The earned income disregard is three of every four dollars earned, i.e., only one-fourth of the gross earnings are considered when determining eligibility and assistance payment amounts.

Beginning 07/01/2024 under Public Act 102-1115, the Illinois Department of Health & Family Services, Child Support Services will pass all child support through to the family.  This includes current support, past support owed, or future support that is collected on or after 01/01/2023.  All child support passed through to the family will be disregarded in determining the amount of the TANF grant provided to the family.

8

ACF 000536

All earnings of children receiving assistance are disregarded.

Payments based on the disability status of a parent in the home are disregarded in amounts up to the Supplemental Security Income payment level for one person with no income. This disregard is applied to disability benefits from Social Security, Railroad Retirement, Veterans' Administration (if the disability is 100%), and Black Lung.

Unearned income from sources specified as exempt from consideration by law is disregarded when determining eligibility and payment amounts. These sources include the following:

- The value of Supplemental Nutrition Assistance Program (SNAP) benefits.

- The value of the U.S. Department of Agriculture donated foods (surplus commodities).

- The value of home produce of an applicant or recipient intended for personal consumption.

- The value of supplemental food assistance provided under the Child Nutrition Act of 1966 as amended, and the special food service program for children under the National School Lunch Act as amended.

- Any benefits received under Title VII, Nutrition Program for the Elderly, of the Older Americans Act of 1965, as amended.

- Any payment received under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970.

- Any payments distributed per capita or held in trust for members of any Indian Tribe under Public Law 92-254, Public Law 93-134, Public Law 94-114 or Public Law 94-540.

- Tax-exempt portions of payments issued pursuant to the Alaska Native Claims Settlement Act.

- Any compensation provided individual volunteers under the Volunteers in Service to America (VISTA) Program.

- Payments for supporting services or reimbursement for out-of-pocket expenses made to volunteers serving as senior health aides, senior companions, foster

9

ACF 000537

grandparents, and persons serving in the Service Corps of Retired Executives (SCORE) and Active Corps of Executives (ACE) and any other programs under Titles II and III, pursuant to section 418 of Public Law 93-113.

- Income received under the provisions of the Illinois Senior Citizens and Disabled Persons Property Tax Relief and Pharmaceutical Assistance Act. This includes both the benefits commonly known as the circuit breaker and "additional grants."

- Cash which is exchanged for purposes of satisfying payment of shelter-related obligations in situations where the assistance unit shares a dwelling unit with another family or individual(s).

- Social Security death benefit expended on a funeral and/or burial.

- Federally subsidized housing payments under Section 8 of the Housing and Community Development Act.

- Payments from the principal or interest of a trust fund made to or on behalf of a child in the assistance unit when the court orders the money released for a specific purpose other than the income maintenance needs of the child.

- Any adoption subsidy payment or foster care payment received from the Department of Children and Family Services or from a state welfare agency of another state.

- Supportive service payments.

- Unearned income, i.e., needs-based payments, cash assistance, compensation in lieu of wages and allowances received under the Workforce Investment Act.

- The amount of the child support passed through to the client.

- Up to $50.00 of inconsequential income per recipient per calendar quarter.

- Any payment received under Title I of Public Law 100-383 of the Civil Liberties Act of 1988.

- Any payment received under Title II of Public Law 100-383 of the Aleutian and Pribilof Islands Restitution Act.

10

ACF 000538

- Payments made to veterans who receive an annual disability payment or to the survivors of deceased veterans who receive a one-time lump sum payment from the Agent Orange Settlement Fund or any other fund referencing Agent Orange product liability under Public Law 101-201.

- Payment received under the Radiation Exposure Compensation Act (Public Law 101-426).

- Any payment provided under the Family Assistance Program for Mentally Disabled Children.

- Emergency Financial Assistance vendor payments provided by a local government public assistance program.

- Any disaster relief payment made by Federal, State, or local government or by adisaster assistance group.

- A non-recurring lump sum SSI payment (e.g., <u>Zebley</u> payment).

- Benefits paid under the Low-Income Home Energy Assistance Act of 1981 pursuant to Section 2605(f) of Public Law 97-35.

- 

- Payments to a member of the Passamaquoddy Indian Tribe, the Penobscot Nation or the Houlton Band of Maliseet Indians pursuant to the Maine Indian Claims Settlement Act of 1980.

- Up to $2,000 per year of income received by individual Indians, which is derived from leases or other uses of individually owned trust or restricted lands pursuant to Section 13736 of PL. 103-66.

- German Reparations Payments to certain survivors of the Holocaust under the German Restitution Act.

- Loans, except loans from individuals who are legally responsible relatives.

- Reimbursements for employment expenses.

- Rickey Ray payments.

- Achieving a Better Life Experience (ABLE) accounts.

- Payments received for participation in a program or research project whose

11

ACF 000539

purpose is to investigate the impacts of policies and programs designed to reduce poverty, promote social mobility, or increase financial stability (Public Act 101-0415).

ACF 000540

Unearned income from other sources is considered dollar for dollar when determining eligibility and assistance payment levels.

A spouse of a caretaker relative, who has no children of his/her own in the TANF unit, is not required to be included in the TANF unit. If he/she chooses to be included, his/her income must be budgeted against the entire TANF unit. His/her income is considered the same as the income of any other assistance unit member. If he/she chooses to be excluded, his/her income must still be budgeted against the needs of his/her spouse only. If the stepparent is not included in the assistance payment the total income for the month is determined and the following deductions are made:

- self-employment business expenses, and

- a "per-person" share for the excluded spouse and for any dependents of either spouse living in the home who are not included in the TANF unit.

The "per person" share is based on the payment level size for the following persons: TANF clients included in the case, the excluded spouse, and any dependents of either spouse who are not included in the TANF unit.

The remaining amount is deemed available to the assistance unit and deducted from the Assistance Payment Level.

Lump sum payments are considered as income in the month received.

**COVID-19 –** Pandemic Unemployment Benefits (Federal Pandemic Unemployment Compensation, Pandemic Unemployment Assistance, and Pandemic Emergency Unemployment Compensation) and the Pandemic Stimulus funds through the CARES Act are considered exempt income beginning April 2020 through the National Pandemic Emergency.

COVID-19- Due to the health emergency, a $500.00 stipend payment was approved for all active TANF cases for the month of June 2020. This stipend is considered a lump sum and exempt to all programs.

COVID-19- Due to the monies received from the American Rescue Plan Act of 2021 and the creation of the Pandemic Emergency Assistance Fund (PEAF), TANF cases active in August 2021 received a one-time payment of $250. The stipend is a lump sum and exempt for TANF and select SNAP households with dependent children with no reported income in August of 2021.

Covid-19- Due to monies received from the American Rescue Plan Act of 2021 and the creation of the Pandemic Emergency Assistance Fund (PEAF). TANF cases with dependent children and active in August 2023 received a $80.00 on time lump sum payment.

13

ACF 000541

## J. Payment levels

The Payment Levels are flat, monthly standard amounts and are established for all counties. The amount for an assistance unit is based on the number in the assistance unit and the presence of an adult in the assistance unit. The TANF payment amounts shall be apportioned so that 75% of the grant will be designated for the child or children of the assistance unit and 25% shall be designated for the adult member or members of the assistance unit.

**Monthly Assistance Payment Levels**
(Effective 10/01/2024)

| Size of Unit | Adult and Child(ren) | Child(ren) Only |
|---|---|---|
| 1 | $439 | $329 |
| 2 | 596 | 447 |
| 3 | 753 | 565 |
| 4 | 910 | 683 |
| 5 | 1067 | 800 |
| 6 | 1224 | 918 |
| 7 | 1381 | 1036 |
| 8 | 1538 | 1154 |
| 9 | 1695 | 1271 |
| 10 | 1852 | 1389 |
| 11 | 2008 | 1506 |
| 12 | 2165 | 1624 |
| 13 | 2322 | 1742 |
| 14 | 2479 | 1859 |
| 15 | 2636 | 1977 |
| 16 | 2793 | 2095 |
| 17 | 2950 | 2213 |
| 18 | 3107 | 2330 |

ACF 000542

Earned income is reported semi-annually.  Working families receiving TANF will file a report of earned income following the end of the fifth month of each six-month period. Paystubs for amounts received during the fifth month are submitted with the report. The report and paystubs will be used as a basis to forecast earnings and hours for the following six months and to determine the amount of earnings to be considered for reducing the assistance payment. The monthly countable earnings projected will not be changed unless the family reports a change. If the client reports that the job has ended, earnings will stop being deducted for the month after the last paycheck is received. This system brings stability to the family's assistance payment and aligns reporting requirements with SNAP.

**K.      Employment and Child Support Requirement**

TANF will not be provided to families if an adult refuses, without good cause, to be available for work or refuses, without good cause, to pursue child support services.

In the first 30 days after application, individuals are expected to work toward stabilizing their family situation and are not required to engage in work activities. Once approved, if they fail to cooperate with an aspect of the Responsibility and Services Plan (RSP) or fail to cooperate with a child support services activity without good cause, the progressive sanction policy contained in Article VII of this Plan will apply.

Individuals who have been cooperative in employment and child support activities and subsequently state they are not available for work or will not cooperate with child support services and good cause is not present are subject to the provisions of this Topic.

If good cause exists for failing to cooperate with the RSP or with a child support services activity, a cash penalty or sanction will not be imposed.

A statement refusing to participate in child support activities without good cause during the application process results in family ineligibility. For an active client, failure to follow an RSP with no verbal refusal to participate in either the employment or child support programs is a circumstance subject to the sanction provisions contained in Article VII of this Plan.

When an individual maintains, without good cause, an inability or refusal to be available for work activities or child support services, an explanation of the consequences is provided.If, after receiving the explanation, the client continues non-participation, existing benefits will be terminated.

All denial or termination actions based on this policy will be reviewed by a higher administrative level to assure proper application of the policy.

15

ACF 000543

**L.    Personal Responsibility**

**Responsibility and Services Plan**

All adults and minor parents applying for or receiving assistance will be required to sign a Responsibility and Services Plan (RSP) and follow through with its provisions.  The RSP will be periodically updated, and staff will monitor the family's progress and compliance. The goal of each person's RSP is to obtain the skills needed to become employed. Based on the Family Assessment, the RSP may include assignment to core and non-core work and training activities, as well as address child immunization, appropriate school attendance, family well-being, and economic self-support goals.

Sanctions, i.e., the reduction of assistance, are included in the program as a tool to enforce the importance of adhering to the activities and goals in the RSP. However, a sanction will not be imposed if good cause exists for the failure to adhere to the RSP. The failure of the Department to make available a supportive service agreed upon in the RSP as necessary for complying with the RSP is always considered good cause.

**COVID-19 –** During the National Pandemic Emergency, Responsibility and Service Plans are temporarily postponed beginning April 2020.  Beginning 10/01/2021 Responsibility and Service Plans are required.

**School Attendance**

TANF families shall be subject to the School Attendance Initiative. The Initiative is a partnership among IDHS, Community-Based Organizations (CBO), and local elementary and middle schools that choose to participate. The schools define initial indicators of truancy and refer the family to a CBO for services designed to improve the child's attendance. If the family fails to participate in the CBO program or attendance fails to improve, the assistance payment is directed to an alternate payee for its management. If the truant behavior is not corrected within three months, the family is subject to the sanction provisions in Topic VII of this Plan.

**Child Support**

Parents will be required to cooperate in establishing paternity for children born out-of-wedlock and in securing child support services.

**M.    60- Month Time Limit**

Families containing an adult head of household or a spouse of the head of household who has received TANF for 60 months may no longer receive benefits unless eligible for an exception in Section II.M below. This is both a Federal and State limit. TANF benefits, which include Federal block grant funds, received in other states and/or in non-continuous months are applied tothe 60-month limitation.

ACF 000544

The following families are in a Solely State-Funded program that is not reported as Maintenance of Effort (MOE):

- two-parent families;
- refugees;
- pregnant women with no other children living with them; and
- a parent with a child under age one.
- a work-eligible individual who is not employed and is not assigned to Work Experience, Community Service, Vocational Education, or a Bachelor Degree Program; and
- a work-eligible individual in their first month of TANF eligibility.

The 60-month time limit applies to all families including those funded in a Separate State Program, unless they meet one of the following exceptions:

- Assistance provided to families with one adult able to work with 30 hours of earnings per week will be provided from State funds (reported as MOE) only and will not be counted against the 60-month limit. Assistance provided to families with both parents present and able to work with 35 hours of earnings per week will be provided from State funds (not reported as MOE) only and will not be counted against the 60-month limit. Assistance provided to families headed by minor parents will also be provided by State funds (reported as MOE) only and not counted against the 60-month limit.

- Assistance provided to single parent families where the parent is in an approved full-time post-secondary degree program and is maintaining a 2.5 cumulative grade point (on a 4.0 scale) will be paid from State funds (reported as MOE) only and will not be counted against the 60-month limit.

- Assistance provided to families who care for a child approved under the Home and Community-Based Care Program waiver will be paid from State funds (reported as MOE) only and will not be counted against the 60-month limit.

- Assistance provided to families where the single parent provides care to a child under age 18 with medical problems, or where one adult provides care to his or her spouse with medical problems and where the demands of care giving do not allow the caregiver to obtain or retain employment of 30 hours per week, will be paid from State funds (reported as MOE) and will not count against the 60-month limit.

- Assistance provided to families where the parent is approved for a Domestic Violence Exclusion will not be counted against the 60-month limit.

Applicants for the Illinois TANF Program will be orally informed of the time limits and will be provided with a clearly written explanation of them.

17

ACF 000545

**N. Exceptions to the Time Limit**

Families containing an adult head of household or a spouse of the head of household who has received TANF for 60 months may receive additional months of TANF cash assistance only if they meet one of the exceptions listed below:

- The client has an application for Supplemental Security Income (SSI) pending at the Social Security Administration and IDHS determines the client is probably eligible for SSI. If the client is in the appeal stage of the SSI application, there must be legal or advocacy representation, unless the client can show legal representation is unavailable.

- IDHS determines that the client has a medical condition which prevents the client from obtaining or retaining employment of at least 30 hours per week.

- The client is in an approved education and training program, which will be completed in six months or less after the client's 60th month.

- The client is in an intensive service program to help overcome a barrier to work, including but not limited to programs under mental health, substance abuse, vocational rehabilitation, domestic violence, homeless services and involvement with the Illinois Department of Children and Family Services. An exception to the 60-month limit will be granted for this reason only if the client's involvement in the program precludes the ability to obtain or retain employment of at least 30 hours per week.

- The client has a severely disabled child approved for a waiver under the Home and Community-Based Care Program.

- The client is the only adult in the assistance unit and is the primary caregiver for a child under age 18 with a physical or mental health problem(s), or is the primary caregiver for his or her spouse who has a physical or mental health problem(s) and the demands of caregiving do not allow the caregiver to obtain or retain employment that would satisfy the criteria in Section II.L which allows a month to not be counted towards the 60-month limit.

The client must request an exception in writing. A written request for an exception may be filed at any time and will be required if the client makes a new application for TANF after the 60-month limit has been exhausted. The client will be informed of the decision on the request in writing. IDHS will periodically review each case to determine if it still meets the criteria for an exception. When IDHS determines the client is no longer eligible for an exception, the client will be notified in writing and will be provided an additional three (3) months of TANF eligibility.

**O.    Other Eligibility Factors**

The following requirements must be met to participate in the Illinois TANF Cash Assistance

18

Program:

- Each member of the assistance unit must provide IDHS with the individual's Social Security number or provide proof of application for a Social Security number.

- The family must cooperate in securing support for a child whose parent is absent from the home.

- The family must take all reasonable steps to produce documentation and information needed to establish eligibility and the payment amount.

- The family's potential TANF eligibility may not result from a strike. A family's TANF payment will not increase as a result of a strike.  Families with strikers may receive TANF if they would have been eligible immediately before the strike began. Workers locked out of a worksite are not considered strikers even if the lockout is a response to a strike.

- The family must report the departure of any family member from the home.

**P.      Application Disposition and Initial Date of Eligibility**

All applications for TANF are to have a disposition made within 45 days.

If the family is eligible the assistance begins on the 30th day after the date of application.

**Q.      Redetermination of Eligibility**

Every effort will be made to complete a redetermination of eligibility timely and accurately in accordance with Federal guidelines.

**COVID-19 –** TANF Redeterminations due in March 2020 through September 2020 are extended by six months.  Decision made to allow state agency to focus on initial applications for assistance.  Changes are implemented in April and TANF cases that canceled for April due to not submitting a Redetermination Report are reinstated with extension allowed.

**COVID-19 –** TANF Redeterminations continued to be extended for six months for cases due for redeterminations October 2020 through February 2021. Beginning March 2021 cases due for a Redetermination will be required to comply with the Redetermination process.

ACF 000547

II.    **Program Model**

Illinois will provide self-sufficiency activities for adults and minor parents in accordance with the following model subject to the availability of limited resources.

A.    All adult clients and teen parents are assessed. The family assessment serves as a basis for creation of the RSP, and the monitoring of the progress of the individual in fulfilling the activities of the RSP is used to identify when an individual is ready to engage in work. Based on this assessment of the client's self-sufficiency strengths and barriers the client will be referred for participation and/or treatment.

B.    Clients for whom barriers to employment are identified through the assessment process will be referred for services or treatment and will be required to follow up as a condition of eligibility. Clients who are identified as having substance abuse problems which prevent them from maintaining successful employment will be referred for treatment. Clients who do not participate in treatment will be subject to sanction.

C.    Clients with a high school education or recent work experience will be referred to local services for job ready clients and will be assigned to job search.

D.    Clients who are determined not job ready will be assisted in the identification of barriers to employment and provision of services to eliminate those barriers.

E.    Clients in need of additional services will be referred to the appropriate provider.

F.    Supportive services will be provided for any client who's approved RSP requires such services.

Supportive services include childcare, transportation, books, fees (e.g., lab or registration), supplies, employment or participation expenses, $20 per month for job search participants, and a $20 per month payment to individuals in work experience, or community service to help cover additional expenses. Supportive services of transportation, employment expenses, costs of books and fees will be provided to clients in accordance with their RSP. Childcare will be provided via the State's Child Care Program which is funded, in part, by the Federal Child Care and Development Fund.

Services in general will be available Statewide. However, each area of the State within IDHS and the community will be asked to develop, coordinate, and target resources needed to serve the population in the area. Partnerships will be developed with the Workforce Investment Area (WIA) program, adult education providers, community colleges, employment and training centers, community-based organizations, and substance abuse, mental health and domestic violence providers to develop a

20

ACF 000548

comprehensive service delivery system for the TANF population.

### III.    Work and Training Participation Requirements

### A.    Work Eligible Individuals - Exclusions

A work eligible individual is an adult receiving cash assistance under the TANF Program or under a Separate State Program for whom Maintenance of Effort (MOE) expenses are claimed or a non-recipient parent living with a child receiving assistance, unless the individual is excluded. Work eligible individuals are included in the Federal work participation rate. The following individuals are excluded as work eligible individuals and are not included in the Federal work participation rate:

- A minor parent who is receiving TANF as a child and is not the head of the household and not the spouse of the head of the household.

- A parent in a family when only children are receiving TANF benefits and the parent is an alien who is ineligible to receive assistance due to his or her immigration status (as outlined in Section II.F of this Plan).

- A parent providing care for a disabled family member living in the home who does not attend school on a full-time basis.

- A non-recipient parent who receives Supplemental Security Income (SSI) benefits.

### B.    Individuals Excluded from the Federal Participation Rate (Receiving assistance under a Solely State Funded Program for whom MOE expenses are not claimed)

The following individuals who receive assistance under a Solely State Funded Program for whom MOE expenses are **not** claimed are excluded from the Federal work participation rate:

- A parent with a child under age one;

- A refugee;

- Two-parent families where both parents are medically able to work;

- A pregnant woman who has no other dependent children living with her;

- A work-eligible individual who is not employed and is not assigned to Work Experience, Community Service, Vocational Education, or a Bachelor Degree Program; and

21

ACF 000549

- A work-eligible individual in their first month of TANF eligibility.

A parent with a child underage one is exempt from participating in work and training activities per Illinois State law (305 ILCS 5/9A-4). The other individuals receiving assistance under a Solely State Funded Program for whom MOE expenses are not claimed may be required to participate in work and training activities.

**C.    Individuals Included in the Federal Participation Rate but Exempt from Work Participation Requirement**

Individuals aged sixty or older who receive assistance under TANF or under a Separate State Program for whom Maintenance of Effort (MOE) expenses are claimed are included in the Federal work participation rate but are excluded from the work participation requirement per State policy.

**IV.    <u>Work and Training Activities</u>**

**A.    Unsubsidized Employment**

Unsubsidized employment is full or part-time employment in the public or private sector where the employer is not subsidized by the TANF Program or any other public program. Self-employment is included as unsubsidized employment and includes farming, sales, small business, domestic work, and providing child care.

**B.    Subsidized Employment**

Subsidized employment is paid employment in the private or public sector for which the employer receives a subsidy from public funds to offset some or all of the wages and costs of employment. The purpose of subsidized employment is to increase the employability of the client by providing needed work experience that will help transition the client to unsubsidized employment.

**C.    Work Experience**

Work experience is a work activity that is performed in return for TANF and SNAP benefits. Partnerships with individual employers are created to provide individuals with experience in a work setting to develop work skills while receiving their TANF assistance.

**D.    Work First - Program deleted 07/01/2021.**

22

ACF 000550

TANF participants assigned to Work First will be assigned to Job Placement.

**E.      Community Service**

Community Service is a structured program of activities in which the client performs work for the direct benefit of the community. Community Service programs serve a useful community purpose in fields of health, social service, environmental protection, education, urban and rural redevelopment, welfare, recreation, public facilities, public safety, and child care. The goal of Community Services is to improve the employability of a client.

**F.      Vocational Education**

Vocational education training is an organized educational program that is directly related to the preparation of an individual for a specific occupation that requires training other than a bachelor's or advanced degree. Vocational education programs are provided by vocational-technical schools and may also include degree or certificate programs based in secondary schools but may not consist of secondary school training. Vocational education programs may also be provided by postsecondary educational institutions. Clients may participate in vocational education for up to 12 months without a work requirement.

**G.      Job Search and Job Readiness Activities**

Job Search is the act of seeking or obtaining employment. Job Readiness is the preparation necessary for a person to seek or obtain employment.  Job Readiness includes barrier reduction services such as substance abuse treatment, mental health treatment, and rehabilitation activities.

**H.      Job Skills Training**

Job Skills training is training or education for job skills required by an employer to provide an individual with the ability to obtain employment or to advance or adapt to the changing demands of the workplace. Job Skills training may be customized training for a specific employer or specific employment. It may also include participation in training or retraining that develops or enhances skills in the areas of writing, reading, math, oral and written business communication, or new industry technology.

**I.      Education Directly Related to Employment**

23

ACF 000551

Education directly related to employment, in the case of a client who has not received a high school diploma or GED, means education related to a specific occupation, job, or job offer. This includes adult basic education, English as a Second Language, and GED classes where required as a prerequisite for employment.

### J.    Satisfactory Attendance at Secondary School

Secondary school attendance is an education program for teen parents age 19 or younger who have not completed secondary school or received their GED. It includes enrollment in a secondary school, a course of study leading to a GED or a basic remedial education.

### K.    Bachelor's Degree Program

An individual with his/her high school diploma or GED may be approved for participation in a Bachelor's Degree program. The degree program must be administered by an educational institution accredited under requirements of State law. Factors to consider when determining whether a Bachelor's Degree program is appropriate include, but are not limited to, the client's educational and work history, his/her aptitude for further education, his/her career goal, his/her ability to finance tuition and other expenses not provided by IDHS, and his/her ability to arrange transportation, child care, and other family obligations.

## V.    Other Self Sufficiency Activities

### A.    Alcohol and Substance Abuse Treatment

Adults identified as having an alcohol or substance problem must participate in treatment unless employed 30 hours or more per week.

### B.    Family Violence Program

Persons participating in a Family Violence program may also participate in other activities, if recommended by the provider.

### C.    Mental Health Treatment

A work-eligible adult who is identified as having a mental health issue that presents a barrier to becoming employed must participate in treatment.

### D.    Parents with Children Under Age One

ACF 000552

Persons with a child under age one may be required to participate in:

- counseling or group sessions that explain the benefits to their child's emotional and financial future of establishing paternity and obtaining child support;
- health-related education and prevention services;
- group activities that promote understanding of the 60-month lifetime limit, the benefits of working, networking and mutual support opportunities;
- a forum with information about child care, education and transportation resources; or
- activities that address access to medical services and housing.
-

The State does not intend to specifically assist individuals to train for, seek and maintain employment providing direct care in a long-term care facility; or in other occupations related to elder care.

**COVID-19 –** During the National Pandemic Emergency, Good Cause was given to individuals required to participate in Work & Training but could not be due to Shelter In Place Order. Beginning 10/01/2021 TANF customers will be assessed/reassessed to determine participation in Work & Training.

## VI.   Work Verification Plan

In accordance with 45 CFR§261.63, the State's TANF Work Verification Plan was approved by the Administration for Children and Families, Office of Family Assistance, on September 19, 2007.

## VII.   Sanctions

Unfortunately, some clients fail to fulfill the obligations they agreed to and only reconsider when their benefits are affected. TANF sanctions, i.e., the reduction of benefits, will be consistent regardless of the reason, and the policy will guarantee fairness with a right to correct the problem. Exempt clients who volunteer to participate in work, education and training activities are not subject to sanctions for not complying with those outlined activities.

A sanction is the tool of last resort and represents a failure of the family to be properly engaged in the self-support process. It is an undesirable outcome, and is to be applied only when the following conditions are met:

1. The client has failed to perform a work, education or training activity in the number of hours required under the Responsibility and Services Plan; or

2. The client has failed to perform a self-sufficiency activity required under the RSP; or

3. The client has failed to cooperate with the Child Support Services Program; or

25

ACF 000553

4. The client has failed to cooperate with the School Attendance Initiative.

ACF 000554

AND

1. There is not a valid good cause for failing to perform the activity or cooperating with the Child Support Services Program; and

2. The client has been given the opportunity by a pre-sanction meeting to correct the issue before the sanction is applied; and

3. Any supportive services agreed to and identified in the RSP as necessary to perform the activity have been made available; and

4. For failure to take action in accordance with a work, education, training or self-sufficiency activity, a clear distinction has been made that the action leading to sanction is a failure to take a step and not a failure to achieve a goal of the RSP. E.g., failure to attend a GED program is a sanctionable issue if the client has not used the opportunity to correct the failure. However, failure to pass the GED test as specified in the RSP is not sanctionable.

Good cause for failing to take indicated actions will be defined in the Illinois Administrative Code.

Sanctions for failing to comply with work, education, training, or self-sufficiencyactivities will not be applied to a single custodial parent of a child if:

- appropriate child care is not available because none is located within reasonable distance of the family's home or work site; or

- informal child care from a relative or elsewhere is not available or suitable; or

- appropriate and affordable formal child care arrangements are not available.

"Appropriate child care" meets the child's needs and complies with all applicable State and local laws and regulations.  "Reasonable distance" means the client's total travel time (from home to child care provider to job/activity, plus return trip) is not more than 25% of the client's total time on the job/activity, e.g., no more than two hours commuting for an 8-hour work day. "Unsuitability of informal child care" means arrangements with family or friends to provide child care do not meet the child's needs, are unreliable and/or violate applicable State or local laws and regulations. "Affordable child care arrangements" are free or eligible for payment by IDHS and do not exceed IDHS' maximum rate for the type of care.

Sanctions for failure to cooperate will be applied to families participating in the Illinois TANF Program. When a sanction is imposed, the TANF grant will be reduced by 30% of the 25% TANF grant designated for the adult member(s) for a TANF adult(s)/child(ren) case. This will result in a 7.5% reduction of the grant amount. When a TANF case is an adult(s) only case,

27

ACF 000555

the TANF grant will be reduced by 30%.

When a TANF case is sanctioned Illinois will seek to engage the individual in the required activity. A pre-sanction meeting will be offered to the client prior to the imposition of any sanction. This meeting will provide the client the opportunity to show good cause or to remedy the situation by immediately complying with the requirement. The full TANF grant will be restored from the date the customer complies or cooperates.

A client who participates in Work Experience or Community Service will be sanctioned if he/she fail to participate in the activity for the maximum hours assigned based on the calculation of his/her TANF grant plus his/her SNAP allotment divided by the higher of the State or Federal minimum wage. When the hours assigned based on this calculation are fewer than 20, the client is deemed to have participated in the 20 core hours needed to meet the Federal participation rate as long as the client completes the maximum number of hours assigned. In order to count a family as having satisfied the 20-hour core activity requirement when it participates, the maximum number hours allowed by dividing TANF and SNAP benefits by the minimum wage, Illinois adopted a mini-simplified SNAP program. Under the mini-simplified SNAP program, when a family fails to cooperate with the TANF work activity requirement, both TANF and SNAP benefits are sanctioned with one exception. If the TANF adult has a child under age 6, the SNAP benefits are not sanctioned.

## VIII.   <u>Client Rights</u>

### A.   **Client Notifications**

Applicants for cash assistance will be sent written notification of the disposition of the application. If the application is denied for all or any family members, the written disposition notification will identify who was denied and who was approved, a statement of the reason for the denial, and a citation of the policy that resulted in the denial.

Families receiving TANF cash assistance will be sent advance notice when an assistance payment is to be reduced or discontinued. The notice will identify the amount of reduction, the reason for the reduction, and provide a citation of the policy that resulted in the reduction or discontinuance.  The notice will be sent at least ten days prior to the effective date of the action.

If the reduction is caused by a client cooperation factor, such as failing to provide available information to determine eligibility, and the client cooperates within ten days of the date the benefit became or would have become available, assistance will be restored retroactive to the date of reduction or discontinuance.

The preceding paragraph does not apply to notices of anticipated sanctions.

### B.   **Right to Appeal**

The application disposition notice, the notices of adverse action, and the written material

ACF 000556

provided to applicants all contain an explanation of the client's right to appeal.  The client has the right to appeal the failure of IDHS to act upon requests, the failure to accept or process an application for benefits, the failure to provide proper notice of adverse actions, issues of program policy, the amount of assistance determined by IDHS, the denial of an application, and the reduction or discontinuation of assistance.  If proper notice of the action has been issued by IDHS the client or representative must file the appeal within 60 days after the date of notification. The 60-day limit is not applied if proper notice was not provided. If the appeal is filed by the date of the change, or within 10 days of the date of the notice, the action under appeal is not taken until the issue has been resolved.

An administrative hearing is held on appeal issues. The appellant has the right to be represented, present evidence, and question IDHS' representative. If the final administrative decision does not resolve the issue to the appellant's satisfaction, the client may opt for a judicial review.

## C.    Client Grievance Procedure

Applicants and recipients have a client grievance procedure available to use if they believe they have not been treated with courtesy, consideration, and respect by a staff member. A management staff member not associated with the grieved action is appointed to investigate the matter. An informal meeting is held among the parties within 10 days. The grievant may bring a representative. Within 15 days of the conference the grievant is informed of any action taken in response to the grievance. Specific employee discipline actions are not included in the disposition notification.

## D.    Non-Discrimination

IDHS does not discriminate against any individual on the basis of race, color, religion, sex, protected age group, disabling condition, national origin/ancestry, political beliefs, or marital status. Vendors contracting with IDHS are required to maintain the same nondiscrimination policy. Complaints of discriminatory acts or treatment may be filed with the IDHS.  These are investigated and resolved by the IDHS' Equal Employment Officer.

## E.    Interpretive Services

Interpretive services are made available to assist Limited English Proficiency applicants and recipients. Interpretive services and TTY devices are available to communicate with individuals who are communication impaired.

## F.    Confidentiality

Client information may only be used for the administration of the program. This includes

ACF 000557

establishing the family's initial or continuing eligibility, establishing financial need, establishing services need (includes self-support services), finding and making needed services and resources available to families, assuring the health and safety of the family members, and assisting the Illinois Department of Children and Family Services in investigating allegations of child abuse or neglect.  Use of information for commercial, personal, or political purposes is prohibited.

Law enforcement agencies are provided the current address of a client for whom they have an outstanding arrest warrant without the family's consent when the law enforcement officer provides the name and Social Security number of the client, evidence that the individual has an outstanding arrest warrant, proof that apprehension of the client is within the officer's official duties, and evidence that the request is made as a proper exercise of the officer's duties.

Families who apply for benefits and contain immigrants will be advised that IDHS will verify their status with the Bureau of Citizenship and Immigration Services if the immigrants are applying to be included in the assistance unit, claim to have assistance qualifying immigration status, and provide some documentation of their status. Applicants will also be advised that IDHS will not verify the status of immigrants unable or unwilling to provide information concerning their status, or not requesting assistance for themselves.

The release or use of information concerning families participating or applying for the Illinois TANF Program is restricted to persons or agency representatives who are subject to standards of confidentiality comparable to those of IDHS.

## G.    Anti-Displacement and Grievance Procedure

1.    An employer may not utilize a work activity participant if such utilization would result in:

   a.    the displacement or partial displacement of current employees, including but not limited to a reduction in hours or non-overtime or overtime work, wages, or employment benefits; or
   b.    the filling of a position that would otherwise be a promotional opportunity for current employees; or
   c.    the filling of a position created by or causing termination, layoff, a hiring freeze, or a reduction in the workforce; or
   d.    the placement of a participant in any established unfilled vacancy; or
   e.    the performance of work by a participant if there is a strike, lockout, or other labor dispute in which the employer is engaged.

2.    An employer who wishes to utilize work activity participants shall notify the appropriate labor organization in accordance with the applicable State statute (305 ILCS 5/9A-13).

3.    Participants, other employees at the work site, or their representatives, may file a grievance with IDHS if they believe the participant's work assignments are causing displacement.  In order for IDHS to consider a grievance, it must be in writing and

30

ACF 000558

contain the following information:

a.  the name and address of the participant or other employee at the work site (the grievant);
b.  the participant's case number (if grievant is participant);
c.  the grievant's Social Security number;
d.  Work Experience (work site); and
e.  a statement as to why the grievant believes the participant is causing displacement.

4.  Within ten days after receipt of a written grievance, IDHS shall arrange an in-person conference with:

a.  the grievant;
b.  the grievant' s representative, if any;
c.  the Work Experience Sponsor;
d.  the Work Experience Sponsor's representative, if any; and
e.  IDHS' representative.

5.  At the in-person conference, IDHS shall solicit and receive from the grievant and the Work Experience Sponsor any documents and statements relevant to the matters alleged in the grievance. The Work Experience Sponsor shall provide whatever documents or other information is requested by the grievant and/or IDHS.

6.  Within 15 days after the in-person conference, IDHS shall advise the participant or other employee at the work site and the Work Experience Sponsor in writing of the information obtained in the investigation and of the findings and conclusions as to the matters alleged in the grievance.

7.  If IDHS concludes that displacement occurred (as described in subsection (q)(1) of this Section), IDHS shall terminate the participant's assignment to that Work Experience Sponsor.  If IDHS concludes, as a result of the evidence presented at the conference, that the Work Experience Sponsor has caused displacement by use of TANF participants in addition to the participants involved in the grievance, IDHS shall terminate those TANF participants' assignment to that Work Experience.

8.  IDHS, its employees, or the Work Experience Sponsor shall not retaliate for filing a grievance or otherwise proceeding under this policy. Retaliation will result in the termination of the Work Sponsor contract.

## IX.  **Additional Program Provisions**

## A.  **Benefits Delivery**

TANF Program benefits are delivered by means of an electronic benefit transfer system,

ACF 000559

Illinois Link.

Clients may also choose to have their cash benefits directly deposited into their financial institution accounts.

The Illinois Link System or the direct deposit system is mandatory for all clients who receive help in the form of cash.

## Training

During the eligibility interview staff must give the client a Link brochure to all cash applicants and discuss the use of the Link card and the client's rights and responsibilities in regard to the card.

The brochure includes the following information:

- Care of the Illinois Link card (e.g., protection of the magnetic stripe).
- How to use and secure the Illinois Link card.
- How to use and secure the PIN.
- How to make an inquiry or report a problem with a purchase or withdrawal.
- Helpline phone number.
- Use of the Helpline Service.
- Web site information.
- How to get benefit balances.
- Replacement card policy.
- How to report lost and stolen cards.
- Responsibilities and liabilities for reporting lost or stolen Illinois Link cards.
- How to get a new PIN.

When discussing with customers, tell the customer to keep the card, as they will not receive a new card each month. Remind customers to use the checking option to withdraw cash benefits at ATMs.

Customers can call the Illinois Link Help Line at 1-800-678-LINK (5465) or visit the Link Card website at www.link.illinois.gov to find out when they can get their benefits (availability date).
Benefit Availability Date

The benefit availability date is the first day the client can access their cash and/or SNAP benefits. Customers can call the Illinois Link Help Line at **1-800-678-LINK (5465)** or visit the Link Card website at **www.link.illinois.gov** to find out when they can get their benefits (availability date). Both the helpline and website will also let them know if there are any pending benefits month and year their current SNAP approval period ends, and the current account balance.

## Accessing Benefits Electronically

A customer who is eligible for both cash and SNAP benefits can access both benefits with one

32

ACF 000560

card.

**Automated Teller Machines (ATMs)**

A customer can access only cash benefits at ATMs. ATMs are associated with banks. At ATM machines, customers are allowed:

- 2 cash withdrawals per calendar month without a transaction fee. For each withdrawal over 2, the Illinois Link system imposes a $1 transaction fee;

- 2 balance inquiries per calendar month without a transaction fee. For each balance inquiry over 2, the Illinois Link system imposes a 50¢ transaction fee.

   **NOTE:** A bank surcharge is not allowed on any Link transaction in Illinois.

   At the time an ATM transaction is requested, the balance in the account must be sufficient to cover:

- the requested withdrawal amount and the transaction fee (if any); or

- the surcharge and/or transaction fee (if any) for the balance inquiry or out-of-state transactions.

   If the account balance is not sufficient to allow the transaction, the transaction is rejected.

   The client may obtain cash or inquire about benefit balance information through a POS terminal without charge. **Encourage clients to use the Illinois Link Helpline at 1-800-678-LINK or the Link Card website at www.link.illinois.gov to obtain their benefit balance and benefit availability date at no charge.**

   Cash benefit withdrawals can be made at most ATMs statewide.

   To make a cash withdrawal from an ATM, the client places (or scans) the Illinois Link card in the machine, enters the PIN, selects the checking option, and enters an amount for withdrawal.

## Accessing Benefits Manually

Key-entry transaction occurs when a Point of Sale (POS) terminal is in working order, the phone lines are operable, but the magnetic stripe of the Illinois Link card can't be read by the equipment. When the magnetic stripe of the card can't be read, the Illinois Link system allows for the manual entry of the Personal Account Number (PAN) displayed on the Illinois Link card and the Personal Identification Number (PIN).

Key-entry transaction can only be done at POS terminals. It can't be done at ATM machines.

## Transaction Receipts

SNAP and **cash** balance information is available from Point of Sale (POS) terminals. Automated Teller Machines (ATMs) provide cash balances only.

   Under Illinois law, it is illegal for any ATM owner to attach surcharges to any cash transaction completed with an Illinois Link card. The Illinois Link brochure informs recipients they may withdraw cash or request a balance inquiry at an ATM two times per month before being charged a fee, and that they may avoid a fee by withdrawing cash at stores which accept

33

ACF 000561

the Illinois Link card and provide cash back.

## B.  Statewide Program Uniformity

Illinois will assist needy families statewide in an objective and uniform manner. The monthly income maintenance support level will be determined by the county in which the family resides. There are three groups of counties and all counties within a group use the same monthly income maintenance levels for each family size.  Individual self-sufficiency planning and support services will also be universally included in the program, although local circumstances may determine the availability of some services.

## C.  Child Support Services Link

Families who apply for the Illinois TANF Program will in the same action apply for child support  services. The application process will secure information pertaining to the need for paternity establishment and child support services and electronically transmit this data to the child support services component of the Illinois Department of Healthcare and Family Services.

The child support link is vital to self-sufficiency efforts for families with children having an absent parent. A combination of child support, earnings, and the earned income tax credit are a solid foundation for a family to become independent of assistance. With the continued aggressive establishment of paternity already initiated by the Illinois Child Support Services Program, and the establishment of new hire reporting, IDHS anticipates even more families will benefit from the receipt of child and spousal support.

Beginning 07/01/2024 under Public Act 102-1115, the Illinois Department of Health & Family Services, Child Support Services will pass all child support through to the family.  This includes current support, past support owed, or future support that is collected on or after 01/01/2023.  All child support passed through to the family will be disregarded in determining the amount of the TANF grant provided to the family.

Under Illinois law, an applicant or recipient of assistance automatically assigns support rights to the State.

## D.  Recoupment of Overpayments

Families participating in the Illinois TANF Program who have received an overpayment of AFDC (prior to July 1, 1997) or TANF, and have not repaid the money, will have the overpayment recouped from the TANF payment. The recoupment amount will be limited to assure that each family has monthly income of at least 90% of the applicable assistance payment level with a $75 monthly maximum deduction.

ACF 000562

**E.    Native American Tribes**

There are no Native American tribal organizations receiving TANF Block Grant funds in Illinois. All Native Americans have access to the Illinois TANF Program equal to that of any other Illinois resident

ACF 000563

**F.      EBT Use Restrictions**

Cash benefits may not be used in any Illinois Link transaction in any liquor store; any casino, gambling casino, or gaming establishment; or any retail establishment which provides adult-oriented entertainment in which performers disrobe or perform in an unclothed state for entertainment.

Clients are informed of this prohibition by means of (a) approval notices; (b) the Illinois Link brochure; and (c) posters displayed in each of the Illinois Department of Human Services Family Community Resource Centers. In addition, posters are hung in liquor stores which are not SNAP approved retailers.  The Illinois Casino Gaming Association voluntarily blocks ATMs at all casinos.

Clients may be subject to sanction if they violate these provisions.

36

ACF 000564

## SECTION 3 - ADDITIONAL USES OF TANF BLOCK GRANT FUNDS AND STATE MAINTENANCE OF EFFORT FUNDS

In addition to the program described in this Plan which provides cash assistance and supportive services to needy families meeting the financial criteria contained in Sections III.H & I of this Plan, the State of Illinois also intends to use TANF Block Grant funds and State Maintenance of Effort (MOE) funds to provide other services which are reasonably calculated to accomplish the purposes outlined in Section 401 of the Social Security Act (42 USC 601 *et seq.*) or which were in Illinois' approved Title IV-A State Plan on August 21, 1996. For some programs, Illinois will claim qualified third-party expenditures toward its MOE requirement via aMemorandum of Understanding with the third party.

### I.    Programs Funded by TANF Block Grant Funds

The following programs were in Illinois' approved State Plan under Title IV-A on August 21, 1996.  The use of TANF Block Grant funds is authorized under Section 604(a)(2) of the Social Security Act (42 USC 604(a)(2)).

- Illinois Department of Children and Family Services Child Welfare Services: Training, emergency assistance, case management, pre-placement, counseling and other services provided to families and children in the child welfare network.

- Emergency Repatriation Planning: Developing and planning activities for emergency repatriation, as needed.

### II.    Programs Funded by TANF Block Grant Funds or MOE Funds to Families with Income Below 200%

The following programs are provided to eligible families whose income is below 200% of the Federal Poverty Level using TANF Block Grant funds or MOE funds (or TANF Emergency Contingency funds).

- Child Care: Child care provided to families to enable the caretaker relative to work.

37

ACF 000565

- Transportation: Payments for transportation for job search and other activities designed to promote self-sufficiency.

- Employment and Training Contracts: Payments to contractors who provide employment and training services, case management, job placement and other job-related services.

- Illinois Student Assistance Commission (including the Monetary Award Program): Payment of tuition and other fees for low-income college students.

- Other Supportive Services: Other supportive services (*e.g.* work and training expenses, uniforms, car repairs) designed to help clients or applicants obtain or retain employment and for training.

- Teen Parent Services: Services which help parents under age 19 stay in school, develop parenting skills, become more self-sufficient and increase self-esteem.

- Crisis Assistance: Payments to families that have emergent needs due to fire, flood, eviction, loss of cash, covering such items as food, clothing and furniture.

- DCFS Teen Parent and Family Preservation Services: Services provided by the Illinois Department of Children and Family Services to help keep intact families together and help teen parents learn to properly care for their children.

- Youth Programs through the Public Schools: Before and after school, weekend and summer programs designed to help keep children in school, stay away from drug and gang activity, reduce teenage pregnancies and other related activities. May include transporting homeless students in Pre-Kindergarten through Grade 6 to their school of origin and picking up homeless youth at their temporary residence.  Outreach programs designed to ensure that all homeless youth and their families are served are included.

- Substitute Parental Care: Care provided to a family when the caretaker must be out of the home on an emergency basis, e.g., the caretaker is hospitalized.

- The Children's Place Contract: A program that allows children infected with HIV to remain in the home by the provision of necessary services to the family.

- Early Childhood Programs: Services to young children and their parents that help learning with long-range outcome of better jobs and reduced teen pregnancies.

- Illinois Community College Board Adult Education Program Funds for educational expenses and supportive services.

38

ACF 000566

- Illinois Free and Reduced Lunch Program: Illinois State Board of Education expenditures for the free and reduced lunch program which are in excess of the Federal program and match requirement.

- Food Banks: Payments to food banks to purchase food for distribution to TANF-eligible clients receiving food at food pantries that participate in the Emergency Food Program.

- Community Based Tax Counseling and Preparation: Payments to providers to provide tax counseling and tax form preparation and filing.

The following is provided to families with a dependent child under age 18 who qualify for the Federal Earned Income Tax Credit:

State Earned Income Tax Credit: This refundable credit supplements the earned income of lower income workers who have children living with them. Persons are eligible if they have at least one qualifying child living with them and are qualified for the Federal Earned Income Tax Credit.

## III.    Programs Funded by TANF Block Grant Funds that Meet Purpose 3 or Purpose 4

The following services meet either Purpose 3 or Purpose 4 under Section 601 (a) of the Social Security Act (42 USC 601(a)).  Purpose 3 is to "prevent and reduce the incidence of out-of-wedlock pregnancies." Purpose 4 is to "encourage the formation and maintenance of two-parent families." TANF Block Grant funds are used, and the services are provided to eligible families without regard to the family's income.

- Teen Responsibility, Education, Achievement, Caring and Hope (Teen REACH): Structured Activities during non-school hours to help prevent involvement in gang activity, alcohol and substance abuse, sexual activity, teen pregnancy and other problems facing teenagers.

- Healthy Families: Intensive home visiting to families at risk of child abuse or neglect, targeting new parents, providing services designed to promote healthy child development, strengthen parent-child relationships, prevent further teen pregnancies, coping with stress and supporting parents as the child's first teacher.

- Parents Too Soon: Counseling and other services for young parents including counseling to help prevent further teen pregnancies.

39

ACF 000567

- Guide to Programs Brochure: a brochure provided to aid recipients detailing the services available through IDHS.

### IV.    Programs Funded by Maintenance of Effort (MOE) funds:

The following services, by their nature, are provided to persons whose income at the time falls below 200% of the Federal Poverty Level. When a client is requesting assistance during their time of crisis, we accept their statement that their income is below 200% of the Federal Poverty Level.

- Homeless Services: Funding for meals, shelter and supportive and prevention services to non-profit organizations that serve homeless families and families at risk of becoming homeless, including overnight shelters, transitional shelters and emergency shelters.

- Domestic Violence Services: Services to victims of domestic violence and their children including shelter, hotlines, individual and group counseling, advocacy, information, referral, transportation, school prevention programs, public education and professional training.

- Crisis Nursery: Shelter services to families experiencing a crisis, e.g., domestic violence, substance abuse, mental health issues.

### V.    Subsidized Employment Programs

TANF Block Grant funds and MOE funds will also be used to fund subsidized employment programs, including transitional jobs programs.

ACF 000568

## SECTION 4 - PROGRAMS TO ATTACK DEPENDENCY RELATED ISSUES

**I.**    **Teen Pregnancy Prevention Strategies and Programs**

The most important factors in preventing teen pregnancies are academic success, involvement with a caring adult and the development of expectations for future success after completing school. During 2017-2018 the teen pregnancy rate continued at 9.6%. From 2010 to 2018 the average out-of-wedlock birth percentage remained at 40%. To maintain the out-of-wedlock pregnancy rate as well as the reduced teenage pregnancy rate, Illinois continues to focus on teen pregnancy prevention strategies. Consequently, the services provided feature parental involvement and work with adult mentors; school completion; health education and access to health care; and development of decision-making skills. The specific programs that use these strategies include:

- **Teen REACH** (Responsibility, Education, Achievement, Caring and Hope) is an initiative to provide out-of-school time programming for children between 10 and 17 years of age who live in high-risk communities. The programs emphasize enrichment, recreation, life skills education and mentoring, with active parental involvement.

- **The Abstinence Education Project** is designed to promote abstinence from sexual activity outside of the context of marriage. Intervention strategies include classroom instruction, supervision and mentoring.

- **Parents Too Soon Primary Prevention programs** offer peer support groups which include mentoring, tutoring, opportunities for community service, cultural education, field trips, promotion of school completion, improved academic achievement, recreation activities and skill building in areas such as effective communication, responsible decision making and goal setting.

- **Adolescent Health Promotion projects** provide health promotion, prevention activities and education services. Projects may be focused toward junior and senior high school students in the areas of self-concept, nutrition, health education and sexuality education (including abstinence), alcohol, tobacco and other drug abuse, developmental crisis, peer relationships, violence prevention and improved communication between teens and adults, particularly parents.

ACF 000569

- **Male Responsibility projects** provide health and sexuality education (including social development and abstinence) and decision-making skills; tutoring; mentoring; and structured activities. Services target 10- to 14-year-old males at risk of school drop-out behavior problems.

- **The Subsequent Pregnancy Prevention program** is designed to help adolescent mothers delay subsequent pregnancies, consistently and effectively practice birth control and continue their schooling to high school graduation.

- **School-Based or School-Linked Health Centers** have established linkages to local health departments, community health care agencies, not-for-profit agencies, parentorganizations, schools and the community-at-large. Services include Early and Periodic Screening, Diagnosis, and Treatment (EPSDT), screening, immunizations, family planning services (on-site or by referral), counseling, health education, acute treatment, sexually transmitted disease (STD) testing and treatment and school or sports physicals.

- **The Family Planning program** provides comprehensive reproductive health services to help men and women control the number and spacing of their children. Program services include health education, contraceptive services, pregnancy testing and counseling and sexually transmitted disease services.

- **Use of Family Planning Services by TANF Recipients.** The ability to avoid unplanned pregnancy is essential for women striving to leave welfare and become economically self-sufficient. Special training is being provided to local office staff by the Family Planning program to improve staff's knowledge of the Family Planning program and to help them encourage women to use family planning services.

- **The Teen Parent Services (TPS) program** helps young, TANF-eligible parents to stay in school and obtain a high school diploma (or its equivalent) so that they may become self-sufficient and economically independent. TPS is a part of the TANF Employment and Training program. Participation is mandatory. TPS services include: intensive case management, comprehensive family assessment, individualized counseling, referral to social service agencies, and reimbursement for child care and transportation to attend school or TPS activities. Since the younger siblings of a teen parent are at increased risk of becoming teen parents themselves, special prevention programs are being developed to serve this population.

- **Substance Abuse Prevention** - Teen pregnancy, delinquency, school drop-out and substance abuse share common risk factors. Therefore, substance abuse prevention efforts also help reduce teen pregnancy and illegitimacy. Illinois' substance abuse prevention program is one of the most comprehensive in the nation. It includes a mix of local, regional and Statewide programs provided by 100 agencies. Substance abuse prevention programs include comprehensive projects, gang and violence prevention, maternal and child health

42

projects, services in public housing, and the Illinois Network to Organize the Understanding of Community Health (In Touch), which organizes and coordinates local prevention efforts.

## II.    Programs that Provide Education on the Problem of Rape/Sexual Assault

IDHS' Division of Family and Community Service's Domestic Violence and Sexual Assault Unit partners with the Illinois Coalition Against Sexual Assault (ICASA) to fund community-based, sexual assault crisis centers and satellite offices throughout the State.

The purpose of ICASA is two-fold: to end sexual assault violence and to alleviate the suffering of sexual assault victims. To accomplish these goals, ICASA advocates for public policy that prevents sexual violence and guarantees sensitivity to victims. ICASA uses the power of public education to change societal attitudes about the causes and consequences of sexual violence.

ICASA's prevention education programs and training sessions are conducted:

- in schools;
- with civic organizations and other community groups;
- with law enforcement officers; and
- with hospital emergency room staff, educators, prosecutors, and others who respond to survivors.

These sessions address aged-based offenses and stress consent, pursuing the issue federally defined as "statutory rape" (statutorily referenced as "sexual assault" in Illinois). The courses are provided to both males and females, targeting the prevention of teen pregnancy.

ICASA's Training Institute also conducts Statewide conferences focused on education, counseling and advocacy. Employees of IDHS and the Illinois Department of Children and Family Services participate in the conferences.

ACF 000571

## SECTION 5 - PROGRAMS TO PROMOTE HEALTHY
## RELATIONSHIPS AND MARRIAGES

The promotion of healthy marriages and healthy relationships is one of the goals of the TANF program. Illinois supports the formation and maintenance of healthy marriages. As a component of the Responsibility and Services Plan (RSP), appropriate adult members of the family may be referred to IDHS' and community-based organizations' workshops geared toward the promotion of healthy relationships and co-parenting skills.

## SECTION 6 - TANF PARTICIPANTS IN RESEARCH PROJECTS

Research projects expand our knowledge to effectively discover ways to improve employment, earnings, and economic stability among TANF customers.  This leads to helping families with economic barriers and overcoming challenges within the household, which leads to self-sufficient. Research can provide a strong impact on how we conduct our practices and policies within TANF.

## EVERY DOLLAR COUNTS (EDC) RESEARCH PROJECT

Every Dollar Counts (EDC) is a research project being conducted by the   University of Chicago Poverty Lab and the Heartland Alliance for Human Needs and Human Rights (10/2020). The research project is designed to study the impact of improved economic stability for residents of Illinois.  The purpose of this project is to understand how providing a minimum level of economic security impacts the choices and outcomes of low-income households.  The eligible population are individuals between the ages of 21 and 40 at the time of enrollment.  Also, in the year prior to enrollment to the study the participants income could not exceed 300 percent of the federal poverty level.  Individuals who participate in the project will receive a cash gift of $50 to $1000 every month for 3 years.  Participants will receive the cash gift through direct deposit and can spend the money however they choose. Through Public Act 101-0415,  money received from this project is considered exempt unearned income for the purposes of determining SNAP, TANF and AABD cash and MAGI medical eligibility and non-exempt for AABD medical eligibility.  EDC is not considered a Work and Training Program for TANF.

## SECTION  7- TANF PARTICIPANTS IN GUARANTEED INCOME PILOTS

Guaranteed Income Pilots align within Illinois Law (Public Act 103-0492) any financial assistance, cash transfers or gifts that is provided to a person through a guaranteed income program through one-time or recurring unconditional payments for the purposes of reducing poverty, promoting economic mobility, or increasing the financial stability of Illinois residents to be excluded from determining eligibility and the amount of public assistance. Guaranteed Income Pilots provide certain individuals

44

ACF 000572

with a guaranteed monthly income to study the effect of a guaranteed monthly income on such individuals and for other purposes.

## SECTION 8 - LIST OF FEDERAL CERTIFICATIONS AND ASSURANCES

In accordance with the requirements of the Personal Responsibility and Work Opportunities Reconciliation Act of 1996, I, J.B. Pritzker, Governor of the State of Illinois, certify that the State of Illinois agrees to the following:

A. CERTIFICATION THAT THE STATE WILL OPERATE A CHILD SUPPORT ENFORCEMENT PROGRAM.  Illinois will operate a child support enforcement program under the State Plan approved under Title IV-D of the Social Security Act.

B. CERTIFICATION THAT THE STATE WILL OPERATE A FOSTER CARE AND ADOPTION ASSISTANCE PROGRAM. Illinois will operate a foster care and adoption assistance program under the State Plan approved under Title IV-E of the Social Security Act, and the state will take such actions as are necessary to ensure that children receiving assistance under such part are eligible for medical assistance under the State Plan pursuant to Title XIX of the Social Security Act.

C. CERTIFICATION OF THE ADMINISTRATION OF THE PROGRAM. The Illinois Department of Human Services is authorized to administer and operate the TANF Program.

D. LOCAL GOVERNMENT AND PRIVATE SECTOR INVOLVEMENT. Illinois assures that local governments and private sector organizations have been consulted regarding the plan and design of welfare services in the State so that services are provided in a manner appropriate to local populations.

E. PUBLIC COMMENT. Illinois assures that local governments and private sector organizations have had at least 45 days to submit comments on the State Plan and the design of such services.

F. CERTIFICATION THAT ILLINOIS WILL PROVIDE NATIVE AMERICANS WITH EQUITABLE ACCESS TO ASSISTANCE.  Illinois will provide each Native American with equitable access to assistance under the State program funded under this part attributable to funds provided by the Federal government.

G. CERTIFICATION OF STANDARDS AND PROCEDURES TO ENSURE AGAINST PROGRAM FRAUD AND ABUSE.  Illinois has established and is enforcing standards and procedures to ensure against program fraud and abuse, including standards and procedures concerning nepotism, conflicts of interest among individuals responsible for the administration and supervision of the State program kickbacks, and the use of political patronage.

H. OPTIONAL CERTIFICATION OF STANDARDS AND PROCEDURES TO ENSURE

45

ACF 000573

THAT THE STATE WILL SCREEN FOR AND IDENTIFY DOMESTIC VIOLENCE. The State of Illinois adopts the Domestic Violence Option pursuant to 42 USC §602(2)(7).

I.  CERTIFICATION THAT THE STATE WILL PROVIDE INFORMATION TO VICTIMS OF SEXUAL HARASSMENT OR SURVIVORS OF DOMESTIC VIOLENCE, SEXUAL ASSAULT, OR STALKING.  Illinois has established and is enforcing standards and procedures to ensure that applicants and potential applicants for TANF are notified of assistance made available by the state to victims of sexual harassment and survivors of domestic violence sexual assault, or stalking.

Illinois will ensure that caseworkers and other agency personnel responsible for administering the TANF program are trained in: the nature and dynamics of sexual harassment and domestic violence, sexual assault, and stalking; state standards and procedures relating to the prevention of, and assistance for, individuals who are victims of sexual harassment or survivors of domestic violence, sexual assault, or stalking; and methods of ascertaining and ensuring the confidentiality of personal information and documentation related to applicants for assistance and their children who have provided notice about their experience of sexual harassment, domestic violence, sexual assault, or stalking.

Illinois has adopted the Family Violence Option set forth in section 402(s)(7) to establish and enforce standards and procedures regarding the screening for, and identification of, domestic violence, sexual assault, or stalking, and will ensure information is provided about the options available to current and potential beneficiaries and ensure that caseworkers and other agency personnel are provided with training regarding relevant state standards and procedures. PUBLIC AVAILABILITY OF STATE PLAN SUMMARY.  The State shall make available to the public a summary of this State Plan upon request.

JB Pritzker Governor
State of Illinois

Date

_Terri Kulhan_
Terri Kulhan
Illinois TANF Director

November 22, 2024
Date

46

ACF 000574



ADMINISTRATION FOR
CHILDREN & FAMILIES
330 C Street, S.W., Washington, DC 20201 | www.acf.hhs.gov

August 15, 2024

Terri Kulhan, Bureau Chief
Illinois Department of Human Services
100 S. Grand Ave East
Springfield, IL 62762

Dear Ms. Kulhan:

In accordance with section 402(a) of the Social Security Act, Illinois must periodically renew its funding status to continue to be eligible to receive federal funds under the Temporary Assistance for Needy Families (TANF) program. This renewal process requires the state to submit a TANF plan that contains all the required elements listed in section 402 of the Social Security Act, including the certifications specified under sections 402(a)(2)-(8). I am pleased to inform you that, as of October 1, 2022, Illinois continues to qualify as an eligible state under the TANF program. Accordingly, Illinois is entitled to an annual SFAG of $583,126,272 subject to the availability of funds.

Under section 402 of the Social Security Act, the Secretary of Health and Human Services has authority to determine completeness of a state's TANF plan but lacks the authority to approve or disapprove a plan. Therefore, the determination of completeness should not be construed as an approval of any particular activity, or as a determination that any particular expenditure is an allowable use of federal TANF or state maintenance-of-effort funds.

If you have any questions about the information in this letter, please contact Ms. Karen Beckerman, the TANF Program Manager for Region V, at (816) 426-2236 or Karen.Beckerman@acf.hhs.gov.

Sincerely,

Julie L. Siegel -S

Digitally signed by Julie L.
Siegel -S
Date: 2024.08.15 14:59:54
-04'00'

Julie L. Siegel
Director
Division of State TANF Policy

ACF 000575

OMB Control No: 0970-0114

Expiration date: 03/31/2027

THE PAPERWORK REDUCTION ACT OF 1995 (Pub. L. 104–13)

The purpose of this information collection is the application for CCDF funds and provides ACF and the public with a description of, and assurance about, the States' and Territories' child care programs. Public reporting burden for this collection of information is estimated to average 150 hours per response, including the time for reviewing instructions, gathering, and maintaining the data needed, and completing the form. This is a mandatory collection of information (Pub. L. 113–186), and 42 U.S.C. 9858.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information subject to the requirements of the Paperwork Reduction Act of 1995, unless it displays a currently valid OMB control number. The OMB # is 0970-0114 and the expiration date is 03/31/2027. If you have any comments on this collection of information, please contact ACF's Office of Child Care.



Appendix 1: Lead Agency Implementation Plan
for
State/Territory Illinois

FFY 2025 – 2027

Version: Initial Plan

Plan Status:  Approved as of 2024-11-09 00:25:06 GMT

For each non-compliance, Lead Agencies must describe the following:

- Action Steps: List the action steps needed to correct the finding (e.g., update policy manual, legislative approval, IT system changes, etc.). For each action step list the:
  o Expected Completion Date: List the expected completion date for the action step.
- Overall Target Date for Compliance: List date Lead Agency anticipates completing implementation, achieving full compliance with all aspects of the findings. (Note: Compliance will not be determined until the FFY 2025-2027 CCDF Plan is amended and approved).

ACF 000576

ELIGIBILITY AND ENROLLMENT:CONTINUITY OF CARE (12-MONTH ELIGIBILITY)

Reason(s) for non-compliance:

• The Lead Agency does not always provide a minimum 12-month eligibility period for each child, as required by 98.21(a)(1). (Plan Questions 2.5.2a and 2.5.2c)
• The Lead Agency graduated phase-out policies do not appropriately support continuity of care, as required by 98.21(b). (Plan Question 2.5.5)

Overall Target Completion Date: 06/30/2026

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not always provide a minimum 12-month eligibility period for each child, as required by 98.21(a). (Plan Questions 2.5.2a and 2.5.2c) | 06/30/2026 |
| 2 | Complete and submit budget impact analysis for approval. | 03/30/2025 |
| 3 | Draft policy and rule language to extend 12-month eligibility whenever a new child is added to the family unit. | 10/30/2025 |
| 4 | Leadership approval | 01/01/2026 |
| 5 | Program, text and launch eligibility system changes to automatically extend eligibility | 02/28/2026 |
| 6 | Train case managers of new policy and procedures | 05/30/2026 |
| 7 | * The Lead Agency graduated phase-out policies do not appropriately support continuity of care as required by 98.21(b).  (Plan Question 2.5.5) | 06/30/2025 |
| 8 | Explore with OCC issues with current FPL cut offs for new applications and redeterminations that do not comply. | 03/30/2025 |
| 9 | Revise current income guidelines to come into compliance. | 10/30/2025 |

ACF 000577

| 10 | Complete and submit budget impact analysis for approval | 11/30/2025 |
|---|---|---|
| 11 | Leadership approval | 01/30/2026 |
| 12 | Revise policies and forms | 03/30/2026 |
| 13 | Program, text and launch eligibility system changes | 04/30/2026 |
| 14 | Train case managers of new policy and procedures. | 05/30/2026 |

EQUAL ACCESS:PAYMENT RATES

Reason(s) for non-compliance:

• The Lead Agency's payment rates for preschoolers in center-based care are not sufficient to ensure equal access, as required by 98.45(a). (Plan Question 4.3.2a)

Overall Target Completion Date: 06/01/2026

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | Determine rates at 5% increments up to 50th percentile of the payment rate for center based preschool care | 03/30/2025 |
| 2 | Review of most recent Market Rate Survey to determine if all current regions represent the current market rate | 07/30/2025 |
| 3 | Develop and submit budget estimates for multiple scenarios. | 09/30/2025 |
| 4 | Leadership approval | 12/31/2026 |
| 5 | Revise policy and forms | 03/01/2026 |
| 6 | Program, test, and launch eligibility system changes | 05/31/2026 |
| 7 | Train case managers of new policy and procedures | 06/01/2026 |

ACF 000578

COMPREHENSIVE BACKGROUND CHECK:BACKGROUND CHECK PROCESSES

Reason(s) for non-compliance:

• The Lead Agency does not post all the required information related to the interstate criminal background check on the consumer education website, as required by 98.33(a)(1)(iii) and 98.43(g). (Plan Question 5.7.15b)

Overall Target Completion Date: 12/31/2026

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | The Lead Agency will collaborate with contractors and IDCFS to develop locations and procedures to post all required Background Check information on the Illinois Cares for Kids consumer website and/or the Sunshine website. | 12/31/2025 |

EQUAL ACCESS:AFFORDABILITY

Reason(s) for non-compliance:

• The Lead Agency does not limit all family co-payments to seven percent or less of family income, as required by 98.45(l)(3). Specifically, the Lead Agency is non-compliant because though co-payments for the lowest income families participating in CCDF are relatively negligible they do exceed 7% in some cases. (Plan Question 3.1.1a). Please note the Lead Agency has an approved waiver for this requirement through August 1, 2026.
• The Lead Agency does not provide data on the extent to which CCDF providers charge families additional amounts above the required co-payment (including data on the size and frequency of such amounts), as required by 98.45(b)(5). (Plan Question 3.1.2eii)

Overall Target Completion Date: 08/01/2026

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not limit all family co-payments to seven percent or less of family | 08/01/2026 |

|  |  |  |
|---|---|---|
|  | income as required by 98.45(i)(3).  Specifically, the Lead Agency is non-compliant because through co-payments for the lowest income families participating in CCDF are relatively negligible they do exceed 7% in come cases (Plan Question 3.1.1a). |  |
| 2 | Request waiver from OCC | 01/08/2025 |
| 3 | Revise Administrative Rule to include families below 100% FPL to have co-payment waived instead of reduced to $1. | 06/30/2025 |
| 4 | Submit and track change through J-CAR | 07/30/2025 |
| 5 | Revise policy and forms | 12/30/2025 |
| 6 | Complete and submit budget impact analysis for approval | 03/30/2026 |
| 7 | Leadership approval | 05/01/2026 |
| 8 | Program, test and launch eligibility system changes | 06/01/2026 |
| 9 | Train case managers of new policy and procedures | 07/01/2026 |
| 10 | * The Lead Agency does not provide data on the extent to which CCDF providers charge families additional amounts above the required co-payment (including data on the size and frequency of such amounts), as required by 98.45(b)(5). (Plan Question 3.1.2 eii) | 01/01/2026 |
| 11 | Examine current Market Rate survey data to determine the size and frequency of the charged above CCAP rates | 01/30/2025 |
| 12 | Revise current survey if not included in collected data, or devise new method to collect this information. | 06/30/2025 |
| 13 | Submit State Plan amendment to include the data, once collected. | 01/01/2026 |

HEALTH AND SAFETY:ADMINISTRATION OF MEDICATION

ACF 000580

Reason(s) for non-compliance:

• The Lead Agency does not require pre-service or orientation training on administration of medication for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1c)
• The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care homes for compliance with pre-service or orientation training requirements related to administration of medication, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not require pre-service or orientation training on administration of medication for licensed centers or licensed family child care homes as required by 98.44(b)(1)(i). (Plan Question 5.4.1c) | 12/31/2025 |
| 2 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care homes for compliance with pre-service or orientation training requirements related to administration of medication as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii) | 12/31/2025 |
| 6 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 7 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 8 | Implementation | 12/31/2025 |

ACF 000581

EQUAL ACCESS:PAYMENT PRACTICES

Reason(s) for non-compliance:

• The Lead Agency does not pay all provider types prospectively or alternatively does not demonstrate that it is not a generally-accepted practice for all provider types, as required by 98.45(m)(1). (Plan Question 4.4.1a). Please note the Lead Agency has an approved waiver for this requirement through August 1, 2026.
• The Lead Agency does not pay based on enrollment or alternatively does not provide justification that this is impracticable or is not a generally-accepted practice, as required by 98.45(m)(2). (Plan Question 4.4.1b). Please note the Lead Agency has an approved waiver for this requirement through August 1, 2026.

Overall Target Completion Date: 08/01/2026

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not pay all provider types prospectively or alternatively does not demonstrate that it is not a generally-accepted proctice for all provider types as required by 98.45(m)(1).  (Plan Question 4.4.1a) | 08/01/2026 |
| 2 | Request waiver from OCC | 01/08/2025 |
| 3 | Complete and submit budget impact analysis for approval. | 09/01/2025 |
| 4 | Draft rules, policy and forms | 12/01/2025 |
| 5 | Program, test and launch eligibility system changes | 03/30/2026 |
| 6 | Train case managers of new policy and procedures | 05/30/2026 |
| 7 | * The Lead Agency does not pay based on enrollment or alternatively does not provide justification that this is impracticable or is not a generally-accepted practice as required by 98.45(m)(2). (Plan Question 4.4.1b). | 08/01/2026 |
| 8 | Request waiver from OCC | 01/08/2025 |
| 9 | Complete and submit budget impact analysis for approval | 09/01/2025 |

ACF 000582

| 10 | Draft rules, policy and forms | 12/01/2025 |
| 11 | Leadership approval | 02/28/2026 |
| 12 | Program, test and launch eligibility system changes | 03/30/2026 |
| 13 | Train case managers of new policy and procedures | 05/30/2026 |

## HEALTH AND SAFETY:CHILD DEVELOPMENT

Reason(s) for non-compliance:

• The Lead Agency does not require pre-service or orientation training on child development for licensed centers and licensed family child care homes, as required by 98.44(b)(1)(iii). (Plan Question 5.4.1l)
• The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care homes for compliance with pre-service or orientation training requirements related to child development, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
| --- | --- | --- |
| 1 | *The Lead Agency does not require pre-service or orientation training on child development for licensed centers and licensed family child care homes as required by 98.44(b)(1)(iii). (Plan Question 5.4.1l) | 12/31/2025 |
| 2 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care homes for compliance with pre-service or orientation training | 12/31/2025 |

ACF 000583

| | | |
|---|---|---|
| | requirements related to child development as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii) | |
| 6 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules | 03/01/2025 |
| 7 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 8 | Implementation | 12/31/2025 |

## HEALTH AND SAFETY:BUILDING AND PHYSICAL PREMISES SAFETY

Reason(s) for non-compliance:

• The Lead Agency does not require pre-service or orientation training on building and physical premises safety, including the identification of and protection from hazards, bodies of water and vehicular traffic for licensed centers, licensed family child care homes, license-exempt centers, license-exempt family child care homes, or license-exempt in-home providers, as required by 98.44(b)(1)(i). (Plan Question 5.4.1e)
• The Lead Agency does not require an unannounced annual inspection for licensed centers or licensed family child care, or an annual inspection for license-exempt centers or license-exempt family child care providers for compliance with pre-service or orientation training requirements related to building and physical premises safety, including the identification of and protection from hazards, bodies of water, and vehicular traffic, as required by 98.42(b)(2)(ii). (Plan Questions 5.5.1aii, 5.5.1bii, 5.5.2ai, and 5.5.2bi)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | *The Lead Agency does not require pre-service or orientation training on building and physical premises safety, including the identification of and protection from hazards, bodies of water and vehicular traffic for licensed care centers, licensed family child care homes, license-exempt centers, license-exempt family child care homes or license-exempt in-home providers as required by 98.44(b)(1)(i). (Plan Question 5.4.1e) | 12/31/2025 |

ACF 000584

| 2 | For licensed providers, Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules | 03/01/2025 |
|---|---|---|
| 3 | For licensed providers, DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | For licensed providers, Implementation | 12/01/2025 |
| 5 | For license-exempt providers, revise the license-exempt Health and Safety Policy and Procedures and checklist to include these requirements | 03/31/2025 |
| 6 | For license-exempt providers, Update CCAP policy manual | 03/31/2025 |
| 7 | For license-exempt providers, Review updated requirements to policy and procedures with contracted health and safety coaches statewide | 05/30/2025 |
| 8 | For license-exempt providers, Implementation. | 07/01/2025 |
| 9 | * The Lead Agency does not require an unannounced annual inspection for licensed centers or licensed family child care, or an annual inspection for license-exempt centers or license-exempt family child care providers for compliance with pre-service or orientation training requirements related to building and physical premises safety, including the identification of and protection from hazards, bodies of water, and vehicular traffic as required by 98.42(b)(2)(ii). (Plan Question 5.5.1aii, 5.5.1biim 5.5.2ai and 5.5.2bi). | 12/31/2025 |
| 10 | For licensed providers, Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 11 | For licensed providers, DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 12 | For licensed providers, Implementation | 12/01/2025 |
| 13 | For license-exempt providers, update CCAP policy manual | 03/31/2025 |
| 14 | For license-exempt providers, Review updated requirements to policy and procedures with contracted health and safety coaches statewide | 05/30/2025 |

ACF 000585

| 15 | For license-exempt providers, Implementation | 07/01/2025 |

## HEALTH AND SAFETY:EMERGENCY PREPAREDNESS AND RESPONSE PLANNING

Reason(s) for non-compliance:

• The Lead Agency standard for emergency preparedness and response planning does not include all the required elements for licensed centers or licensed family child care homes, as required by 98.41(a)(1)(vii). (Plan Questions 5.3.7ii, 5.3.7iii, 5.3.7iv, 5.3.7vii, 5.3.7viii, 5.3.7ix, and 5.3.7x)
• The Lead Agency does not require pre-service or orientation training on emergency preparedness and response planning for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1g)
• The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with a standard for emergency preparedness and response planning and with related pre-service or orientation training requirements, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency standard for emergency preparedness and response planning does not include all the required elements for licensed centers or licensed family child care homes, as required by 98.41(a)(1)(vii). (Plan Questions 5.3.7ii, 5.3.7iii, 5.3.7iv, 5.3.7vii, 5.3.7viii, 5.3.7ix, and 5.3.7x) | 12/31/2025 |
| 2 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require pre-service or orientation training on emergency preparedness and response planning for licensed | 12/31/2025 |

ACF 000586

| | | |
|---|---|---|
| | centers or licensed family child care homes as required by 98.44(b)(1)(i). (Plan Question 5.4.1g) | |
| 6 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 7 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 8 | Implementation | 12/31/2025 |
| 9 | * The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with a standard for emergency preparedness and response planning and with related pre-service or orientation training as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii). | 12/31/2025 |
| 10 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 11 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 12 | Implementation | 12/31/2025 |

HEALTH AND SAFETY:HANDLING AND STORAGE OF HAZARDOUS MATERIALS AND DISPOSAL OF BIOCONTAMINANTS

Reason(s) for non-compliance:

• The Lead Agency does not require pre-service or orientation training on handling and storage of hazardous materials and disposal of biocontaminants for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1h)
• The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to the handling and storage of hazardous materials and disposal of biocontaminants, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii)

Overall Target Completion Date: 12/31/2025

ACF 000587

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not require pre-service or orientation training on handling and storage of hazardous materials and disposal of biocontaminants for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1h) | 12/31/2025 |
| 2 | Lead agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to the handling and storage of hazardous materials and disposal of biocontaminants, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii) | 12/31/2025 |
| 6 | Lead agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 7 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 8 | Implementation | 12/31/2025 |

HEALTH AND SAFETY:IDENTIFICATION AND REPORTING OF CHILD ABUSE

Reason(s) for non-compliance:


• The Lead Agency does not require all staff in licensed centers or licensed family child care homes to complete pre-service or orientation training within three months on the identification and reporting of child abuse, as required by 98.44(b). (Plan Question 5.4.1m)
• The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care homes for compliance with pre-service or

ACF 000588

orientation training requirements related to the identification and reporting of child abuse, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not require all staff in licensed centers or licensed family child care homes to complete pre-service or orientation training within three months on the identification and reporting of child abuse, as required by 98.44(b). (Plan Question 5.4.1m) | 12/31/2025 |
| 2 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care homes for compliance with pre-service or orientation training requirements related to the identification and reporting of child abuse, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii) | 12/31/2025 |
| 6 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/11/2025 |
| 7 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 8 | Implementation | 12/31/2025 |

HEALTH AND SAFETY:ONGOING TRAINING

Reason(s) for non-compliance:

ACF 000589

• The Lead Agency does not have enforceable requirements for ongoing training on health and safety standards for licensed child care centers and licensed family child care providers, as required by 98.44(b)(2)(i). (Plan Questions 5.6.1a and 5.6.1.c.)
• The Lead Agency does not require an annual unannounced inspection for licensed centers and licensed family child care for compliance with ongoing training requirements, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not have enforceable requirements for ongoing training on health and safety standards for licensed child care centers and licensed family child care providers, as required by 98.44(b)(2)(i). (Plan Questions 5.6.1a and 5.6.1.c.) | 12/31/2025 |
| 2 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require an annual unannounced inspection for licensed centers and licensed family child care for compliance with ongoing training requirements, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii) | 12/31/2025 |
| 6 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 7 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 8 | Implementation | 12/31/2025 |

HEALTH AND SAFETY:PEDIATRIC FIRST AID AND PEDIATRIC CPR

Reason(s) for non-compliance:

• The Lead Agency has not established a standard for pediatric first aid or pediatric CPR for all staff for licensed centers and licensed family child care homes, as required by 98.41(a)(1)(x). (Plan Questions 5.3.10ai, 5.3.10aii, 5.3.10bi, and 5.3.10bii)
• The Lead Agency does not require pre-service or orientation training on pediatric first aid and pediatric CPR for licensed centers, licensed family child care homes, license-exempt centers, license-exempt family child care homes, or license-exempt in-home providers, as required by 98.44(b)(1)(i). (Plan Question 5.4.1j)
• The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with a standard for pediatric first aid and pediatric CPR and with related pre-service or orientation training requirements. Additionally, the Lead Agency does not require an annual inspection for license-exempt centers or license-exempt family child care providers for compliance with pre-service or orientation training requirements related to pediatric first aid and pediatric CPR, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii, 5.5.1bii, 5.5.2ai, and 5.5.2bi)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency has not established a standard for pediatric first aid or pediatric CPR for all staff for licensed centers and licensed family child care homes, as required by 98.41(a)(1)(x). (Plan Questions 5.3.10ai, 5.3.10aii, 5.3.10bi, and 5.3.10bii) | 12/31/2025 |
| 2 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require pre-service or orientation training on pediatric first aid and pediatric CPR for licensed centers, licensed family child care homes, license-exempt centers, license-exempt family child care homes, or license-exempt in-home providers as required by 98.44(b)(1)(i) (Plan Question 5.4.1j) | 12/31/2025 |
| 6 | For licensed centers and licensed family child care homes, Lead Agency will assist the Illinois | 03/01/2025 |

ACF 000591

| | | |
|---|---|---|
| | licensing agency (DCFS) in efforts to revise administrative rules. | |
| 7 | For licensed centers and licensed family child care homes, DCFS revisions of policies, procedures and forms. | 07/01/2025 |
| 8 | For licensed centers and licensed family child care homes, Implementation. | 12/31/2025 |
| 9 | For license-exempt centers, license-exempt family child care homes or license-exempt in-home providers, revise the License Exempt Health and Safety Policy and Procedures and checklist to include these requirements. | 03/31/2025 |
| 10 | For license-exempt centers, license-exempt family child care homes or license-exempt in-home providers, update CCAP policy manual | 03/31/2025 |
| 11 | For license-exempt centers, license-exempt family child care homes or license-exempt in-home providers, review updated requirements to policy and procedures with contracted health and safety coaches statewide. | 05/30/2025 |
| 12 | For license-exempt centers, license-exempt family child care homes or license-exempt in-home providers, implementation. | 07/01/2025 |
| 13 | * The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with a standard for pediatric first aid and pediatric CPR and with related pre-service or orientation training requirements. Additionally, the Lead Agency does not require an annual inspection for license-exempt centers or license-exempt family child care providers for compliance with pre-service or orientation training requirements related to pediatric first aid and pediatric CPR, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii, 5.5.1bii, 5.5.2ai, and 5.5.2bi) | 12/31/2025 |
| 14 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules for all providers | 03/01/2025 |
| 15 | DCFS revisions of policies, procedures and forms for all providers | 07/01/2025 |

ACF 000592

| 16 | Implementation | 12/31/2025 |
|----|----------------|------------|

## HEALTH AND SAFETY:POSTING INSPECTION REPORTS

**Reason(s) for non-compliance:**

• The Lead Agency does not post full monitoring and inspection reports that include all areas of compliance and non-compliance for all licensed centers, licensed family child care, license-exempt centers, license-exempt family child care providers, or license-exempt in-home care, as required by 98.33(a)(4)(ii). (Plan Question 5.5.4aii). Please note the Lead Agency has an approved waiver for portions of this requirement through August 1, 2026.
• The Lead Agency does not post pre-licensing inspection reports for licensed centers or licensed family child care, as required by 98.33(a)(4). (Plan Question 5.5.4ai)
• The Lead Agency monitoring and inspection reports do not contain all the required elements, specifically corrective action taken by the State and child care provider and a minimum of three years of results where available, as required by 98.33(a)(4). (Plan Question 5.5.4b)

Overall Target Completion Date: 04/01/2026

| Action Step Number | Action Step Description | Target Completion Date |
|--------------------|------------------------|------------------------|
| 1 | * The Lead Agency does not post full monitoring and inspection reports that include all areas of compliance and non-compliance for all licensed centers, licensed family child care, license-exempt centers, license-exempt family child care providers, or license-exempt in-home care, as required by 98.33(a)(4)(ii). (Plan Question 5.5.4aii) | 12/31/2025 |
| 2 | Request waiver from OCC | 01/08/2025 |
| 3 | Lead Agency will collaborate with contractor to develop required monitor inspection reporting on the Illinois Cares for Kids consumer website. | 06/30/2025 |
| 4 | Review updated requirements for posting monitoring inspections on the consumer education website with the contracted health and safety coaches statewide | 06/30/2025 |

ACF 000593

| 5 | Implementation | 06/30/2025 |
| 6 | * The Lead Agency does not post pre-licensing inspection reports for licensed centers or licensed family child care, as required by 98.33(a)(4). (Plan Question 5.5.4ai) | 04/01/2026 |
| 7 | Lead agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 04/01/2025 |
| 8 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 9 | Complete IT planning and development of Sunshine Site for licensed provider reports | 12/31/2025 |
| 10 | * The Lead Agency monitoring and inspection reports do not contain all the required elements, specifically corrective action taken by the State and child care provider and a minimum of three years of results where available, as required by 98.33(a)(4). (Plan Question 5.5.4b) | 12/31/2025 |
| 11 | Lead Agency will collaborate with contractor to develop required monitor inspection reporting on the Illinois Cares for Kids consumer website | 06/30/2025 |

HEALTH AND SAFETY:PRECAUTIONS IN TRANSPORTING CHILDREN

Reason(s) for non-compliance:


• The Lead Agency does not require pre-service or orientation training on precautions in transporting children, if applicable, for licensed centers or licensed family child care providers, as required by 98.44(b)(1)(i). (Plan Question 5.4.1i)
• The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to transporting children, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii)


Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
| --- | --- | --- |

ACF 000594

| 1 | * The Lead Agency does not require pre-service or orientation training on precautions in transporting children, if applicable, for licensed centers or licensed family child care providers, as required by 98.44(b)(1)(i). (Plan Question 5.4.1i) | 12/31/2025 |
|---|---|---|
| 2 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to transporting children, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii) | 12/31/2025 |
| 6 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 7 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 8 | Implementation | 12/31/2025 |

HEALTH AND SAFETY:PREVENTION AND CONTROL OF INFECTIOUS DISEASES

Reason(s) for non-compliance:

• The Lead Agency does not require pre-service or orientation training on prevention and control of infectious diseases (including immunizations) for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1a)
• The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to the prevention and control of infectious diseases (including immunizations), as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii)

Overall Target Completion Date: 12/31/2025

ACF 000595

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not require pre-service or orientation training on prevention and control of infectious diseases (including immunizations) for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1a) | 12/31/2025 |
| 2 | Lead agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to the prevention and control of infectious diseases (including immunizations), as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii) | 12/31/2025 |
| 6 | Lead agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules | 03/01/2025 |
| 7 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 8 | Implementation | 12/31/2025 |

HEALTH AND SAFETY:PREVENTION AND RESPONSE TO EMERGENCIES FROM FOOD AND ALLERGIC REACTIONS

Reason(s) for non-compliance:

• The Lead Agency does not require pre-service or orientation training on prevention of and response to food and allergic reactions for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1d)
• The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to the prevention and response to emergencies

ACF 000596

from food and allergic reactions, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not require pre-service or orientation training on prevention of and response to food and allergic reactions for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1d) | 12/31/2025 |
| 2 | Lead agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures, and forms. | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to the prevention and response to emergencies from food and allergic reactions, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii) | 12/31/2025 |
| 6 | Lead agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 7 | DCFS revisions of policies, procedures, and forms. | 07/01/2025 |
| 8 | Implementation | 12/31/2025 |

HEALTH AND SAFETY:PREVENTION OF SHAKEN BABY SYNDROME, ABUSIVE HEAD TRAUMA, AND CHILD MALTREATMENT

Reason(s) for non-compliance:

ACF 000597

• The Lead Agency has not established a standard for the prevention of shaken baby syndrome, abusive head trauma, and child maltreatment for license-exempt centers, license-exempt family child care homes, or license-exempt in-home providers, as required by 98.41(a)(1)(vi). (Plan Questions 5.3.6aiv, 5.3.6av, 5.3.6avi, 5.3.6biv, 5.3.6bv, and 5.3.6bvi)

• The Lead Agency does not require pre-service or orientation training on prevention of shaken baby syndrome, abusive head trauma, and child maltreatment for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1f)

• The Lead Agency does not require an annual inspection for license-exempt centers or license-exempt family child care providers for compliance with a standard for prevention of shaken baby syndrome, abusive head trauma, and child maltreatment. Additionally, the Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to the prevention of shaken baby syndrome, abusive head trauma, and child maltreatment, as required by 98.42(b)(2)(i)(B) and 98.42(b)(2)(ii). (Plan Questions 5.5.1aii, 5.5.1bii, 5.5.2ai, and 5.5.2bi)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency has not established a standard for the prevention of shaken baby syndrome, abusive head trauma, and child maltreatment for license-exempt centers, license-exempt family child care homes, or license-exempt in-home providers, as required by 98.41(a)(1)(vi). (Plan Questions 5.3.6aiv, 5.3.6av, 5.3.6avi, 5.3.6biv, 5.3.6bv, and 5.3.6bvi) | 12/31/2025 |
| 2 | Revise the License Exempt Health and Safety Policy and Procedures and checklist to include these requirements | 03/31/2025 |
| 3 | Update CCAP policy manual | 03/31/2025 |
| 4 | Review updated requirements to policy and procedures with contracted health and safety coaches statewide | 05/30/2025 |
| 5 | Implementation | 07/01/2025 |
| 6 | * The Lead Agency does not require pre-service or orientation training on prevention of shaken | 12/31/2025 |

ACF 000598

| | | |
|---|---|---|
| | baby syndrome, abusive head trauma, and child maltreatment for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1f) | |
| 7 | Lead agencies will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 8 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 9 | Implementation | 12/31/2025 |
| 10 | * The Lead Agency does not require an annual inspection for license-exempt centers or license-exempt family child care providers for compliance with a standard for prevention of shaken baby syndrome, abusive head trauma, and child maltreatment. Additionally, the Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to the prevention of shaken baby syndrome, abusive head trauma, and child maltreatment, as required by 98.42(b)(2)(i)(B) and 98.42(b)(2)(ii). (Plan Questions 5.5.1aii, 5.5.1bii, 5.5.2ai, and 5.5.2bi) | 12/31/2025 |
| 11 | The Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rule | 03/01/2025 |
| 12 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 13 | Implementation | 12/31/2025 |
| 14 | Revise the License Exempt Health and Safety Policy and Procedures and checklist to include these requirements | 03/31/2025 |
| 15 | Update CCAP policy manual | 03/31/2025 |
| 16 | Review updated requirements to policy and procedures with contracted health and safety coaches statewide | 05/30/2025 |
| 17 | Implementation | 07/01/2025 |

ACF 000599

HEALTH AND SAFETY:SUDDEN INFANT DEATH SYNDROME AND SAFE SLEEP

Reason(s) for non-compliance:

• The Lead Agency does not require pre-service or orientation training on prevention of sudden infant death syndrome and use of safe sleep practices for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1b)
• The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to prevention of sudden infant death syndrome and safe sleep, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not require pre-service or orientation training on prevention of sudden infant death syndrome and use of safe sleep practices for licensed centers or licensed family child care homes, as required by 98.44(b)(1)(i). (Plan Question 5.4.1b) | 12/31/2025 |
| 2 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules | 03/01/2025 |
| 3 | DCFS revisions of policies, procedures and forms | 07/01/2025 |
| 4 | Implementation | 12/31/2025 |
| 5 | * The Lead Agency does not require an annual unannounced inspection for licensed centers or licensed family child care providers for compliance with pre-service or orientation training requirements related to prevention of sudden infant death syndrome and safe sleep, as required by 98.42(b)(2)(i)(B). (Plan Questions 5.5.1aii and 5.5.1bii) | 12/31/2025 |
| 6 | Lead agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules. | 03/01/2025 |
| 7 | DCFS revisions of policies, procedures, and forms. | 10/31/2025 |

ACF 000600

| 8 | Implementation | 12/31/2025 |

## CONSUMER EDUCATION:WEBSITE AND RESOURCES FOR PARENTS

Reason(s) for non-compliance:

• The Lead Agency does not include aggregate data for the total number of children in care by provider category and licensing status when posting data on serious injuries, fatalities, and substantiated cases of child abuse in care, as required by 98.33(a)(5)(iv). (Plan Question 9.2.5aiv)
• The Lead Agency does not provide a consumer statement to families participating in CCDF, as required by 98.33(d). (Plan Question 9.3.3)

Overall Target Completion Date: 03/31/2026

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | * The Lead Agency does not include aggregate data for the total number of children in care by provider category and licensing status when posting data on serious injuries, fatalieies and substantiated cases of child abuse in care, as required by 98.33(a)(5)(iv). (Plan Question 9.2.5aiv) | 07/01/2025 |
| 2 | Formalize reporting procedures between CCR&R and within DEC | 03/01/2025 |
| 3 | Add area to Illinois Cares for Kids to display data | 05/01/2025 |
| 4 | * The Lead Agency does not provide a consumer statement to families participating in CCDF as required by 98.33(d). (Plan Question 9.3.3) | 03/31/2026 |
| 5 | Conduct collaboration meetings with relevant DEC program staff and CCR&R stakeholders to develop letter | 03/31/2025 |
| 6 | Leadership approval of content | 06/30/2025 |
| 7 | Forms Management approval of formatting and translation | 12/31/2025 |

ACF 000601

| 8 | System programming to issue statement with all new CCAP approvals | 03/31/2026 |

## QUALITY IMPROVEMENT AND SUPPORT FOR CHILD CARE WORKFORCE:PROFESSIONAL DEVELOPMENT

Reason(s) for non-compliance:

• The Lead Agency does not have an annual requirement for a minimum number of hours of ongoing professional development for licensed family child care providers, as required by 98.44(b)(2). (Plan Question 6.3.1c)

Overall Target Completion Date: 12/31/2025

| Action Step Number | Action Step Description | Target Completion Date |
|---|---|---|
| 1 | Lead Agency will assist the Illinois licensing agency (DCFS) in efforts to revise administrative rules | 03/01/2025 |
| 2 | DCFS revisions of policies, procedures and forms | 07/01/2025 |

ACF 000602



No. 170.1

## EXECUTIVE ORDER

### AMENDMENT TO EXECUTIVE ORDER 170 - STATE POLICY CONCERNING IMMIGRANT ACCESS TO STATE SERVICES AND BUILDINGS

WHEREAS, access to State services is critical to the well-being of immigrant communities and their integration into the State;

WHEREAS, New York State remains committed to welcoming immigrants as vital and respected members of our State;

WHEREAS, pursuant to Executive Order No. 170, it is the policy of the State that State officers or employees shall not inquire about an individual's immigration status unless necessary to determine eligibility for a program, benefit, or provision of a service, or disclose information to federal immigration authorities for the purpose of federal civil immigration enforcement unless required by law;

WHEREAS, the State has a recognized interest in maintaining the safety and security of its facilities to ensure that all residents have equal access to State programs, benefits, and services and must implement policies in furtherance thereof;

WHEREAS, federal immigration authorities have increasingly conducted immigration enforcement activity in sensitive spaces crucial to immigrants' full participation in the economic, civil, and cultural life of the State;

WHEREAS, immigration enforcement activity in these spaces create a chilling effect, preventing immigrants from fully participating in the State;

NOW, THEREFORE, I, ANDREW M. CUOMO, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and laws of the State of New York, do hereby proclaim and order as follows:

A.    Definitions

    1.    "State facility" shall mean any building, or part thereof, owned or leased by any

ACF 000603

B.    Federal Immigration Authorities Access to State Buildings

Civil arrests by federal immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order authorizing them to take into custody the person who is the subject of such warrant, unless the civil arrest is related to a proceeding within such facility.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this twenty-

fifth day of April in the year two

thousand eighteen.

BY THE GOVERNOR

Secretary to the Governor

ACF 000604

An official website of New York State    Here's how you know ⌄

Q



**GOVERNOR** KATHY HOCHUL

🏷 Executive Order

JANUARY 16, 2025

# No. 6.1: Continuation and Expiration of Prior Executive Orders

### Executive Order 6.1

Continuation and Expiration of Prior Executive Orders

(https://www.governor.ny.gov/sites/default/files/2025-01/executive-order_6.1.pdf)

No. 6.1

<u>E X E C U T I V E O R D E R</u>

**CONTINUATION OF PRIOR EXECUTIVE ORDERS**

**WHEREAS**, pursuant to Executive Order No.6 issued on October 8, 2021, Executive Order 170 "State Policy Concerning Immigrant Access to State Services" was extended;

**WHEREAS**, amendments to Executive Order 170 also address ongoing issues and should be continued;

ACF 000605

**NOW, THEREFORE, I, KATHY HOCHUL**, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and laws of the State of New York, do hereby order that Executive Order 170.1 also remains in full force and effect until otherwise revoked, superseded, or modified.

G I V E N under my hand and the Privy Seal of the State in the City of Albany this 16th day of January in the year two thousand twenty-five.

BY THE GOVERNOR

Secretary to the Governor

# Translations

### Arabic Translation
الترجمة إلى العربية


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_arabic.pdf)


### Bengali Translation
বাংলা অনুবাদ


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_bengali.pdf)


### Chinese Translation
中文翻譯


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_chinese.pdf)


### French Translation
Traduction en français

ACF 000606

(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_french.pdf)

## Haitian-Creole Translation
Tradiksyon kreyòl ayisyen


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_haitiancreole.pdf)


## Italian Translation
Traduzione italiana


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_italian.pdf)


## Korean Translation
한국어 번역


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_korean.pdf)


## Polish Translation
Polskie tłumaczenie


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_polish.pdf)


## Russian Translation
Перевод на русский язык


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_russian.pdf)


## Spanish Translation
Traducción al español


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_spanish.pdf)

ACF 000607

## Urdu Translation

پیلے رنگ سے نمایاں کردہ ٹیکسٹ


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_urdu.pdf)


## Yiddish Translation

אידישע איבערטייטשונג


(https://www.governor.ny.gov/sites/default/files/2025-01/eo_6.1_yiddish.pdf)

ACF 000608



PRESS RELEASE

# Five Defendants Arrested For Stealing Millions From Government-Funded Childcare Programs For Low Income Families

—

Wednesday, January 11, 2023

**For Immediate Release**

U.S. Attorney's Office, Southern District of New York

Damian Williams, the United States Attorney for the Southern District of New York, Michael J. Driscoll, the Assistant Director in Charge of the New York Office of the Federal Bureau of Investigation ("FBI"), and Susan A. Frisco, the Acting Special Agent in Charge of the New York Regional Office of the U.S. Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), announced the unsealing of a seven-count Indictment today charging five defendants with participating in schemes to steal millions of dollars from government-funded childcare programs for low-income families, including by stealing proceeds from a fake after-school program that received millions in funding and by using funds to purchase private real estate, items at auction, and a luxury vehicle.  Four of the defendants were arrested today and will be presented before U.S. Magistrate Judge Robert W. Lehrburger in federal court in Manhattan.  HAROLD SCHWARTZ was arrested and will be presented in the Southern District of Florida.  The case has been assigned to U.S. District Judge Jennifer H. Rearden.

U.S. Attorney Damian Williams said: "As alleged, the defendants brazenly participated in schemes that stole from programs meant to benefit society's most vulnerable members —

ACF 000609

children — and spent the proceeds of their crimes on items like real estate, cars, and to buy items at auction. Their schemes used children as currency, creating a fake afterschool program and 'enrolling' in that program children who never attended it, all so they could line their own pockets. Let me be clear: this Office is committed to rooting out the abuse of government funds intended for the public welfare."

FBI Assistant Director Michael J. Driscoll said: "Today we allege the defendants operated multiple schemes to enrich themselves by defrauding government-funded childcare programs designed to assist needy families. The FBI remains dedicated to uncovering and eliminating the abuse of government-sponsored programs and ensuring those who exploit programs intended to assist low-income families will be held accountable."

HHS-OIG Acting Special Agent in Charge Susan A. Frisco said: "The monies that the defendants are alleged to have stolen were intended to support New York families that greatly need financial assistance in securing safe and quality care for their children. HHS-OIG and our law enforcement partners are fervent in our efforts to detect and investigate individuals believed to defraud federally funded childcare programs and deprive deserving enrollees in an attempt to gain personal wealth."

As alleged in the Indictment unsealed today in Manhattan federal court and statements made in court filings:[1]

MARTIN HANDLER, MENACHEM LIEBERMAN, HAROLD SCHWARTZ, ISIDORE HANDLER, and BEN WERCZBERGER participated in multiple related schemes to steal from and defraud daycares receiving funding from the City of New York's Administration for Children's Services ("ACS") and the U.S. Department of Health and Human Services ("HHS").

Among their schemes, MARTIN HANDLER, LIEBERMAN, SCHWARTZ, and ISIDORE HANDLER participated in a scheme to fraudulently claim reimbursement from ACS for the enrollment of children in a fake after-school program purportedly operated by a non-profit daycare provider ("Daycare Provider-1"), resulting in the theft of more than $1,000,000.

MARTIN HANDLER and LIEBERMAN perpetrated another fraudulent scheme against HHS by concealing their secret ownership of Daycare Provider-1, an ostensible "non-profit" entity without any legal owners that has received in excess of $90 million in federal funding since 2009. MARTIN HANDLER's and LIEBERMAN's secret ownership of Daycare Provider-1 allowed them to circumvent statutory and regulatory restrictions against less-than-arm's length partnerships. MARTIN HANDLER and LIEBERMAN steered Daycare Provider-1 into partnerships with their respective for-profit daycares ("Daycare Provider-2 and Daycare Provider-3"), that resulted in millions of dollars of federal funding for Daycare Provider-2 and Daycare Provider-3.

MARTIN HANDLER, LIEBERMAN, SCHWARTZ, and ISIDORE HANDLER also submitted false information to HHS to hide their fraudulent schemes. In about December 2021, HHS initiated

ACF 000610

an investigation into Daycare Provider-1 and conveyed allegations that had arisen about LIEBERMAN's relationship with Daycare Provider-1. MARTIN HANDLER, LIEBERMAN, SCHWARTZ, and ISIDORE HANDLER then conspired to submit a letter to the regional HHS office responding to these allegations that, among other things, falsely denied LIEBERMAN had a less-than-arm's length relationship with Daycare Provider-1, even though, in fact, LIEBERMAN secretly owned it.

MARTIN HANDLER and BEN WERCZBERGER participated in a scheme to steal, and to launder the proceeds of their theft, from HANDLER's for-profit daycare, Daycare Provider-2. MARTIN HANDLER and WERCZBERGER stole at least $2.8 million in federal funding intended for childcare services for low-income children in the Bronx. They carried out this theft by funneling a portion of HHS's monthly funding to WERCZBERGER, by providing no-show jobs to WERCZBERGER's wife and grandson, and by having Daycare Provider-2 cover the cost of a luxury SUV for WERCZBERGER's wife.

Finally, MARTIN HANDLER himself stole funds from Daycare Provider-2's operating expenses, including to purchase real estate, to repay a $500,000 loan to a business associate, to purchase historical items at auction, and to purchase a luxury vehicle.

\*        \*        \*

A chart containing the names of the defendants who were charged today and the charges and maximum penalties they face is attached. The statutory maximum sentences are prescribed by Congress and are provided here for informational purposes only, as any sentencing of the defendants will be determined by the judge.

| Defendant | Age | Charges | Maximum Penalties |
|---|---|---|---|
| MARTIN HANDLER<br><br>Brooklyn, NY | 48 | Wire Fraud Conspiracy<br><br>Count One | 20 years |
| | | Conspiracy to Defraud the United States<br><br>Count Three | Five years |
| | | Conspiracy to Falsify Documents and Records<br><br>Count Four | Five years |
| | | Theft of Government Funds | 10 years |

ACF 000611

| | | | |
|---|---|---|---|
| | | Count Five | 20 years |
| | | Money Laundering Conspiracy | |
| | | Count Six | 10 years |
| | | Theft of Government Funds | |
| | | Count Seven | |
| MENACHEM LIEBERMAN<br><br>Brooklyn, New York | 46 | Wire Fraud Conspiracy<br><br>Count One | 20 years |
| | | Aggravated Identity Theft<br><br>Count Two | Two-year term consecutive to any other prison term |
| | | Conspiracy to Defraud the United States<br><br>Count Three | Five years |
| | | Conspiracy to Falsify Documents and Records<br><br>Count Four | Five years |
| HAROLD SCHWARTZ<br><br>Brooklyn, New York | 67 | Wire Fraud Conspiracy<br><br>Count One | 20 years |
| | | Conspiracy to Falsify Documents and Records<br><br>Count Four | Five years |
| ISIDORE HANDLER<br><br>Brooklyn, New York | 37 | Wire Fraud Conspiracy<br><br>Count One | 20 years |
| | | Conspiracy to Falsify Documents and Records<br><br>Count Four | Five years |

ACF 000612

| BEN WERCZBERGER | 70 | Theft of Government Funds | 10 years |
| | | Count Five | |
| Brooklyn, New York | | Money Laundering Conspiracy | 20 years |
| | | Count Six | |

Mr. Williams praised the outstanding investigative work of the FBI and HHS-OIG. Mr. Williams also thanked the U.S. Department of Agriculture, Office of the Inspector General for their assistance with this investigation.

This case is being handled by the Office's Public Corruption Unit. Assistant U.S. Attorneys Daniel Wolf and Mollie Bracewell are in charge of the prosecution.

The charges contained in the Indictment are merely accusations, and the defendants are presumed innocent unless and until proven guilty.

[1] As the introductory phrase signifies, the entirety of the text of the Indictment constitutes only allegations, and every fact described herein should be treated as an allegation.

**Contact**

Nicholas Biase

(212) 637-2600

*Updated January 11, 2023*

**Topic**

**FINANCIAL FRAUD**

**Component**

USAO - New York, Southern

ACF 000613

Press Release Number: 23-009

# Related Content

**PRESS RELEASE**

## Investment Manager Extradited Back To The United States To Face Securities Fraud Charges

United States Attorney for the Southern District of New York, Jay Clayton, and Assistant Director in Charge of the New York Field Office of the Federal Bureau of Investigation ("FBI")...

December 23, 2025

**PRESS RELEASE**

## Founder Of Private Equity Firm Charged With Defrauding Investors Out Of Millions

United States Attorney for the Southern District of New York, Jay Clayton, and Assistant Director in Charge of the New York Field Office of the Federal Bureau of Investigation ("FBI")...

December 18, 2025

**PRESS RELEASE**

## Fraudster Sentenced To 71 Months In Prison For Crypto Ponzi Scheme "IcomTech"

United States Attorney for the Southern District of New York, Jay Clayton, announced that Magdaleno Mendoza was sentenced to 71 months in prison for his role in the large-scale

ACF 000614