**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF ILLINOIS; and STATE OF MINNESOTA,

Plaintiffs,

v.

ADMINISTRATION FOR CHILDREN AND FAMILIES; ALEX J. ADAMS, in his official capacity as the ASSISTANT SECRETARY OF THE ADMINISTRATION FOR CHILDREN AND FAMILIES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as the SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as the DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET,

Defendants.

Case No. 26-cv-00172-VSB-RFT

**PLAINTIFF STATES' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REQUEST FOR A PERMANENT INJUNCTION**

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES** ..... **ii**

**PRELIMINARY STATEMENT** ..... **1**

**BACKGROUND** ..... **2**

- I. The ACF Funding Freeze ..... 2
- II. This Lawsuit ..... 3
- III. The July 8 Letters and Permanent Injunction Motion ..... 4
- IV. OMB and Plaintiffs' Amendment ..... 5
- V. Defendants' Motion to Dismiss ..... 6

**ARGUMENT** ..... **7**

- I. Defendants' 12(b)(1) Motion Should be Denied ..... 7
  - A. Plaintiffs' Claims Are Not Moot ..... 7
    - 1. Plaintiffs' Claims Against OMB and its Director Are Not Moot. ..... 7
    - 2. Plaintiffs' Claims Against the HHS Defendants Are Not Moot ..... 10
  - B. The Voluntary Cessation Exception to Mootness Applies ..... 13
  - C. Plaintiffs' Claims Are Ripe ..... 18
- II. Defendants' 12(b)(6) Motion as to OMB and its Director Should be Denied ..... 21
- III. Defendants' Request for a Permanent Injunction Should Be Denied ..... 23

**CONCLUSION** ..... **23**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab. v. Gardner*,
387 U.S. 136 (1967)....................20

*Am. Fed'n of State, Cnty., & Mun. Emps. v. U.S. Dep't of Health and Human Services*,
No. 26-cv-00759-TLT (N.D. Cal. 2026)....................3

*Chafin v. Chafin*,
568 U.S. 165 (2013)....................10, 13

*City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*,
24 F.3d 1421 (D.C. Cir. 1994)....................20

*Connecticut v. Duncan*,
612 F.3d 107 (2d Cir. 2010)....................18, 20

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019)....................10

*Doe v. McDonald*,
128 F.4th 379 (2d Cir. 2025)....................13

*Fed. Bureau of Investigation v. Fikre*,
601 U.S. 234 (2024)....................17

*Florida Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)....................22

*Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*,
528 U.S. 167 (2000)....................2, 7, 13-16

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
567 U.S. 298 (2012)....................7

*Lamar Advert. of Penn, LLC v. Town of Orchard Park, New York*,
356 F.3d 365 (2d Cir. 2004)....................14

*Mantena v. Johnson*,
809 F.3d 721 (2d Cir. 2015)....................7

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
819 F.3d 581 (2d Cir. 2016)....................1, 7, 15, 17

*Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*,
680 F.2d 810 (D.C. Cir. 1982)....................14

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
775 F. Supp. 3d 100 (D.D.C. 2025)....................22

*Nat'l Min. Ass'n v. U.S. Dep't of Interior*,
251 F.3d 1007 (D.C. Cir. 2001)....................14

*Nat'l Treasury Emps. Union v. Vought*,
149 F.4th 762 (D.C. Cir. 2025)....................19

*New York Pub. Int. Rsch. Grp. v. Whitman*,
321 F.3d 316 (2d Cir. 2003)....................15

*New York v. Admin. for Child. & Fams.*,
No. 26 Civ. 2726 (D.D.C.)....................15

*New York v. Admin. for Child. & Fams.*,
No. 26-CV-172 (VSB), 2026 WL 673848 (S.D.N.Y. Mar. 10, 2026).................... *passim*

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026)....................8, 22

*Nutritional Health All. v. Shalala*,
144 F.3d 220 (2d Cir. 1998)....................19

*Princeton Univ. v. Schmid*,
455 U.S. 100 (1982)....................14

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015)....................22

*Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*,
736 F.2d 19 (2d Cir. 1984)....................18

*Sharkey v. Quarantillo*,
541 F.3d 75 (2d Cir. 2008)....................19, 21

*Texas v. United States*,
523 U.S. 296 (1998)....................19

*Town of Newburgh v. Newburgh EOM LLC*,
151 F.4th 96 (2d Cir. 2025) ....................................................................................17

*United States v. Balon*,
384 F.3d 38 (2d Cir. 2004)......................................................................................19

*Washington v. Dep't of Hous. & Urb. Dev.*,
No. 25-CV-626-MSM-AEM, 2026 WL 1863886 (D.R.I. June 29, 2026) ..............................17

**Federal Statutes**

42 U.S.C.
§ 9858g......................................................................................................................11

**Federal Regulations**

45 C.F.R.
§ 96.30......................................................................................................................11
§ 98.90......................................................................................................................11

90 Fed. Reg. 42613 ..........................................................................................................9

91 Fed. Reg. 13485 ..................................................................................................14-15

91 Fed. Reg. 32198 ..........................................................................................................9

**Miscellaneous Authorities**

WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE (3d ed. 2026) ............................18, 20

## PRELIMINARY STATEMENT

This case began with Defendants' sudden and unlawful freeze of $10 billion of critical funds to Plaintiff States, jeopardizing the well-being of millions of American families. Federal officials said they were seeking to punish the "Democrat-led" Plaintiff States, leading the Court to make a finding, in preliminarily enjoining the freeze, that a "potentially arbitrary reason for the termination of these grants" was "partisan targeting." The Administrative Record produced by Defendants then revealed that the Office of Management and Budget (OMB), situated within the White House, was directly involved with the Department of Health and Human Services (HHS) in this partisan targeting. OMB directed the targeting of Plaintiff States, at least in part, because the Plaintiff States are so-called "sanctuary" jurisdictions, a term used by this administration to target those jurisdictions that impose restrictions on the use of their limited law enforcement resources to assist with federal immigration enforcement.

Defendants have now moved to dismiss this case as moot and to enter a proposed permanent injunction—apparently wanting the case to go away to avoid the discovery that Plaintiffs have sought and that Defendants initially agreed to provide. HHS's Administration for Children and Families (ACF) sent letters on July 8 to Plaintiff States claiming to "rescind[]" their January 5 and 6 letters announcing the funding freeze. Defendants then filed their request to permanently enjoin themselves, seeking a Court order that would render this Court's earlier preliminary injunction of the funding freeze permanent.

These efforts to engineer mootness under "suspicious timing and circumstances" provide no basis for dismissal. *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 604 (2d Cir. 2016). To start, the July 8 letters present a quintessential example of the sort of voluntary cessation that defeats a mootness claim under settled law. Defendants plainly have not met the "heavy burden"

of making it "absolutely clear that the[ir] allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Indeed, Defendants have offered no relief *at all* against OMB, and their proposed permanent injunction does not address the extreme data demands ACF made as part of the funding freeze. If Defendants' motion to dismiss were granted, Defendants would be "free to return to [their] old ways" the very next day: OMB could freeze funding for these same programs; ACF could send the very same data demands; and all Defendants could continue illegal efforts to punish Plaintiff States for their political views. *Id*.

Moreover, entering the proposed permanent injunction would not address these problems because the injunction is too narrow, again failing to cover OMB, the data demands at issue in the litigation, and Defendants' partisan targeting.

## BACKGROUND

### I. The ACF Funding Freeze

This case concerns the federal government's attempt to freeze $10 billion of funding from the Administration for Children and Families to five states, and only five states. ECF No. 121 ("Am. Compl.") ¶¶ 1-2. The three programs at issue in this case—the Child Care and Development Fund (CCDF), Temporary Assistance for Needy Families (TANF), and the Social Services Block Grant (SSBG)—are critical to Plaintiff States, as they fund essential programs and services for needy families. Here in New York this includes, for example, childcare assistance to over 200,000 children; direct financial assistance to over 300,000 residents of New York City; approximately half the cost of providing shelter to families with children in the City; emergency services to domestic violence survivors; and adult and child protective services. *See Id*. ¶¶ 26-39; ECF No. 40-16 ¶¶ 6, 10-18, 40; ECF No. 40-17 ¶¶ 13, 16-18; ECF No. 40-20 ¶¶ 7, 17.

On January 6, 2026, HHS announced that ACF had "froze[n] access to certain federal child care and family assistance funds for California, Colorado, Illinois, Minnesota and New York." Am. Compl. ¶ 52; *see also* ECF No. 40-6. The freeze was effectuated via letters sent to States on January 5 and 6, 2026 (the "January 5 and 6 Letters"), which each asserted that ACF was "concerned by the potential for extensive and systemic fraud" within the programs. Am. Compl. ¶¶ 57-85; *see also* ECF Nos. 1-1 to 1-5. However, as the Court later found, "Defendants d[id] not identify even a *single dollar* that has gone to any Plaintiff State that has been used fraudulently." *New York v. Admin. for Child. & Fams.*, No. 26-CV-172 (VSB), 2026 WL 673848, at *16 (S.D.N.Y. Mar. 10, 2026) (hereinafter, "PI Opinion"). The January 5 and 6 letters also made demands for States' data that the Court concluded were "onerous and unrealistic," *id.* at *20, including "the complete universe of" TANF and SSBG administrative data and the personally identifiable information on all TANF and SSBG recipients. Am. Compl. ¶¶ 60-85.

## II. This Lawsuit

On January 8, 2026, Plaintiffs filed this action and sought a temporary restraining order. ECF Nos. 1, 8. On January 9, 2026, Judge Subramanian, presiding in Part I, granted a temporary restraining order. ECF No. 22. After further briefing and a hearing, the Court then granted Plaintiffs' preliminary injunction motion. ECF Nos. 71, 80.[1]

After the Court entered the Preliminary Injunction, Defendants produced an Administrative Record composed of the January 5 and 6 letters, two post-hoc decision memos (with attachments) and a single YouTube video, all of which were created during a twelve-day period. ECF No. 85.

[1] Defendants' time to appeal the preliminary injunction has expired. A second court also granted a preliminary injunction against the freeze, which likewise was not timely appealed. *Am. Fed'n of State, Cnty., & Mun. Emps. v. U.S. Dep't of Health and Human Services*, No. 26-cv-00759-TLT (N.D. Cal.), ECF No. 56.

Plaintiffs sent a letter to Defendants stating Plaintiffs' position that the Administrative Record was substantially incomplete because, among other things, it failed to include information relating to the decision to withhold funds or why that decision was narrowed to the Plaintiff States. Defendants agreed to conduct an additional search for documents in the Administrative Record and found one more: an email chain over which Defendants claimed privileges that Judge Tarnofsky eventually rejected. See ECF Nos. 91-1, 118.

After Plaintiffs indicated that they planned to seek a court order compelling discovery to complete and supplement the incomplete Administrative Record, the Parties agreed that Plaintiffs could conduct some discovery in this matter; Plaintiffs served document requests and interrogatories; the Parties agreed on the scope of the agreed-upon discovery; and Defendants served their responses and objections to Plaintiffs' requests. ECF Nos. 89, 100. Defendants have not yet produced any documents responsive to Plaintiffs' requests. As detailed below, the Administrative Record and Defendants' interrogatory responses revealed the substantial role that the OMB and OMB Director Russell Vought played in the freeze.

On July 7, 2026, in connection with the Parties' privilege dispute over the email chain produced as part of the Administrative Record, Judge Tarnofsky ordered the Parties to appear for a conference later that same week. ECF No. 113.

### III. The July 8 Letters and Permanent Injunction Motion

The following day, July 8, 2026, Defendant ACF sent each Plaintiff State's benefits agency a substantially similar letter, which stated that ACF was "rescind[ing]" the January 5 and 6 Letters and that "this letter rescinds the alleged funding decisions at issue in" this action. ECF No. 115-1. On that same day, Defendants notified Plaintiffs of their view that the case was now moot in light of the July 8 letters. The following day, Defendants sought an adjournment of the just-scheduled

discovery conference, ECF No. 114, which Judge Tarnofsky denied, ECF No. 116. The Judge then declined to grant a stay of discovery. ECF No. 118.

Defendants first notified Plaintiffs that they would be seeking the entry of a permanent injunction against themselves at 11 a.m. on July 13, 2026. Defendants provided a draft of the proposed permanent injunction later that day and asked for Plaintiffs' comments within three hours. Defendants filed a letter motion seeking entry of a permanent injunction later that evening. ECF No. 119. Plaintiffs filed a responsive letter, requesting that the Court direct the Parties to confer and allow Plaintiffs additional time to oppose the letter motion, which the Court granted. ECF Nos. 120, 122. The Parties have conferred again and engaged in email communications regarding Defendants' proposed order but have been unable to reach agreement. Plaintiffs have proposed their own injunction, ECF No. 132-1, which Defendants have not agreed to.

## IV. OMB and Plaintiffs' Amendment

On July 10, 2026—prior to learning of Defendants' intention to seek a permanent injunction—Plaintiffs notified Defendants that they were considering whether to amend their complaint to add OMB and its Director as defendants in light of Defendants' Administrative Record and interrogatory responses, and would do so within a week. This was in line with prior conversations between the Parties. Plaintiffs filed their Amended Complaint adding OMB and Director Vought on July 14. ECF No. 121.

The Amended Complaint alleges that, as adduced in the Administrative Record and limited discovery conducted by the Parties so far, OMB and Director Vought directed the freeze. To start, President Trump himself publicly stated (after this lawsuit was filed and the preliminary injunction was entered) that he had "said to Russell [Vought, the director of OMB], don't send any money for

daycare." Am. Compl. ¶ 139.[2] An email chain included as part of the Administrative Record shows that on January 5, Anne DeCesaro, the Director of Education, Income Maintenance, and Labor at OMB and the main point of contact between HHS and OMB during the deliberations and decision making for the freeze, scheduled a meeting for that same morning with Defendant Alex J. Adams to discuss the freeze. *Id.* ¶ 140; *see also* ECF No. 91-1. At 2 p.m. that afternoon, Ms. DeCesaro told ACF that "We will be including Colorado for child care"—that is, OMB was directing that ACF freeze funds to Colorado. Am. Compl. ¶ 141; *see also* ECF No. 91-1. Her email also contained information regarding California, Illinois, and New York that ACF relied upon in enacting the freeze, including that each was "considered a 'sanctuary state' for non-citizens." Am. Compl. ¶ 142; *see also* ECF No. 91-1. Defendants have, in sworn interrogatory responses, stated that Director Vought and Ms. DeCesaro "held a decision-making role and /or directly participated in HHS' deliberations with respect to HHS' decision to implement" the freeze. Am. Compl. ¶ 142; *see also* ECF No. 125-4 at 5.

**V. Defendants' Motion to Dismiss**

On July 27, Defendants moved to dismiss. ECF No. 129. On July 28, the Parties appeared before Judge Tarnofsky and agreed on a briefing schedule for this motion that was entered by the Court. ECF No. 131. The Court also ordered that the Parties' briefing on the pending request for a permanent injunction be extended and submitted together with the briefing on the motion to dismiss. *Id.* Defendants also moved for a stay of discovery due to the pending motion to dismiss, ECF No. 130, which Judge Tarnofsky has since denied, ECF No. 135.

---

[2] President Trump Holds Easter Lunch At The White House With Hours Until Iran Address, Forbes Breaking News, (April 1, 2026), available at, https://youtu.be/u-Ay6bTN1yU?t=1019.

## ARGUMENT

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), a Court must accept all of a plaintiff's factual allegations as true. *Mantena v. Johnson*, 809 F.3d 721, 727 (2d Cir. 2015). "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (internal quotation and citation omitted). "[T]he burden of showing mootness . . . falls on a defendant." *Mhany Mgmt.,* 819 F.3d at 603. Where a defendant voluntarily ceases the challenged practice, it faces an especially "heavy burden," as the standard "for determining whether a case has been mooted by the defendant's voluntary conduct is stringent." *Friends of the Earth*, 528 U.S. at 189. A case becomes moot only "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*

### I. Defendants' 12(b)(1) Motion Should be Denied

#### A. Plaintiffs' Claims Are Not Moot

##### 1. Plaintiffs' Claims Against OMB and its Director Are Not Moot.

Defendants OMB and Vought were an essential part of designing and implementing the freeze. Plaintiffs' Amended Complaint—consistent with what the Administrative Record and limited discovery have demonstrated—alleges that the ACF Funding Freeze was implemented pursuant to a directive from OMB and seeks a permanent injunction prohibiting Defendants from implementing that directive. Am. Compl. ¶¶ 137-43; *id.* at 42. The OMB defendants have done *nothing at all* that would render the claims against them moot. They have not sent any letters, rescinded any policies, and, perhaps most crucially, Defendants' proposed permanent injunction would not bind them.

Judge Tarnofsky concluded in her recent denial of Defendants' motion to stay discovery that Plaintiffs "raise credible concerns" that OMB "could take steps to re-impose the funding freeze without violating" a permanent injunction that runs solely against HHS and ACF. ECF No. 135 at 3. Plaintiffs have ample experience to substantiate these concerns. Nevertheless, Defendants argue that OMB and Director Vought cannot implement the freeze other than through HHS and therefore that the proposed permanent injunction would moot Plaintiff States' claims against OMB and Director Vought. *See* Mem. of Law in support of Defs.' Mot. to Dismiss, ECF No. 129 ("Mot.") at 13. But the reality is that OMB and Director Vought have repeatedly demonstrated that they disagree with the assertion that OMB has no independent authority over funding suspensions, as the following examples show.

In January of 2025, OMB implemented a massive funding freeze through its own memorandum. That memo was followed by an immediate and devastating government-wide freeze of funding involving no decision-making whatsoever from federal agencies who actually administer federal funding—Treasury and the agencies relied on the authority OMB alone exercised. *See New York v. Trump*, 171 F.4th 1 (1st Cir. 2026).

On September 3, 2025, on the eve of the expiration of certain appropriations, OMB—on its own—published a "special message" purporting to rescind the remainder of the appropriations as the end of the federal fiscal year neared, despite the fact that legislators of both parties and the Government Accountability Office have stated that such rescissions are illegal. Office of

Management & Budget, *Rescissions Proposals Pursuant to the Congressional Budget and Impoundment Control Act of 1974*, 90 Fed. Reg. 42613 (Sept. 3, 2025).[3]

OMB has pursued this strategy as to the programs at issue in this lawsuit: earlier this year, OMB did not timely apportion TANF funds, so ACF did not disburse them to Plaintiff States on the quarterly timeline provided by statute. ECF Nos. 72, 76. ACF pointed the finger at OMB, arguing that the "TANF funds are not yet available to Defendants to disburse because OMB has not yet apportioned these for any states," so ACF was "not attempting to improperly withhold funds—they cannot withhold funds that they do not have." ECF No. 76.

In a recent notice of proposed rulemaking, OMB has asserted that its limited authorizing statutes alone permit it to completely and independently overhaul federal spending, including by enacting binding regulations governing the termination, suspension, and conditioning of federal funding. *Regulation for Federal Financial Assistance*, 91 Fed. Reg. 32198 (May 29, 2026), Docket No. OMB–2026–0034. The rule as proposed requires wholesale and largely identical adoption of the OMB binding regulations by dozens of other agencies, relying only on OMB's authority without even identifying any other agency's statutory authority or any meaningful agency-specific reasoning for the Rule.

As these examples show, Defendants cannot plausibly argue that OMB will not claim authority to freeze funds due to Plaintiff States when OMB has repeatedly done just that. And

[3] The White House, *Historic Pocket Recission Package Eliminates Woke, Weaponized, and Wasteful Spending*, (Aug. 29, 2025), https://www.whitehouse.gov/briefings-statements/2025/08/historic-pocket-rescission-package-eliminates-woke-weaponized-and-wasteful-spending/; Jennifer Scholtes, *OMB nominee 'can't commit' to forgoing 'pocket rescissions' funding gambit this year*, POLITICO (June 16, 2026), *available at* https://www.politico.com/live-updates/2026/06/16/congress/pocket-rescissions-on-the-table-00963376; Government Accountability Office, B-330330.1 (Dec. 10, 2018), *available at* https://www.gao.gov/assets/b-330330.1.pdf.

nothing in Defendants' Motion disclaims the authority over spending that OMB has asserted since January 2025, when OMB and Director Vought have repeatedly taken the position that they can act independently of executive agencies to impound or withhold funds from grant recipients. In the past, OMB never claimed such extraordinary power, but today's OMB does. And in this very case, there are explicit indicators that OMB is asserting such undue authority—with the President stating that he directed Russell Vought, OMB's Director, to freeze the childcare funding and with an administrative record that suggests that OMB simply *mandated* the States to be targeted before involving the agency's decision-making at all. Am. Compl. ¶¶ 137-143. This Court need not "exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).

If OMB and its Director are not enjoined, the day after a permanent injunction is entered, they could seek to impose another funding freeze as to these same benefits programs against these same States. A case "'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox*, 567 U.S. at 307). Here, Plaintiff States cannot obtain complete relief without relief binding upon OMB and Director Vought.

**2. Plaintiffs' Claims Against the HHS Defendants Are Not Moot**

Plaintiffs' claims against the remaining defendants—HHS and its Secretary and ACF and its Assistant Secretary—also are not moot. In addition to challenging the OMB Directive, as described above, Plaintiffs' complaint challenges the "ACF Funding Freeze": Defendants' "unilateral[] fr[ee]ze [on] all federal funding for three essential programs that serve vulnerable children and their families and individuals with disabilities in the five Plaintiff States, and only in those States: New York, Illinois, California, Colorado, and Minnesota." Am. Compl. ¶ 2. Plaintiffs

have pled that the ACF Funding Freeze was designed "to punish States the Trump Administration disfavors," *id.* ¶ 169, and included coercive "data demand[s]," *id.* ¶ 7. Plaintiffs allege that the ACF Funding Freeze was "implemented through" the January 5 and 6 Letters. *Id.* ¶ 6. Plaintiffs' First Amended Complaint seeks, among other things, vacatur of the ACF Funding Freeze and a permanent injunction prohibiting "Defendants from implementing the ACF Funding Freeze, including enjoining Defendants from implementing the January 5 and 6 Letters in their entirety." *Id.* at 42.

While ACF now "rescinds" the January 5 and 6 Letters, the July 8 letters are vague about what besides those letters Defendants have rescinded. ACF hangs its hat on the July 8 letters' boilerplate statement that "[f]or the avoidance of doubt, this letter rescinds the alleged funding decisions at issue in *New York v. ACF, et al.*, 26 Civ. 172 (SDNY)." Mot. 8-9. But what exactly those funding decisions were remains unclear: Defendants have refused to acknowledge to this Court that their actions were a freeze and refused to concede the illegality of their conduct. *See, e.g.,* ECF No. 53 at 8, 17; ECF No. 66 ¶¶ 33-38; Mot. 1. In this light, the July 8 letters' statement that ACF will "continue to administer these programs and exercise its monitoring, oversight, and enforcement authorities in accordance with applicable statutes and regulations," including *the very same statutes and regulations* under which Defendants asserted the ACF Funding Freeze was lawful, does not provide assurance that Defendants will not resume the freeze. *Compare* ECF No. 115-1 (July 8 letters stating that ACF will "continue" to "exercise its monitoring, oversight, and enforcement authorities in accordance with," among other things, 42 U.S.C. § 9858g, 45 C.F.R. part 98, 45 C.F.R. part 96) *with* ECF No. 53 at 11 (arguing that the freeze was lawful because "the Secretary of HHS acted in accordance with his monitoring authority pursuant § 658I(b)(1) of the CCDBG Act [42 U.S.C. § 9858g], 45 C.F.R. § 98.90(c) [and] 45 C.F.R. § 96.30 . . . .").

This is not an abstract dispute. As Plaintiffs' preliminary injunction briefing explained, the freeze violates the statutes and regulations governing the programs at issue many times over. "[E]ach of these three funding programs—CCDF, TANG, and SSBG—have a statutory and regulatory scheme that provides mechanisms to monitor states, procedures for the disallowance of funds, and steps to be taken before the Government can issue sanctions or penalties for a grantee's noncompliance of their program obligations or the law." PI Opinion at *21. The law requires Defendants to follow particular procedures; they did not follow them. *See* ECF No. 39 at 16. The law limits the amount of the penalties Defendants may impose; Defendants cut off *all* funding anyway. *Id.* at 17-18. Defendants maintained that they could do so under their "monitoring" authority, but the Court disagreed: "If I was to read these general monitoring statutes to confer a broad power to restrict and condition billions of dollars without any process, the scope of Defendants' power would be breathtaking. Any concern of wrongdoing or fraud, even if such concerns were documented and substantiated, could cause a restriction or freeze of billions of dollars' worth of childcare assistance without providing Plaintiffs any opportunity to contest this point." *Id.* at 22. The letters leave all of these issues unresolved. It is anyone's guess how Defendants will "continue" to use their statutory and regulatory authorities, including as to "enforcement" against Plaintiff States, ECF No. 115-1, so Plaintiffs' claims are not moot.

And that uncertainty itself harms Plaintiffs. The freeze involved *ten billion dollars*—an extraordinary amount of money that supports extraordinarily important programs. It threw Plaintiff States' programs into chaos, undermining certainty that they have operated under for decades in reliance on the appropriations and procedural protections provided by Congress. This caused massive immediate budgetary uncertainty, while also raising the threat of potential layoffs and reduction of critical subsistence benefits and services. *See* ECF No. 39 at 7-13. Defendants' failure

to make clear that such chaos is truly over continues to harm Plaintiffs and to demonstrate that the case is not moot. Moreover, Defendants have taken the position that the January 5 and 6 letters were merely an "*intermediate step* that is part of the agency's *ongoing monitoring and review of the grantees' use of funds*," further muddying the waters. ECF No. 53 at 12, emphasis added. *See Chafin*, 568 U.S. at 172 (internal quotation and citation omitted) (a case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party").

Moreover, the fact that Plaintiffs provided Defendants with a proposed permanent injunction, ECF No. 132-1, to which Defendants would *not* agree, further demonstrates that Plaintiffs maintain "a concrete interest . . . in the outcome of the litigation" and could obtain additional relief, such that "the case is not moot." *Id*.

**B. The Voluntary Cessation Exception to Mootness Applies**

Even if Defendants' July 8 letters had resolved all disputed issues in this case, which they have not, this Court would still have jurisdiction over this suit under the voluntary cessation doctrine. A party's decision to stop "a challenged practice does not deprive a federal court of its power to determine [its] legality." *Friends of the Earth*, 528 U.S. at189. "If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Id.* (internal citation omitted). Under the voluntary cessation exception to mootness, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. at 190. Defendants must show that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Doe v. McDonald*, 128 F.4th 379, 385 (2d Cir. 2025).

Defendants have not met their "formidable burden." *Friends of the Earth*, 528 U.S. at 190. To start, as detailed above, Defendants' July 8 letters state that they will "continue to administer"

the three programs, including exercising their "monitoring, oversight, and enforcement authorit[y]," pursuant to the exact same statutes and regulations that they maintained made the freeze lawful. *Supra* p. 11 (comparing authorities cited at ECF No. 115-1 and ECF No. 53 at 11). That alone is sufficient to foreclose a finding that it is "absolutely clear" that the freeze will not recur. *Friends of the Earth*, 528 U.S. at 190. Nothing would seem to stop Defendants from using those purported enforcement authorities to issue a new freeze the day after this case was dismissed and identifying it as unrelated to the funding policy at issue here—a policy they have refused to define. Cases cited by Defendants regarding agencies' "corrective action" are inapposite, as each of these involved a published recission of a notice-and-comment rule, where (unlike here) the bounds of the challenged action were not in dispute. *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982) (cited Mot. 9) (agency repromulgating rule in accordance with APA's requirements mooted a claim that original promulgation without opportunity to comment was unlawful); *Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (cited Mot. 10) (substantial amendment to regulations mooted challenge to regulation "no longer in force"); *Nat'l Min. Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007, 1010 (D.C. Cir. 2001) (cited Mot. 10) (similar). But underscoring the exceedingly high bar a defendant asserting voluntary cessation must clear, the Second Circuit has maintained that even the amendment or repeal of a challenged statute does not always suffice to moot a claim. *Lamar Advert. of Penn, LLC v. Town of Orchard Park, New York*, 356 F.3d 365, 377 (2d Cir. 2004).

This is particularly so in light of Defendants' steadfast commitment to interpret the relevant public benefits statutes aggressively to conduct "ongoing monitoring and review of the grantees' use of funds." *See* ECF No. 53 at 12. For example, on March 16, 2026, President Trump signed Executive Order 14395, 91 Fed. Reg. 13485 (2026), which claims that "some States have

embraced loopholes" in public benefits programs and "have refused to institute basic fraud controls," allowing "illegal aliens [and] criminals" to "exploit" them. It established a Task Force to Eliminate Fraud, with duties including "maximiz[ing] enforcement" "audit[ing] and ensur[ing] prospective compliance monitoring." *Id.* at 13487. This effort has a direct impact on the programs implicated in this lawsuit. Earlier this month Plaintiff States filed a separate lawsuit challenging ACF's announcement of new broad monitoring and oversight authorities for the TANF program. *New York v. Admin. for Child. & Fams.*, No. 26 Civ. 2726 (D.D.C.). In light of these steps, Defendants plainly have not met their burden to show it is "absolutely clear" that the freeze will not recur, *Friends of the Earth*, 528 U.S. at 190; to the contrary, the administration has given substantial reason to believe that it will recur. *See Mhany Mgmt.*, 819 F.3d at 604.

Further, Defendants have provided absolutely no future assurances *at all* as to three key issues, further underscoring that they cannot meet their heavy burden to show that their voluntary cessation of the challenged conduct moots the case.

*First*, as detailed above, Defendants have not provided any relief as to OMB and its Director. Defendants claim that "there is no reason to enjoin OMB, or any other [non-HHS] federal entity or official for that matter, who may be involved in the decision making." Mot. 13. But without relief against OMB, there is, at a minimum, a likelihood that OMB will against assert its unprecedented authority to suspend federal funding. *See supra* pp. 7-10. Defendants cannot carry "the formidable burden of making absolutely clear that the problems identified [by plaintiffs] could not reasonably be expected to recur" when they have not offered any relief as to these Defendants. *New York Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 327 (2d Cir. 2003).

*Second*, Defendants cannot say the risk of a future freeze has been "irrevocably eradicated," while at the same time sending purported "rescission" letters and

proposing a permanent injunction that is silent as to the nature of future data demands, which were an integral part of the freeze. Indeed, Defendants have never conceded that they are legally prohibited from making the exact same data demands in the future. Defendants still could implement the exact same data demands and characterize them as arising from something other than the freeze at issue. Absent any concession on the illegality of data demands or clear agreement not to issue similar demands in the future, Defendants cannot show it is "absolutely clear" that Plaintiffs will not soon suffer the harm that caused them to file this lawsuit in the first instance.

*Third*, Defendants have not acknowledged, let alone alleviated, the partisan targeting that motivated their efforts to deprive children in the Plaintiffs States of funding for essential programming—leaving Plaintiff States with substantial concern that they may be politically targeted again. President Trump has been crystal clear why the funding freeze here occurred. He explained in December 2025 that he would be targeting Plaintiff States. Am. Compl. ¶ 47. Days later, he once again referenced this targeting by highlighting Minnesota, California, and Illinois during a press gaggle on Air Force One. *Id.* ¶ 48. He did something similar the following day. *Id.* ¶ 49. That same day, Defendants announced their targeting of "Democrat-led states" over their administration of federal benefits for their residents. *Id.* ¶ 50. The following day, President Trump gleefully revealed that this targeting "has begun." *Id.* ¶ 51. The Court agreed at the preliminary injunction stage, finding that a "potentially arbitrary reason for the termination of these grants" was "partisan targeting." PI Opinion at *19. And the Administrative Record in this instance shows Defendants here translated the President's partisan animus into a policy, directing funding freezes against the Plaintiff States because they are "sanctuary states." ECF No. 91-1. Defendants have provided no evidence that they will not continue this targeting, despite bearing the "formidable burden" of proving the wrongful conduct here will never occur again. *Friends of the Earth*, 528

U.S. at 190. Plaintiff States have maintained throughout this litigation that the allegations of fraud against them were "pretextual, vague, and unsubstantiated," and that the real basis for the freeze against them, and them alone, was purely political. Am. Compl. ¶ 40. Yet Defendants have not rescinded any political targeting and, in fact, have stated that the freeze was merely an intermediate step of a larger "ongoing" program of targeting Plaintiffs States' use of federal funds. No risk has been "irrevocably eradicated."

The voluntary cessation doctrine is meant to prevent the type of gamesmanship Defendants are deploying here. Defendants' mootness strategy strongly suggests that Defendants are acting "strategically to moot the case by voluntarily ceasing [their] allegedly unlawful conduct." *Town of Newburgh v. Newburgh EOM LLC*, 151 F.4th 96, 102 (2d Cir. 2025); *see also Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 242 (2024). Defendants issued the July 8 letters that purportedly mooted this case forty-eight hours before they were scheduled to appear at a discovery conference. *See* ECF Nos. 108-110, 112; *cf. Mhany Mgmt.*, 819 F.3d at 604 (voluntary cessation exception applied when "suspicious timing and circumstances" underlay government's actions "on the eve of summary judgment motions"); *Washington v. Dep't of Hous. & Urb. Dev.*, No. 25-CV-626-MSM-AEM, 2026 WL 1863886, at *4 (D.R.I. June 29, 2026) (federal agency's "evasive behavior" of "rescind[ing]" a challenged policy to "evade the Court's review" rendered it not moot). And since then, Defendants have made repeated efforts to block any discovery, which have been rejected by the Court. *See* ECF No. 135 (denying stay of discovery); *see also* ECF No. 118.

Independently, the facts of this case show that the "capable of repetition, yet evading review" exception to the mootness doctrine also applies. *Town of Newburgh*, 151 F.4th at 102 (exception appliable where conduct "is too short in duration to be fully litigated before it ceases,

and it is probable that the pleading party will need to seek the same relief from the defendant's same conduct again in the future.") (internal quotation and citation omitted). Here, Defendants announced the funding freeze via letter, were immediately blocked from implementing the freeze by a court, and subsequently withdrew the letters initiating the freeze. Absent full resolution of this case through full production of the administrative record, discovery, and litigation through summary judgment for complete relief, Defendants could simply continue to issue and withdraw freeze letters or data demands at their whim.

**C. Plaintiffs' Claims Are Ripe**

Defendants repackage their mootness arguments to assert that even if Plaintiffs' claims are "not moot," then they "are no longer ripe for review." Mot. 16 (cleaned up). They are wrong. *Mootness* is the justiciability doctrine that addresses "peculiar problems of a suit's death, rather than its birth," 13A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 3533.1 (3d ed. 2026), whereas ripeness is an "initial requirement[]" that "is invoked to determine whether a dispute has yet matured to a point that warrants decision," *id.* §§ 3532, 3533. In APA cases, ripeness is closely "related" to final agency action, as both doctrines "'protect the agencies from judicial interference until an administrative decision has been formalized.'" *Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*, 736 F.2d 19, 26 (2d Cir. 1984) (quoting *Abbott Lab. v. Gardner*, 387 U.S. 136, 148–49 (1967)). In such cases, Courts consider whether "judicial review" should "await a more advanced state of administrative consideration," *Labor Council for Latin Am. Advancement v. U.S. Envtl. Prot. Agency*, 12 F.4th 234, 252 (2d Cir. 2021) ("*Lab. Council*"), so that an agency can "crystaliz[e] its policy before that policy is subjected to judicial review." *Connecticut v. Duncan*, 612 F.3d 107, 114 (2d Cir. 2010) (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 84 (D.C. Cir. 2006)). Both prongs of the operative test for ripeness—"(1) the fitness of

the issues for judicial decision and (2) the hardship to the parties of withholding court consideration"—favor Plaintiffs here. *Sharkey v. Quarantillo*, 541 F.3d 75, 89 (2d Cir. 2008).

*First*, the issues in this case are fit for judicial decision. Plaintiffs challenge concrete agency actions that have already happened: the ACF funding freeze and the OMB Directive that led to it. The Court has already found—and Defendants now concede—ACF's "agency action is final." PI Opinion at *16; *see* Mot. 21 (describing final agency action as "an action taken by ACF, not OMB"). Those same findings support fitness for review: the freeze "impose[d] clear restrictions on Plaintiffs' funding access" and "ha[d] immediate consequences in how states materially access funding." PI Opinion at *15.

Defendants, by contrast, cite inapposite cases involving challenges only to future speculative events. *United States v. Balon*, 384 F.3d 38, 46 (2d Cir. 2004) (cited Mot. 17) (holding challenge to terms of supervised release not ripe when plaintiff would "not begin his term of supervised release for three years"); *Nutritional Health All. v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998) (cited Mot. 17) (holding First Amendment challenge to food labeling claim not ripe when plaintiffs had neither alleged they had sought to make a health claim in the past nor alleged any particular claim they intended to make in the future); *Texas v. United States*, 523 U.S. 296, 300 (1998) (cited Mot. 18) (finding State's request for declaratory judgment as to certain statutory sanctions not ripe when the applicability of those sanctions to the State would be "contingent on a number of factors" and the State had not "pointed to" any situation where application was "currently foreseen or even likely"); *Nat'l Treasury Emps. Union v. Vought,* 149 F.4th 762, 786 (D.C. Cir. 2025) (cited Mot. 18) (in now-vacated decision, finding claims not ripe because "agency consideration remained ongoing" and the challenged "decision was not final"), *reh'g en banc granted, opinion vacated*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).

Nor have Defendants made any claim "that further administrative proceedings are contemplated" or ongoing. *Abbott Lab.*, 387 U.S. at 149; *Cf. Connecticut*, 612 F.3d at 115 (finding claims not ripe because "further administrative proceedings" may resolve claims); *Labor Council*, 12 F.4th at 254 (finding claims not ripe because new agency rule was forthcoming). In any event, the Court has already rejected Defendants' argument that any such future proceedings, were they to occur, would render the freeze nonfinal. PI Opinion at *14-16.

Defendants' insistence that denying their motion would require the Court to rule on "hypothetical[s]," Mot. 17, is doubly flawed. To start, as detailed above, the July 8 letters leave substantial unresolved issues as to the agency action that has already occurred—among other things, these letters offer no relief at all as to the OMB Defendants. *See supra* pp. 7-10, 15. Moreover, "[t]he fact that once there was a suitable basis for litigation"—as the Court has found and Defendants have conceded here—"indicates that the full factual development required by ripeness continues to be available to guide decision," thus meeting the "fitness for review" prong. 13A WRIGHT & MILLER, *supra* p. 18, § 3533.1. The ripeness concerns Defendants invoke—where a Court has "'no means to evaluate in the abstract the myriad circumstances that might'" implicate a future alleged illegal action, Mot. 17 (quoting *City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1429 (D.C. Cir. 1994))—are not present in this case about a clear final agency action subject to a specific and concrete dispute that is very much alive. This case is thus far from the "amorphous category" of cases found not to be ripe in *City of Houston*. And the Court in *City of Houston* noted that the extent to which a court may be able to award potential relief is a consideration relevant to ripeness *only* when a plaintiff's claim is moot and not subject to the voluntary cessation exception, unlike here. *City of Houston*, 24 F.3d at 1429 and 1431.

*Second*, the hardship to Plaintiffs is significant. As detailed above, Defendants' July 8 letters did not "remove[] any concrete threat to Plaintiffs' access to the three funding programs." *See* Mot. 18. And Defendants' suggestion that Plaintiffs should just "return[] to court" to solve these problems is completely impractical. Mot. 18. The Second Circuit has recognized that, where a plaintiff is aggrieved by agency action, requiring her to again "submit to the discretion of the agency" can constitute hardship. *Sharkey*, 541 F.3d at 90. And here, where a renewed funding freeze could immediately create precisely the same chaos, disruption, and harm to the States, they have established hardship.

## II. Defendants' 12(b)(6) Motion as to OMB and its Director Should be Denied

Defendants argue that even apart from their mootness theory, Plaintiff States have not alleged sufficient facts to state a claim against OMB and Director Vought, arguing that Plaintiffs "fail to articulate some final agency action that OMB took." Mot. 18–19. But Plaintiffs specifically allege that OMB directed HHS to freeze child care and safety net funding via a directive (the "OMB Directive"), and support that allegation with (1) a statement from President Trump explaining that he told OMB Director Vought to freeze child care funds, and with a link to a video in which the statement was made, Am. Compl. ¶ 139, (2) descriptions of emails showing that an OMB director met with one of the ACF defendants to discuss the freeze on the morning the first child care freeze letter went out, *id.* ¶ 140, and (3) a specific statement made by an OMB director telling ACF to add an additional state to the freeze, *id.* ¶ 141. These are not "vague" or "conclusory" allegations, as Defendants suggest, but are instead specific allegations supported by documents already produced in this case that show the OMB Defendants' participation in the illegal conduct that is the subject of this case. See ECF No. 91-1 (January 5 email chain produced in this case showing OMB direction to HHS on January 5). Nothing more is necessary to state an

APA claim, where "the focal point for judicial review" is the existing administrative record, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985), or a Constitutional claim. Plaintiffs expect that more detail regarding the full list of participants who gave the OMB Directive, and the exact contours of that directive, will come out through complete production of the administrative record as to OMB, including evidence of any oral directives, as "[a]gency action . . . need not be in writing to be final and judicially reviewable." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015). But Plaintiffs have no obligation to tell this full story at the pleading stage; nor could they, given that the relevant information remains in Defendants' possession.

Furthermore, Defendants argue that because there is already one final agency action issue here—the HHS Defendants' decision to freeze funds—any prior directives regarding that action are not "final" and therefore not subject to APA review. Mot. at 20. But other courts have considered, and rejected, this exact argument. *Trump*, 171 F.4th at 18 (finding that both the "freeze that each of the Agency Defendants allegedly put in place" and the "OMB directive" to conduct such a freeze were distinct final agency actions, because "nothing prevents a plaintiff from challenging more than a single discrete final agency action in a single suit"); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 123-4 (D.D.C. 2025) (finding OMB's "one specific act" of ordering that other agencies pause funding was a final agency action, notwithstanding the fact that "it was the individual agencies that carried out the funding freeze"). This Court should recognize, as other Courts have, that OMB's role within the executive branch means that, when it does what it did here, it creates a parallel agency action subject to APA review.

## III. Defendants' Request for a Permanent Injunction Should Be Denied

Prior to filing their Motion to Dismiss, Defendants took the unusual step of filing a request to permanently enjoin themselves in order to moot this case and block the very discovery that Plaintiffs need in order to understand the ACF Funding Freeze, including OMB's role in creating it. *See* ECF No. 119. Early discovery has begun to reveal that role, and yet Defendants argue that OMB has no meaningful involvement such that their proposed order is sufficient to protect Plaintiff States. *See supra* at pp. 7-10. Defendants cite no real authority, let alone a case in which a similar motion has been filed, much less granted. Defendants merely assert that Plaintiffs' claims are moot and thus efficiency favors the entry of Defendants' preferred order. *See* ECF No. 119-1. As described extensively above, the proposed permanent injunction does not resolve Plaintiffs' claims, which are ripe, and Plaintiffs have properly stated a claim against OMB and Director Vought—who are not even covered by the proposed permanent injunction. *See supra* pp. 7-10. While Plaintiffs did not object to a similar order at the preliminary injunction stage, that was prior to learning the further facts from the Administrative Record and discovery. Further, a preliminary injunction merely preserves the status quo throughout the pendency of the litigation and is not required or intended to include all injunctive relief sought by the lawsuit. Defendants' entirely one-sided attempt to end this case through the entry of an insufficient permanent injunction should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court deny Defendants' Motion to Dismiss and Request for a Permanent Injunction.

Dated: August 25, 2026

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Jessica Ranucci
Molly Thomas-Jensen
*Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8333
rabia.muqaddam@ag.ny.gov
jessica.ranucci@ag.ny.gov
molly.thomas-jensen@ag.ny.gov

*Attorneys for the State of New York*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Daniel C. Sheehan*
Daniel C. Sheehan*
*Deputy Attorney General*
Paul Stein*
Christine Chuang
*Supervising Deputy Attorneys General*
Jesse Basbaum
Alexis Piazza
Harald Kirn
James Bowen
*Deputy Attorneys General*
California Department of Justice
300 South Spring Street, Los Angeles, CA
90013
(213) 269-6078
Daniel.Sheehan@doj.ca.gov

*Attorneys for the State of California*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
Nora Passamaneck
*Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for the State of Colorado*

**KWAME RAOUL**
Attorney General of Illinois

**KEITH ELLISON**
Attorney General of the State of Minnesota
By: */s/ Lindsey E. Middlecamp*

By: */s/ Vikas Didwania*
Vikas Didwania
*Complex Litigation Counsel*
Sherief Gaber
Michael Tresnowski
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Vikas.Didwania@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Attorneys for the State of Illinois*

Lindsey E. Middlecamp
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Attorneys for the State of Minnesota*

*Pro hac vice application forthcoming

## CERTIFICATION

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum of Law contains 7,313 words, calculated using Microsoft Word, which complied with Rule 6.3 of the Local Rules of the United States District Court for the Southern District of New York.

Dated: New York, New York
August 25, 2026

LETITIA JAMES
Attorney General of the State of New York
By: /s Molly Thomas-Jensen
Molly Thomas-Jensen
Special Counsel
28 Liberty Street
New York, NY 10005